UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOORDASH, INC. and UBER TECHNOLOGIES, INC.,<br><br>Plaintiffs,<br><br>-against-<br><br>THE CITY OF NEW YORK,<br><br>Defendant. | Case No. 1:25-cv-10268 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**


Gabriel Herrmann
Nicholaus C. Mills
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
GHerrman@gibsondunn.com
NMills@gibsondunn.com

Michael Holecek* (*PHV forthcoming*)
Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
MHolecek@gibsondunn.com
KTownsend@gibsondunn.com

Connor P. Mui* (*PHV forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
CMui@gibsondunn.com

*Attorneys for Plaintiff DoorDash, Inc.*

John C. Quinn
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
jquinn@heckerfink.com

Trisha Anderson* (*PHV forthcoming*)
Chloe Goodwin* (*PHV forthcoming*)
HECKER FINK LLP
1050 K Street, NW, Suite 1040
Washington, D.C. 20001
(212) 763-0883
tanderson@heckerfink.com
cgoodwin@heckerfink.com

*Attorneys for Plaintiff Uber Technologies, Inc.*


Dated: December 11, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ i

PRELIMINARY STATEMENT ........ 1

RELEVANT FACTS ........ 4

I. Plaintiffs have partnered with restaurants and delivery workers to drive enormous benefits for New Yorkers. ........ 4

II. New York City aggressively regulates online delivery platforms. ........ 4

III. Amidst rising prices, the City's onerous regulations, and consumer frustration over tipping, Plaintiffs carefully tailor their messaging about the discretionary practice of tipping. ........ 5

IV. The City enacts the Tipping Law to force platforms to espouse the City's preferred message about tipping. ........ 7

LEGAL STANDARD ........ 8

ARGUMENT ........ 9

I. Plaintiffs are likely to succeed on their First Amendment compelled-speech claim. ........ 9

A. The Tipping Law compels speech and thereby triggers First Amendment scrutiny. ........ 9

B. The Tipping Law cannot survive strict scrutiny. ........ 12

1. The Tipping Law triggers strict scrutiny. ........ 12

2. The Tipping Law fails strict scrutiny. ........ 17

C. At a minimum, the Tipping Law cannot survive intermediate scrutiny. ........ 21

1. The Tipping Law triggers at least intermediate scrutiny. ........ 21

2. The Tipping Law fails intermediate scrutiny. ........ 22

D. *Zauderer* does not apply here. ........ 24

II. Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. ........ 25

**TABLE OF CONTENTS** *(continued)*

Page

III. The balance of equities and public interest favor relief. 27

CONCLUSION 28

CERTIFICATE OF COMPLIANCE 29

## TABLE OF AUTHORITIES

Page(s)

### Cases

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) ....... 15, 16

*Agudath Israel of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020) ....... 25

*Bad Frog Brewery, Inc. v. New York State Liquor Authority*,
134 F.3d 87 (2d Cir. 1998) ....... 14, 15

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ....... 13, 14

*Brooklyn Branch of Nat'l Ass'n for the Advancement of Colored People v. Kosinski*,
735 F. Supp. 3d 421 (S.D.N.Y. 2024) ....... 20

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) ....... 18, 19, 20

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ....... 13, 15, 16, 21, 22, 23

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ....... 19

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025) ....... 18

*Conn. Bar Ass'n v. United States*,
620 F.3d 81 (2d Cir. 2010) ....... 15

*Covino v. Patrissi*,
967 F.2d 73 (2d Cir. 1992) ....... 25

*Edenfield v. Fane*,
507 U.S. 761 (1993) ....... 14, 21, 22

*Evergreen Ass'n v. City of New York*,
740 F.3d 233 (2d Cir. 2014) ....... 1, 11, 14, 18, 22, 24

*Expressions Hair Design v. Schneiderman*,
581 U.S. 37 (2017) ....... 9, 10, 11

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ....... 28

*International Dairy Foods Ass'n v. Amestoy*,
92 F.3d 67 (2d Cir. 1996) ....................12, 21, 26

*Linmark Assocs., Inc. v. Willingboro Twnp.*,
431 U.S. 85 (1977)....................15

*Lynch v. City of New York*,
589 F.3d 94 (2d Cir. 2009)....................26

*Mercado v. Noem*,
--- F. Supp. 3d ---, 2025 WL 2658779 (S.D.N.Y. Sept. 17, 2025) ....................27

*Mullins v. City of New York*,
626 F.3d 47 (2d Cir. 2010)....................26

*N.Y. Progress & Protection PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013)....................27, 28

*N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health*,
556 F.3d 114 (2d Cir. 2009)....................24

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)....................10, 12, 13, 22, 23, 24, 25

*Nat'l Inst. of Fam. & Life Advocs. v. Clark*,
737 F. Supp. 3d 246 (D. Vt. 2024)....................16

*Nat'l Inst. of Fam. & Life Advocs v. James*,
--- F.4th ---, 2025 WL 3439256 (2d Cir. Dec. 1, 2025)....................15

*Nken v. Holder*,
556 U.S. 418 (2009)....................9, 27

*Nwajei v. E&E of Five Towns, Inc.*,
2024 WL 3522108 (E.D.N.Y. July 9, 2024)....................16

*Ohralik v. Ohio State Bar Ass'n*,
426 U.S. 447 (1978)....................14

*Owen v. City of Independence*,
445 U.S. 622 (1982)....................26

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................13, 18, 19

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)....................26

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
487 U.S. 781 (1988)....................12, 14, 16, 17, 23

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)....................25

*Safelite Group, Inc. v. Jepsen*,
764 F.3d 258 (2d Cir. 2014)....................13, 21, 23, 24

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)....................11, 22, 23

*Turner Broad. Sys. v. FCC*,
512 U.S. 622 (1994)....................2, 3, 14, 18, 27

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)....................18, 20, 21

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001)....................9

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)....................13, 23

*Village of Schaumberg v. Citizens for a Better Env't*,
444 U.S. 620 (1980)....................17

*Volokh v. James*,
148 F.4th 71 (2d Cir. 2025)....................12, 18

*W. Va. State Bd. of Education v. Barnette*,
319 U.S. 624 (1943)....................17

*Winter v. Nat. Resources Def. Council, Inc.*,
555 U.S. 7 (2008)....................9

*Wooley v. Maynard*,
430 U.S. 705 (1977)....................1, 9

*Zauderer v. Office of Disciplinary Counsel*,
471 U.S. 626 (1985)....................3, 24, 25

