# Exhibit 4



June 25, 2024

Council Member Julie Menin, Chair
Committee on Consumer and Worker Protection
New York City Council
New York, NY 10004

**RE: Testimony Supporting Int 762; Opposing Int 0030, 715, 737, 738, & 859**

On behalf of DoorDash, I am writing to share our positions on the seven bills being considered by the New York City Council Committee on Consumer and Worker Protection. While we welcome the Committee's consideration of Int 762, legislation that would amend the city's price controls on third-party food delivery services, the hearing ultimately represents one step forward, but several steps backwards to policy making with respect to third-party food delivery. Other bills being considered by the Committee – Ints 0030, 715, 737, 738, and 859 – are deeply concerning and, if passed, would negatively impact Dashers, restaurants, and consumers using the platform.

Please see our positions on the bills before the Committee detailed in the letter below.

### I.    SUPPORT: INT 762 - PRICE CONTROL AMENDMENT

DoorDash supports Int 762, legislation that would reform New York City's existing price control on food delivery. This bill will help restaurants, workers, and consumers by easing upward pressure on prices and ensuring restaurants can choose the products and services they need.

### A.    <u>Reforming the price controls will benefit local restaurants, workers and consumers.</u>

Food delivery has changed dramatically since New York City passed its first price control in 2020. The COVID-19 pandemic has since subsided. Partnership plans for restaurants have evolved. And today, restaurants continue to have access to affordable delivery options in New York City and throughout the U.S. In fact many restaurants already pay commissions lower than what the City's fee cap requires. Restaurants chose our lower-cost plans because they offer real value. Of merchants surveyed about our most affordable delivery option, our Basic partnership plan:
- 62% would recommend DoorDash for reaching consumers they would not otherwise have been able to reach.
- 72% would recommend DoorDash for increasing sales or volume.
- 73% would recommend DoorDash for reaching a wider range of consumers.[1]

Contrary to some representations made at the hearing, our Basic plan also offers a true presence on the platform and access to its features. For example, restaurants on Basic can be found in valuable homepage carousels that reach consumers, like "Fastest Near You," "Most Popular

---

[1] 2022 DoorDash Economic Impact Report.

Restaurant," and others, while also maintaining access to our suite of marketing and analytics tools and live support, just like those on our Plus and Premier plans.

The true effect of the price controls is to force consumers to pay more for, or cut restaurants off from, optional services that they may need and value. These are services that restaurants want to grow their businesses, reach new markets, and find new consumers. DoorDash doesn't only offer its Basic partnership plan, it offers other plans that provide different benefits for restaurants that want them. Whether it's more reach, access to DashPass, or additional advertising and promotions for a new product launch, DoorDash empowers restaurants to choose what they need to compete in today's marketplace. Price controls discourage all of these options and promote a one-size-fits-all approach.

These impacts are not hypothetical. Price controls have previously forced us to raise consumer prices in other markets, an action that drove down consumer orders and hurt both restaurants and Dashers. In New York City, we were similarly forced to raise consumer prices in response to the City's pay standard. As a result, in just a two month period, we estimate that New York City restaurants experienced 850K fewer orders and $17M less in revenue than they would have earned on DoorDash Marketplace had the market remained unchanged and continued to grow at expected levels. Over the course of a year, 5.6M orders in NYC might not be placed that we would have otherwise expected leading to over $110M in lost merchant sales.[2] These lost orders won't all be replaced. According to our consumers, 72% of meals delivered through the app might not have been ordered at all if DoorDash did not exist.[3]

Fewer orders from New York City consumers also means less work for Dashers, along with longer wait times for orders. The number of new Dashers in New York City has fallen by 20% compared to before the new minimum pay rate took effect.[4]

NYC's existing price controls put even more pressure on platforms to increase consumer fees further, or make service changes that adversely impact merchants. Like we did in response to the pay standard, we'll have to alter business operations to make them sustainable. Int 762 reduces these risks by opening the door to more choice for restaurants.

