# Exhibit 14

<u>Committee on Consumer Affairs and Business Licensing</u>
Stephanie Jones, Legislative Counsel
Leah Skrzypiec, Legislative Policy Analyst
Noah Meixler, Legislative Policy Analyst
J. Florentine Kabore, Financial Analyst



### THE COUNCIL OF THE CITY OF NEW YORK

### BRIEFING PAPER AND COMMITTEE REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION

**Jeffrey Baker, Legislative Director**
**Rachel Cordero, Deputy Director, Governmental Affairs Division**

### COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING
**Hon. Diana Ayala, Chair**

**June 8, 2021**

| | |
|---|---|
| **INT. NO. 2163** | By Council Members Reynoso, Lander, Van Bramer, Adams, Kallos, Menchaca, Gibson, Rivera, Rosenthal and the Public Advocate (Mr. Williams) |
| **TITLE:** | A Local Law to amend the administrative code of the city of New York, in relation to allowing a food service establishment surcharge, and to repeal local law number 100 for the year 2020, relating to a COVID-19 recovery charge |
| **INT. NO. 2288** | By Council Members Brannan, Rivera, Chin, Louis and Ayala |
| **TITLE:** | A Local Law to amend the administrative code of the city of New York, in relation to requiring certain businesses using bicycles for commercial purposes to provide bicycle operators with insulated food delivery bags |

1

**INT. NO. 2289**            By Council Members Brannan, Menchaca, Chin, Rivera, Louis and Ayala

**TITLE:**                   A Local Law to amend the administrative code of the city of New York, in relation to requiring that third-party food delivery services permit delivery workers to set limitations on distance and route for deliveries

**INT. NO. 2294**            By Council Members Lander, Menchaca, Chin and Ayala

**TITLE:**                   A Local Law to amend the administrative code of the city of New York, in relation to establishing minimum per trip payments to third party food delivery service workers

**INT. NO. 2296**            By Council Members Menchaca, Rivera, Louis and Ayala

**TITLE:**                   A Local Law to amend the administrative code of the city of New York, in relation to establishing standards for payment of third-party service platform workers and a navigation program to aid such workers

**INT. NO. 2298**            By Council Members Rivera, the Public Advocate (Mr. Williams), Menchaca, Chin, Louis and Ayala

**TITLE:**                   A Local Law to amend the administrative code of the city of New York, in relation to requiring food service establishments to provide toilet facility access to food delivery workers

**INT. NO. 2311**            By Council Members Powers, Rosenthal, and Kallos

**TITLE:**                   A Local Law to amend the administrative code of the city of New York, in relation to requiring food service establishments to provide toilet facility access to food delivery workers

**OVERSIGHT - PROTECTIONS FOR DELIVERY WORKERS**

2

## I.    INTRODUCTION

On June 8, 2021, the Committee on Consumer Affairs and Business Licensing, chaired by Council Member Diana Ayala, will hold an oversight hearing on "Protections for Delivery Workers." The Committee will also hear a package of seven pieces of legislation designed to help provide workplace protections to these essential gig economy workers. Those invited to testify at the hearing include representatives of the Department of Consumer Affairs and Worker Protection (DCWP), third-party delivery platforms, Los Deliveristas Unidos and other delivery workers, advocates, and business groups.

The package of legislation includes the following bills: (1) Introduction Number 2163 (Int. 2163), in relation to allowing a food service establishment surcharge, and to repeal local law number 100 for the year 2020, relating to a COVID-19 recovery charge; (2) Introduction Number 2288 (Int. 2288) in relation to requiring certain businesses using bicycles for commercial purposes to provide bicycle operators with insulated food delivery bags; (3) Introduction Number 2289 (Int. 2289), in relation to requiring that third-party food delivery services permit delivery workers to set limitations on distance and route for deliveries; (4) Introduction Number 2294 (Int. 2294), in relation to establishing minimum per trip payments to third party food delivery service workers; (5) Introduction Number 2296 (Int. 2296), in relation to establishing standards for payment of third-party service platform workers and a navigation program to aid such workers; (6) Introduction Number 2298 (Int. 2298), in relation to requiring food service establishments to provide toilet facility access to food delivery workers; and (7) Introduction Number 2311 (Int. 2311), in relation to data on orders placed through third-party food delivery services.

## II.   BACKGROUND

### Food Delivery Workers

There are approximately 80,000 food delivery workers in New York City,[1] and although some may work directly for restaurants, third-party platforms (TPPs) such as DoorDash, Grubhub and Uber Eats, have redefined the food delivery market over the past decade.[2] Under a TPP model, a restaurant signs a contract with a TPP that offers a range of services, including access to a fleet of delivery workers, advertising, and placement of the restaurant on the TPP app, which centralizes food ordering for customers. The restaurants then pay either a monthly fee or commission for such services.[3] Although some research suggests that hiring delivery workers directly is actually cheaper for restaurants,[4] the growth in the use of TPPs means that restaurants rely heavily on this model. Prior to the COVID-19 pandemic, consumers in New York City spent the most in the country on food ordered through TPPs, spending more than $770 per capita per year, and way ahead of the second most common consumers in San Francisco, who spent just under $580, per capita each year.[5]

---

[1] Clayton Guse "Restaurants would be required to allow NYC's 80,000 food delivery workers to use restrooms under proposed legislation", *NY Daily News*, April 27, 2021, available at: https://www.nydailynews.com/new-york/ny-delivery-workers-bathroom-wage-legislation-20210427-zpy25xy3ajcfroncy674t6pqzq-story.html.

[2] Amir Khafagy "Delivery workers are struggling to survive the pandemic", *The Counter,* January 5, 2021, available at: https://thecounter.org/nyc-delivery-workers-pandemic-grubhub-seamless/.

[3] There are other companies that have entered the app-based delivery industry, but operate slightly differently to the TPPs mentioned. Relay, for example, only offers a delivery service to restaurants. Under this model, a customer can place an order either through a TPP or directly with the restaurant, but Relay will arrange the delivery. Relay argues that this allows restaurants to continue using the websites and menu platforms that TPPs offer, but allows restaurants to not use the delivery services that TPPs also offer, which Relay argues is more expensive than their service (see: Relay "Grow your restaurant's margins by switching to Relay", available at: https://www.relay.delivery). For delivery workers though, Relay operates in a similar fashion to TPPs.

[4] Stephanie Resendes "Why hiring your own delivery drivers may not be as expensive as you think", *Upserve*, July 28, 2020, available at: https://upserve.com/restaurant-insider/delivery-service-for-restaurants/.

[5] S. Lock "Food delivery: U.S. cities with the highest spend per capita 2019", *Statista,* September 7, 2019, available at: https://www.statista.com/statistics/1051250/us-food-delivery-cities-spending-per-capita-2019/.

For the delivery worker, the employment contract is even more complicated. Under their current classification, delivery workers are independent contractors. In theory, this means that they have no employer and enjoy flexible work schedules. The lived reality, however, is very different, and one worker described it more of a "hustle" akin to selling drugs on a corner rather than a steady job where you can make a living wage.[6] Part of the difficulty for delivery workers is navigating the complicated conditions set by TPPs. Typically, a TPP will pay a delivery worker a fee based on the number of miles travelled, how successful the delivery was, and how many minutes an order took to be delivered.[7] For example, for a delivery worker using the Postmates app in late 2019, they would receive "$2.50 for a successful pickup and drop-off, $1.05 per mile, and $0.07 per minute in Manhattan, the most lucrative borough; in the Bronx, the pay per mile is only sixty cents."[8] These small payments often are not enough to make the job lucrative and so delivery workers rely on tips and bonuses offered by the TPP to help boost pay.[9]

The low base rate for deliveries means that most delivery workers will deliver for multiple TPPs,[10] each of which have their own conditions and bonuses. Grubhub, for example, requires delivery workers to accept a majority of orders in order to secure a guaranteed wage (around $11

---

[6] Willa Glickman "What the apps that bring food to your door mean for delivery workers", *The New York Review*, September 20, 2019, available at: https://www.nybooks.com/daily/2019/09/20/what-the-apps-that-bring-food-to-your-door-mean-for-delivery-workers/?lp_txn_id=1253341.

[7] Willa Glickman "What the apps that bring food to your door mean for delivery workers", *The New York Review*, September 20, 2019, available at: https://www.nybooks.com/daily/2019/09/20/what-the-apps-that-bring-food-to-your-door-mean-for-delivery-workers/?lp_txn_id=1253341.

[8] Willa Glickman "What the apps that bring food to your door mean for delivery workers", *The New York Review*, September 20, 2019, available at: https://www.nybooks.com/daily/2019/09/20/what-the-apps-that-bring-food-to-your-door-mean-for-delivery-workers/?lp_txn_id=1253341.

[9] Willa Glickman "What the apps that bring food to your door mean for delivery workers", *The New York Review*, September 20, 2019, available at: https://www.nybooks.com/daily/2019/09/20/what-the-apps-that-bring-food-to-your-door-mean-for-delivery-workers/?lp_txn_id=1253341.

