# Exhibit 15

## New York City Department of Consumer and Worker Protection

### Notice of Adoption of Final Rule

Pursuant to the authority vested in the Department of Consumer and Worker Protection ("DCWP" or "Department") by Sections 1043 and 2203(f) of the New York City Charter and Sections 20-1507(c) and 20-1522(a)(3) of the New York City Administrative Code, and in accordance with the requirements of Section 1043 of the Charter, the Department amends Subchapter H of Chapter 7 of Title 6 of the Rules of the City of New York.

### Statement of Basis and Purpose of Final Rule

The Department of Consumer and Worker Protection ("DCWP" or "Department") adopts these rules to implement Local Law 115 of 2021, which required DCWP to study the pay and working conditions of food delivery workers and, based on the results of its study, to establish a method for determining the minimum payments that third-party food delivery services and third-party courier services (together, "apps") must pay to food delivery workers. *See* NYC Admin. Code § 20-1501 (defining "food delivery worker," "third-party food delivery service," and "third-party courier service").

**Background**. Prior to the passage of Local Law 115 of 2021, there were no minimum pay protections for food delivery workers who work for apps as independent contractors. The legislative record indicates that these workers face low pay and high expenses. Local Law 115 of 2021 charged DCWP with studying this workforce and developing an appropriate minimum pay rate to ensure adequate compensation for these workers.

**First Proposed Rule**. To implement Local Law 115 of 2021, DCWP published a proposed rule in the City Record on November 16, 2022 ("First Proposed Rule"). Concurrently with the publication of the First Proposed Rule, DCWP published a report titled *A Minimum Pay Rate for App-Based Restaurant Delivery Workers in NYC* ("Report"). Sections 1 through 4 of the Report discuss the Department's sources, methods, and findings concerning the delivery industry and the working conditions of food delivery workers. (Report at 1-26). Section 5 of the Report describes the First Proposed Rule. (Report at 27-33). Section 6 of the Report models the impacts of the First Proposed Rule on food delivery workers, apps, restaurants, and consumers. (Report at 34-36).

The First Proposed Rule proposed the following amendments:

- Section 7-801 to add definitions of "on-call time," "pay period," and "trip time";
- Section 7-805 to add the recordkeeping and reporting obligations for a third-party food delivery service or third-party courier service;
- Section 7-806 to clarify what constitutes "required" travel across a bridge or through a tunnel;
- Section 7-807 to establish that compensation must be calculated for each pay period; and
- Section 7-810 to set the minimum pay rate and method requiring apps to pay each worker for their trip time and to pay all workers, in the aggregate, for their combined on-call time using a methodology of their choosing.

The First Proposed Rule was the subject of a public hearing held on December 16, 2022. The Department received comments on the First Proposed Rule from food delivery workers, third-party food delivery services (Uber Eats, Grubhub, and DoorDash), a third-party courier service (Relay), worker advocates, transportation safety advocates, restaurants, researchers, elected officials, consumers, and members of the public, among others.

**Second Proposed Rule**. After considering the comments received, the Department published a Second Proposed Rule on March 7, 2023, which reflected the following changes from the First Proposed Rule:

1

- Section 7-801 added definitions of "cancellation," "cancelled," "internal identifier," and "utilization rate";
- Section 7-805 narrowed the scope of apps' reporting obligations and added to apps' recordkeeping requirement an obligation to maintain a food delivery worker's taxpayer identification number and certain information about a food delivery worker's phone;
- Section 7-806 adjusted apps' disclosure requirements to reflect changes to the minimum pay rate;
- Section 7-810 adjusted the minimum pay rate to reflect "multi-apping" and to incorporate additional inflation data; renamed the minimum pay method set forth in the First Proposed Rule "the standard method"; added an alternative method for determining minimum pay; adjusted the effective date of implementation; and adjusted the phase-in schedule for the minimum pay rate; and
- The Second Proposed Rule also corrected minor typographical errors in the First Proposed Rule and made technical corrections to clarify certain text.

The Second Proposed Rule was the subject of a public hearing held on April 7, 2023. The Department received comments on the Second Proposed Rule from food delivery workers, third-party food delivery services (Uber Eats, Grubhub, and DoorDash), a third-party courier service (Relay), worker advocates, transportation safety advocates, restaurants, researchers, elected officials, consumers, and members of the public, among others.

**Final Rule**. After considering the comments received, this Final Rule adopts the Second Proposed Rule, with the following adjustments:

- Provides for a limited "safe harbor" to the low-utilization floor required under the Alternative Method.
- Provides for review of certain aspects of the rule based on updated data in the report due on September 24, 2024.

Table 1 summarizes the calculations the Department performed to develop the minimum pay rate under both the Final Rule and the Second Proposed Rule.

**Table 1. Minimum Pay Rate Calculations Under the Final Rule ($)**

| | |
|---|---|
| ***Base Pay*** | |
| Pay for Wages and Time Off | 18.12 |
| *Base Pay Subtotal ($19.62), less Adjustment for Medicare and Social Security Contributions ($1.50)* | |
| Adjustment for Medicare and Social Security Contributions | 1.50 |
| *Base Pay Subtotal ($19.62) x employer share of Medicare and Social Security contributions (7.65%)* | |
| Base Pay Subtotal | 19.62 |
| ***Workers' Compensation*** | |
| Workers' Compensation if App Delivery Workers were Employees | 1.42 |
| *Pay for Wages and Time Off x expected costs (7.84%)* | |
| Adjustment for Medicare and Social Security Contributions | 0.26 |
| *Workers' Compensation Subtotal, less the employer and employee shares of Medicare and Social Security contributions ($1.68 x 15.3%). (Report at 30-31).* | |

| | |
|---|---|
| Workers' Compensation Subtotal<br>*Pay such that after adjustment for Medicare and Social Security contributions (15.3%), app delivery workers receive the same value as the coverage they would receive if they were employees ($1.42)* | 1.68 |
| ***Expense Component*** | |
| Average Hourly Expenses of E-Bike Workers<br>*See Report at 18-20, 30-31.* | 2.26 |
| ***Total*** | |
| Component Subtotals<br>*Sum of Base Pay Subtotal, Workers' Compensation Subtotal, and Average Hourly Expenses of E-Bike Workers* | 23.56 |
| Adjustment for Multi-Apping<br>*Component Subtotal x multi-apping adjustment factor [1 – 0.8471]* | -3.60 |
| Adjusted Total<br>*Sum of Subtotal and Adjustment for Multi-Apping* | 19.96 |

*Notes: Adapted from the Report (at 31).*

As in the Second Proposed Rule, the minimum pay rate in the Final Rule phases-in over three years. Table 2 summarizes the phase-in schedule under the Final Rule.

**Table 2. Minimum Pay Rate Under the Final Rule, 2023-2025 ($)**

| | |
|---|---|
| 2023 | 17.96 |
| April 1, 2024 | 18.96 |
| April 1, 2025 | 19.96 |

*Notes: April 1, 2024 and April 1, 2025 values shown are prior to inflation adjustment. In the Final Rule, the 2023 rate takes effect 30 days after adoption.*

The following sections summarize the Department's deliberations on comments received from the public on the Second Proposed Rule. Many public comments on the Second Proposed Rule restate the substance of comments offered on the First Proposed Rule. For purposes of brevity, the Department incorporates by reference all prior pertinent responses to comments on the First Proposed Rule and focuses this Statement of Basis and Purpose on new issues raised in comments on the Second Proposed Rule.

**Methods for Determining Minimum Pay**

3

The Final Rule retains the two methods for calculating compensation to workers described in the Second Proposed Rule (the Standard Method and the Alternative Method), with one adjustment. Specifically, the Final Rule adopts a modified version of DoorDash's proposal for a "safe harbor" to the low-utilization floor under the Alternative Method.

Under the Standard Method, an app's payment to each delivery worker, individually, would have to meet or exceed the minimum pay rate multiplied by the sum of each individual worker's own trip time during the week; and the app's total payments to all its delivery workers, together, would have to meet or exceed the minimum pay rate multiplied by the sum of all workers' total trip time and on-call time during the week.

Under the Alternative Method, an app must pay each food delivery worker individually for trip time at no less than the alternative minimum pay rate. The alternative minimum pay rate is calculated by dividing the minimum pay rate by 60%. The 60% figure reflects the average "utilization rate" of apps that pay per trip. An app's utilization rate is the amount of "trip time" workers engage in for the app, divided by their workers' total time connected to that app, including both "trip time" and "on-call time." "Trip time" is the time between acceptance of a trip offer and its completion or cancellation and "on-call time" is the time in which a worker is connected to an app in a status where they can receive or accept trip offers, excluding "trip time." Under the Alternative Method, food delivery workers have a right to higher pay for their trip time, but no additional right to compensation for their on-call time.

An app may choose the Alternative Method or the Standard Method, provided that on or after April 1, 2024, an app may only choose the Alternative Method for a pay period if it has a utilization rate above 53%, with limited exceptions. The incorporation of a low-utilization floor of 53% ensures that workers who are only paid for trip time have adequate opportunities to pick up trips to earn income and do not spend excessive time on-call waiting for trip offers. In the Second Proposed Rule, there was no exception to the 53% requirement. In the Final Rule, on or after April 1, 2024, an app may still use the Alternative Method despite having a utilization rate below 53% in up to two pay periods per year. For all other pay periods starting on or after April 1, 2024, the 53% low-utilization floor applies. For purposes of this exception, a year begins with the first pay period that begins on or after April 1 of a calendar year and ends with the last pay period that begins on or before March 31 of the following calendar year.

The Alternative Method implements the method of payment proposed by Uber Eats, DoorDash, and Grubhub in their comments to the First Proposed Rule, with some modification. The change to the low-utilization floor in the Final Rule implements DoorDash's proposal in its comment to the Second Proposed Rule.

Under both the Standard Method and Alternative Method apps assume financial responsibility for time that workers spend working, including all trip time and on-call time. In the Standard Method, this result is achieved because apps must pay for all trip time and aggregate on-call time. In the Alternative Method, the incorporation of a utilization rate of 60% ensures that workers are paid a rate for trip time that indirectly compensates them for uncompensated on-call time. The two methods accommodate the variety of pay arrangements already present in the industry.

<u>Comment</u>:

Comments from Uber Eats, Grubhub, and DoorDash stated that the alternative minimum pay rate should be lowered to only account for a subset of delivery workers' on-call time. Uber Eats recommended calculating the alternative minimum pay rate using an 87% utilization rate, and Grubhub and DoorDash recommended using a 1.156 multiplier; each of these calculations produces approximately the same result. The apps argued that their recommendations appropriately exclude on-call time that precedes a rejected or expired trip offer and time between completing a trip and logging off the app. Uber Eats commented that its recommendation was based on analysis of its own data. Grubhub and DoorDash commented that their recommendation was derived from data published by the Department. Uber Eats, Grubhub, and DoorDash also reiterated similar comments in opposition to the compensation of on-call time in the Standard Method, which were first submitted in response to the First Proposed Rule.

4

Response:

The Department is not adopting the apps' recommendation to exclude certain portions of on-call time from the utilization rate calculation, which would reduce the alternative minimum pay rate and workers' incomes. The Department previously discussed its rationale for compensating all on-call time under the Standard Method. (Report at 32; Second Proposed Rule at 12). The Department's reasoning applies equally to treatment of on-call time under the Alternative Method. The Department is required to set the minimum pay rate based on the results of its study, which must consider delivery workers' hours, and is further required to establish the minimum pay rate in consideration of "the on-call and work hours of food delivery workers." NYC Admin. Code § 20-1522(a)(3). For these reasons, it would not be appropriate to exclude portions of workers' on-call time from the alternative minimum pay rate calculation. The study did not identify any basis for departing from the precedent set by the NYC Taxi and Limousine Commission's (TLC) minimum pay rule in compensating all on-call time, including time workers spend waiting for offers they find acceptable and for offers they find unacceptable. Like for-hire vehicle drivers, the ongoing assessment of trip offers is intrinsic to work on the apps and fundamental to how workers manage the earnings uncertainty created by apps' business model. Further, the apps' suggestions to use a 1.156 multiplier or 87% utilization rate are arbitrary and not based on the results of the study, which found that on-call time represents 24 out of every 60 minutes workers log on the apps.

