# Exhibit 16

**New York City Department of Consumer and Worker Protection**

**Notice of Public Hearing and Opportunity to Comment on Proposed Rules**

**What are we proposing?** The Department of Consumer and Worker Protection ("DCWP" or "Department") is proposing to add rules establishing methods for determining the minimum payments that must be made to a food delivery worker by a third-party food delivery service or third-party courier service, as required by New York City Administrative Code § 20-1522.

**When and where is the hearing?** DCWP will hold a public hearing on the proposed rule. The public hearing will take place at 11:00am on April 7. The public hearing will be accessible by phone and videoconference.

- To participate in the public hearing via phone, please dial 646-893-7101
  - Meeting ID: 273 020 226 537
  - Passcode: R3sJ2u

- To participate in the public hearing via videoconference, please follow the online link: https://tinyurl.com/nhcp5t8d
  - Meeting ID: 273 020 226 537
  - Passcode: R3sJ2u

**How do I comment on the proposed rules?** Anyone can comment on the proposed rules by:

- **Website.** You can submit comments to DCWP through the NYC rules website at http://rules.cityofnewyork.us.

- **Email.** You can email comments to Rulecomments@dcwp.nyc.gov.

- **By speaking at the hearing.** Anyone who wants to comment on the proposed rule at the public hearing must sign up to speak. You can sign up before the hearing by calling (212) 436-0396. You can also sign up on the phone or videoconference before the hearing begins at 11:00am on Friday, April 7. You can speak for up to three minutes.

**Is there a deadline to submit comments?** Yes. You must submit any comments to the proposed rule on or before Friday, April 7.

**What if I need assistance to participate in the hearing?** You must tell DCWP's External Affairs division if you need a reasonable accommodation of a disability at the hearing. You must tell us if you need a sign language interpreter. You may tell us by telephone at (212) 436-0210 or by email at Rulecomments@dcwp.nyc.gov. Advance notice is requested to allow sufficient time to arrange the accommodation. Please tell us by Friday, March 31.

**Can I review the comments made on the proposed rules?** You can review the comments made online on the proposed rules by going to the website at http://rules.cityofnewyork.us/. A few days after the hearing, all comments received by DCWP on the proposed rule will be made available to the public online at http://www1.nyc.gov/site/dca/about/public-hearings-comments.page.

**What authorizes DCWP to make this rule?** Sections 1043 and 2203(f) of the New York City Charter and Sections 20-1506(a), 20-1507(c), and 20-1522(a)(3) and (d) of the New York City Administrative Code authorize the Department of Consumer and Worker Protection to make these proposed rules. The proposed rule was included in the agency's regulatory agenda.

**Where can I find DCWP's rules?** The Department's rules are in Title 6 of the Rules of the City of New York.

**What laws govern the rulemaking process?** DCWP must meet the requirements of Section 1043 of the City Charter when creating or changing rules. This notice is made according to the requirements of Section 1043 of the City Charter.

**Statement of Basis and Purpose of Proposed Rule**

The Department of Consumer and Worker Protection ("DCWP" or "Department") proposes these rules to implement Local Law 115 of 2021, which required DCWP to study the pay and working conditions of food delivery workers and, based on the results of its study, to establish a method for determining the minimum payments that third-party food delivery services and third-party courier services (together, "apps") must pay to food delivery workers. *See* NYC Admin. Code § 20-1501 (defining "food delivery worker," "third-party food delivery service," and "third-party courier service").

**Background**. Prior to the passage of Local Law 115 of 2021, there were no minimum earnings protections for food delivery workers who work for apps as independent contractors. The legislative record indicated that these workers faced low pay and high expenses. Local Law 115 of 2021 charged DCWP with studying this workforce and developing an appropriate minimum pay rate to ensure adequate compensation for these workers.

**First Proposed Rule**. To implement Local Law 115 of 2021, DCWP  published a proposed rule in the City Record on November 16, 2022 ("First Proposed Rule"). The First Proposed Rule made the following amendments to Subchapter H, of Chapter 7 of Title 6 of the Rules of the City of New York:

- Section 7-801 added definitions of "on-call time", "pay period", and "trip time";
- Section 7-805 added recordkeeping and reporting obligations for a third-party food delivery service or third-party courier service;
- Section 7-806 clarified what constitutes "required" travel across a bridge or through a tunnel;
- Section 7-807 established that compensation must be calculated for each pay period; and
- Section 7-810 set minimum pay rates, the time periods for which such pay rates apply, and the inflation adjustments required for such pay rates.

Concurrently with the publication of the First Proposed Rule, DCWP published a report titled *A Minimum Pay Rate for App-Based Restaurant Delivery Workers in NYC* ("Report"). Sections 1 through 4 of the Report discussed the Department's sources, methods, and findings concerning the delivery industry and the working conditions of food delivery workers. (Report at 1-26.) Section 5 of the Report described the First Proposed Rule. (Report at 27-33.) Section 6 of the Report modeled the impacts of the First Proposed Rule on food delivery workers, apps, restaurants, and consumers. (Report at 34-36.)

The First Proposed Rule was the subject of a public hearing held on December 16, 2022. The Department received comments on the First Proposed Rule from food delivery workers, third-party food delivery services (Uber Eats, GrubHub, and DoorDash), a third-party courier service (Relay), worker advocates, transportation safety advocates, restaurants, researchers, elected officials, and members of the public, among others.

**Second Proposed Rule**. The Department made certain changes after consideration of comments received in response to the First Proposed Rule and is now proposing these revised proposed rules ("Second Proposed Rule"). Specifically, the Department is making the following changes from the First Proposed Rule:

- Section 7-801 retains the definitions of "on-call time," "pay period," and "trip time" from the First Proposed Rule and adds definitions of "cancellation," "cancelled," "internal identifier," and "utilization rate."
- Section 7-805 retains most recordkeeping and reporting obligations for a third-party food delivery service or third-party courier service from the First Proposed Rule, but narrows the scope of apps' reporting obligations and adds to apps' recordkeeping requirement an obligation to maintain a food delivery worker's taxpayer identification number and certain information about a food delivery worker's phone.
- Section 7-806 retains the clarification of what constitutes "required" travel across a bridge or through a tunnel; from the First Proposed Rule and adjusts apps' disclosure requirements to reflect changes to the minimum pay rate.
- Section 7-810: retains the inflation adjustment methodology from the First Proposed Rule, adjusts the minimum pay rate to reflect "multi-apping" and to incorporate the latest inflation data; renames the minimum pay method

set forth in the First Proposed Rule "the standard method;" adds an alternative method for determining minimum pay; adjusts the effective date of implementation; and adjusts the phase-in schedule for the minimum pay rate.
- The Second Proposed Rule also corrects minor typographical errors in the First Proposed Rule and makes technical corrections to clarify certain text.

**The "Standard Method" to Meet the Minimum Payment Requirement**

The Second Proposed Rule retains the individual pay and aggregate pay requirements set forth in the First Proposed Rule for apps to determine the minimum payments they must make to food delivery workers each week. In the Second Proposed Rule these two requirements are referred to as the "standard method." Under the standard method, an app's payment to each delivery worker, individually, would have to meet or exceed the minimum pay rate multiplied by the sum of each individual worker's own trip time during the week; and the app's total payments to all its delivery workers, together, would have to meet or exceed the minimum pay rate multiplied by the sum of all workers' total trip time and on-call time during the week.

**The "Alternative Method" to Meet the Minimum Payment Requirement**

After consideration of relevant comments, the Department has added an alternative option to the standard method. Under the alternative method, an app must pay each food delivery worker individually for trip time at no less than the alternative minimum pay rate. The alternative minimum pay rate is calculated by dividing the minimum pay rate by 60%. Under this method, food delivery workers have a right to higher pay for their trip time, but no additional right to compensation for their on-call time. The 60% figure reflects the proportion of time food delivery workers spend engaged in trips, known as the "utilization rate." An app may choose the alternative method or the standard method, provided that after April 1, 2024, an app may only choose the alternative method if its food delivery workers, in aggregate, have a utilization rate of at least 53% (*i.e.*, they spend at least 53% of their trip time and on-call time engaged in trips).

Table 1 summarizes the calculations the Department performed to develop the minimum pay rate under the First Proposed Rule and Second Proposed Rule.

