UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| DOORDASH, INC. and UBER TECHNOLOGIES, INC., | No.   1:25-cv-10268 |
| Plaintiffs, | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| THE CITY OF NEW YORK, | |
| Defendant. | |

---

Plaintiffs DOORDASH, INC. ("DoorDash"), by and through its attorneys, Gibson, Dunn & Crutcher LLP, and UBER TECHNOLOGIES, INC. ("Uber Eats" and, together with DoorDash, "Plaintiffs"), by and through its attorneys, Hecker Fink LLP, allege for their complaint against Defendant THE CITY OF NEW YORK, as follows:

## NATURE OF THE ACTION

1.    New York City enacted a statutory scheme that forces third-party food- and grocery-delivery platforms, including those owned by Plaintiffs, to include a pre-checkout gratuity prompt with a 10% tip option.  By doing so, the City compels Plaintiffs to advocate for and implicitly endorse the City's preferred message—*i.e.*, that ***New York City customers should tip delivery workers,*** that they should do so ***before those workers complete the delivery,*** and that ***10% is an appropriate amount***.  That violates multiple provisions of the United States and New York Constitutions.  Plaintiffs bring this action to enjoin that novel regime and vindicate their rights, as well as to prevent the indisputable irreparable harm that will occur absent judicial intervention.

2.    Plaintiffs challenge New York City Local Laws 107 and 108 of 2025 (together, the "Tipping Law") that compel them and other companies that own online third-party food- and

grocery-delivery platforms ("platforms") to speak a government-mandated message in a prescribed manner and at a prescribed time. The Tipping Law does so by requiring Plaintiffs to solicit tips for third-party food- and grocery-delivery workers ("delivery workers") before or at the time of checkout (*i.e.*, before a delivery has been made) and to include at least one option to tip 10% or more of the purchase price. Indeed, Plaintiffs are conscripted to amplify the City's message despite the fact that food deliveries in New York City recently became more expensive due to the City's guaranteed minimum-earnings requirements for delivery workers. By commandeering space on Plaintiffs' online platforms and dictating the content, timing, and manner of Plaintiffs' communications with their customers regarding the discretionary act of tipping, the law violates core constitutional protections.

3.      The Tipping Law unlawfully compels Plaintiffs to convey and endorse a message in New York City that they do not communicate now and would not otherwise communicate, in a manner they would not otherwise use, about a controversial subject, in violation of the First Amendment. The Tipping Law further violates the First Amendment because it was imposed in retaliation for earlier speech by Plaintiffs with which the City disagrees. It also interferes with Plaintiffs' longstanding property rights and interests in the free use of their platforms, and does so without just compensation—acts which constitute unconstitutional regulatory takings under both the federal and New York Constitutions. Further, the law reflects arbitrary and irrational policy choices that exceed the City's police power, and its vague terms invite *ad hoc* and discriminatory enforcement in violation of Plaintiffs' due-process rights. Plaintiffs therefore seek declaratory and injunctive relief, as well as damages to the extent appropriate, to prevent and remedy these violations.

4.      Plaintiffs operate online platforms that connect customers, merchants, and delivery workers.  Plaintiffs developed and supported their respective platforms through significant, continuing investments in, among other things, platform development and operations, customer acquisition, brand and performance marketing, and relationships with and the experience of customers, merchants, and delivery workers.  Until now, Plaintiffs have maintained the unilateral right to determine whether, when, and how to configure their platforms to offer customers a mechanism for paying discretionary tips to delivery workers—including by determining what, if any, tip amounts to suggest to customers and whether to make that suggestion before or after delivery workers complete a delivery.  Plaintiffs each exercise care and discretion with this functionality because they view it as a way to communicate with their customers regarding a subject of social consequence.

5.      Tipping in the United States is at a crossroads.  What was once a discretionary courtesy intended to acknowledge exceptional service is spreading to new contexts as some businesses solicit tips in increasingly aggressive ways.  Practices like suggested tip amounts and suggested pre-service tipping can convey the hotly debated message that tipping should not just be a recognition of good service but an expectation regardless of service quality.  The more frequent solicitation of tips at higher amounts has led to "tipping fatigue" among U.S. customers, with reports indicating that "90% of Americans express[] that tipping culture has spiraled out of control," particularly in the context of rising prices.  Compl. ¶ 32.  And customers are reportedly particularly opposed to tipping "when the request [for a tip] feels premature."  *Id.*  That is because an overwhelming majority of customers (77%) "say the quality of the service they receive is a major factor in deciding whether and how much to tip."  *Id*.

6.     The Tipping Law strips Plaintiffs of their right to decide whether, how, and when to communicate with customers about tipping practices by mandating that Plaintiffs give a megaphone to the City's preferred message at the time and in the manner dictated by the City. Even worse, because Plaintiffs are expressing that message on their platforms to their customers, many of those customers will likely perceive that Plaintiffs are endorsing pre-delivery tips of 10% in New York City, despite separately asking consumers to pay higher fees in response to guaranteed minimum-earnings requirements.  In other words, the law would require Plaintiffs to express that they believe New York City customers should tip delivery workers irrespective of other charges or the quality of the service they receive, and that 10% is an appropriate—perhaps even expected—minimum amount for that tip, irrespective of purchase price or other factors.

7.     The City enacted the Tipping Law against the backdrop of a series of regulatory measures aimed at food- and grocery-delivery platforms, including the Minimum Pay Rule (defined in ¶ 38), for third-party delivery workers.

8.     Amidst growing "tip fatigue," generally rising prices, and higher required payments to New York City delivery workers, Plaintiffs altered their approach to tipping in New York City and the messages they send to customers about this controversial topic.  Before December 2023, Plaintiffs gave customers in New York City the option of leaving the assigned delivery worker a tip before checkout; beginning in December 2023, when the Minimum Pay Rule took effect, Plaintiffs no longer displayed the tipping screen to all customers before checkout in New York City, instead providing almost all customers with the option of leaving a tip only after the order is completed.  Not only were those modifications entirely Plaintiffs' prerogative, they were a commercially sensible choice that the very agency that crafted the Minimum Pay Rule suggested Plaintiffs could implement to address rising order costs as a result of that new rule.  Compl. ¶ 39.

The Tipping Law nullifies that measured adjustment and forces Plaintiffs instead to "conspicuous[ly]" solicit tips on behalf of delivery workers pre-delivery, and to include an option suggesting that a tip of at least 10% is appropriate.

9.      The harms inflicted by the Tipping Law are concrete and compounding. Beyond compelling speech—a *per se* irreparable harm—the law also will materially impair goodwill, customer demand, business opportunities, and revenue for Plaintiffs.

10.      Given growing customer "tip fatigue," New York City's heightened minimum pay, and a general rise in cost of living, Plaintiffs expect customers in New York City will react to a mandated pre-delivery 10% tip suggestion by reducing their engagement with Plaintiffs' platforms. Lessened engagement would result in fewer orders. Fewer orders would cause reduced business opportunities and revenue for Plaintiffs. Fewer orders would also mean reduced earnings for delivery workers and reduced revenues for merchants, which would damage Plaintiffs' goodwill and reputation with those workers and merchants.

11.      The Tipping Law directly burdens speech by compelling Plaintiffs to solicit tips for delivery workers at a specific time, in a specific format, and with specific content, thereby forcing Plaintiffs to communicate the City's preferred message: Plaintiffs must "conspicuous[ly]" ask customers for tips in "plain language" (implying that customers should tip), make that request before delivery (suggesting customers should tip even before seeing whether and how the delivery worker performed), and recommend a tip of 10% (suggesting that anything less would be low regardless of purchase price or other factors). These mandates violate well-settled constitutional principles protecting both the right to speak and the right not to speak.

12.      The Tipping Law also violates Plaintiffs' First Amendment rights to be free from government retaliation. When Plaintiffs modified their communications regarding gratuities for

delivery workers following the enactment of the Minimum Pay Rule, the City quickly took steps to force Plaintiffs to conform their speech to the City's preferences (despite the fact that the very agency that promulgated the Rule suggested that altered gratuity solicitations could help alleviate the Rule's burden on consumers).  It did so by enacting the Tipping Law, which threatens food- and grocery-delivery platforms with civil penalties and other enforcement measures if they don't speak the government's mandated message.  The Tipping Law and its penalties are aimed at deterring Plaintiffs from communicating their preferred messaging on the contested issue of tipping.  Plaintiffs' speech was therefore a substantial or motivating factor in the City's decision to enact the Tipping Law, and the City's action would objectively deter similarly situated entities of ordinary firmness from exercising their constitutional rights to speak on a contested matter of public concern.  The First Amendment protects Plaintiffs from such retaliatory government action.

13.    The Tipping Law also constitutes a regulatory taking of Plaintiffs' property rights and interests in their platforms.  Plaintiffs have long relied on the ability to design their interfaces to optimize user experience and brand perception.  By compelling Plaintiffs to insert a gratuity prompt for delivery workers in conformance with the City's preferences, the Tipping Law improperly nullifies Plaintiffs' prior value-enhancing product decisions, forecloses Plaintiffs from implementing future product innovations, and diminishes Plaintiffs' platforms' economic value— all without conferring any (let alone just) compensation on Plaintiffs.

