# Exhibit D

CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

of the

COMMITTEE ON CONSUMER AFFAIRS
AND BUSINESS LICENSING

------------------------ X

June 8, 2021
Start:  1:10 p.m.
Recess: 4:07 p.m.


HELD AT:          Remote Hearing, Virtual Room 2

B E F O R E:      Diana Ayala
                  Chairperson


COUNCIL MEMBERS:  Diana Ayala
                  Justin L. Brannan
                  Margaret S. Chin
                  Eric Dinowitz
                  Ben Kallos
                  Peter A. Koo
                  Karen Koslowitz
                  Brad S. Lander
                  Carlos Menchaca
                  Keith Powers
                  Carlina Rivera
                  Kalman Yeger

2

A P P E A R A N C E S (CONTINUED)

Sandra Abeles
Acting Commissioner
Department of Consumer and Worker
Protection

Steven Ettannani
Executive Director of External Affairs
Department for Consumer and Worker
Protection

Vincent Maniscalco
Assistant Commissioner of Highway
Inspection and Quality Assurance
Department of Transportation

Angelo Cucuzza

Gustavo Ajche

Ligia Guallpa

State Senator Jessica Ramos

Teodora Flores

Saru Jayaraman

Candis Tolliver

Russell Jackson

Jessica Wong

Andrew Rigie

Kathleen Reilly

Mikey Knab

Maria Figueroa

James Parrott

Sarah Rothman

Pepe Jhonson

Cesar Marino

Gustavo Mancilla

Roberto Corrales

Juan Carlos Huerta

Oscar Gonzales

Pedro Castillo

Juan Reynoso

Isabel Navarro

James Parrott

Sarah Brafman

Brian Chen

Andrew Stettner

Gonzalo Mercado

Irene Lew

Lisa Orman

Austin Horse

Richard Robbins

@

COMMITTEE ON CONSUMER AFFAIRS AND                    5
AND BUSINESS LICENSING

SERGEANT AT ARMS:  Computer started.

SERGEANT AT ARMS:  Cloud is started.

SERGEANT AT ARMS:  Sergeant Lugo, do your opening, please.

SERGEANT AT ARMS LUGO:  Good afternoon, everyone.  Welcome to today's remote New York City Council hearing on the Committee on Consumer Affairs and Business Licensing.  At this time would all panelists please turn on your video.  To minimize disruption, please place electronic devices to vibrate or silent.  If you wish to submit testimony you may do so at testimony@council.nyc.gov. Again, that's testimony@council.nyc.gov.  Thank you for your cooperation.  Chair Ayala, we are ready to begin.

CHAIRPERSON AYALA: Thank you, thank you. Ah, good afternoon, and thank you all for joining us. My name is Diana Ayala and I am the chair of the Committee on Consumer Affairs and Business Licensing. We are also joined, ah, today by my colleagues on the committee, Council Members Brannan, Chin, Koo, Koslowitz, Powers, Menchaca, Lander, and Rivera.  I'm not sure if I missed anyone, but if I did I will come around to you.  Um, today we'll be hearing a number of bills related third-party delivery platforms, such

COMMITTEE ON CONSUMER AFFAIRS AND                6
BUSINESS LICENSING

as Grub Hub, Door Dash, and Uber Eats and how they treat their contracted delivery workers.  The five bills include 2288 in relation to platforms providing insulated bags for delivery workers, and Intro 2289, allowing delivery workers to set distance and route limitations for themselves, both of which are sponsored by Council Member Brannan.  We will also hear Intro 2294, from Council Member Lander, that would establish minimum payments for delivery.  Intro 2296, from Council Member Menchaca, that would establish standards of payments for delivery workers, and Intro 2298, from Council Member Rivera, that would ensure that these delivery workers have access to toilet facilities.  Throughout the pandemic food delivery workers have been on the front line.  When lockdown orders and indoor dining restrictions were put in place it was the delivery workers that helped keep restaurants open and New Yorker fed. Politicians and the public recognize them as essential workers and heaped much-deserved praise on them.  However, beyond the rhetoric, these delivery workers have little substantive support.  Most of our city's delivery workers are immigrants and many are undocumented.  This means that many missed out on

COMMITTEE ON CONSUMER AFFAIRS AND                7
BUSINESS LICENSING

stimulus checks and other forms of government assistance during the peak of the pandemic. They struggled to get PPE and during the curfew some of them found themselves target of police enforcement despite being recognized as essential workers. The package of bills that we are hearing today aims to rectify some of the concerns raised by delivery workers. As independent contractors they are not protected by the city's best worker protection laws. Similarly, some of these conditions set by third-party delivery platforms force these workers to rush around the city delivering orders in unrealistic time frames just to maintain the customer ratings, but for very minimal pay. I look forward to hearing from the platforms and the delivery workers themselves on how these bills will improve their working conditions. We will also hear two additional bills today, Intro 2163, from Council Member Reynoso, would allow restaurants to add a surcharge to their bills, provided they pay their tip workers at $15 minimum wage. The City Council had already enacted legislation that would allow restaurants to add a surcharge of no more than 10% while restaurants are prohibited from operating at, ah, maximum capacity

COMMITTEE ON CONSUMER AFFAIRS AND                8
BUSINESS LICENSING

and for 90 days after.  The purpose of this law was to help restaurants in their economic recovery spurred by the health emergency.  Intro 2163 would repeal this law, replacing it with a new surcharge provision, linking it to tip worker wages.  Like restaurants, tip worker, ah, tipped workers in the hospitality industry have also been negatively impacted by the economic downturn.  According to some reports, the restaurant industry lost 43% of its jobs in 2020 and even those who were able to stay working reported a severe downturn in tips.  Unlike back-of-house staff who receive a standard minimum wage, workers in the front of the house, like servers and hosts, rely on tips to supplement their wages.  This means that there are times when they earn well below the standard $15 an hour.  Furthermore, research has shown that there are tipping disparities along racial and gender lines, meaning that on average black women earn $7.75 less than their white male counterparts.  By linking restaurant surcharges to a base salary to tipped workers, we hope to mitigate some of these inequities.  The final bill we will hear feedback on today is Intro 2311, from Council Member Powers.  Under this bill, restaurants would have access to

COMMITTEE ON CONSUMER AFFAIRS AND                          9
BUSINESS LICENSING

customer data collected by third-party platforms. This data is one of the most important tools restaurants can use to develop marketing strategies and customer relations. However, under the current contracts third-party delivery platforms do not allow the restaurants to retain this data, depriving them of key information to develop and grow their businesses. The hospitality industry was hit hard by COVID-19 pandemic. And as the industry begins to recover, this committee will ensure that delivery works, restaurant staff, and restaurant owners have the protections they need to succeed. As you can, we have quite an agenda to get through today. And I thank you in advance for your patience, as we ensure that every stakeholder gets their opportunity to speak. I am going to invite the various bill sponsors to make a short opening statement on their bills, but before I do that I want to thank committee staff, legislative counsel Stephanie Jones, policy analyst Noah Mitzler, and Leah Scripia for putting this hearing together. I will now turn it over, I'm sorry, to which council member, I think it's Council Member Brannan.

COMMITTEE ON CONSUMER AFFAIRS AND                    10
BUSINESS LICENSING

COUNCIL MEMBER BRANNAN:  Thank you, Chair, um, and thanks to the legislative staff, and obviously thank you to my colleagues, ah, Councilwoman Rivera and Councilman Menchaca, who we've been closely on this issue, along with obviously the leadership of the Workers Justice Project.  Ah, so this is a big day for us, ah, here in the council.  Today we're hearing two pieces of my legislation that, that I've introduced, ah, which seek to provide just basic protection and benefits to delivery workers.  Ah, both these pieces of legislation recognize two important and unfortunate realities, ah, to the nature of third-party delivery work.  One, that their out-of-pocket costs required to begin this work are substantial and they act as a barrier to entry for many workers.  And, two, ah, that many workers are penalized for failing to have adequate equipment and/or for attempting to exercise basic control over their work day.  So Intro, ah, 2289 aims to provide workers with a very crucial protection - the ability to set the distance that wish to travel while delivering and the ability to refuse to cross a bridge or a tunnel without being penalized for refusing an order.  Ah, Intro 2289 is a

COMMITTEE ON CONSUMER AFFAIRS AND                           11
BUSINESS LICENSING

result of the stories that we've heard from the deliveries [inaudible] while delivering for certain apps are sent all over the city on their bicycles, sometimes traveling multiple miles between single orders and sometimes being sent over a bridge or a tunnel into another borough without warning.  We've even heard from delivery workers who, ah, one, one delivery worker who was delivering in Manhattan.  He was sent to an address in New Jersey on his bike. For many of these apps, when a worker decides to reject an order based on its distance, they receive a lower rating from the app's internal algorithm and it has a negative effect on their ability to receive future orders.  So it bears repeating that these workers are independent contractors.  They should not be required to go wherever these apps assign them for fear of negative repercussions, especially if it jeopardizes their safety.  Second, lastly for me, ah, Intro 2288, it's very straightforward and simple.  It would require third-party apps to provide workers with insulated bags for food delivery at no cost to the worker.  This legislation aims to minimize the cost that a worker incurs on the job.  Ah, these workers already supply their own bicycles, their own

COMMITTEE ON CONSUMER AFFAIRS AND                    12
BUSINESS LICENSING

helmets, their own safety equipment, and there's no reason that they should also need to provide bags to keep food warm during delivery.  Ah, we've heard stories of delivery workers who, ah, lacking delivery bags and, and what-not receive low ratings when the food arrived cold to their customer.  Again, a were should not be penalized because they can't afford to purchase an item that is a necessity for the job. Ah, this cost should really rest with apps.  So, again, I want to thank my colleagues and especially the incredible workers who have organized to get us here today, especially the Workers Justice Project, and thank my colleagues, ah, Council Members Rivera, Menchaca, ah, their legislative staff for their hard work on this package.  And, of course, ah, to, ah, Chairwoman Ayala for all your leadership and getting this done today.  This is a big day for us and for the workers.  So I appreciate it, and thanks for letting me, ah, talk on these bills.

CHAIRPERSON AYALA:  Thank you, Council Member Brannan.  We've also been joined by Council Member Reynoso.  Um, we [inaudible] Council Member Lander, prime sponsor of Intro 2294, to deliver a opening statement.  Council Member Lander?

COMMITTEE ON CONSUMER AFFAIRS AND                        13
BUSINESS LICENSING

COUNCIL MEMBER LANDER:  Thank you so very much, ah, Chair Ayala.  It's really an honor to be one of the sponsors today, along with Council Members Rivera, Menchaca, Brannan, and I'm excited also about the tipped, ah, worker, ah, that Council Reynoso is carrying and I also strongly support it.  I want to thank you for having this hearing.  I want to especially thank the workers for their organizing and their courage and they're making their voices heard out in the streets, and today in this hearing I really look forward to hearing from them.  Delivery workers have been feeding us throughout the pandemic, but too often the app companies have been starving them.  Many delivery workers, ah, they perform hard, dangerous essential work.  Imagine riding 10 or 12 hours in the heat today, and yet they earn far less than the minimum wage, sometimes just even $4 or $5 an hour.  Ah, Door Dash, Seamless, Red, Instacart have exploited the independent contractor who [inaudible] to shortchange workers.  This is supposed to be a city where every worker earns at least $15 an hour and we do not have to allow them to continue shortchanging workers.  For Uber and Lyft drivers, by requiring that the Taxi and Limousine Commission set

COMMITTEE ON CONSUMER AFFAIRS AND                    14
BUSINESS LICENSING

a per-trip minimum we've guaranteed that the drivers can earn a living wage of at least $17.50 an hour. Ah, my legislation, Intro 2294 will do similarly for delivery workers that will require the Department of Consumer and Worker Protection to establish a per-trip payment for food delivery workers in order to guarantee them living wage pay.  Now, we may hear from Uber or Door Dash that they can't afford it, but Uber's revenue from delivery service soared 215% to the first quarter of 2021 and they even increased their take rate, what they take that restaurants or delivery workers don't get, from 11% to 14%.  That's hundreds of millions of dollars that went to Uber that could have gone to delivery workers.  And Door Dash's revenues jumped threefold.  Their CEO received a stock package worth 400 million dollars in December.  They can afford to pay their delivery workers a living wage.  Intro 2294 will make sure we get it done.  I support all the other bills in this package and I'm honored to be a cosponsor.

CHAIRPERSON AYALA:  Thank you, Council Member Lander.  We've also been joined by Council Member Kallos.  Um, we will now turn it over to

COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING                                              15

Council Member Menchaca, prime sponsor of Intro 2296, to deliver an opening statement.

COUNCIL MEMBER MENCHACA:  Ah, thank you. I, I want to just first start by saying thank you to Chair Ayala and Speaker Corey Johnson.  Without them and the committee staff and central staff there's no way that we would have gotten to this point.  And I just want to say thank you in a moment where so much of what we are trying to do we are doing with our immigrant New Yorkers.  Ah, there's no way we can do it without you.  And so both you, Speaker Corey Johnson, and Chair Ayala deserve so much credit for today's hearing.  Now, what I want to lift in this conversation is the sheer fact that so many New Yorkers have gotten rich on the backs of our immigrant workers for many years.  COVID accelerated the conversation that we're having today, where the apps have taken advantage, and you're hearing from the sponsors about how the different ways we have benefitted as New Yorkers without justice, and so these bills that you're hearing today are about that. My bill is really focused on regulating the apps. The apps have charged workers, essential workers, the delivery says, ah, for paying, paying their salary,

COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING                16

ah, using non-banking options. Ah, this is something that was brought to my attention over a year ago in Sunset Park and we submitted an LS request and here is the bill. The bill also ensure that workers get paid on time. We know from workers that you're gonna hear from today who have not been paid in months, ah, and at this point I think there are a lot of, ah, tactics that apps will use so they never pay workers their salary. That's gonna end. And I'm just really proud to be here with this committee. The workers are gonna tell their story. Let's listen to that, ah, and let's move these bills fast, and so I'm, I'm asking all my council member colleagues, especially those that have been on the front, ah, Justin Brannan and Carlina Rivera, Brad Lander, ah, Council Member Ayala, Chair Ayala, and so many more that have, ah, joined this, this effort. Let's make this happen and glad to be here today. Thank you.

CHAIRPERSON AYALA: Thank you, Council Member, ah, Menchaca. We will now turn it over to Council Member Rivera, who is the prime sponsor of Intro 2298, to deliver an opening statement.

COUNCIL MEMBER RIVERA: Hi, can you hear me OK? OK, sorry, trying something new. Thank you,

COMMITTEE ON CONSUMER AFFAIRS AND                                    17
BUSINESS LICENSING

Madam Chair and thank you to the committee for holding this important hearing.  For the past year and a half while we battled the COVID-19 pandemic and fought for a just recovery, delivery workers have [inaudible] their lives and livelihoods at risk, reporting to work every day to keep New Yorkers fed and restaurants afloat.  They have been and continue to be just as essential to our city's survival as our healthcare heroes, yet they have not been awarded even a design of the honor and respect that they deserve.  My colleagues and I introduced this package of legislation, drafted in partnership with the Workers Justice Project and Los Deliveristas Unidos to begin to address the dangers of abuses and inequities facing deliveristas.  On average, a delivery worker works 12 hours a day, seven days a week, earning a grand total of $300.  That is less than $4 an hour.  When they need to take a break or use the restroom they are denied basic courtesy and treated with hostility by some of the very same restaurants kept open by their labor.  They are no safer out in our streets, where they face robberies and violent assaults at the hands of individuals who target them for their valuable e-bikes.  Without

COMMITTEE ON CONSUMER AFFAIRS AND                    18
BUSINESS LICENSING

protected bike lanes and safe street infrastructure the deliveristas continue, community has lost several workers to traffic fatalities.  Today is a historic date because after a year of organizing you'll hear directly from the workers fighting for dignity in their workplace, the streets of New York.  My bill, Intro 2298, would require all restaurants to provide something seemingly very basic - access to bathrooms for delivery workers who are picking up a delivery, except in restaurants where accessing the bathroom would create a serious health and safety risk. Deliveristas have single-handedly kept restaurants across the five boroughs in business and yet are often faced to go an entire 12-hour work day without any access to a bathroom.  Just outside of my own district we learned of a restaurant charging delivery workers an astonishing $5 to use their bathroom.  The rights and protections we seek to codify and defended in this package are just the minimum of delivery workers deserve.  And it is far past time that we as a council stepped in to help deliver justice where it is long overdue.  Thank you again, Madam Chair, and the committee.  Thank you to Speaker Johnson and my colleagues for their advocacy and their

COMMITTEE ON CONSUMER AFFAIRS AND                    19
BUSINESS LICENSING

collaboration.  I'd especially like to thank the Workers Justice Project and Los Deliveristas Unidos for their partnership and for entrusting us with this fight.  Following today's hearing, I look forward to getting these bills passed.  And finally, this fight did not start in the council and nor does it end here.  I call on our city agencies to step up and do their part to ensure these workers are regarded with dignity and respect and provide a safe, supportive environment to work.  Thank you very much.

CHAIRPERSON AYALA:  Thank you, Council Member Rivera.  I'll turn it over to Council Member Powers, prime sponsor of Intro 2311, to deliver an opening statement.