**Statutes**

N.Y.C. Local Law 107 (2025).................... *passim*

N.Y.C. Local Law 108 (2025).................... *passim*

N.Y.C. Local Law 95 (2025)....................8

**Regulations**

N.Y.C. Admin. Code § 20-1522(b)....................2, 5, 8, 19

**Constitutional Provisions**

U.S. Const. amend. I.................... *passim*

**PRELIMINARY STATEMENT**

New York City has enacted a statutory scheme that violates Plaintiffs' constitutional free-speech rights by compelling Plaintiffs to speak the City's preferred message about whether, when, and how New Yorkers should tip the couriers who deliver orders placed on Plaintiffs' food-delivery platforms. Plaintiffs currently offer New York consumers the opportunity to tip delivery workers *after* orders are placed, consistent with the historical practice of tipping for services after they are received and in recognition that consumers pay higher amounts in response to guaranteed minimum-earnings requirements for delivery workers in New York City. But the City seeks to compel Plaintiffs to solicit tips for workers *before* any order is placed—and to promote an upfront pre-tipping option of "at least 10%" for every order. Amid rising cost-of-living expenses and the widely debated proliferation of tipping prompts, this law improperly forces Plaintiffs "to be an instrument for fostering public adherence to an ideological point of view" they do not wish to advocate, *Wooley v. Maynard*, 430 U.S. 705, 715 (1977), and "affirmatively [to] espouse the government's position on a contested public issue," *Evergreen Ass'n v. City of New York*, 740 F.3d 233, 250 (2d Cir. 2014) (quotation marks omitted). Its effectiveness, implementation, and enforcement should therefore be enjoined before it takes effect on January 26, 2026.

The City cannot meet its burden to justify forcing Plaintiffs to speak by arguing, as it presumably will, that its goal is to increase delivery workers' earnings. The City already enacted a comprehensive minimum-pay regime for delivery workers just a few years ago. In doing so, it specifically chose not to factor tipping into the new minimum-pay standard. Moreover, the City agency responsible for administering that regime concluded that tips are an "unreliable form of income." It even justified the new minimum-pay rule in part by noting that delivery platforms

could and likely would try to mitigate the resulting cost increases by changing the way they solicit tips—including by "discourag[ing] or eliminat[ing] tipping."

After Plaintiffs changed how they communicate about and solicit tips, however, the City retaliated by enacting Local Laws 107 and 108 of 2025, which add new subsections 20-1522(d)(3), (d)(4), and (d)(5) to the City's Administrative Code (collectively, the "Tipping Law"). The Tipping Law forces platforms to advocate—and implicitly endorse—the City's preferred message about whether, when, and how consumers should tip delivery workers: namely, that customers should tip at least 10% upfront, before an order is placed, regardless of the quality of the delivery service they ultimately receive. That is not the message Plaintiffs choose to convey in New York City, where consumers are already charged higher fees to support guaranteed minimum pay. Nor is it an uncontroversial view; 90% of Americans believe "tipping culture has spiraled out of control," and consumers are especially frustrated with suggested tip amounts and requests to tip before receiving service. Decl. of Gabriel Herrmann, Exs. 1, 2. And, as one sponsor of the Tipping Law conceded, both the purpose and effect of this law is to compel Plaintiffs to speak the City's preferred message about this issue—even though Plaintiffs have chosen to speak a *different* message about tipping in New York City—in order to promote what the City deems to be "better consumer habits."

The First Amendment prohibits such blatant attempts to hijack Plaintiffs' private speech for the government's preferred purposes. "Laws that compel speakers to utter or distribute speech bearing a particular message" are subject to "the most exacting scrutiny." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). The Tipping Law does just that—it compels Plaintiffs to speak the City's preferred message about the discretionary practice of tipping delivery workers. As such, it is subject to strict constitutional scrutiny and plainly fails under that standard. At minimum, the

Tipping Law is subject to the heightened standard of intermediate scrutiny that governs regulation of purely commercial speech, and it fails that standard as well. Requiring Plaintiffs to solicit tips at the time and in the manner preferred by the City does not directly advance any compelling or substantial governmental interest in increasing compensation for delivery workers, which was addressed by the City's comprehensive recent minimum-wage rule. Nor does the law advance—or the legislative history reflect—any supposed government interest in encouraging tipping generally. In any event, the Tipping Law is insufficiently tailored to any such interests. There are myriad alternative ways the City could increase delivery-worker compensation or encourage tipping without burdening Plaintiffs' speech. For similar reasons, although the standard announced in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), is inapplicable here because the Tipping Law does not compel disclosure of uncontroversial, factual information, the law would fail even under *Zauderer* because it is not reasonably related to any interest in preventing customer deception.

Plaintiffs therefore are likely to succeed on their First Amendment challenge. Moreover, the impending violation of their constitutional rights constitutes per se irreparable harm. Plaintiffs also face irreparable harm from the damage to their consumer relationships and lost business opportunities this law will inflict. And the public interest and balance of equities favor upholding Plaintiffs' constitutional rights, particularly given the utter lack of any real problem that the Tipping Law might address during the pendency of this action. Thus, the Court should preliminarily enjoin this unconstitutional legislative attempt by the City to commandeer Plaintiffs' freedom to decide which "ideas" about tipping practice they deem "deserving of expression." *Turner*, 512 U.S. at 641.

## RELEVANT FACTS

### I. Plaintiffs have partnered with restaurants and delivery workers to drive enormous benefits for New Yorkers.

Plaintiffs operate e-commerce platforms—including DoorDash Marketplace, Caviar, and Uber Eats—that connect restaurants, consumers, and independent delivery workers, benefiting all parties. Decl. of Ann Marie Rosenthal ¶¶ 5–7; Decl. of Nike Lawrence ¶ 2. Restaurants that partner with Plaintiffs increase their visibility to consumers, consumers enjoy convenient access to thousands of local menus, and delivery workers earn income while enjoying the flexibility of being independent contractors. Plaintiffs generate revenue through, among other things, commissions on orders. Lawrence Decl. ¶ 3. Since their inception, Plaintiffs have provided massive benefits to New York City businesses, delivery workers, and customers.

### II. New York City aggressively regulates online delivery platforms.

Over the past decade, the role of online, third-party platforms in facilitating delivery of food and groceries to retail consumers has grown exponentially. New York City has recently enacted several local laws that have imposed substantial new burdens and obligations on technology companies like Plaintiffs to benefit other industry participants whom the City favors. These laws include Local Law 115 of 2021, and the "Minimum Pay Rule" adopted by the New York City Department of Consumer and Worker Protection ("DCWP"), which established a minimum-earnings standard for delivery workers who contract with online food-delivery platforms such as Plaintiffs'—and, now, the Tipping Law.