**B. <u>Int 762 has undergone significant changes to address Council feedback and stakeholder pain points.</u>**

The third-party food delivery services regulated by the price controls engaged in extensive conversations with the Council and stakeholders on last year's bill, Int 813. That dialogue and feedback has led to significant changes in this year's bill, including:
- Upper limits on allowable fees for certain services, including delivery.
- The ability for restaurants to manage online searches for their restaurant.
- Assurance that restaurants control menu pricing when they use third-party services for delivery.
- Certainty that restaurants can directly market to consumers by adding menus or flyers to deliveries.

---

[2] DoorDash, An Update on the DoorDash Experience in NYC.
[3] 2022 DoorDash Economic Impact Report.
[4] DoorDash, An Update on the DoorDash Experience in NYC.

The bill has new supporters (including organizations that did not support Int 813), and even the most ardent detractors have acknowledged the improvements. This bill has evolved substantially from last session, and the industry has put its best foot forward to support a package of reforms that the Council can stand behind.

### C. <u>Nearly every city in the U.S. has repealed their price controls, with little impact on restaurants.</u>

The fact that price controls ultimately hurt restaurants rather than help them is demonstrated by the elimination of price controls throughout the U.S. since the pandemic ended. Unsurprisingly, moving back towards normal market conditions, and allowing businesses more choice over which products and services they want, has not resulted in fallout for restaurants.

New York City's existing price controls are an extreme outlier at this point. The vast majority of U.S. jurisdictions that imposed food delivery price controls have repealed those laws, many as early as 2021. And while a handful of U.S. cities imposed permanent laws that require platforms to offer affordable delivery options, those laws otherwise leave restaurants and platforms free to choose additional products and services beyond basic delivery without constraint. No cities have reverted to policies like New York's. At this point there is a proven track record that these laws aren't necessary.

### D. <u>Reforming the price control can eliminate needless risk.</u>

Important developments have occurred since the Council last held a hearing on reforming the price controls. A court considering legal challenges to New York City's current law has raised even more serious questions about its unlawfulness. When rejecting the City's motion to dismiss the legal claims challenging the price controls, and permitting each and every claim filed to move forward, the Court expressed many concerns about the law. The current law not only remains at risk of being invalidated. If that happens, there is a serious risk of liability for the City, totalling hundreds of millions of dollars. There is no reason to take such a risk and when the existing price controls is bad policy to begin with.

## II. OPPOSE: INT 0030 - E-BIKE REQUIREMENTS

Int 0030 would require food delivery workers and other people engaged in commerce to use only certified e-bikes, and envisions that businesses would provide certified e-bikes to people that don't already have them. This bill continues to have multiple, fundamental problems that would prevent it from being effective. It ultimately seems designed to promote cutting workers off from app-based work rather than supporting them.

### A. <u>Int 0030 completely fails to provide accountability for the businesses that created the City's battery fire problem (instead allowing them to further profit), while still requiring third-party food delivery services to pay for e-bikes twice</u>.

The most glaring and significant issue with Int 0030 is that it fails to account for the fact that platforms like DoorDash are already paying food delivery workers for their e-bikes and batteries. **The problem is not that third-party food delivery services aren't providing workers with**

**resources to upgrade their e-bikes—the problem is that no other entities are making any further contributions to solve this problem.**

As we've previously explained, the minimum pay standard requires third-party food delivery services (and no other businesses) to pay workers $2.26 per hour in compensation for their equipment and vehicles, the vast majority of which was calculated based on the cost of e-bikes, batteries, bike maintenance, bike safety accessories, and replacement expenses. Before the end of the year, platforms like DoorDash will already have paid even part-time workers enough in dedicated e-bike pay to purchase a new e-bike. Based on DCWP's data from July 2021 - June 2022, platforms are estimated to pay around $50 million annually to e-bike Dashers just to cover e-bike expenses, a figure that could grow to more than $66M by 2025. With this pay, even a worker that spends only the DCWP's average 21.3 number of hours per week doing this type of work  will have received enough money to buy a certified e-bike in one year. For people that are frequent delivery workers, they have likely already received enough earmarked funds under the minimum pay standard to upgrade their e-bike to a certified model.