[10] Andy Newman "My frantic life as a cab-dodging, tip-chasing food app deliveryman", *New York Times*, July 21, 2019, available at: https://www.nytimes.com/2019/07/21/nyregion/doordash-ubereats-food-app-delivery-bike.html.

per hour in 2019).[11] Uber Eats, meanwhile, does not show their delivery workers how far away an order is before the worker accepts the job.[12] All of these variations feed into hiding the true pay rate and if that rate has been maintained. If delivery workers were paid a standard rate per hour or per delivery, "you could see very clearly when they start lowering your wage…When every order is dynamically priced, it gets so much harder to see if you're making less money. Drivers wonder, did I reject too much? Did I work a little less? Might it be an incidental thing?"[13] This obfuscation combined with the juggling of different requirements by individual TPPs means that delivery workers aren't easily able to track their rate per hour or per delivery.

During the height of the COVID-19 pandemic, when lockdowns were in place and restaurants were restricted from offering dining at full capacity, many restaurants relied on food TPPs to stay in business, and TPPs benefitted from a surge in consumer use of their platforms. The major food delivery TPPs – Uber Eats, DoorDash, and Grubhub – doubled their combined revenue during the pandemic, making a profit of $5.5 billion in April to September 2020, compared to $2.5 billion during the same months the previous year.[14]

---

[11] Willa Glickman "What the apps that bring food to your door mean for delivery workers", *The New York Review*, September 20, 2019, available at: https://www.nybooks.com/daily/2019/09/20/what-the-apps-that-bring-food-to-your-door-mean-for-delivery-workers/?lp_txn_id=1253341.

[12] Willa Glickman "What the apps that bring food to your door mean for delivery workers", *The New York Review*, September 20, 2019, available at: https://www.nybooks.com/daily/2019/09/20/what-the-apps-that-bring-food-to-your-door-mean-for-delivery-workers/?lp_txn_id=1253341.

[13] Niels van Doorn as quoted by Willa Glickman "What the apps that bring food to your door mean for delivery workers", *The New York Review*, September 20, 2019, available at: https://www.nybooks.com/daily/2019/09/20/what-the-apps-that-bring-food-to-your-door-mean-for-delivery-workers/?lp_txn_id=1253341.

[14] Levi Sumagaysay "The pandemic has more than doubled food-delivery apps' business. Now what?", *MarketWatch*, November 27, 2020, available at: https://www.marketwatch.com/story/the-pandemic-has-more-than-doubled-americans-use-of-food-delivery-apps-but-that-doesnt-mean-the-companies-are-making-money-11606340169.

In New York City, the delivery drivers for these platforms tend to be immigrants and people of color.[15] During the pandemic, when unemployment rates were skyrocketing, many people turned to this work to make ends meet. According to a survey on such workers in New York City by Cornell University, "75 percent of delivery workers joined the industry because they lost work during the pandemic".[16] While this work offered an important avenue for employment, many feel exploited by poor conditions and pay. One group of frustrated workers, mainly from Mexico and Guatemala, have begun organizing under the collective banner of Los Deliveristas Unidos in order to push for better pay and conditions.[17]

The classification of delivery workers as independent contractors essentially means "that the very concept of a labor violation does not apply."[18] Although TPPs set the conditions of employment, the classification of delivery workers as independent contractors means that they are excluded from typical worker protections, such as a minimum wage, health benefits, and overtime.[19] During the peak of COVID-19, when TPPs were flourishing and more people were turning to food delivery for work, delivery workers were struggling to access much needed PPE,[20] despite being classified as essential workers. Delivery workers were on the frontlines of the pandemic, making sure New Yorkers were fed and helping to keep the restaurant industry alive.

---

[15] Wilfred Chan "Food delivery workers are coronavirus first responders — here's how you can repay us", *NBC News*, March 22, 2020, available at: https://www.nbcnews.com/think/opinion/food-delivery-workers-are-coronavirus-first-responders-here-s-how-ncna1164946.

[16] Lauren Kaori Gurley "NYC gig workers are organizing against rampant e-bike e-bike theft and assault", *Vice*, April 22, 2021, available at: https://www.vice.com/en/article/epn437/nyc-gig-workers-are-organizing-against-rampant-e-bike-theft-and-assault.

[17] *Los Deliveristas Unidos*, https://losdeliveristasunidos.org/.

[18] Willa Glickman "What the apps that bring food to your door mean for delivery workers", *The New York Review*, September 20, 2019, available at: https://www.nybooks.com/daily/2019/09/20/what-the-apps-that-bring-food-to-your-door-mean-for-delivery-workers/?lp_txn_id=1253341.

[19] Kimiko de Freytas-Tamura "Food delivery apps are booming. Their workers are often struggling", *New York Times,* November 30, 2020, available at: https://www.nytimes.com/2020/11/30/nyregion/bike-delivery-workers-covid-pandemic.html.

[20] Amir Khafagy "Delivery workers are struggling to survive the pandemic", *The Counter,* January 5, 2021, available at: https://thecounter.org/nyc-delivery-workers-pandemic-grubhub-seamless/.

In spite of this, they struggle to secure the most basic worker protections, while the platforms that employ them rake in the profits.

**Restaurant Workers**

Like delivery workers, restaurant workers have been hit hard by the COVID-19 pandemic and the ongoing economic fallout. Due to limitations on dining,[21] it is estimated that the hospitality industry lost around 43 percent of jobs in 2020.[22] The high rate of unemployment within the City's hospitality industry is around four times higher than New York City's general unemployment rate, and is also above the national unemployment average for the hospitality industry.[23] Even as dining restrictions have been lifted and the industry begins to return to some sense of normalcy, "unemployment plagues the industry."[24]

Prior to the pandemic, the hospitality industry reported some of the country's lowest wages, in part because workers are forced to rely heavily on tips to supplement their wages.[25] In New York, "tipped restaurant workers are twice as likely to live in poverty and rely on food stamps as the general workforce."[26] There is also a large disparity between tipped workers based

---

[21] Governor Andrew Cuomo "Executive Order No. 202.3: Continuing temporary suspension and modification of laws relating to the disaster emergency", March 16, 2020, available at: https://www.governor.ny.gov/news/no-2023-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

[22] Carl Campanile "New York lost 1 million jobs in 2020 due to COVID-19", *NY Post*, January 22, 2021, available at: https://nypost.com/2021/01/22/new-york-lost-1-million-jobs-in-2020-due-to-covid-19/.

[23] Chris Crowley "The human toll of New York's restaurant unemployment crisis", *Grub Street*, January 26, 2021, available at: https://www.grubstreet.com/2021/01/the-human-toll-new-york-restaurant-unemployment-crisis.html.

[24] Chris Crowley "The human toll of New York's restaurant unemployment crisis", *Grub Street*, January 26, 2021, available at: https://www.grubstreet.com/2021/01/the-human-toll-new-york-restaurant-unemployment-crisis.html.

[25] One Fair Wage "It's a wage shortage, not a worker shortage", *UC Berkeley Food Labor Research Center*, May 2021, available at: https://onefairwage.site/wp-content/uploads/2021/05/OFW_WageShortage_F.pdf, p. 4.

[26] One Fair Wage "Doing more for less: New York restaurant workers' experiences of tips, surcharges, racial inequity, and why they're leaving the industry during COVID-19", *UC Berkeley Food Labor Research Center*, February 2021, available at: https://onefairwage.site/wp-content/uploads/2021/02/OFW_DoingMoreForLess_NY.pdf, p. 4.

on gender and race, with "Black women tipped workers earn[ing] $7.75 less than their white male counterparts due to being segregated into casual restaurants where less tips were available, and customer bias in tipping."[27]

The COVID-19 pandemic has only made things worse for these workers. According to a survey of New York state hospitality workers conducted by One Fair Wage and the UC Berkeley Food Labor Research Center, "59 percent of all New York restaurant workers, and 75 percent of Black New York restaurant workers reported that their tips declined 50 percent or more" during the pandemic.[28] Furthermore, having to enforce strict health and safety measures, such as social distancing and mask wearing, puts these tipped workers in a precarious position with customers who, at times, baulk at such requirements. This also negatively impacts the amount of tips restaurant workers receive, as highlighted in the table below.

---

[27] One Fair Wage "Doing more for less: New York restaurant workers' experiences of tips, surcharges, racial inequity, and why they're leaving the industry during COVID-19", UC Berkeley Food Labor Research Center, February 2021, available at: https://onefairwage.site/wp-content/uploads/2021/02/OFW_DoingMoreForLess_NY.pdf, p. 6.