In setting the minimum pay rate, the Department is also required to consider, among other factors, "the adequacy of food delivery worker income considered in relation to trip-related expenses." NYC Admin. Code § 20-1522(a)(3). The apps' proposed multiplier results in inadequate food delivery worker income when considered in relation to their expenses. The Department estimates that the alternative minimum pay rate based on a 1.156 multiplier proposed by apps would provide delivery workers with $16.34 per hour worked, or $13.52 after accounting for expenses. (Table 3). By comparison, for-hire vehicle drivers covered by the TLC's minimum pay rule receive $19.62 per hour, not including the expense component of their pay, and receive coverage for work-related injuries through the Black Car Fund. (Second Proposed Rule at 5-7). If apps classified delivery workers as employees, the minimum pay and benefit requirements would be worth $23.21 per hour by 2025. (Table 5).

**Table 3. Analysis of Delivery Worker Pay per Hour Worked Under an Alternative Minimum Pay Rate Based on a 1.156 Multiplier ($)**

| | |
|---|---|
| Minimum Pay Rate | 19.96 |
| Alternative Minimum Pay Rate<br>*Minimum Pay Rate (19.96) x Multiplier (1.156)* | 23.07 |
| Pay per Hour Worked<br>*Alternative minimum pay rate ($23.07) x Utilization rate (0.60) ÷ Multi-apping Adjustment Factor (0.8471)* | 16.34 |
| Pay per Hour Worked, Less Expenses<br>*Pay per hour worked ($16.34), less expenses ($2.82)* | 13.52 |

Notes: *Projection is for 2025. Expenses are as described in the Report (at 18, 34).*

Comment:

5

Uber Eats raised several objections to the Department's use of a 60% utilization rate to calculate the alternative minimum pay rate, in addition to the objections discussed above related to on-call time. Uber Eats asserted that the Department did not adequately explain: why the Department used data from the period January 1, 2021 through June 30, 2022 to obtain the 60% rate, as opposed to reliance on more recent data; what utilization rates the Department would have obtained had it calculated the utilization rate over other periods; and how the Department calculated average utilization. It also objected to the Department's decision to exclude Relay from the dataset it used to obtain the 60% utilization rate and proposed instead that the alternative minimum pay rate reflect only Relay's data and exclude data from all other apps. Finally, it asserted that the utilization rates exhibited by apps prior to implementation of the minimum pay rule are irrelevant for purposes of calculating the alternative minimum pay rate.

Response:

The Department used the weekly aggregate data provided by Uber Eats, Grubhub, and DoorDash to calculate their combined utilization for each week from January 1, 2021 through June 30, 2022, as follows:

$$Utilization\ rate = \frac{Total\ trip\ time}{(Total\ trip\ time\ +\ Total\ on\text{-}call\ time)} \tag{eq.1}$$

The Department then obtained the utilization rate used in the alternative minimum pay rate by taking the mean of the weekly utilization rates calculated as above.

The Department used data from the period January 1, 2021 through June 30, 2022 because this is the data the apps provided in response to the Department's subpoenas in connection with the statutorily-required study. Utilization trended down during this period. The combined weekly utilization rates for Uber Eats, Grubhub, and DoorDash during this period are available on DCWP's website. A quarterly summary is available below. (Table 4).

**Table 4. Average Combined Weekly Utilization Rates for Uber Eats, Grubhub, and DoorDash, 2021 Q1 – 2022 Q2**

| Quarter | Utilization Rate |
|---|---|
| 2021 Q1 | 68% |
| 2021 Q2 | 65% |
| 2021 Q3 | 59% |
| 2021 Q4 | 57% |
| 2022 Q1 | 57% |
| 2022 Q2 | 52% |

Notes: Department analysis of weekly aggregate data obtained from apps.

The Department is not incorporating Uber Eats's recommendations to include data from Relay in the utilization rate calculation or to exclude data from other apps. The Department introduced the Alternative Method in response to requests by Uber Eats, Grubhub, and DoorDash to better accommodate their existing operating models, which involve high levels of on-call time. Therefore, basing the Alternative Method's utilization rate and corresponding low-utilization floor on these apps' past experience is appropriate. In contrast, Relay has a model in which it pays workers for all trip time and on-call time and achieves a high utilization rate, and this model is best accommodated by the Standard Method. Had the Department based the Alternative Method's utilization rate and corresponding low-utilization floor on Relay's past experience, both would be higher, and less reflective of the operating models the Alternative Method seeks to accommodate. If Uber Eats, Grubhub, or DoorDash wish to change their operating models and instead pursue higher utilization, they may do so under the Standard Method, and so a change to the Alternative Method is not necessary. To the extent Uber Eats' comment implies that the Department should calculate the alternative minimum pay rate consistent with

6

high utilization while still permitting apps to operate with low utilization, this would result in inadequate pay per hour worked, and so the Department is not incorporating this suggestion.

The Department will monitor apps' utilization rates when the Final Rule is in effect. If utilization changes, the Department will consider whether a corresponding change is warranted.

Comment:

Uber Eats and DoorDash expressed concern that requiring apps that use the Alternative Method to pay workers according to the Standard Method if they fall below the 53% utilization floor in a pay period is unduly punitive and administratively burdensome. Both apps recommended that instead of requiring apps to increase worker pay to the Standard Method to account for excessive on-call time, the rule should require an app that falls below the 53% utilization floor to suspend giving new workers access to the app's platform until the 53% floor is achieved.

Uber Eats contended that apps using the Alternative Method should be permitted to account for utilization volatility by calculating it on a monthly basis, instead of each pay period, and make retroactive payments to workers pursuant to the Standard Method only if average utilization over the month falls below 53%. Uber Eats also asked for clarification about how an app can account for multi-apping when determining whether it meets the 53% utilization floor.

DoorDash suggested that the Department incorporate a "safe harbor" whereby a platform using the Alternative Method would be required to pay workers in accordance with the Standard Method only if it fell below the 53% utilization floor on four or more weeks during a calendar year.

Uber Eats requested clarification of the calculations the Department performed to obtain the 53% low-utilization floor.

Response:

The Department calculated the low-utilization floor by measuring the standard deviation of weekly utilization rates for Uber Eats, Grubhub, and DoorDash separately from January 1, 2021 to June 30, 2022. The Department then determined that, among these three apps, the app with the median volatility had a standard deviation of 7% in its weekly utilization rates. As previously explained, the alternative minimum pay rate is designed around expected average utilization of 60%. Seven percent less than 60% is 53%. Setting the low-utilization floor at this level should lead apps to maintain average utilization rates around 60% and provide for greater consistency in utilization rates than they have previously, while still allowing for some natural variation week to week.

The Department disagrees that the 53% utilization floor is punitive or administratively burdensome. The utilization floor is not punitive and ensures that workers' pay is not less than intended when averaged across all work time. Further, apps can measure their utilization rates with data they are already capturing routinely. Application of the Standard Method is not administratively burdensome, as an app can comply by paying workers a straight hourly rate for all work time, among other practical formulas that would be consistent with the Standard Method.

The Department is not incorporating Uber Eats and DoorDash's recommendation to require an app that falls below the 53% utilization floor to suspend giving new workers access to the app's platform until the 53% floor is achieved. Such specific regulation of labor usage is not necessary. Apps have flexibility to manage their own labor needs and costs within the Final Rule framework and may choose to self-impose restrictions on platform access if they wish.

The Department is not adopting Uber Eats' recommendation to allow apps to calculate their utilization rates on a monthly, rather than weekly, basis. Application of the low utilization floor on a weekly basis ensures that workers are paid what

7

they are owed in a timely manner. In response to Uber Eats' request for clarification, the Department confirms that each app is required to measure its own utilization rate. The Final Rule, like the Second Proposed Rule, accounts for multi-apping by factoring it into the minimum pay rate, not into the measurement of the utilization rate.

The Department is, however, adopting a modified version of the "safe harbor" proposed by DoorDash. Under the Final Rule, apps are allowed to use the Alternative Method on the first two pay periods that they have utilization below 53% in any year (measured between April 1 and March 31), but for the remainder of the year may not use the Alternative Method for any pay periods in which their utilization is below 53%. This relaxation of the low utilization floor provides apps with additional room to accommodate occasional unexpected volatility without undermining the purpose of the low utilization floor.

Comment:

Some commenters, including elected officials, workers, and worker advocacy groups contended that delivery workers should be paid for their individual on-call time, and that apps should not be permitted to choose which workers they pay for all aggregate on-call time using the Standard Method. These commenters expressed concern about the aggregate pay methodology, noting that it may not result in adequate compensation if some workers still receive no pay at all for their on-call time. Accordingly, these commenters recommended that the Standard Method be converted to an hourly rate that applies to each individual worker's combined trip time and on-call time.

Response:

The Department is not incorporating this recommendation. The Department acknowledges the earnings certainty that an hourly rate for each individual's combined trip time and on-call time would provide. However, the Standard Method's aggregate payment requirement ensures appropriate average pay among the workforce as a whole for on-call time and affords each app flexibility to make aggregate payments using a methodology of its choosing. The Department ultimately determined that the benefits of affording apps this flexibility outweighed the benefits of a rule that would require apps to pay each worker for their individual on-call time.


**Base Pay Component**

The Department made no changes to the base pay component of the minimum pay rate in the Final Rule.

Comment:

Comments from some workers, worker advocates, elected officials, and academic researchers reiterated prior comments in support of a base pay component that significantly increases worker pay relative to the status quo, noting that as independent contractors these workers do not receive a minimum wage or other employee benefits.

DoorDash, Uber Eats, Grubhub, Relay, and tech industry advocates reiterated prior comments that the base pay component of the rate should be reduced to factor in workers' tip earnings or should be based on the hourly pay of tipped workers.

Response:

The Department did not make changes to the base pay component, which provides for parity with high-volume for-hire vehicle drivers covered by the TLC's minimum payment rate. The Department's rationale for the base pay component is the same as in the Second Proposed Rule. (Second Proposed Rule at 4-5). The Department did not incorporate the apps'

8

recommendation to reduce the base pay component or match it to the hourly rate for tipped workers, for reasons discussed previously. (Second Proposed Rule at 5).

## Workers' Compensation Component

The Department made no changes to its method for calculating the workers' compensation component of the rate in the Final Rule.

Comment:

Comments from Uber Eats, DoorDash, tech industry advocates, and business advocates reiterated previous recommendations that the Department eliminate the workers' compensation component because it would not actually be used to purchase workers' compensation coverage.

Response:

For the reasons stated previously (Report at 30, Second Proposed Rule at 6), the Department did not adopt this recommendation and is maintaining the workers' compensation component.

## Expense Component

The Department made no changes to the $2.26 expense component of the rate in the Final Rule. The purpose of the expense component is to compensate food delivery workers for necessary expenses they incur to perform delivery work. (Report at 18-20; 30-31). As in the Second Proposed Rule, the expense component of $2.26 is DCWP's estimate of average hourly expenses for workers who perform deliveries using an electric bicycle ("e-bike"), less the cost of traffic or parking tickets, which are not deductible under IRS rules. The expense component includes both phone-related and e-bike-related expenses. (Report at 30).