**Table 1. Minimum Pay Rate Calculations Under the First Proposed Rule and Second Proposed Rule ($)**

| *Base Pay* | First Proposed Rule | Second Proposed Rule |
|---|---|---|
| Pay for Wages and Time Off<br>*Base Pay Subtotal, less Adjustment for Medicare and Social Security Contributions* | 18.34 | 18.12 |
| Adjustment for Medicare and Social Security Contributions<br>*Base Pay Subtotal x employer share of Medicare and Social Security contributions (7.65%)* | 1.52 | 1.50 |
| Base Pay Subtotal | 19.86 | 19.62 |
| *Workers' Compensation* | | |
| Workers' Compensation if App Delivery Workers were Employees<br>*Pay for Wages and Time Off x expected costs (7.84%)* | 1.44 | 1.42 |
| Adjustment for Medicare and Social Security Contributions<br>*Workers' Compensation Subtotal, less the employer and employee shares of Medicare and Social Security contributions (15.3%)* | 0.26 | 0.26 |
| Workers' Compensation Subtotal | 1.70 | 1.68 |

*Pay such that after adjustment for Medicare and Social Security contributions (15.3%), app delivery workers receive the same value as the coverage they would receive if they were employees*

| | | |
|---|---|---|
| **Expense Component** | | |
| Average Hourly Expenses of E-Bike Workers <br> *See Report at 18-20, 30-31* | 2.26 | 2.26 |
| **Total** | | |
| Subtotal <br> *Sum of Base Pay Subtotal, Workers' Compensation Subtotal, and Average Hourly Expenses of E-Bike Workers* | 23.82 | 23.56 |
| Adjustment for Multi-Apping <br> *Component Subtotal x multi-apping adjustment factor (1 - 0.8471) (applies to Second Proposed Rule only)* | 0.00 | -3.60 |
| Adjusted Total <br> *Sum of Subtotal and Adjustment for Multi-Apping* | 23.82 | 19.96 |

*Notes: Adapted from Report at 31.*

Table 2 summarizes the phase-in schedule under the First Proposed Rule and Second Proposed Rule.

**Table 2. Minimum Pay Rate Under the First Proposed Rule and Second Proposed Rule, 2023-2025 ($)**

| | First Proposed Rule | Second Proposed Rule |
|---|---|---|
| 2023 | 17.87 | 17.96 |
| April 1, 2024 | 20.25 | 18.96 |
| April 1, 2025 | 23.82 | 19.96 |

*Notes: All values shown are prior to inflation adjustment. In the First Proposed Rule, the 2023 rate was scheduled to take effect January 1, 2023. In the Second Proposed Rule, the 2023 rate takes effect 30 days after adoption.*

The following sections discuss key components of the Second Proposed Rule and summarize the Department's deliberations on comments received from the public on these components.

**Base Pay Component**

The Department made minor changes to the base pay component of the minimum pay rate in the Second Proposed Rule. The base pay component of the rate in the Second Proposed Rule is $19.62, a reduction of $0.24 from the original proposed $19.86.

The basis for the base pay component of the rate is similar in the First Proposed Rule and the Second Proposed Rule. For both the First Proposed Rule and Second Proposed Rule, the Department derived the base pay component of the rate from the New York City Taxi and Limousine Commission's (TLC) minimum per-minute payment rate for high-volume for-hire vehicle service drivers ("high-volume drivers"), which TLC developed as the independent contractor equivalent of the 2019 minimum wage. (Report at 21.) When first implemented, this rate was $17.22 per hour. (*Id.*) TLC has updated the $17.22 rate for inflation several times since. (*Id.*) In proposed rules published on September 6, 2022, TLC proposed an inflation-adjusted rate of $19.86 per hour, which reflected inflation data through June 2022. (*Id.*; Proposed 35 RCNY § 59D-22(a)(2) and (b)(1).) For parity, the Department also used $19.86 as the base pay component in its First Proposed

Rule. (Report at 29.) Since then, TLC has implemented a $19.62 per hour rate for "high-volume drivers," reflecting the December price level. For parity, the Department is also using $19.62 as the base pay component in its Second Proposed Rule.

Comments:

Several commenters, including members of the public, elected officials, worker advocacy groups, bicycle safety advocates, and food delivery workers, expressed support for the base pay component, noting that as independent contractors these workers do not receive a minimum wage or other employee benefits. Many workers described low pay they currently earn working for apps and their need for a higher wage to survive in New York City and support their families. Several described the impacts of recent inflation on their ability to earn a living working for apps.

DoorDash, Uber Eats, Grubhub, and tech industry advocates commented that the base pay component of the rate should factor in workers' tip earnings or should be based on the hourly pay of tipped workers. Uber Eats contended that to the extent an earnings standard is based on the minimum wage equivalent, it should not be adjusted for inflation and should instead be adjusted based on future increases in the minimum wage. Uber Eats also contended that delivery workers should be paid less than high-volume drivers, citing differences between the two occupations, including differences between transporting people and food, licensure requirements, expenses, and skillsets.

Conversely, workers, worker advocates, and industry researchers commented that tips are unreliable, and customers may decrease tips or not tip at all due to factors outside workers' control. Some worker comments described situations in which customers revoked promised tips after receiving a delivery, leaving the worker with very low compensation for the trip.

Uber Eats, DoorDash, Grubhub, and tech industry advocates commented that the base pay rate should take into consideration the flexibility of food delivery workers' work arrangement and would appropriately be lower than the minimum wage applicable to employees. Some workers, while expressing a desire for higher pay, also described why they value the flexibility of gig work for apps. Conversely, industry researchers and other workers commented that the minimum pay rate should be increased to account for the unique stresses for food delivery workers who are managed by algorithms, including unpredictable availability of work, changing compensation levels, and management decisions based on customer ratings, acceptance rates, and delivery speeds.

Response:

The Department is not incorporating the recommendation to base the rate on the hourly pay of tipped workers for reasons set forth in the Report, which are summarized here. (Report at 29-30.) First, Section 20-1522(b) of the Minimum Pay Law states that "any minimum payment rate determined by the department pursuant to this section shall not include gratuities." Using a tip credit rate as a base rate would conflict with the letter and spirit of that legal requirement. (*Id*.) Second, under New York State law, the tip credit is a special permission afforded to a subset of restaurants, not a general exception for delivery as an occupation. (*Id*.) Currently, the tip credit under New York State law does not apply to delivery workers employed by fast food restaurants or to delivery services in the convenience and grocery sectors that use an employee model and would not apply if the restaurant apps were to classify their workers as employees. (*Id*.) Finally, tips are an unreliable form of income and apps may respond to these rules by reducing or removing tipping features on their platforms. (Report at 23, 36.)

The Department is not incorporating the recommendation to index the minimum pay rate to future changes in the New York State minimum wage. The base pay rate builds on the City's existing determination of appropriate compensation for low-wage independent contractors and sets a clear and consistent standard for independent contractors working for apps in related industries. Further, the real value of the New York State minimum wage of $15 has declined significantly due to inflation since it went into effect in December 2018, and it is not possible to predict when or whether the State Legislature will increase it. If the New York State minimum wage were to increase such that the food delivery worker minimum pay

rate would no longer approximate the total compensation app-based restaurant delivery workers would receive if classified as employees, the Department can revisit the minimum pay rate in future rulemaking at that time.

The Department is not incorporating the recommendation to set a lower rate due to the flexibility of app-based delivery work and is also not incorporating the recommendation to set a higher rate due to the unique stresses delivery workers face. As comments from apps, workers, and industry researchers demonstrate, app delivery can have unique benefits and challenges, from flexibility to instability. Each worker may subjectively value these characteristics of the work differently.

Lastly, the Department is not incorporating Uber Eats' recommendation to set a base pay component that differs from the per-minute rate guaranteed to high-volume drivers. The differences Uber Eats noted in expenses between the two workforces is not relevant to this base pay component of the rate; such differences are reflected in the expense component of the rates applicable to each workforce. The Department determined that the other differences Uber Eats cited do not support setting a different base pay rate between food delivery workers and high-volume drivers. There are close similarities between the two workforces, in that both are independent contractors performing on-demand piece work on mobile applications involving the transport of goods or persons short distances within New York City, and both receive customer tips. Further, as set forth in the Report, the TLC's per-minute rate reflects a determination about the minimum amount that should be paid for an hour of a worker's labor, regardless of occupation; differences in Medicare and Social Security contribution requirements between independent contractors and employees; and average levels of paid leave received by workers in a U.S. Bureau of Labor Statistics occupational category that includes both app delivery workers and high-volume drivers (production, transportation, and material moving employees). (Report at 29.) None of these factors distinguish delivery workers from high-volume drivers.

### Workers' Compensation Component

The Department made no changes to its method for calculating the workers' compensation component of the rate in the Second Proposed Rule. However, in both the First Proposed Rule and Second Proposed Rule the Department calculates the workers' compensation component as a function of the base rate. (*see* Table 1.) As a result, the change in the base pay component from $19.86 in the First Proposed Rule to $19.62 in the Second Proposed Rule produces a $0.02 reduction to the workers' compensation component from $1.70 to $1.68.

The purpose of the workers' compensation component is to compensate for expected income loss and medical expenses associated with on-the-job injuries that food delivery workers experience. (Report at 30.) Although food delivery workers experience high rates of injury on the job, they do not have access to traditional workers' compensation, as workers classified as employees in New York State do. Unlike high-volume drivers, who have the Black Car Fund, food delivery workers also do not have access to an alternative system for medical care and wage replacement for on-the-job injuries. (*Id.*) DCWP calculated the workers' compensation component of $1.68 to provide for comparability to the actuarial value of the workers' compensation coverage received by employed restaurant delivery workers in New York State (7.84% of payroll). The workers' compensation component also includes an adjustment to reflect differences in how federal Medicare and Social Security contributions apply to independent contractor income and employee benefits (*i.e.*, independent contractors pay 15.3% in contributions to Medicare and Social Security on their income, while an employee does not make any contributions to Medicare and Social Security on the value of benefits like workers' compensation). This ensures that app delivery workers receive the same value, despite a less advantageous tax treatment. (*Id.*) The components of this adjustment are detailed in Table 1, above.