14.    The City's measures cannot be justified as reasonable regulation.  Compelling private businesses to communicate government-preferred messages that purport to advance a narrow redistributive aim to the benefit of *other* players in a private industry bears no substantial relation to public health, safety, or general welfare, and is, at minimum, arbitrary and irrational. Any legitimate interest in supporting delivery workers could be pursued through less restrictive,

non-speech-burdening alternatives, including direct subsidies or the City's own public messaging, rather than by conscripting private businesses to serve as the City's mouthpieces. Moreover, the Tipping Law's indeterminate requirements—such as "conspicuous manner," and "opportunity to pay a gratuity"—lack clear standards, leaving covered entities to guess at compliance and inviting arbitrary enforcement in contravention of core due-process principles.

15.    Plaintiffs therefore seek a declaration that the Tipping Law violates (1) the First Amendment and state-law protections against compelled speech; (2) the First Amendment and state-law protections against government retaliation; (3) the Takings Clauses of both the federal and state Constitutions; (4) federal and state due-process guarantees, including the proscriptions against arbitrariness and vagueness; and (5) limits on the City's police power under state constitutional and statutory law. Plaintiffs further seek preliminary and permanent injunctive relief barring the Tipping Law from taking effect, just compensation and damages where appropriate, and fees and costs as provided by law. Without immediate relief, Plaintiffs will suffer irreparable harm to their speech rights, property interests, revenues, business opportunities, reputation, goodwill, and marketplace participation.

## THE PARTIES

16.    Plaintiff DoorDash, Inc. ("DoorDash") is a Delaware corporation founded in 2013 and headquartered in San Francisco, California. DoorDash has and continues to develop, host, maintain, update, and improve its platforms, including Marketplace and Caviar (as defined in ¶ 23). DoorDash's platforms generally connect customers, a broad array of merchants, and delivery workers (often called "Dashers"). The Tipping Law is aimed at and directly affects DoorDash's platforms and, as such, DoorDash has a beneficial interest in the relief sought herein.

17.    Plaintiff Uber Technologies, Inc. ("Uber Eats") is a Delaware company founded in 2009 and headquartered in San Francisco, California.  Uber Technologies, Inc. and its subsidiaries own and operate the Uber Eats and Postmates online platforms that connect restaurants and other merchants to customers and a network of delivery workers in their communities.  Customers can access the Uber Eats platforms via websites or mobile applications on a smartphone.  The Tipping Law is aimed at and directly affects the platforms and, as such, Uber Eats has a beneficial interest in the relief sought herein.

18.    Defendant the City of New York (the "City" or "New York City") is a municipal corporation organized and existing under and by virtue of the laws of the State of New York.  The New York City Council (the "Council") is the principal legislative body of the City responsible for establishing the City's official legislative policies.  The Council enacted the Tipping Law.  The Tipping Law expressly assigns rulemaking authority to the Department of Consumer and Worker Protection ("DCWP").  The Commissioner of DCWP has the authority to enforce the provisions of the Tipping Law.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) over Plaintiffs' federal constitutional claims and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining claims.  This Court also has jurisdiction over all claims pursuant to 28 U.S.C. § 1332.

20.    Plaintiffs bring this action as both a facial challenge and an "as-applied" challenge to the Tipping Law and are excused from exhausting any administrative remedy, to the extent any such remedy is available, before the City.

21.     Venue is proper under 28 U.S.C. § 1391(b)(1), (2), and/or (3) in this Court because the Tipping Law was enacted by the City and the violations of Plaintiffs' rights occurred in this judicial district.

**FACTUAL BACKGROUND**

I.    **Plaintiffs are key players in the national and New York City online food- and grocery-delivery space.**

22.     Online food- and grocery-delivery in New York City has evolved from simple online ordering portals in the 1990s into multi-sided, online- and app-based platforms connecting customers, merchants, and delivery workers across all five boroughs.  By the mid-2010s, those platforms layered in real-time logistics, integrated payment-processing features, and discovery tools to enable on-demand delivery and pickup on a City-wide scale.  As those platforms expanded, thousands of City businesses adopted them, and New Yorkers placed millions of orders using them.

23.     Plaintiffs are two companies that operate such platforms.  Since their inception, Plaintiffs have sought to grow and empower local economies, including New York City's, by developing, deploying, and maintaining online platforms that connect customers, merchants, and delivery workers.  As relevant to this action, Plaintiffs' platforms include:

a.    "Marketplace" is DoorDash's consumer app and website where customers browse local merchants, place orders, and pay; DoorDash then transmits the order to the merchant and, where applicable, arranges delivery through a Dasher.

b.    "Caviar" is another one of DoorDash's platforms, functioning similarly to Marketplace by connecting customers, delivery workers, and a broad array of restaurants.

c. "Uber Eats" operates the Uber Eats and Postmates brands and consumer app and website, an earner-facing app, and merchant-facing technology that work together to connect customers, merchants, and delivery workers, allowing customers to order food deliveries from merchants.

24. Plaintiffs generate significant revenue through their platforms. These revenue streams reflect significant ongoing investments in, among other things, platform development and operations, customer acquisition, brand and performance marketing, and relationships with and the experience of customers, merchants, and delivery workers.

25. Plaintiffs' investments (some of which are described above) have yielded outsized returns for merchants, customers, and delivery workers.

26. For example, according to surveys conducted by DoorDash, restaurant owners report that these platforms help them tap into the roughly 40% of diners who prefer to order online and who spend about 20% more per online order, with studies estimating that as much as 80% of online delivery sales are incremental—orders that would not have occurred as dine-in or traditional takeout. In large markets, platform-driven demand can translate to over $250,000 in extra annual revenue per high-performing restaurant. DoorDash's surveys likewise show that 75% of restaurants on DoorDash report reaching new customers and 69% report acquiring new dine-in customers through DoorDash's platforms.

27. Delivery workers have similarly benefited. In the first three quarters of 2025, for example, over 90,000 individuals turned to DoorDash's platforms to earn supplemental income in New York City. During this period, those Dashers averaged almost $30 per hour, before tips, for time spent on delivery. And collectively, New York City Dashers earned over $330,000,000 via DoorDash's platforms before tips.

28.     In New York City, when a customer places an order with a merchant through one of Plaintiffs' platforms and a delivery worker delivers it, Plaintiffs collect payment from the consumer and compensate the delivery worker in accordance with the Minimum Pay Rule (as defined in ¶ 38).  Currently, the Minimum Pay Rule requires platforms to pay each delivery worker either (1) $21.44 per hour that the worker spent making deliveries and, in the aggregate, pay all delivery workers at least $21.44 per hour multiplied by the sum of the time all delivery workers spent logged into a platform (even if the workers were not engaged in deliveries), or (2) $35.73 per hour spent actually making deliveries. The Minimum Pay Rule prohibits platforms from counting gratuities towards such minimums, and gratuities—whether to pay them and, if so, the amount to pay—are entirely discretionary for consumers.

29.     Plaintiffs have the property right to design, control and modify their platforms to permit customers to pay a tip to delivery workers, or to refrain from doing so.

30.     Over the past years, Plaintiffs have exercised that right to modify when and how they prompt for tips for delivery workers in New York City.  That flexibility is important to make the best experience for everyone who uses Plaintiffs' platforms: merchants, customers, and delivery workers.

## II.     There is widespread customer frustration with current tipping practices.

31.     Studies have shown that soliciting tips affects customer behavior.  That is because there are "two main motivations for tipping: expressing gratitude and conforming to the social norm."     Kirk    Kardashian,    *The    Science    of    Tipping*,    Tuck    (June    5,    2024), https://tuck.dartmouth.edu/news/articles/the-science-of-tipping.  With respect to online food- and grocery-delivery platforms, expressing gratitude plays an outsized role.  *See* Khalil Bullock, *From Reward to Requirement: The New Tipping Culture*, Temple Now (Aug. 14, 2025), https://news.temple.edu/news/2025-08-14/reward-requirement-new-tipping-culture.  The timing

of tip solicitation and the suggested amount are important drivers of consumer behavior.  *See* Yan Wen et al., *More to Tip, or Tip More? Examining Customers' Preserve Tipping Behavior in the on-Demand Supermarket Delivery Context*, 178 Decision Support Sys. (Mar. 2024); Ce Liang et al., *Let Me Show You What Your Tips Can Do! Materially Referenced Tip Recommendations Prompt Tipping*, J. Customer Rsch. (forthcoming 2025).

32.    Recent research bears out that 90% of Americans believe "that tipping culture has spiraled out of control."  Janae Bowens, *Tipping Fatigue Rises as Americans Push Back Against Growing Culture*, The Nat'l News Desk (Mar. 14, 2025, at 10:10 AM), https://thenationaldesk.com/news/americas-news-now/tipping-fatigue-rises-as-americans-push-back-against-growing-culture.  Customers report growing confusion about when, where, and how much to tip, with only a third of Americans feeling confident about tipping for various services. *See* Drew DeSilver & Jordan Lippert, *Tipping Culture in America: Public Sees a Changed Landscape*, Pew Rsch. Ctr. (Nov. 9, 2023), https://www.pewresearch.org/2023/11/09/tipping-culture-in-america-public-sees-a-changed-landscape/.  They also report growing dissatisfaction with changes businesses have made to their tipping models, including by offering suggested tip amounts.  Bowens, *supra.*  And customers are reportedly particularly opposed to tipping "when the request [for a tip] feels premature," *id.*, because "the quality of the service they receive is a major factor in deciding whether and how much to tip," according to the overwhelming majority of customers (77%), DeSilver & Lippert, *supra.*  In response, some customers have changed their tipping habits, with "three in ten Americans" deciding "to tip less if confronted with a tip suggestion," and others "choos[ing] not to tip at all."  *Id.*  The net result is that how businesses have messaged regarding tipping has caused some Americans to develop negative attitudes toward current tipping practices.  *See* Betty Lin-Fisher, *To Tip or Not and How Much? Here's How People*

*Feel About Tipping*, USA TODAY (July 9, 2025, 6:16 p.m. ET), https://www.usatoday.com/story/money/2025/06/27/tipping-how-much-highest-lowest/84292188007/.