COUNCIL MEMBER POWERS:  Thank you and good afternoon.  Thank you, Chair Ayala.  I'm gonna keep my comments a little shorter since I know you have a lot on the agenda today.  Ah, but thanks for giving me time to speak on Intro 2311, which requires third-party food delivery services, which are entities of providing restaurants with online order and delivery services, to share certain information with restaurants with, with, about customer data.  Um, we're living in an era where more and more people

COMMITTEE ON CONSUMER AFFAIRS AND                    20
BUSINESS LICENSING

are turning to technology and the cloud is as an entity intermediary to traditional brick and mortar services.  There is a trillion app for everything these days and I know I take advantage of them as well.  Um, but we do want to make sure that we [inaudible] strike the right balance and equity between those that hold the information and those that supply the goods and services, and that's ultimately the intention of my bill.  The goal is to allow for more information sharing and transparency between the platforms that retain and, and hold that data, and the restaurants rely on them, but should be able to use that data when it comes to marketing and understanding their business.  Um, we have heard from folks about their concerns in terms of protecting privacy data and, ah, eager to hear suggestions from stakeholders on how to best address those concerns and reach a bill that helps do all the above.  Um, and I just have to say, this has been such a hard year for our restaurants and our local businesses and this is a really good opportunity for us again to look at them and think about ways to keep them surviving here in the city, but also give them a better opportunity to compete and to be able to stay

COMMITTEE ON CONSUMER AFFAIRS AND                    21
BUSINESS LICENSING

in our communities for a very long time.  And so that's the goal of my bill here today.  And I want to thank, ah, Chair Ayala for having this hearing and the speaker as well for putting the bill on the agenda, and I want to thank all the colleagues so far who have signed onto the bill.  I want to encourage everyone to take a look at it and sign on and, ah, we look forward to hearing comments.  So thank, thank you, Chair, and I look forward to hearing testimony.

CHAIRPERSON AYALA:  Thank you, and before I turn it over to our moderator, Stephanie Jones, I just wanted to take a moment to remember Francisco Rialba Depineo who, ah, was murdered in my district in April.  Um, Francisco was a delivery, ah, worker, um, who after his, um, his day of work, was sitting in a park bench when he was, um, murdered, from what we presume was, um, someone trying to steal his bike, um, to steal his livelihood.  And I want to thank and acknowledge the work of Los Deliveristas Unidos and Workers Justice Project for, um, not only, you know, shedding light on, on, on Francisco's story, but also, ah, offering their support to the family and to the entire community.  Um, with that I'll now turn it

COMMITTEE ON CONSUMER AFFAIRS AND                      22
BUSINESS LICENSING

over to moderator Stephanie Jones for some procedural items.

COMMITTEE COUNSEL:  Thank you, Chair.  I am Stephanie Jones, counsel to the Committee on Consumer Affairs and Business Licensing.  And I will be moderating this hearing.  Before we begin, I'd like to remind everyone that you will be on mute until you are called on to testify, at which point you will be unmuted by the host.  During the hearing I will be calling on panelists to testify.  Please listen for your name to be called as I will periodically be announcing who the next panelist will be.  At this hearing we'll first be inviting testimony from the Department of Consumer and Worker Protection, followed by testimony from members of the public.  During the hearing if council members would like to a question of the administration or a specific panelist please use the Zoom hand raise function and I will call on you in order.  We will be limiting council member questions to five minutes, which includes the time it takes to answer your question.  For all panelists, when called on to testify please state your name and the organization you represent, if any.  We will now call

COMMITTEE ON CONSUMER AFFAIRS AND                23
BUSINESS LICENSING

representatives of the administration to testify.  We will be hearing testimony from Sandra Abeles, acting commissioner of the Department of Consumer and Worker Protection.  We will also be joined for question by Steven Ettannani, Vincent Maniscalco, assistant commissioner of highway inspection and quality assurance of the Department of Transportation, and Miranda Alquist, assistant director of legislative affairs of the Department of Transportation.  At this time I will administer the affirmation. Administration panelists, please raise your right hands and I will call on each of you individually to respond.  Do you affirm to tell the truth, the whole truth, and nothing but the truth before this committee and to respond honestly to council member questions?  Commissioner Abeles.

ACTING COMMISSIONER ABELES:  I do.

COMMITTEE COUNSEL:  Thank you.  Executive Director Ettannani.

EXECUTIVE DIRECTOR ETTANNANI:  I do.

COMMITTEE COUNSEL:  Thank you.  Assistant Commissioner Maniscalco?

ASSISTANT COMMISSIONER MANISCALCO:  I do.

COMMITTEE ON CONSUMER AFFAIRS AND                    24
BUSINESS LICENSING

COMMITTEE COUNSEL:  Thank you.  Finally, Assistant Director Alquist.

ASSISTANT DIRECTOR ALQUIST:  I do.

COMMITTEE COUNSEL:  Thank you.  At this time I'd like to invite Commissioner Abeles to present her testimony.

ACTING COMMISSIONER ABELES:  Good afternoon, Chair Ayala and members of the Committee on Consumer Affairs and Business Licensing.  I'm Sandra Abeles, acting commissioner of the Department of Consumer and Worker Protection.  And I'm joined today by Steven Ettannani, our agency's executive director of external affairs.  We're also joined by our colleagues from the Department of Transportation, Vincent Maniscalco, assistant commissioner of highway inspections and quality assurance, and Miranda Alquist, assistant director of legislative affairs.  Chair Ayala, it's a pleasure to see you again and I look forward to working with you and members of the committee on the significant issues impacting New York's delivery workers.  I've been with the agency since 2014 and prior to stepping into my current role I served as the first deputy.  Before joining DCWP I worked at the New York State Department of Labor,

COMMITTEE ON CONSUMER AFFAIRS AND                     25
BUSINESS LICENSING

enforcing labor standards and ensuring the health and safety of public employees, and at the attorney general's office in the civil rights bureau, protecting our immigrant communities from fraud. This is why I joined DCWP, because I consider our mission of protecting consumers and workers an essential part of ensuring equity and justice in our city.  The agency licenses about 59,000 businesses and individuals in approximately 50 different categories.  We enforce consumer protection, business licensing, and workplace laws that serve New Yorkers throughout the city and offer programming that increases access in our city to free financial services for New Yorkers.  DCWP's Office of Labor Policing and Standards, or OLPS, enforces our city's workplace protections, including New York City's paid safe and sick leave and Fair Work Week laws, and it administers the Freelance Isn't Free Act to protect freelancers' right to get paid, and conducts vital education and outreach to workers and businesses on their rights and responsibilities.  Throughout the pandemic DCWP received thousands of complaints and inquiries about workers' rights in New York City.  We have investigated and brought successful enforcement

COMMITTEE ON CONSUMER AFFAIRS AND                    26
BUSINESS LICENSING

actions against employers that violated the rights of essential workers, even up to the point of illegal firings.  We've also adapted throughout the pandemic to focus our available tools and resources on the most pressing concerns for workers, including providing referrals on critical economic supports, developing new resources to help workers navigate reopening, and prioritizing the swift resolution of complaints to ensure workers can access their sick leave and receive any compensation to which they're entitled.  Another major step our city is taking to protect our city's workers is the passage and implementation of groundbreaking Just Cause protections for tens of thousands of essential workers in our fast food industry.  For too long workers in this industry have faced arbitrary firings, at times dismissed for no reason at all. Just Cause as a new frontier in workers' rights will bring greater stability and equity to our city's fast food workers by ensuring there are disciplinary processes in place before a worker is terminated. Turning towards the legislation at hand today I'd like to take a moment to recognize the incredible efforts and sacrifices made by delivery workers

COMMITTEE ON CONSUMER AFFAIRS AND                    27
BUSINESS LICENSING

during one of the most difficult times in this city's history.  Delivery workers helped carry the city through an unprecedented, ongoing public health crisis.  When many of us were isolated in our homes or caring for loved ones, delivery workers were among the essential workers who kept going to work every day, ensuring that New Yorkers could have access to meals and other goods without having to leave home.  And while many industries shrank, the number of workers doing deliveries through third-party apps has increased.  To that end, DCWP support protections for these workers.  We've worked closely with the partners that the council has engaged with and are always encouraged to see that workers' rights are at the forefront of conversations in the city.  We look forward to working with the council on these important bills to ensure they'll provide meaningful protections to app-based delivery workers while also making sure they are enforceable once passed.  Intro 2288, which requires a third-party food delivery service to provide insulated food delivery bags for each of its bicycle operators at the company's expense.  It would be under the purview of DOT.  The administration supports the intent of this

COMMITTEE ON CONSUMER AFFAIRS AND                    28
BUSINESS LICENSING

legislation to reduce financial burdens on workers and to ensure food is properly stored.  Delivery cyclists are under significant pressure when traveling far and fast throughout the city to deliver our food.  Improving their working conditions also enhances safety on the city streets, helping keep the cyclists and all New Yorkers safe.  Introduction 2298 would require food service establishments that utilize delivery workers to provide those workers with access to the toilet facilities, provided that in doing so there's no risk to health and safety standards.  The administration supports the intent of this legislation, which is consistent with existing employee rights to bathroom access under the federal Occupational and Safety and Health Act and extends similar protections to app-based delivery workers. There may be challenges in enforcement when determining whether a violation has occurred based on information offered by the worker or the business. Therefore, it will be a priority to develop clear and understandable standards for workers and businesses and for the agency to be able to assess violations. Ultimately, our city's delivery workers deserve a right to bathroom access.  Introduction 2289 would

COMMITTEE ON CONSUMER AFFAIRS AND                    29
BUSINESS LICENSING

allow a third-party delivery worker to specificity to their food delivery service the maximum distance the worker will travel and the restrictions on traveling over bridges or through tunnels.  This bill directly addresses a significant safety concern of workers and we support its intent.  Introduction 2294 would require DCWP to commission a study of working conditions for third-party delivery workers, as well as determining minimum per-trip payments for these workers to be established by law.  While DCWP does not have information on the inner workers of the industry or the staff required to develop minimum pay rates, we do look forward to discussing how this would work with the council and other stakeholders to ensure it translates into real benefits for delivery workers.  Introduction 2296 would require DCWP to establish standards for payment for third-party delivery workers and establish a program to provide real-time assistance to delivery workers in disputes with third-party service platforms.  DCWP supports the intent of this legislation to ensure delivery workers are properly paid and looks forward to working with the council on this bill.  These bills establish a new administrative framework with a

COMMITTEE ON CONSUMER AFFAIRS AND                    30
BUSINESS LICENSING

significant investment for this group of workers.

While DCWP currently lacks the expertise to

effectively regulate this industry, we know it

operates through a highly sophisticated and

constantly changing technology.  Additionally, the

industry itself continues to adapt very quickly to

the market demand for delivery services in the midst

of the pandemic, which could mean there are also

people who are evading regulations if enforcement is

not carefully constructed.  To address these concerns

the agency will need to work closely with the council

and stakeholders representing our city's delivery

workers, restaurants, and other industry experts.

Similar to other laws the city has implemented,

stakeholders can assist the agency in understanding

how this industry operates and help develop standards

of protection for delivery workers, and these

stakeholders could work with the agency to develop

recommendations on an ongoing basis to ensure that we

as a city are taking necessary steps in the short

term to protect workers while we analyze these

technology platforms and also set the most

appropriate standards for the industry.  The

structure for Intro 2294 provides an example of what

COMMITTEE ON CONSUMER AFFAIRS AND                    31
BUSINESS LICENSING

this approach could look like, ensuring DCWP can gather the needed expertise to set up enforceable standards that are responsive to working conditions in this fast-changing industry and allowing the city to protect and enhance the rights of these delivery workers for years to come.  Introduction 2163 would permit restaurants to impose a surcharge of up to 15% in addition to the stated price of individual items, provided that a restaurant appropriately discloses the surcharge to its consumers and provides their tipped workers with an hourly cash wage that is not less than the minimum wage set by the state for New York City.  The administration supports the intent of this bill and we look forward to further discussing with the council.  DCWP has long advocated for an end to the state's two-tiered wage system to cure the serious equity gaps in current wage in our law. Action must be taken by the state to eliminate the two-tiered wage system for tipped workers, which is why we've called on the governor many times to eliminate this system for restaurant workers. Lastly, Introduction 2311 would third-party delivery apps to share customer information with the restaurants with whom those customers are placing

COMMITTEE ON CONSUMER AFFAIRS AND                    32
BUSINESS LICENSING

orders.  Unfortunately, this legislation was only recently added to today's agenda and the administration is still reviewing its language and impact.  One final concern with impingement any new enforcement contemplated in these bills is our current work implementing Just Cause protections and other new offices.  We'll certainly need additional resources to ensure we implement any new mandates effectively, though it's too soon to tell exactly what resources would be required.  Ultimately, we welcome the council's efforts to improve the lives of vulnerable workers in our city.  At the present time when many employers are experiencing a labor shortage we hope that these efforts and our continued partnership can demonstrate that we must increase wages and improve benefits so that these workers can continue to be a part of the economic recovery in New York City.  The administration has continuously advocated alongside thousands of workers for a $15 minimum wage and groundbreaking legislation, such as Just Cause protections, which brings stability to the lives of so many essential workers.  This also includes our agency's priorities to bring the Consumer Protection Law into the 21st century.  Intro

COMMITTEE ON CONSUMER AFFAIRS AND                    33
BUSINESS LICENSING

1622, with commonsense penalties to protect consumers

for predatory corporations and tools to protect

consumers conducting transactions over the internet

and in languages other than English.  As always, we

value the council as our partner in ensuring that

workers' rights are a priority for this city, with

sound and resource protections for our workers.

Effective enforcement, whether on behalf of consumers

or workers, depends on a well-calibrated regulatory

structure that deters the most harmful activity so

that breaking the law in our city is not just the

cost of doing business.  Thank you for the

opportunity to testify, and I look forward to any

questions you may have.

            COMMITTEE COUNSEL:  Thank you,

Commissioner.  I will now turn it over to questions

from Chair Ayala, followed by questions from other

council members.  Chair?

            CHAIRPERSON AYALA:  Thank you.  Um,

considering that we're, we're hearing so many bills

and that we have so many of the bill sponsors, ah, on

at this moment, I would love to give those members an

opportunity to ask questions first.  I think that I

see Council Member Menchaca.

COMMITTEE ON CONSUMER AFFAIRS AND                    34
BUSINESS LICENSING

COMMITTEE COUNSEL:  Council Member Menchaca.

COUNCIL MEMBER MENCHACA:  Can you hear me?  Am I coming in?

COMMITTEE COUNSEL:  Yes, we can hear you.

COUNCIL MEMBER MENCHACA:  Wonderful, thank you.  So, ah, thank you, thank you, Chair, for this opportunity and I guess, ah, ah, to, to the commissioner, I want to, I want to focus on my bill that really requires a prompt, a, a timeline for payment and a removal of any [inaudible] connected to salary.  And can you talk a little bit about other instances where you have seen this kind of enforcement from the city that we can look at and bring into this conversation, 'cause I think this, you, you support the intention of the bill and, and I think you were looking more at how, how are we, how do we enforce this.  Do you, does your, has your team thought about other models that we can bring into this conversation?

ACTING COMMISSIONER ABELES:  Thank you so much, ah, Council Member Menchaca.  I think that, you know, overall we do have the sense that this is a, ah, a new industry for our agency to look into.  I

COMMITTEE ON CONSUMER AFFAIRS AND                    35
BUSINESS LICENSING

think that we understand that many delivery workers

may work for multiple services at the same time and

it might be difficult for them or confusing to track,

ah, their payments and make sure that they're being

paid correctly.  As we learn more about how these

different platforms operate we'll better understand

how the fees and payments are actually charged and

calculated.  And then we can figure out how best to,

to mediate that.  I think maybe the closest analogy

would be the Freelance Isn't Free Act, but, again,

that's really early for us to tell, um, what's the

best way, ah, to implement such a thing.

COUNCIL MEMBER MENCHACA:  OK.  Ah, 'cause

I, I know we're gonna have some ideas as well and,

and I think part, part of this is the, the fact that

there are many, many different apps, but that

shouldn't preclude the city from creating a

regulation that says here's what you have to follow

and then allowing for a legal recourse from the

advocates working with each of these workers to be

able to say the city, or not the city but sue the,

um, with the support of the city the, the apps.  And

so I think, I think this is, this is kind of what

we're, we're thinking about as well.  Maybe the next

COMMITTEE ON CONSUMER AFFAIRS AND                    36
BUSINESS LICENSING

question I have for you is the banking options.  So much of what we've been trying to do with [inaudible] NYC is to link our immigrant communities to bank accounts, um, but also to really understand that sometimes bank accounts are not gonna be an option for immigrants and to create other ways for banking to be, to be created and so maybe, um, ah, you can talk a little bit about that and what you might be thinking working with your other commissioner colleagues.

ACTING COMMISSIONER ABELES:  Sure.  Ah, I think that when it comes to the unbanked and certainly we've seen a lot of this from, um, the work we've done in our Office of Financial Empowerment, is, is seeing just what you mentioned, where for some people, um, they haven't been able to find the right banking products, um, that are suitable for their situation.  We do offer free financial counseling throughout the city and we've continued to do that throughout the pandemic, um, also offering some remote options for folks while it was unsafe to do so in person.  And so we would really be looking with them to see what would be the best options that we could offer people, um, in terms of banking products

COMMITTEE ON CONSUMER AFFAIRS AND                         37
BUSINESS LICENSING

that don't charge exorbitant fees and that are transparent in terms of their offerings, so that we can help match people up, educate them, work with them on their particular situations.  So I think we would work with our Office of Financial Empowerment in that regard.

COUNCIL MEMBER MENCHACA:  And then, lastly, ah, I think one, one, one question that I want to drill down on are other models in which the city has polled a third-party, ah, system, I want to be general about it, that basically says you have to pay your workers on time.  Is there anything that exists right now in the city in terms of relationship, ah, including potentially itself, and what kind of regulations that we can really set for, for these apps that are really kind of growing in, in scope as well.  Ah, I think we're all anticipating the world of this third-party is why we're trying to fix it here but this is a longer labor movement, um, work that we have to do, but specifically looking toward a, um, a salary timeline [inaudible].

ACTING COMMISSIONER ABELES:  Well, that's a great question.  I'm not entirely sure of another model that's so similar here in the city.  Um, and

COMMITTEE ON CONSUMER AFFAIRS AND                    38
BUSINESS LICENSING

again, as I mentioned, these third-party apps, we know these are global companies. They're, they have presences in cities throughout the, throughout the world. Um, they have different platforms that they use and different models for how they set their pay rates, um, for their delivery workers. And so we'd want to work really closely with the stakeholders, especially the ones you've gathered here today...