Local Law 115 of 2021 directed DCWP to study delivery workers' pay and working conditions and promulgate a minimum-earnings standard. DCWP's study noted concerns that raising minimum pay would increase prices for consumers but concluded that companies like Plaintiffs could, among other things, "choose to reduce consumers' costs through changes to the

user interface that discourage or eliminate tipping," apparently in recognition of the financial burden such a rule would place on consumers. *See* Herrmann Decl., Ex. 3 at 36. Notably, Local Law 115 directed that the minimum-earnings standard that DCWP would devise "shall not include gratuities," N.Y.C. Admin. Code § 20-1522(b), and DCWP further concluded during its rule-making process that relying on tips was an "unreliable" means of increasing delivery workers' compensation, Herrmann Decl., Ex. 16 at 6. DCWP then promulgated the Minimum Pay Rule, which currently requires delivery platforms either to (1) pay each delivery worker (a) at least $21.44 per hour—an amount over 20% higher than New York City's normal minimum wage—multiplied by that delivery worker's trip time in the pay period, and (b) in the aggregate, pay all delivery workers at least $21.44 per hour multiplied by the sum of all delivery workers' time logged into a delivery platform app, or (2) pay each worker $35.73 per hour spent actually making deliveries—a rate more than 100% higher than the City's general minimum wage. *See id.*, Ex. 15. The Minimum Pay Rule became effective in December 2023.

The Minimum Pay Rule had an immediate, severe impact on Plaintiffs. Due to the law, consumers in New York pay more for deliveries, as DCWP had predicted they would, causing consumers to place fewer orders than they otherwise would have. Lawrence Decl. ¶ 4. For example, in just two months, New York City consumers placed roughly 850,000 fewer orders on DoorDash Marketplace than they would have placed in the absence of the Minimum Pay Rule—resulting in a loss of approximately $17,000,000 in revenue for restaurants and other local merchants. Herrmann Decl., Ex. 4 at 2.

## III. Amidst rising prices, the City's onerous regulations, and consumer frustration over tipping, Plaintiffs carefully tailor their messaging about the discretionary practice of tipping.

Tipping in the United States is at a crossroads, and a matter of significant public debate. What was once a discretionary courtesy customarily limited to particular industries and

contemplated as a means of acknowledging exemplary service has spread to new contexts as businesses solicit tips in increasingly aggressive ways. New technologies, like touchscreen point-of-sale systems and electronic ordering, have enabled businesses to solicit tips in previously gratuity-free environments, even before the customer receives any service. *See* Rosenthal Decl. ¶ 13. Practices like suggested tip amounts and mandatory pre-checkout tipping screens convey the message that tipping should not just be an acknowledgment of good service but an expectation regardless of service quality. *See id.* ¶ 22.

The more frequent solicitation of tips at higher amounts and in new contexts has led to "tipping fatigue" among consumers, with "90% of Americans expressing that tipping culture has spiraled out of control," particularly in the context of rising prices. *See* Herrmann Decl., Ex. 1 at 2. Public debate on this topic is so pervasive that it has become a popular topic for late-night shows and comedians—with John Oliver noting that "people are fed up" because "tipping is everywhere" and Netflix publishing entire compilations of tipping jokes. *Id.*, Ex. 5 at 1–2. Forty percent of Americans now oppose suggested tip amounts, *see id.*, Ex. 6 at 5, and more than 60% have negative attitudes toward tipping, *see id.*, Ex. 7 at 1. Three in ten Americans "are likely to tip less"—or "not to tip at all"—"if confronted with a tip suggestion screen." *Id.*, Ex. 1 at 3. Customers are particularly opposed to tipping "when the request [for a tip] feels premature." *Id.*, Ex. 2 at 2. That is because an overwhelming majority of customers (77%) "say the quality of the service they receive is a major factor in deciding whether and how much to tip." *Id.*, Ex. 6 at 6. Thus, nearly 40% of consumers express annoyance when presented with suggested tip amounts at checkout, and increased costs, including expected tips, have led some consumers to abandon purchases they otherwise would have made. *Id.*, Ex. 6 at 13.

Plaintiffs' communications with New York City consumers about tipping comes in the context of the nationwide controversy over tipping and the significantly increased consumer costs already imposed by the Minimum Pay Rule. Before December 2023, Plaintiffs chose to provide New York City consumers the option of leaving a tip before checkout: Specifically, after a customer selected the items to add to their virtual basket, Plaintiffs displayed a screen providing the customer the option to leave a tip, and then the customer could complete the checkout process. Beginning in December 2023, in connection with the Minimum Pay Rule taking effect, Plaintiffs' platforms no longer display a tipping screen to all New York City consumers before checkout, but they continue to provide customers with the option of leaving a discretionary tip after the order is completed. *See* Rosenthal Decl. ¶ 22; Lawrence Decl. ¶¶ 5–6. After considering the increased costs resulting from the Minimum Pay Rule, as well as the growing trend of consumer tipping fatigue, Plaintiffs moved the tipping option to convey to New York City consumers the view that tipping should be an optional acknowledgement for good service, not a default expectation. Rosenthal Decl. ¶ 22; Lawrence Decl. ¶ 7. Plaintiffs changed their messages about tipping to combat tipping fatigue among consumers in New York City, and because local regulations already make delivery costs higher in New York City. Rosenthal Decl. ¶ 22; Lawrence Decl. ¶ 7. The harms Plaintiffs sought to avoid include consumers placing fewer or smaller orders or reducing their usage of Plaintiffs' platforms. Rosenthal Decl. ¶ 22; Lawrence Decl. ¶ 7

## IV. The City enacts the Tipping Law to force platforms to espouse the City's preferred message about tipping.

Despite DCWP's suggestion that platforms like Plaintiffs' could minimize consumer-cost increases by altering their tipping options, members of the New York City Council were unhappy that Plaintiffs changed how they communicate about tips. Council Member Shaun Abreu, for example, incorrectly claimed that Plaintiffs altered their messaging about discretionary tipping to

"retaliate[]" against delivery workers. Herrmann Decl., Ex. 9 at 23. So on April 11, 2024, the City Council (with Abreu sponsoring) introduced the Tipping Law, which requires platforms to solicit tips before or at the same time an order is placed with a suggested tip option of at least 10% on each order. *Id.*, Ex. 10 at 64–65. Abreu explained that the law was intended to "contribute[] to better consumer habits" by forcing platforms like Plaintiffs' to "encourage[]" customers to tip. *Id.*, Ex. 13 at 8.

The City enacted the Tipping Law on August 13, 2025. As relevant here, it will amend section 20-1522(d) of the New York City Administrative Code to state that:

> A third-party food delivery service . . . must provide such customer an opportunity to pay a gratuity to the food delivery worker . . . retained by such service who delivers, selects, prepares, or assembles such order[, and] . . . must provide such opportunity to a customer in plain language and in a conspicuous manner *before or at the same time such customer places such order*. . . .
>
> When providing an opportunity to pay a gratuity . . . a third-party food delivery service . . . shall provide a customer with gratuity options that . . . include an option to pay *a gratuity that is at least 10 percent of the purchase price* . . . .

Local Law 107 § 1 (2025) (emphasis added); Local Law 108 § 1 (2025) (emphasis added). The Tipping Law is effective as of January 26, 2026. *See* Local Law 107 § 2 (2025); Local Law 108 § 2 (2025); Local Law 95 § 3 (2025).

Plaintiffs do not wish to communicate the City's preferred message about tipping to all their New York City consumers, and they would not alter their current approach to tipping were it not for the Tipping Law. *See* Rosenthal Decl. ¶ 29; Lawrence Decl. ¶ 9.