A valid question was raised at the hearing: what about workers who are just getting started with delivery work and need a bike? The City has already addressed this issue. An important component of solving the battery fire problem is enacting and enforcing safety standards on the sale of e-bikes and batteries. Fortunately the City has already done so by passing a new law that took effect last fall. This law requires e-bikes sold in the City to meet UL 2849 and batteries to meet UL 2271 standards. This means it should now be impossible for workers to purchase an uncertified e-bike and battery in New York City. If retailers are selling products to workers that don't meet those standards, they must be held accountable. If the City's laws don't facilitate adequate enforcement mechanisms to protect consumers that are sold uncertified products, those enforcement mechanisms should be changed (an issue we understand DCWP already supports).

Unfortunately, we're yet to see any policy proposal that would see the entities that sold these fire-prone batteries make any financial commitments to help New Yorkers upgrade and dispose of their uncertified batteries. Instead the City's theory seems to be that we should in fact let these businesses profit twice by having New Yorkers go purchase safe replacements from them. This approach should be unacceptable to everyone on the Council.

We do recognize that amendments to the bill have increased the types of workers and companies that would be subject to its requirements. But this change misses the mark completely. The bill still lacks: 1) any acknowledgement of the fact that only third-party food delivery services are already required to pay workers a substantially higher wage specifically for their e-bikes and batteries; and 2) accountability for retailers that have sold dangerous batteries.

In sum, DCWP and the Council have already made a choice with respect to how third-party food delivery services are to provide workers with the funds they need to purchase e-bikes, maintain them, and replace their batteries. That policy is clear—platforms are obligated to pay workers directly. The better question that the Council should now ask when considering solutions to the e-bike fire problem is how other industries beyond third-party food delivery should contribute and help workers. Likewise, the Council has not yet addressed how to prevent retailers from unfairly profiting from selling dangerous products to delivery workers and other New Yorkers. The

Council should address those issues before adding even more requirements on third-party food delivery services.

### B. **The bill will still hurt workers because it fails to include the right range of compliance options.**

Inexplicably, the bill continues to limit workers to having e-bikes or other e-devices that meet the UL certification for the device's entire electrical or drive system (UL 2849 or UL 2272), while the City simultaneously pursues an entirely different approach by piloting battery-only replacement programs that wouldn't enable workers to comply with either of those standards. Despite us identifying this issue multiple times since the bill was first introduced last year, the legislation still has not been amended to align with programs the City itself is piloting. This simply makes no sense. Int 0030 would literally make it unlawful for workers to keep their existing e-bike and participate in these programs (one of the key reasons for pursuing them in the first place). As long as the City continues to pilot or support battery-only e-bike replacement options for workers, the Council should not consider passing any bill that effectively prohibits workers from upgrading to a safer battery certified to UL 2271.

### C. **The bill still does not address one of the most crucial issues to solve the battery fire problem—recycling and disposing of dangerous batteries.**

Int 0030 seems content to ignore the question of how old e-bike batteries will actually end up responsibly recycled and disposed of so that they don't continue to pose a fire risk to the community. This is a baffling omission. Programs aimed at helping people upgrade their e-bikes or batteries can only be effective if they also require that dangerous batteries be handed over so the City can be certain they won't start fires. If older batteries are not removed from circulation, they will either: 1) continue to be used in the second-hand market and charged in people's homes; or 2) be placed in the regular waste disposal stream. Either scenario furthers the risk of fires and prevents proper recycling where environmental risks can be eliminated and valuable components can be extracted. The Council should not support any e-bike or e-mobility replacement programs that don't address battery recycling and disposal.