[28] One Fair Wage "Doing more for less: New York restaurant workers' experiences of tips, surcharges, racial inequity, and why they're leaving the industry during COVID-19", UC Berkeley Food Labor Research Center, February 2021, available at: https://onefairwage.site/wp-content/uploads/2021/02/OFW_DoingMoreForLess_NY.pdf, p. 2

**Customer Interactions and the Impact on Tipping[29]**

| | ALL NYC WORKERS | BLACK WORKERS |
|---|---|---|
| Report that tips have decreased since COVID-19 by at least 50% or more | 59% | 75% |
| Felt reluctant to enforce COVID-19 safety protocols upon customers out of concern that customer would tip less | 56% | 56% |
| Has received a decreased tip from a customer in response to enforcing COVID-19 safety protocols | 65% | 71% |

It is no wonder then that, facing these ongoing difficulties plus poor wages, more than half of restaurant workers are considering leaving their jobs.[30] There is, however, hope. In a national survey of tipped restaurant workers, 78 percent of respondents reported that, if their job provided "a full, stable, livable wage", then they would consider staying in their position.[31]

**Access to Restaurant Data**

Restaurant owners who sign up with TPPs can fall victim to exploitative contract terms, especially when it comes to access to customer data. TPPs typically limit the ability of restaurants to retain data on their own customers, as the platforms assert ownership over all orders placed through their products. However, customer data can be a useful mechanism to drive future profits for restaurant owners, including growing the loyalty of a restaurant's existing customers and reaching new audiences. It is common in the restaurant industry for 80 percent of a restaurant's

---

[29] One Fair Wage "Doing more for less: New York restaurant workers' experiences of tips, surcharges, racial inequity, and why they're leaving the industry during COVID-19", UC Berkeley Food Labor Research Center, February 2021, available at: https://onefairwage.site/wp-content/uploads/2021/02/OFW_DoingMoreForLess_NY.pdf, p. 6.

[30] One Fair Wage "It's a wage shortage, not a worker shortage", *UC Berkeley Food Labor Research Center*, May 2021, available at: https://onefairwage.site/wp-content/uploads/2021/05/OFW_WageShortage_F.pdf, p. 1.

[31] One Fair Wage "It's a wage shortage, not a worker shortage", *UC Berkeley Food Labor Research Center*, May 2021, available at: https://onefairwage.site/wp-content/uploads/2021/05/OFW_WageShortage_F.pdf, pp. 1-2.

business to come from 20 percent of its customers.[32] Therefore, possessing information on their loyal customers – such as their names, email addresses or phone numbers – can enable restaurants to conduct specific outreach to retain those customers.[33] Infrequent or new customers can also be made into loyal customers through marketing outreach like offering promo codes, new menu items, or special discounts, but data on these customers is crucial.[34] Data on customers' ordering habits can further enable a restaurant owner to assess the popularity of their menu items, allowing a restaurant owner to decide which items they should keep or drop from their menu, or which to highlight in marketing campaigns.[35] Aside from driving profits, knowing more about their customers can also enable restaurateurs to develop interpersonal relationships in their communities.

Customers who sign up to use TPPs typically agree that the TPP may use their data in accordance with guidelines laid out in the agreement.[36] These agreements allow the TPP to limit the restaurants' access to data on their own customers,[37] even though the order is placed with the restaurant and the TPP simply acts as a conduit for that order. Although TPPs have to provide certain information on the customer and their order to enable the restaurant to fulfill the order, the TPP may opt to limit future access to or retention of that information after the order is completed.

---

[32] "The 80/20 Restaurant", The Restaurant Coach, December 6, 2017, available at: https://www.therestaurantcoach.com/blog/the-80-20-restaurant

[33] Jason Untracht, "Why Your Restaurant Needs to Take Advantage of Customer Data," ChowNow, May 2, 2018, available at: https://get.chownow.com/blog/why-your-restaurant-needs-to-take-advantage-of-customer-data/

[34] *Id.*

[35] Ryan Andrews, "How Restaurants Are Using Data and Analytics to Increase Profits", July 17, 2019, available at: https://restaurant.eatapp.co/blog/restaurant-data-and-analytics-increase-revenue

[36] *See, for example*, DoorDash, Terms and Conditions – United States: DoorDash Consumers, Terms and Conditions Agreement, Effective Date: December 22, 2020, Sections 1 (definition of "Service") and 7 (a), https://help.doordash.com/consumers/s/terms-and-conditions-us?language=en_US.

[37] *See, for example*, DoorDash, Terms of Service – United States: DoorDash Merchants, Effective Date: February 1, 2021, Section 12 (1): Data Privacy and Security: General, https://help.doordash.com/merchants/s/terms-of-service-us?language=en_US.

11

In some instances, TPPs may provide the restaurant with historical information on their most popular menu items, and restaurant reviews, however, they may not allow restaurants to access comprehensive data on past customers' contact information or phone numbers.[38]  Accordingly, restaurants may develop loyal customers ordering food regularly through a TPP, but the restaurant owner may have no record of the specific customers placing repeat orders.[39] Furthermore, TPPs that charge a commission fee may use customer data from rival restaurants to promote those restaurants that have agreed to pay a higher commission fee. Armed with data on customer preferences, TPPs may recommend to consumers a restaurant of the same cuisine as a restaurant they previously ordered from that pays the TPP a higher per-order commission.[40]

TPPs' ownership of the data of thousands of restaurants in a city also enables them to enhance their own services and produce more efficient, profitable systems. Data from numerous restaurants on how long it takes to prepare and cook a meal can allow the platform to combine pickup orders, so drivers are picking up and delivering multiple meals at the same time. According to Eric Gu, an engineering manager with Uber Eats' data team, the harnessing of this data enables the company to "save on delivery costs and pass back some savings to the eater."[41]

With access to data on what food consumers are searching for in a given area, TPPs are also able to use data to promote "virtual restaurants." A "virtual restaurant" is a restaurant without

---

[38] "Implications for Customer Data When Using Third-Party Restaurant Technology" Total Food Service, January 20, 2021, available at: https://totalfood.com/implications-for-customer-data-when-using-third-party-restaurant-technology/

[39] Kyle Bagley, "Why Restaurant Delivery Companies Don't Share Their Data," May 23, 2019, available at: https://medium.com/@kb_77275/why-restaurant-delivery-companies-dont-share-their-data-267b97e587eb

[40] "Why Third-Party Marketplaces Want Your Restaurant's Data" July 9, 2019, available at: https://get.chownow.com/blog/why-third-party-marketplaces-want-your-restaurant-data/

[41] Tom Simonite, "How Data Helps Deliver Your Dinner On Time—and Warm," Wired, February 27, 2019, available at: https://www.wired.com/story/how-data-helps-deliver-your-dinner-on-time-warm/

a storefront that operates out of a traditional brick-and-mortar store.[42] Restaurants using this model produce food sold under a variety of eatery names, differing from the name displayed outside their storefront, and meals are sold exclusively on third-party delivery platforms. This model allows restaurants to maximize kitchen space and produce a greater variety of food.[43] For example, SushiYaa, a sushi chain restaurant in Dallas, operates five brick-and-mortar restaurants but these five restaurants produce food for nearly two dozen online-only virtual restaurants, selling separate menus and dishes such as bento boxes, poke and dumplings, which are only available for delivery on Uber Eats.[44] While the creation of virtual restaurants may generate profits for a restaurant, they benefit the TPPs both financially and in further ensuring a restaurant's loyalty to the platform.

## III.    ISSUES AND CONCERNS FOR DELIVERY WORKERS

### a.  High Cost of Entry

Delivery workers face challenges that make it difficult for them to earn a livable wage under safe working conditions. Since delivery workers are employed as independent contractors by TPPs, they are responsible for purchasing the necessary equipment to perform their jobs. Due to the physical demands of delivering food, workers' need to deliver food quickly to obtain positive ratings by customers, and to maximize profits, delivery workers typically use electric bikes (e-

---

[42] Mike Isaac and David Yaffe-Bellany, *The Rise of the Virtual Restaurant,* The New York Times, August 14, 2019 https://www.nytimes.com/2019/08/14/technology/uber-eats-ghost-kitchens.html
[43] Jennifer Gould Keil, *NYC restaurateurs setting up 'ghost kitchens'* New York Post, October 6, 2019, https://nypost.com/2019/10/06/nyc-restaurateurs-setting-up-ghost-kitchens/
[44] Whitney Filloon, *Uber Eats' Path to Delivery Domination: Restaurant Inception,* Eater, October 24, 2018, https://www.eater.com/2018/10/24/18018334/uber-eats-virtual-restaurants

bikes) for deliveries.[45] New e-bikes cost $1,800 to $2,000,[46] and delivery workers commonly refrain from purchasing used e-bikes to avoid supporting the underground market of stolen e-bikes from other workers.[47] Delivery workers must purchase other expensive equipment as well that, while not technically necessary for the job, are considered essential. Delivery workers must purchase lights for their e-bikes to deliver food at night, a spare battery,[48] and locks to prevent their e-bike from being stolen.[49] Thermal bags to keep food warm is another unofficial requirement of the job, as restaurants will often refuse to give delivery workers orders unless they have one.[50] An insulated bag from the delivery service Relay costs between $40 to $60, while on Amazon these insulated bags are sold for as much as $120.[51] The total cost to become a delivery worker is estimated to be around $3,000, a substantial price and financial investment for delivery workers that is not subsidized by their employers.[52]

---

[45] Do J. Lee, "Delivering Justice: Food Delivery Cyclists in New York City," The Graduate Center, City University of New York, available at: https://academicworks.cuny.edu/cgi/viewcontent.cgi?article=3854&context=gc_etds

[46] Kimiko de Freytas-Tamura, "Food Delivery Apps Are Booming. Their Workers Are Often Struggling," *The New York Times*, November 30, 2020, available at: https://www.nytimes.com/2020/11/30/nyregion/bike-delivery-workers-covid-pandemic.html; and Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