Comment:

Elected officials and worker advocates reiterated prior comments that the Department should annually review worker expenses and incorporate car expenses into the minimum pay rate. Some of these commenters also suggested adjusting expenses annually using a price index specific to transportation and setting the expense component above the level measured in the Department's study because present expenses are unduly low due to workers' low incomes.

Response:

For the reasons stated previously (Report at 31, Second Proposed Rule at 10), the Department did not adopt the recommendation to incorporate car drivers' higher expenses into the minimum pay rate.

With respect to comments regarding changes in expenses over time, in the Second Proposed Rule the Department noted that, along with other factors, regulation of e-bikes and batteries may change in ways that affect worker expenses. (Second Proposed Rule at 9). Since publication of the Second Proposed Rule, NYC enacted Local Law 39 of 2023, which prohibits sale of electric bikes and batteries that do not meet certain safety certification standards. The Department plans to monitor the potential impact of the new law on the costs of acquiring legal e-bikes and batteries within NYC, and to that end, has added a new subsection 7-810(j) to the Final Rule. Subsection 7-810(j) requires the Department to review the expense component of the minimum pay rate for the report required by Section 20-1522(d) of the Administrative Code on or

9

before September 24, 2024 ("the 2024 Report"). The Department may revise the expense component in future rulemaking, if warranted.

## Multi-Apping Adjustment

The Department made no changes in the Final Rule to the multi-apping adjustment. The Department found that in the fourth quarter of 2021 workers spent an average of 17.7% of their combined trip time and on-call time logged into multiple apps simultaneously (Report at 5), that during this time they were connected to 2.02 apps, on average, and that multi-apping occurred at all apps. As described in the Second Proposed Rule (at 10), the Alternative Method may result in workers continuing to spend an average of 17.7% of their combined trip time and on-call time logged into multiple apps simultaneously, and so a multi-apping adjustment based on this rate is appropriate. The Department assumes that Uber Eats, Grubhub, and DoorDash, which do not currently pay workers for on-call time, will choose the Alternative Method, and that Relay, which already pays workers for on-call time, will choose the Standard Method. The Final Rule therefore applies a multi-apping adjustment factor of 0.8471 in its calculation of the minimum pay rate for both the alternative and standard methods. This figure represents the unduplicated work hours of food delivery workers (*i.e.*, the time a food delivery worker spends engaged in on-call time or trip time with at least one app), divided by the total recorded hours of food delivery workers (*i.e.*, the sum of a food delivery workers' on-call time and trip time at each of the apps they work for).

The calculation is as follows: $\dfrac{1}{(1-0.177)+(2.02 \times 0.177)} = 0.8471$.

The fourth quarter of 2021 was chosen as the reference period for the multi-apping adjustment because this is the sole period for which the Department received data from the apps to perform such an analysis. The Department subpoenaed this information from the apps for a longer time period, but apps did not produce it.

Comment:

Several commenters, including the Comptroller, other elected officials, worker advocacy groups, and academic researchers recommended that DCWP eliminate the multi-apping adjustment. These commenters stated that the multi-apping adjustment inappropriately lowers the minimum pay rate, that multi-apping is a "canard" fabricated by the apps, and/or to the extent multi-apping does occur, it does not justify lowering the minimum pay rate. Some of these commenters also stated that the TLC minimum pay rule does not include a reduction for multi-apping for for-hire vehicle drivers.

Apps' comments expressed a need for a multi-apping adjustment because the Standard Method and Alternative Method both require apps to compensate workers for on-call time, directly or indirectly. These commenters noted that some on-call time occurs when workers are performing deliveries for one app while on-call for a second app. In their view, overlapping periods of work time should not be compensated by multiple apps.

Response:

After considering all comments, DCWP determined that the multi-apping adjustment is appropriate. Workers are connected to more than one app for 17.7% of their on-call and trip time, and the addition of the Alternative Method means that apps have less incentive to increase their utilization rates and thereby decrease multi-apping. However, as Uber Eats noted in its comment, apps may react to the implementation of the minimum pay rate by increasing utilization rates. If this occurs, rates of multi-apping may decrease in the future. The Department will monitor rates of multi-apping after the Final Rule is in effect using records the apps are required to provide to the Department, including worker taxpayer identification

10

number, which will allow the Department to track multi-apping on the individual level from app to app. In the Final Rule, the Department is required to review the multi-apping adjustment for the 2024 Report and may revise the multi-apping adjustment in future rulemaking, if warranted.

Commenters who asserted that the TLC minimum pay rule does not account for multi-apping are mistaken. The TLC's minimum pay rule does account for multi-apping, though the mechanics differ from the Department's minimum pay rule. To obtain its trip time rate, the TLC divides its minimum pay rate by a measure of utilization that reflects multi-apping, 35 R.C.N.Y. § 59D-03(j), whereas the Department divides its minimum pay rate by a measure of utilization that does not reflect multi-apping. Then, the Department applies a multi-apping adjustment to the minimum pay rate. For parity with the TLC rate, a multi-apping adjustment is appropriate.

## Phase-in

The Department made no changes to the phase-in of the minimum pay rate in the Final Rule. The minimum pay rate in the Final Rule phases in at 90% of the full rate in 2023, 95% starting April 1, 2024, and 100% starting April 1, 2025. These rates are $17.96 in 2023, $18.96 in 2024, and $19.96 in 2025. The rates in 2024 and 2025 are also subject to adjustment for inflation.

Comment:

Several commenters, including elected officials, workers, worker advocates, and academic researchers contended that DCWP should eliminate the phase-in for the minimum pay rate. These commenters state that the phase-in will result in workers being paid a $12.69 subminimum hourly wage in 2023.

Response:

The Department disagrees with the assertion that the Final Rule provides for a $12.69 hourly rate. Table 5 presents the Department's calculation of the minimum pay rate during the phase-in period and a comparison to what the minimum wage and benefit requirements would be if the apps were to classify their delivery workers as employees.

**Table 5. Comparison of Delivery Worker Pay under the Final Rule with the Pay and Benefit Requirements that would apply if Apps Classified Delivery Workers as Employees, 2023-2025 ($)**

|  | Delivery Worker Pay under the Final Rule | | | Pay and Benefit Requirements that would apply if Apps Classified Delivery Workers as Employees | | |
|---|---|---|---|---|---|---|
|  | 2023 | 2024 | 2025 | 2023 | 2024 | 2025 |
| Pay and Benefits | 21.20 | 22.38 | 23.56 | 21.09 | 22.50 | 23.21 |
| Expenses (-) | 2.98 | 2.90 | 2.82 | 0.00 | 0.00 | 0.00 |
| Net Pay | 18.22 | 19.48 | 20.74 | 21.09 | 22.50 | 23.21 |

*Notes: For delivery workers covered under the Final Rule, pay and benefits are expressed per hour worked, after accounting for multi-apping. The 2024 and 2025 minimum pay rates in the Final Rule are subject to inflation adjustment. Expenses are assumed to decrease in equal increments from $3.06 per hour in 2022 (Report at 18) to $2.82 in 2025, due to decreased use of cars for delivery (Report at 34). The minimum wage applicable to employees is $15.00 in 2023, $16.00 in 2024, and $16.50 in 2025. The Department assumes employee health insurance costs per hour will remain*

*constant between 2023 and 2025 as a percentage of payroll. All other employee pay and benefit calculations are as published previously. (Report at 22).*

Comment:

Other commenters, including Uber Eats and Doordash, contended that DCWP should adopt a phase-in schedule similar to the First Proposed Rule, which was 75% in 2023, 85% in 2024, and 100% in 2025, to give apps time to adjust to increased costs.

Response:

The Department is not adopting this recommendation. As stated previously, the Department agrees with commenters to the First Proposed Rule that this phase-in provides for pay in 2023 and 2024 that would provide for inadequate worker income in relation to workers' trip-related expenses, which would fail to meet the commands of Local Law 115. (Second Proposed Rule at 13).

Table 6 compares the apps' proposed phase-in to what the minimum wage and benefit requirements would be if the apps were to classify their delivery workers as employees.

**Table 6. Comparison of Delivery Worker Pay under Apps' Proposed Phase-In with the Pay and Benefit Requirements that Would Apply if Apps Classified Delivery Workers as Employees, 2023-2025**

|  | Delivery Worker Pay under Apps' Proposed Phase-in | | | Pay and Benefit Requirements that would apply if Apps Classified Delivery Workers as Employees | | |
|---|---|---|---|---|---|---|
|  | 2023 | 2024 | 2025 | 2023 | 2024 | 2025 |
| Pay and Benefits | 17.67 | 20.02 | 23.56 | 21.09 | 22.50 | 23.21 |
| Expenses (-) | 2.98 | 2.90 | 2.82 | 0.00 | 0.00 | 0.00 |
| Net Pay | 14.69 | 17.12 | 20.74 | 21.09 | 22.50 | 23.21 |

*Notes: Methods are as described in Table 5.*

The Department also notes that apps have had ample time to plan and adjust in advance of the effective date of the rule. By the rule's effective date, it will have been 21 months since the enactment of the Local Law, eight months since the First Proposed Rule, four months since the Second Proposed Rule, and 30 days following issuance of the Final Rule.

**Inflation Adjustment**

The Department did not change the inflation adjustment methodology. To ensure that the rate keeps pace with the cost of living, the Final Rule provides for inflation adjustments to the minimum pay rate on April 1 of every year. DCWP chose the Consumer Price Index for Urban Wage Earners and Clerical Workers for the New York-New Jersey-Pennsylvania metropolitan area as the most appropriate index to capture changes in NYC delivery workers' cost of living.

Comment:

Apps reincorporated prior comments to the First and Second Proposed Rules, proposing no inflation adjustment or an inflation adjustment once every five years.

Response:

For the reasons stated previously (Report at 32-33, Second Proposed Rule at 12-13), the Department did not adopt this recommendation.

## Coverage

The Department made no changes to which entities or types of trips are covered by the minimum pay rule. The Final Rule applies to the deliveries food delivery workers perform for third-party food delivery services or third-party courier services, as defined in Subchapter 1 of Chapter 15 of Title 20.

Comment:

Grubhub commented that the minimum pay rule should apply to all delivery companies, not only food delivery services. It contends that the minimum pay rule should apply to quick convenience and grocery delivery companies.

Response:

The Department cannot adopt Grubhub's recommendation because it is outside the scope of the Department's authority granted by Local Law 115 of 2021.

Comment:

DoorDash requested that the Department exempt trips its food delivery workers make from businesses other than food service establishments, such as convenience and grocery stores, from the minimum pay rule.

Response:

The Department is not incorporating DoorDash's recommendation to exempt from the minimum pay method deliveries that its food delivery workers make from businesses other than food service establishments. Food delivery workers require adequate pay for these trips as well. The protections of Subchapter 1 of Chapter 15 of Title 20 of the Administrative Code generally apply to such trips, and the law does not specify that minimum pay protections should apply more narrowly than other protections.

Comment:

Relay and some restaurants commented that because Relay does not have a customer-facing platform that would enable it to pass its increased costs on to customers, restaurants would incur the costs of implementing the minimum pay rule or would have to charge customers delivery fees directly. These commenters requested that Relay be exempt from the minimum pay rule.

Response:

The Department is not incorporating the recommendation from Relay and some restaurants that Relay be exempt from the minimum pay rule. Local Law 115 of 2021 does not authorize the Department to exempt Relay from the minimum pay rule and there is no reason to believe Relay's food delivery workers have less need for the protections of a minimum pay rate than food delivery workers engaged by other apps.