### Comments:

Comments from Uber Eats, DoorDash, tech industry advocates, and business advocates stated that the minimum pay rate should not include a workers' compensation component. These commenters contended that it was unlikely workers would purchase workers' compensation coverage and recommended that the Department consider alternatives, such as exempting apps that provide occupational accident insurance, requiring apps to offer occupational accident insurance, or working with New York State to establish a compensation fund for delivery workers, similar to the Black Car Fund that exists for rideshare drivers. DoorDash stated that it offers an occupational accident policy that covers medical expenses

and disability payments for some occupational injuries and may stop doing so if it is required to pay the workers' compensation component.

Other commenters, including elected officials and food delivery workers, stated that the workers' compensation component of $1.68 should be higher, because $1.68 is inadequate to compensate workers for the frequent workplace injuries they experience and the attendant out-of-pocket medical costs. Comments from food delivery workers and their family members described the dangers of delivery work, such as traffic accidents, robberies, assaults, and severe weather conditions. Some described suffering injuries on-the-job and incurring medical expenses and lost work time for which they received no compensation due to the lack of workers' compensation coverage and stated that apps' insurance coverage was burdensome or impossible to access.

Response:

After considering these comments, the Department determined that retaining the workers' compensation component is necessary to compensate workers for lost income and out-of-pocket medical expenses associated with job-related injuries. Food delivery workers' rates of injury and work-loss time are high. (Report at 24-26.) Workers report substantial out-of-pocket medical expenses associated with work related injuries that are not reimbursed by the apps. (Report at 26.) Comments show that three of the four largest apps offer no occupational injury or accident coverage. The occupational injury policy offered by DoorDash does not provide coverage for injuries sustained during on-call time; such injuries can and do occur before a worker accepts a trip or after dropping off a delivery. Its policy also contains coverage exclusions that make benefits difficult or impossible for injured workers to access, and includes coverage terms that are less generous than the requirements of the New York State workers' compensation system.

The purpose of the workers' compensation component is not to enable workers to purchase their own insurance, as some commenters asserted. Rather, the purpose is to compensate food delivery workers for their exclusion from the workers' compensation benefits available to most workers. Were food delivery workers to gain a legal right to a benefit equivalent to the workers' compensation coverage currently available to employees, the Department may choose to revisit the workers' compensation component at that time. The existing occupational injury coverage offered by DoorDash is inadequate to warrant exemption from the workers' compensation component. However, in a future rulemaking the Department may consider providing for an exemption for policies that meet minimum coverage and accessibility criteria.

In response to comments that $1.68 is inadequate, the Department acknowledges that its approach only partially compensates workers for injuries. The workers' compensation benefit provided to employees in New York State also does not fully replace workers' lost income or compensate for pain and suffering. Because the Department derived the workers' compensation component to provide for equivalence with the benefits provided to employees, the minimum pay rate component also reflects these limitations. It is also possible that given food delivery workers' exceptionally poor safety conditions (Report at 25), they may be at higher risk than the population of insured employees from which the Department derived the workers' compensation component. However, the detailed data necessary to perform an actuarial analysis of food delivery workers' work-related injury and illness costs does not exist. For this reason, the Department chose to base the component on the claims experience of the closest-comparable insured population within the New York State workers' compensation system, despite this limitation. *See* Report at 22 (referring to employed delivery workers, who belong to rate class 7380, which includes commercial drivers, chauffeurs, and their helpers).

**Expense Component**

The Department made no changes to the $2.26 expense component of the rate in the Second Proposed Rule. The purpose of the expense component is to compensate food delivery workers for necessary expenses they incur to perform delivery work. (Report at 18-20; 30-31). The expense component of $2.26 is DCWP's estimate of average hourly expenses for workers who perform deliveries using an electric bicycle ("e-bike"), less the cost of traffic or parking tickets, which are not deductible under IRS rules.

<u>Comments</u>:

DoorDash, Uber Eats, their experts, and some tech industry advocates commented that the expense component of the rate is too high, arguing that the Department relied on a biased survey, did not account for use of equipment and services outside of delivery for restaurant apps, and did not account for tax deductibility of expenses. Some of these commenters proposed alternatives for the expense component of the minimum pay rate.

Several other commenters, including members of the public, elected officials, worker advocacy groups, bicycle safety advocates, and food delivery workers, commented that the $2.26 expense component of the rate is too low, and recommended increasing it by $5.00 to $7.26 per hour. These commenters expressed concern that DCWP may not have adequately considered workers' expenses for items such as GPS trackers, monthly subscriptions for GPS services, battery replacements, mopeds, gas, weather-proof clothing, safety gear, incidents of theft, insurance, registration, or anti-theft alarm devices.

<u>Response</u>:

After considering apps' and workers' comments and proposed alternatives, DCWP determined that $2.26 is appropriate for the expense component of the rate.

First, DCWP's expense measurement is methodologically sound. As part of its expense measurement, DCWP fielded a survey of all workers who accepted an offer to perform a delivery in NYC between October 1 and December 31, 2021 for Uber Eats, Grubhub, DoorDash, Relay, Chowbus, or HungryPanda, except a small number of workers whose contact information was missing or suppressed. (Report at 2.) In its fielding and analysis of this survey, the Department used appropriate controls to authenticate responses, exclude submissions from inattentive or unreliable respondents, and address possible non-response bias. (Report at 2-5.) The 8,000 responses the Department used from the survey represent a response rate of 6.5%, which is several times the rate obtained by leading academic researchers conducting surveys of low-wage work. (Report at 3.) The Department then validated these survey responses against matched administrative records from the apps. In consideration of the foregoing, the Department reviewed the methodological critiques provided in comments but was not persuaded that the survey is inappropriate for its applications within the Department's expense calculations. Specifically, the Department used the survey to measure the frequency with which workers experience loss or theft of their e-bike, purchase replacement batteries or e-bike accessories, and buy and trade-in phones. The Department separately gathered market prices for relevant equipment from retailers and other independent sources, including for the specific makes and models of the phones workers reported buying and selling, and did not use workers' recollections of the dollar amounts they spent on any item. (Report at 5.) Further, the Department's methods for estimating e-bike depreciation, maintenance, and data plan costs did not draw on survey responses at all. To confirm that the Department's estimates of e-bike-related expenses is not overstated, the Department, in a supplemental analysis, found that e-bike rentals and sales in promotions marketed by Uber Eats and DoorDash are significantly more expensive than the costs reflected in the expense component of the minimum pay rate. Additionally, the Second Proposed Rule amends apps' recordkeeping requirements to include certain information about the phones food delivery workers use. This information will enable the Department to efficiently measure phone expenses without reliance on a survey should it choose to re-estimate expenses for use in future rulemaking.

Second, DCWP's method appropriately reflects the tax deductibility of expenses. The minimum pay method is designed such that a worker who deducts expenses from taxable income will be taxed on their earnings net of expenses.

Third, DCWP's methodology for accounting for the use of equipment and services outside of app delivery is sound. With respect to phone expenses, the Department assumes that workers' data plans, as well as all phones workers report purchasing for work with apps, are also used for personal use at typical levels, and allocates cost proportionate to use. Under this method, the expense component of the rate reflects only 37% of total phone costs. (Report at 19.) This is consistent with IRS principles. With respect to e-bikes and e-bike accessories, the Department attributes the entire cost to

app delivery. Seventy percent of e-bike workers report app delivery as their only job, and another 7% as their main job. (Report at 15.) This sets a low upper limit on the amount of use such equipment could be put towards other purposes. Further, DCWP determined that e-bike and e-bike accessory costs should be fully covered by the minimum pay rate, and that the economies of scope some workers achieve by applying their equipment to additional uses should accrue to their benefit.

Fourth, the Department is not incorporating the recommendation to increase the expense component of the rate by $5.00, as some commenters recommended. DCWP considered all appropriate expenses for the equipment, services, and accessories necessary to perform delivery on e-bikes, which is the most common and economical means of making most deliveries. (Report at 2-5; 18-20; 30-31.) However, the Department recognizes that some workers, such as car drivers, have higher expenses.

Lastly, the Department notes that costs may change over time in ways that are difficult to predict in advance. For instance, workers may respond to higher pay by purchasing different equipment. Average hours may also change, which will impact average hourly costs. The market for e-bikes, batteries, and related technologies is also evolving rapidly, as is the regulation of these goods, and for this reason there is no guarantee that the mix of items available to workers will remain consistent over time. For these reasons, the Department may consider reassessing expenses after an appropriate interval.

## Multi-Apping

In response to comments, and in light of changes to the basis of pay discussed below, in the Second Proposed Rule the Department is reducing the minimum pay rate to account for the time workers spend connected to multiple apps ("multi-apping").

Comments:

Several commenters, including Grubhub, Uber Eats, DoorDash, tech industry advocates, and business advocates contended that because workers spend a significant amount of time simultaneously engaged in trip time or on-call time on multiple apps, the Department's methodology produces total pay per hour that is above the level intended under the rule. These commenters recommended that the Department incorporate into its minimum pay methodology an adjustment to account for this practice of "multi-apping." This adjustment is included in Table 1, above.