33.     Concerns about tipping practices are particularly salient in the New York City market, which features rising costs of living and increased delivery costs caused by the City's Minimum Pay Rule.  As prices rise and tipping fatigue grows, Plaintiffs expect that customers in New York City will react to a mandated tip suggestion by reducing their engagement with Plaintiffs' platforms.  *See* Vincent E. Castillo et al., *Designing Technology for on-Demand Delivery: The Effect of Customer Tipping on Crowdsourced Driver Behavior and Last Mile Performance*, 68 J. Operations Mgmt. 424 (2022).  Lessened engagement would mean fewer business opportunities and reduced revenue for Plaintiffs as well as damaged goodwill and reputation with their delivery workers, merchants, and customers.

**III.    The Tipping Law improperly infringes on Plaintiffs' rights and will result in irreparable harm to them and their customers, merchants, and delivery workers.**

34.     The Tipping Law purports to economically advantage delivery workers at the expense of Plaintiffs' rights by mandating that Plaintiffs express the City's message that customers should tip, that they should do so as a matter of course before even receiving the service for which their tips purportedly are given, and that they should consider 10% as an appropriate tip amount. That requirement violates Plaintiffs' constitutional rights to express whatever gratuity message they want on their platforms—or to express no such message at all.  It also interferes with Plaintiffs' property rights and irreparably harms their business opportunities and revenues as well as damages their goodwill and reputation with their delivery workers, merchants, and customers throughout New York City.

13

**A.    The Tipping Law is the latest in the City's long line of misguided attempts to overregulate online food- and grocery-delivery platforms.**

35.    Over the past decade, the online food- and grocery-delivery industry has experienced significant growth.  That growth has at times warranted sensible regulation.  But in the last five years, the approach of the City Council and outgoing mayoral administration to regulating in this sector has been overreaching and counterproductive.

36.    Beginning in 2020, the Council sought to cap the commissions that third-party food delivery platforms could charge restaurants.  Those efforts ultimately resulted in New York City Local Law 52 of 2020 (the "Commission Caps"), which established two separate price controls applicable to Plaintiffs: (1) a 15% cap on delivery fees, and (2) a 5% aggregate cap on all other fees.  Litigation challenging those Commission Caps followed.  In September 2023, the Honorable Judge Gregory H. Woods of the Southern District of New York denied the City's motion to dismiss, holding that the complaint adequately pleaded that the Commission Caps were unconstitutional.  *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 277 (S.D.N.Y. 2023).  The City subsequently settled and amended the Commission Caps to allow for higher commissions.

37.    In August 2021, the Council enacted New York City Local Law 90 of 2021 (the "Data Law"), which violated the platforms' First Amendment rights by requiring them to share specified customer information with restaurants upon request.  Litigation followed and, on cross-motions for summary judgment, the Honorable Judge Analisa N. Torres of the Southern District of New York agreed the law unconstitutionally infringed on free speech; that ruling is on appeal to the Second Circuit.  *DoorDash, Inc. v. City of New York*, 750 F. Supp. 3d 285 (S.D.N.Y. 2024), *superseded*, 789 F. Supp. 3d 337 (S.D.N.Y. 2025), *appeal pending*, No. 25-81 (2d Cir.).

38.     In December 2021, the Council passed Local Law 115 of 2021 (together with the rule subsequently issued pursuant to the law, the "Minimum Pay Rule").  The law directed DCWP to study delivery workers' pay and working conditions and to promulgate a rule establishing a method for determining the minimum amount that covered delivery platforms had to pay delivery workers.

39.     During DCWP's study, several stakeholders expressed concern that imposing minimum-pay requirements would increase the prices customers would have to pay.  DCWP responded that, to offset rising prices, Plaintiffs could reduce overall customer costs by making changes to their apps and websites.  For example, it stated that "apps could choose to reduce customers' costs through *changes to the user interface that discourage or eliminate tipping*."  N.Y.C. DCWP, *A Minimum Pay Rate for App-Based Restaurant Delivery Workers in NYC* 36 (2022),        https://www.nyc.gov/assets/dca/downloads/pdf/workers/Delivery-Worker-Study-November-2022.pdf (emphasis added).

40.     DCWP also recognized that minimum-pay standards for delivery workers ought not be based on assumptions that workers will receive tips because "tips are an unreliable form of income."  N.Y.C. DCWP, *Notice of Public Hearing and Opportunity to Comment on Proposed Rules* 6 (2023), https://rules.cityofnewyork.us/wp-content/uploads/2023/03/DCWP-NOH-Minimum-Pay-for-Food-Delivery-Service-Workers.pdf.  Indeed, the City Council recognized as much in passing the Minimum Pay Rule, which specified that the minimum-payment standard to be established by DCWP "shall not include gratuities."  N.Y.C. Admin. Code § 20-1522(b).

41.     DCWP adopted its final rule in June 2023, which set a "Minimum Pay Rate" to be phased in over three years and provided two mutually exclusive methods by which Plaintiffs could compensate delivery workers.

42.     First, under the Standard Method, Plaintiffs could (1) pay each delivery worker at least $21.44 per hour[1]—an amount over 20% higher than New York City's normal minimum wage—multiplied by that delivery worker's trip time in the pay period, and (2) in the aggregate, pay all delivery workers at least $21.44 per hour multiplied by the sum of all delivery workers' trip time plus what DCWP deemed "on-call time," defined as "the time a food delivery worker is connected to a third-party food delivery service or third-party courier service's electronic system for arranging or monitoring trips in a status where the food delivery worker is available to receive or accept trip offers or assignments with a pickup or drop-off location in New York City and excludes all trip time."  Rules of the City of New York § 7-801(a)(4).

43.     Second, under the Alternative Method, Plaintiffs could pay each delivery worker $35.73 per hour for the delivery worker's trip time (*i.e.*, the $21.44 standard rate divided by 0.60, where 0.60 is DCWP's systemwide ratio of trip time to total online time).

44.     The Minimum Pay Rule had an immediate and detrimental impact on platforms like Plaintiffs' and their customers, merchants, and delivery workers.

45.     With respect to DoorDash, for example, the Minimum Pay Rule required DoorDash to increase its fees to offset its increased operating costs, customer orders became more expensive, and customers ended up placing fewer orders.  New York City customers placed an estimated 850,000 fewer orders over a mere two-month period on DoorDash Marketplace than they would have had the market remained unchanged and continued to grow at expected levels.  These are lost earning opportunities for Dashers and equate to approximately $17,000,000 in lost revenue for restaurants and other local merchants.

---

[1] The Minimum Pay Rate was increased from $19.56 to $21.44 as of April 1, 2025.  *See* N.Y.C. DCWP, *Minimum Pay Rate for App-Based Restaurant Delivery Workers*, http://nyc.gov/site/dca/workers/Delivery-Worker-Public-Hearing-Minimum-Pay-Rate.page.

46.     DoorDash attempted to mitigate these harms through modifications to its platforms. On December 4, 2023 (the day that the Minimum Pay Rule went into effect), DoorDash moved all tipping functionality for New York City customers to post-checkout only and informed customers as follows:

> We are making changes to your checkout experience in response to new NYC regulations. Starting on Monday, December 4th, we're moving the option to tip in the DoorDash app to after checkout. This change will apply to all orders where either the merchant or dropoff location is located in New York City.
>
> We know tips are an important way to show Dashers your appreciation for their service. You'll still be able to <u>tip after checkout</u> and for up to 30 days after your order. 100% of your tip goes to the Dasher.

47.     Uber Eats also altered its approach to tipping in New York City following enactment of the Minimum Pay Rule.  Prior to December 2023, Uber Eats provided New York City customers with the option of leaving their delivery workers a tip prior to checkout:  After a customer selected their order, Uber Eats displayed a screen providing the customer the option to leave a tip, and then the customer could proceed to complete the checkout process.  Beginning in December 2023, when the Minimum Pay Rule took effect, Uber Eats no longer displayed the tipping screen to all customers prior to checkout, instead providing almost all customers with the option of leaving a tip only after the order is completed:  A customer may select a completed order in their account and then select the option of adding a tip.

48.     Uber Eats informed its New York City customers about this change as follows:

# NYC upfront tipping update

Beginning in December 2023, you may notice some changes in the Uber Eats app. These updates are related to a new guaranteed minimum earnings rule for third-party couriers established by the City of New York.