SERGEANT AT ARMS:  Time expired.

ACTING COMMISSIONER ABELES: ...to gain. OK.

COUNCIL MEMBER MENCHACA:  Yeah, yeah, just finish that and then I'm out [inaudible].  Thank you, Chair.

ACTING COMMISSIONER ABELES:  Ah, bear with me, this is my first one.  Ah, to, to gain a better grasp of the work and then develop the clear standards, um, with the, with the advocates on, on what we should do for this particular bill.

COUNCIL MEMBER MENCHACA:  Wonderful. And, again, this is your first one, so welcome and looking forward to working with you.

ACTING COMMISSIONER ABELES:  Thank you.

COMMITTEE ON CONSUMER AFFAIRS AND                    39
BUSINESS LICENSING

COMMITTEE COUNSEL:  Thank you, Council Member.  I see that Council Member Lander also has his hand raised.  If any other council members would like to ask a question and you have not yet raised your hand, please do so using the Zoom raise hand function.  Council Member Lander?

SERGEANT AT ARMS:  Starting time.

CHAIRPERSON AYALA:  Council Member Lander, give me on second, I'm sorry.  I did want to recognize that we were also joined by Council Member Yeger, [inaudible].  Thank you.  You may proceed.

COUNCIL MEMBER LANDER:  Thank you so much, and Chair, thank you for, ah, letting us ask our, ask our questions first.  Um, we appreciate that a lot.  Ah, Commissioner, welcome.  It's wonderful to have you.  Congratulations on your new position.  I know you've, ah, working in this field and in this agency and, and protecting workers' rights a long time.  But it's great to have you as our, as our commissioner at DCWP.  So thank you, um, and thanks for your mentions of, ah, Just Cause and the Freelance Isn't Free Act, and the work that you guys are doing to diligently enforce existing, ah, worker protections and we appreciate the point that if we're

COMMITTEE ON CONSUMER AFFAIRS AND                    40
BUSINESS LICENSING

going to expand, um, we need to have you have the resources to be able to, to deliver on them.  That's literally true.  Um, so I'm gonna ask a little about 2294.  I appreciate your praise of the approach of having a study and digging and really understanding, ah, the, so I am glad that you like that approach. But I guess I wasn't clear, in your testimony whether that means you support the bill, um, so can you say a little more about if you like the approach, if you agree that time is needed to develop, ah, an approach on minimum pay, um, you know, what is there we need to work on to make sure we can, we can pass this legislation and move forward?

ACTING COMMISSIONER ABELES:  Absolutely, and yes, we do appreciate the concept of having a study to develop the appropriate standards, because, as I mentioned, this is a very quickly evolving industry and we know that the platforms operate differently in how they set, ah, their payment rates. So the one, I think, concern that we have is just the timeline, ah, to make sure that it, um, is adequate and it, and it does a comprehensive review of what's required for, to set minimum pay rates.  Um, and as you mentioned, um, the resources for the kind of

COMMITTEE ON CONSUMER AFFAIRS AND                           41
BUSINESS LICENSING

procurement, ah, we would need for experts to conduct

this study and determine also how the access, um, can

be, ah, delivered in terms of the data from the

third-party apps as we know this is like, primarily

like data, um, driven industry.

COUNCIL MEMBER LANDER:  Great.  I, those

are all really helpful.  I think timeline, resources

are things we can negotiate, and we're definitely

gonna have to work on the data.  In the case of the

TLC, the [inaudible], ah, for-hire vehicle app, we

had the data being provided to the TLC, ah, pursuant

to a law that we already had so, um, that is

something that I think we can work on, ah, together

as well as resources and timeline.  Um, I just, ah,

have you had chance to, you know, to look at bit at

the, ah, that study that Mike Reich and James Parrott

did, ah, you know, ah, coming out of the legislation

that, that council passed for minimum trip rates and

minimum pay therefore for-hire drivers?

ACTING COMMISSIONER ABELES:  Yeah, we

certainly looked at that as a potential model.

Again, we're still in the very early stages of

thinking through, ah, how it would work in this

particular circumstance.  Um, the other piece that we

COMMITTEE ON CONSUMER AFFAIRS AND                    42
BUSINESS LICENSING

would welcome a partnership with you on is also identifying the correct experts that we would want to tap for this kind of, ah, expertise, because we know that, again, this industry is very particular and, and we would love to, ah, work with you on identifying who the proper experts would be, ah, to figure out the best way forward.

COUNCIL MEMBER LANDER:  That sounds great.  We're gonna hear from some of them today, the workers themselves.  Ah, I hope some of the app companies will testify because even though they may resist some of the legislation, they are critical, ah, partners here.  If we're gonna make this work, we have to make this work, ah, with them and then obviously they'll be other experts that we can tap, ah, tap into.  OK.  Um, but yeah, just generally you agree that, you know, in a city with a $15 minimum wage we want to make sure all workers are earning at least that, you know, after other expenses per hour so they can feed their families and pay the rent.

ACTING COMMISSIONER ABELES:  Yeah, we absolutely think that all workers deserve a certain basic level of support and we know how expensive it is to live in the city, um, and so we want to do

COMMITTEE ON CONSUMER AFFAIRS AND                    43
BUSINESS LICENSING

everything that we can, ah, to work with the council and figure out how best to, to implement the intent of each of these bills.

COUNCIL MEMBER LANDER:  Thank you very much.  We look forward to working with you after this hearing and look forward to pass this bill and then move forward to guarantee that living wage for delivery workers who so, who so, you know, been there for us and we really have to be there for them. Thank you very much, and thank you, Chair.

ACTING COMMISSIONER ABELES:  Thank you.

COMMITTEE COUNSEL:  Thank you, Council Member.  Ah, seeing no other council member hands raised I will turn it back to Chair Ayala for any questions.  Chair?

CHAIRPERSON AYALA:  Ah, Commissioner Abeles, do we have any, any information on the cost, the, the average rate per trip, ah, payment is at this time, and is that rate comparable amongst [inaudible]?

ACTING COMMISSIONER ABELES:  We actually do not have industry data at this time.  Ah, but that's one of the things that we would seek to learn

COMMITTEE ON CONSUMER AFFAIRS AND                44
BUSINESS LICENSING

through, for example, the study that Council Member Lander is suggesting.

CHAIRPERSON AYALA:  Can you explain, ah, can you explain for us the way that DCWP has engaged with delivery workers to educate the, ah, [inaudible] rights and provide them with financial [inaudible]?

ACTING COMMISSIONER ABELES:  Sure.  Um, so because we know how essential delivery workers have been throughout the pandemic, DCWP has worked to provide ongoing education to workers and also field inquiries about worker rights throughout this pandemic.  One issue that, um, we know has come up is certainly, as you mentioned, access to financial counseling, um, and so, like I said, we've worked with our providers to make sure that even throughout the pandemic there have been some remote options for folks so that they can make appointments and go over their budget and go over their, their debt and figure out what their goals are and get that kind of support and help.  Particularly with deliveries we would want to learn a little bit better about what kind of targeted outreach would be necessary to help them, the languages that they will require, and other questions that they may have, so that we can target

COMMITTEE ON CONSUMER AFFAIRS AND                    45
BUSINESS LICENSING

and tailor our outreach specifically to them, um, if these bills move forward.

CHAIRPERSON AYALA:  So has DCWP engaged with, with the groups?

ACTING COMMISSIONER ABELES:  We've had ongoing relationships with the partners that you've mentioned here for sure.  I think that the one thing we haven't honed in on is really the needs of this particular subset of workers.  Um, our focus has been on continuing the paid safe and sick leave, which has been, you know, so critical during the pandemic, and then, like I mentioned earlier, um, setting up the infrastructure for the Just Cause implementation that will be happening in the next couple of months.

CHAIRPERSON AYALA:  OK.

EXECUTIVE DIRECTOR ETTANNANI:  And the thing that's so important, to just reaffirm the message that this is new work for DCWP, and on top of that such a dynamic industry and we want to make sure, as, ah, as Acting Commissioner Abeles mentioned, that we have all the information on of the ground so that we can effectively concentrate and work with council on long-term policies that are gonna be [inaudible] very impactful for this

COMMITTEE ON CONSUMER AFFAIRS AND                    46
BUSINESS LICENSING

industry.  Um, and that means convening stakeholders, ah, the, the apps, the workers themselves, the folks that I'm sure will be testifying in, in forecoming panels and, and, you know, that's something that, that we're gonna be, ah, leaning on, ah, to help, ah, inform, you know, work in this case.

CHAIRPERSON AYALA:  Has any efforts at convening the groups, though, happened before today's hearing?  Is, ah, this industry [inaudible] I mean, we saw an opportunity and I would say the last year or so has been pretty eye-opening [inaudible] the disparities in pay and we [inaudible] the injustices and how [inaudible] so, you know, this would be whether or not prior to today's hearing there has been any attempt to engage with, ah, the different groups, um, and what, if anything, has come out of the conversations, ah, because obviously [inaudible], you know, pay equity is [inaudible] safety concerns and so many other layers to this, and, and I, you know, so would love to kind of get some insight in terms of what the thought process is, you know, at DCWP in relationship to this industry and, you know, um, [inaudible] happening.

COMMITTEE ON CONSUMER AFFAIRS AND                47
BUSINESS LICENSING

ACTING COMMISSIONER ABELES:  Yeah.  As I mentioned, like we work closely with the Workers Justice Project, New Immigrant Community Empowerment, and, and other worker groups, ah, to make sure that we are preparing information about the laws that we enforce and making sure that they know about their rights and responsibilities and how to access additional economic resources that are available to them.  And we would do the same thing here.  You know, whenever we, ah, roll out, ah, some new protections we'll work closely with our partners to make sure that we're getting to the most frequently asked questions, that we're translating them into all the appropriate languages, um, and that we're making it as plain language as possible, so that it's really accessible to the worker community that we're trying to target.  And that's the approach that I think we would look at here.

CHAIRPERSON AYALA:  And then..

EXECUTIVE DIRECTOR ETTANNANI:  We're, we're still, I'm sorry, Chair.  I, I just wanted to say we're so happy that the council has introduced these bills.  I think these bills are gonna allow us to, you know, the, the hearing process of, you know,

COMMITTEE ON CONSUMER AFFAIRS AND                         48
BUSINESS LICENSING

closer to the beginning of the legislative process than, than the end, and I think that this is gonna allow our agency to kind of coalesce around some of these ideas and principles that are being raised by the sponsors of these bill, so that we can engage with a safe [inaudible] explicitly around some of these concepts going forward.

CHAIRPERSON AYALA:  Oh, and again, I think that we focus a lot of our, you know, [inaudible] on worker protection and [inaudible] however there has to be a conversation about, you know, the safety, right, ah, in, in performing these jobs.  You know, as you heard [inaudible] minutes ago, you know, I, I, I had an unfortunate incident where I had a delivery worker murdered in my district, um, because someone was trying to steal his bicycle.  A couple of days after that, you know, there were a number of, you know, delivery workers trying to cross over the Willis Avenue bridge who were [inaudible] was an attempt, um, by, um, some pedestrians, ah, to, to rob them of their, their, their money and, and really, you know, expressing how this was a common occurrence.  So, ah, really how are we engaging, ah, with the groups and with the workers

COMMITTEE ON CONSUMER AFFAIRS AND                49
BUSINESS LICENSING

in a way that allows the [inaudible] understand what their rights are, um, how they're communicating and reporting these incidents to the, you know, to the NYPD, um, and whether or not, you know, there are other ways that we could be helpful in ensuring that they're doing their jobs as safely as possible.

ACTING COMMISSIONER ABELES:  And we're certainly open to working with our sister agencies and the PD and DOT on any safety issues that come and, and like you said, to make sure that workers really know where they go to get these resources, how they go and file reports, how they can, um, let us know like where the trouble areas are so that we can work together to make sure that those are, those concerns are being addressed.

CHAIRPERSON AYALA:  And just to clarify, because I'm not sure [inaudible] existing worker protection laws that delivery workers are covered by?

ACTING COMMISSIONER ABELES:  No, that's something that we're looking into.  Our current workplace protection laws really tend to skew towards the traditional employment model, like, like I mentioned, other than Freelance Isn't Free, um, which, you know, we worked very closely with Council

COMMITTEE ON CONSUMER AFFAIRS AND                          50
BUSINESS LICENSING

Member Lander on.  Um, most of the work that we have done, you know, tends to apply to a traditional employment model, so with the independent contractors we would have to look at, you know, what kinds of protections, um, make the most sense and how do you implement that in this kind of industry.

CHAIRPERSON AYALA:  Um, can you explain how [inaudible] in relation to [inaudible] can you explain how the [inaudible] about the [inaudible] family workers?

ACTING COMMISSIONER ABELES:  I'm so sorry, I only caught the first part.  I know you're talking about the restaurant surcharge bill, but I didn't hear the exact question.

CHAIRPERSON AYALA:  Can you explain how that and cash wages work for restaurant workers?

ACTING COMMISSIONER ABELES:  Oh, sure. So the legislation, um, that requires tipped workers, ah, as defined by New York State code be provided at least the minimum wage, not including their tips.  So we think that currently the back of the house workers should already be receiving the minimum wage.  Tip sharing, which could benefit the back of the house workers, is currently prohibited by the state, and so

COMMITTEE ON CONSUMER AFFAIRS AND                    51
BUSINESS LICENSING

we've called upon the state to address that inequality. Um, we think that, you know, because we've advocated for so long for an end to that two-tier wage system, um, you know, we're looking forward to working with the council on this particular bill. Currently the Law Department is also reviewing, um, and we want to circle back, ah, once they've done their analysis, ah, to make sure that this bill has the intended impact, which is that if you charge the surcharge then you are also making sure that you are paying people properly and at least the minimum wage.

CHAIRPERSON AYALA:  Absolutely.  Do you have [inaudible] this bill will create any, ah, type of pay, ah, discrepancy between front and back, ah, of the house staff?

ACTING COMMISSIONER ABELES:  You know, it's possible.  I think that, again, we would, um, call upon the state to really take action here so that, um, all the, all the workers are paid appropriately and at least get the minimum wage.  Um, again, I think that, you know, we'll work with the Law Department and with the council, um, to see what the impact of the bill might be.

COMMITTEE ON CONSUMER AFFAIRS AND                    52
BUSINESS LICENSING

CHAIRPERSON AYALA:  Thank you.  Um, and then has [inaudible] has DCWP received any, ah, customer inquiries into the current COVID-19 recovery surcharges permitted under Local Law 100?

ACTING COMMISSIONER ABELES:  Sure.  So since the COVID surcharge was implemented in October 2020 to support struggling restaurant owners, and we do know that restaurants were particularly hard hit by the pandemic, um, DCWP has been responding to complaints related to restaurant surcharges, although it doesn't always, the complaints don't always specifically reference the COVID, ah, surcharge.  It could be that restaurant labeled it differently, um, but we have issued only two violations where the restaurant actually specifically referenced the COVID surcharge.  But we've done, ah, dozens of inspections to check on that.

CHAIRPERSON AYALA:  Ah, OK.  Ah, [inaudible] I am [inaudible] my colleagues and I see that Council Member Reynoso has raised his hand.  So I will allow, ah, council member questions.

SERGEANT AT ARMS:  Starting time.

COUNCIL MEMBER REYNOSO:  Thank you, Chair.  Um, just wanted the, ah, it seems like there

COMMITTEE ON CONSUMER AFFAIRS AND                      53
BUSINESS LICENSING

is a, an agreement between all of us that we should be doing something, ah, to help the back of the house workers that don't receive any tips.  It seems like it's something we agree with.  Ah, but you're saying that we should leave it to the state to take care of it, or that it might be a state issue.  Um, but should we, should we find that we can do something, that your Law Department agrees that what we're asking for is legal and can be done and we are not preempted by the state, then it is my understanding that you would be supportive?  Because it achieves the goals that we've all set forth for you?

ACTING COMMISSIONER ABELES:  I, I certainly and the agency, the administration, certainly supports the intent of this bill.  I think what we wanted to make sure is that in our analysis that it does have its intended impact and I think my references to the state are really, um, to, to note just their role in setting, um, the minimum wage throughout the state and also to enforce, ah, that the minimum wage is being paid to workers.  And so for us we certainly look forward to working with the council and the Law Department, um, on other approaches to the get to the same ending place, which

COMMITTEE ON CONSUMER AFFAIRS AND                54
BUSINESS LICENSING

I think we all certainly agree on that workers should be getting at least the minimum wage.

COUNCIL MEMBER REYNOSO:  Yeah, but, um, what other approaches is there to guaranteeing that tipped workers get a minimum wage?  'Cause what we did, ah, and I just wanted to let the council like just be aware, what we did was we allowed for restaurants, um, one second, we allowed for restaurants to get an increase in how much money they bring in, how much revenue they bring in, um, and after getting that done, um, there was no increase, no opportunity to get into the tipped workers and to the people in the back of the house.  We solely assisted the restaurants, um, and, and that's, that's an issue.  Um, one, I don't the surcharge we put out actually was used by restaurants and I don't necessarily think that restaurants [inaudible] was helpful in any way.  Um, you know, the outdoor dining bill was more of a way to help restaurants than these, than these surcharges.  I don't think these surcharges are actually helpful to restaurants per se.  Um, but if we're gonna look out for the restaurants, which I think we should be doing and allowing for the surcharge to exist if they think

COMMITTEE ON CONSUMER AFFAIRS AND                     55
BUSINESS LICENSING

it's of value, but why not also take care of the workers that were working during COVID?  Um, and we're like, frontline workers, having to put on masks and put their lives in danger and receive the same pay that they were receiving prior to, ah, prior to COVID.  Ah, there was a higher risk with no reward, um, while we're looking out for the interest of the business, which I think is important and I don't want to take that away from them.  We should also be looking out for the workers.  So I just want to know again if we're able to achieve the goals that we're setting forth, um, which is to help these tipped workers and it is legal, what the intent of the bill is actually legal, then what I'm understanding is that the city would have no objections.