**<u>LEGAL STANDARD</u>**

Plaintiffs are entitled to a preliminary injunction upon showing that they are "likely to succeed on the merits," are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."

*Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the government is the defendant, the balance-of-equities and public-interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. Plaintiffs are likely to succeed on their First Amendment compelled-speech claim.

The First Amendment protects the fundamental "right to refrain from speaking." *Wooley*, 430 U.S. at 714. The Tipping Law infringes upon that right by requiring Plaintiffs to espouse the City's preferred message, in the City's preferred manner, at the City's preferred time. By doing so, the Tipping Law triggers strict scrutiny. The City cannot meet its burden to demonstrate that the law would survive strict scrutiny—or, at a minimum, intermediate scrutiny—because the law is not tailored to directly advance any governmental interest. Plaintiffs therefore are overwhelmingly likely to succeed on their claim that the First Amendment bars the City's attempt to force them to advocate the City's preferred message regarding the highly contested public issue of tipping.

#### A. The Tipping Law compels speech and thereby triggers First Amendment scrutiny.

In evaluating a First Amendment claim, courts first ask whether the law compels or otherwise regulates "speech" within the meaning of the First Amendment, *see Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445-46, 449-50 (2d Cir. 2001), including by regulating "how" a private party "may communicate" on a particular topic, *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47–48 (2017). The Tipping Law requires Plaintiffs to speak the City's preferred message; it therefore regulates—and, indeed, compels—not just conduct, but speech, and accordingly triggers First Amendment scrutiny.

The Tipping Law mandates what Plaintiffs must say and precisely how they must say it, thereby compelling speech and triggering First Amendment scrutiny. *Expressions*, 581 U.S. at 46-47. The only way Plaintiffs can comply with the Tipping Law is by *speaking*: Plaintiffs must affirmatively and "conspicuously" ask customers for tips in "plain language" (implying that customers *should* tip), make that request before delivery is even finalized (suggesting that customers should tip even *before* seeing how the delivery worker performs), and propose a tip of 10% or more (suggesting that this is an appropriate amount to tip). Rosenthal Decl. ¶¶ 27–29; Lawrence Decl. ¶ 8. The Tipping Law thus compels Plaintiffs and other online delivery platforms to "alter the content of their speech" and "speak a particular message," *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*"); namely, that it is customary or recommended to leave a tip, irrespective of quality of service, and 10% is an appropriate amount, *see* Rosenthal Decl. ¶ 29; Lawrence Decl. ¶ 8.

By regulating when and how platforms must solicit tips, the Tipping Law does not just govern conduct; it compels speech. The Supreme Court's decision in *Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017), makes the difference clear. In *Expressions*, the Court considered a challenge to a New York law prohibiting merchants from "posting a cash price and an additional credit card surcharge, expressed either as a percentage surcharge or a 'dollars-and-cents' additional amount." *Id*. at 44. The Second Circuit held that the law "posed no First Amendment problem" because it "regulated conduct, not speech." *Id.* at 46. But the Supreme Court disagreed because the law was "not like a typical price regulation" whose "effect on speech would be only incidental to its primary effect on conduct"; rather, the law regulated "how sellers may *communicate* their prices." *Id.* at 47 (emphasis added). "In regulating the communication of prices rather than prices themselves," the law "regulate[d] speech." *Id.* at 48. So too here: The

Tipping Law regulates "the communication of" discretionary tipping options and therefore "regulates speech." *Id.*, 581 U.S. at 48. The City could (and has) set minimum wages. The Tipping Law does far more. By definition, tips are the product of discretionary choices made by consumers. Thus, the only way to increase tips (rather than wages or fees) is to *encourage* customers to tip—*i.e.*, by *speaking with* consumers not only to provide them with tipping options but also to advocate tipping in suggested amounts. Indeed, according to the Tipping Law's sponsor, the purpose of the law is to commandeer platforms' *speech* in order to "encourage[]" customers to adopt, in the City's view, "better . . . habits." Herrmann Decl., Ex. 13 at 8.

The Tipping Law therefore compels and regulates Plaintiffs' speech regarding the propriety of consumers' discretionary tipping practices in at least four ways: by requiring platforms to (1) solicit tips (2) before delivery (3) in plain and conspicuous language (4) while proposing an amount of at least 10%. In other words, the Tipping Law regulates—and, in some respects, *mandates*—"how [platforms] may communicate" with consumers about tipping. *Expressions*, 581 U.S. at 47. It "impose[s] more than an incidental burden" on speech; "on [its] face and in [its] practical operation" it imposes "a burden based on the content of speech and the identity of the speaker." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566–67 (2011) (rejecting argument that law was a "mere commercial regulation" because it was "directed at certain content and [was] aimed at particular speakers"). The law "mandat[es] that [Plaintiffs] affirmatively espouse the government's position on a contested public issue" and thereby deprives Plaintiffs of their "right to communicate freely on matters of public concern." *Evergreen Ass'n*, 740 F.3d at 250–51 (quotation marks omitted).

Because the Tipping Law compels speech, it triggers First Amendment scrutiny. In "the context of protected speech," the "difference between compelled speech and compelled silence . . . is without constitutional significance," because the "freedom of speech . . . necessarily

compris[es] the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796–97 (1988); *see also, e.g.*, *NIFLA*, 585 U.S. at 766; *Volokh v. James*, 148 F.4th 71, 84 (2d Cir. 2025) ("We treat a law compelling—rather than restricting—speech like any other content-based regulation because '[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech.'") (quoting *Riley*, 487 U.S. at 795)). "The right not to speak inheres in political and commercial speech alike and extends to statements of fact as well as statements of opinion." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) (citations omitted). So regardless of whether the Tipping Law is viewed as compelling non-commercial or commercial speech, it must survive First Amendment scrutiny.

### B. The Tipping Law cannot survive strict scrutiny.

Because the Tipping Law compels platforms to espouse government-mandated messages about a contested public issue and does not merely propose a commercial transaction, it is a content-based compulsion of speech and strict scrutiny applies—a standard the law cannot meet.

#### 1. The Tipping Law triggers strict scrutiny.

The Tipping Law is a "content-based" regulation that compels Plaintiffs to "speak a particular message" favored by the City and "alte[r] the content of their speech." *NIFLA*, 585 U.S. at 766 (quotation marks and alterations omitted). The law does not just compel commercial speech; it compels speech on a divisive topic and forces companies to solicit tips from their customers on behalf of delivery workers at a time and in a manner designed to encourage discretionary tipping (an interaction in which Plaintiffs—the speakers—derive no economic benefit). It is therefore subject to strict scrutiny.