### D. **Recent amendments to the bill have not eliminated, or even mitigated, the myriad of harmful unintended consequences that would result from this policy.**

We previously pointed out that Int 0030 won't achieve its aim of getting workers on safe e-bikes more quickly, and will instead result in many unintended consequences. None of these issues have been addressed in the new bill. This bill would still: 1) discourage e-bike use, meaning fewer jobs for workers that rely on e-bikes, more deliveries on modes like cars, and less reliable delivery in general; 2) disrupt small business restaurants by driving up delivery costs or putting their access to delivery at risk; and 3) make workers targets for enforcement by subjecting them to requirements for e-bikes that don't apply to other New Yorkers.

### E. **Int 0030 remains incompatible with app-based work.**

The structure of this policy remains unworkable for third-party food delivery services. When workers use multiple apps, and work irregular hours, there is no solution to deciding which

workers should get new, certified e-bikes and who should be providing them. This structural problem has not been addressed, and in its current form, the policy simply can't be implemented.

### F. **The City already has multiple policies in place that are aimed at helping workers upgrade their e-bikes that need to be implemented.**

The City has already addressed the problem of helping workers get certified e-bikes and batteries, not once but twice. First, it mandated a pay requirement for third-party food delivery services, which was calculated to include compensation specifically for the ongoing cost of worker's e-bikes, including regularly replacing their battery. Second, the Council passed Int 949, establishing a trade-in fund with an explicit mandate that the agency in charge "target[] food delivery workers" when implementing the program. Unlike Int 0030, the trade-in program that was established addressed key issues such as turning over old batteries, avoided new problems for app-based by placing control over trade-ins with the City, and it actually supported adjacent City programs by permitting battery-only upgrades. We fail to understand why the Council would now consider a new policy while Int 949 hasn't even yet been implemented.

## III. OPPOSE: INT 715 - TRAFFIC VIOLATIONS

Int 715 would require third-party food delivery services to "ensure" each worker follows certain traffic laws and require them to pay for citations. This proposal will not result in meaningful safety improvements–they'll simply discourage e-bikes from being used at all.

First, we're concerned that this bill is rooted in a significant misunderstanding of how the DoorDash platform works and the safeguards in place to prevent workers from rushing deliveries in a manner that jeopardizes pedestrian safety. Second, this bill would risk causing widespread worker deactivations by setting terrible incentives that actually undermine safety. Finally, the City's own data seems to be squarely at odds with this proposal as a policy response to pedestrian safety given that pedestrian fatalities in the City are overwhelmingly being caused by motor vehicles, not e-bikes.

### A. **DoorDash does not incentivize rushing deliveries at the expense of safety.**

Based on the testimony at the hearing, it appears this bill is rooted in a misperception that DoorDash encourages Dashers to rush deliveries, breaking traffic laws in the process, and therefore the platform should be accountable for paying tickets that workers receive. Nothing could be further from the truth.

We don't require Dashers to deliver at unsafe speeds, and actually try to encourage the opposite. We use conservative ETA estimates. We also don't factor in wait time at a restaurant or other merchant, so if a restaurant's slow, Dashers don't have to make up that time. If a Dasher accepts an additional delivery while actively on another trip, the ETA adjusts to reflect the time needed to complete the current delivery and begin the next one. Further, only Dashers who are repeatedly and excessively late risk losing access to the platform.

On top of those measures we take proactively to ensure that Dashers do not have to rush, City law guarantees all food delivery workers the ability to set a maximum delivery distance according

to their preferences.[5] So it is never the case that a Dasher must accept a delivery that they may believe is too far for them to deliver in a reasonable time. Once a Dasher has set a maximum delivery distance of their choosing, they will never be offered a delivery farther than that distance. Plus, Dashers always see – upfront, before deciding whether to accept a delivery – where they would have to go, and they can always turn down any offer they do not wish to do.

### B. Int 715 would encourage more reckless behavior, and in response, a zero tolerance approach to deactivating workers over tickets.