[47] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

[48] A spare battery can cost $600

[49] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

[50] *Id.*

[51] *Id.*

[52] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment; and Do J. Lee, "Delivering Justice: Food Delivery Cyclists in New York City," The Graduate Center, City University of New York, available at: https://academicworks.cuny.edu/cgi/viewcontent.cgi?article=3854&context=gc_etds

**b. Violence and Harassment**

The high cost to purchase e-bikes coupled with the dramatic growth of delivery workers has led to the development of an underground market of stolen e-bikes. Stolen e-bikes can be easily resold for cash in NYC or dismantled and sold for their parts.[53] Reported cases of e-bike thefts nearly doubled in 2020 according to the New York Police Department (NYPD), increasing from 166 in 2019 to 328 in 2020.[54] The NYPD has not always been very helpful to delivery workers in recovering stolen e-bikes. For example, a worker named Rodrigo had his e-bike stolen while making a delivery, and while the bike had a trackable GPS, an NYPD officer allegedly "refused" to recover it.[55] In October 2021, a delivery worker was mugged at gunpoint and had his $3,000 e-bike stolen while waiting for his next delivery.[56] When the delivery worker contacted the police, the 20th precinct officer who responded to the complaint allegedly told the worker the NYPD could not do anything about the robbery because of budget cuts to the NYPD.[57] In response to the NYPD's inaction, dozens of workers biked to the 20th precinct to protest the police department's inaction and the rise in e-bike related muggings in the neighborhood.[58] Overall, the NYPD solved around 36 percent of e-bike robberies in 2020.[59]

---

[53] Edgar Sandoval, "'My Turn to Get Robbed': Delivery Workers Are Targets in the Pandemic'" *The New York Times*, March 9, 2021, available at: https://www.nytimes.com/2021/03/09/nyregion/delivery-workers-robberies-nyc.html
[54] *Id.*
[55] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City,* December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment
[56] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment
[57] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment
[58] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment
[59] Edgar Sandoval, "'My Turn to Get Robbed': Delivery Workers Are Targets in the Pandemic'" *The New York Times*, March 9, 2021, available at: https://www.nytimes.com/2021/03/09/nyregion/delivery-workers-robberies-nyc.html

Delivery workers' substantial investment in buying an e-bike and reliance on e-bikes to perform their jobs has also led e-bike robberies to turn violent. In April of 2021, 29-year-old Francisco Villalva Vitinio was killed when he refused to give up his e-bike to a man robbing him at gunpoint.[60] According to delivery worker Gustavo Ajche, "We're facing many issues: robberies, physical assault…We're being killed in the streets by people who steal our bikes. This is happening more and more and we're angry because no one does anything."[61] According to preliminary results from a recent Cornell University Worker Institute survey of over 500 e-bike delivery workers in NYC, over 50 percent of workers reported having had their e-bikes stolen.[62] Maria Figueroa, Director of Labor and Policy Research at the Worker Institute, reported that around half of delivery workers experienced violence or harassment while on the job.[63] Given their status as independent contractors, when delivery workers are robbed, assaulted or murdered on the job, delivery companies do not owe the workers or their families any compensation.[64]

It is important to note that the number of robberies reported to the police may be substantially undercounted given the poor relationship these workers historically have with the

---

[60] "Deliveryman gunned down during attempted E-bike robbery in Manhattan park" *ABC7NY*, April 4, 2021, available at: https://abc7ny.com/francisco-villalva-vitinio-poor-richards-park-deliveryman-murder-east-harlem-shooting/10463988/

[61] Lauren Kaori Gurley, "NYC Gig Workers Are Organizing Against Rampant E-Bike Theft and Assault," *Vice News*, April 22, 2021, available at: https://www.vice.com/en/article/epn437/nyc-gig-workers-are-organizing-against-rampant-e-bike-theft-and-assault

[62] Lauren Kaori Gurley, "NYC Gig Workers Are Organizing Against Rampant E-Bike Theft and Assault," *Vice News*, April 22, 2021, available at: https://www.vice.com/en/article/epn437/nyc-gig-workers-are-organizing-against-rampant-e-bike-theft-and-assault

[63] Clayton Guse, "Restaurants would be required to allow NYC's 80,000 food delivery workers to use restrooms under proposed legislation" *NYDaily News*, April 27, 2021, Available at: https://www.nydailynews.com/new-york/ny-delivery-workers-bathroom-wage-legislation-20210427-zpy25xy3ajcfroncy674t6pqzq-story.html

[64] Lauren Kaori Gurley, "NYC Gig Workers Are Organizing Against Rampant E-Bike Theft and Assault," *Vice News*, April 22, 2021, available at: https://www.vice.com/en/article/epn437/nyc-gig-workers-are-organizing-against-rampant-e-bike-theft-and-assault

police. Before e-bikes were legalized in the New York State budget in April of 2020,[65] the NYPD was responsible for issuing summonses and confiscating e-bikes, which were not street-legal vehicles. In 2017, the NYPD confiscated nearly 1,000 e-bikes.[66] Police ticketing and confiscation of e-bikes served as an existential threat to delivery workers' livelihoods, which created an environment of fear towards the police. This historical distrust of the police, coupled with fears of deportation due to the undocumented immigration-status of many delivery workers, has led many delivery worker-related accidents and issues to remain unreported.[67]

c.  **Bathroom Access**

The lack of workplace protections for delivery workers is apparent in the absence of available bathrooms for delivery workers. Restaurants often post signs reserving their bathrooms for use by customers or employees.[68] As delivery workers are neither a customer nor an employee, they are often denied this basic necessity. According to data from the Worker Institute at Cornell University, over 65 percent of NYC delivery workers reported being denied access to a restaurant bathroom.[69] Delivery workers that are delivering food either in areas of NYC without public bathrooms or during hours when public bathrooms are closed have therefore been forced to use the bathroom in public. According to DoorDash delivery worker Sergio Solano, "We use [a]

---

[65] "Electric scooters and bicycles and other unregistered vehicles" DMV NY, available at: https://dmv.ny.gov/registration/electric-scooters-and-bicycles-and-other-unregistered-vehicles#:~:text=Effective%20April%202020%20%2D%20the%20law,highways%20in%20New%20York%20State.&text=2%20A%20bicycle%20with%20electric,t%20have%20the%20same%20equipment.

[66] Do J. Lee, "Delivering Justice: Food Delivery Cyclists in New York City," The Graduate Center, City University of New York, available at: https://academicworks.cuny.edu/cgi/viewcontent.cgi?article=3854&context=gc_etds

[67] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

[68] Edward Ongweso Jr. and Lauren Kaori Gurley, "Gig Workers Have Nowhere to Pee", *Vice News*, January 31, 2020, available at: https://www.vice.com/en/article/884xyp/gig-workers-have-nowhere-to-pee

[69] Claudia Irizarry Aponte and Josefa Velasquez, "Food Delivery Workers Could Get Relief From Council Bills to Open Restaurant Restrooms and Regulate Apps" *The City*, April 27, 2021, available at: https://www.thecity.nyc/work/2021/4/27/22405641/food-delivery-workers-open-restaurant-restrooms-regulate-apps

Gatorade bottle because it is wider…[D]iscreetly, we pee in the bottle behind the stairways of buildings after delivering an order."[70] Delivery worker Mamadou Kokeina expressed frustration with restaurants for not allowing delivery workers to use their bathrooms: "I'm outside for 10 hours. I have to use the bathroom… I'm picking up food to bring to your customers, so you should allow me at least to use the bathroom…We are human. We have needs."[71] Relay Delivery has allegedly sent the message "Don't ask to use restroom!!" to delivery workers upon sending a delivery request.[72] Grubhub also allegedly sent a notification to delivery workers saying: "Come and wait at the host station. Please do not use the restroom, ask for a drink or bring outside food to eat while you wait."[73] The lack of bathroom access is not an issue for delivery workers who are employed by the restaurants from which they deliver food.