13

**Fraud and Misconduct**

There are no changes in the Final Rule to the circumstances in which delivery workers are entitled to payment under the minimum pay rate. As in the Second Proposed Rule, all trip time under the Alternative Method, and all trip time and aggregate on-call time under the Standard Method, must be compensated.

Comment:

Apps expressed concern that the minimum pay rule requires them to pay workers for time spent on their platforms committing fraud or misconduct. Grubhub and DoorDash recommended that if a worker cancels a trip prior to completion, the app should not be required to compensate the worker for any time they spent on that trip. These commenters noted that a delivery worker could accept trips with no intention of completing them or could abandon a trip when they receive a higher paying trip on another application. Grubhub also recommended that apps should be permitted to not pay for some trip time if doing so is reasonably necessary to remedy or prevent fraudulent use of the app platform.

Response:

The Department is not permitting apps to withhold payment from workers for time spent on cancelled trips, regardless of the reason for cancellation. Delivery workers may need to cancel trips for routine and legitimate reasons, such as if they are in an accident, experience equipment malfunction, if a food delivery is packaged poorly and spills, or if completion of the trip would pose a risk to their safety. In such cases, there is no basis for leaving time spent completing the delivery uncompensated. Apps also have other tools to deter misconduct, for example, by deactivating the worker found to have engaged in it. Higher pay will also make the threat of deactivation more effective than it is at present, in that a worker has more to lose, and produce a more stable workforce where fewer trips are offered to new entrants who lack an established pattern of faithful performance.

The Department considered apps' proposal in which they would have discretion to withhold payment based on their determination of whether misconduct occurred, but it is not incorporating it. Workers commonly report instances in which they believe an app unfairly denied them the payment they were owed (Report at 23), and the Department is unable to conclude that inappropriate withholding of payment by apps is less of a concern than fraudulent conduct by workers.

**Recordkeeping and Reporting**

The Department made a minor change to the recordkeeping and reporting requirements.

The Second Proposed Rule required apps to maintain certain information regarding each instance in which a food delivery worker connects to an app's platform. The Final Rule clarifies that apps are not required to maintain this information when the food delivery worker does not engage in trip time or on-call time.

Comment:

Comments from Uber Eats, Grubhub, and DoorDash recommended that DCWP remove certain recordkeeping and reporting requirements from the Final Rule based on concerns that they were either burdensome, required apps to produce proprietary information, and/or could negatively affect worker privacy. These commenters contended that data such as the number of consumers, number of completed deliveries, total amounts charged to consumers for delivery, gratuities paid by consumers, subscription and membership fees charged to consumers, number of merchants, fees charged to merchants,

14

distances travelled, food delivery worker identifying information, and information about instances in which a food delivery worker connects to a platform but does not engage in on-call or trip time, have no relation to calculating minimum pay or demonstrating compliance.

Comments from elected officials, worker advocates, and academic researchers recommended that the Department require apps to collect more data, such as data on equipment theft and breakage and on-the-job accidents and injury. These commenters contended that such data would inform the Department's future assessment of worker expenses.

Response:

In response to comments, the Department clarified that apps are not required to maintain the information specified in 7-805(c)(9) for instances in which a food delivery worker connects to an app's platform without engaging in trip time or on-call time.

The Department is not otherwise incorporating the apps' recommendation to remove certain recordkeeping and reporting requirements. The recordkeeping and reporting requirements in the Final Rule will enable the Department to effectively monitor compliance with the minimum pay rule and understand the impact of the minimum pay rule on the food delivery market. These requirements will also enable the Department to carry out its statutory obligation under subdivisions (c) and (d) of Section 20-1522 of the Administrative Code to amend the minimum pay rule, if warranted or necessary, and to ensure the 2024 Report is based on accurate, relevant, up-to-date information.

These recordkeeping requirements do not have a negative impact on worker privacy. The City's Identifying Information Law places safeguards on DCWP's collection, retention, and disclosure of identifying information. Each worker's identifying information is also exempt from public disclosure under Section 87 of the Public Officers Law. Notably, neither workers nor worker advocates expressed concern that worker privacy is compromised by the recordkeeping requirements of this Final Rule.

The Department is not incorporating the recommendation to require data collection on equipment theft, breakage, and accidents or injuries.

**Impacts on Workers, Apps, Consumers, and Restaurants**

The Department performed two additional sensitivity analyses, but otherwise made no changes in its methodology for estimating impacts between the Second Proposed Rule and the Final Rule.

The Department's impact estimates rely on certain assumptions about how apps, workers, consumers, and restaurants will respond to the Final Rule. The Department previously discussed its methodology for projecting impacts of the First Proposed Rule (Report at 34-36), and how it adapted these methods to reflect changes in the Second Proposed Rule (Second Proposed Rule at 14-15). The relevant features of the Second Proposed Rule and Final Rule are identical, and further revision to the methodology was unnecessary for purposes of projecting the impacts of the Final Rule.

Table 7, below, elaborates on the impact analysis previously discussed in the Second Proposed Rule. The table presents the Department's projections under its main specification as well as under seven sets of alternative assumptions about how apps and consumers may react to the minimum pay rule.

**Table 7. Projected Outcomes of the Final Rule under the Department's Main and Alternative Specifications**

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| *Worker outcomes* | | | | | | | | |
| Pay per hour ($) | 23.56 | 23.56 | 23.56 | 23.56 | 23.56 | 23.56 | 23.56 | 23.56 |
| Tips per hour ($) | 9.41 | 0.00 | 9.41 | 12.82 | 7.89 | 9.41 | 9.41 | 9.41 |
| Expenses per hour ($) | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 |
| Net earnings per hour ($) | 30.15 | 20.74 | 30.15 | 33.56 | 28.63 | 30.15 | 30.15 | 30.15 |
| Net earnings per year ($, in thousands) | 32.5 | 22.3 | 32.5 | 36.1 | 30.8 | 32.5 | 32.5 | 32.5 |
| Total hours (in millions) | 76 | 87 | 84 | 61 | 84 | 84 | 67 | 60 |
| Total net earnings ($, in billions) | 2.3 | 1.8 | 2.5 | 2.0 | 2.4 | 2.5 | 2.0 | 1.8 |
| *Consumer Outcomes* | | | | | | | | |
| Average order cost, including taxes, tips, and fees ($) | 39.17 | 35.06 | 39.17 | 36.43 | 41.15 | 36.18 | 39.17 | 39.17 |
| Total spending on app delivery ($, in billions) | 6.8 | 7.0 | 7.5 | 7.0 | 6.6 | 6.9 | 6.0 | 5.4 |
| *App Outcomes* | | | | | | | | |
| Total deliveries (in millions) | 173 | 200 | 192 | 191 | 161 | 192 | 154 | 138 |
| Total gross margin ($, in millions) | 725 | 838 | 804 | 800 | 675 | 232 | 645 | 578 |

*Notes: Worker outcomes reflect adjustment for multi-apping. All outcomes are for 2025. Specification (1) is the Department's main specification. (See Table 8). Specifications (2)-(8) are the same as the main specification, except as follows: (2) Tipping is eliminated instead of averaging 17.3% of the order subtotal; (3) The price elasticity of demand for app delivery is -0.5 instead of -1; (4) Apps' deliveries per hour increase to 2.64 instead of 1.94; (5) Apps' deliveries per hour remain constant at 1.63 instead of increasing to 1.94; (6) Apps pass-through 50% of increased labor costs to consumers instead of 100%; (7) The price elasticity of demand for app delivery is -1.5 instead of -1; (8) Underlying annual growth in app deliveries is 8.5% instead of 17.0%.*

Comment:

Uber Eats commented that the Department's projections understate adverse impacts on the delivery industry, in part, because apps are unlikely to improve their productivity in response to the Second Proposed Rule to the level the Department projected. Uber Eats also commented that the Department provided insufficient information about how it arrived at its assumptions concerning the impact of the rule on apps' deliveries per hour.

Response:

In its modeling of both the Second Proposed Rule and the Final Rule, the Department assumes that Uber Eats, Grubhub, and DoorDash will use the Alternative Method, which they proposed, and Relay will use the Standard Method, which is closest to its current practice. Under the Alternative Method, apps have an incentive to reduce workers' trip time per delivery, which saves labor costs (stated equivalently, the Alternative Method incentivizes apps to increase deliveries per hour of trip time). The Department expects that Uber Eats, Grubhub, and DoorDash, which currently pay per delivery, will increase their deliveries per hour of trip time in response to the rule, partially closing the gap with the deliveries per hour of trip time exhibited by Relay, which already pays for trip time as part of its hourly pay model. The Department then assumes that these apps will facilitate an average of 40 minutes of on-call time for every 60 minutes of trip time, which will allow them to maximize on-call time under the Alternative Method while still maintaining a buffer above the 53% low-utilization floor. Specifically, the Department projects that Uber Eats, Grubhub, and DoorDash's deliveries per hour would change as follows:

$$T_{A_{2025}} = \alpha\, T_{A_{2022}} + (1 - \alpha)T_{R_{2022}} \tag{eq. 2}$$

16

$$O_{A_{2025}} = T_{A_{2025}} * \frac{0.4}{0.6} \qquad \text{(eq. 3)}$$

$$D_{A_{2025}} = \frac{60}{O_{A_{2025}} + T_{A_{2025}}} \qquad \text{(eq. 4)}$$

where $T_{A_Y}$ is the number of trip minutes per delivery for Uber Eats, Grubhub, and DoorDash in year $Y$, $T_{R_Y}$ is the number of trip minutes per delivery for Relay in year $Y$, $\alpha$ is a parameter indicating how much Uber Eats, Grubhub, and DoorDash close their gap in trip minutes per delivery with Relay, $O_{A_Y}$ is the number of on-call minutes per delivery for Uber Eats, Grubhub, and DoorDash in year $Y$, $D_{A_Y}$ is the number of deliveries per hour for Uber Eats, Grubhub, and DoorDash in year $Y$. The Department is unable to disclose the specific values for the variables used in equations 2-4 due to the confidentiality agreements apps insisted on as a condition of producing this data.

Equation 2 states that trip minutes per delivery at Uber Eats, Grubhub, and DoorDash in 2025 will be somewhere between these three apps' trip minutes per delivery in 2022 and Relay's trip minutes per delivery in 2022. Equation 3 states that in 2025 Uber Eats, Grubhub, and DoorDash will facilitate 0.6 minutes of on-call time for every 0.4 minutes of trip time. Equation 4 converts the trip minutes per delivery and on-call minutes per delivery from equations 2 and 3 into deliveries per hour at Uber Eats, Grubhub, and DoorDash for 2025. The Department then used the result from equation 5, together with Relay's deliveries per hour from 2022, which the Department assumed will remain constant, to obtain the projected 1.94 deliveries per hour in the Department's impact model. (Table 8).

Uber Eats, Grubhub, and DoorDash may seek to increase deliveries per hour of trip time in several ways. For instance, apps can make increased use of bundled trips, offer trips closer to the time that food is expected to be ready, or impose greater accountability on workers for timeliness. Apps may also pursue strategies that change the mix of orders they receive, such as varying consumer fees or order minimums based on the expected duration of a trip, privileging closer restaurants in consumers' search results and interfaces, setting shorter maximum delivery radiuses, or using advertising and promotion to focus growth on market segments where trips tend to be of shorter duration.

In its sensitivity analysis, the Department also considered two alternative scenarios in respect to productivity improvements. In one scenario, deliveries per hour of trip time do not change in response to the minimum pay rule. In this scenario, $\alpha$ in equation 2 is one, and apps' deliveries per hour remain at 1.63 through 2025. In the other scenario, apps using the Alternative Method achieve greater increases in deliveries per hour of trip time. In this scenario, $\alpha$ in equation 2 is less than in the main specification, and apps' deliveries per hour increase to 2.64 by 2025. (Table 7).