Response:

The Department is incorporating this recommendation. Under the First Proposed Rule framework, apps would have reduced the proportion of time that workers spent on-call. (Report at 32.) This would have also led to less multi-apping, as workers who were more engaged during their time on an app would have less need and ability to simultaneously work for another app. However, under the Second Proposed Rule, if apps use the alternative method for determining minimum pay, this may result in continued high levels of multi-apping. This is because an app using the alternative method pays its workers the same amount regardless of how much time they spend on-call. For this reason, an adjustment to the rate for multi-apping is appropriate. The study found that in the fourth quarter of 2021 workers spent an average of 17.7% of their combined trip time and on-call time logged into multiple apps simultaneously (Report at 5), that during this time they were connected to 2.02 apps, on average, and that multi-apping occurred at all apps. Department assumes that Uber Eats, Grubhub, and DoorDash, which do not currently pay workers for on-call time, will choose the alternative method, and that Relay, which already pays workers for on-call time, will choose the standard method. The Second Proposed Rule therefore applies a multi-apping adjustment factor of 0.8471 in its calculation of the minimum pay rate for both the alternative and standard methods. This figure represents the unduplicated work hours of food delivery workers (*i.e.*, the time a food delivery worker spends engaged in on-call time or trip time with at least one app), divided by the total recorded hours of food delivery workers (*i.e.*, the sum of a food delivery workers' on-call time and trip time at each of the apps they work for).

The calculation is as follows: $\dfrac{1}{(1-0.177)+(2.02 \times 0.177)} = 0.8471$.

The fourth quarter of 2021 was chosen as the reference period for the multi-apping adjustment because this is the sole period for which the Department received data from the apps to perform such an analysis. The Department subpoenaed this information from the apps for a longer time period, but apps did not produce it. The proportion of time spent multi-apping can be affected by many factors and potentially by implementation of the minimum pay rate itself. For this reason, the Department may in future rulemaking revise the multi-apping adjustment once apps, workers, consumers, and restaurants have adjusted to the new rule. In advance, the Department is amending the recordkeeping requirements in this Second Proposed Rule to include food delivery worker taxpayer identification number, which will ensure the Department can access the information necessary to re-estimate multi-apping when warranted.

## Basis of Pay

The Department made changes in the Second Proposed Rule to add an alternative to the methodology for calculating compensation to workers for trip time and on-call time, in consideration of comments and recommendations received from apps, tech industry advocates, and workers.

The First Proposed Rule required an app to satisfy two requirements each week: an individual pay requirement and an aggregate pay requirement.

1) **Individual Pay Requirement**: The app's payment to each delivery worker, individually, would have to meet or exceed the minimum pay rate multiplied by the sum of each individual worker's own trip time during the week; and

2) **Aggregate Pay Requirement**: The app's total payments to all its delivery workers, together, would have to meet or exceed the minimum pay rate multiplied by the sum of all workers' total trip time and on-call time during the week.

(Report at 28.) This method combined two key features: 1) a requirement that apps assume financial responsibility for all time that workers spend working, including on-call time and trip time, and 2) flexibility for apps to determine how they pay each worker. (Report at 31.) Rationales underlying this method included: (1) to incentivize apps to make operational changes to use workers' time on the apps more efficiently, thereby increasing deliveries per hour, partially offsetting apps' increase in unit labor costs associated with higher pay, and increasing workers' tips per hour; (2) to accommodate the variety of pay arrangements already present in the industry, which includes per-trip rates and hourly pay; (3) to guarantee that each app will pay at or above the intended average hourly pay each week, regardless of what variations occur in the mix of trip time and on-call time; and (4) to use a method that is feasible to implement for both apps and the Department. (Report at 31-32.)

Comments:

Comments from Uber Eats, DoorDash, Grubhub, tech industry advocates, and business advocates stated that the minimum pay rule should not require apps to compensate workers for aggregate on-call time. These commenters contended that the aggregate on-call payment component of the rule would require apps to make operational changes that (i) control labor supply by restricting platform access; (ii) limit worker flexibility to reject trip offers; and (iii) create earnings uncertainty for workers. Some food delivery workers and worker advocacy groups shared similar concerns.

To compensate workers for on-call time, Uber Eats and DoorDash suggested that the Department apply a fixed, industry-wide multiplier to the minimum pay rate, which would be paid on each worker's trip time. These commenters analogized favorably to the TLC framework for high-volume for-hire vehicle drivers, under which the minimum pay rate is set based on an industry-wide utilization rate multiplier that indirectly compensates workers for on-call time. These commenters also recommended that, in calculating a minimum pay rate applicable to trip time, the Department include only a subset of on-call time. Uber Eats suggested including only the on-call time between trip offers. DoorDash suggested including only the on-call time that precedes an accepted trip offer.

Comments from many food delivery workers, worker advocacy groups, elected officials, and industry researchers emphasized the importance of compensating workers for on-call time. These commenters described workers' long wait times to receive trip offers and described the ways in which unpaid on-call time places economic pressure on workers to accept trip offers for very low pay, rather than continue waiting on-call for no pay. These commenters also noted that other essential workers are paid for on-call time. However, some of these commenters expressed concern about the aggregate pay methodology, noting that it may not result in adequate compensation if some workers still receive no pay at all for their on-call time. Some of these commenters urged the Department to require payment of the full minimum pay rate for all trip time and on-call time, with some recommending integration of a utilization rate into the calculation of minimum pay.

Response:

The Second Proposed Rule is responsive to, and accommodates, key priorities apps and workers raised in comments. In the Second Proposed Rule, the Department retained the individual pay and aggregate pay requirements set forth in the First Proposed Rule, now referred to as the standard method. However, after consideration of relevant comments, the Department revised the First Proposed Rule to allow an alternative to the standard method. As suggested by apps in comments, the alternative method would allow apps to pay workers for trip time only at a set multiplier of the standard minimum pay rate, so that workers are paid a rate for trip time that indirectly compensates them for uncompensated on-call time. Under the alternative method, the alternative minimum pay rate is calculated by dividing the minimum pay rate by 60%. The 60% figure reflects the average weekly utilization rate from January 2021 through June 30, 2022 for Uber Eats, Grubhub, and DoorDash, combined. This means that across this 18-month period, in the average week, workers at these apps were engaged in trip time 60% of the time and on-call time 40% of the time. The Department excluded Relay from this calculation because its practice of directly compensating for on-call time differs from the requirements under the alternative method. The Department used the period from January 2021 through June 30, 2022 because this is the period for which the Department obtained aggregate data from the apps. (Report at 2.)

To avoid exacerbating the concerns expressed by workers related to not being paid for on-call time, after April 1, 2024, the alternative method will only be available to apps with a utilization rate above 53%. If an app's utilization rate is less than 53% in a week, the alternative method is not available to the app, and it must calculate minimum pay based on the standard method. Without this threshold, the increase in labor supply arising from higher pay could produce longer wait times for trip offers and pay per hour worked (including both on-call time and trip time) would therefore be less than intended. The Department derived 53% as the utilization floor by assessing variation in utilization rates over the 18-month period at each of Uber Eats, Grubhub, and DoorDash. The Department found that the median app had a standard deviation of 7% in its weekly utilization rate (*i.e.*, on average, its weekly utilization rate was 7% above or below its mean utilization rate for the period). Subtracting 7% from 60% yields 53%. The Department selected April 1, 2024 for the utilization floor to take effect to give apps adequate time to adjust their utilization rates.

The Department is not incorporating the recommendation from apps to exclude portions of workers' on-call time from the calculation of utilization rates. Apps derive financial benefit from the time they propose to exclude from the calculation of on-call time, in part by using it to provide for high service availability, and these portions of on-call time are reasonably related to the service workers perform for apps. For example, under apps' proposals, on-call time that occurs during scheduled shifts would be excluded, as would on-call time after a trip, in which a worker is ready and waiting for the next offer, but never receives one. Further, apps can and often do condition future work opportunities on workers' performance during on-call time, for example by giving preference in platform access to workers who accept a certain proportion of trip offers. Finally, the Second Proposed Rule's approach to calculating on-call time is consistent with TLC's minimum pay standard, which sets trip time rates that provide for indirect compensation of all on-call time in aggregate, and does not exclude portions of on-call time. (Report at 32.)

The Department's use of a 60% utilization rate for calculating minimum pay for the alternative method, and 53% floor for utilization, reflects past experience by the apps. If utilization patterns change, the Department can revisit this utilization rate and utilization floor in future rulemaking.

**Effective Date**

The Department made changes to the effective date of the rate in the Second Proposed Rule in response to comments from apps.

Comments:

DoorDash, Uber Eats, tech industry advocates, and business advocates requested that the effective date of the rules be extended from January 1, 2023 for a period of time to allow apps to implement the minimum pay method and recordkeeping requirements. One app requested 120 days for implementation.

Response:

The Department partially incorporated this recommendation. First, the effective date of the minimum pay rate is 30 days following adoption of a final rule, consistent with the requirements of the City Administrative Procedures Act for the effectuation of new rules, rather than January 1, 2023, as in the First Proposed Rule. Thirty days provides sufficient time for apps to prepare to comply with this requirement and any further delay would cause an undue hardship to workers. Second, the effective date of the requirement for apps to maintain a minimum utilization rate of 53% to use the alternative method goes into effect April 1, 2024. This provides apps with additional time to prepare for compliance with this requirement and, for any app that has utilization rates below 53%, an opportunity to reduce on-call time in advance of the requirement's effective date.