As a result of NYC's new earnings standard, tipping will now only be available in the Uber Eats app after your order has been delivered. Follow these steps to tip your courier in the app:

1. After your order is completed, select Account at the bottom of your screen
2. Click **Orders › All Orders**
3. Select the desired order
4. Select **Rate and tip**

As always, tipping is optional and is a way to thank your courier for excellent service. Couriers will still receive 100% of tips for any given order.

49.     Even though the City had justified its Minimum Pay Rule in part by noting that platforms could eliminate or reduce tipping entirely, and even though delivery workers receive no pay for orders abandoned by customers based on actual or perceived increased costs—the Council framed the platforms' change as an attack on delivery workers and as supposed "retaliation" for the passage of the Minimum Pay Rule.  Council Member Shaun Abreu, for example, incorrectly claimed that Plaintiffs moved their tipping option to after checkout to "retaliate[]" against delivery workers.  Council Member Abreu made that claim despite the fact that ***DCWP itself*** had suggested that platforms like Plaintiffs' could minimize cost increases for customers by altering tipping practices.

50.     In April 2024, Council Member Abreu introduced the bills that ultimately led to the enactment of the Tipping Law:  (1) Introduction 738, requiring delivery platforms like Plaintiffs' to solicit tips before or at the same time an order is placed, in plain and conspicuous language, and (2) Introduction 737, requiring those same platforms to provide customers with tipping options that include one set to a minimum of 10% of the purchase price on each delivery order, as well as an option to manually enter a tip.

51.     Council Member Abreu made clear that he believed removing the pre-checkout tip option was a form of speech by Plaintiffs, namely, that they were communicating that, because delivery workers were receiving higher pay under the Minimum Pay Rule, they should not be getting tips.  He also made it clear that he disapproved of that supposed message and wished to compel the platforms to convey a different message.  He stated on the record that the purpose of the bills was to use Plaintiffs as a conduit for the City to combat "this notion out there that because [delivery workers] . . . are getting minimum wage, then therefore they should not be getting this tip."  Council Member Abreu denounced Plaintiffs for "removing this option at checkout" and stated that the bills would "require food delivery apps to put the tipping option back at checkout like the way it used to be."

52.     Both bills were referred to the Committee on Consumer and Worker Protection (the "Committee").  The Committee held a hearing in June 2024, during which the Tipping Law received statements from DCWP, the Office of the New York City Comptroller, third-party food- and grocery-delivery platforms, workers' rights advocates, business groups, and other stakeholders.  Testimony in opposition from industry stakeholders argued that mandating tip prompts and suggested gratuities would affect customer costs and platform operations; other testimony addressed worker-pay standards and tipping practices following the City's Minimum Pay Rule for delivery workers.

53.     At this hearing, one delivery worker, Edward Hatchett, opposed the proposed bills because he "worr[ied] that proposed new requirements will ultimately end up hurting [delivery workers] in the long run."  And another delivery worker, Joseph Mele, stated that "tipping culture has changed in this country" and further stated that "people get insulted if you ask for a tip . . . [w]hen you have a tip up front . . . people I think will get their hackles up."

54.     Council Member Abreu, who introduced the two bills that became the Tipping Law, also spoke in support of the bills' passage.  He once again stated, without evidence, that "delivery apps have retaliated [against delivery workers]," falsely claiming that they are "hiding the tip menu [from] consumers."  Council Member Abreu specifically named Plaintiffs, stating that "Uber and DoorDash [have] removed [the tip prompt]" for consumers.  He described Plaintiffs' actions as "insanity" and "not necessarily illegal behavior, but . . . certainly behavior that has bad intent," and he affirmed, "that's why we're here today."

55.     Council Member Abreu further stated that the Tipping Law was meant to "contribute[] to better consumer habits."  That is, he said that the purpose of the law was to make companies like Plaintiffs update their apps to communicate a specific message to their customers with the hopes of changing their behavior.

56.     Following that hearing, the Tipping Law was amended, expanding the scope of both measures beyond food delivery to include grocery delivery.

57.     The Committee considered those amendments during a hearing in July 2025. Council Member Abreu spoke at this hearing, as well, reemphasizing his prior statements.  For example, he stated that giving customers "a clear, easy opportunity to tip helps foster better habits and supports workers directly."  And in his view, the Tipping Law—implemented by platforms like Plaintiffs'—"[e]ncourag[ed]" customers to do just that.

58.     The Committee voted to report both measures favorably, as amended, to the full Council.  The Committee's action advanced the Tipping Law to the General Orders calendar.

59.     That same day, the Council met to discuss the General Orders calendar.  That meeting included a vote on the Tipping Law, now styled as Introductions 737-A and 738-A, as

20

part of a larger vote on a package of bills regulating the food-delivery industry.  Both bills passed and were sent to Mayor Eric Adams for his consideration.

60.    The Tipping Law was enacted by operation of law in August 2025, and Introductions 737-A and 738-A were assigned local law numbers 107 and 108, respectively.

61.    As enacted, Local Law 107 states in relevant part:

When providing an opportunity to pay a gratuity pursuant to paragraph 3 of [subdivision b of section 20-1522 of the administrative code of the City of New York], a third-party food delivery service or third-party grocery delivery service shall provide a customer with gratuity options that may be set at the discretion of such service, provided that such gratuity options include an option to pay a gratuity that is at least 10 percent of the purchase price and an additional option that allows such customer to manually enter a different amount or percentage of such purchase price.

62.    Similarly, Local Law 108 states:

A third-party food delivery service or third-party grocery delivery service that allows a customer to place an order by, through or with the assistance of its website, mobile application or other internet service must provide such customer an opportunity to pay a gratuity to the food delivery worker or grocery delivery worker retained by such service who delivers, selects, prepares, or assembles such order. Such third-party food delivery service or third-party grocery delivery service must provide such opportunity to a customer in plain language and in a conspicuous manner before or at the same time such customer places such order.  Nothing herein shall be construed to require a customer to pay a gratuity or to prohibit a third-party food delivery service or third-party grocery delivery service from providing a customer an additional opportunity to add, remove, or adjust a gratuity after an order is placed.

63.    Altogether, the Tipping Law imposes multiple burdens on Plaintiffs, dictating both the content and manner of their speech by appropriating space on their platforms and requiring them to solicit tips on delivery workers' behalf in a conspicuous manner at the time orders are placed and to provide an option to tip 10%.

**B.    Imminent compliance with and/or enforcement of the Tipping Law irreparably harms Plaintiffs.**

64.    The Tipping Law goes into effect on January 26, 2026.  Given the close temporal proximity to mandatory compliance, Plaintiffs are faced with the choice to attempt to comply with the Tipping Law (and speak a message they would not otherwise) or to undergo the material risk of an imminent enforcement action by the City's enforcement authorities.

65.    Even if Plaintiffs attempt to comply with the Tipping Law (therein being compelled to speak), the imminent threat of enforcement still causes irreparable harm.  That is because Plaintiffs cannot determine *ex ante* what type of modifications will be deemed to constitute an "opportunity to pay a gratuity" that is presented in a sufficiently "conspicuous manner[,]" as judged by the City's enforcement authorities, and so Plaintiffs still face the material risk that DCWP will bring an enforcement action against them no matter their good-faith attempts at compliance.

66.    In any event, there is no dispute that the Tipping Law imminently threatens to force Plaintiffs to speak the City's preferred message, inflicting irreparable harm with respect to Plaintiffs' First Amendment rights.  *See Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003) (explaining that compelled speech is *per se* irreparable harm).

67.    Specifically, the law requires Plaintiffs to affirmatively ask customers for tips, make that request before delivery, and suggest a tip of 10%.  Taken together, these aspects of the Tipping Law require Plaintiffs to communicate to customers that it is customary to provide a tip upfront, irrespective of service or other factors, and that 10% is an appropriate amount.

68.    In the wake of the Minimum Pay Rule, tipping fatigue, and the rising cost of living, Plaintiffs do not wish to communicate the City's preferred message on tipping to their New York City customers, and do not wish to provide those customers with a prompt to add a tip of 10% to

their order before or at the time of checkout, prior to the delivery worker completing the delivery. Plaintiffs would not do so were it not for the Tipping Law.

69.     Compliance with the Tipping Law will also irreparably harm Plaintiffs by damaging their reputation, goodwill, and business models in ways that are difficult (if not impossible) to quantify and remedy.  *See Tom Doherty Assocs., Inc. v. Saban Ent. Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (explaining that irreparable harm exists "where there is a threatened imminent loss that will be very difficult to quantify at trial.").  For example:

   a.  In an environment of rising prices and pervasive tipping fatigue, Plaintiffs expect the Tipping Law will reduce their customer bases and order volume, due to reduced engagement with the platforms, resulting in fewer (and likely smaller) orders;

   b.  When customers do place orders on Plaintiffs' platforms, those customers may face high all-in costs, harming Plaintiffs' reputation and goodwill with those customers;

   c.  The Tipping Law will likely deteriorate Plaintiffs' relationships, goodwill, and reputation with delivery workers and merchants as the foregoing will lead to fewer orders for merchants and less earnings for delivery workers.

   d.  For all these reasons, the Tipping Law will cause Plaintiffs to suffer reduced revenue and difficult-to-quantify lost business opportunities, namely, revenue from customers and orders that Plaintiffs would have received absent the Tipping Law.