ACTING COMMISSIONER ABELES:  Well, I think that part of what you're raising is that, um, workers also have to complain oftentimes that they're not getting paid properly.  With respect to how broadly the COVID surcharge was used, that's also, that's an interesting question.  I actually don't know how broadly it was used and, and perhaps the council has more data on that.  Um, but, yes, if, if after the Law Department's review we certainly

COMMITTEE ON CONSUMER AFFAIRS AND                    56
BUSINESS LICENSING

support the intent of this because we do want to see people get paid properly. You know, at the moment, it's really incumbent upon workers to make sure that, you know, and if they do reach out to our office, I want you to know that we will, you know, work with them and make sure that they have the information that they need, ah, to be able to, even, even if we can't anything about it at the moment we will refer them out to the right place, um, so that they do get support and help, because we do agree with you that, you know, these workers have been working throughout the pandemic, um, and that they should be paying at least the minimum wage, um, and, and it's, it's a balance of supporting both the restaurants and also their workers.

COUNCIL MEMBER REYNOSO: And, and the last thing I would say is that we have something called the itemized, itemized pricing that exists for restaurants, um, that, I mean, for supermarkets. Um, it's not a bill that we have on the docket. There is a bill that existed in a time when, ah, when we had no scanners, right. There was no scanners so we had to put a price on every single item. Now that we have scanners it doesn't make any sense. If we want

COMMITTEE ON CONSUMER AFFAIRS AND                  57
BUSINESS LICENSING

to help businesses and supermarkets and bodegas this is the, um, most often and commonly used fine by DCA for restaurants, ah, for bodegas and supermarkets which have, that, that has no more value because everything we do or we've done moving forward is technology based, it's just scanned.  A scan will also scan the correct item and always make sure the price is correct, um, and I just...

SERGEANT AT ARMS:  Time expired.

COUNCIL MEMBER REYNOSO: ...[inaudible] we should think about, and I hope DCA can be supportive on getting rid of, um, the number one fine being given to restaurants and bodegas in a time when we need to be looking out for businesses, not hurting them.  But, um, thank you so much for listening your first time.  I really appreciate being here, um, and I appreciate you answering all of our questions. Thank you so much.

ACTING COMMISSIONER ABELES:  Absolutely, and we're open to working with the council on, on making, ah, updates like that.  So thank you for that.

COUNCIL MEMBER REYNOSO:  Thank you. Thank you, Chair.

COMMITTEE ON CONSUMER AFFAIRS AND                    58
BUSINESS LICENSING

CHAIRPERSON AYALA:  Thank you, ah, Council Member Reynoso.  Um, Mr. Ettannani, did you have a question?  Did you have something that you wanted to add?  No?  Steven, no questions?  OK.  All right.  Thank you.  Um, I just have two, two final questions.  So regarding Intro 2289, um, obviously there's been some concerns.  Could, could the ability to opt out of the [inaudible] delivery in certain New York City, ah, neighborhoods?  Is that a concern?

ACTING COMMISSIONER ABELES:  You know, I think that alto 2289, it could definitely be a key safety protection for delivery workers.  As you mentioned, there are definitely safety concerns that delivery workers have when they have to travel so far, um, and under time pressure to really maximize the efficiency of their deliveries.  We're not entirely sure how the platforms dictate, you know, the trips that delivery workers take or how they set those routes, or under what conditions.  So I think, you know, we would need to learn more about how, ah, what the parameters are, um, that the different platforms allow you to set and then see, you know, what the potential, ah, ramifications of that would

COMMITTEE ON CONSUMER AFFAIRS AND                    59
BUSINESS LICENSING

be.  So I think it's too soon probably to answer your question.

CHAIRPERSON AYALA:  I, I would imagine that the same is, is true of the next question, but I have to ask anyway.  Um, does, does the bill also prohibit [inaudible] number of trips [inaudible] deliveries [inaudible] with the parameters the workers have set?  Does DCWP foresee any issues pertaining whether or not the number of trips offered is less than what it should be?

ACTING COMMISSIONER ABELES:  Well, I think, again, we would want to learn more about how the apps operate, because, for example, if you were to set certain parameters but they're too restrictive, then that in and of itself could limit the number of trips that you might take, and so learning how the apps operate and how much, ah, leeway a driver has to set those parameters would be really important for us, um, before we recommend, um, which ways would, would really fulfill the intent of the bill.  I hope that helps answer your question.

CHAIRPERSON AYALA:  Yeah, ah, thank you.  I am not sure if we have any council members with questions.  Um, I don't see any.

COMMITTEE ON CONSUMER AFFAIRS AND                    60
BUSINESS LICENSING

ACTING COMMISSIONER ABELES:  And, Chair, I just want to add, you know, thank you so much again for having us participate in this hearing.  It's, these issues are really important and we value, ah, this opportunity to bring to the forefront the, the hard work and the sacrifices that the delivery workers have made and we look forward to working with you on figuring out some of the details, um, and how we can support, ah, the intent of all these bills.

CHAIRPERSON AYALA:  And we appreciate you willing to want to be a partner in this.

ACTING COMMISSIONER ABELES:  Absolutely.

CHAIRPERSON AYALA:  I actually have no further questions.  Assuming that there are no other, ah, council members with questions I will turn it over to [inaudible].

COMMITTEE COUNSEL:  Thank you, Chair.  Um, we will now turn public testimony.  I'd like to remind everyone that unlike our typical council hearings we'll be calling individuals one by one to testify.  Each panelist will be given two minutes to speak.  Please begin once the sergeant has started the timer.  Council members who have questions for a particular panelist should use the raise hand

COMMITTEE ON CONSUMER AFFAIRS AND                          61
BUSINESS LICENSING

function in Zoom and I will call on you after the panelist has completed their testimony.  For panelists, once your name is called a member of our staff will unmute you and the Sergeant at Arms will give you the go-ahead to begin upon setting the timer.  Please wait for the sergeant to announce that you may begin before delivering your testimony.  I would like to now welcome Angelo Cucuzza to testify, followed by Gustavo Ajche, then Ligia Guallpa. Angelo?

SERGEANT AT ARMS:  You may begin.

ANGELO CUCUZZA:  [inaudible] council members.  My name is Angelo Cucuzza and I am the organizing director of the Transport Workers Union of America, speaking on behalf of our 150,000 members across the country.  I'm here today to testify in full support of Los Deliveristas Unidos and all New York City app-based worker food delivery workers. Our union leadership stands alongside these workers and their demands for dignity and respect while providing an essential service to both their customers and the restaurants who feed our city. These food delivery workers have worked tirelessly with many of you to see introduction of a series of

COMMITTEE ON CONSUMER AFFAIRS AND                    62
BUSINESS LICENSING

bills targeting the services they provide, and TWU is providing testimony today to ensure that these bills or any other food bills that come forward for food delivery workers see their way to the full council for, for a vote as soon as possible.  Of particular interest to our labor organization is Bill 2298, which seeks to require food establishments to provide toilet facility access to delivery workers.  It is almost absurd that in 2021 there would be a need for such a mandate and there's absolutely no reason why this bill should not be passed unanimously by the council.  It is ridiculous that in an almost post pandemic world we actually have members on community boards, like Community Board 7 of the Upper West Side of Manhattan refusing to support such a bill for fear of upsetting restaurant owners who take for granted the services food delivery workers provide to them and their so-called customers.  When you have community boards out there who think that food delivery workers should not be using a toilet the apps have won.  TWU members, whether a New York City bike share mechanic, an airline baggage handler like myself, or a subway train operator are not unlike food delivery workers.  We are all essential and as a

COMMITTEE ON CONSUMER AFFAIRS AND                63
BUSINESS LICENSING

result we expect restaurant and bar owners to truly value the services being provided by app-based food delivery workers.  They risked their lives working throughout the pandemic to feed New Yorkers and they continue to do so as businesses bounce back.  The least restaurant owners and staff can do is allow them to use the bathroom when needed before picking up food they will deliver on their behalf.  As a lifelong Brooklyn resident, I am...

SERGEANT AT ARMS:  Time has expired.

ANGELO CUCUZZA: ...[inaudible] waste another day in passage of these six bills.  Thank you.

COMMITTEE COUNSEL:  Thank you, Angelo. Before we continue, I see State Senator Jessica Ramos has joined us.  Um, Senator Ramos, would you like to testify, please?

STATE SENATOR RAMOS:  Hi, good afternoon. Yes, I'd be honored.  Thank you so much for having me.  Ah, good afternoon to everyone, committee Chair Diana Ayala and members of the Consumer Affairs and Business Licensing Committee.  I'm New York State Senator Jessica Ramos and I represent the 13th District in Queens, where the largest concentration

COMMITTEE ON CONSUMER AFFAIRS AND                    64
BUSINESS LICENSING

of food and hospitality workers in New York resides. Many of my neighbors work as deliveristas, which proved to be an essential service throughout the pandemic and I'm thankful we're having this important conversation today that will surely lead to improvements in their work lives.  Since I have been in office I have introduced and passed legislation to legalize the main tool of their trade, e-bikes, in the state legislature, and most recently have championed legislation to bring cargo bikes to our streets as a means to reduce truck traffic and therefore carbon emissions in our air with the added benefit of addressing occupational injuries and illnesses that arise from long-term, literal back-breaking work in the delivery industry.  Deliveristas are my neighbors and the backbone of my community. Their safety and their autonomy is my number one concern.  Over the past two weeks Door Dash, Uber, Seamless, Grub Hub, and other delivery apps have schemed to introduce legislation behind the backs of these workers.  They want to amend our state labor laws to thwart their rights on the job under the guise of collective bargaining.  One of the most egregious parts of the so-called Right to Bargain

COMMITTEE ON CONSUMER AFFAIRS AND                    65
BUSINESS LICENSING

bill is that it undercuts delivery workers' local organizing efforts, and I am here in support of deliveristas' right to organize on the city level and their fight to set limits on their travel, to a living minimum wage, to transparency in salaries and tips, access to bathroom, to provisions of equipment, like insulated food bags, and certainly the means to recover stolen wages.  Most workers have managers to supervise them.

SERGEANT AT ARMS:  Time has expired.

STATE SENATOR RAMOS:  But deliveristas are disciplined by an algorithm.  Currently if a worker denies making a specific trip they run the risk of being deactivated by the app for an undetermined amount of time.  There are no clear guidelines on this and there's no formal process to change it.  So Intro 2289 by Council Member Brannan will allow these workers to put their protection and safety above the bottom line of these apps.  I also call on the City Council to pass Council Member Lander's Intro 2294 so deliveristas can make a living wage.  Just like in 2018, when the city set a minimum wage for app-based drivers the city's initiative to set the minimum wage for deliveristas allows for a

COMMITTEE ON CONSUMER AFFAIRS AND                    66
BUSINESS LICENSING

true accounting of our city's unaffordability.  Right now there's no rhyme or reason set for how much workers will be paid per trip, and there are no guidelines from the government that specifics deliveristas pay.  I also support Intro 2288 by Council Member Brannan to provide equipment to deliveristas to perform their job, and Intro 2296 by Council Member Menchaca to eliminate fees and hurdles for workers to receive their tips.  It really is a moral failing on the part of the delivery industry that we actually need to legislate, how, how to allow deliveristas to use restrooms in the restaurants they are picking up food from.  It's an utter embarrassment that we need to legislate basic human dignity, but that's what Council Member Rivera is doing in Intro 2298.  None of your efforts here in the City Council would be possible if app companies get their way with that so-called right to bargain bill they want to introduce to the state legislature.  Drafts we've seen destroy the right for cities to improve their labor stands, preventing bodies, such as your own, from passing any legislation that relates to app-based companies regarding, and I quote, "all matters."  It is my hope that if and when

COMMITTEE ON CONSUMER AFFAIRS AND                    67
BUSINESS LICENSING

this dangerous piece of legislation is officially introduced you will continue to stand shoulder to shoulder with me and my neighbors, the deliveristas, to stop them.  I applaud the City Council Committee on Consumer Affairs, Chair Ayala, and Council Members Rivera, Lander, Menchaca, and Brannan for working directly with the deliveristas to sponsor these bills, and I preemptively thank all the council members who will vote in their favor.  Thank you.  Thank you all for caring about my neighbors.

COMMITTEE COUNSEL:  Thank you, Senator.  I see Council Member Lander has his hand raised.  Council Member?

COUNCIL MEMBER LANDER:  Senator, I just want to make sure that we thank you for being such a champion of your neighbors and all our neighbors and those workers up there.  You know, as you noted, if that legislation that has not yet been introduced would pass many of the pieces of legislation we're hearing today would be preempted.  I know for certain that my bill to set a minimum pay standard would be, and your courage and voice and just tireless fighting on behalf of workers in general, ah, and today on behalf of delivery workers really, ah, stands out.

COMMITTEE ON CONSUMER AFFAIRS AND                    68
BUSINESS LICENSING

And then that you would come to our hearing, you know, and pay us the honor of, ah, talking with us about the laws we're considering, ah, we really appreciate it.  So thank you for being a champion up there.

STATE SENATOR RAMOS:  Oh, thank you, Council Member Lander.  Look, we have to stick together for those of us who truly believe in worker power and their ability to organize for themselves, I want the City Council to be able to protect them in these ways.  It's important that the City Council has the power to do this.  Our cost of living is just so high here in New York that their pay really should not be determined by their employers, especially when they have no real union to represent them.  So, thank you all for your efforts.

COMMITTEE COUNSEL:  Thank you, Senator, for joining us.  Next we will call on Gustavo Ajche, followed by Ligia Guallpa, and then Teodora Flores.  Gustavo?

SERGEANT AT ARMS:  You may begin.

GUSTAVO AJCHE:  [speaking in Spanish]...

SERGEANT AT ARMS:  Time expired.

GUSTAVO AJCHE:  ...[speaking in Spanish].

COMMITTEE ON CONSUMER AFFAIRS AND                69
BUSINESS LICENSING

UNIDENTIFIED: I'm gonna be briefly translating.  Ah, my name is Gustavo Ajche and a [inaudible] worker member of the Workers Justice Project and leader of [inaudible].  Today [inaudible].

GUSTAVO AJCHE:  [speaking in Spanish]

UNIDENTIFIED:  [inaudible], ah, kept the city running.  We have been applaud as essential workers.  But that's not enough for us.  [inaudible] we need to [inaudible] the first package of legislation that will make our work more dignified and more respected.  We hope, we hope to get your support since this package of policies will guarantee some protections for us.  The workers who are delivering your food, your medicine, your groceries, you're essential.  These apps have become more popular every day.  There is a lot more to do to make our labor more dignified.  We deserve protections because we are the essentials who are on the front lines of this pandemic.  But still delivering your food, your essentials, despite a change [inaudible] weather condition.  It is time for the city to recognize us as essential with action, not with words.  The passage of the legislation is the first

COMMITTEE ON CONSUMER AFFAIRS AND                    70
BUSINESS LICENSING

step to guarantee the respect that we deserve and also ensure that there is more transparency in the payment of our tips.  Certainly I have seen this irregularity of these apps.  It is frustrating to see how these apps are, are disappearing our tips, and for the restaurants, and for the restaurant systems to show us something different than the apps.  It is hard to see that the customer's gratuity doesn't get to, into our account.  Many of my coworkers don't have the courage to report this irregularity because of the fear they have when it comes to confronting this company.  But here we are on behalf of them making visible our reality with these apps.  The, the summer is, the summer season is, is very hard for food delivery workers, who struggle and we barely make enough to cover our daily expenses.  I have actually made little as $30 a day working from 7:00 a.m. ...

SERGEANT AT ARMS:  Time has expired.

UNIDENTIFIED:  ...to 8:00 p.m. These apps manipulate the algorithm to their benefit, without any consideration of concerns about our reality in working conditions.  At the end of the day we are disposable labor.  When they, when they no longer

COMMITTEE ON CONSUMER AFFAIRS AND                    71
BUSINESS LICENSING

need us they deactivate us without reason, without any kind of explanation.  For this reason we are organizing as the Delivery Workers United, and won't be silent in this.  Today you have the opportunity to, um, listen to, to us, the essential workers, with actions, not with words.  We look forward in passing this legislation that will continue to provide protections to the essential workers of New York City.

UNIDENTIFIED:  Thank you.

COMMITTEE COUNSEL:  Thank you for your testimony.  Next we have Ligia Guallpa, ah, Teodora Flores, and then Saru Jayaraman.  Ligia?

SERGEANT AT ARMS:  Your time will begin.

LIGIA GUALLPA:  Um, yeah, here I am, sorry.  Technology and translation [laughs].  Um, so my name is Ligia Guallpa.  I am the executive director of the Workers Justice Project, a workers' rights organization that represents New York City food delivery workers, house cleaners, day laborers, and essential workers, who are placed, who are playing an irreplaceable role in our city's recovery.  Since last year Workers Justice Project has been responding to the most basic human needs of app-based

COMMITTEE ON CONSUMER AFFAIRS AND                    72
BUSINESS LICENSING

food delivery workers, who were left to survive without economic relief, without unemployment insurance, without health insurance, without [inaudible], without workers' comp, and most importantly, without essential workers' rights protection. We have been witnessing how New York City's most essential workers are dehumanized and treated as disposable labor. As delivery workers we're invisiblized by this pandemic. WJP has been lifting up their dignity by helping them band together as Los Deliveristas Unidos, or the Delivery Workers United. For more than a year, New York, New Yorkers, including yourselves, have been relying on apps like Door Dash, Grub Hub, Uber Eats, and others to transport your food, your medicine, your groceries, and other essentials. But what these apps have failed to tell you is that their delivery drivers are not paid a living wage. I'm, I'm told not to ask for a restroom when they pick up your food, and I'm working in constant fear of being deactivated or terminated for demanding better working conditions. These tech companies are making billions in pandemic profits by stealing the tips of delivery workers and charging high percentage fees

COMMITTEE ON CONSUMER AFFAIRS AND                    73
BUSINESS LICENSING

from your local restaurants and for consumers like yourselves. The truth is that delivery workers are barely, are barely able to feed their own families, pay their rent, by mostly relying on tips as a form of wage. As delivery apps keep expanding their market to deliver groceries, medicine, and other essentials workers are becoming victims of ruthless exploitation that puts our lives at risk with no guarantee of payment in case of death or serious injury, or no protection against unsafe working conditions. When a delivery worker gets injured or dies while on duty with their...