"Content-based" laws—*i.e.*, laws that require regulated parties to "speak a particular message," *id.* at 766—generally are subject to strict scrutiny. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or

message expressed"; such regulations "are subject to strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015). The Tipping Law undoubtedly "define[s the] regulated speech by [its] subject matter," *id.* at 163–64, expressly directing Plaintiffs what to say, how to say it, and when to say it. Moreover, the law was openly "adopted by the [City] 'because of disagreement with the message'" Plaintiffs are currently communicating with respect to discretionary tipping, another hallmark of a content-based law. *Reed*, 576 U.S. at 164. Indeed, when considering the Tipping Law, the City Council expressly identified its displeasure with DoorDash's and Uber Eats' decisions to change their tipping messaging as the reason for passing the law. Herrmann Decl., Ex. 10 at 64.

While laws compelling a speaker to convey a particular message typically are subject to strict scrutiny, the Second Circuit has applied intermediate scrutiny to a law that compelled what it termed "undisputed . . . commercial speech." *Safelite Group, Inc. v. Jepsen*, 764 F.3d 258, 265–68 (2d Cir. 2014).[1] "Commercial speech" is a narrow category of speech that does "no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). Paradigmatic commercial speech is a business's communications promoting its products or services—*e.g.*, "the advertisement of prescription drug prices," *Va. State Bd. of Pharmacy*, 425 U.S. at 758, "advertising that promotes the use of electricity," *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 558 (1980) (quotation marks omitted), and business

[1] Plaintiffs reserve the right to argue that under cases like *Volokh* and *Riley*, laws compelling commercial speech (but that do not fall within *Zauderer*'s narrow exception) should be treated like all other content-based laws and subjected to strict scrutiny. *See NIFLA*, 585 U.S. at 783 (declining to decide whether intermediate or strict scrutiny applied to a requirement that pregnancy centers disclose information about state-sponsored services).

solicitation by certified public accountants, *Edenfield v. Fane*, 507 U.S. 761, 763 (1993), and lawyers, *Ohralik v. Ohio State Bar Ass'n*, 426 U.S. 447, 454–55 (1978).

Conversely, if compelled speech does *more* than propose a commercial transaction, it is "*non*-commercial speech" for which "content-based restrictions" are subject to strict scrutiny and thus permissible "only in the most extraordinary circumstances." *Bolger*, 463 U.S. at 65–66 (emphasis added); *Riley*, 487 U.S. at 795–96, 800–01 (content-based mandatory-disclosure law that applied to more than just commercial speech must be justified by "compelling necessity"); *Turner*, 512 U.S. at 642 ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to" "the most exacting scrutiny."); *Evergreen Ass'n*, 740 F.3d at 244 (2d Cir. 2014) ("We therefore consider laws mandating speech to be content-based regulations subject to strict or exacting scrutiny." (quotation marks and alterations omitted)).

The Tipping Law compels non-commercial speech because it requires Plaintiffs, who would otherwise be free to remain silent on tipping before or at checkout, to convey messages that do "more than propose a commercial transaction." *Bolger*, 463 U.S. at 66 (quotation marks omitted). In *Bad Frog Brewery, Inc. v. New York State Liquor Authority*, the Second Circuit drew on *Bolger* to develop a test for whether a communication "is to be treated as commercial speech"—based on "[1] whether the communication is an advertisement, [2] whether the communication makes reference to a specific product, and [3] whether the speaker has an economic motivation for the communication." 134 F.3d 87, 97 (2d Cir. 1998) (citing *Bolger*, 463 U.S. at 66–67). "[N]one of these factors alone" renders speech commercial; only if all three factors are present is there "'strong support'" for characterizing the speech as "commercial." *Id.* (quoting *Bolger*, 463 U.S. at 66–67).

The Tipping Law compels speech that satisfies *none* of the *Bad Frog* / *Bolger* criteria: The compelled solicitation of gratuities (1) is not "an advertisement," (2) does not refer "to a specific product" (Plaintiffs must solicit a tip on behalf of delivery workers), and (3) does not reflect Plaintiffs' "economic motivation[s]" (the tips benefit delivery workers, not Plaintiffs). *Bad Frog*, 134 F.3d at 97.

These criteria confirm the commonsense conclusion that the compelled solicitation of gratuities on behalf of third parties before checkout differs in meaningful—indeed, dispositive—ways from speech proposing purely commercial transactions. *First*, Plaintiffs' compelled pre-checkout solicitation of tips from and for third parties—customers and independent-contractor delivery workers—is not driven by (and in fact *harms*) Plaintiffs' own economic interests. *See Central Hudson*, 447 U.S. at 561 (presuming that "[c]ommercial expression . . . serves the economic interest of the speaker"); *Nat'l Inst. of Fam. & Life Advocs v. James,* --- F.4th ---, 2025 WL 3439256 (2d Cir. Dec. 1, 2025) (when the speaker "receive[s] no remuneration or other financial benefit for engaging in it," speech is more likely to be non-commercial); *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010) (defining "commercial speech" as "expression related solely to the economic interests of the speaker and its audience" (citing *Central Hudson*, 447 U.S. at 561)). The commercial-speech doctrine does not apply when the government coerces a private party to propose commercial transactions for the benefit of others. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 499 (1996) (describing commercial speech as the "commercial aspect of . . . offerors communicating offers to offerees") (quoting *Linmark Assocs., Inc. v. Willingboro Twnp.*, 431 U.S. 85, 96 (1977)). *Second*, the solicitation of a gratuity is not a commercial transaction in the first place, because the customer paying the gratuity does not receive anything in return beyond what they receive if they do not tip. *Cf. Nwajei v. E&E of Five Towns,*

*Inc.*, 2024 WL 3522108, at *6 (E.D.N.Y. July 9, 2024) (quoting Department of Labor regulations that define a "tip" as "a gift or gratuity in recognition of some service performed for the customer" that "is to be distinguished from payment of a charge, if any, made for the service"). Accordingly, under *Bad Frog* and *Bolger*, the Tipping Law compels *non-commercial* speech and must be analyzed under strict scrutiny. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Clark*, 737 F. Supp. 3d 246, 261–63 (D. Vt. 2024) (applying *Bolger* factors to determine that speech was non-commercial).

Moreover, unlike laws burdening voluntary commercial communications, the Tipping Law erases Plaintiffs' freedom to remain silent. It *requires* Plaintiffs to promote a gratuitous payment for delivery workers even if Plaintiffs would otherwise choose not to speak at all. Although the commercial-speech doctrine has been applied to government-compelled disclosures that businesses must make when they voluntarily engage in commercial speech, *see Central Hudson*, 447 U.S. at 562; *44 Liquormart Inc.*, 517 U.S. at 498–99, Plaintiffs are aware of no case applying the doctrine to a rule that prohibits silence and requires businesses to propose transactions in the first instance—let alone one that mandates the solicitation of gratuitous payments from one party to another that do not benefit the party compelled to speak. Unlike laws that regulate voluntary communications that economically benefit the speaker, a law that destroys the freedom of the speaker not to speak at all infringes on a fundamental pillar of the First Amendment—"[t]he right to speak and the right to refrain from speaking" on matters of public concern. *Riley*, 487 U.S. at 797 (quotation omitted).