Int 715 will encourage exactly what it intends to prevent–more traffic violations that could put pedestrians at risk. If workers no longer need to worry about paying traffic tickets, they aren't likely to take fewer chances, they'll take more. This bill is fundamentally flawed in its approach and creates the wrong set of incentives. In response platforms will have few options but to deactivate workers to prevent this obvious moral hazard. We see only one outcome of this policy–workers being removed from the platform more often to prevent liability for tickets.

We understand that some groups are calling on the City Council to adopt restrictions on deactivations before Int 715 is adopted in order to prevent platforms from removing workers who commit traffic violations. This makes the problem even worse – there is no downside whatsoever for a worker who repeatedly commits traffic violations since they cannot be liable for tickets and platforms cannot remove them.

### C. Int 715 is out of step with New York City's own data regarding pedestrian safety.

In addition to actually increasing risks for pedestrians, the bill is a troubling policy response to a serious problem when viewed next to the City's own safety data. That data demonstrates that motor vehicles are–by a wide margin–the largest driver of pedestrian deaths and injuries while e-bikes account for a tiny fraction of the problem. In 2023, vehicles like cars and trucks accounted for 8,500 of the 9,000 injuries suffered by pedestrians from all vehicles (including bikes), and 101 of the 103 fatalities.[6] This data simply doesn't support the premise that e-bike delivery workers pose an imminent threat requiring targeted intervention, and it should cause the Council to reconsider what legislation it should prioritize to actually address the important issue of pedestrian safety.

### D. Int 715 would be impossible to comply with.

Int 715 requires third-party food delivery services to "ensure" that workers don't violate certain traffic laws. This is simply impossible, and we don't think any business could comply with that mandate. A quick walk down a street in the City is likely to reveal countless commercial vehicles violating traffic requirements by double parking or obstructing a bike lane. No matter what measures we put in place, nor how strict our policies are, we can't prevent every traffic violation that a Dasher could commit. Int 715 is not a workable policy because it sets an unachievable high bar.

---

[5] "Each third-party food delivery service and third-party courier service shall provide each food delivery worker with the ability to specify . . . the maximum distance per trip . . . that such worker will travel on trips." NYC Admin. Code § 20-1521(a)(1).
[6] NYC Bicycle Crash Data 2023 Report.

### IV. OPPOSE: INT 737 AND INT 738 - TIP MANDATES

The Council has proposed two bills mandating tip solicitation requirements for third-party food delivery services:

- Int 737: if a platform solicits a tip from a consumer, the platform must suggest and offer an option of tip that is at least 10% of the item purchase price.
- Int 738: if a platform solicits a tip from a consumer, the platform must solicit the tip before or at the same time the order is placed.

These requirements only apply to platforms that facilitate third-party delivery from restaurants. These bills do not apply to platforms that deliver groceries, alcohol, or other goods, chain or local restaurants doing delivery directly, or any other services.

### A. <u>Recent changes to tipping were made to benefit NYC consumers, Dashers, and restaurants. Conversely, this legislation would ultimately harm all parties.</u>

These bills are purportedly in response to changes in tipping operations by DoorDash and other platforms following NYC's food delivery worker minimum pay regulations going into effect.

The minimum pay regulations require that DoorDash and other food delivery platforms ensure that delivery workers earn at least $19.56 per hour before tips. This pay standard – more than 20% higher than NYC's minimum wage – significantly increased operating costs requiring us to increase consumer fees. To better balance costs for NYC consumers facing increased fees at checkout, we moved the tipping option to after-checkout. The option to tip after checkout is very accessible and available during multiple points in the delivery process (see screenshots below) and up to 30 days following completion of the order.

Even with this change to tipping, over just a two month period, higher costs have resulted in NYC consumers placing an estimated **850,000 fewer orders** on the DoorDash Marketplace than they would have had the market remained unchanged and continued to grow at expected levels. These are lost earning opportunities for Dashers and equate to approximately **$17,000,000 in lost revenue** for restaurants and other local merchants.