In response to delivery workers organizing to demand access to bathrooms at restaurants, DoorDash released a statement stating that they are "engaging with local leaders to find additional ways to address bathroom access."[74] DoorDash's statement was met with skepticism by delivery workers, however, and Ligia Guallpa, executive director of Worker's Justice Project, commented, "We know that at the end of the day, if it's not a law, it's not going to happen."[75]

---

[70] Luis Feliz Leon, "The Labor Battle for the Right to Pee" *New Republic*, April 30, 2021, available at: https://newrepublic.com/article/162266/doordash-uber-eats-delivery-workers-bathrooms-employee-status
[71] Luis Feliz Leon, "The Labor Battle for the Right to Pee" *New Republic*, April 30, 2021, available at: https://newrepublic.com/article/162266/doordash-uber-eats-delivery-workers-bathrooms-employee-status
[72] Luis Feliz Leon, "The Labor Battle for the Right to Pee" *New Republic*, April 30, 2021, available at: https://newrepublic.com/article/162266/doordash-uber-eats-delivery-workers-bathrooms-employee-status
[73] Luis Feliz Leon, "The Labor Battle for the Right to Pee" *New Republic*, April 30, 2021, available at: https://newrepublic.com/article/162266/doordash-uber-eats-delivery-workers-bathrooms-employee-status
[74] "Standing for New York City Dashers", DoorDash, December 16, 2020, available at: https://blog.doordash.com/standing-for-new-york-city-dashers-162eef27487
[75] Josefa Velasquez and Claudia Irizarry Aponte, "DoorDash Pledge of NYC Bathroom Access and Safety Boosts for Delivery Workers Gets Skeptical Reception," *The City*, December 16, 2020, available at: https://www.thecity.nyc/work/2020/12/16/22179823/doordash-nyc-bathroom-access-skeptical-workers

### d. Wage Issues and Delivery Distances

As delivery workers are employed as independent contractors instead of full time employees, TPPs are not required to pay delivery workers minimum wage, overtime or other benefits, such as health insurance.[76] Accordingly, even though TPPs profited from the dramatic increase in usage of their services by New Yorkers during the pandemic, delivery workers did not see an increase in their hourly wages. In fact, unemployed undocumented workers, who were not eligible for unemployment or federal coronavirus assistance, joined delivery services during the pandemic to maintain an income, and the added competition from the increase in workers further compounded workers' financial challenges.[77] According to Maria Figueroa, "In addition to getting low pay, [delivery workers] don't get enough work from each of the applications, so they have to work for at least three or four of them, and there are more workers than the market can hold."[78]

TPPs have stated that delivery workers can earn as much as $22 per hour, including tips, while delivering food through their platform.[79] Delivery workers have objected to those claims, however, arguing that compensation is never that high. Delivery workers working 12 hours a day for seven days a week can earn between $300 and $800.[80] Edgar Usac, a delivery driver on a TPP,

---

[76] Kimiko de Freytas-Tamura, "Food Delivery Apps Are Booming. Their Workers Are Often Struggling," *The New York Times*, Updated March 19, 2021, available at: https://www.nytimes.com/2020/11/30/nyregion/bike-delivery-workers-covid-pandemic.html

[77] Kimiko de Freytas-Tamura, "Food Delivery Apps Are Booming. Their Workers Are Often Struggling," *The New York Times*, Updated March 19, 2021, available at: https://www.nytimes.com/2020/11/30/nyregion/bike-delivery-workers-covid-pandemic.html

[78] Kimiko de Freytas-Tamura, "Food Delivery Apps Are Booming. Their Workers Are Often Struggling," *The New York Times*, Updated March 19, 2021, available at: https://www.nytimes.com/2020/11/30/nyregion/bike-delivery-workers-covid-pandemic.html

[79] Kimiko de Freytas-Tamura, "Food Delivery Apps Are Booming. Their Workers Are Often Struggling," *The New York Times*, Updated March 19, 2021, available at: https://www.nytimes.com/2020/11/30/nyregion/bike-delivery-workers-covid-pandemic.html

[80] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

made $11 from four hours of work.[81] Elias Pacheco, another delivery worker, made $32 dollars

for six and a half hours of work.[82]

As mentioned previously, unlike the other delivery services, Relay delivery pays couriers

operating on its platform minimum wage, which includes payment for the time couriers wait

between new deliveries.[83] Worker, however, have accused Relay of wage theft. A 2016 lawsuit

against Relay was filed by six delivery workers accusing the company of underpaying them. The

case was settled outside of court.[84] In 2017, two Relay workers filed a class action lawsuit over

allegations of a lack of overtime pay and diverted tips.[85] The workers reached a $100,000

settlement with Relay. DoorDash delivery service was also diverting tips from delivery drivers, as

the platform was found to be using tips to subsidize its payment to workers.[86] DoorDash reached

a settlement of $2.5 million with the D.C. Attorney General for misleading consumers over how it

tipped its workers.[87] Survey data from Cornell University's Worker Institute found that 45 percent

---

[81] Kimiko de Freytas-Tamura, "Food Delivery Apps Are Booming. Their Workers Are Often Struggling," *The New York Times*, Updated March 19, 2021, available at: https://www.nytimes.com/2020/11/30/nyregion/bike-delivery-workers-covid-pandemic.html

[82] Kimiko de Freytas-Tamura, "Food Delivery Apps Are Booming. Their Workers Are Often Struggling," *The New York Times*, Updated March 19, 2021, available at: https://www.nytimes.com/2020/11/30/nyregion/bike-delivery-workers-covid-pandemic.html

[83] Kimiko de Freytas-Tamura, "Food Delivery Apps Are Booming. Their Workers Are Often Struggling," *The New York Times*, Updated March 19, 2021, available at: https://www.nytimes.com/2020/11/30/nyregion/bike-delivery-workers-covid-pandemic.html

[84] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

[85] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

[86] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

[87] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

of workers have had problems with TPPs related to their pay.[88] According to Maria Figuroa, "These workers don't get paid on time. Tips disappear. The pay isn't credited to their bank accounts even though they file a claim. There's definitely a need for more transparency so these problems are clarified."[89]

Delivery workers have also objected to the long distances they must travel for deliveries. Unlike delivery workers employed by restaurants who only service the area around the restaurant, delivery workers can be responsible for picking up deliveries across the City. Long trips that require delivery workers to travel across the City for a few dollars pay may not be worth the time or expense.[90] According to delivery worker Lucina Villano, Relay delivery service does not allow her to see where she is taking a delivery in advance. If she declines a delivery from the application, she risks losing out on further jobs.[91]

Because delivery workers need to travel long distances as quickly as possible so they can obtain positive ratings and tips by customers, certain delivery workers may e-bike dangerously. As e-bikes can reach speeds of up to 30 miles per hour, e-bike collisions with pedestrians can be fatal. Two pedestrians have been killed in the City since November 2020.[92] The delivery conditions

---

[88] Lauren Kaori Gurley, "NYC Gig Workers Are Organizing Against Rampant E-Bike Theft and Assault," *Vice News*, April 22, 2021, available at: https://www.vice.com/en/article/epn437/nyc-gig-workers-are-organizing-against-rampant-e-bike-theft-and-assault

[89] Lauren Kaori Gurley, "NYC Gig Workers Are Organizing Against Rampant E-Bike Theft and Assault," *Vice News*, April 22, 2021, available at: https://www.vice.com/en/article/epn437/nyc-gig-workers-are-organizing-against-rampant-e-bike-theft-and-assault

[90] Bill Miller, "Workers Justice Project a Voice for Delivery Workers," *The Tablet*, June 2, 2020, available at: https://thetablet.org/workers-justice-project-a-voice-for-delivery-workers/

[91] Beth Fertig, "Pandemic-Scarred Restaurants And Gig Workers Fight Back Against The Delivery Apps," *Gothamist*, March 1, 2021, available at: https://gothamist.com/food/pandemic-scarred-restaurants-and-gig-workers-fight-back-against-delivery-apps

[92] Liza Rozner, "E-Bike Crash That Killed Queens Woman Sparks Calls To Add More Safety Measures To Protect Pedestrians On NYC Streets", CBSN New York, June 1, 2021, available at: https://newyork.cbslocal.com/2021/06/01/e-bike-crash-kelly-killian-astoria-crash-victim-rights-and-safety-act/

set by TPPs, such as those that pay more for fast delivery to customers, only encourages such dangerous biking behavior.

### e. Worker Organizing

To compensate for the lack of workplace protections provided to them by TPPs, delivery workers have organized WhatsApp groups to report which restaurants let them use bathrooms or open parks that they can use to wait between deliveries.[93] The Whatsapp group has grown to over 200 members, and the Worker's Justice Project has been advising the workers on how to fight for improved workplace conditions. Thousands of workers came together to form Los Deliveristas Unidos, the United Delivery Workers, to demand workplace protections including, but not limited to, a living wage and transparency on tips, safety from robberies and access to bathrooms and a place to wait between deliveries.[94] On October 15, 2020, hundreds of workers rallied at City Hall to demand City officials force restaurants to let workers use their bathrooms and create spaces where they can wait safely between deliveries.[95] On April 2, 2021, Los Deliveristas Unidos organized a protest in Time Square. Over 1,000 delivery workers attended the protest, and workers honked horns, waved Mexican and Guatemalan flags, and held banners that read "Don't buy bikes on the street without a receipt" and "United we are stronger."[96]

---

[93] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

[94] Clayton Guse, "Restaurants would be required to allow NYC's 80,000 food delivery workers to use restrooms under proposed legislation," *NY Daily News* April 27, 2021, available at: https://www.nydailynews.com/new-york/ny-delivery-workers-bathroom-wage-legislation-20210427-zpy25xy3ajcfroncy674t6pqzq-story.html

[95] Claudia Irizarry Aponte and Josefa Velasquez, "NYC Food Delivery Workers Band to Demand Better Treatment. Will New York Listen to Los Deliveristas Unidos?" *The City*, December 6, 2020, available at: https://www.thecity.nyc/work/2020/12/6/22157730/nyc-food-delivery-workers-demand-better-treatment

[96] Lauren Kaori Gurley, "NYC Gig Workers Are Organizing Against Rampant E-Bike Theft and Assault," *Vice News*, April 22, 2021, available at: https://www.vice.com/en/article/epn437/nyc-gig-workers-are-organizing-against-rampant-e-bike-theft-and-assault

## IV.    CONCLUSION

No industry has been left untouched by the impact of COVID-19, but for workers within the restaurant industry, existing inequalities and poor conditions have been amplified by the pandemic. Restaurant delivery workers were considered essential during the peak of the health emergency, and yet they continue to be denied adequate pay and benefits that are truly reflective of the value of the work they conduct. Similarly, tipped restaurant workers have been one of the hardest hit by unemployment. However, even with the City returning to "normal", they continue to face sub-minimum wages because they need to rely heavily on tips. If the City's restaurant and hospitality industry has any chance of rebounding to its former glory, the working conditions of its workers needs to be thoughtfully considered. The package of bills being heard by this Committee aims to address some of those concerns.