Comment:

Uber Eats commented that in its Report the Department made two calculation errors in respect to the average number of deliveries workers perform per hour. Specifically, Uber Eats asserted that the Department's data implies that the number of deliveries per hour in the fourth quarter of 2021 was 1.70 (instead of 1.63, as published by the Department), and that Department's projected increase of 0.87 deliveries per hour by 2025 conflicts with its statement that deliveries per hour will increase by 51%. Additionally, DoorDash incorporated comments in response to the First Proposed Rule that the Department made an error in finding that the workers replace both phones and batteries at a rate of 1.74 per year.

Response:

With respect to deliveries per hour in the fourth quarter of 2021, Uber's claim that the deliveries per hour by mode of transportation shown in Table 3 of the Report implies 1.70 deliveries per hour across all modes of transportation is incorrect. Uber Eats obtained this figure as the average of the deliveries per hour shown for each mode of transportation, weighting by each mode's share of total deliveries. This weighting is inappropriate, because it over-weights modes with high deliveries per hour and under-weights modes with low deliveries per hour, biasing the figure upwards. Instead, the Department obtained 1.63 directly by first summing the deliveries and hours in the record-level data it obtained from the apps and then dividing total deliveries by total hours. The Department then confirmed this result against Table 3 of the Report by calculating average deliveries per hour across all modes of transportation, weighting by each mode's share of total hours, which is the correct weighting. (*See* Report at 14).

With respect to the projected increase in deliveries per hour, the Department determined that 51% was a drafting error, and that the correct value is 53%.

Regarding DoorDash's comment about workers replacing both phones and batteries at a rate of 1.74 per year, the Department found no errors in these calculations. The Department's figures for phones (1.7414) and batteries (1.7392) differ but coincidentally both round to 1.74.

Comment:

Uber Eats commented that the Department's projections understate adverse impacts on merchants and consumers, in part, because consumers may be more sensitive to the price of app delivery than the Department assumes. Uber Eats also commented that the Department provided insufficient information about how it arrived at its assumptions concerning the elasticity of demand for app delivery in respect to price.

Response:

The Department previously noted the possibility of higher and lower elasticities and the rationale for assuming an elasticity of 1 (Report at 34). Results from an alternative considering higher elasticity are presented in Table 7.

In response to comments, the Department performed additional research into elasticities of demand for related services, and they were confirming. Specifically, the Department reviewed studies which estimate elasticities for food away from home and concluded that an elasticity of 1 is appropriate and a possibly conservative estimate. Of particular relevance is the United States Department of Agriculture's (USDA) finding of a 0.13 elasticity for limited-service restaurants, 1.96 for full-service restaurants, and 0.43 for other food away from home. *See* The Demand for Disaggregated Food Away-From-Home and Food-at-Home Products in the United States, U.S. Department of Agriculture (August 2012). Weighting these elasticities by their shares in overall food away from home spending produces an elasticity of 0.96, which is very close to 1. In comments, Uber Eats claimed that the USDA has found that the elasticity of demand for restaurant meals is 2.3. However, the citation given by Uber Eats is to a blog post by a consulting firm that does not include any citation for the underlying finding. The Department has been unable to locate any material from the USDA that supports Uber Eats' claim. Uber Eats did not otherwise provide support for the alternative, higher elasticities it modelled.

Comment:

Uber Eats commented that the Department did not perform an analysis of its impact estimates' sensitivity to alternative assumptions or consider the risk that its assumptions are incorrect, which it alleges caused the Department to under-estimate the adverse consequences to merchants or consumers. Uber Eats also submitted its own sensitivity analysis in which it substituted the Department's projected productivity increases and assumed demand elasticity with others that show larger adverse impacts on the volume of app delivery.

18

Response:

The Department summarized the results of its sensitivity analysis of the First Proposed Rule (Report at 36) and is publishing sensitivity analyses of the Final Rule. (Table 7).

To address the possibility that adverse impacts could be greater than anticipated, the Final Rule includes a phase-in of the minimum pay rate and a monthly reporting requirement so the Department can monitor outcomes and adjust the minimum pay rate if warranted.

The Department reviewed the additional sensitivity analyses provided by Uber Eats and determined that the scenarios showing large adverse impacts are not plausible. As discussed above, consumers are not likely to be as responsive to price changes as Uber Eats proposes in their alternate sensitivity analyses, which considered elasticities as high as 3. Further, Uber Eats' projections of large adverse impacts rely on assumptions concerning tipping, markups, and productivity that are inconsistent with such high elasticities of demand. For instance, the total cost increase to consumers would likely be mitigated by reduced tipping, either at consumers' discretion or through changes apps would make to their consumer interfaces. Similarly, an app facing such high elasticity of demand would likely reduce its markups or increase deliveries per hour above the levels Uber Eats assumes in its analysis. The Department discussed the methods apps might use to achieve these results above (at 18) and in the Report (at 35-36).

Comment:

Uber Eats commented that the Department's assumption for growth in the number of deliveries in the absence of a minimum pay rule was overstated, and so the Department's projections for the number of app deliveries that would occur under the minimum pay rule is also overstated.

Response:

The Department assumed that in the absence of a minimum pay rule, growth would continue at the same rate as during the January 1, 2021 through June 30, 2022 period, which is the extent of the data the apps produced to the Department. (Report at 34). Apps have not provided information on what their growth has been since then or alternative projections for expected growth in the absence of a minimum pay rule. The Department considered using publicly-available national projections for industry growth, but determined that these sources would be less informative than the data the Department used, which is specific to NYC and reflects apps' own records. The Department inspected apps' NYC delivery volumes from January 1, 2021 through June 30, 2022 for signs of deceleration, but did not observe a slowdown during this period. Still, the Department considered a scenario with slower-than-anticipated underlying growth in app delivery and concluded that no changes were warranted in light of the additional sensitivity analysis. (Table 7).

Comment:

Uber Eats commented that the Department provided insufficient information about its impact modeling, depriving commenters of the ability to meaningfully comment on the impact of the minimum pay rate and preventing commenters from critiquing the model. Uber Eats recommended that the Department delay adoption of the Final Rule until at least June 6, 2023.

Response:

The Department provided a plain-language description and results of its impact modeling in the Report (at 34-36) and additional information in the Second Proposed Rule (at 15-16). Commenters engaged with the Department's modeling by

19

pointing out their disagreement with the assumptions the Department incorporated into its analysis, replicating key calculations, and performing their own sensitivity analyses.

In this Final Rule, the Department is also publishing Table 8, which provides a formal statement of the inputs and calculations the Department used to model impacts of the Final Rule.

**Table 8. Model Inputs and Calculations Used to Project Impacts under the Final Rule**

| Row | Inputs | Value | Rounding |
|---|---|---|---|
| 1 | Minimum pay rate, 2025 | $19.96 | $0.01 |
| 2 | Apps' deliveries per hour, 2025 | 1.94 | 0.01 |
| 3 | Consumers' average order cost, 2022 | $33.20 | $0.01 |
| 4 | Workers' pay per delivery, 2022 | $4.32 | $0.01 |
| 5 | Labor cost pass-through | 1.00 | 0.00 |
| 6 | Workers' tips per delivery, 2022 | $4.11 | $0.01 |
| 7 | Workers' tips per delivery, 2025 | $4.11 | $0.01 |
| 8 | Total deliveries, 2022 | 132,000,000 | 1,000,000 |
| 9 | Industry growth rate | 17.0% | 0.0% |
| 10 | Price elasticity of demand | -1.00 | -0.01 |
| 11 | Multi-apping adjustment | 0.8471 | 0.0001 |
| 12 | Workers' expenses per hour, 2025 | $2.82 | $0.01 |
| 13 | Workers' hours worked per week, 2022 | 20.7 | 0.1 |
| 14 | Workers' weeks worked per year | 52 | 1 |
| 15 | Apps' gross margin per delivery, 2022 | $4.19 | $0.01 |

| Row | Calculations | Formula | Rounding |
|---|---|---|---|
| 16 | Workers' pay per delivery, 2025 | $[1] / [2]$ | $0.01 |
| 17 | Consumers' average order cost, 2025 | $[3] + (([16] - [4]) * [5]) + [7] - [6]$ | $0.01 |
| 18 | Total deliveries, 2025 | $[8] * (1+[9])\char`\^3 * (1+([17] - [3]) / [3] * [10])$ | 1,000,000 |
| 19 | Workers' pay per hour, 2025 | $[1] / [11]$ | $0.01 |
| 20 | Workers' deliveries per hour, 2025 | $[2] / [11]$ | 0.01 |
| 21 | Workers' tips per hour, 2025 | $[7] * [20]$ | $0.01 |
| 22 | Workers' net earnings per hour, 2025 | $[19] + [21] - [12]$ | $0.01 |
| 23 | Workers' net earnings per year, 2025 | $[22] * [13] * [14]$ | $1 |
| 24 | Workers' total hours, 2025 | $[18] / [20]$ | 1,000,000 |
| 25 | Workers' total net earnings, 2025 | $[22] * [24]$ | $100,000,000 |
| 26 | Consumers' total spending, 2025 | $[17] * [18]$ | $100,000,000 |
| 27 | Apps' gross margin per delivery, 2025 | $[15] - ([16] - [4]) * (1 - [5])$ | $0.01 |
| 28 | Apps' total gross margin, 2025 | $[18] * [27]$ | $1,000,000 |

Notes: *Values for model inputs correspond to the Department's main specification. Numbers in brackets refer to the value or formula in the referenced row (e.g., "[8]" refers to the value in row 8; "[17]" refers to the result obtained in row 17). Consumers' average order cost includes taxes, tips, and fees. Consumers' total spending is for app delivery only. The Department calculated consumers' average order costs for January 2021 – June 2022 by synthesizing the weekly*

20

*aggregate data, zip code summary data, and record-level data it obtained from apps and Kabir Ahuja et al., Ordering in: The rapid evolution of food delivery, McKinsey and Company (Sept. 22, 2021). The Department calculated apps' gross margin per delivery from the record-level data it obtained from apps. In the Report, this value was erroneously stated as $4.16 per delivery due to a typographical error (Report at 35). The corrected value of $4.19 appears in row 15, above. For further information on sources and methods, see Report (at 8, 16, 34-35), Second Proposed Rule (at 5, 10, 16), and above (at 2-3, 10, 16-17). "Rounding" refers to the digit to which values are rounded before being carried over to subsequent calculations.*

Comment:

Uber Eats, Relay, restaurants, and restaurant advocates commented that apps will respond to the Second Proposed Rule in ways that harm restaurants. These commenters asserted that apps and restaurants will increase the prices they charge to consumers, thereby decreasing demand for app delivery. Uber Eats contended that apps will reduce maximum delivery radii, reducing restaurants' customer base. Uber Eats also asserted that the Department's assumption that restaurants earn margins of 0% on delivery is wrong. Uber Eats contends that restaurants do earn a profit on each order and, because the minimum pay rule will lead to fewer orders, restaurant profits will decline.