**Phase-in**

The Department made changes to the phase-in of the rate in the Second Proposed Rule to accelerate the pay increases for workers.

The First Proposed Rule phased in the minimum pay rate over two years, with the rates in 2023, 2024, and 2025 representing 75%, 85%, and 100% of the full rate in the First Proposed Rule, respectively. The Second Proposed Rule replaces this phase-in with 90% of the full rate in the Second Proposed Rule in 2023 ($17.96), 95% in 2024 ($18.96), and 100% in 2025 ($19.96).

Comments:

Several commenters, including members of the public, elected officials, industry researchers, worker advocacy groups, bicycle safety advocates, and food delivery workers, commented that the phase-in rate in 2023 was too low, noting that after workers' expenses for equipment and workers' compensation, the 2023 rate would be below the $15 minimum wage that applies to employees. These commenters recommended that DCWP phase in the full minimum pay rate more quickly.

Response:

The Department's decision to accelerate the phase-in is responsive to these comments. The accelerated phase-in also partially offsets food delivery workers' lost pay as a result of the delayed effective date of the rule.

**Inflation Adjustment**

The Department made no material changes to the inflation adjustment methodology between the First Proposed Rule and the Second Proposed Rule. To ensure that the rate keeps pace with the cost of living, the Second Proposed Rule provides for inflation adjustments to the minimum pay rate on April 1 of every year. DCWP chose the Consumer Price Index for

Urban Wage Earners and Clerical Workers for the New York-New Jersey-Pennsylvania metropolitan area as the most appropriate index to capture changes in NYC delivery workers' cost of living.

Comments:

DoorDash contended that inflation adjustments should not be incorporated, or should be reduced to no more often than once every five years. One elected official recommended that the Department adjust the inflation methodology by annually reviewing worker expenses and separately calculating inflation for the base pay, workers' compensation, and expense components of the rate.

Response:

The Department is not incorporating the recommendation to set a rate that excludes inflation adjustments or reduces inflation adjustments to once every five years. Annual adjustments ensure that inflation will not devalue the minimum pay rate.

Though inflation in delivery workers' expenses and New York State workers' compensation coverage may differ from inflation in workers' general cost of living, the Second Proposed Rule does not separately adjust each component, but rather applies the chosen index to the entire rate, so that each inflation adjustment is predictable, ministerial, and relies on consistent data and methods. If in the future the Department has reason to believe that expenses or the basis of the workers' compensation component have materially changed since issuance of a final rule , it may reassess these components at that time.

## Recordkeeping

The Second Proposed Rule amends the Recordkeeping requirements from the First Proposed Rule to correspond to changes in the basis of pay, further clarifies certain language to ensure recordkeeping requirements are narrowly tailored to the information DCWP needs to discharge its responsibilities under the statute, and adds taxpayer identification number and phone information as required records for use by the Department in performing updates to the rate in future rulemaking. The taxpayer identification number serves as a unique identifier of a worker across the various apps a worker may use. This information will enable the Department to match workers across multiple apps, re-evaluate rates of multi-apping after a final rule goes into effect, and appropriately update the multi-apping adjustment in the minimum pay rate. Information about the phones food delivery workers use will enable the Department to efficiently and reliably measure phone expenses without reliance on a survey should it choose to re-estimate expenses for use in future rulemaking.

Comments:

Comments from Uber Eats, DoorDash, and Grubhub stated that the additional recordkeeping requirements in the First Proposed Rule go beyond what is necessary to monitor compliance with the minimum pay rule or require the collection and reporting of personal information of workers. These commenters contended that data points on their platforms such as distance traveled by workers, number of orders, number of merchants, or cost of food ordered by consumers, number of consumers, or amount of gratuities have no relation to calculating minimum pay.

Other commenters, including elected officials, worker advocates, and industry researchers, urged DCWP to closely monitor apps' compliance with the minimum pay rate. Some of these commenters recommended adding additional recordkeeping requirements, such as reporting on worker equipment theft and breakage and on-the-job accidents and injury, to inform re-assessments of the adequacy of the minimum pay rate.

Response:

The recordkeeping requirements in the Second Proposed Rule will enable the Department to effectively monitor compliance with the minimum pay rule. These requirements will also enable the Department to carry out its statutory obligation under subdivisions (c) and (d) of Section 20-1522 of the Administrative Code to amend the minimum pay method, if warranted or necessary, and to complete its statutorily required reporting obligations.

**Impacts on Workers, Apps, Consumers, and Restaurants**

The Report summarized results from the Department's impact modeling of the First Proposed Rule. (Report at 34-36.) Due to the changes from the First Proposed Rule, the Department is updating its estimate of impacts to reflect provisions of the Second Proposed Rule. The Department is not otherwise changing its estimate of policy impacts.

Comments:

Comments from DoorDash, Uber Eats, and industry advocates suggested larger increases in costs to consumers and restaurants, and larger declines in the demand for delivery, than those set forth in Section 6 of the Report. Some apps stated that even if costs rose $5.18 per order as the Department predicted, such an increase will place food delivery out of reach for many families.

Relay commented that because it does not have a customer-facing platform that would enable it to pass its increased costs on to customers, it should be exempt from the minimum pay rule altogether. A comment signed by over two hundred restaurant operators echoed Relay's recommendation.

DoorDash contended that the Department did not adequately study the impact of the rule on workers, consumers, and restaurants in low-income areas of the City. It noted that workers have lower utilization rates in low-income communities and contended that apps would have to limit opportunities for workers in such communities to reduce on-call time. DoorDash contended that restaurants with lower menu prices serving working-class communities will experience the cost of delivery as a greater percentage of each total order.

DoorDash requested that the Department exempt trips its food delivery workers make from businesses other than food service establishments, such as convenience and grocery stores, from the minimum pay method.

Some commenters, including apps, asserted that the Department has not made adequate disclosures concerning the methods it used to estimate impacts.

Response:

The Department updated its impact estimates to reflect the changes between the First Proposed Rule and the Second Proposed Rule. The impact estimates assume that Uber Eats, GrubHub, and DoorDash will choose the Alternative Method and Relay will choose the Standard Method. The updated estimates show that the changes between the First Proposed Rule and Second Proposed Rule will reduce delivery workers' average hourly earnings, but increase aggregate hours worked, resulting in little difference in aggregate earnings between the two versions of the minimum pay rate. Impacts on consumers are not materially different between the First Proposed Rule and Second Proposed Rule. Under both the First Proposed Rule and Second Proposed Rule, delivery workers experience a large increase in earnings and app delivery continues to grow. The Department reviewed its impact model and assumptions in light of criticisms raised in comments but found that no changes were warranted.

**Table 3. Minimum Pay Rate Projected Outcomes under the First Proposed Rule and Second Proposed Rule**

|  | First Proposed Rule | Second Proposed Rule |
|---|---|---|
| *Worker Outcomes* |  |  |

| | | |
|---|---|---|
| Pay per hour ($) | 23.82 | 23.56 |
| Tips per hour ($) | 10.28 | 9.41 |
| Expenses per hour ($) | 2.82 | 2.82 |
| Net earnings per hour ($) | 31.28 | 30.15 |
| Net earnings per year ($) | 33,670 | 32,453 |
| Total hours (in millions) | 71 | 76 |
| Total net earnings ($, in billions) | 2.3 | 2.3 |
| | | |
| *Consumer Outcomes* | | |
| Average order cost, including taxes, tips, and fees ($) | 38.38 | 39.17 |
| Total spending on app delivery ($, in billions) | 6.8 | 6.8 |
| | | |
| *App Outcomes* | | |
| Total deliveries (in millions) | 178 | 173 |
| Total gross margin ($, in millions) | 746 | 725 |

*Notes: First Proposed Rule values are as published in Section 6 of the Report, except for Total hours, which in the Report was expressed as a percentage change from 2022. All estimates are for 2025. To model the Second Proposed Rule, DCWP assumes that apps that currently pay per trip will begin to use trip time more efficiently and maintain a 60% utilization rate, consistent with the incentives under the alternative method. Based on differences DCWP observed between apps, DCWP assumes this will result in apps averaging 1.94 deliveries per hour in 2025. Under the Second Proposed Rule, DCWP also assumes multi-apping will continue at the same level as in the fourth quarter of 2021 (see above), i.e. that workers will spend an average of 17.7% of their combined trip time and on-call time logged into multiple apps simultaneously (Report at 5). Because of this, workers are projected to receive the equivalent of $23.56 per hour, taking into account the multiple apps they work for, even though each app will only pay $19.96 per hour, on average. Similarly, workers will average 2.29 deliveries per hour, taking into account the multiple apps they work for. All other modeling assumptions and inputs are as described in the Report. (Report at 34-36).*

The Department is not incorporating the recommendation from Relay and some restaurants that Relay be exempt from the minimum pay rule, because there is no reason to believe its food delivery workers have less need for the protections of a minimum pay rate than food delivery workers engaged by other apps.

The Department recognizes that some consumers may be more price-sensitive than others, that app-based delivery is less costly to provide where there are high order volumes and short trip distances, and that willingness to pay is likely greatest on larger orders. The Department subpoenaed data from the apps that would have enabled it to model incidence of higher pay on detailed subsets of merchants and consumers, but the apps did not produce it. The Department did use the data apps provided to measure differences in app-based delivery between zip codes and found that low-income zip codes order app delivery less frequently, but order sizes are approximately the same. (Report at 9.) The Department determined that raising food delivery workers' pay is valuable, and that some consumers' inability or unwillingness to pay for the cost of their labor does not justify limiting food delivery workers' incomes below the levels provided for in this Second Proposed Rule.