70.     For example, with respect to DoorDash, because there will be fewer orders placed through DoorDash's platforms as a result of the Tipping Law, DoorDash will be forced to take

measures to compensate for that lost revenue.  This could lead to an increase in Dasher cost per order.  Due to the Commission Caps, DoorDash cannot offset that increase by raising merchant commissions, so DoorDash expects that it may need to implement higher consumer fees, introduce changes that may limit which merchants customers can order from, and/or provide fewer cost-saving promotions to customers.  DoorDash may also need to hold New York City Dashers to higher performance expectations to qualify for certain performance-based rewards, which will reduce flexibility and choice for Dashers.

71.    Even if Plaintiffs attempt to comply with the Tipping Law, the threat of imminent enforcement action by the City will irreparably harm Plaintiffs.  Such an enforcement action would materially harm Plaintiffs' reputation and goodwill with customers, merchants, and delivery workers in ways that are difficult (if not impossible) to quantify and even harder to repair.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (noting that "injunctive relief is appropriate where it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come" (quotation omitted)).  And considering the City enforcement authority's consistent and recent history of enforcing similar laws against subject businesses, such an enforcement action is sufficiently imminent.  N.Y.C. DCWP, *In Honor of Labor Day, NYC Department of Consumer and Worker Protection Announces $3 Million Secured for Workers From Four Companies* (Aug. 28, 2025), https://www.nyc.gov/site/dca/news/026-25/in-honor-labor-day-nyc-department-consumer-worker-protection-3-million;  N.Y.C.  DCWP,  *Delivering Relief: DCWP Announces Settlement with Relay Over Widespread Violations of Delivery Workers' Rights* (June  23,  2025),  https://www.nyc.gov/site/dca/news/020-25/delivering-relief-dcwp-settlement-relay-widespread-violations-delivery.

72.     All told, even if and to the extent Plaintiffs attempt to comply with the Tipping Law, it (and imminent enforcement thereof) imposes imminent irreparable harm to Plaintiffs.

## FIRST CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the First Amendment to the United States Constitution (42 U.S.C. § 1983); Declaratory Relief and Injunctive Relief for Violation of Article I Section 8 of the New York Constitution (Compelled Speech))**

73.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 72 above.

74.     The Tipping Law violates the First and Fourteenth Amendments to the United States Constitution, which protect both the freedom *to* speak and the freedom *not* to speak.  *See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796–97 (1988).  The Tipping Law compels Plaintiffs to espouse the City's view on a controversial issue by mandating that they communicate a particular message, at a particular time, in a particular manner:  It requires Plaintiffs to solicit tips from customers on behalf of delivery workers, before or at the time of checkout, in plain language and in a conspicuous manner, and with the suggestion of tipping 10%.

75.     The Tipping Law does not merely regulate conduct; it regulates how Plaintiffs must *communicate* about tipping, and it provides specific content-based rules that Plaintiffs must follow. *See Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47–48 (2017).

76.     Plaintiffs would not speak about tips in New York City in the manner prescribed by the Tipping Law if they were not compelled to do so.

77.     The Tipping Law is subject to strict scrutiny because it is a content-based law that requires Plaintiffs to speak the City's preferred message on the controversial subject of tipping. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*").  Laws that compel non-commercial speech—*i.e.*, speech that does more than "propose a commercial

25

transaction," *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quotation marks omitted)—are subject to strict scrutiny. *See, e.g.*, *Evergreen Ass'n v. City of New York*, 740 F.3d 233, 244 (2d Cir. 2014) ("We therefore consider laws mandating speech to be content-based regulations subject to strict or exacting scrutiny." (quotation marks and alterations omitted)).

78.    The Tipping Law compels non-commercial speech because, unlike traditional commercial-speech cases involving advertisements and solicitations for services in which the entity speaking is a party to the proposed transaction, Plaintiffs are being conscripted to promote gratuity payments from one third party to another that are not driven by (and do not necessarily advance) Plaintiffs' own economic interests. *See Nat'l Inst. of Fam. & Life Advocs. v. James*, --- F.4th ---, 2025 WL 3439256, at *1, 11 (2d Cir. Dec. 1, 2025) (commercial speech generally involves "advertising products or services [offered by the speaker] in order to gain some financial benefit," and excludes speech for which the speaker "receive[s] no remuneration or other financial benefit"). As the Second Circuit has explained, whether speech is commercial or non-commercial "depends on factors such as whether the communication is an advertisement, whether the communication makes reference to a specific product, and whether the speaker has an economic motivation for the communication." *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 97 (2d Cir. 1998). The Tipping Law compels speech that satisfies none of those criteria. The tipping prompt is not a paid advertisement published by Plaintiffs for a delivery worker's service; it is an encouragement for customers to provide an additional, discretionary payment, gratuity, or gift to delivery workers over and above the consideration exchanged for the delivery worker's service. And unlike commercial speech, the prompt required by the Tipping Law requires Plaintiffs to take a position on a hotly debated topic—tipping—regardless of whether that position is consistent with their views. The speech compelled by the Tipping Law is *non-commercial*, and

the Tipping Law is subject to strict scrutiny.  *See Wooley v. Maynard*, 430 U.S. 705, 715–16 (1977).

79.    The Tipping Law is also subject to strict scrutiny because it compels Plaintiffs to solicit quasi-charitable contributions—contributions in excess of the earnings required by the Minimum Pay Rule—on behalf of third parties and in so doing convey a particular message.  *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980).  By compelling Plaintiffs to solicit tips of 10% at or before checkout, the Tipping Law requires them to convey (and impliedly endorse) the City's value-based messaging on a disputed subject—*i.e.*, that customers should tip, should do so even before seeing how the delivery worker performs, and that 10% is an appropriate tip amount to consider.  The Tipping Law therefore forces Plaintiffs to convey the City's preferred message on the controversial subject of tipping.  The law therein implicates the foundational First Amendment "principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994).

80.    The Tipping Law fails strict scrutiny.  A content-based regulation of non-commercial speech must "survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (quotation marks omitted).  The law must also be "the least restrictive means to achieve its ends." *CompassCare v. Hochul*, 125 F.4th 49, 63 (2d Cir. 2025) (quoting *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014)).  This is an exacting standard, and "[i]t is rare that a [law regulating] speech because of its content will ever be permissible." *United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 818 (2000).

81.     The City cannot meet that standard here:  The legislative history of the Tipping Law indicates that the City's primary interest in advancing the law is to increase overall income for delivery workers, but the City already defined its interest in delivery-worker compensation through passage of the Minimum Pay Rule, which expressly excludes gratuities from any fair-pay calculation—meaning the City has already stated that tipping is not necessary to furthering its interest in delivery-worker compensation.  The legislative history also claims that the Tipping Law model "contributes to better consumer habits," but offers no explanation as to what that means beyond potentially paying more to delivery workers, nor why that is the case or why the City has any interest in it, let alone a compelling one.

82.     Even if the City's interests were compelling, the Tipping Law is not narrowly tailored to serve those interests.  As for delivery-worker compensation, the City itself already stated that tipping is an ineffective mechanism for increasing such income in the passage of the Minimum Pay Rule.  The Tipping Law is also meaningfully underinclusive relative to any supposed goal of encouraging tipping in general:  The law is limited to a small sliver of the tipped workforce, and it encourages tipping in only an indirect manner, with no corresponding effort from the City to educate the general public through its own messaging about the professed importance of tipping.

83.     There are many less restrictive alternatives to serve the City's supposed interests. With respect to increasing delivery workers' pay, the City has already enacted the Minimum Pay Rule.  Indeed, the City has insisted that the Rule is an effective tool for increasing delivery-worker pay, and would be even if customers ***no longer left gratuity of any kind***.  *See* N.Y.C. DCWP, *A Minimum Pay Rate*, *supra*, at 36 (claiming that "if tipping were eliminated [on] all [food-delivery platforms] . . . workers [would] still receiv[e] sizeable pay increases" under the Minimum Pay

Rule). And as for any interest in encouraging tipping in general, the City could simply use its own voice to further this end by, for example, initiating a public campaign that promotes the importance of tipping—something it has not done, preferring instead to commandeer Plaintiffs to speak for it.

84.    Even if the Tipping Law compels Plaintiffs "to engage in purely commercial speech," the law is subject to intermediate scrutiny. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71–73 (2d Cir. 1996); *see also Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 264–66 (2d Cir. 2014) (applying intermediate scrutiny because challenged law compelled commercial speech).

85.    The Tipping Law fails under intermediate scrutiny. Intermediate scrutiny requires that the government establish that the interest served by the law is substantial, that the law directly advances the asserted interest, and that the interest could not be served as well by a more limited regulation of speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980). Here, the City cannot establish any substantial interest in further increasing delivery workers' compensation such that it exceeds even more greatly what the City decided is an appropriate minimum-earnings standard for such workers, nor can it establish that forcing Plaintiffs to ask for tips in the City's preferred manner would "alleviate" any problems with delivery-worker compensation "to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). Likewise, any interest in encouraging tipping cannot be materially served by the nudge to tip in a single industry, as contemplated by the Tipping Law. Nor does the Tipping Law *directly* advance any interest in increasing compensation for delivery workers or encourage tipping, as it circuitously forces platforms to encourage customers in the hope that customers will tip more. And any interest the City might have here could be served without burdening private speech—for instance, by leveraging the Minimum Pay Rule or by the City itself engaging in speech to promote tipping.