SERGEANT AT ARMS: Time has expired.

LIGIA GUALLPA: Um, most of these workers have to pay for all their medical costs. I'm just gonna end like this. There has been 11 workers, invisible heroes, who were killed this past year while delivering the food for New York food, for New Yorkers. And I, it is important to not, it is important to mention their names, and I'm gonna briefly just mention because their names cannot be invisiblized. Juan Cruz, Victoria Filaro Guzman, Adrianco Yot, Juan Luciguago, Alejandro Santos Estamiga, Michael Baturta Larino, Estelle, Ernesto

COMMITTEE ON CONSUMER AFFAIRS AND                          74
BUSINESS LICENSING

Icedora Guzman, Martin Morel, Francisco Hilgaba, Reynaldo Rodriguez, Luz Alvarado.  These are just some of the voices that were invisiblized by the apps, who continuously exploit and put at risk the livelihood of New Yorkers who live in work in our city as essential workers.  Now would you listen to them?  Would you honor and protect them by passing this six landmark proposals that will set an example for the rest of the country?  We look forward to working with you.  Thank you.

COMMITTEE COUNSEL:  Thank you, Ligia. Next we have Teodora Flores, Saru Jayaraman, and then Candis Tolliver.  Teodora?

SERGEANT AT ARMS:  Your time will begin.

TEODORA FLORES:  Hello.  My name is Carlton Anders and I currently work at Chick-fil-A. And I have been in the fast food industry for the past two years.  I'm here today to offer my support and solitary to the, to the delivery staff workers and the fight for dignity before the City Council. Fast food workers like myself share many of the same struggle with delivery workers and we are united in our fights for worker rights.  At my store I see how stressed our delivery workers are when it comes to

COMMITTEE ON CONSUMER AFFAIRS AND                          75
BUSINESS LICENSING

pick up orders and I see how hard their job is. Like them, I am also a front-line worker during the pandemic, like my job as a fast food worker is very taxing and physical. For instance, my feet and my back often hurt after a long week. And just like delivery drivers here today, fast food workers have been fighting throughout the pandemic in the hope that we can change our lives and our jobs for the better. Over the last year fast food workers has organized at restaurants throughout the city and testified before this very council and it paid off. This past December the council voted to past groundbreaking Just Cause legislation that provides me and my coworkers with protections on the job that we did not have before. Now all of a sudden we no longer have to fear being fired without a reason. Now we have rights. Fast food and delivery are two sides of the same coin. Together we have braved the worst days of the pandemic, setting aside our own safety to feed all types of New Yorkers. I am grateful to the council for the solitary you have shown to the, for fast food workers of New York City. Today here delivery drivers near the same solitary. Because when you get down to it their demand is

COMMITTEE ON CONSUMER AFFAIRS AND                 76
BUSINESS LICENSING

ultimately the same as ours, safety and justice for the essential workers who kept this city going through the worst pandemic we ever seen.  Thank you, and God bless.

COMMITTEE COUNSEL:  Thank you, Carlos. Next up we have Saru Jararam, ah, Candis Tolliver, and then Russell Jackson.  Saru?

SERGEANT AT ARMS:  Your time will begin.

SARU JAYARAMAN:  Hi, everybody, and thank you so much, ah, Chair Ayala, Council Member, ah, Reynoso, the champion of our bill, Council Member Lander, who's the champion of all workers all the time, and all of you who are, ah, fighting so hard for so many different workers.  I want to definitely first start by saying with stand in solidarity with the deliveristas and their struggles today.  Kudos to them, for their courage.  I'm here to speak today on Intro 2163 about tipped workers.  Ah, first who say who tipped workers are, because I think quite often the Restaurant Association confuses us.  Ah, over two-thirds of the tipped workers in New York are women.  Over 75% are immigrants.  They are overwhelming people of color, mostly women of color, working in very casual restaurants, Ihops, Denny's,

COMMITTEE ON CONSUMER AFFAIRS AND                77
BUSINESS LICENSING

mom and pop diners across New York City.  They mostly do not work in fine dining.  And even prior to the pandemic the sub minimum wage, which is a direct legacy of slavery, a way for the industry to hire black people at emancipation and not pay them anything has been a source of incredible poverty and sexual harassment for a mostly female workforce that has to tolerate inappropriate customer behavior to get tips to make up their base wage.  To clarify and answer the question that was asked earlier, I don't think it was clearly answered, tipped workers get a sub minimum wage of $10 in New York and tips are supposed to bring them to the full minimum wage, but often don't.  In fact, Obama administration reported an 84% violation with regard to tips bringing people to the full minimum wage.  Now, during the pandemic the situation got so much worse.  Workers reported that tips went down 50% to 75%, and health risks, hostility, and harassment went way up with hundreds of New York women reporting that they were asked repeatedly by male customers to take off their mask so men could judge their looks and their tips on that basis, a life-threatening situation, and frankly disgusting.  Well intentioned, the surcharge bill

COMMITTEE ON CONSUMER AFFAIRS AND                    78
BUSINESS LICENSING

that the city passed to support struggling restaurants has hurt these workers.  We surveyed several hundred earlier this year.  33% of New York City workers report that their...

SERGEANT AT ARMS:  Time has expired.

SARU JAYARAMAN: ...restaurant employers using the surcharge and 60% of those workers say their types have been cut in half by the surcharge. This bill would solve that problem by requiring employers, providing them more than enough to cover the wage increase and requiring employers to pay these workers a full minimum wage, like every other worker, in every other industry.  And by the way, that is what workers are calling for before they come back to work.  We surveyed 3000 workers.  53% say they're leaving the restaurant industry.  78% say the only thing that will make them come back is a full livable wage with tips on top.  And so it has to be understood this bill is not just important to protect workers who got hurt by a surcharge bill that the council passed, it's also essential to allow the New York City restaurant industry to reopen.  The speaker's lawyers have said that it's legal.  The city, City Hall lawyers have said that it's legal.

COMMITTEE ON CONSUMER AFFAIRS AND                    79
BUSINESS LICENSING

In fact, the mayor ran a similar program already that was declared legal. There is no legality issue here. There is an inertia issue here and the inertia has led to workers who you all care about, I know, being hurt by a well-intentioned bill that has cut their tips in half. Every day that goes by their tips get cut by the surcharge and we need you, please, to rectify it through Intro 2163. Biden has made ending the sub minimum wage a top priority. New York City can lead. New York City Council can lead by first saying if you're gonna have the privilege of adding a surcharge you must have the requirement to protect workers, paying them a full livable wage with tips on top.

COMMITTEE COUNSEL: Thank you. I see Council Member Lander has his hand raised. Council Member Lander?

COUNCIL MEMBER LANDER: Thank you. Just a very quick question. Saru, thanks for, for being here. Are there other cities, ah, that have taken some actions, you know, obviously we want the state to move forward, ah, to one fair wage, but, you know, and we'll all keep pushing for that together. But in the interim I like this idea of us taking a step here

COMMITTEE ON CONSUMER AFFAIRS AND                                80
BUSINESS LICENSING

and I praise Council Member Reynoso for his bill. Are there other cities that have similarly taken some kind of action in the absence of state action to push forward?

SARU JAYARAMAN:  Absolutely, absolutely. Well, first of all, cities that are able to go to one fair wage, some have done it.  Flagstaff, Arizona moved to one fair wage.  Ah, but in, during the pandemic multiple cities created programs to provide restaurant owners with privileges or benefits if they moved to full minimum wage with tips on top.  Chicago provided a big program called High Road Kitchens, where they provided cash grants to restaurants, like some form of revenue if they transitioned to a full minimum wage.  Detroit did the same exact thing.  Ah, Boston, we worked with Mayor Walsh, who's now become Secretary of Labor, to institute a similar program. He used stimulus funding to provide cash grants to restaurants if they commit to moving to one fair wage.  As you all know, New York City worked with us to do the same thing and this would be an extension of that program, which is to say restaurants are right now voluntarily moving to one fair wage because they have to, to get workers to come back to work.

COMMITTEE ON CONSUMER AFFAIRS AND                    81
BUSINESS LICENSING

There's a massive shortage.  We're not calling it a worker shortage.  It's a wage shortage.  It's workers saying we won't go back without full minimum wages. So New York City realized that and has been rewarding restaurants for moving in this direction.  This surcharge bill would be an extension of that.  Let's reward restaurants that are willing to move already voluntarily in this direction by allowing them to have some additional revenue through the surcharge. And let's ensure that the surcharge that already exists, a COVID surcharge, has protections built into it, because right now employers can use that surcharge for anything.  As Council Member Reynoso said, there is a lot of concern.  You rightfully wanted to help restaurants.  You've got to ensure workers are protected and help workers as well.

COUNCIL MEMBER LANDER:  Thank you.

COMMITTEE COUNSEL:  Thank you, Saru. Next we have Candis Tolliver, followed by Russell Jackson, and then Jessica Wong.  Candis?

SERGEANT AT ARMS:  Your time will begin.

CANDIS TOLLIVER:  Hi, good afternoon. Um, good afternoon, Chair Ayala and members of the committee.  My name is Candis Tolliver and I'm the

COMMITTEE ON CONSUMER AFFAIRS AND                    82
BUSINESS LICENSING

vice president of SEIU Local 32BJ.  32BJ is the largest building service union in the country with over 85,000 of our members living in New York City metro area.  32BJ supports Intro 2288, 2289, 2294, 2296, and Intro 2298.  These bills provide needed and overdue reforms that will improve the working condition of one of our most important yet vulnerable workforces.  These bills would ensure that, one, the cost of insulated food delivery bags are not passed on to the workers; ah, two, give workers control over the maximum distance they will travel in a work time;, ah, three, establish a method for determining minimum pay; and four, provide bathroom access, sorry, and number five, prevent fees from being charged to the workers for receiving their pay.  Food delivery workers have played a crucial role in the pandemic.  Um, while many of us were sheltering in place, New Yorkers were venturing out into the restaurants and into our apartment buildings, putting their lives at risk to keep us fed.  Food delivery workers also played a crucial role in keeping restaurants open, thus saving many small businesses and restaurant jobs.  These are basic human rights that all workers deserve.  Despite these important

COMMITTEE ON CONSUMER AFFAIRS AND                    83
BUSINESS LICENSING

roles, food delivery workers find themselves without many of the protections that most workers take for granted, such as being, being protected by a [inaudible] on compensation and even having access to a bathroom.  Food delivery workers are a workforce composed of multiple people of color and immigrants. Thus, it is not surprising that just like other similar, similarly situated workers, farm workers and domestic workers, sorry, I was getting while I was talking, um, farm workers and domestic workers, they have been treated as less than...

SERGEANT AT ARMS:  Time has expired.

CANDIS TOLLIVER: ...[inaudible].  Were you talking to me?  I'm sorry, I heard a voice.

CHAIRPERSON AYALA:  No, you can finish.

CANDIS TOLLIVER:  Keep going, OK. However, today the council has an opportunity to recognize these workers, ah, that these workers are essential workers, and are deserving of protection of the law.  32BJ looks forward to working with the workers, advocates, stakeholders, and the council on finalizing these important policies.  I particular want to emphasize how important it is for the city to give itself the power to collect and analyze data as

COMMITTEE ON CONSUMER AFFAIRS AND                    84
BUSINESS LICENSING

it seeks to formulate protections for delivery and other gig workers.  Lastly, I want to thank Los Deliveristas Unidos and the Workers Justice Project for their efforts to improve working conditions for food delivery workers.  Thank you.

COMMITTEE COUNSEL:  Thank you, Candis.  Next up we have Russell Jackson, followed by Jessica Wong, and then Andrew Rigie.  Russell?

SERGEANT AT ARMS:  Your time will begin.

RUSSELL JACKSON:  Hi, yes, um, my name is Russell Jackson.  I am the chef owner of, ah, Reverence in Harlem.  Um, New York needs restaurants.  And restaurants need customers.  Without the staff, all the customers in the world won't matter.  Ah, 50% of workers say that they're leaving the industry because they view jobs as exploitive and a two-tiered wage system perpetuates that.  Ah, lots of restaurant owners, they want to do the right thing, like we do, and pay good wages.  The low-road employers are short-sighted, don't have a full understanding of the long-term aspect of what they're, what they're doing to the industry.  They continue to leverage, ah, the poverty-level wages to drive down, ah, the understanding and true cost of food and hospitality

COMMITTEE ON CONSUMER AFFAIRS AND                     85
BUSINESS LICENSING

in the minds of the consumers, putting high-road employers at a competitive disadvantage. This surcharge and support of this surcharge sends several signals. To the workers it sends, it sends information that the employers are committed to fair wage practices and that these are good jobs. To the consumers, it allows them to understand that there are charges are going to higher wages, an investment in improved working conditions for all of their staff. To Albany and, and where they have failed to support the restaurant workers, the city needs to lead the way, and I've been fighting for this well over since 2009 and my time in San Francisco, and now I'm here in New York. It's imperative that the city takes the initiative to be the first in on this. We can lead the way in the right way and make sure that the rest of the country is following us. Thank you.

COMMITTEE COUNSEL: Thank you, Russell. Next we have Jessica Wong, followed by Andrew Rigie, and then Kathleen Reilly. Jessica?

SERGEANT AT ARMS: Your time will begin.

JESSICA WONG: Hello, good afternoon everyone. Um, my name is Jessica Wong and I'm a service industry professional. Um, I work with, ah,

COMMITTEE ON CONSUMER AFFAIRS AND                        86
BUSINESS LICENSING

Best of New York [inaudible], a bar and lounge.  Um, today I'm speaking in support of Intro 2163, sponsored by Council Member Reynoso, which would allow restaurants to permanently add a surcharge if they pay their workers a full minimum wage with tips on top.  The federal government and New York State have offered up billions in restaurant relief to restaurant owners, but restaurants cannot recover without fair relief for the workforce.  We rely on the restaurant industry to help New York State's economy and the rest of our industry depends on its workers.  New York City can take the first step towards raising the wages for tip workers to the full minimum wage with tips on top as an urgent matter to let New York, ah, New York's restaurant industry fully reopen and recover.  While well intentioned, the temporary COVID surcharge policy allowing restaurants to add a surcharge of up to 10%, confused consumers, who believe that the surcharge was going to workers, when in fact it was going to employers.  If they were planning to tip 20%, the 10% surcharge resulted in them tipping an additional 10%.  Intro 2163 would fix it, allowing New York City restaurant owners to permanently add a surcharge of up to 15% as

COMMITTEE ON CONSUMER AFFAIRS AND                    87
BUSINESS LICENSING

long as they pay their tipped employees a full minimum wage with tips on top, instead of the sub minimum wage.  Paying workers a full minimum wage would guarantee a stable base wage regardless of customer reactions to the surcharge.  It would also award restaurants willing to pay the full minimum wage allowing them to bring in increased revenue during the pandemic.  The sub minimum wage was always unjust, but the pandemic made our bad situation worse.  Tips went down and health risks and harassment went up.  Restaurants aren't facing a worker shortage.

SERGEANT AT ARMS:  Your time has expired.

JESSICA WONG:  Thank you so much.

COMMITTEE COUNSEL:  Thank you, Jessica.  Next we have Andrew Rigie, followed by Kathleen Reilly, and then Mikey Knab.  Andrew?

SERGEANT AT ARMS:  Your time will begin now.

ANDREW RIGIE:  Good afternoon.  My name is Andrew Rigie.  I am the executive director of the New York City Hospitality Alliance.  We are a not-for-profit trade association that represents restaurants and nightlife venues in the five

COMMITTEE ON CONSUMER AFFAIRS AND                           88
BUSINESS LICENSING

boroughs.  Today I'm gonna testify on 2311, 2298, and 2163.  On 23ll we strongly support this bill, that would require third-party delivery companies provide customer data to restaurants.  Ah, this would allow restaurants to basically even the playing field, being able to reach out their customers to market to them and really own that delivery, ah, customer, who is their customer.  Currently, by withholding the data the third-party delivery companies have enormous leverage over restaurants, because restaurants can't leave the platform because then essentially they leave their customers, and then the third-party platform will use that customer data to market to competitor restaurants.  So we strongly support this.  This is an urgent bill.  We would just ask that it be slightly amended to also require third-party reservation companies to provide customer data to those restaurants, ah, because it's a similar dynamic there, and we want to commend Council Member Powers on that bill.  Ah, the second bill is related to restaurants being required to provide toilet facility access.  Ah, obviously our delivery workers have been essential heroes throughout the pandemic and it is a common courtesy to provide access to their restroom.

COMMITTEE ON CONSUMER AFFAIRS AND                    89
BUSINESS LICENSING

We surveyed a couple hundred restaurants.  The vast majority of them already did provide access, but we do understand, by speaking with delivery workers and their representatives that that is not always the case.  So while we wish the city had a robust public restroom, ah, network, that is not the case and we support this legislation.  We would just ask for two updates to be made.  One, we'd like to ensure that any...

SERGEANT AT ARMS:  Your time has expired.