Finally, Plaintiffs' compelled solicitation of gratuities for delivery workers is less like the advertising in the Supreme Court's seminal commercial-speech cases and more like the charitable solicitations the Court has held constitute non-commercial speech because they involve

"communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes." *Village of Schaumberg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980). "[B]ecause charitable solicitation . . . is not primarily concerned with providing information about the characteristics and costs of goods and services, it has not been dealt with . . . as a variety of purely commercial speech." *Id.*; *see also Riley*, 487 U.S. at 795–96 (even if "charitable solicitation" has "commercial" features, it remains "fully protected" speech). Solicitation of a tip for a third party more closely resembles a charitable appeal because it is "not primarily concerned with providing information about . . . goods and services" and necessarily involves the "propagation of views" or "advocacy of causes." *Schaumberg*, 444 U.S. at 632.

Indeed, the Tipping Law does not require Plaintiffs to provide information about their services; it compels Plaintiffs to endorse the proposition that consumers should tip delivery workers as a matter of course and convey the message that they ought to give upfront tips of at least 10% regardless of service quality. Plaintiffs must advocate the City's controversial message even though 90% of Americans believe tipping has "spiraled out of control," 77% prefer to see how service is performed before tipping, and tipping historically has occurred (in virtually every context) only *after* service is received. *See* Herrmann Decl., Exs. 1 at 2, 6 at 6. The City aims to hijack Plaintiffs' speech to "encourage[]" customers to change their "habits." *Id.,* Ex. 13 at 8. The Tipping Law thus attempts to "prescribe what shall be orthodox" in "matters of opinion" with respect to tipping. *W. Va. State Bd. of Education v. Barnette*, 319 U.S. 624, 642 (1943). It compels non-commercial speech akin to charitable solicitation, independently triggering strict scrutiny. *See Riley*, 487 U.S. at 480–81.

**2. The Tipping Law fails strict scrutiny.**

"'Government action that . . . requires the utterance of a particular message favored by the Government[] contravenes' the right of each person to 'decide for himself or herself the ideas and

beliefs deserving of expression,' and is subject to 'the most exacting scrutiny.'" *CompassCare v. Hochul*, 125 F.4th 49, 63 (2d Cir. 2025) (quoting *Turner*, 512 U.S. at 641–42). A content-based regulation of non-commercial speech must "survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quotation marks omitted). The law must also be "the least restrictive means to achieve its ends." *CompassCare*, 125 F.4th at 63 (quoting *Evergreen Ass'n*, 740 F.3d at 246). This standard is exacting; "[i]t is rare that a [law regulating] speech because of its content will ever be permissible."[2] *United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 818 (2000). The burden of proving the constitutionality of any compelled speech—non-commercial or commercial—rests firmly with the government. *Id.* at 816.

To establish that the Tipping Law furthers a compelling interest, the City "must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Volokh*, 148 F.4th at 84 (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011)). The City's own pronouncements foreclose such a showing. First, the Tipping Law's legislative history indicates that the City's primary interest in advancing it is to increase overall income for delivery workers. Herrmann Decl., Ex. 9 at 23 (claiming that without pre-checkout tipping, delivery workers "lose out on meaningful earnings" that would "make [a] difference for [] working-class families"). But the City just adopted the Minimum Pay Rule, which already professes to guarantee delivery workers fair earnings. Moreover, that Rule expressly *excludes* gratuities from any fair wage calculation, NYC Admin. Code § 20-1522(b)(1), so the City has already defined its interest in delivery-worker compensation in a manner that purposefully

[2]Any argument that Plaintiffs' speech about tipping is "not very important" would be irrelevant to the constitutional analysis. *Playboy*, 529 U.S. at 818.

excludes the consideration of gratuities. It follows that encouraging consumers to tip is not "necessary" to furthering the City's interests.

The legislative history also claims that the pre-checkout-tipping model is intended to "contribute[] to better consumer habits"—*i.e.*, more tipping in higher amounts regardless of service quality. But while the City might hold such a view, the legislative history offers no explanation as to why such tipping is actually a "better consumer habit[]" or why the City has any interest in it, let alone a compelling one.

Even if the City had a compelling interest here, the Tipping Law must be "narrowly tailored" to achieve the City's interest in increasing delivery-worker compensation or encouraging tipping, *Reed*, 576 U.S. at 171—meaning the law can be neither "underinclusive" nor "overinclusive" in achieving the City's goals, *Brown*, 564 U.S. at 805. As for delivery-worker compensation, the City itself admitted that tipping is an ineffective mechanism for increasing such income. *See* Herrmann Decl., Ex. 3 at 28 (concluding that before the Minimum Pay Rule, delivery worker income was "unstable" and "subject to considerable risk" in part due to a "dependence on tips"); Ex. 14 at 8–9 (explaining that reliance on tips to increase income has led tipped workers to have low wages and be twice as likely to live in poverty as other segments of the workforce). Likewise, the Tipping Law is also underinclusive relative to any supposed goal of encouraging tipping in general: The law is limited to a small sliver of the tipped workforce, and it encourages discretionary tipping in only an indirect manner, with no corresponding effort from the City to educate the public about the professed importance of tipping. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'"). Because the

Tipping Law is underinclusive relative to both of the City's supposed interests, it is not narrowly tailored. *Cf. Brown*, 564 U.S. at 802 ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.").

Finally, under strict scrutiny, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813. And when "a plausible, less restrictive alternative is offered, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Id.* at 816. The City can make no such showing. With respect to increasing delivery workers' pay, "the [City] has already enacted" a less restrictive means of furthering its goals: the Minimum Pay Rule, which is designed precisely to increase delivery-worker compensation. *Brooklyn Branch of Nat'l Ass'n for the Advancement of Colored People v. Kosinski*, 735 F. Supp. 3d 421, 448 (S.D.N.Y. 2024). Indeed, the City has insisted that the Rule is an effective tool for increasing delivery-worker pay and would be even if consumers *no longer left gratuities of any kind*. Herrmann Decl., Ex. 3 at 41 ("if tipping were eliminated [on] all [food delivery platforms] . . . workers [would] still receiv[e] sizeable pay increases" under the Minimum Pay Rule). And as for any interest in encouraging tipping in general, the City could simply use its own voice to further this end by, for example, initiating a public campaign that promotes the importance of discretionary tipping—something it has not done, preferring instead to commandeer Plaintiffs to speak for it. There is no reason to believe that the City expressing its own views on tipping "[would] not be as effective" as the Tipping Law at encouraging discretionary tipping. Given that there is a "feasib[le]" alternative to compelling Plaintiffs to speak, this interest, too, fails strict scrutiny. *Playboy*, 529 U.S. at 814.

### C. At a minimum, the Tipping Law cannot survive intermediate scrutiny.

Even if the Court were to view the Tipping Law as compelling purely commercial speech, it at least triggers—and fails—intermediate scrutiny.