Forcing platforms to offer tips before checkout and suggest a tip of 10% would heavily amplify these negative impacts. More and more NYC consumers would likely abandon placing an order because of even higher costs. This is a bad result for NYC Dashers and restaurants: each lost order not only guarantees that there won't be a tip, but also means there won't be an earning opportunity for Dashers or an order for a restaurant at all.

Understanding these adverse impacts are likely to occur if tipping is retained, **Int 737 and 738 are actually encouraging third-party food delivery services to remove tips altogether**.

### B. <u>Changes to tips were not only fully expected by DCWP – but recommended – in response to the delivery worker minimum pay regulations.</u>

Claims by the Department of Consumer and Worker Protection (DCWP) and other stakeholders that changes to tipping are "troubling" or not an expected outcome of the City's minimum pay regulations are disingenuous.

In adopting these pay regulations, DCWP suggested that moving tips until after checkout or removing tips altogether was one strategy for how platforms could mitigate the cost impacts for NYC consumers. In the agency's own report – a *Minimum Pay Rate for App-Based Delivery Workers* – to support adoption of the regulations, they state:

> *Beyond productivity, there also exist several other margins for adjustment to higher delivery worker pay.* ***For instance, apps could choose to reduce consumers' costs through changes to the user interface that discourage or eliminate tipping (or, equivalently, consumers could choose to tip less in light of workers' higher pay, independent of any changes engineered by apps)****. The Department finds that if tipping were eliminated at all apps, costs to consumers would increase by $1.06 per delivery (3%) with workers still receiving sizable pay increases.*

This statement by DCWP demonstrates that these changes are not "retaliation" as some have claimed, but rather fully aligned with how the City expected platforms to respond to minimize consumer impacts once the agency's pay rules went into effect. There is nothing nefarious about making tipping available after a consumer places an order.

### C. <u>Despite widespread use of tipping across numerous services, the legislation arbitrarily targets just a small number of platforms</u>.

As demonstrated above, any policy regulating tipping is ill-advised because of the potential adverse impacts that can occur. Int 737 and Int 738 are made even worse because they create special rules about how tips should be solicited only for DoorDash and other third-party platforms that facilitate restaurant delivery. Even more perplexing is that these platforms are the only ones that are already subject to a premium minimum pay standard under NYC law. Consider these examples if the legislation were adopted:

- Under NYC law, platforms like DoorDash and Uber Eats are required to pay independent delivery workers **$19.56 per hour before tips**. Int 737 and 738 require that **tips be available to a consumer at checkout** and that 10% be suggested.
- Under NYC law, Instacart, Amazon, Shipt, and other platforms that use independent delivery workers to deliver goods other than restaurant food have **no minimum pay requirements whatsoever**. Int 737 and 738 imposes **no requirements** for how tips are solicited on these platforms.
- Under NYC law, a chain restaurant that accepts orders through its own app and fulfills the delivery with its own workers is required to ensure that they earn **$13.35 per hour, before tips**. Int 737 and 738 imposes **no requirements** for how tips are solicited on these apps.

Platforms or services that have lower or <u>NO</u> minimum pay requirements at all remain unregulated under Int 737 and Int 738. This is not only an illogical policy, but also likely unconstitutional. The Council should reject these bills.

### V.  OPPOSE: INT 859 - MANDATE NEW APP FEATURES AND NOTICES

Int 859 would mandate that third-party food delivery services implement new app features regarding delivery worker hours and pay. Specifically, the bill requires platforms to notify workers before the pay period begins regarding which pay method will be used, offer a tracker of NYC-specific hours spent on delivery and on the app, and a pay period receipt. All of these notices and features must be provided in the app.

#### A.  **Some requirements of int 859 are based on a misunderstanding of NYC's minimum pay regulations**.

Under NYC's minimum pay regulations for delivery workers, a platform is allowed to determine the pay method at the end of the pay period based on how the market behaved during that week. In fact, in some instances platforms cannot choose a pay method (the alternative method) if worker utilization during the pay period falls below a specific threshold. Int 859 is in tension with these requirements because it requires platforms to indicate the intended pay method at the beginning of each pay period.