## V.    BILL ANALYSIS

**Int. 2163, in relation to allowing a food service establishment surcharge, and to repeal local law number 100 for the year 2020, relating to a COVID-19 recovery charge**

While the Governor has declared a state of emergency in the City in response to COVID-19 and all restaurants are prohibited from operating at the maximum indoor occupancy, plus 90 days, City restaurants have been temporarily permitted to charge a "COVID-19 surcharge" in addition to listed food and drink prices, pursuant to Local Law 100 of 2020. However, when that period concludes, the Local Law no longer applies and City rules limiting the ability to add such surcharges would be in effect. This bill would repeal Local Law 100 of 2020 and would instead allow restaurants to impose a "Food Service Establishment Surcharge" on a permanent basis. The

23

Food Service Establishment Surcharge could be up to 15 percent of a customer's total bill, as long as restaurants pay their tipped workers a cash wage that is not less than the City's minimum wage of $15 per hour. Tips received by such workers would not be credited towards the hourly cash wage. The surcharge would apply to outdoor as well as indoor dining, but not to take out or delivery orders. The surcharge would have to be clearly disclosed on the menu, final bill and receipt, and the disclosure must be explicit that the additional charge is not a gratuity. Restaurants that violated the provisions of this bill would be liable for civil penalties of not less than $50 nor more than $350 for each violation. Proceedings to recover civil penalties would be adjudicated by OATH or by another agency designated to conduct such proceedings.

This bill would take effect 120 after it becomes law, except that DCWP, which is authorized under the bill to promulgate rules as necessary to carry out the bill's provisions, must take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

**Int. 2288, in relation to requiring certain businesses using bicycles for commercial purposes to provide bicycle operators with insulated food delivery bags**

This bill would amend Section 10-157 of the Administrative Code relating to bicycles used for commercial purposes. It would require third-party food delivery services, entities that provide restaurants with online order and delivery services, to provide at their own expense or otherwise make available at no expense, an insulated food delivery bag for individuals delivering their goods by bicycle. The bill would prohibit such a third-party food delivery service from requiring the individual delivering the goods to pay for such a bag at their own expense. The bag provided by the third-party food delivery service must be designed to be used in accordance with Article 1235

of the New York State Vehicle and Traffic Law, which prohibits the carrying of bags that prevent the bicyclist from keeping at least one hand on the handlebars of their bicycle.

This bill would take effect 120 days after it becomes law.

**Int. 2289, in relation to requiring that third-party food delivery services permit delivery workers to set limitations on distance and route for deliveries**

This bill would require that third-party food delivery services – entities that provide restaurants with online order and delivery services – provide their delivery workers with the option to set a maximum distance for trips and to indicate that they will not accept routes that would require travel over a bridge or through a tunnel, or over or through specific bridges or tunnels. The third-party food delivery services would also be prohibited from imposing any negative consequences on their delivery workers as a result of the limitations they have chosen, such as reducing or downgrading the worker's rating, limiting access to the third-party food delivery service, and decreasing the number of trips offered to the delivery worker consistent with the limitations that worker has put in place in accordance with the bill. Third-party food delivery services, and any other entity that violates or causes a violation of the bill, would be liable for civil penalties equivalent with those in Section 20-1209 of the Administrative Code: $500 for a first violation, $750 for a second violation within two years of the first, and $1,000 for third and subsequent violations within two years of any previous violation.

This bill would take effect 120 days after it becomes law.

**Int. 2294, in relation to establishing minimum per trip payments to third party food delivery service workers**

25

This bill would require DCWP, in the nine months following the effective date of the bill, to study the working conditions of third party food delivery workers, including pay for each delivery trip and the methods by which such pay is determined, total income, expenses, required equipment, hours worked and safety. Following the study, the department would be required to promulgate rules establishing minimum per trip payments that must be made to third party food delivery workers. Such rules must take into consideration the duration and distance of the trip, the mode of transportation used by the delivery worker and the associated expenses, the type of trip, including the number of separate deliveries along the route, and delivery worker income relative to their expenses. The third-party food delivery services that pay the delivery workers would not be permitted to use gratuities towards meeting any minimum pay requirements established by the department. DCWP would be required to review the minimum pay standards it established by rule at least once annually to determine whether amendments are warranted or necessary. The department would also be required to submit a report to the Council and the Mayor on the pay standards they established, including any changes to such standards and the effect of those standards on food delivery workers and the delivery industry.

This bill would take effect immediately.

**Int. 2296, in relation to establishing standards for payment of third-party service platform workers and a navigation program to aid such workers**

This bill would require that DCWP promulgate rules relating to how workers for third-party service platforms, entities that provide prearranged online services connecting customers with workers for a fee, are paid. In particular, the rules would prohibit the third-party service platforms from charging workers any fees to receive payment, require that there be an option for payment that does not require a bank account, and require that payments are made at least once a week. In

26

addition, DCWP would be required to establish a navigation program to provide information to workers about their rights and to help workers who experience issues with payments. The program would provide information in English and each of the citywide languages designated in Section 23-1101 of the City's Language Access Law, and would include assistance by a person over phone and e-mail, as well as online help. A person who violates any of the rules promulgated by DCWP pursuant to this bill would be liable for civil penalties equivalent to those in Section 20-1209 of the Administrative Code: $500 for a first violation, $750 for a second violation within two years of the first, and $1,000 for third and subsequent violations within two years of any previous violation.

This bill would take effect immediately.

**Int. 2298, in relation to requiring food service establishments to provide toilet facility access to food delivery workers**

This bill would require food service establishments to provide food delivery workers access to the establishment's toilet facilities while such workers are at the establishment to pick up food or beverage for delivery. Exceptions to access would include situations in which a food delivery worker would be required to walk through the establishment's kitchen, food preparation or storage area or utensil washing area to access the toilet, or in which access would otherwise present a health or safety risk to the food delivery worker or to the establishment. The bill would require DCWP to promulgate rules identifying circumstances that would give rise to the aforementioned health and safety risks, precautions that food service establishments may take to mitigate those risks, and the obligations of food service establishments to provide access to toilet facilities during periods when there are State restrictions on indoor dining. DCWP would be required to conduct outreach, receive complaints, and carry out enforcement of the law, including providing food

delivery workers multiple means by which to lodge complaints against food service establishments in violation of the law. Food service establishments found to be in violation of the bill would be liable for civil penalties of not more than $50 for the first violation and not more than $100 for each subsequent violation.

This bill would take effect 120 days after it becomes law, except that the Commissioner of DCWP would be required to take such measures as are necessary for the implementation of the local law, including the promulgation of rules, before such date.

**Int. 2311, in relation to data on orders placed through third-party food delivery services**

This bill would require third-party food delivery services, entities that provide restaurants with online order and delivery services, to share with restaurants certain information on their customers each time a customer places an order with that restaurant. Such information would consist of all of the following, as applicable to the order: the customer's name, phone number, e-mail address, delivery address and the contents of their order. Third-party food delivery services would be required to share such information with restaurants in a machine-readable format at the time the customer places the order. Third-party food delivery services would be prohibited from limiting the ability of restaurants to download such information, retain it, or use it for marketing or other purposes outside of the third-party food delivery service's platform. Third-party food delivery services that violate any provision of the bill would be liable for civil penalties of no more than $100 per restaurant per day during which each violation occurs.

This bill would take effect 60 days after it becomes law.

29

Int. No. 2163

By Council Members Reynoso, Lander, Van Bramer, Adams, Kallos, Menchaca, Gibson, Rivera, Rosenthal and the Public Advocate (Mr. Williams)

A Local Law to amend the administrative code of the city of New York, in relation to allowing a food service establishment surcharge, and to repeal local law number 100 for the year 2020, relating to a COVID-19 recovery charge.

Be it enacted by the Council as follows:

Section 1. Local law number 100 for the year 2020 is REPEALED.

§ 2. Chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 24 to read as follows:

SUBCHAPTER 24

FOOD SERVICE ESTABLISHMENT SURCHARGES

§ 20-855 Definitions. For purposes of this subchapter, the following terms have the following meanings:

Food service establishment. The term "food service establishment" has the same meaning as set forth in subdivision (s) of section 81.03 of the New York city health code, except that such term does not include pushcarts, stands, vehicles or a food service establishment that is part of a chain with 15 or more locations nationally doing business under the same name and offering for sale substantially the same menu items.

Stated price. The term "stated price" means the amount that a consumer owes for an individual listed item.  The term "stated price" does not include any additional charge that was not included in the pricing of an individual listed item.