Response:

The Department considered apps' possible responses to the minimum pay rule and their impacts on restaurants. Because consumers may substitute away from app delivery towards restaurant sales channels that have higher margins, the effect of any reduction in demand from apps' pass-through of costs to consumers may be to increase profitability. (Report at 35). With respect to shorter delivery distances (which could result from lower maximum radii, among other strategies), the effect is ambiguous. Longer delivery distances benefit some restaurants, though these restaurants' enlarged markets come at the expense of other restaurants that face increased competition. If consumers value long delivery distances, apps are free to continue offering them and can set the fees they charge to consumers at any level they choose. The Department's finding of a 0% margin on app delivery is consistent with prior research. (Report at 15). The Department also confirmed this finding through discussions with restaurant industry stakeholders. Restaurants choose to use delivery apps despite low or no margins, in part, because such sales provide restaurants with opportunities to reach new customers in the hopes of converting them to more profitable channels on subsequent purchases.

Comment:

Apps, restaurant owners, and chambers of commerce expressed concern about the impact of the rule on consumers and restaurants in less busy areas or low-income areas of the City. These commenters contended that the increase in the cost of app delivery places it out of reach for many New Yorkers and will result in fewer restaurant orders through apps. Uber Eats noted that in these communities, workers have lower utilization rates, and that it would need to limit service in those communities to achieve a 60% utilization rate.

Response:

As stated previously, the Department recognizes that some consumers may be more price-sensitive than others, but determined that raising food delivery workers' pay is necessary, and that some consumers' inability or unwillingness to pay for the cost of their labor does not justify limiting food delivery workers' incomes below the levels provided for in this Final Rule. (Second Proposed Rule at 16).

Comment:

Apps and some workers also expressed concern that, although the Alternative Method's trip-time only pay option is partially responsive to concerns they expressed about the Standard Method in the First Proposed Rule, it will still reduce workers' flexibility in that after April 1, 2024, apps must maintain a utilization floor of at least 53% in order to use the Alternative Method. These commenters expressed concern that apps would reduce workers' opportunities to login to the platforms without advance planning or further encroach on workers' discretion to reject or accept trips.

Response:

The Department adopted the Alternative Method in response to concerns raised by apps and some workers that the aggregate on-call payment component of the Standard Method in the First Proposed Rule would lead apps to make operational changes that increase utilization by restricting platform access and limiting worker flexibility to reject trip offers. The Alternative Method accommodates recent utilization rates and does not incentivize apps to boost utilization above 60% to save on labor costs.

Comment:

Some elected officials, advocacy groups, labor unions, and academic researchers suggested that the Department monitor "order bundling" out of concern that it could negatively impact worker earnings or allow apps to pay a subminimum wage. Order bundling is a practice where apps assign multiple orders that a worker needs to fulfill during the same trip.

Response:

The Department does not agree that the practice of "order bundling" will negatively impact worker earnings or allow apps to pay workers a subminimum wage. Under both the Standard Method and Alternative Method, workers will be paid for their trip time, regardless of the number of orders fulfilled in a single trip. Using workers' time more efficiently through this practice may also help increase the number of deliveries per hour, as the Department projects, partially offsetting the increased cost of delivery on consumers. However, the recordkeeping requirements of this Final Rule require apps to maintain records that will allow the Department to monitor the impact of order bundling on worker earnings and the Department can revisit this practice in future rulemaking if warranted.


**Use of Survey Data**

The Department relied, in part, on data from its NYC Delivery Worker Survey in developing the minimum pay rate under the First Proposed Rule and the Second Proposed Rule. (Report at 2-5, Second Proposed Rule at 9). The Department also fielded two other surveys, the Columbia-Sam-Schwartz -Deliveristas Survey, and the NYC Restaurant Delivery Survey, but the Department did not use data from these surveys in calculating the minimum pay rate. (Report at 3). The Department is not modifying its use of survey data in this Final Rule.

Comment:

Uber Eats commented that the Department has not meaningfully responded to criticisms that it relied on survey data that is unreliable.

Response:

The Department discussed its use of survey data in the Report and the Second Proposed Rule. (Report at 2-5, Second Proposed Rule at 9). The Department is providing further discussion in this Final Rule.

22

Comment:

Uber Eats' consultant commented that the Department has not indicated how many times each phone number or email address was contacted, how the language(s) of the message and survey were chosen, when each recipient responded, how the Department confirmed the identity of the survey recipients, how the Department estimated the number of unique individuals receiving surveys, or how the Department analyzed the survey.

Response:

The Department previously described its fielding and analysis of the NYC Delivery Worker Survey in the Report (at 2-5), and the Second Proposed Rule (at 9) and is providing further detail in this Final Rule. In the NYC Delivery Worker Survey, the Department contacted each phone number and email address once for every associated account. A contact by phone consisted of one or more text messages during a day. The Department conducted the survey in English and eight of the ten designed citywide languages under Local Law 30 (Haitian Creole and Polish were omitted due to limitations in the Department's survey software). The Department received responses between June 8, 2022 and July 28, 2022. The Department distributed survey links that were unique to each phone number and associated email address and removed any duplicate responses from the survey results. The Department estimated the number of workers who received a survey by dividing the number of accounts by the weighted average number of apps that workers reported working for in the survey. (Report at 4-5). This approach accounts for multi-apping that cannot be identified in the record-level data.

To analyze the survey, the Department applied the inclusion criteria and post-stratification weights described in the Report. (Report at 3, 5). The Department further described narratively in the Report and Second Proposed rule how it calculated the specific inputs into the minimum pay rate that it derived from the survey. They are also listed and explained in Table 9 below.

**Table 9: List of Inputs into the Minimum Pay Rate Derived from NYC Delivery Worker Survey**

| Calculation | Equation | Subpopulation | Variables |
|---|---|---|---|
| Percentage of workers who multi-app | $\dfrac{\sum W_M}{\sum W}$ | All workers | $W_M$ is the post-stratification weight if a respondent says they have worked for multiple apps (or 0 otherwise), and $W$ is the post-stratification weight. |
| Probability that a worker experiences loss or theft of their e-bike in a month | $\dfrac{\sum W_L}{\sum WT}$ | Workers who reported that the first vehicle they used for app delivery was an e-bike | $W_L$ is the post-stratification weight if a respondent reports experiencing an instance of loss due to theft or irreparable damage to their e-bike (or 0 otherwise), $W$ is the post-stratification weight, and $T$ is the time, in months, between the start of a worker's app delivery career and either (1) the date of loss incident to their first e-bike, if they experienced a loss incident for their first e-bike or (2) the date of survey completion, if they did not experience a loss incident. |
| Frequency with which workers purchase replacement batteries or phones, or trade-in phones | $\dfrac{\sum W_R F}{\sum W}$ | Workers who reported that they use an e-bike for app delivery | $W_R$ is the post-stratification weight if a respondent says they purchased or traded-in the relevant item (or 0 otherwise), $F$ is the quantity the respondent reported purchasing or trading-in in the last year, and $W$ is the post-stratification weight. |

| Share of respondents purchasing each e-bike accessory | $\dfrac{\sum W_R}{\sum W}$ | Workers who reported that they use an e-bike for app delivery | $W_R$ is the post-stratification weight if a respondent says they purchased the accessory in the past year (or 0 otherwise), and $W$ is the post-stratification weight. |
|---|---|---|---|
| Average phone purchase and/or trade-in price | $\dfrac{\sum VW}{\sum W}$ | Workers who reported that they use an e-bike for app delivery | $V$ is the purchase or trade-in value of the most recent phone that a respondent reports purchasing, and $W$ is the post-stratification weight. |

Comment:

Uber Eats' consultant commented that the Department's explanation of the survey's sponsor and purpose to potential respondents biased the results of the NYC Delivery Worker Survey, leading to an overestimate of expenses.[1] The consultant asserted that a survey can only be reliable if its sponsor and purpose is concealed from the respondent. The consultant also stated that eight of the survey questions were drafted in a way that produces bias. The consultant objected to questions asking workers to consider their expenses, to give estimates (especially of amounts spent), and select answers from sets of close-ended responses. The consultant recommended instead the use of open-ended questions, collection of receipts from respondents, and use of free response formats. Finally, the consultant criticized the Department's choice not to include "phantom questions" as part of a method to control for the possibility that respondents reported purchasing certain items for their work which they did not in fact purchase for work.

Response:

It would not have been appropriate to conduct a survey without informing respondents that it was being conducted by the City of New York or informing respondents how their responses would be used. Such disclosures, which are customary, do not invalidate the survey results. Had the Department not provided appropriate disclosure, it is likely that participation would have been lower and less representative.

None of the eight questions to which Uber Eats' consultant objected were used in calculating the minimum pay rate. Still, the Department considered the extent to which such criticisms might also extend to questions the Department did use in its expense calculation (*see* Second Proposed Rule at 9) but found that they either do not apply or are not valid. First, the Department's decision to ask workers about whether they purchased specific accessories, as opposed to an open-ended question about expenses, followed from initial testing with delivery workers in which respondents had difficulty recalling the accessories they purchased without prompting. Had the Department adopted commenter's recommendation, it would have led to an under-estimate of accessory expense. Second, as stated previously (Second Proposed Rule at 9), the Department did not use any responses in which a respondent was asked to report a monetary amount in its calculation of the minimum pay rate. Lastly, field surveyors on the Columbia-Sam Schwartz-Deliveristas Survey reported that delivery workers experienced a high level of difficulty completing free response format or numeric input questions, leading the Department to determine that close-ended responses were the most appropriate format for this population and essential in

---

[1] The preamble was: "NYC is surveying New Yorkers about their work for delivery apps. This is part of a new law to raise pay for app delivery workers. Your answers will help NYC set a minimum pay rate that reflects your expenses and needs."

24

keeping the voluntary survey short and cognitively undemanding, which increases survey completion and representativeness.

With respect to "phantom questions," respondents to the NYC Delivery Worker Survey reported purchasing some items at very low rates (e.g., anti-theft camera at 13 percent), putting a low upper bound on the frequency with which respondents may have reported purchasing an item for delivery work that they did not in fact purchase for that purpose. The use of "phantom questions" is not customary in government surveys and the Department's choice not to include them in the NYC Delivery Worker Survey does not invalidate its results.

Comment:

Uber Eats commented that the Department should consider methodologies for developing the minimum pay rate that do not rely on the surveys it conducted.

Response:

In the Second Proposed Rule, the Department stated that it compared the vehicle expense portion of the minimum pay rate to the cost of the e-bike sales and rental promotions marketed by Uber Eats and DoorDash and found that the vehicle expenses reflected in the minimum pay rate are lower. (Second Proposed Rule at 9).

For the Final Rule, the Department additionally compared the phone portion of the minimum pay rate to publicly-available benchmarks for employee cell phone stipends and confirmed that the phone expenses reflected in the minimum pay rate are not inappropriate due to its use of survey data. Specifically, for an e-bike worker working average weekly hours (21.3), the phone portion of the minimum pay rate provides for $57.45 per month. In comparison, the Department found that some benefit experts recommend $75 per month on the high-end and that some prominent corporations provide cell phone stipends above this level. Since e-bike delivery involves extraordinarily intensive use of a cell phone for work, and many workers use multiple phones for their work, the Department concludes that its use of survey data to estimate phone expenses did not produce an unreasonable rate.

For these reasons, the Department is not adopting an alternative method to develop the minimum pay rate that does not rely on survey data. Further, as stated previously, the rule's recordkeeping requirements will enable the Department to use apps' data in place of survey responses for purpose of measuring phone expenses and multi-apping in future rulemaking. (Second Proposed Rule at 14).

New material is underlined.
[Deleted material is in brackets.]

"Shall" and "must" denote mandatory requirements and may be used interchangeably in the rules of this Department, unless otherwise specified or unless the context clearly indicates otherwise.