The Department is not incorporating DoorDash's recommendation to exempt from the minimum pay method deliveries that its food delivery workers make from businesses other than food service establishments. Food delivery workers require adequate pay for these trips as well. The protections of Subchapter 1 of Chapter 15 of Title 20 of the Administrative Code generally apply to such trips, and the law does not specify that minimum pay protections should apply more narrowly than other protections.

The Department disagrees with commenters' statements that the Department did not adequately disclose the methods it used to estimate impacts. The Report discusses the methods the Department used, and the Department has published additional information on its website, taking care not to compromise information deemed confidential by the apps. More

detailed disclosures could violate confidentiality agreements that govern the use and disclosure of most data the apps produced in response to the Department's subpoenas. Apps required the Department to enter into such agreements as a condition of producing this data.

**Fraud and Misconduct**

The Second Proposed Rule adds "cancellation" and "cancelled" as defined terms with respect to a trip or delivery that ends prior to drop-off with a consumer. This change helps clarify apps' obligations under the rule and establishes a clear and consistent standard for when payment is owed to a food delivery worker.

Comments:

Comments from Uber Eats and Grubhub recommended that the minimum pay rule allow apps to withhold payment from a worker where the app believes the worker engaged in fraud or misconduct. Some apps expressed concern that they were unsure how to compensate workers for cancelled orders under the First Proposed Rule because "cancelled" was not a defined term. These commenters contended that the minimum pay rule should not require apps to compensate workers that end a trip before delivery or fail to complete a trip. These commenters further contended that requiring apps to compensate workers for cancelled shifts would incentivize workers to prolong trips or accept trips with no intention of completing them.

Response:

The Department considered apps' proposal in which they would have discretion to withhold payment based on their determination of whether misconduct occurred, but it is not incorporating it. Workers commonly report instances in which they believe an app unfairly denied them the payment they were owed (Report at 23), and the Department is unable to conclude that inappropriate withholding of payment by apps is less of a concern than fraudulent conduct by workers. Apps also have other tools to deter misconduct, for example, by deactivating the worker found to have engaged in it. Higher pay will also make the threat of deactivation more effective than it is at present and produce a more stable workforce where fewer trips are offered to new entrants who lack an established pattern of faithful performance.

Apps, workers, and the Department require a clear, consistent, and easily observed standard for determining the amount of payment due. To further this objective, the Department is incorporating the recommendation to define "cancellation" and "cancelled" in the rules.

New material is underlined.
[Deleted material is in brackets.]

"Shall" and "must" denote mandatory requirements and may be used interchangeably in the rules of this Department, unless otherwise specified or unless the context clearly indicates otherwise.

Subchapter H of Chapter 7 of Title 6 of the Rules of the City of New York is amended to read as follows:

**Subchapter H: Third-Party Service Workers**
**§ 7-801 Definitions.**

(a) As used in this subchapter, the following terms have the following meanings:

(1) "Cancellation" or "Cancelled", when used with respect to a trip or delivery, means that the trip or delivery ends prior to drop-off of an order with the consumer. When used with respect to trips including multiple deliveries, the terms mean that the trip ends prior to the completion of all planned drop-offs on the trip. The terms encompass cancellation initiated by a consumer, a food delivery worker, or a third-party food delivery service or third-party courier service.

(2) "Deactivation" means a third-party food delivery service or third-party courier service ceases to offer shifts or trips to a food delivery worker on a temporary or permanent basis.

(3) "Internal identifier" means a character string comprised of letters, numbers, or symbols that a third-party food delivery service or third-party courier service assigns to a food delivery worker for purposes of uniquely identifying such worker within its records.

(4) "On-call time" means the time a food delivery worker is connected to a third-party food delivery service or third-party courier service's electronic system for arranging or monitoring trips in a status where the food delivery worker is available to receive or accept trip offers or assignments with a pickup or drop-off location in New York City and excludes all trip time.

(5) "Pay period" means a fixed and regularly recurring period of 168 hours or seven consecutive 24-hour periods.

([2]6) "Trip" has the same meaning as set forth in Section 20-1501 of the Administrative Code, provided that a single trip may encompass multiple deliveries.

(7) "Trip time" means the span of time between the moment a food delivery worker accepts an offer from a third-party food delivery service or third-party courier service to perform a trip with a pickup or drop-off location in New York City, or receives an assignment to perform such a trip, through the moment such trip is completed or cancelled.

(8) "Utilization rate" means a third-party food delivery service or third-party courier service's total trip time divided by the sum of its trip time and on-call time.

(b) As used in this subchapter, the following terms have the same meanings as set forth in Section 20-1501 of the Administrative Code: "Food delivery worker," "food service establishment," "third-party courier service," and "third-party food delivery service."

## § 7-804 Notice of Rights.

(b) The notice of rights required by Section 20-1505 of the Administrative Code must be provided by email and as a link within a text message sent to the food delivery worker. In addition to provision by text [or]and email, such notice must also be made continuously available to all active food delivery workers through any website, mobile application, or other internet service used by a food delivery worker to perform work for a third-party food delivery service or third-party courier service.

(d) If the commissioner updates the information in the notice of rights pursuant to § 20-1505(a) of the Administrative Code, no later than thirty (30) days following the effective date of such update, a third-party food delivery service or third-party courier service must provide such updated notice to all food delivery workers in the manner provided in subdivisions (a) through ([f]c) of this section.

## § 7-805 Recordkeeping.

(a) (1) A request or subpoena for information or records from the Department must be served on a third-party food delivery service or third-party courier service in writing in person, via mail, or via email. When the Department issues a written request or subpoena for data, information or documents under Section 20-1506(a) of the Administrative Code, a third-party food delivery service or third-party courier service must provide all responsive data, information, or documents to the Department within thirty (30) days of receiving such request or subpoena. The Department may issue such written request or subpoena for purposes of discharging any of its responsibilities under Sections 20-1507 or 20-1522 of the Administrative Code.

(2) A deadline of more than 30 days may be agreed to on consent by the Department and the third-party food delivery service or third-party courier service.

(3) A third-party food delivery service or third-party courier service must provide data, information, or documents to the Department in their original format or, if so requested, in the comma-delimited formats and layouts prescribed by the Department in such written request or subpoena.

(4) The Department may issue a notice of violation to a third-party food delivery service or third party courier service who fails to provide true and accurate electronic records or information by the deadline provided in the written request or subpoena or the deadline agreed to by the parties, provided that any monetary penalties authorized by law for a violation of Section 20-1506 of the Administrative Code shall not apply while such written request or subpoena is the subject of a [pending]timely-filed pre-compliance review proceeding.

(b) A third-party food delivery service or third-party courier service must create and maintain contemporaneous, true, and accurate records documenting compliance with the requirements of Chapter 15 of Title 20 of the Administrative Code and any rules promulgated thereunder for a period of three years. If, in the ordinary course of business, any record required to be maintained under this subdivision is created by a person other than such third-party food delivery service or third-party courier service, it is the responsibility of such third-party food delivery service or third-party courier service to obtain a copy of such record.

(c) A third-party food delivery service or third-party courier service must maintain the [data specified in this subdivision, or a copy of such data, according to record layouts prescribed by the Department, provided that such record layouts have been published and made available on the Department's website. Such data shall include] following data and records:

(1) With respect to all food delivery workers, first name, last name, phone number, email address, [a unique] internal identifier [for the worker], taxpayer identification number if required to maintain such number under federal or state law, preferred language, first date hired, retained or engaged, and last date hired, retained or engaged.

(2) With respect to the notice of rights, data sufficient to show each email [or]and text message containing the notice of rights that was sent to a food delivery worker, the date and time such email or text message was sent, the first name, last name, and [a unique] internal identifier of the recipient, and[, as applicable,] the phone number [or]and email address of the recipient.

(3) With respect to the maximum distance, bridge, or tunnel parameters set or updated under Section 20-1521(a)-(b) of the Administrative Code, the date, time, and content of every selection of or update to such parameters and the first name, last name, and [a unique] internal identifier of the food delivery worker who selected or updated such parameters.