86.    The less-demanding requirements of *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), apply only where a compelled-speech requirement is "limited to 'purely factual and uncontroversial information about the terms under which . . . services will be available[,]'" and concerns preventing consumer deception and ensuring safety. *NIFLA*, 585 U.S. at 768 (citing *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995)). *Zauderer* does not apply to the Tipping Law because the law does not merely require the disclosure of purely factual and uncontroversial information about Plaintiffs' services. And even if *Zauderer* did apply, the Tipping Law would *still* be unconstitutional. That is because the Tipping Law is "unjustified," "unduly burdensome," and not "reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. There is no consumer-protection interest that is served by the Tipping Law because no customer would be deceived about anything in the absence of a law requiring Plaintiffs to solicit tips in a certain way.

87.    For substantially similar reasons, the Tipping Law violates Article I, Section 8 of the New York Constitution.

88.    The City, as a municipality, may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (establishing that municipal liability under Section 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights).

89.    In enacting the Tipping Law, the City acted under color of state law and pursuant to an official policy or custom.

90.    The City's unconstitutional conduct proximately caused Plaintiffs' injuries.

91.     A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Tipping Law violated the First and Fourteenth Amendments to the United States Constitution and Article I, Section 8 of the New York Constitution.

92.     Plaintiffs desire a judicial determination of the validity of the Tipping Law to save themselves from the irreparable harm caused by the enactment of the Tipping Law, which deprives them of their First Amendment right not to speak—*per se* irreparable harm.  Plaintiffs will also be forced to modify their platforms (and forgo certain future modifications)—*i.e.*, speak—in a way that will likely result in lost revenue.  Forcing Plaintiffs to solicit pre-delivery tips from tip-fatigued customers in New York City's increasingly costly market materially and irrevocably damages their relationships with, as well as goodwill and reputation among, customers, merchants, and delivery workers.  As does the net impact of the Tipping Law on Plaintiffs' business models—*i.e.*, lessened customer engagement, fewer orders, difficult-to-quantify lost business opportunities, and reduced revenue.

93.     A judicial determination of the validity of the Tipping Law is necessary and appropriate to avoid the deprivation of federal constitutional rights that results from applying the Tipping Law to Plaintiffs.

94.     In light of the violation of the First and Fourteenth Amendments to the United States Constitution and Article I, Section 8 of the New York Constitution, Plaintiffs further seek preliminary and permanent injunctive relief against enforcement of the Tipping Law.  The imminent violation of Plaintiffs' constitutional speech rights constitutes *per se* irreparable harm, and will also cause irreparable harm to their revenue, business models, customer relationships, and goodwill, as well as difficult-to-quantify lost business opportunities.

## SECOND CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the First Amendment to the United States Constitution (42 U.S.C. § 1983); Declaratory Relief and Injunctive Relief for Violation of Article I Section 8 of the New York Constitution (Retaliation))**

95.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 94 above.

96.     The Tipping Law amounts to an official reprisal against Plaintiffs for communicating to New York City customers a message about tipping with which the City disagrees.  The Tipping Law therefore violates the First and Fourteenth Amendments to the United States Constitution, which prohibit government officials from retaliating against private actors for engaging in protected speech.  *See Hartman v. Moore*, 547 U.S. 250, 256 (2006).

97.     The Tipping Law retaliates against Plaintiffs for their protected speech, not merely their unexpressive conduct.  *See Expressions Hair Design*, 581 U.S. at 47–48.  Plaintiffs' choices to prompt (or not prompt) users on their platforms to provide a gratuity for delivery workers is speech.  The specific gratuity options shown are also speech.  And the decision to provide the option to tip after service is completed, rather than at the time of checkout, is an expression of Plaintiffs' carefully balanced decisions about how to communicate with their New York City customers concerning their tipping practices, especially in light of the Minimum Pay Rule and a general environment of rising prices and affordability challenges in New York City.  Taken together, this message implicates matters of public concern, including matters related to remuneration for delivery workers and tipping norms more broadly.  The prompt (or lack thereof) for a tip, the tip options that are offered, and the timing of the prompt are therefore protected speech under the First Amendment.  That speech is protected even if it is considered purely commercial speech.  *See United States v. Caronia*, 703 F.3d 149, 163 (2d Cir. 2012).

98.    Plaintiffs would not speak about tips in the manner prescribed by the Tipping Law if they were not compelled to do so.

99.    The Tipping Law is an adverse action for the purposes of the First Amendment. *See Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011).  It requires Plaintiffs to restrict their own protected speech while communicating the City's preferred messaging on a subject of public concern.  If Plaintiffs fail to comply with the vague requirements of the Tipping Law to the City's satisfaction, they will face civil penalties and be subject to the threat of private and public enforcement actions.  *See* N.Y.C. Admin. Code §§ 20-1507 to 20-1512.  Because the Tipping Law has the force and effect of law and is accompanied by significant penalties for lack of compliance, enactment of the law is "conduct that would deter a similarly situated [entity] of ordinary firmness from exercising [its] constitutional right[]" to engage in protected speech.  *Cox*, 654 F.3d at 273 (quoting *Zelnik v. Fashion Inst. of Techn.*, 464 F.3d 217, 225 (2d Cir. 2006)).

100.    The Tipping Law's legislative history underscores that the City enacted it to retaliate against Plaintiffs for engaging in protected speech the City disagrees with.  Council Member Abreu, the lead sponsor of the bills that ultimately became the Tipping Law, expressly named Plaintiffs as subjects of the bills; criticized Plaintiffs for engaging in speech that the sponsor described as "insan[e]" and the result of "bad intent"; and stated at various points that the bills would "send[] a message that we're standing up for our [delivery workers]" by forcing companies like Plaintiffs to "put the tipping option back at checkout like the way it used to be."  Council Members and witnesses also expressed frustration that platforms like Plaintiffs' had successfully challenged prior New York City regulations in court.  Statements like these demonstrate that Plaintiffs' protected speech "was a substantial or motivating factor in [the] adverse decision taken by [the City]," *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006), and

that the City would not "have taken the same adverse . . . action . . . in the absence of the protected conduct," *Cotarelo v. Sleepy Hollow Police Dept.*, 460 F.3d 247, 251–52 (2d Cir. 2006) (quotation marks omitted).

101.    For substantially similar reasons, the Tipping Law violates Article I, Section 8 of the New York Constitution.

102.    The City, as a municipality, may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983. *Monell*, 436 U.S. at 694 (establishing that municipal liability under Section 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights).

103.    In enacting the Tipping Law, the City acted under color of state law and pursuant to an official policy or custom.

104.    The City's unconstitutional conduct proximately caused Plaintiffs' injuries.

105.    A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Tipping Law violated the First and Fourteenth Amendments to the United States Constitution and Article I, Section 8 of the New York Constitution.

106.    Plaintiffs desire a judicial determination of the validity of the Tipping Law to save themselves from the harm caused by the enactment of the Tipping Law, which deprives Plaintiffs of their First Amendment right to be free from retaliation—*per se* irreparable harm. Plaintiffs will also be forced to modify their platforms (and forgo certain future modifications)—*i.e.*, speak—in a way that will likely result in lost revenue. Forcing Plaintiffs to solicit pre-delivery tips from tip-fatigued customers in New York City's increasingly costly market materially and irrevocably damages their relationships with, as well as goodwill and reputation among, customers, merchants,

and delivery workers.  As does the net impact of the Tipping Law on Plaintiffs' business models—
*i.e.*, lessened customer engagement, fewer orders, difficult-to-quantify lost business opportunities,
and reduced revenue.

107.    A judicial determination of the validity of the Tipping Law is necessary and
appropriate to avoid the deprivation of federal constitutional rights that results from applying the
Tipping Law to Plaintiffs.

108.    In light of the violation of the First and Fourteenth Amendments to the United
States Constitution and Article I, Section 8 of the New York Constitution, Plaintiffs further seek
preliminary and permanent injunctive relief against enforcement of the Tipping Law.  The
imminent violation of Plaintiffs' constitutional speech rights constitutes *per se* irreparable harm,
and will also cause irreparable harm to their revenue, business models, customer relationships, and
goodwill, as well as difficult-to-quantify lost business opportunities.

## THIRD CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Takings Clause of
the Fifth and Fourteenth Amendments to the United States Constitution (42 U.S.C. § 1983);
Declaratory and Injunctive Relief for Violation of Article I, Section 7 of the New York
Constitution (Regulatory Taking))**

109.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 108
above.

110.    The federal and state Constitutions prohibit the government from taking private
property "without just compensation."  U.S. Const. amend. V; N.Y. Const. art. I, § 7.  Contractual
rights and intellectual property constitute property within the meaning of the Fifth Amendment
and are susceptible to a "taking" within the meaning of the Takings Clause.  *See Lynch v. United
States*, 292 U.S. 571, 579 (1934); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984).  Thus,

the City may not deprive Plaintiffs of the benefits of their contractual and intellectual property rights without prior and just compensation.

111.    Plaintiffs have contractual and intellectual property rights in their platforms. *See, e.g.*, DoorDash Consumer Terms and Conditions §§ 3, 11 (September 3, 2025); Uber U.S. Terms of Use § 3, Uber 2025 10-K p. 7.