ANDREW RIGIE: ...[inaudible] would provide a cure period or a warning before a fine is levied.  And the second is we want to ensure that restaurants, within reason, have the ability to set up a, ah, policy to allow third-party delivery workers to use their restrooms.  And then finally, if I may, real quickly, on the last bill, Chair, may I?  Yes?  Thank you so much.  Um, and then on this COVID surcharge I, I don't have time, obviously, to go over many of the comments, ah, that were made earlier.  I commend, Chef, um, Russell on, ah, his comments.  He obviously should run his business how he sees fit, and being an advocate out there, ah, is something that's really important.  However, the 15% surcharge

COMMITTEE ON CONSUMER AFFAIRS AND                    90
BUSINESS LICENSING

does not work for the vast majority of restaurants from an operational or a financial perspective. Restaurants that want to do surcharges usually fall into two camps. One, a single-digit surcharge, the money goes to gross receipts in the bus. They continue to take the tip credit and that surcharge is used to offset different expenses, which includes wages. The second camp tends to be someone that wants to do an 18% to, say, 25% surcharge in which case the customer usually would not leave a tip. And they would pay a straight hourly wage. In some cases maybe customers would continue to tip. In that case, the tips wouldn't be enough to cover the, ah, tip wage compared to the full minimum wage, so the restaurants would not be taking the tip credit from a practical standpoint. But 15% does not do enough. Losing the tip credit equals a 50% increase in labor cost for tipped workers, plus there are additional expenses associated with not taking the tip credit, which will make it even more devastating for restaurants that are shuttering and really teetering on the edge of survival, particular when the law does require all tipped employees to receive at least $15 an hour. But in most cases they are earning much,

COMMITTEE ON CONSUMER AFFAIRS AND                        91
BUSINESS LICENSING

much more.  And, in fact, throughout the state and just here in New York, the reason the tip credit is in place in many regions is because a worker-led movement to keep the tip credit in effect.  But at 15% it doesn't do much, because if a restaurant does a 15% surcharge and doesn't take the tip credit it's not enough to really offset their expenses and for a consumer, if they see a 15% surcharge they will probably end up tipping less.  And at the outcome you could see tipped workers even making less money as a result.  So we'd say drop this bill or amend it to allow restaurants to do a smaller surcharge where they would still be required to pay $15 an hour minimum wage, but the, the workers can earn more.  Or do a larger surcharge than 15%, say 18% to 25%, in which case restaurants would not take the tip credit. I think that's a much better balance, ah, it's workable, because as is, I've spoken with so many restaurants and at 15% it's just not going to be something that they are going to use.  So I'll leave it at that.  I'm happy to answer any questions, and speak further about these bills.  But, again, we strongly support third-party delivery services providing customer data to restaurants.  We support,

COMMITTEE ON CONSUMER AFFAIRS AND                    92
BUSINESS LICENSING

ah, requiring restaurants to provide toilet facility access to food delivery workers, presuming those two amendments are made, and we strongly appose, ah, repealing the COVID surcharge and implementing a new 15% surcharge unless it's modified to provide more flexibility, so different types of restaurants can implement the surcharge in a way that works for their business.  I want to thank you, Chair, thank you members, for your consideration.  I'm happy to answer any questions.

COMMITTEE COUNSEL:  Thank you, Andrew. Next up we have Kathleen Reilly, followed by Mikey Knab and then Maria Figueroa.  Kathleen?

SERGEANT AT ARMS:  Your time will begin now.

KATHLEEN REILLY:  Thank you, good afternoon, everyone.  My name is Kathleen Reilly with the New York State Restaurant Association and we'd like to use our time today to discuss, um, the Intro regarding data sharing.  Ah, other comments we'll in writing after the fact that there's a lot on the table today.  Um, the pandemic has exacerbated so many dynamics in our industry, but in particular restaurants' relationships with food delivery

COMMITTEE ON CONSUMER AFFAIRS AND                    93
BUSINESS LICENSING

platforms have grown all the more important over the last 16 months.  When our city's eateries were closed for on-premise dining and limited to outdoor dining and strictly capacity restricted for indoor dining, restaurants relied up take-out and delivery orders to keep any amount of cash flow coming in.  Take-out and delivery sales could not make up for the losses sustained from pandemic limitations, though.  In a survey we conducted in partnership with the National Restaurant Association earlier this year we found that increased take-out and delivery orders made up for under 30% of lost on-premise business for most restaurant operators.  Yet restaurants were still forced to rely on take-out and delivery in order for their businesses to survive until the reopening, and in many cases that placed restaurant operators in a difficult, can't live with it, can't live without it position towards the food delivery platforms. Thankfully, the City Council took the responsible step last spring to set some boundaries on the fee structures these delivery platforms were charging restaurants, correctly noting that restaurant operators were effectively hamstrung between pandemic restrictions coupled with exploitative fees from the

COMMITTEE ON CONSUMER AFFAIRS AND                  94
BUSINESS LICENSING

these platforms.  With feet caps in place, one facet of the relationship was put in check.  However, in regards to customer data for the third-party food delivery orders there's still an exploitative dynamic in play.  We are so appreciative to Council Member Powers and the cosponsors for bringing Intro 2311 forward today and recognizing that this dynamic needs to change.  As things currently stand, the food delivery platforms control the customer data for orders that they facilitate, which makes them simple enough, but what it means is that restaurants are kept at arms' length from their customers, even repeat customers, even regulars, because the platforms do not share critical information like phone number, order history, email address with the restaurant operators and allow them to maintain it. Restaurants work hard to cultivate lasting relationships with their customers and their community.  They need to be able to reach out directly to their customers, whether to give an update on an order, or offer a promotion.  It's restaurants and their quality food and beverage that keep customers coming back to delivery platforms, but then it's only the platforms are able to form

COMMITTEE ON CONSUMER AFFAIRS AND                    95
BUSINESS LICENSING

relationships with diners and that's not right.  The New York State Restaurant Association supports the solution offered in Intro 2311, which would give restaurant operators access to the customer data, ah, their own customers, and stop the gatekeeping by third-party platforms.  It's a reform that our members have been asking for and we believe it's an important step in leveling the playing field for restaurant...

SERGEANT AT ARMS:  Time has expired.

KATHLEEN REILLY: ...[inaudible].  Thank you.  The restaurants operating in a market heavily influenced by these delivery platforms.  Um, I also think that what Andrew pointed around, ah, reservation-making platforms is a great point and I think that they do play a similar kind of role in keep, ah, consumer data from the restaurants themselves.  Thank you for your time this afternoon, and we will follow up in writing.

COMMITTEE COUNSEL:  Thank you, Kathleen.  Next up we have Mikey Knab, followed by Maria Figueroa, and then James Parrott.  Mikey?

SERGEANT AT ARMS:  Your time will begin now.

COMMITTEE ON CONSUMER AFFAIRS AND                     96
BUSINESS LICENSING

MIKEY KNAB:  Hello, can you hear me?

COMMITTEE COUNSEL:  Yes, we can hear you.

MIKEY KNAB:  Thank you, sorry.  Hi, my name is Mikey Knab.  I'm the codirector of Raise High Road Restaurants, which is a national network of over 1000 restaurant owners across the country, including over 100 in New York who have made commitments to high road employment practices, like increasing wages and improving working conditions.  Chef Russell, who spoke earlier, is one of our members, ah, and my members had asked me to come and speak on behalf of the robust industry in New York City of, of restaurants and hospitality professionals that make New York dynamic and unique in the sense that it contributes so much to the economy.  If restaurant workers leave the industry and/or the city at the rates that they saying they're considering do it, they will never recover and the restaurant landscape and the future of New York will be bleak.  The restaurants that fund the National Restaurant Association are mostly massive, multinational, publicly traded corporations that we would consider low road employers that have been fighting to suppress wages and subjugate our workforce for

COMMITTEE ON CONSUMER AFFAIRS AND                    97
BUSINESS LICENSING

decades, almost over 100 years.  If that continues to happen, workers will never come back.  Ah, they'll see the job exploitative, as Russell mentioned.  We need to send a signal to the entire workforce that New York is a magical place for a restaurant, that these are good jobs, that we do treat them with dignity and respect.  And this surcharge allows restaurants to opt in, it's  not required.  If restaurants don't want to charge a 15% surcharge and pay one fair wage they don't need to.  But if they can figure out how to run their business they want to, as Andrew Rigie, [inaudible] Russell should do, then they can opt into it.  Ah, we, we believe that this would send a signal to the workforce that we're trying our best as an industry to make these jobs professional and treat them with dignity, and also send a message to Albany that you can't just save restaurant owners.  You need to save restaurant workers or else the owners have no way to prepare and distribute the food and offer great service and hospitality to our guests.  So I strongly urge you to support this, this measure, and I, and I thank you for your time.

COMMITTEE ON CONSUMER AFFAIRS AND                    98
BUSINESS LICENSING

COMMITTEE COUNSEL:  Thank you, Mikey.  Next we have Maria Figueroa, followed by James Parrott, and then Sarah Rothman.  Maria?

SERGEANT AT ARMS:  Your time will begin now.

MARIA FIGUEROA:  Good afternoon.  Ah, my name is Maria Figueroa.  I'm director of labor and policy research at the Worker Institute of Cornell Universe.  Thank you for the opportunity to deliver this testimony, which draws on field research we conducted in partnership with Workers Justice Project.  We surveyed more than 500 workers, ah, app-based, ah, food delivery workers from all five boroughs and all demographic groups, that this diverse workforce comprises.  Our findings revealed a range of present issues, including low earnings, lack of transparency in payment and evaluation assistance, lack of access to bathrooms, um, and, and very serious, ah, safety hazards such as exposure to violent crime related to the e-bike, ah, theft, um, and risk of accidents on the road which workers face without any type of compensation for healthcare expenses and lost work time.  Our survey data revealed that the base, um, the base pay of app-based

COMMITTEE ON CONSUMER AFFAIRS AND                    99
BUSINESS LICENSING

delivery workers is between $6.57, about $7 hour, and about $8 per hour.  These excludes tips and operating expenses, such as, ah, sale and internet, ah, service, vehicle maintenance, and other expenses.  In order for workers to achieve this low level of pay, which is well below minimum, ah, legal minimum wages in the city, they have to work long hours and for multiple apps, since each individual app does not generate enough work.  About two-thirds of survey respondents reported that they have regularly worked at least six days per week, and 85% said that this was their main and only job.  Ah, additionally, about 40% of all survey respondents, um, reported experiencing issues related to payments from...

SERGEANT AT ARMS:  Your time has expired.

MARIA FIGUEROA: ...apps, including nonpayment and underpayment of tips, receiving lower pay than indicated on the apps, late payment or no payment of earnings from an entire work week.  Um, we strongly support 2294 and 2296 to increase the base pay that workers receive and regulate the, the payment system, and we call for new regulation that would require the apps to share their data with a city agency, such as DCWP, which would be given an

COMMITTEE ON CONSUMER AFFAIRS AND                    100
BUSINESS LICENSING

authority similar to the TLC's in collecting data from their ride share, ah, platforms.  Thank you.

CHAIRPERSON AYALA:  Yeah, could I interject a second?  [speaking in Spanish] OK, so we only have translation services available to 4:00, so we're asking members, um, that are here to fiscal year, um, who need the service to please raise their hand so that we can call on them first.  I see quite a few, Stephanie.

COMMITTEE COUNSEL:  Yeah, I see, yep, I see about three.  Um, OK, so why don't we start with Pepe Jhonson.  I see your hand is raised.

CHAIRPERSON AYALA:  Pepe, [speaking in Spanish].

SERGEANT AT ARMS:  Your time will begin.

INTERPRETER:  [speaking in Spanish]

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  [speaking in Spanish]

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  [speaking in Spanish]

PEPE JHONSON:  [speaking in Spanish] buenos tardes.

INTERPRETER:  Good afternoon.  [speaking in Spanish]

COMMITTEE ON CONSUMER AFFAIRS AND                    101
BUSINESS LICENSING

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  [speaking in Spanish]

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  I'm sorry, it's very hard to hear her.  Her volume is very low.

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  [speaking in Spanish]

PEPE JHONSON:  [inaudible]

CHAIRPERSON AYALA:  We'll come back to Pepe in, in a moment.

INTERPRETER:  [speaking in Spanish]

COMMITTEE COUNSEL:  OK, so let's move on to Cesar Marino.

INTERPRETER:  Cesar Marino, [speaking in Spanish]

CESAR MARINO:  [speaking in Spanish]

INTERPRETER:  [speaking in Spanish] Hello, my name is Cesar Marino.  I'm a food distributor.  I worked for Rely as of two months ago.  I suffered an assault while was doing a delivery.  [speaking in Spanish]

CESAR MARINO:  [speaking in Spanish]

INTERPRETER:  [speaking in Spanish] So the application, I have no hours during the day.  I

COMMITTEE ON CONSUMER AFFAIRS AND                    102
BUSINESS LICENSING

need hours during the night and then because there's these long distances, they send me to do these deliveries to very far places, very dangerous places, and then the company does not let me know where it is located until I receive the food, and then if I don't deliver at that point they deny me, if I deny delivering to these risky places where I risk my life, the company then punishes me by blocking my hours or not giving me any work.  [speaking in Spanish]

CESAR MARINO:  [speaking in Spanish]

INTERPRETER:  I try to go into the application and it doesn't let me.  I try to go into one or two, or two hours, and I tried but the application does not let me in.  [speaking in Spanish]

CESAR MARINO:  [speaking in Spanish]

INTERPRETER:  [speaking in Spanish] So the application like threatens us.  It threatens to block our account and it never gives us any chance to call anyone to debate the issue.  There's no number to communicate or anything.  Basically, all its workers are invisible.  [speaking in Spanish]

CESAR MARINO:  [speaking in Spanish]

COMMITTEE ON CONSUMER AFFAIRS AND                     103
BUSINESS LICENSING

INTERPRETER:  Council, people I ask us, I ask you all to please pass, approve this law because it would help us all.  Thank you.

COMMITTEE COUNSEL:  Thank you.  Next we'll call on Gustavo Mancilla.

INTERPRETER:  Gustavo Mancilla?

SERGEANT AT ARMS:  Your time will begin.

GUSTAVO MANCILLA:  [speaking in Spanish]

INTERPRETER:  Good afternoon.  My name is Gustavo Mancilla.  I work as a food distributor and I work for the food distribution apps.  [speaking in Spanish]

GUSTAVO MANCILLA:  [speaking in Spanish]

INTERPRETER:  I live in Manhattan.  I work throughout all the whole city making deliveries.  [speaking in Spanish]

GUSTAVO MANCILLA:  [speaking in Spanish]

INTERPRETER:  [speaking in Spanish] I'm one of many who suffer the abuse given out by these companies.  They're not transparent with the amount of tips that we earn.  [speaking in Spanish]

GUSTAVO MANCILLA:  [speaking in Spanish]

INTERPRETER:  For example, about a week ago I was delivering food to a client from one of

COMMITTEE ON CONSUMER AFFAIRS AND                    104
BUSINESS LICENSING

these restaurants, and after the delivery the client asked me if I had received the tips.  [speaking in Spanish]

GUSTAVO MANCILLA:  [speaking in Spanish]

INTERPRETER:  I immediately reviewed the application and zero is what appeared.  [speaking in Spanish]

GUSTAVO MANCILLA:  [speaking in Spanish]

INTERPRETER:  The client then showed me his receipt, which showed he gave a $9.60 tip, although my app was showing zero.  [speaking in Spanish]

GUSTAVO MANCILLA:  [speaking in Spanish]

INTERPRETER:  When I made a claim about this thievery of tips the app gave the blame to the restaurant.  [speaking in Spanish]

GUSTAVO MANCILLA:  [speaking in Spanish]

INTERPRETER:  Constantly the applications like Rely sends us messages threatening us to say not to ask the clients or the customers any information. [speaking in Spanish]

GUSTAVO MANCILLA:  [speaking in Spanish]

INTERPRETER:  And if we do it they will block our account.  [speaking in Spanish]

COMMITTEE ON CONSUMER AFFAIRS AND                    105
BUSINESS LICENSING

GUSTAVO MANCILLA:  [speaking in Spanish]

SERGEANT AT ARMS:  Time has expired.

INTERPRETER:  Another way that they rob our tips is when you round off.  [speaking in Spanish]

COMMITTEE COUNSEL:  Thank you.  Next we'll call Roberto Corrales please.

SERGEANT AT ARMS:  Your time will begin now.

INTERPRETER:  Roberto Corrales [speaking in Spanish]

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  My name is Roberto Corrales.  [speaking in Spanish]

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  We need you not to abandon us when we have an accident.  [speaking in Spanish]

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  Because they don't want to be responsible when they rob our bikes from work.  [speaking in Spanish]

ROBERTO CORRALES:  [speaking in Spanish]

COMMITTEE ON CONSUMER AFFAIRS AND                    106
BUSINESS LICENSING

INTERPRETER:  They kill us on the streets, as well as rob us of our tips.  [speaking in Spanish]

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  We want the apps to be transparent, as well as the restaurants.  [speaking in Spanish]

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  Because they also have to do with the thieving, the robbing of tips.  [speaking in Spanish]

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  We also want this law to pass so we can get paid minimum wage, because this is a real job.

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  And on the other hand there's also the discrimination, because then we show up and sometimes they don't even want to let us into the restaurants.  [speaking in Spanish]

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  And we're outside dealing with all kind of temperatures, hot and cold temperatures.  We are part of this system.

COMMITTEE ON CONSUMER AFFAIRS AND                    107
BUSINESS LICENSING

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  And as far the apps, we need  not to be sent further than two to three miles away from the destination, especially when the climate is to take into account.

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  And managing the distances, like driving around, it's not very easy and I've seen many accidents occurred.  I, too, was involved in an accident.  [speaking in Spanish]

ROBERTO CORRALES:  [speaking in Spanish]

INTERPRETER:  Thank you very much.  Thank you all, thank you.

COMMITTEE COUNSEL:  Thank you, next we'll call on Juan Carlos Huerta, followed by Oscar Gonzales.

INTERPRETER:  [speaking in Spanish]

SERGEANT AT ARMS:  Your time will begin.

JUAN CARLOS HUERTA:  [speaking in Spanish]

INTERPRETER:  Give me one second, please.