#### 1. The Tipping Law triggers at least intermediate scrutiny.

As demonstrated above, the speech at issue under the Tipping Law does not constitute commercial speech. But even if it did, the law would at least trigger the still-demanding burdens of intermediate scrutiny. *See, e.g.*, *Edenfield*, 507 U.S. at 767; *Central Hudson*, 447 U.S. at 563–64.

Intermediate scrutiny applies to laws compelling commercial speech just as it does to laws restricting such speech. It is an exacting standard that courts have used to strike down numerous laws. In *International Dairy Foods Ass'n v. Amestoy*, the Second Circuit explained that a law that "compels [speakers] to engage in purely commercial speech" must satisfy *Central Hudson*'s intermediate-scrutiny standard. 92 F.3d 67, 71 (2d Cir. 1996) (law requiring dairy manufacturers to identify products from synthetic-hormone-treated cattle failed the intermediate-scrutiny standard "applicable to compelled commercial speech"). Similarly, in *Safelite*, the Second Circuit held that a law requiring car-insurance companies to provide their insureds with the name of an unaffiliated automotive-glass shop whenever the company referred the insured to an affiliated shop compelled commercial speech, intermediate scrutiny applied, and the law could not survive. 764 F.3d at 260, 264–66. And in *NIFLA*, the Supreme Court treated a law requiring crisis pregnancy centers to "notify women that California provides free or low-cost services, including abortions" as though it compelled commercial speech and held it unconstitutional because it could not "survive even intermediate scrutiny." 585 U.S. at 761, 773; *see also Evergreen*, 740 F.3d at 244–45.

**2. The Tipping Law fails intermediate scrutiny.**

To survive intermediate scrutiny, a regulation of lawful, non-misleading speech must serve a "substantial" governmental interest, must "directly advance[] the governmental interest asserted," and must not be "more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566. As with strict scrutiny, "[u]nder a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment." *Sorrell*, 564 U.S. at 571–72. The Tipping Law fails all aspects of this test. *See Central Hudson*, 447 U.S. at 564–65 (a regulation "cannot survive" if any of these "criteria" is not satisfied).

To begin, the speech in question—proposing (or not proposing) that customers provide a discretionary gratuity—"concern[s] lawful activity" and is not "misleading." *Central Hudson*, 447 U.S. at 566. There is nothing unlawful or misleading about Plaintiffs offering consumers the opportunity to tip only after checkout or remaining silent on the subject.

That means the City must establish a substantial interest served by its speech regulation. This criterion cannot be "satisfied by mere speculation or conjecture"; the City "must demonstrate that the harms it recites are real and that its [regulation] will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71. As with strict scrutiny, the City cannot establish any substantial interest in *further* increasing delivery workers' compensation such that it exceeds even more greatly what the City decided is an appropriate minimum earnings for such workers, nor can it establish that forcing Plaintiffs to ask for tips in the City's preferred manner would "alleviate" any problems with delivery-worker compensation "to a material degree," *id.*—to the contrary, the City has already concluded that reliance on tipping is ineffective at addressing compensation concerns. Likewise, any interest in encouraging discretionary tipping generally cannot be materially served by pressing consumers to tip at a particular time, in a particular way, in a single subsector of a single industry, as contemplated by the Tipping Law.

The City also cannot demonstrate that the Tipping Law "directly advances" the interests involved. *Central Hudson*, 447 U.S. at 564. The government may not "seek[] to achieve its policy objectives through the indirect means of" regulating "certain speech by certain speakers." *Sorrell*, 564 U.S. at 577. The Tipping Law does not *directly* advance any governmental interest because it does "not directly affect" compensation or tipping behavior; it might do so "only through the reactions it is assumed people will have to" the compelled speech. *Va. State Bd. of Pharmacy*, 425 U.S. at 769; *see also Central Hudson*, 447 U.S. at 564–65. The only way the Tipping Law would have any effect on delivery workers' compensation is indirectly—*i.e.*, by using Plaintiffs' compelled speech to "encourage[]" customers to make the independent decision to tip regardless of quality of service and to tip in greater amounts. Herrmann Decl., Ex. 13 at 8; *cf. id.*, Ex. 16 at 6 (DCWP noting comments that "tips are unreliable" as a means of increasing compensation"). Such unreliable, indirect, customer-mediated effects are insufficient to satisfy this prong of *Central Hudson*.

Finally, the City could advance its purported interest in increasing delivery worker compensation and encouraging discretionary tipping "without burdening a speaker with unwanted speech." *NIFLA*, 585 U.S. at 775 (quoting *Riley*, 487 U.S. at 800). The Tipping Law "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Safelite*, 764 F.3d at 265 (quotation marks omitted); *see also Central Hudson*, 447 U.S. at 566. If it wishes to encourage discretionary tipping, the City itself could speak and promote tipping among New York City customers through advertising or other means. If the City truly believes that delivery workers should be paid more, it could accomplish that through legislation without compelling speech. Because there are options that "would have served the same governmental

interests, but would [be] less burdensome on [Plaintiffs'] speech rights," the Tipping Law cannot survive intermediate scrutiny. *Safelite*, 764 F.3d at 266.

The Tipping Law thus fails intermediate scrutiny thrice over, and violates the First Amendment.

**D. *Zauderer* does not apply here.**

In *Zauderer*, the Supreme Court "created an exception" that subjects certain regulations of commercial speech to less than intermediate scrutiny. *Id.* at 261–62. *Zauderer* held that fewer First Amendment interests are at stake when the government requires that a speaker "include in his advertising purely factual and uncontroversial information about the terms under which his services will be available," when such disclosures would reduce "the possibility of consumer confusion or deception." 471 U.S. at 651 (quotation marks omitted). "*Zauderer* does not apply outside of" such circumstances. *NIFLA*, 585 U.S. at 768.

Here, the Tipping Law does not require the disclosure of "purely factual and uncontroversial information about the terms under which" Plaintiffs' "services will be available." *Zauderer*, 471 U.S. at 651. More specifically, the law does not require Plaintiffs to provide information about *their* platforms, services, or fees, *see Safelite*, 764 F.3d at 264, and the compelled disclosures are not "uncontroversial" given the public debate over tipping, *Evergreen Ass'n*, 740 F.3d at 245 n.6. Instead, the law requires Plaintiffs to solicit tips from consumers for delivery workers at a particular time and in a particular amount. It thus bears no resemblance to the information-disclosure requirements upheld under *Zauderer* and its progeny. *See, e.g.*, *Zauderer*, 471 U.S. at 650 (information regarding client liability for costs in contingent-fee arrangements); *N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 131–34 (2d Cir. 2009) (calorie counts on menus). "*Zauderer* does not apply." *NIFLA*, 585 U.S. at 768.