Similarly, the pay period receipt currently suggests that delivery workers exclusively earn based on the number of hours they are on delivery. This is not true for Dashers and other delivery workers who often earn by offer and are simply trued-up at the end of the pay period if the pay-by-offer earnings do not satisfy the minimum pay requirements.

#### B.  **The proposed hour tracker is an extreme engineering burden, with limited benefit for workers.**

Int 859 requires platforms to build and offer a tracker in the app of both hours on delivery and on the online during the pay period. The tracker would be exclusively for hours incurred in NYC. Building this new feature would be complex, costly, and highly burdensome. It would require teams of engineers months to build.

In addition to being a massive undertaking to implement, this tracker would have limited added benefit for workers. After each delivery, all Dashers are already informed about the amount of time they spent on the trip. This information can be used by a Dasher to estimate the minimum pay accrued during the week. Of course, this tracker would be pointless for all Dashers and delivery workers outside of NYC.

Finally, we are concerned that the tracker would be confusing for Dashers. Any necessary pay adjustments to satisfy the minimum pay regulations do not occur until the end of the pay period. As a result, a Dasher's earnings will not necessarily align with the number of hours in the tracker at any point before the end of the pay period.

#### C.  **We are not opposed to a pay period receipt, but additional clarifications are needed.**

We share the Council's goal of ensuring Dashers are informed about their pay. We think the best way to accomplish this goal is through the pay period receipt proposed in Int 859. However, changes are needed to clarify certain requirements and the methods by which the receipt can be provided to workers.

We have submitted proposed amendments to Int 859 to help clarify the requirements of the pay period receipt and look forward to working with the sponsor to improve that section of the bill.

## VI. PRELIMINARY FEEDBACK: INT 972 - MOPED REGISTRATION

One bill before the Committee at today's hearing was only recently introduced, and we're still reviewing the legislation to understand its implications. Based on our initial review, we offer the following feedback regarding Int 972, which would require third-party food delivery services to verify whether mopeds used by food delivery workers are registered. We note that we share the City's vision of promoting safe streets where traffic laws are followed, and we expect the same of Dashers. All Dashers must agree to follow all applicable vehicle and traffic laws when they use the DoorDash platform, including those pertaining to vehicle registration.

### A. The proliferation of unregistered mopeds must be addressed with comprehensive policy.

Like many bills before the Committee today, this bill assumes that third-party food delivery platforms can single-handedly solve complex transportation problems that involve many other industries and people. This approach won't be effective and can't continue. There are many aspects of this problem that go far beyond third-party food delivery, and relate to the manufacturing, sale, and use of mopeds on New York City streets. We urge the Council to take into account that third-party platforms are not the police, nor the entities that make and sell mopeds.

It is crucial that both legislative and policy efforts to reduce the use of unregistered mopeds: 1) Ensure that the manufacturers that make these products are properly equipping them so that they can be registered in the first place (for example, by providing them with Vehicle Identification Numbers); 2) Require that retailers that sell mopeds provide accurate information to consumers about the legal status of the vehicle, and provide registrations at the point of sale in accordance with potential new state laws; and 3) Include an appropriate enforcement framework to hold those that choose not to register their vehicles accountable, since many users likely have no connection to delivery work. Many of these steps may prove far more effective than a registration verification that a business performs after someone has already purchased their moped.

### B. Legislation addressing commercial moped use should include all types of businesses.

In a similar vein, this bill would also create a bespoke set of vehicle verification requirements applicable only to third-party food delivery services. This targeted and discriminatory approach to policymaking must stop. If businesses are required to verify the status of mopeds that share a connection to their business operations, then those requirements should apply to all businesses.

*        *        *

We urge the City Council to support Int 762 and reject Int 0030, 715, 737, 738, and 859 that were considered at the hearing. Thank you for your consideration of these comments, and we look forward to working with the Committee to address these issues.

Sincerely,


Kassandra Perez-Desir
Head of Government Relations, NY/NJ & Puerto Rico