Surcharge. The term "surcharge" means a charge imposed in addition to the stated price of individual listed items. The term "surcharge" does not include tax, gratuity, tip or a charge for the

administration of a banquet, special function or package deal pursuant to section 146-2.19 of title 12 of the New York codes, rules and regulations.

Tipped worker. The term "tipped worker" means a service employee or food service worker, as such terms are defined in sections 146-3.3 and 146-3.4 of title 12 of the New York codes, rules and regulations, respectively.

§ 20-856 Food service establishment surcharge. a. A food service establishment may impose a surcharge of no more than 15 percent of a consumer's total bill, to be known as the "Food Service Establishment Surcharge."

b. The food service establishment surcharge shall be imposed for on-premises dining only. Such surcharge shall be imposed for indoor or outdoor dining but shall not be imposed for takeout or delivery orders.

c. A food service establishment shall not impose the food service establishment surcharge unless each tipped worker employed at such food service establishment is paid an hourly cash wage that is not less than the city's minimum wage in effect pursuant to paragraph (a) of subdivision 1 of section 652 of the labor law. Tips received by tipped workers employed at a food service establishment that imposes the food service establishment surcharge pursuant to this subchapter shall not be credited towards the hourly cash wage.

d. A food service establishment shall not impose the food service establishment surcharge in addition to a charge for the administration of a banquet, special function or package deal pursuant to section 146-2.19 of title 12 of the New York codes, rules and regulations.

§ 20-857 Disclosure. a. A food service establishment that imposes the food service establishment surcharge shall conspicuously disclose the amount of such surcharge to a prospective consumer before any item is ordered by placing it at the bottom of each menu page

supplied to the consumer. If no menus are used, the disclosure shall be placed wherever food and beverage choices are listed. The disclosure must be:

1. Written;

2. Explicit that the additional charge is a surcharge and not a gratuity;

3. Clear and conspicuous;

4. On each page of any document, whether in paper or electronic format, that lists prices for the consumer, including but not limited to, any paper or electronic menu;

5. In plain English, or in the same language as the rest of the menu, if applicable; and

6. In a font size similar to surrounding text.

b. A consumer's final bill and receipt, if a receipt is provided, shall disclose the food service establishment surcharge and the total dollar amount attributable to such surcharge.

c. A food service establishment shall not give the food service establishment surcharge any other name, and shall reference such charge as the "Food Service Establishment Surcharge" on all disclosures required by this section, except that such charge may be referred to as the "FSE Surcharge" on any final consumer bill or receipt.

§ 20-858 Rules. The department shall promulgate such rules as are necessary to carry out the provisions of this subchapter, including but not limited to, rules related to the form and manner of disclosures related to the food service establishment surcharge.

§ 20-859 Enforcement. Any food service establishment that violates any provision of this subchapter or any rule promulgated pursuant to this subchapter is subject to a civil penalty of not less than $50 nor more than $350 for each violation. A proceeding to recover any civil penalty authorized pursuant to this subchapter is returnable to any tribunal established within the office of

administrative trials and hearings or within any agency of the city designated to conduct such proceedings.

§ 3. This local law takes effect 120 days after it becomes law, except that the commissioner of consumer and worker protection shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.


MHL
LS #16262
11/12/20

Int. No. 2288

By Council Members Brannan, Rivera and Chin

A Local Law to amend the administrative code of the city of New York, in relation to requiring certain businesses using bicycles for commercial purposes to provide bicycle operators with insulated food delivery bags

Be it enacted by the Council as follows:

Section 1. Subdivision a of section 10-157 of the administrative code of the city of New York, as amended by local law number 91 for the year 2017, is amended by adding a new definition of "third-party food delivery service" in alphabetical order to read as follows:

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 food service establishments located in the city that are owned and operated by different persons.

§ 2. Section 10-157 of the administrative code of the city of New York, as amended by local law number 91 for the year 2017, is amended by adding a new subdivision l to read as follows:

l. A business using a bicycle for commercial purposes, where that business is a third-party food delivery service, shall provide at its own expense or ensure the availability of an insulated food delivery bag for each of its bicycle operators. Such business may not require any of its bicycle operators to provide an insulated food delivery bag at such operator's expense. Such insulated food delivery bag must be designed for use in accordance with section 1235 of the vehicle and traffic law.

§ 2. This local law takes effect 120 days after it becomes law.


SG
LS #16930
4/13/21

Int. No. 2289

By Council Members Brannan, Menchaca and Chin

A Local Law to amend the administrative code of the city of New York, in relation to requiring that third-party food delivery services permit delivery workers to set limitations on distance and route for deliveries

Be it enacted by the Council as follows:

Section 1. Chapter 12 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 8 to read as follows:

Subchapter 8

Delivery Workers

§ 20-1281 Definitions. For the purposes of this subchapter, the following terms have the following meanings:

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

Third-party food delivery worker. The term "third-party food delivery worker" means any person engaged by a third-party food delivery service to carry out deliveries.

Trip. For purposes of this section, the term "trip" means the entirety of the process by which a worker is engaged to provide food delivery services to a customer through a third-party delivery service, to include travel to a food service establishment, picking up prepared food for delivery,

36

and taking and depositing such delivery at a different location as requested.

§ 20-1282 Delivery distance and route. All third-party food delivery services shall provide each third-party food delivery worker with an option to specify:

1. The maximum distance that such worker will travel on trips;

2. That such worker will not accept trips that require travel over any bridge or over particular bridges chosen by such worker; and

3. That such worker will not accept trips that require travel through any tunnel or through particular tunnels chosen by such worker.

b. All third-party food delivery services shall allow each third-party food delivery worker to directly modify, at any time, the parameters set by such worker pursuant to subdivision a.

c. A third-party food delivery service shall not offer any third-party food delivery worker any trip that is inconsistent with the parameters set by such worker.

d. A third-party food delivery service shall not impose any negative consequence on any third-party food delivery worker as a result of such's workers choice of parameters for trips, including, without limitation:

1. Reducing or downgrading any public or internal rating of such worker;

2. Refusing or limiting access to the third-party food delivery service; or

3. Decreasing the number of trips offered to such worker that are consistent with the parameters set by such worker.

e. The requirements of this section shall apply to trips that originate in the city, end in the city or involve picking up food from a food service establishment located in the city.

37

§ 20-1283 Penalties and enforcement. Any person who violates, or causes another person to violate, a provision of this subchapter or any rule promulgated pursuant to this subchapter, shall be liable for civil penalties in amounts equivalent to those set forth in section 20-1209.

§ 2. This local law takes effect 120 days after it becomes law.

LS #17300/17301
NAB
4/22/21 4:45 PM

Int. No. 2294

By Council Members Lander, Menchaca and Chin

A Local Law to amend the administrative code of the city of New York, in relation to establishing minimum per trip payments to third party food delivery service workers

Be it enacted by the Council as follows:

Section 1. Chapter 2 of title 20 of the administrative code of the city of New York is amended by adding a new section 20-565.6 to read as follows:

§ 20-565.6 Minimum per trip payments. a. Definitions. For the purposes of this section, the following terms have the following meanings:

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Gratuity. The term "gratuity" means a voluntary payment from a customer to a third party delivery worker made in addition to the total cost of the delivery service, food and any other taxes, fees or surcharges.

Third party food delivery service. The term "third party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, no fewer than 20 separately owned and operated food service establishments.

Third party food delivery worker. The term "third party food delivery worker" means any person engaged by a third party food delivery service to carry out deliveries.

Trip. For purposes of this section, the term "trip" means the entirety of the process by which a worker is engaged to provide food delivery services to a customer through a third party delivery service, to include travel to a food service establishment, picking up prepared food for delivery, taking and depositing such delivery at a different location as requested, and any associated waiting time.

b. Minimum payments. 1. In the nine months following the effective date of this law, the department shall study the working conditions for third party food delivery workers. In conducting such study, the department may coordinate with any other agency, office, or organization deemed relevant. Such study shall include, at minimum, per trip pay and the methods by which such pay is determined, total income, expenses and required equipment, hours worked, trip mileage, mode of travel, safety, and any other topics relevant to third party food delivery workers, as determined by the department.

2. Following the study required by this subdivision, the department shall by rule establish a method for determining the minimum payment that must be made to a third party food delivery worker for any trip dispatched by a third party food delivery service. In establishing such method, the department shall, at minimum, consider the duration and distance of the trip, the mode of transportation used by the worker and the associated expenses of operation, the type of trip, including the number of separate deliveries made along a route, the adequacy of third party delivery worker income considered in relation to expenses, and any other relevant factors, as determined by the department. Minimum per trip payments shall not include any taxes, fees or surcharges imposed on the purchase of food or food deliveries. Any rules promulgated by the department pursuant to this subdivision shall not prevent payments to third party delivery workers from being calculated on an hourly or weekly basis, or by any other method, provided that the

40

actual payments made to such drivers are no less than the minimum payments determined by the department.

c. Gratuities. Minimum payments determined by the department pursuant to this section shall not include gratuities. Third party delivery services shall not use gratuities to offset minimum payments required by this section.

d. Review. No less than once annually, the department shall review the minimum payments established pursuant to this section to determine whether any amendment of such payments is warranted or necessary. If the department determines that such an amendment is warranted or necessary, it is hereby authorized to promulgate such amendment by rule.

e. Report. In conjunction with the review required by subdivision d of this section, the department shall, at least once annually, submit to the council and the mayor a report on the minimum payment standards, any changes to such standards, and the effect of such minimum payment standards on food delivery workers and the food delivery industry.