Subchapter H of Chapter 7 of Title 6 of the Rules of the City of New York is amended to read as follows:

**Subchapter H: Third-Party Service Workers**
**§ 7-801 Definitions.**

(a) As used in this subchapter, the following terms have the following meanings:

(1) "Cancellation" or "Cancelled", when used with respect to a trip or delivery, means that the trip or delivery ends prior to drop-off of an order with the consumer. When used with respect to trips including multiple deliveries, the terms mean

25

that the trip ends prior to the completion of all planned drop-offs on the trip. The terms encompass cancellation initiated by a consumer, a food delivery worker, or a third-party food delivery service or third-party courier service.

(2) "Deactivation" means a third-party food delivery service or third-party courier service ceases to offer shifts or trips to a food delivery worker on a temporary or permanent basis.

(3) "Internal identifier" means a character string comprised of letters, numbers, or symbols that a third-party food delivery service or third-party courier service assigns to a food delivery worker for purposes of uniquely identifying such worker within its records.

(4) "On-call time" means the time a food delivery worker is connected to a third-party food delivery service or third-party courier service's electronic system for arranging or monitoring trips in a status where the food delivery worker is available to receive or accept trip offers or assignments with a pickup or drop-off location in New York City and excludes all trip time.

(5) "Pay period" means a fixed and regularly recurring period of 168 hours or seven consecutive 24-hour periods.

([2]6) "Trip" has the same meaning as set forth in Section 20-1501 of the Administrative Code, provided that a single trip may encompass multiple deliveries.

(7) "Trip time" means the span of time between the moment a food delivery worker accepts an offer from a third-party food delivery service or third-party courier service to perform a trip with a pickup or drop-off location in New York City, or receives an assignment to perform such a trip, through the moment such trip is completed or cancelled.

(8) "Utilization rate" means a third-party food delivery service or third-party courier service's total trip time divided by the sum of its trip time and on-call time.

(b) As used in this subchapter, the following terms have the same meanings as set forth in Section 20-1501 of the Administrative Code: "Food delivery worker," "food service establishment," "third-party courier service," and "third-party food delivery service."

## § 7-804 Notice of Rights.

(b) The notice of rights required by Section 20-1505 of the Administrative Code must be provided by email and as a link within a text message sent to the food delivery worker. In addition to provision by text [or]and email, such notice must also be made continuously available to all active food delivery workers through any website, mobile application, or other internet service used by a food delivery worker to perform work for a third-party food delivery service or third-party courier service.

(d) If the commissioner updates the information in the notice of rights pursuant to § 20-1505(a) of the Administrative Code, no later than thirty (30) days following the effective date of such update, a third-party food delivery service or third-party courier service must provide such updated notice to all food delivery workers in the manner provided in subdivisions (a) through ([f]c) of this section.

## § 7-805 Recordkeeping.

(a) (1) A request or subpoena for information or records from the Department must be served on a third-party food delivery service or third-party courier service in writing in person, via mail, or via email. When the Department issues a

26

written request or subpoena for data, information or documents under Section 20-1506(a) of the Administrative Code, a third-party food delivery service or third-party courier service must provide all responsive data, information, or documents to the Department within thirty (30) days of receiving such request or subpoena. The Department may issue such written request or subpoena for purposes of discharging any of its responsibilities under Sections 20-1507 or 20-1522 of the Administrative Code.

(2) A deadline of more than 30 days may be agreed to on consent by the Department and the third-party food delivery service or third-party courier service.

(3) A third-party food delivery service or third-party courier service must provide data, information, or documents to the Department in their original format or, if so requested, in the comma-delimited formats and layouts prescribed by the Department in such written request or subpoena.

(4) The Department may issue a notice of violation to a third-party food delivery service or third party courier service who fails to provide true and accurate electronic records or information by the deadline provided in the written request or subpoena or the deadline agreed to by the parties, provided that any monetary penalties authorized by law for a violation of Section 20-1506 of the Administrative Code shall not apply while such written request or subpoena is the subject of a [pending]timely-filed pre-compliance review proceeding.

(b) A third-party food delivery service or third-party courier service must create and maintain contemporaneous, true, and accurate records documenting compliance with the requirements of Chapter 15 of Title 20 of the Administrative Code and any rules promulgated thereunder for a period of three years. If, in the ordinary course of business, any record required to be maintained under this subdivision is created by a person other than such third-party food delivery service or third-party courier service, it is the responsibility of such third-party food delivery service or third-party courier service to obtain a copy of such record.

(c) A third-party food delivery service or third-party courier service must maintain the [data specified in this subdivision, or a copy of such data, according to record layouts prescribed by the Department, provided that such record layouts have been published and made available on the Department's website. Such data shall include] following data and records:

(1) With respect to all food delivery workers, first name, last name, phone number, email address, [a unique] internal identifier [for the worker], taxpayer identification number if required to maintain such number under federal or state law, preferred language, first date hired, retained or engaged, and last date hired, retained or engaged.

(2) With respect to the notice of rights, data sufficient to show each email [or]and text message containing the notice of rights that was sent to a food delivery worker, the date and time such email or text message was sent, the first name, last name, and [a unique] internal identifier of the recipient, and[, as applicable,] the phone number [or]and email address of the recipient.

(3) With respect to the maximum distance, bridge, or tunnel parameters set or updated under Section 20-1521(a)-(b) of the Administrative Code, the date, time, and content of every selection of or update to such parameters and the first name, last name, and [a unique] internal identifier of the food delivery worker who selected or updated such parameters.

(4) With respect to each trip offered to a food delivery worker:

(i) All information disclosed to a food delivery worker before such worker accepts a trip under Section 20-1521(d) of the Administrative Code, including:

a. The address(es) where the food, beverage or other goods must be picked up;

27

b. The estimated distance for the trip;

c. The estimated time for the trip or, if disclosed in lieu of estimated time for the trip pursuant to 6 RCNY § 7-80[7]6([e]f) of this subchapter, the expected or required time of the last drop-off on the trip;

d. The amount of any gratuity(ies) specified by the consumer(s); and

e. The amount of compensation excluding gratuity to be paid to the food delivery worker for the trip or, if disclosed in lieu of compensation excluding gratuity pursuant to 6 RCNY § 7-80[7]6(h), the hourly pay rate applicable to the trip;

(ii) The date and time that the trip offer was made to the food delivery worker;

(iii) If different from the date and time that the trip offer was made to the food delivery worker, the date(s) and time(s) that the information required to be disclosed by Section 20-1521(d) of the Administrative Code was first disclosed to a food delivery worker;

(iv) Whether the offer was accepted, declined, or expired, and the date and time at which this status was recorded;

(v) The route used to generate the estimated trip distance disclosed to a food delivery worker pursuant to Section 20-1521(d)(2) of the Administrative Code and the date and time it was generated. Such route must include a sequence of latitude and longitude coordinates;

(vi) The route distance between the first food service establishment from which the food, beverage or other goods must be picked up on the trip and the last delivery address on the trip;

(vii) The address(es) of where the food, beverage or other goods must be picked-up and, for the location(s) to which the food, beverage, or other goods must be delivered, the zip code and the latitude and longitude [of the location(s) to which the food, beverage, or other goods must be delivered], accurate to a precision of three decimal places;

(viii) The gratuity the third-party food delivery service or third-party courier service charged to the consumer(s) for the order(s) on the trip;

(ix) The gratuity the third-party food delivery service or third-party courier service paid to the food delivery worker for the trip;

(x) The compensation, excluding gratuity, paid to the food delivery worker for the trip. If a third-party food delivery service or third-party courier service compensates a food delivery worker on an hourly basis, the amount of compensation for a trip is the time between the acceptance of an offered trip and its completion or cancellation, multiplied by the hourly payment rate for that trip;

(xi) Whether the trip was completed or cancelled, and the date and time of completion or cancellation; and if cancelled, whether the cancellation was initiated by the food delivery worker, the customer, the business from which the food, beverage, or other good was to be picked-up, or the third-party food delivery service or third-party courier service;

(xii) The first name, last name, and [a unique] internal identifier of the food delivery worker to whom the offer was made; and

28

(xiii) Whether each business from which the food, beverage or other goods must be picked up was a food service establishment.

(5) With respect to each pay[ment to] period during which a food delivery worker engaged in any trip time or on-call time:

(i) The first name, last name, and [a unique] internal identifier of the food delivery worker [receiving payment]; [and]

(ii) The date[ and], time, and amount of any payment [,the start and end date of the pay period, the amount of compensation, and all fees or deductions from compensation, itemized by type.] made to the food delivery worker for the pay period, or any part thereof;

(iii) The start date and time and end date and time of the pay period;

(iv) The minutes of trip time worked by the food delivery worker;

(v) The minutes of on-call time worked by the food delivery worker;

(vi) The compensation, excluding gratuities, paid to the food delivery worker and the basis for such compensation, including rates of pay and units of pay. Such records must distinguish between compensation creditable towards a third-party food delivery service or third-party courier service's obligations under 6 RCNY § 7-810 and any other compensation the third-party food delivery service or third-party courier service may have paid to the food delivery worker;

(vii) The gratuities paid to the food delivery worker for trips with a pickup or drop off location in New York City;

(viii) All deductions from, additions to, or adjustments of compensation owed or paid to the food delivery worker, itemized by type.

(ix) The minimum pay method chosen for the pay period pursuant to 6 RCNY § 7-810(c).

(6) With respect to each pay period:

(i) The start date and time and end date and time of the pay period;

(ii) The total minutes of trip time for all food delivery workers;

(iii) The total minutes of on-call time for all food delivery workers;

(iv) The total compensation paid to all food delivery workers. Such records must distinguish between (a) compensation creditable towards a third-party food delivery service or third-party courier service's obligation under Section 7-810 and any other compensation the third-party food delivery service or third-party courier service may have paid to the food delivery worker;

(v) The minimum pay method chosen for the pay period pursuant to 6 RCNY § 7-810(c).

(7) With respect to each insulated food delivery bag provided to a food delivery worker:

(i) The first name, last name, and [a unique] internal identifier of the worker to whom the delivery bag was provided; and

29

(ii) The date of provision, and whether provision was by pickup or whether the third-party food delivery service or third-party courier service sent the insulated delivery bag to the food delivery worker.

([7]8) With respect to each deactivation of a food delivery worker:

(i) The first name, last name, and [a unique] internal identifier of the worker who was deactivated;

(ii) The date and time of deactivation;

(iii) The date and time of reactivation, if applicable;

(iv) The reason for the deactivation; and

(v) Whether the deactivation was effected through an automatic or a manual process.

(9) With respect to each instance in which a food delivery worker engages in trip time or on-call time:

(i) The first name, last name, and internal identifier of the food delivery worker;

(ii) The start date and time and end date and time of each span of on-call time;

(iii) The start date and time and end date and time of each span of trip time; and

(iv) The manufacturer, name, and model number of the phone that the food delivery worker used to engage in trip time or on-call time.