(4) With respect to each trip offered to a food delivery worker:

(i) All information disclosed to a food delivery worker before such worker accepts a trip under Section 20-1521(d) of the Administrative Code, including:

a. The address(es) where the food, beverage or other goods must be picked up;

b. The estimated distance for the trip;

c. The estimated time for the trip or, if disclosed in lieu of estimated time for the trip pursuant to 6 RCNY § 7-80[7]6([e]f) of this subchapter, the expected or required time of the last drop-off on the trip;

d. The amount of any gratuity(ies) specified by the consumer(s); and

e. The amount of compensation excluding gratuity to be paid to the food delivery worker for the trip or, if disclosed in lieu of compensation excluding gratuity pursuant to 6 RCNY § 7-80[7]6(h), the hourly pay rate applicable to the trip;

(ii) The date and time that the trip offer was made to the food delivery worker;

(iii) If different from the date and time that the trip offer was made to the food delivery worker, the date(s) and time(s) that the information required to be disclosed by Section 20-1521(d) of the Administrative Code was first disclosed to a food delivery worker;

(iv) Whether the offer was accepted, declined, or expired, and the date and time at which this status was recorded;

(v) The route used to generate the estimated trip distance disclosed to a food delivery worker pursuant to Section 20-1521(d)(2) of the Administrative Code and the date and time it was generated. Such route must include a sequence of latitude and longitude coordinates;

(vi) The route distance between the first food service establishment from which the food, beverage or other goods must be picked up on the trip and the last delivery address on the trip;

(vii) The address(es) of where the food, beverage or other goods must be picked-up and, for the location(s) to which the food, beverage, or other goods must be delivered, the zip code and the latitude and longitude [of the location(s) to which the food, beverage, or other goods must be delivered], accurate to a precision of three decimal places;

(viii) The gratuity the third-party food delivery service or third-party courier service charged to the consumer(s) for the order(s) on the trip;

(ix) The gratuity the third-party food delivery service or third-party courier service paid to the food delivery worker for the trip;

(x) The compensation, excluding gratuity, paid to the food delivery worker for the trip. If a third-party food delivery service or third-party courier service compensates a food delivery worker on an hourly basis, the amount of compensation for a trip is the time between the acceptance of an offered trip and its completion or cancellation, multiplied by the hourly payment rate for that trip;

(xi) Whether the trip was completed or cancelled, and the date and time of completion or cancellation; and if cancelled, whether the cancellation was initiated by the food delivery worker, the customer, the business from which the food, beverage, or other good was to be picked-up, or the third-party food delivery service or third-party courier service;

(xii) The first name, last name, and [a unique] internal identifier of the food delivery worker to whom the offer was made; and

(xiii) Whether each business from which the food, beverage or other goods must be picked up was a food service establishment.

(5) With respect to each pay[ment to] period during which a food delivery worker engaged in any trip time or on-call time:

(i) The first name, last name, and [a unique] internal identifier of the food delivery worker [receiving payment]; [and]

(ii) The date[ and], time, and amount of any payment [,the start and end date of the pay period, the amount of compensation, and all fees or deductions from compensation, itemized by type.] made to the food delivery worker for the pay period, or any part thereof;

(iii) The start date and time and end date and time of the pay period;

(iv) The minutes of trip time worked by the food delivery worker;

(v) The minutes of on-call time worked by the food delivery worker;

(vi) The compensation, excluding gratuities, paid to the food delivery worker and the basis for such compensation, including rates of pay and units of pay. Such records must distinguish between compensation creditable towards a third-party food delivery service or third-party courier service's obligations under 6 RCNY § 7-810 and any other compensation the third-party food delivery service or third-party courier service may have paid to the food delivery worker;

(vii) The gratuities paid to the food delivery worker for trips with a pickup or drop off location in New York City;

(viii) All deductions from, additions to, or adjustments of compensation owed or paid to the food delivery worker, itemized by type.

(ix) The minimum pay method chosen for the pay period pursuant to 6 RCNY § 7-810(c).

(6) With respect to each pay period:

(i) The start date and time and end date and time of the pay period;

(ii) The total minutes of trip time for all food delivery workers;

(iii) The total minutes of on-call time for all food delivery workers;

(iv) The total compensation paid to all food delivery workers. Such records must distinguish between (a) compensation creditable towards a third-party food delivery service or third-party courier service's obligation under Section 7-810 and any other compensation the third-party food delivery service or third-party courier service may have paid to the food delivery worker;

(v) The minimum pay method chosen for the pay period pursuant to 6 RCNY § 7-810(c).

(7) With respect to each insulated food delivery bag provided to a food delivery worker:

(i) The first name, last name, and [a unique] internal identifier of the worker to whom the delivery bag was provided; and

(ii) The date of provision, and whether provision was by pickup or whether the third-party food delivery service or third-party courier service sent the insulated delivery bag to the food delivery worker.

([7]8) With respect to each deactivation of a food delivery worker:

(i) The first name, last name, and [a unique] internal identifier of the worker who was deactivated;

(ii) The date and time of deactivation;

(iii) The date and time of reactivation, if applicable;

(iv) The reason for the deactivation; and

(v) Whether the deactivation was effected through an automatic or a manual process.

(9) With respect to each instance in which a food delivery worker is connected to a third-party food delivery service or third-party courier service's electronic system for arranging, monitoring, and performing trips:

(i) The first name, last name, and internal identifier of the food delivery worker;

(ii) The start date and time and end date and time of each span of on-call time;

(iii) The start date and time and end date and time of each span of trip time; and

(iv) The manufacturer, name, and model number of the phone that connected to such electronic system.

(d) In accordance with applicable law and upon receipt of appropriate notice, a third-party food delivery service or third-party courier service must produce reports to the Department concerning such third-party food delivery service or third-party courier service's operations in New York City for all periods on or after January 1, 2022; provided however, that for all periods between January 1, 2022 and the effective date of this subdivision, a third-party food delivery service or third-party courier service must produce reports only to the extent that such third-party food delivery service or third-party courier service maintained all or part of such records. The reports required to be produced pursuant to this subdivision may be required by the Department no more frequently than monthly and must be produced in accordance with a format, layout, and procedure prescribed by the Department, provided that this subdivision shall not be construed as requiring a third-party food delivery service or third-party courier service to submit reports on orders for which it had no responsibility for facilitating or arranging the delivery or pickup of food, beverages, or other goods by a food delivery worker. A third-party food delivery service or third-party courier service must maintain the records used to produce such reports for a period of three years. Such reports may include the following information for each pay period aggregated citywide and by zip code of the pickup or drop-off location in New York City, food delivery worker mode of transportation, and merchant line of business:

(1) The number of food delivery workers who engaged in any trip time;

(2) The number of food delivery workers who engaged in any on-call time;

(3) The number of trips with a pickup or drop-off location in New York City;

(4) The minutes of trip time;

(5) The minutes of on-call time;

(6) The total amount paid to food delivery workers, excluding gratuities, creditable towards a third-party food delivery service or third-party courier service's obligation under 6 RCNY § 7-810;

(7) The total gratuities paid to food delivery workers for trips with a pickup or drop-off location in New York City;

(8) The minimum pay method chosen for the pay period pursuant to 6 RCNY § 7-810(c);

(9) The number of consumers who received at least one delivery with a pickup or drop-off location in New York City;

(10) The number of completed deliveries with a pickup or drop-off location in New York City;

(11) The total amount charged to consumers for the food, beverage, or other goods on deliveries with a pickup or drop-off location in New York City;

(12) The fees charged to consumers on orders for delivery with a pickup or drop-off location in New York City;

(13) The subscription and membership fees charged to consumers in New York City;

(14) The number of merchants who prepared at least one order for delivery with a pickup or drop-off location in New York City;

(15) The delivery fees, payment processing fees, and other fees charged to merchants on orders for delivery with a pickup or drop-off location in New York City, itemized by type.

(e) The Department may prescribe data specifications, including field definitions, record layouts, and uniform codes, for any record required to be maintained pursuant to subdivision (c) or (d) of this section. If prescribed by the Department, a third-party food delivery service or third-party courier service must maintain the required records in accordance with such specifications.

## § 7-806 Delivery Distance and Route.

(j) For purposes of Section 20-1521(a)(1)-(3) of the Administrative Code and this section, a trip offered to a food delivery worker by a third-party food delivery service or third-party courier service requires travel across a bridge or through a tunnel if the shortest route generated by a routing engine selected by the Department for such trip involves passage over such bridge or through such tunnel, unless such third-party food delivery service or third-party courier service produces contemporaneous records showing that it provided an alternative route not requiring passage over such bridge or through such tunnel to such food delivery worker and that such route was consistent with the time and distance disclosed under Section 20-1521(d)[(2)] of the Administrative Code.

## § 7-807 Payments to Workers.

(a) For purposes of Section 20-1523(a) of the Administrative Code, a third-party food delivery service or third-party courier service shall be considered to have charged or imposed a fee on a food delivery worker for the use of a form of payment selected by such service if (1) the service does not offer a form of payment to a food delivery worker free from any fees charged or imposed by a financial intermediary or other person or (2) a fee for payment is charged or imposed on a food delivery worker by any parent, affiliate, or subsidiary entity of the third-party food delivery service or third-party courier service.

(b) A third-party food delivery service or third-party courier service must calculate compensation owed to a food delivery worker for each pay period. The pay period need not coincide with the calendar week but may begin on any day and at any hour of the day. A third-party food delivery service or third-party courier service must establish a single pay period for all food delivery workers it engages. Once the beginning time of the pay period is established, it must remain fixed, and may be changed only if the change is intended to be permanent.

(c) [Pursuant to Section 20-1523(b) of the Administrative Code, a]A third-party food delivery service or third-party courier service must pay [a food delivery worker for work performed weekly and] all compensation owed to each food delivery worker for a pay period no later than seven (7) calendar days after the end of [the week in which the work was performed] such pay period.

## § 7-810 Minimum Pay.

(a) When the [d]Department issues a subpoena for data, information or documents under § 20-1522(a)(2) of the Administrative Code, a third-party food delivery service or third-party courier service must provide all responsive data, information or documents to the [d]Department within 30 days of receiving such subpoena and, if so requested, in the comma-delimited formats and layouts prescribed by the [d]Department in such subpoena.