112.    By forcing Plaintiffs to modify their platforms to include a tipping prompt in a "conspicuous manner" before or at the time of checkout, including at least one prompt of 10% or higher, the Tipping Law materially interferes with Plaintiffs' contractual property rights to modify their platforms at will, including the right to add or remove a gratuity feature, as well as their intellectual property rights to the beneficial use and free enjoyment of those platforms.  By eliminating those rights, the City has affected a non-categorical regulatory taking.  *See generally Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).  The Tipping Law does not provide any compensation to Plaintiffs, nor does the City otherwise offer any.

113.    The Tipping Law goes too far in its economic effect on Plaintiffs, and the economic injuries caused by the Tipping Law should be compensated by the government rather than remain disproportionately borne by Plaintiffs without compensation.  The City has interfered with Plaintiffs' legitimate and reasonable investment-backed expectations in their intellectual property to such a degree that the Tipping Law is the functional equivalent of government appropriation without just compensation.  The City has failed to provide any cognizable justification for that regulatory taking.

114.    The Tipping Law will significantly diminish the value of Plaintiffs' platforms. Plaintiffs generate substantial revenue from their right to modify their platforms.  For example, Plaintiffs have modified their platforms in various ways over the past years, each of which has

generated millions of dollars in additional revenue as compared to the pre-modification platforms. By forcing Plaintiffs to include a "conspicuous" gratuity feature before or at checkout with specific recommended amounts in New York City, Plaintiffs may be forced to undo some of those prior valuable modifications in order to accommodate the gratuity feature in the particular form mandated by the Tipping Law. Moreover, the Tipping Law hamstrings Plaintiffs' ability to modify their platforms moving forward and thereby forces Plaintiffs to forgo millions of dollars in additional revenue they could gain from future modifications.

115.    The Tipping Law will therefore materially interfere with Plaintiffs' investment-backed expectations in their platforms, and their marketability, by eliminating millions in current and future revenue. The value of Plaintiffs' property rights and interests in their platforms will be substantially reduced as a result. Plaintiffs have spent millions of dollars to develop, maintain, and modify their platforms premised on their right to modify their platforms at will. By compelling Plaintiffs to undo their prior modifications and restrict their future ones by implementing the gratuity feature according to its intrusive requirements, the Tipping Law will cause Plaintiffs to forgo material revenue that they would have otherwise derived. The Tipping Law thus substantially diminishes the economic value of Plaintiffs' property rights and interests and prevents Plaintiffs from obtaining reasonable returns on their investments therein.

116.    The Tipping Law seeks to exclusively benefit delivery workers, at the expense of Plaintiffs' property rights and interests. The regulatory taking of Plaintiffs' property is therefore not for any valid public purpose, and the Tipping Law does not substantially advance a closely and legitimately connected government interest. The Tipping Law is expressly designed to force Plaintiffs to modify their platforms to include a "conspicuous" message to customers that they should tip a certain amount to their delivery worker. *Cf. Buffalo Teachers Fed'n v. Tobe*, 464 F.3d

362, 368 (2d Cir. 2006) ("A legitimate public purpose is one 'aimed at remedying an important general social or economic problem *rather than providing a benefit to special interests*.'" (emphasis added)).  Its enactment is therefore "solely for the benefit of private parties" as opposed to a legislative desire to serve "important public interests."  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86 (1987).  This fact alone "outweigh[s] the other two" and conclusively evidences a regulatory, non-categorical taking.  *Lebanon Valley Auto Racing Corp. v. Cuomo*, 478 F. Supp. 3d 389, 402 (N.D.N.Y. 2020).

117.    The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

118.    In enacting the Tipping Law, the City acted under color of state law and pursuant to an official policy or custom.

119.    The City's unconstitutional conduct proximately caused Plaintiffs' injuries.

120.    A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Tipping Law violated Article I, Section 7 of the New York Constitution and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

121.    Plaintiffs desire a judicial determination of the validity of the Tipping Law to save themselves from the harm caused by the enactment of the Tipping Law, which deprives Plaintiffs of the benefit of their property rights and interests in their platforms without just compensation. The enactment of the Tipping Law results in substantial hardship to Plaintiffs.  Plaintiffs will be forced to modify their platforms (and forgo future modifications) in a way that will likely result in substantial lost revenue and therefore deprive Plaintiffs of their investment-backed expectations in their property, the platforms.

122.    A judicial determination of the validity of the Tipping Law is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Tipping Law to Plaintiffs.

123.    In light of the violation of Article I, Section 7 of the New York Constitution and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution, Plaintiffs further seek an injunction against enforcement of the Tipping Law.  The imminent violation of Plaintiffs' constitutional rights constitutes substantial harm to their revenue, business models, customer relationships, and goodwill, as well as difficult-to-quantify lost business opportunities.

124.    In light of the violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution, Plaintiffs further seek monetary damages.

<u>**FOURTH CAUSE OF ACTION**</u>

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of Article I, Section 6 of the New York Constitution (Due Process – Legislative Purpose))**

125.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 124 above.

126.    The Tipping Law violates the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of Article I, Section 6 of the New York Constitution because it imposes an irrational and arbitrary disclosure requirement on Plaintiffs and provides preferential economic treatment to delivery workers at the direct expense of Plaintiffs.

127.    Businesses have a constitutionally protected interest in operating free from unreasonable governmental interference and are also protected from excessive and unreasonable

government conduct intentionally directed toward them. *Principle Homecare, LLC v. McDonald*, 2025 WL 622876, at *9 (S.D.N.Y. Feb. 26, 2025), *aff'd*, 2025 WL 2957991 (2d Cir. Oct. 21, 2025). The Tipping Law lacks a reasonable and nondiscriminatory legislative purpose. It has no (let alone a substantial) relation to public health, safety, or general welfare. Favoring a specific economic group at the expense of another is not a legitimate legislative purpose. *See Buffalo Teachers Fed'n*, 464 F.3d at 368 (2d Cir. 2006).

128.   There is no rational basis for forcing Plaintiffs to speak, let alone in a specific manner. Nor is there such a basis for effecting a regulatory taking of Plaintiffs' property interests and rights in their platforms without just compensation.

129.   Both the content and context of the Tipping Law demonstrate that it is confiscatory in nature and intended to harm online food-delivery platforms.

130.   The unreasonable interference that the Tipping Law imposes on delivery-platform businesses, coupled with the negative effects on the delivery platforms that may result from the Tipping Law, demonstrates that the Tipping Law is arbitrary and irrational, without any conceivable rational basis, and was enacted in violation of due process.

131.   The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

132.   In enacting the Tipping Law, the City acted under color of state law and pursuant to an official policy or custom.

133.   The City's unconstitutional conduct proximately caused Plaintiffs' injuries.

134.   A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Tipping Law violated Article I,

Section 6 of the New York Constitution and the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution.

135.    Plaintiffs desire a judicial determination of the validity of the Tipping Law to save themselves from the harm caused by the enactment of the Tipping Law, which deprives Plaintiffs of the benefit of their speech rights and property rights and interests—*per se* irreparable harm. Plaintiffs will also be forced to modify their platforms (and forgo certain future modifications)—*i.e.*, speak—in a way that will likely result in lost revenue.  Forcing Plaintiffs to solicit pre-delivery tips from tip-fatigued customers in New York City's increasingly costly market materially and irrevocably damages their relationships with, as well as goodwill and reputation among, customers, merchants, and delivery workers.  As does the net impact of the Tipping Law on Plaintiffs' business models—*i.e.*, lessened customer engagement, fewer orders, difficult-to-quantify lost business opportunities, and reduced revenue.

136.    A judicial determination of the validity of the Tipping Law is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Tipping Law to Plaintiffs.

137.    In light of the violation of Article I, Section 6 of the New York Constitution and Section 1 of the Fourteenth Amendment to the United States Constitution, Plaintiffs further seek preliminary and permanent injunctive relief against enforcement of the Tipping Law.  The imminent violations of Plaintiffs' constitutional speech rights constitute *per se* irreparable harm, and will also cause irreparable harm to their revenue, business models, customer relationships, and goodwill, as well as difficult-to-quantify lost business opportunities.

138.    In light of the violation of Section 1 of the Fourteenth Amendment to the United States Constitution, Plaintiffs further seek monetary damages.

## FIFTH CAUSE OF ACTION

**(Declaratory Relief, Injunctive Relief, and Damages for Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983); Declaratory and Injunctive Relief for Violation of Article I, Section 6 of the New York Constitution (Due Process – Void for Vagueness Facial Challenge))**

139.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 138 above.

140.    "As one of the most fundamental protections of the Due Process Clause, the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (citation and quotation marks omitted).

141.    The vagueness doctrine serves to ensure that "regulated parties [] know what is required of them so they may act accordingly" and "that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television*, 567 U.S. 239, 253 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54; *see Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("[W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'" (citation omitted)).

142.    The Tipping Law violates the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of Article I, Section 6 of the New York Constitution because it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and "authorize[s] and even encourage[s]

arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *see also Hill v. Colorado*, 530 U.S. 703, 732 (2000) (same).

143.    The Tipping Law's plain text is inherently ambiguous and provides insufficient notice as to what is required of covered parties in order to comply therewith.  For example, no ordinary person could tell what would suffice to "provide [a] customer an opportunity to pay a gratuity[,]" let alone what would satisfy the "conspicuous manner" requirements.  Local Law 108 (2025).  As a result, "the [Tipping Law] as a general matter [does not] provide[] sufficiently clear standards to minimize the risk of arbitrary enforcement." *Thibodeau*, 486 F.3d at 67.