JUAN CARLOS HUERTA:  [speaking in Spanish]

COMMITTEE ON CONSUMER AFFAIRS AND                    108
BUSINESS LICENSING

INTERPRETER:  Do I have to put on my camera?  [speaking in Spanish]

JUAN CARLOS HUERTA:  OK, um.  Hi, how are?  My name is, um, Juan Carlos.  I work as a chef at a top restaurant, as well as a consultant for restaurants and [inaudible] Estates.  Due to COVID I'm now a food delivery worker.  I work as a Door Dasher at Door Dash.  I also worked for Rely originally when I seen the advertisements for this companies.  I thought this line of work will be excellent for my financial and well-being.  For the time being, however, [inaudible] holds and this companies began to, ah, [inaudible].  And I had no idea how to use the app.  And there was, and there wasn't a service to show, to show me how.  So I was unable to work initially for all, for at all times.  For example, my first day of working for Door Dash was very difficult since I didn't know how to use the app.  I had no idea that it was accepting an order from my hand to grouping, and 40 degrees weather, near-freezing temperature, snow on the ground, and it was raining.  After my initial delivery I went home with my clothes soaked, took a hot shower in hopes of warming up my body and face.  It feel like needles

COMMITTEE ON CONSUMER AFFAIRS AND                    109
BUSINESS LICENSING

because of the, of the wind.  That was in February 2021, it was the [inaudible] the snowiest February in the history of New York.  I was physically able to perform anymore, ah, deliveries that day, and only made $16.00, and I got a little sick.  In order to be a top dasher you have to have near, ah, perfect rating from customers and [inaudible], ah, most of the orders regardless of the distance.  If you're not a top dasher you cannot simply log in, in or out anytime to work.  You are required to serve your hours and advance...

SERGEANT AT ARMS:  Your time has expired.

JUAN CARLOS HUERTA: ...[inaudible].

COMMITTEE COUNSEL:  Thank you for your testimony.  Next we will be calling on Oscar Gonzales, followed by Pedro Castillo.

INTERPRETER:  [speaking in Spanish]

OSCAR GONZALES:  [speaking in Spanish]

SERGEANT AT ARMS:  Your time will begin.

OSCAR GONZALES:  [speaking in Spanish]

INTERPRETER:  OK.  No need for translation.

OSCAR GONZALES:  OK, so my name is Oscar Gonzales.  I worked for Uber Eats, um, Door Dash, and

COMMITTEE ON CONSUMER AFFAIRS AND                    110
BUSINESS LICENSING

Grub Hub.  So I have three topics.  The first one is deactivations.  They deactivate you without any warning and without you being able to explain yourselves against the accusation that was why you got deactivated.  And when you call regarding that deactivation all you get is poor sport and they never solve your problems and just give you lame answers and go over the same thing over and over until you get tired of it and stop dealing with them.  And when you appeal, if you do, they always deny it.  So how is that?  Um, [inaudible] not fair.  The second topic is help.  Ah, sometimes when you call you have to wait 10-plus minutes to get support, ah, to answer the call.  Meanwhile, the customers are waiting for the food, which makes them mad, obviously, and less likely to order again through that app, which makes us less money because they're ordering somewhere else or directly through the restaurant delivery services they have.  Um, when you need help with anything associated with your access, for example you need to update your [inaudible], your name, or your picture, you can't except with Grub Hub.  They let you change your picture.  Ah, and they tell you that don't know how to solve, um, your concern or what is the process

COMMITTEE ON CONSUMER AFFAIRS AND                       111
BUSINESS LICENSING

to solve it.  And if they don't know, who knows?  And the third topic and last one is promotions.  They offer you X amount of money if you complete a certain amount of deliveries or complete them in a certain amount of time.  Just to...

SERGEANT AT ARMS:  Your time has expired.

OSCAR GONZALES: ...[inaudible] that you didn't complete all the deliveries or didn't do it in time.  And when you call to solve it they just transfer it to another department that deals with that, from which you never ever get any type of answers, either good or bad.  It doesn't matter if you provide any proof of that.  That's it for me. Thank you.

COMMITTEE COUNSEL:  Thank you.  We'd like to announce also that you may submit your written testimony at the email address testimony@council.nyc.gov.

INTERPRETER: [speaking in Spanish]

COMMITTEE COUNSEL:  Thank you.  Now we'll continue with Pedro Castillo, followed by Juan Reynoso.

INTERPRETER:  Pedro Castillo, [speaking in Spanish].

COMMITTEE ON CONSUMER AFFAIRS AND                        112
BUSINESS LICENSING

SERGEANT AT ARMS:  Your time will begin.

PEDRO CASTILLO:  [speaking in Spanish]

INTERPRETER:  Good afternoon.  [speaking in Spanish]

PEDRO CASTILLO:  [speaking in Spanish]

INTERPRETER:  Hi, my name is Pedro Castillo.  I have two kids.  I live in Queens.  I work with Rely and another app.  [speaking in Spanish]

PEDRO CASTILLO:  [speaking in Spanish]

INTERPRETER:  Doing delivery work using these apps, I feel like I'm putting myself at risk, in too much risk for my family.  [speaking in Spanish]

PEDRO CASTILLO:  [speaking in Spanish]

INTERPRETER:  These applications ignore any situation that could happen to us, and they pressure us constantly.  [speaking in Spanish]

PEDRO CASTILLO:  [speaking in Spanish]

INTERPRETER:  They have us deliver at distances that are very far and they do not see the risks.  [speaking in Spanish]

PEDRO CASTILLO:  [speaking in Spanish]

COMMITTEE ON CONSUMER AFFAIRS AND                    113
BUSINESS LICENSING

INTERPRETER:  About three weeks ago I had an accident.  I was hit by a car.  It was really big.  It opened up my head, broke my clavicle, and my bike was destroyed.  [speaking in Spanish]

PEDRO CASTILLO:  [speaking in Spanish]

INTERPRETER:  Thank God I'm alive.  [speaking in Spanish]

PEDRO CASTILLO:  [speaking in Spanish]

SERGEANT AT ARMS:  Time has expired.

INTERPRETER:  [speaking in Spanish] I don't know how much time I can continue with my recuperation.  I am very worried.  I don't have anything to pay my rent, feed my family.  I'm paralyzed.  I have no way to earn a living.

PEDRO CASTILLO:  [speaking in Spanish]

INTERPRETER:  These applications should be more conscious of their workers and help, with helping us.

PEDRO CASTILLO:  [speaking in Spanish]

INTERPRETER:  We need these companies to pay a minimum wage and to give us some kind of protection.  These laws need to pass so that we can feel we can trust working with them.

PEDRO CASTILLO:  [speaking in Spanish]

COMMITTEE ON CONSUMER AFFAIRS AND                    114
BUSINESS LICENSING

INTERPRETER:  And them become responsible for us so that we can work with dignity and respect. Thank you very much.

COMMITTEE COUNSEL:  Thank you.  We'd like to call next Juan Reynoso, followed by Isabel Navarro.

INTERPRETER:  [speaking in Spanish]

SERGEANT AT ARMS:  Your time will begin.

JUAN REYNOSO:  [speaking in Spanish]

INTERPRETER:  Good afternoon.  My name is Juan Reynoso.  I come from Guatemala and I live in the Bronx.  [speaking in Spanish]

JUAN REYNOSO:  [speaking in Spanish]

INTERPRETER:  I've been working for two years with the application Door Dash and Grub Hub. [speaking in Spanish]

JUAN REYNOSO:  [speaking in Spanish]

INTERPRETER:  I've worked 10 to 12 hours each day and I earn about $100 to $120 a day, which is very little.  It's not enough for living to pay any bills.  [speaking in Spanish]

JUAN REYNOSO:  [speaking in Spanish]

INTERPRETER:  We are asking the companies to give us a dignifying wage.  And what do I mean by

COMMITTEE ON CONSUMER AFFAIRS AND                        115
BUSINESS LICENSING

that is for them to pay us per hour.  [speaking in Spanish]

                JUAN REYNOSO:  [speaking in Spanish]

                INTERPRETER:  Like for in the present time with Door Dash and Grub Hub, if I don't deliver within one or two hours then I don't even get a dollar of payment.  [speaking in Spanish]

                JUAN REYNOSO:  [speaking in Spanish]

                INTERPRETER:  I have a specific situation in my case.  In one month I lost two bikes.  Each bike being $1500, that's $3000.  [speaking in Spanish]

                JUAN REYNOSO:  [speaking in Spanish]

                INTERPRETER:  And then by the end of the month I find myself asking myself what do I do?  Do I use my money to buy another bike?  Do I pay rent?  Do I feed my family?  I have two daughters.  I find myself in a predicament.  [speaking in Spanish]

                JUAN REYNOSO:  [speaking in Spanish]

                INTERPRETER:  And then furthermore the delivery companies, us as delivery people, the companies indicate that we're independent contractors.  So then that leaves us having to get

COMMITTEE ON CONSUMER AFFAIRS AND                          116
BUSINESS LICENSING

our own equipment, our own raincoat, repairs, get our own food.  [speaking in Spanish]

JUAN REYNOSO:  [speaking in Spanish]

INTERPRETER:  Trying to support ourselves with this kind of money, about $100 a day, it's not possible.  How are we supposed to give our families a better life?  [speaking in Spanish]

JUAN REYNOSO:  [speaking in Spanish]

INTERPRETER:  We need the help for the authorities to support us, to talk to these companies to reach some sort of agreement so we can get a fair wage.  [speaking in Spanish]

JUAN REYNOSO:  [speaking in Spanish]

INTERPRETER:  That's all.  Thank you very much.

COMMITTEE COUNSEL:  Thank you.  Next we'll call on Isabel Navarro and then Pepe Jhonson.

INTERPRETER:  [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

INTERPRETER:  Good afternoon, my name is Isabel Navarro.  [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

INTERPRETER:  So I live in the Bronx.  I have two kids.  I work as a delivery person now for

COMMITTEE ON CONSUMER AFFAIRS AND                    117
BUSINESS LICENSING

six months.  For me to get $500 I have to work over 45 hours.  [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

INTERPRETER:  We need the companies to pay at least the minimum amount per hour, because that way we could cover all, any other costs that are involved with this job.  [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

INTERPRETER:  With $3 per order, it's very difficult for us even to cover the costs that are needed just to bring about the job.  [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

INTERPRETER:  Furthermore, the company sometimes give us addresses that are very different from the actual addresses where the deliveries are supposed to go.  [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

INTERPRETER:  In fact, the more orders they give us, the harder it is to cover all the costs needed just to be a delivery person.  [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

COMMITTEE ON CONSUMER AFFAIRS AND                    118
BUSINESS LICENSING

INTERPRETER:  And the company should also give us all the necessary tools to bring about the job.  For instance, like those thermal bags or the bags to keep the food warm or whatever.  I've had occasions where they've broke on me on my way to bringing food to the client, customer.  [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

INTERPRETER:  Basically, what we're earning here is $10 an hour, and the risks involved to do this job are very high, and, and furthermore, I am a woman doing it.  [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

INTERPRETER:  And I ask you all, who could live in the City of New York on $10 an hour? [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

INTERPRETER:  And then on top of that we have to buy our own tools, bags, our own equipment, transportation, even medical insurance.  And I my case I also had an accident doing this job. [speaking in Spanish]

ISABEL NAVARRO:  [speaking in Spanish]

COMMITTEE ON CONSUMER AFFAIRS AND                119
BUSINESS LICENSING

INTERPRETER:  We need these bills to be paid so that the companies can pay us a dignified wage so we can continue living and earning a living. Thank you.

COMMITTEE COUNSEL:  Thank you.  We'd like to call on Pepe Jhonson next, please.

INTERPRETER:  [speaking in Spanish]

SERGEANT AT ARMS:  Your time will begin.

PEPE JHONSON:  Hello.  [speaking in Spanish]

INTERPRETER:  [speaking in Spanish]

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  My name is Pepe Jhonson. I'm from West Africa and I work using these apps, Uber Eats, Door Dash, Grub Hub, for about two years now.  [speaking in Spanish]

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  The problem I have with the job, like many other women, me being as a woman and I'm sure other women have the same problem, is access to a bathroom.

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  Using the bathroom is a human necessity and the companies need to take this

COMMITTEE ON CONSUMER AFFAIRS AND                120
BUSINESS LICENSING

into account when they're sending you to all these places that are further than five, six kilometers away from our home. [speaking in Spanish]

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  So even if you're just going about three kilometers away and then you find yourself having to use a bathroom, the only bathroom you can really use is the restaurants and the restaurants deny us.  [speaking in Spanish]

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  And the other reason we need it so urgently is because we can't also control the situation with the climate.  [speaking in Spanish]

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  And then during the summer we have to hydrate constantly, right?  And we're using our bikes and we're going around so we're going to need to use the bathrooms at some point.

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  And that's why I'm asking for the government and the companies to try to understand and to speak for us because the

COMMITTEE ON CONSUMER AFFAIRS AND                    121
BUSINESS LICENSING

restaurants should at least give us the option of using the bathrooms.

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  And the last thing that I'm asking for also is for, especially for me that has to do with safety, safety in the streets, safety for us when we are traveling around.  We need this.

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  And I think the clients must understand that the company does not let to help us in finding out where we have, where we have to go and the high risk of going into some of these buildings.

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  If the company is not responsible to know what's happening to us, nor should they punish us by blocking us any, blocking us from our account or the app when we decide not to up into some high-risk building.

PEPE JHONSON:  [speaking in Spanish]

INTERPRETER:  In fact, we have, we have colleagues, coworkers that have died and the company was not even aware or did anything about it to help us.  Thank you.

COMMITTEE ON CONSUMER AFFAIRS AND                    122
BUSINESS LICENSING

COMMITTEE COUNSEL:  Thank you for your testimony.

INTERPRETER:  [speaking in Spanish]

COMMITTEE COUNSEL:  Next we'll be calling on James Parrott, followed by Sarah Brafman, and then Brian Chen.  James?

JAMES PARROTT:  Hello.  Thank you for the opportunity to testify.  I support Intro 2294, to establish a minimum per trips payment to third-party food service, ah, workers.  This measure builds on the highly successfully minimum pay standard for-hire drivers established in December 2018 by the city's Taxi and Limousine Commission, following passage of authorizing legislation passed by the council in August of 2018.  I coauthored a study for the TLC, analyzing the need for the New York City driver pay standard and also coauthored a July 2020 study for the city of Seattle, analyzing the need for a similar minimum driver pay standard, that was enacted in August of 2020.  In both cities the driver pay standards were designed to compensate drivers for all their working time and to account fully for drivers' vehicle and other expenses during all of their working time.  In an evaluation of the first year of

COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING                                              123

the NYC app-dispatched driver pay standard our research found a high rate of compliance and that driver pay had increased by about 9%, or $1.33 per trip.  Total driver pay increased by $340 million dollars for the 11 months of 2019 that the pay standard was in effect.  Passenger wait times declined and some of the pay increase was absorbed through lower effective commission rates taken by the companies, while passenger fares rose and trip volumes leveled and declined some in the latter part of 2019.  These trends were also evident in Chicago, where a minimum pay standard was not implemented. Intro 2294 appropriately calls for a study of third-party food delivery worker per trip pay and the methods by which that pays [inaudible] hours of work and an analysis of delivery worker expenses, as well as other pertinent factors and issues.  The TLC's ability to effectively regulate driver pay and ensure a high rate of compliance...

SERGEANT AT ARMS:  Time has expired.

JAMES PARROTT: ...depends in part on the authority the TLC has exercised to require the app companies to provide data on all trips, payments to drivers, hours worked, and miles driven.  It will be

COMMITTEE ON CONSUMER AFFAIRS AND                    124
BUSINESS LICENSING

important for the Department of Consumer and Worker

Protection to have the authority to similarly compel

data sharing by third-party delivery services.  This

is particularly crucial given the experience of

delivery workers regarding tip theft and significant

data transparency problems.  Delivery workers are

among the heroes of the pandemic.  At great personal

health risk, they responded to the explosion and

demand for food service, ah, delivery over the past

year, providing a tremendous service to remote

working and homebound New Yorkers and the struggling

restaurant owners.  Yet they were forced to endure

tip theft and extensive payment problems from the

delivery companies.  They had to deal on their own

with the indignity of finding a place to use the

bathroom and confronting a wave of bicycle thefts

that jeopardize their livelihoods.  As contractors

they have no employee rights, no paid sick days, and

virtually no access to a worker safety net.  Irony or

not, the jobs that increased the most during the

pandemic were those most devoid of basic worker

rights and protections.  Thank you.

COMMITTEE ON CONSUMER AFFAIRS AND                          125
BUSINESS LICENSING

COMMITTEE COUNSEL:  Thank you.  I see Council Member Lander has his hand raised.  Council Member?

COUNCIL MEMBER LANDER:  Thanks very much, ah, James.  Thank you for the work you did to make it possible for us to do the study, you know, to do the study and then establish the driver minimum pay for Uber and Lyft.  I appreciate your point, and the commissioner made a similar one, about the need to compel data from, ah, the delivery apps in order to be able really do this study.  Um, do you think that that needs to be included in our legislation?  Do we need to amend the legislation or have companion legislation to require the companies to provide that data so that we can do what's necessary to figure out the minimum pay approach?

JAMES PARROTT:  I, I do think that is, that as in the case of the TLC that company access to do business in New York City should be conditioned on their, ah, providing data sharing to appropriate city agencies.  So I think you're gonna have to legislate that in order to require the companies to do that.

COUNCIL MEMBER LANDER:  Super.  Thank you very much.

COMMITTEE ON CONSUMER AFFAIRS AND                     126
BUSINESS LICENSING

COMMITTEE COUNSEL:  Thank you.  Next with have Sarah Brafman and then Brian Chen, and finally Andrew Stettner.  Sarah?

SERGEANT AT ARMS:  Your time will begin.