Even if it did, the Tipping Law would still be unconstitutional. Under *Zauderer*, a disclosure mandate must (1) not be "unjustified," (2) not be "unduly burdensome," and (3) be "reasonably related to the [City's] interest in preventing deception of consumers." 471 U.S. at 651. The Tipping Law is unjustified because it does not "remedy a harm that is 'potentially real, not purely hypothetical,'" *NIFLA*, 585 U.S. at 776; it is "unduly burdensome" because it precludes Plaintiffs from conveying other messages on the limited space of their app screens, regulating speech more "broad[ly] than reasonably necessary"; and it is not "reasonably related" to any "interest in preventing deception of customers." *Zauderer*, 471 U.S. at 651. In particular, there is no risk of consumer deception when platforms are free to solicit (or not solicit) *optional* tips after food is delivered or when platforms are free to suggest (or not suggest) any tip amount they choose. *See* Rosenthal Decl. ¶ 25; Lawrence Decl. ¶ 6. The Tipping Law therefore is not reasonably related to any interest in preventing consumer deception.

* * *

The Tipping Law compels Plaintiffs to speak and cannot survive any potentially applicable level of First Amendment scrutiny. Plaintiffs are likely to succeed on the merits.

## II. Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction.

Plaintiffs have established irreparable harm sufficient for a preliminary injunction because they face the imminent "deprivation of" their "constitutional rights." *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quotation marks omitted); *see also e.g.*, *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) ("[A] presumption of irreparable injury . . . flows from a violation of constitutional rights." (quotation marks omitted)). Once the unconstitutional Tipping Law goes into effect, Plaintiffs will be compelled to speak messages they otherwise would not, on pain of

coercive penalties. Plaintiffs will lose their "right not to speak." *Int'l Dairy Foods*, 92 F.3d at 71. Nothing more beyond this imminent violation of Plaintiffs' First Amendment rights is required to demonstrate irreparable harm. *See, e.g.*, *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009).

But Plaintiffs also face other "threat[s] of irreparable harm" sufficient for a preliminary injunction. *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010). The Tipping Law threatens to irreparably damage Plaintiffs' relationships and goodwill with consumers. Given tipping fatigue and the high costs that New York City consumers already encounter due to the Minimum Pay Rule and inflation, it is likely that at least some consumers will order fewer or smaller items, decide not to place orders at all, and reduce their usage of Plaintiffs' platforms altogether. *See* Rosenthal Decl. ¶¶ 32–33; Lawrence Decl. ¶ 10. Under Second Circuit precedent, "loss of reputation, good will, and business opportunities" are considered irreparable harm because it is "impossible to estimate with any precision the amount of monetary loss" occasioned by such injuries. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). Plaintiffs are likely to suffer this irreparable harm.

Finally, Plaintiffs are threatened with potentially unrecoverable financial losses, which similarly suffice for irreparable harm. As just explained, the Tipping Law is very likely to cause Plaintiffs to incur lost sales. *See* Rosenthal Decl. ¶ 33; Lawrence Decl. ¶ 10. While money damages are available against the City under Section 1983, *see Owen v. City of Independence*, 445 U.S. 622, 656 (1982), Plaintiffs' damages from lost sales resulting from the Tipping Law likely will be "difficult to establish and measure," *Register.com*, 356 F.3d at 404. While at least some lost sales are nearly certain, it will be hard to identify *which* sales were lost because of the changes forced by the Tipping Law, so it will be "difficult to calculate monetary damages." *Id.* (quotation marks omitted). That difficulty renders Plaintiffs' likely loss of business opportunities an

irreparable harm. *Id.* Each of the aforementioned irreparable injuries is independently sufficient to support preliminary injunctive relief.

### III. The balance of equities and public interest favor relief.

Because the City is the defendant, the balance-of-equities and public-interest factors "merge." *Nken*, 556 U.S. at 435. These factors conclusively favor Plaintiffs because Plaintiffs have established that they will suffer a violation of their First Amendment rights absent a preliminary injunction. "[S]ecuring First Amendment rights is in the public interest," and the "Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quotation marks omitted). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights and, however inconvenient compliance may be, the government suffers no harm from an injunction that merely ends unconstitutional practices or ensures that constitutional standards are implemented." *Mercado v. Noem*, --- F. Supp. 3d ---, 2025 WL 2658779, at *36 (S.D.N.Y. Sept. 17, 2025).

Even were it not for this principle, the City will suffer no harm from a preliminary injunction maintaining the status quo by enjoining enforcement of the Tipping Law against Plaintiffs; the City can claim no injury, financial or otherwise, even if Plaintiffs' customers were to tip the same as they have been doing since December 2023. Plaintiffs, by contrast, would be forced to utter speech and espouse the City's messages about tipping that they otherwise would prefer not to, infringing on their fundamental First Amendment right to decide for themselves "the ideas and beliefs deserving of expression." *Turner*, 512 U.S. at 641. And as explained above, Plaintiffs will suffer irreparable injuries to their customer relationships and goodwill as well as lost business opportunities.

Finally, the public interest favors an injunction. As noted, the public interest always lies with the protection of constitutional rights; the First Amendment's framers conclusively

determined that the public interest is served by the right to speak or not to speak. *See N.Y. Progress*, 733 F.3d at 488; *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

## CONCLUSION

This Court should grant Plaintiffs' motion for a preliminary injunction in advance of the Tipping Law's January 26, 2026 effective date.

Dated: December 11, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ *Gabriel Herrmann*

Gabriel Herrmann

Gabriel Herrmann
Nicholaus C. Mills
200 Park Avenue
New York, NY 10166
GHerrman@gibsondunn.com
NMills@gibsondunn.com

Michael Holecek* (*PHV forthcoming*)
Katie Townsend
333 South Grand Avenue
Los Angeles, CA 90071
MHolecek@gibsondunn.com
KTownsend@gibsondunn.com

Connor P. Mui* (*PHV forthcoming*)
1700 M Street, N.W.
Washington, D.C. 20036-4504
CMui@gibsondunn.com

*Attorneys for Plaintiff DoorDash, Inc.*

HECKER FINK LLP

By: /s/ *John C. Quinn (with permission)*

John C. Quinn

John C. Quinn
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
jquinn@heckerfink.com

Trisha Anderson* (*PHV forthcoming*)
Chloe Goodwin* (*PHV forthcoming*)
1050 K Street, NW, Suite 1040
Washington, D.C. 20001
(212) 763-0883
tanderson@heckerfink.com
cgoodwin@heckerfink.com

*Attorneys for Plaintiff Uber Technologies, Inc.*[3]

[3] Pursuant to Section 8.5 of the SDNY ECF Rules and Instructions, electronic signatures are being used on consent of all parties.

**CERTIFICATE OF COMPLIANCE**

As required by S.D.N.Y. Local Civil Rule 7.1(c), I certify that this document contains 8,743 words, excluding parts of the document that are exempted by Rule 7.1(c).

I declare under penalty of perjury that the foregoing is true and correct.

/s/ *Gabriel Herrmann*

Gabriel Herrmann

/s/ *John C. Quinn (with permission)*

John C. Quinn

*Counsel for Plaintiffs*