§ 2. This local law takes effect immediately.


EL
LS 7933
4/26/21 10:40 AM

Int. No. 2296

By Council Members Menchaca and Rivera

A Local Law to amend the administrative code of the city of New York, in relation to establishing standards for payment of third-party service platform workers and a navigation program to aid such workers

Be it enacted by the Council as follows:

Section 1. Chapter 12 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 8 to read as follows:

Subchapter 8

Third-party service platforms

§ 20-1281 Definitions. For the purposes of this subchapter, the following terms have the following meanings:

Third-party service platform. The term "third-party service platform" means any entity that offers prearranged services for compensation using an online-enabled application or platform to connect customers with workers.

Third-party service platform worker. The term "third-party service platform worker" means any person engaged by a third-party service platform to provide services except an employee, as defined in section 190 of the labor law, of such third-party service platform.

§ 20-1282 Payment to workers. a. The commissioner shall promulgate rules establishing standards for payments made by third-party service platforms to third-party service platform workers. Such rules shall, at a minimum:

1. Prohibit third-party service platforms from charging any fee for any form of payment used by such a platform to pay a third-party service platform worker for work performed;

2. Require that all third-party service platforms offer at least one form of payment that can be accessed by third-party service platform workers who do not have bank accounts; and

3. Ensure that all third-party service platform workers can receive payments due to them from third-party service platforms no less frequently than once a week.

b. The commissioner shall establish a navigation program that provides information and assistance to third-party service platform workers relating to issues with or disputes about payments from third-party service platforms. Such information shall be provided in English and each of the designated citywide languages, as defined in section 23-1101. Such program shall include assistance by a natural person by phone and e-mail and shall also include online information. The navigation program shall, at a minimum, provide the following:

1. Information regarding the rights of third-party service platform workers pursuant to this section;

2. Assistance in understanding payment options;

3. Assistance in setting up accounts to receive payments, including connecting bank accounts to third-party service platform accounts; and

4. Assistance in troubleshooting problems with receipt of payment.

§ 20-1283 Penalties and enforcement. a. Any person who violates, or causes another person to violate, a provision of this subchapter or any rule promulgated pursuant to such subchapter, shall be liable for civil penalties in amounts equivalent to those set forth in section 20-1209.

§ 2. This local law takes effect immediately.

LS #17253
NAB
4/23/21 12:40PM

Int. No. 2298

By Council Members Rivera, the Public Advocate (Mr. Williams), Menchaca and Chin

A Local Law to amend the administrative code of the city of New York, in relation to requiring food service establishments to provide toilet facility access to food delivery workers

Be it enacted by the Council as follows:

Section 1. Chapter 12 of title 20 of the administrative code of the city of New York is amended by adding a new subchapter 8 to read as follows:

SUBCHAPTER 8

TOILET FACILITY ACCESS FOR FOOD DELIVERY WORKERS

§ 20-1281 Definitions. As used in this subchapter, the following terms have the following meanings:

Food delivery worker. The term "food delivery worker" means an individual who is hired or retained as an independent contractor by a food service establishment or as an independent contractor or employee of a third-party food delivery service to deliver food or beverage from such establishment to a consumer in exchange for compensation.

Food service establishment. The term "food service establishment" has the same meaning as provided in subdivision s of section 81.03 of the health code of the city of New York.

Toilet facility. The term "toilet facility" means a food service establishment's toilet facility for its patrons, where such establishment has a dedicated facility for its patrons; or a food service establishment's toilet facility for its employees, where such establishment does not have a dedicated facility for its patrons.

Third-party food delivery service. The term "third-party food delivery service" means any website, mobile application or other internet service that offers or arranges for the sale of food and

44

beverages prepared by, and the same-day delivery or same-day pickup of food and beverages from, food service establishments.

§ 20-1282 Access to toilet facility. A food service establishment that has a toilet facility and that utilizes food delivery workers shall provide such workers access to its toilet facility while such workers are lawfully on such establishment's premises to pick up such establishment's food or beverage for consumer delivery.

§ 20-1283 Exceptions. a. Notwithstanding the requirements of section 20-1282 and section 492 of the general business law, a food service establishment shall not be required to provide food delivery workers access to its toilet facility in the following circumstances:

1. Where accessing the toilet facility would require a food delivery worker to walk through such establishment's kitchen, food preparation or storage area or utensil washing area to access such facility, pursuant to subdivision d of section 81.22 of the health code;

2. Where accessing the toilet facility would create an obvious health and safety risk to the food delivery worker or to the establishment; and

3. Any additional exceptions that the commissioner promulgates by rule.

b. The commissioner, in consultation with the commissioner of health and mental hygiene, shall promulgate rules necessary and appropriate to the administration of this section. Such rules shall identify:

1. The circumstances where access to a toilet facility would create an obvious health or safety risk to the food delivery worker or to the food service establishment;

2. Any precautions an establishment may take to mitigate such health or safety risks; and

45

3. The obligations of the food service establishment to provide access to a toilet facility during any restrictions on indoor dining at such establishment, issued by the governor of the state of New York, the New York state department of health or other relevant agencies.

§ 20-1284 Enforcement and penalties. a. The commissioner shall enforce the provisions of this subchapter. In doing so, the commissioner shall establish a system that provides a food delivery worker multiple means to communicate complaints regarding a food service establishment's non-compliance with this subchapter and that allows for the investigation of such complaints in a timely manner.

b. A food service establishment that the commissioner finds to be in violation of this subchapter shall be liable for a civil penalty of not more than $50 for the first violation and not more than $100 for each subsequent violation.

c. The commissioner shall promulgate rules necessary and appropriate to the administration of this section.

§ 20-1285 Outreach. No more than 30 days after the effective date of the local law that added this subchapter, the commissioner, in collaboration with relevant agencies, food service establishments, third-party food delivery services and relevant stakeholders, shall conduct culturally appropriate outreach in the designated citywide languages, as defined in section 23-1101, to alert food delivery workers and food service establishments to this subchapter. Such outreach shall include, but need not be limited to, posting information on relevant government websites and distributing information to food delivery workers, food service establishments, third-party food delivery services and relevant stakeholders.

46

§ 2. This local law takes effect 120 days after it becomes law, except that the commissioner of consumer and worker protection shall take such measures as are necessary for the implementation of this local law, including the promulgation of rules, before such date.

NLB/EL
LS #16766/16838
4/22/2021

Int. No. 2311

By Council Members Powers, Rosenthal and Kallos

A Local Law to amend the administrative code of the city of New York, in relation to data on orders placed through third-party food delivery services

Be it enacted by the Council as follows:

Section 1. Section 20-845 of the administrative code of the city of New York, as amended by local law number 88 for the year 2020, is amended by adding a new definition in alphabetical order to read as follows:

Customer data. The term "customer data" means the following information provided by a customer of a third-party food delivery service who is not known by a third-party food delivery service to be less than 16 years of age and who has placed an online order:

i) Customer's name;

ii) Customer's telephone number;

iii) Customer's e-mail address;

iv) The delivery address of the online order; and

v) The contents of the online order being requested to be fulfilled by a food service establishment.

§ 2. Subchapter 22 of chapter 5 of title 20 of the administrative code of the city of New York is amended by adding a new section 20-848 to read as follows:

§ 20-848 Customer data. a. Third-party food delivery services shall share all customer data applicable to an online order with the food service establishment fulfilling such online order. Customer data shared pursuant to this subdivision shall be made available in a machine-readable format at the time an online order is placed. Third-party food delivery services shall not limit the ability of food service establishments to download and retain such data, or limit their use of such

48

data for marketing or other purposes outside the third-party food delivery service website, mobile application or other internet service.

b. This section does not apply to telephone orders.

§ 3. Section 20-848 of the administrative code of the city of New York, as amended by local law number 51 for the year 2020, is renumbered section 20-849, and subdivision a of such section is amended to read as follows:

a. Any person that violates any provision of section 20-846 or any rule promulgated pursuant thereto shall be subject to a civil penalty that shall not exceed $1,000 per violation. Any person that violates any provision of section 20-847 or any rule promulgated pursuant thereto shall be subject to a civil penalty that shall not exceed $500 per violation. Any person that violates any provision of section 20-848 or any rule promulgated pursuant thereto shall be subject to a civil penalty that shall not exceed $100 per violation. Violations under this subchapter shall accrue on a daily basis for each day and for each food service establishment charged a fee or to which customer data is not provided in violation of this subchapter or any rule promulgated pursuant to this subchapter. A proceeding to recover any civil penalty authorized pursuant to this subchapter may be brought in any tribunal established within the office of administrative trials and hearings or within any agency of the city designated to conduct such proceedings.

§ 4. This local law takes effect 60 days after it becomes law.

SJ
LS #11769
4/23/2021

49