(d) In accordance with applicable law and upon receipt of appropriate notice, a third-party food delivery service or third-party courier service must produce reports to the Department concerning such third-party food delivery service or third-party courier service's operations in New York City for all periods on or after January 1, 2022; provided however, that for all periods between January 1, 2022 and the effective date of this subdivision, a third-party food delivery service or third-party courier service must produce reports only to the extent that such third-party food delivery service or third-party courier service maintained all or part of such records. The reports required to be produced pursuant to this subdivision may be required by the Department no more frequently than monthly and must be produced in accordance with a format, layout, and procedure prescribed by the Department, provided that this subdivision shall not be construed as requiring a third-party food delivery service or third-party courier service to submit reports on orders for which it had no responsibility for facilitating or arranging the delivery or pickup of food, beverages, or other goods by a food delivery worker. A third-party food delivery service or third-party courier service must maintain the records used to produce such reports for a period of three years. Such reports may include the following information for each pay period aggregated citywide and by zip code of the pickup or drop-off location in New York City, food delivery worker mode of transportation, and merchant line of business:

(1) The number of food delivery workers who engaged in any trip time;

(2) The number of food delivery workers who engaged in any on-call time;

(3) The number of trips with a pickup or drop-off location in New York City;

(4) The minutes of trip time;

30

(5) The minutes of on-call time;

(6) The total amount paid to food delivery workers, excluding gratuities, creditable towards a third-party food delivery service or third-party courier service's obligation under 6 RCNY § 7-810;

(7) The total gratuities paid to food delivery workers for trips with a pickup or drop-off location in New York City;

(8) The minimum pay method chosen for the pay period pursuant to 6 RCNY § 7-810(c);

(9) The number of consumers who received at least one delivery with a pickup or drop-off location in New York City;

(10) The number of completed deliveries with a pickup or drop-off location in New York City;

(11) The total amount charged to consumers for the food, beverage, or other goods on deliveries with a pickup or drop-off location in New York City;

(12) The fees charged to consumers on orders for delivery with a pickup or drop-off location in New York City;

(13) The subscription and membership fees charged to consumers in New York City;

(14) The number of merchants who prepared at least one order for delivery with a pickup or drop-off location in New York City;

(15) The delivery fees, payment processing fees, and other fees charged to merchants on orders for delivery with a pickup or drop-off location in New York City, itemized by type.

(e) The Department may prescribe data specifications, including field definitions, record layouts, and uniform codes, for any record required to be maintained pursuant to subdivision (c) or (d) of this section. If prescribed by the Department, a third-party food delivery service or third-party courier service must maintain the required records in accordance with such specifications.


## § 7-806 Delivery Distance and Route.

(j) For purposes of Section 20-1521(a)(1)-(3) of the Administrative Code and this section, a trip offered to a food delivery worker by a third-party food delivery service or third-party courier service requires travel across a bridge or through a tunnel if the shortest route generated by a routing engine selected by the Department for such trip involves passage over such bridge or through such tunnel, unless such third-party food delivery service or third-party courier service produces contemporaneous records showing that it provided an alternative route not requiring passage over such bridge or through such tunnel to such food delivery worker and that such route was consistent with the time and distance disclosed under Section 20-1521(d)[(2)] of the Administrative Code.

## § 7-807 Payments to Workers.

(a) For purposes of Section 20-1523(a) of the Administrative Code, a third-party food delivery service or third-party courier service shall be considered to have charged or imposed a fee on a food delivery worker for the use of a form of payment selected by such service if (1) the service does not offer a form of payment to a food delivery worker free from any fees charged or imposed by a financial intermediary or other person or (2) a fee for payment is charged or imposed on

31

a food delivery worker by any parent, affiliate, or subsidiary entity of the third-party food delivery service or third-party courier service.

(b) A third-party food delivery service or third-party courier service must calculate compensation owed to a food delivery worker for each pay period. The pay period need not coincide with the calendar week but may begin on any day and at any hour of the day. A third-party food delivery service or third-party courier service must establish a single pay period for all food delivery workers it engages. Once the beginning time of the pay period is established, it must remain fixed, and may be changed only if the change is intended to be permanent.

(c) [Pursuant to Section 20-1523(b) of the Administrative Code, a]A third-party food delivery service or third-party courier service must pay [a food delivery worker for work performed weekly and] all compensation owed to each food delivery worker for a pay period no later than seven (7) calendar days after the end of [the week in which the work was performed] such pay period.

§ 7-810 Minimum Pay.

(a) When the [d]Department issues a subpoena for data, information or documents under § 20-1522(a)(2) of the Administrative Code, a third-party food delivery service or third-party courier service must provide all responsive data, information or documents to the [d]Department within 30 days of receiving such subpoena and, if so requested, in the comma-delimited formats and layouts prescribed by the [d]Department in such subpoena.

(b) **Standard Method**. A third-party food delivery service or third-party courier service must make payments to food delivery workers for their trip time and on-call time in a pay period that meet the individual and aggregate requirements of subparagraphs 1 and 2 of this subdivision.

(1) **Individual requirement**. A third-party food delivery service or third-party courier service must pay to a food delivery worker who engages in trip time in a pay period no less than the sum of such food delivery worker's trip time in that pay period multiplied by the following minimum pay rates:

(i) $17.96 per hour, for pay periods that start on or after the effective date of this section;

(ii) $18.96 per hour, adjusted for inflation as set forth in subdivision (g) of this section, for pay periods that start on or after April 1, 2024; and

(iii) $19.96 per hour, adjusted for inflation annually as set forth in subdivisions (h) and (i) of this section, for pay periods that start on or after April 1, 2025.

(2) **Aggregate requirement**. A third-party food delivery service or third-party courier service must pay, in aggregate, to the food delivery workers who engage in trip time or on-call time in a pay period no less than the sum of all such food delivery workers' trip time and on-call time in that pay period multiplied by the following minimum pay rates:

(i) $17.96 per hour, for pay periods that start on or after the effective date of this section;

(ii) $18.96 per hour, adjusted for inflation as set forth in subdivision (g) of this section, for pay periods that start on or after April 1, 2024; and

(iii) $19.96 per hour, adjusted for inflation annually as set forth in subdivisions (h) and (i) of this section, for pay periods that start on or after April 1, 2025.

32

(c) **Alternative Method.** Notwithstanding the requirements of subdivision (b) of this section, an eligible third-party food delivery service or third-party courier service may use the alternative method specified in this subdivision to determine the minimum payments it must make to food delivery workers for their trip time and on-call time in a pay period.

(1) For pay periods that begin prior to April 1, 2024, any third-party food delivery service or third-party courier service may use the alternative method specified in this subdivision. For pay periods that begin on or after April 1, 2024, a third-party food delivery service or third-party courier service may use the alternative method for any pay period in which its utilization rate is greater than or equal to 0.53 and in up to two pay periods per year in which its utilization rate is less than 0.53. For purposes of this subdivision, a year begins with the first pay period that begins on or after April 1 of a calendar year and ends with the last pay period that begins on or before March 31 of the following calendar year. If an eligible third-party food delivery service or third-party courier service chooses this alternative method, the method applies to each and every food delivery worker who engages in trip time in the pay period. An eligible third-party food delivery service or third-party courier service that chooses the alternative method for a pay period must document its utilization rate and choice of method no later than when payment is due pursuant to Section 20-1523(b) of the Administrative Code and 6 RCNY § 7-807.

(2) An eligible third-party food delivery service or third-party courier service that chooses the alternative method must pay to each food delivery worker who engages in trip time in a pay period no less than such food delivery worker's trip time in that pay period multiplied by the alternative minimum pay rate. Such alternative minimum pay rate is calculated by dividing the minimum pay rate otherwise required by subdivision (b) of this section by 0.60. Such third-party food delivery service or third-party courier service is not required to pay a food delivery worker for the pay period if the food delivery worker engages in on-call time but no trip time.

(d) **Bases of Pay**. A third-party food delivery service or third-party courier service may fulfill its obligation under subdivision (b) or subdivision (c) of this section using any basis of pay it chooses, including paying an hourly rate, a per-trip rate or other piece rate, a bonus or other lump-sum payment, or any other basis.

*Example: In a pay period that begins on April 1, 2024, 5,000 food delivery workers, in aggregate, engage in 55,000 hours of trip time and 45,000 hours of on-call time. Worker A, individually, engages in 30 hours of trip time and 5 hours of on-call time. Following a 2% inflation adjustment performed by the Department pursuant to subdivision (g) of this section, the minimum pay rate is $19.34. The alternative minimum pay rate is $19.34 divided by 0.60.*

*Standard Method: The third-party food delivery service meets the requirements of both subdivision (b)(1) and subdivision (b)(2) of this section if it pays its food delivery workers as follows:*

1. *Each food delivery worker is paid at least an amount equal to their trip time multiplied by $19.34. For instance, worker A receives at least $580.20, which is $19.34 multiplied by 30 hours; and*

2. *The total the third-party food delivery service pays for the pay period meets or exceeds the aggregate amount of trip time and on-call time (100,000 hours) multiplied by $19.34, which equals $1,934,000. Worker A's payment of at least $580.20 for trip time is credited towards the aggregate requirement and Worker A may, or may not, receive an additional payment.*

*Alternative Method: The third-party food delivery service has a utilization rate of 0.55, which is its trip time (55,000) divided by the sum of its trip time and on-call time (100,000). Since 0.55 is greater than 0.53, the third-party food delivery service is eligible under subdivision (c)(1) to use the alternative method to determine the minimum payments it must make to its food delivery workers for the pay period. If the third-party food delivery service uses the alternative method, it meets the requirements of subdivision (c) if each food delivery worker is paid at least an amount equal to their trip time*

33

*multiplied by $19.34 divided by .60. For instance, worker A receives $967.00, which is $19.34 divided by .60 multiplied by 30 hours.*

(e) A third-party food delivery service or third-party courier service may not use gratuities paid to a food delivery worker to offset such third-party food delivery service or third-party courier service's obligation to pay the food delivery worker the minimum pay required by this section.

(f) A third-party food delivery service or third-party courier service may not use amounts paid to a food delivery worker for trips with a pickup and drop-off location outside of New York City to offset such third-party food delivery service or third-party courier service's obligation to pay to the food delivery worker the minimum pay required by this section.

(g) The Department shall perform the inflation adjustment required by subdivisions (b)(1)(ii) and (b)(2)(ii) of this section by multiplying $18.96 by the percent change in the All Items Consumer Price Index for Urban Wage Earners and Clerical Workers for the NY-NJ-PA metro area between December 2022 and December 2023 and rounding to the nearest cent, provided that if the percentage change is zero or negative, the adjustment shall be zero. The Department shall post the Consumer Price Index adjusted minimum pay rate on its website on or before the first day of February 2024.

(h) For pay periods beginning on or after April 1, 2025 and before April 1, 2026, the Department shall perform the inflation adjustment required by subdivisions (b)(1)(iii) and (b)(2)(iii) of this section by multiplying $19.96 by the percent change in the All Items Consumer Price Index for Urban Wage Earners and Clerical Workers for the NY-NJ-PA metro area between December 2022 and December 2024 and rounding to the nearest cent, provided that if the percentage change is zero or negative, the adjustment shall be zero. The Department shall post the Consumer Price Index adjusted minimum pay rate on its website on or before the first day of February 2025.

(i) Beginning with the minimum pay rate for pay periods that start on or after April 1, 2026, and continuing each calendar year thereafter, the Department shall post the inflation-adjusted minimum pay rate required by subdivisions (b)(1)(iii) and (b)(2)(iii) of this section on or before the first day of February of the calendar year in which the rate will take effect. Such inflation adjustments will be performed by multiplying the minimum pay rate in effect prior to adjustment by the most recent December to December percent change in the All Items Consumer Price Index for Urban Wage Earners and Clerical Workers for the NY-NJ-PA metro area and rounding to the nearest cent, provided that if the percentage change is zero or negative, the adjustment shall be zero.

(j) In the report the Department must submit to the council and the mayor no later than September 24, 2024 pursuant to Section 20-1522(d) of the Administrative Code, the Department will review the base pay, workers' compensation, expense, and multi-apping components of the minimum pay rate, the utilization eligibility threshold for the Alternative Method, and the calculation used to determine the alternative minimum pay rate to determine if adjustments need to be made to the rates set forth in subdivision (b) of this section. As part of such review, the Department may utilize any records and reports that a third-party food delivery service or third-party courier service is required to maintain, produce, or submit to the Department pursuant to 6 RCNY § 7-805, as well as any other information the Department deems relevant.

34