(b) **Standard Method**. A third-party food delivery service or third-party courier service must make payments to food delivery workers for their trip time and on-call time in a pay period that meet the individual and aggregate requirements of subparagraphs 1 and 2 of this subdivision.

(1) **Individual requirement**. A third-party food delivery service or third-party courier service must pay to a food delivery worker who engages in trip time in a pay period no less than the sum of such food delivery worker's trip time in that pay period multiplied by the following minimum pay rates:

(i) $17.96 per hour, for pay periods that start on or after the effective date of this section;

(ii) $18.96 per hour, adjusted for inflation as set forth in subdivision (g) of this section, for pay periods that start on or after April 1, 2024; and

(iii) $19.96 per hour, adjusted for inflation annually as set forth in subdivisions (h) and (i) of this section, for pay periods that start on or after April 1, 2025.

(2) **Aggregate requirement**. A third-party food delivery service or third-party courier service must pay, in aggregate, to the food delivery workers who engage in trip time or on-call time in a pay period no less than the sum of all such food delivery workers' trip time and on-call time in that pay period multiplied by the following minimum pay rates:

(i) $17.96 per hour, for pay periods that start on or after the effective date of this section;

(ii) $18.96 per hour, adjusted for inflation as set forth in subdivision (g) of this section, for pay periods that start on or after April 1, 2024; and

(iii) $19.96 per hour, adjusted for inflation annually as set forth in subdivisions (h) and (i) of this section, for pay periods that start on or after April 1, 2025.

(c) **Alternative Method.** Notwithstanding the requirements of subdivision (b) of this section, an eligible third-party food delivery service or third-party courier service may use the alternative method specified in this subdivision to determine the minimum payments it must make to food delivery workers for their trip time and on-call time in a pay period.

(1) For pay periods that begin prior to April 1, 2024, any third-party food delivery service or third-party courier service is eligible to use the alternative method specified in this subdivision. For pay periods that begin on or after April 1, 2024, a third-party food delivery service or third-party courier service is eligible to use this alternative method only if its utilization rate for the pay period is greater than or equal to 0.53. If an eligible third-party food delivery service or third-party courier service chooses this alternative method, the method applies to each and every food delivery worker who engages in trip time in the pay period. An eligible third-party food delivery service or third-party courier service that chooses the alternative method for a pay period must document its utilization rate and choice of method no later than when payment is due pursuant to Section 20-1523(b) of the Administrative Code and 6 RCNY § 7-807.

(2) An eligible third-party food delivery service or third-party courier service that chooses the alternative method must pay to each food delivery worker who engages in trip time in a pay period no less than such food delivery worker's trip time in that pay period multiplied by the alternative minimum pay rate. Such alternative minimum pay rate is calculated by dividing the minimum pay rate otherwise required by subdivision (b) of this section by 0.60. Such third-party food delivery service or third-party courier service is not required to pay a food delivery worker for the pay period if the food delivery worker engages in on-call time but no trip time.

(d) **Bases of Pay**. A third-party food delivery service or third-party courier service may fulfill its obligation under subdivision (b) or subdivision (c) of this section using any basis of pay it chooses, including paying an hourly rate, a per-trip rate or other piece rate, a bonus or other lump-sum payment, or any other basis.

*Example: In a pay period that begins on April 1, 2024, 5,000 food delivery workers, in aggregate, engage in 55,000 hours of trip time and 45,000 hours of on-call time. Worker A, individually, engages in 30 hours of trip time and 5 hours of on-call time. Following a 2% inflation adjustment performed by the Department pursuant to subdivision (g) of this section, the minimum pay rate is $19.34. The alternative minimum pay rate is $19.34 divided by 0.60.*

*Standard Method: The third-party food delivery service meets the requirements of both subdivision (b)(1) and subdivision (b)(2) of this section if it pays its food delivery workers as follows:*

1. *Each food delivery worker is paid at least an amount equal to their trip time multiplied by $19.34. For instance, worker A receives at least $580.20, which is $19.34 multiplied by 30 hours; and*

2. *The total the third-party food delivery service pays for the pay period meets or exceeds the aggregate amount of trip time and on-call time (100,000 hours) multiplied by $19.34, which equals $1,934,000. Worker A's payment of at least $580.20 for trip time is credited towards the aggregate requirement and Worker A may, or may not, receive an additional payment.*

*Alternative Method: The third-party food delivery service has a utilization rate of 0.55, which is its trip time (55,000) divided by the sum of its trip time and on-call time (100,000). Since 0.55 is greater than 0.53, the third-party food delivery service is eligible under subdivision (c)(1) to use the alternative method to determine the minimum payments it must make to its food delivery workers for the pay period. If the third-party food delivery service uses the alternative method, it meets the requirements of subdivision (c) if each food delivery worker is paid at least an amount equal to their trip time multiplied by $19.34 divided by .60. For instance, worker A receives $967.00, which is $19.34 divided by .60 multiplied by 30 hours.*

(e) A third-party food delivery service or third-party courier service may not use gratuities paid to a food delivery worker to offset such third-party food delivery service or third-party courier service's obligation to pay the food delivery worker the minimum pay required by this section.

(f) A third-party food delivery service or third-party courier service may not use amounts paid to a food delivery worker for trips with a pickup and drop-off location outside of New York City to offset such third-party food delivery service or third-party courier service's obligation to pay to the food delivery worker the minimum pay required by this section.

(g) The Department shall perform the inflation adjustment required by subdivisions (b)(1)(ii) and (b)(2)(ii) of this section by multiplying $18.96 by the percent change in the All Items Consumer Price Index for Urban Wage Earners and Clerical Workers for the NY-NJ-PA metro area between December 2022 and December 2023 and rounding to the nearest cent, provided that if the percentage change is zero or negative, the adjustment shall be zero. The Department shall post the Consumer Price Index adjusted minimum pay rate on its website on or before the first day of February 2024.

(h) For pay periods beginning on or after April 1, 2025 and before April 1, 2026, the Department shall perform the inflation adjustment required by subdivisions (b)(1)(iii) and (b)(2)(iii) of this section by multiplying $19.96 by the percent change in the All Items Consumer Price Index for Urban Wage Earners and Clerical Workers for the NY-NJ-PA metro area between December 2022 and December 2024 and rounding to the nearest cent, provided that if the percentage change is zero or negative, the adjustment shall be zero. The Department shall post the Consumer Price Index adjusted minimum pay rate on its website on or before the first day of February 2025.

(i) Beginning with the minimum pay rate for pay periods that start on or after April 1, 2026, and continuing each calendar year thereafter, the Department shall post the inflation-adjusted minimum pay rate required by subdivisions (b)(1)(iii) and (b)(2)(iii) of this section on or before the first day of February of the calendar year in which the rate will take effect. Such inflation adjustments will be performed by multiplying the minimum pay rate in effect prior to adjustment by the most recent December to December percent change in the All Items Consumer Price Index for Urban Wage Earners and Clerical Workers for the NY-NJ-PA metro area and rounding to the nearest cent, provided that if the percentage change is zero or negative, the adjustment shall be zero.

**NEW YORK CITY LAW DEPARTMENT**

**DIVISION OF LEGAL COUNSEL**
**100 CHURCH STREET**
**NEW YORK, NY 10007**
**212-356-4028**

**CERTIFICATION PURSUANT TO**

**CHARTER §1043(d)**

**RULE TITLE:** Calculation of Minimum Pay for Food Delivery Service Workers

**REFERENCE NUMBER:** 2022 RG 076

**RULEMAKING AGENCY:** Department of Consumer and Worker Protection

I certify that this office has reviewed the above-referenced proposed rule as required by section 1043(d) of the New York City Charter, and that the above-referenced proposed rule:

(i)     is drafted so as to accomplish the purpose of the authorizing provisions of law;

(ii)    is not in conflict with other applicable rules;

(iii)   to the extent practicable and appropriate, is narrowly drawn to achieve its stated purpose; and

(iv)    to the extent practicable and appropriate, contains a statement of basis and purpose that provides a clear explanation of the rule and the requirements imposed by the rule.

/s/ STEVEN GOULDEN                    Date:  February 27, 2023
Acting Corporation Counsel

**NEW YORK CITY MAYOR'S OFFICE OF OPERATIONS**
**253 BROADWAY, 10ᵗʰ FLOOR**
**NEW YORK, NY 10007**
**212-788-1400**


**CERTIFICATION / ANALYSIS**
**PURSUANT TO CHARTER SECTION 1043(d)**


**RULE TITLE: Calculation of Minimum Pay for Food Delivery Service Workers**

**REFERENCE NUMBER: DCWP-31**

**RULEMAKING AGENCY: Department of Consumer and Worker Protection**


I certify that this office has analyzed the proposed rule referenced above as required by Section 1043(d) of the New York City Charter, and that the proposed rule referenced above:

(i)     Is understandable and written in plain language for the discrete regulated community or communities;

(ii)    Minimizes compliance costs for the discrete regulated community or communities consistent with achieving the stated purpose of the rule; and

(iii)   Does not provide a cure period because it does not establish a violation, modification of a violation, or modification of the penalties associated with a violation.


_/s/ Francisco X. Navarro_                           _February 28, 2023_
Mayor's Office of Operations                              Date