144.    Plaintiffs do not understand what is necessary for compliance with the Tipping Law and therefore face the material risk of being found to have violated the law even if Plaintiffs attempt to modify their platforms to comply with the law.  That is because they do not and cannot have any reasonable level of certainty whether those modifications will be deemed to constitute an "opportunity to pay a gratuity" that is presented in a sufficiently "conspicuous manner[,]" as judged by the City's enforcement authorities.

145.    It is therefore far from clear whether attempted compliance would "fall[] within the core of the [Tipping Law's] prohibition," and any enforcement against Plaintiffs would be "the result of the unfettered discretion [of] law enforcement officers and factfinders." *Thibodeau*, 486 F.3d at 67–68.  That conclusion is particularly apt as the Tipping Law infringes on Plaintiffs' First Amendment rights. *See Grayned*, 408 U.S. at 109.

146.    The City may be held liable for this violation of the United States Constitution under 42 U.S.C. § 1983.

147.    In enacting the Tipping Law, the City acted under color of state law and pursuant to an official policy or custom.

148.    The City's unconstitutional conduct proximately caused Plaintiffs' injuries.

149.    A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Tipping Law violated Article I, Section 6 of the New York Constitution and the Due Process Clause of Section 1 of the Fourteenth Amendment to the United States Constitution.

150.    Plaintiffs desire a judicial determination of the validity of the Tipping Law to save themselves from the harm caused by the enactment of the Tipping Law, which deprives Plaintiffs of the benefit of their speech rights and property rights and interests—*per se* irreparable harm. Plaintiffs will also be forced to modify their platforms (and forgo certain future modifications)— *i.e.*, speak—in a way that will likely result in lost revenue.  Forcing Plaintiffs to solicit pre-delivery tips from tip-fatigued customers in New York City's increasingly costly market materially and irrevocably damages their relationships with, as well as goodwill and reputation among, customers, merchants, and delivery workers.  As does the net impact of the Tipping Law on Plaintiffs' business models—*i.e.*, lessened customer engagement, fewer orders, difficult-to-quantify lost business opportunities, and reduced revenue.

151.    A judicial determination of the validity of the Tipping Law is necessary and appropriate to avoid the deprivation of federal and state constitutional rights that results from applying the Tipping Law to Plaintiffs.

152.    In light of the violation of Article I, Section 6 of the New York Constitution and Section 1 of the Fourteenth Amendment to the United States Constitution, Plaintiffs further seek preliminary and permanent injunctive relief against enforcement of the Tipping Law.  The imminent violation of Plaintiffs' constitutional speech rights constitutes *per se* irreparable harm,

and will also cause irreparable harm to their revenue, business models, customer relationships, and goodwill, as well as difficult-to-quantify lost business opportunities.

153.    In light of the violation of Section 1 of the Fourteenth Amendment to the United States Constitution, Plaintiffs further seek monetary damages.

## SIXTH CAUSE OF ACTION

**(Declaratory and Injunctive Relief for Violation of Article IX, Section 2(c) of the New York Constitution, New York Municipal Home Rule Law Section 10(ii)(a)(12), and New York General City Law Section 20(13) (Police Power))**

154.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 153 above.

155.    Contained within the New York Constitution and state statutes are limitations on the City's right to exercise the police power, *i.e.*, to enact laws for the safety, health, well-being, and welfare of its residents.  The City exceeds its police power when a law "bears no relation to the welfare of the public generally," including when it is "designed for the convenience and interest of a special class."  *People v. Greeman*, 137 N.Y.S.2d 388, 389 (1952).

156.    The Tipping Law exceeds the City's police power because it does not promote the public health, safety, or general welfare.  It does not seek to benefit all New York City workers or businesses.  The Tipping Law instead aims to advance the narrow interests of delivery workers at the expense of Plaintiffs' legal rights and interests as well as Plaintiffs' and their stakeholders' economic interests.

157.    Upon information and belief, the City has not conducted (or asked anyone else to conduct), among other things, research or analysis regarding the Tipping Law's potential effect on (1) customers, for example, whether they would be economically and/or otherwise worse off as a result of the Tipping Law; (2) delivery workers, for example, whether they would be economically

and/or otherwise worse off as a result of the Tipping Law; (3) merchants, for example, whether they would be economically and/or otherwise worse off as a result of the Tipping Law; (4) platforms, for example, whether they would be economically and/or otherwise worse off as a result of the Tipping Law; and/or (5) the local economy, for example, whether it would be materially and irreparably damaged as a result of the Tipping Law.

158.    The Tipping Law does not require any other third party beyond those that are a "third-party food delivery service or third-party grocery delivery service that allows a customer to place an order by, through or with the assistance of its website, mobile application or other internet service" to express certain speech in a specific manner (let alone forgo property rights and interests).  Local Law 108 (2025).  Rather, it compels speech and takes the property interests and rights of only certain large third-party platforms.

159.    A bona fide and actual controversy exists between Plaintiffs and the City in that Plaintiffs allege, and the City denies, that the enactment of the Tipping Law violated Article IX, Section 2(c) of the New York Constitution and related statutes setting the limits of municipal police power.

160.    Plaintiffs desire a judicial determination of the validity of the Tipping Law to save themselves from the harm caused by the enactment of the Tipping Law, which deprives  Plaintiffs of the benefits of their speech and property rights and interests—*per se* irreparable harm.  Plaintiffs will also be forced to modify their platforms (and forgo certain future modifications)—*i.e.*, speak—in a way that will likely result in lost revenue.  Forcing Plaintiffs to solicit pre-delivery tips from tip-fatigued customers in New York City's increasingly costly market materially and irrevocably damages their relationships with, as well as goodwill and reputation among, customers, merchants, and delivery workers.  As does the net impact of the Tipping Law on Plaintiffs'

business models—*i.e.*, lessened customer engagement, fewer orders, difficult-to-quantify lost business opportunities, and reduced revenue.

161.    A judicial determination of the validity of the Tipping Law is necessary and appropriate to avoid the deprivation of state constitutional and statutory rights that results from applying the Tipping Law to Plaintiffs.

162.    In light of the violation of Article IX, Section 2(c) of the New York Constitution, Plaintiffs further seek preliminary and permanent injunctive relief against enforcement of the Tipping Law.  The imminent violation of Plaintiffs' constitutional speech rights constitutes *per se* irreparable harm, and will also cause irreparable harm to their revenue, business models, customer relationships, and goodwill, as well as difficult-to-quantify lost business opportunities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and grant the following relief:

a.    A declaration that the Tipping Law violates provisions of the United States Constitution and the New York Constitution, is invalid, and is unenforceable against Plaintiffs;

b.    Just compensation, according to proof, for taking of property;

c.    An award of damages against the City according to proof;

d.    A preliminary and permanent injunction (1) enjoining the City, and each of its officers, agents, servants, employees, and attorneys, and any other person or entity subject to its control, acting on its behalf, or acting directly or indirectly in concert or participation with it from taking any steps to (a) implement any provision of the Tipping Law against Plaintiffs or their affiliated entities, or (b) enforce or apply, retroactively or prospectively, to or as against Plaintiffs or their affiliated entities, any provision of the

Tipping Law; and (2) staying, enjoining, and restraining from taking effect the effective date of the Tipping Law as to Plaintiffs and thereby staying, enjoining, and restraining the Tipping Law from taking effect against Plaintiffs;

e.      An award of fees, costs, expenses, and disbursements, including attorneys' fees to which Plaintiffs are entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

f.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury in this action of all issues so triable.

*(Remainder of this page is intentionally left blank.)*

Dated: December 11, 2025
New York, New York


GIBSON, DUNN & CRUTCHER LLP          HECKER FINK LLP


By: /s/ *Gabriel Herrmann*                        By: /s/ *John C. Quinn (with permission)*
     Gabriel Herrmann                                    John C. Quinn


Gabriel Herrmann                                      John C. Quinn
Nicholaus C. Mills                                     350 Fifth Avenue, 63rd Floor
200 Park Avenue                                      New York, New York 10118
New York, NY 10166                                (212) 763-0883
GHerrmann@gibsondunn.com                 jquinn@heckerfink.com
NMills@gibsondunn.com
                                                               Trisha Anderson* (*PHV forthcoming*)
Michael Holecek* (*PHV forthcoming*)      Chloe Goodwin* (*PHV forthcoming*)
Katie Townsend                                         1050 K Street, NW, Suite 1040
333 South Grand Avenue                          Washington, D.C. 20001
Los Angeles, CA  90071                            (212) 763-0883
MHolecek@gibsondunn.com                     tanderson@heckerfink.com
KTownsend@gibsondunn.com                   cgoodwin@heckerfink.com


Connor P. Mui* (*PHV forthcoming*)          *Attorneys for Plaintiff Uber*
1700 M Street, N.W.                                  *Technologies, Inc.*[2]
Washington, D.C. 20036-4504
CMui@gibsondunn.com


*Attorneys for Plaintiff DoorDash, Inc.*

---

[2] Pursuant to Section 8.5 of the SDNY ECF Rules and Instructions, electronic signatures are being used on consent of all parties.