SARAH BRAFMAN:  Thank you, Chair Ayala, Council Member Reynoso, and members of the committee for the opportunity to testify today.  I will speak on Intro 2163, a critical piece of legislation for New York City restaurant workers.  I am senior policy counsel at A Better Balance, a national legal nonprofit headquartered in New York City.  Our mission is to advance justice for workers so they can care for themselves and their loved ones without compromising their economic security.  Here in New York City we're proud to have helped lead advocacy efforts to support working families, including New York City paid safe and sick time, to work week laws, and protections for pregnant and caregiving workers. The sub minimum wage for tipped workers is in effect legislated gender inequality for predominantly female, disproportionately women of color, workforce perpetuating the gender pay gap.  Two-thirds of tipped workers are women, disproportionately women of color, and of particular importance to us, nearly 40%

COMMITTEE ON CONSUMER AFFAIRS AND                    127
BUSINESS LICENSING

of them are mothers.  In fall 2020, as you've heard, ah, restaurants were permitted to charge customers a 10% surcharge.  Many customers thought the surcharge was a tip that would benefit workers, not owners, and so reduced their tips as a result, ah, sometimes in half.  Intro 2163 doesn't completely resolve this problem, but at least would remedy the particular problem set by the 10% surcharge.  Allowing restaurant owners to implement a surcharge of up to 15% so long as they pay their tipped employees a full minimum wage with tips on top will persuade more restaurant owners to share the benefits of the surcharge with their workers rather than have the surcharge cause further harm.  And I just want to say something about the preemption question, and it's important to emphasize that this bill does not run afoul of any limitations on this council's ability to regulate minimum, the sub minimum wage.  No state law expressly prohibits such a restaurant surcharge.  In fact, state law appears entirely silent on the issue of business surcharges.  And while New York State's minimum wage law has been interrupted as preempting local minimum wage increases, it is not the case that

COMMITTEE ON CONSUMER AFFAIRS AND                    128
BUSINESS LICENSING

it would preempt voluntary incentives, like this one, that encourage employers to...

SERGEANT AT ARMS:  Time has expired.

SARAH BRAFMAN: ...to pay workers a wage higher than the minimum set by the state.  So I'll just end by saying Intro 2163 is a pivotal policy to ensure the quality and economic security for New York City's restaurant workers.  There's more in our written testimony about all of these issues and especially the preemption issue, which is a non-issue.  Thank you very much, and I, you know, we look forward to working with the, with the council to enact 2163.  Thank you for your time.

COMMITTEE COUNSEL:  Thank you.  Next we'll be calling on Brian Chen, followed by Andrew Stettner, and then Gonzalo Mercado.

SERGEANT AT ARMS:  Your time will begin.

BRIAN CHEN:  Good afternoon, and thank you to the committee for the opportunity to testify today.  My name is Brian Chen and I am attorney at the National Employment Law Project, a national nonprofit policy organization that advocates for good jobs and good policies for workers.  NELP strongly supports the deliveristas and there are five bills

COMMITTEE ON CONSUMER AFFAIRS AND                           129
BUSINESS LICENSING

being considered today by the council, and I'm submitting a longer written statement, but for time I'm going to highlight just two things for the committee today. Ah, the first, um, these, these bills are basic, basic protections for an underpaid workforce that is majority immigrant, majority person of color, and that has virtually zero workplace rights under the law as it is now. As some have noted, because these workers are called independent contractors by their employers, they have no practical access to a guaranteed minimum wage, overtime pay, workers' compensation, paid sick leave, and basic health and safety standards under New York State law. And without those state protections delivery workers are often on the precipice of devastation. So these bills being considered today are long overdue and will help establish a baseline of stability and decent work for workers who are among the most underpaid, marginalized, and exploited. The second point is that greater worker protections and regulation will bring stability to the food delivery industry over the long run. As it is now, app-based food delivery is really like the Wild West. It is dramatically under-regulated and

COMMITTEE ON CONSUMER AFFAIRS AND                    130
BUSINESS LICENSING

therefore very easy for, ah, big corporations to exploit workers, diners, and restaurants.  If we want to sustain this business model we need to start with making, making, ah, sure that the delivery workers have basic protections against low pay and difficult conditions.  And in cities that have legislated gig worker protections before, the sky has not fallen.  Seattle has passed premium pay and paid sick leave for app-based workers.  The industry adapted and moved on.  Philadelphia passed paid sick leave.  The industry adapted and moved on.  And here in New York minimum pay for Uber and Lyft drivers resulted in a 9%...

SERGEANT AT ARMS:  Time has expired.

BRIAN CHEN: ...increase in driver pay.  The reality is that these commonsense protections will bring greater stability to an industry that New York City has come to depend on.  These bills are good for food delivery workers, for customers, and for restaurants.  We strongly support this package of bills and urge the City Council to pass them into law.  Thank you.

COMMITTEE ON CONSUMER AFFAIRS AND                     131
BUSINESS LICENSING

COMMITTEE COUNSEL:  Thank you, Brian.
Ah, let's see.  Next we have Andrew Stettner,
followed by Gonzalo Mercado and Irene Lew.  Andrew?

SERGEANT AT ARMS:  Your time will begin.

ANDREW STETTNER:  Good afternoon.  Thanks
for the opportunity to testify in support of Intro
2163.  My name is Andrew Stettner.  I'm a senior
fellow at the Century Foundation.  We're an
independent think tank based here in New York.  Over
the past year we played a leading to understand the
impact of COVID-19 on the economy.  I commend the
council for this [inaudible] action to rectify a deep
injustice in the state's wage structure.  Under
current law, tipped workers currently can be paid as
little as $10 per hour, which is only $13,000 per
year for someone who averages 25 hours per week.
While the city does not have direct authority to
raise this wage, it should do everything in its power
to incentivize wage increases.  This disparity is
even worse for women and people of color who
experience the highest rates of sexual harassment
compared to any other industry.  Providing a minimum
wage would help to alleviate the pressure facing
women workers.  This proposal properly amends the

COMMITTEE ON CONSUMER AFFAIRS AND                    132
BUSINESS LICENSING

surcharge originally put in place during the pandemic to support restaurants.  The original 10% surcharge benefitted employers with more revenue, yet did not require businesses to pass along the revenue to service workers.  This proposed legislation would facilitate the recovery of the economy.  With in-person dining reopening, city restauranteurs are bemoaning a labor shortage.  Focus groups of immigrant workers connected by the Century Foundation found that many had left the restaurant sector for other work during the pandemic due to the fear of infection or a decline in earnings.  These employers who are complaining about a worker shortage are really suffering from a wage shortage.  With a full minimum wage workers will be able to better provide for themselves and employers can, who can attract new workers and preserve their talent with both being able to benefit from this bill.  In conclusion, we all know that restaurants are at the heart of New York City's consumer economy.  Nothing is more important to the city's recovery than supporting this sector and the workers at the heart of it.  Intro 2163 is a bold and powerful step in the right direction.

COMMITTEE ON CONSUMER AFFAIRS AND                    133
BUSINESS LICENSING

COMMITTEE COUNSEL:  Thank you.  Before we continue, I'd like to acknowledge, ah, Council Member Rosenthal has joined us.  Next we have, ah, Gonzalo Mercado, followed by Irene Lew, and then Lisa Orman.  Gonzalo?

GONZALO MERCADO:  Thank you, thank you very much.  Ah, Gonzalo Mercado, director of Transnational Initiatives for the National Day Laborer and Organization Network, NDLON, ah, I'm very happy to provide testimony today.  NDLON's mission is to provide, improve the lives of day laborers, migrant, and low-wage workers.  We build leadership and power among those facing injustice so they can challenge inequality and expand labor, civil, and political rights for all.  Today we stand in support of New York City food delivery workers, who despite the essential labor provided to keep New Yorkers fed and restaurants running during the worst public health emergency of our generation, while enduring inhumane treatment, wage theft, lack of bathroom access, exclusion from government aid, and even death due to traffic accidents and violent robberies of their electric bikes.  This is a pattern that affects app-based food delivery workers, not only in New York

COMMITTEE ON CONSUMER AFFAIRS AND                   134
BUSINESS LICENSING

City, but nationwide and around the world, while corporations see their profits grow on the back of essential and excluded workers.  Deliveristas have been providing this essential work long time, ah, a long time before the pandemic, and as New York City is reopening this set of bills and protections are a starting point to recognize the dignity and value that food delivery workers deserve from all New Yorkers.  Ah, in the interest of time I'm not going to list all of the bills, but I want to make sure that, ah, it's noted that we support all of them.  By passing this legislative package, New York City can set a model for how localities across the country and around the world can protect the deliveristas from the exploitation of these apps and make sure that no matter how a worker is classified, every worker has dignity and respect.  We applaud the work of the Workers Justice Project and Deliveristas Unidos.  Ah, WJP is a member of NDLON, 60 member organizations nationwide, and we remain committed to support their efforts to bring recognition and basic dignity to New York City's food delivery workers.  Thank you very much.

COMMITTEE ON CONSUMER AFFAIRS AND                135
BUSINESS LICENSING

COMMITTEE COUNSEL:  Thank you.  Next we'd like to call Irene Lew, followed by Lisa Orman and then Austin Horse.  Irene?

SERGEANT AT ARMS:  Your time will begin.

IRENE LEW:  Hi, good afternoon.  Thank you for the opportunity to testify today.  My name is Irene Lew and I'm a policy analyst at the Community Service Society of New York, a nonprofit that works to lift up low-income New Yorkers.  While CSS is supportive of the entire package of bills before the committee today, I'll focus on two of them, Intro 2294 to establish a minimum pay standard for third-party delivery workers, and Intro 2163, to allow restaurants to raise their recovery surcharge to require employers to pay their workers a full minimum wage of $15 an hour.  First, I would like to highlight our support for Intro 2294.  Throughout the pandemic app-based delivery workers have braved the risk of exposure to COVID-19 to keep New Yorkers fed.  Yet, as we've heard today from so many, these workers, many of them low income and workers of color continue to struggle with feeding their own families and making the rent.  Based on the Unheard Third, CSS's annual survey of low-income New Yorkers, we

find that the [inaudible] app-based gig workers experienced food and housing insecurity as well as difficulties with accessing affordable health care at much higher rates than regular employees. Compared to regular employees, app-based gig workers were more likely to go hungry, to fall behind on their rent, or delay necessary medical care. App-based gig workers were also more likely to worry about their finances and their ability to make ends meet. Establish a minimum payment for each trip would be a small but critical first step to improving economic security of third-party delivery workers, who are classified as independent contractors and are denied a $15 minimum wage and other essential rights granted to employees. We would also like to express our support for Intro 2163, specifically the provision of the bill mandating restaurant employers to pay their workers a full $15 minimum wage without using tips to make up the difference between a lower tipped rate of $10 an hour and the full wage. Similar to the widespread hardship that we saw among app-based gig workers and our Unheard Third survey data, our previous research has also shown that workers relying on tips suffer higher levels of poverty and hardship than workers

COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING                                              137

covered by the full minimum wage.  Guaranteeing

restaurant workers the full minimum wage would help

ensure predictable income and improve financial

stability for this workforce.  Low wages, long hours,

and adequate safety standards can become the norm for

the city's delivery and restaurant workers.  For too

long the city has enabled delivery platforms, app-

based companies to circumvent labor laws...

SERGEANT AT ARMS:  Time has expired.

IRENE LEW: ...by allowing the companies

to choose [inaudible] with little to now oversight

how to compensate their workers, how they should be

protect.  Ah, we strongly urge the council to pass

the entire package of bills.  Thank you.

COMMITTEE COUNSEL:  Thank you, Irene.

Next we'd like to call Lisa Orman, followed by Austin

Horse, and then Richard Robbins.  Lisa?

SERGEANT AT ARMS:  Your time will begin.

LISA ORMAN:  Hi, my name is Lisa Orman.

I am the chief of strategy at Open Plans and the

director of Streetopia Upper West Side.  On the Upper

West Side we've been for decades for safer bike

infrastructure.  For many this is about getting their

kids to school safely or being able to bike to work

COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING                                    138

safely.  For others, like delivery workers, the streets are literally their working conditions.  They risk their lives day in and day out in order to feed people in the city, which became even more necessary and visible over the past year.  Ken Coglin, a board member of Streets PAC and a board member of Manhattan Community Board 7, recently proposed a resolution on the Upper West Side at CB7 simply asking restaurants to allow delivery workers to use their bathrooms. Listening during these meetings has been both saddening and maddening, but it's also exposed so many people to the idea that working conditions for delivery workers are not fair, just, or humane.  I am proud that the City Council is discussing these vital bills.  Both deliveristas and all delivery workers deserve a fair wage, transparency with their tips, safe and fair working conditions, including bike infrastructure, and a place to use the bathroom. Tonight we'll be back at CB7 fighting a bid to ban e-bikes from protected bike lanes.  Make no mistake, this resolution is targeted directly at deliveristas. We need to support our essential workers, not target them again and again.  We strongly support the passage of these bills.  We hope that future bills

COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING                                          139

will address the apps' incentive structures, which force delivery workers to choose between getting paid and following all of the traffic laws.  Instead of blaming workers for biking the wrong way or going too fast, let's figure out why they feel the need to deliver meals so quickly and change that.  Thank you very much.

COMMITTEE COUNSEL:  Thank you for your testimony.  Next we have Austin Horse, followed by Richard Robbins.  Austin?

SERGEANT AT ARMS:  Your time will begin.

AUSTIN HORSE:  Thank you so much.  Um, I actually come to speak really to some history with, with food delivery in New York City.  I was, ah, have been a food delivery person.  I started doing that in 2006 actually, before these apps came along, and at that time we actually had great relationships.  We would often work for just a restaurant or a group of restaurants and it was, it was a much better environment.  I would routinely make $20 to $25 an hour doing that.  Um, it was very reliable.  It was actually, once app companies started to compete with us that I was laid off from restaurants because they switched from, ah, having the in-house delivery model

COMMITTEE ON CONSUMER AFFAIRS AND BUSINESS LICENSING                                    140

to this third-party independent contractor model, ah, because it was cheaper for the restaurants.  So as far as regulation going to, um, ah, either to, to affect these restaurants and force them to, ah, allow bathroom access and maybe even charge them a little bit more for, for their delivery people, this is a good thing, because they made this switch, ah, almost 10 years ago, when they went off of, um, when they went to the apps.  And then for the third-party apps, with the independent contractors, they operate with, um, an independent contractor model that shields them from, from Workers' Comp.  So any other delivery business utilizing bikers [inaudible] $30 to $40, ah, 30 to 40 cents on the dollar for every payroll, for, ah, for payroll, which is a huge burden, and so they're already existing outside of this.  Thank you.

COMMITTEE COUNSEL:  Thank you, Austin.  Finally, we have Richard Robbins.  Richard?

SERGEANT AT ARMS:  Your time will begin.

RICHARD ROBBINS:  I thank you very much.  My name is Richard Robbins.  I live on the Upper West Side and I am testifying my personal [inaudible] and not as a CB7 board member.  As someone who cares about transportation safety in New York City I've

COMMITTEE ON CONSUMER AFFAIRS AND                    141
BUSINESS LICENSING

been to countless transportation meetings.  Without fail, at these meetings people call for greater enforcement of bikes and e-bikes.  While I ride a bike for transportation, I wanted to better understand delivery riders' experience and signed up for Door Dash.  Last month I tried working, followed every traffic law, stopping at every red light.  In one hour I got no orders, making no money.  Then this past Sunday in 90-degree heat, Door Dash sent me an alert to note how busy we were, so I tried again.  In 90 minutes while following every law I made three deliveries and earned $22.50, exactly minimum wage, only because they were really busy.  Incidentally, my last delivery was picking up dinner that my wife ordered at [inaudible] for $47, three hours of work. In doing this I saw a number of troubling issues. New York City already has laws that businesses must provide delivery cyclists with unique three-digit ID tags, reflective apparel, the business name, and the bicyclist's three-digit ID number, and a helmet.  But the third-party delivery services evade these laws, as well as minimum wage law, liability laws, OSHA bathroom requirements, and requirements to provide equipment by making delivery cyclists independent

COMMITTEE ON CONSUMER AFFAIRS AND                        142
BUSINESS LICENSING

contractors.  In fact, Door Dash did not even inform me of the New York City laws when I signed up for their service.  We need to fix this.  Further, Door Dash didn't, ah, the Door Dash system didn't provide apartment numbers and the messaging systems customers didn't work.  They told me to leave food outside and take a picture.  After the first customer yelled at me, for the second delivery I rang every one of the 15 buzzers in the building to alert the person that [inaudible] was downstairs.  I couldn't believe I was doing it, and now I see why delivery riders make [inaudible].  Upton Sinclair wrote, "It is difficult for a man to understand something the salary-dependent is not understanding it."  If we want to make our streets safe for all the pedestrians who are terrified of bikes, not to mention for our delivery cyclists, we need to address the economic issue. Without a fair wage we can't expect delivery workers to follow laws.  We also need to make the third-party delivery, ah, companies accountable, ideally by making...

                    SERGEANT AT ARMS:  Your time has expired.

COMMITTEE ON CONSUMER AFFAIRS AND                     143
BUSINESS LICENSING

RICHARD ROBBINS: ...[inaudible] employees and not independent contractors.  Thank you very much.

COMMITTEE COUNSEL:  Thank you.  If we had inadvertently missed anyone who has registered to testify today and has yet to be called, please use the Zoom raise hand function and you will be called on in that your hand was raised.  Seeing no hands raised, I will now turn it over to Chair Ayala to offer closing remarks.  Chair?

CHAIRPERSON AYALA:  Thank you.  Um, I just really want to thank all of you for coming today, for staying, um, for exercising patience.  I know it's been a long hearing, but it's an important hearing, um, and I think that we've all learned a lot today about what it takes to be a deliverista in New York City and all of the ways that we can make this better.  Um, it has been my pleasure to, ah, chair this hearing today and I look forward to, ah, passing this, ah, this set of, ah, bills, um, relatively soon.  So thank you all, and with that this hearing is adjourned.

C E R T I F I C A T E

World Wide Dictation certifies that the foregoing transcript is a true and accurate record of the proceedings. We further certify that there is no relation to any of the parties to this action by blood or marriage, and that there is interest in the outcome of this matter.



Date    July 8, 2021