# Exhibit I

COMMITTEE ON CONSUMER AND WORKER PROTECTION    1

CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

Of the

COMMITTEE ON CONSUMER AND WORKER
PROTECTION

----------------------- X

June 21, 2024
Start:  10:09 a.m.
Recess:  1:01 p.m.


HELD AT:        COUNCIL CHAMBERS – CITY HALL

B E F O R E:    Julie Menin, Chairperson


COUNCIL MEMBERS:
                Shaun Abreu
                Gale A. Brewer

OTHER COUNCIL MEMBERS ATTENDING:
                Lynn C. Schulman
                Rafael Salamanca, Jr.
                Oswald Feliz

COMMITTEE ON CONSUMER AND WORKER PROTECTION     2

A P P E A R A N C E S

Andrew Schwenk, Associate General Counsel at New York City Department of Consumer and Worker Protection

Carlos Ortiz, Assistant Commissioner for External Affairs at New York City Department of Consumer and Worker Protection

Elizabeth Wagoner, Deputy Commissioner of Office of Labor and Policy Standards at New York City Department of Consumer and Worker Protection

Claudia Henriquez, Director of Worker Rights in the Bureau of Labor Law at the Office of the New York City Comptroller

Joshua Bocian, Head of Government Affairs for GrubHub in New York City

Hayley Prim, Senior Policy Manager at Uber

Kassandra Perez-Desir, DoorDash

Andrew Rigie, Executive Director of the New York City Hospitality Alliance

Chris Lauber, Senior Director of Operations for a restaurant group in New York City

Ligia Guallpa, Executive Director of the Workers' Justice Project

Alejandro Grajales, Workers Justice Project

COMMITTEE ON CONSUMER AND WORKER PROTECTION     3

A P P E A R A N C E S  (CONTINUED)

William Medina, member of the Worker Justice Project and leader of La Deliveristas Unidos

Antonio Solis, Workers Justice Project

Brianna January, Chamber of Progress

Darry Saldana, Bronx Chamber of Commerce

Millie Sialer, on behalf of Sandra Jaquez, owner of El Sol Restaurant in Manhattan and the head of New York State's Latino Restaurant Association

Justin Nelson, Co-Founder and President of the National LGBT Chamber of Commerce

Paul Zuber, Executive Vice President of the Business Council of New York State

Jian Hui, delivery worker

Jose Yos, Workers Justice Project

David Dimas, member of Los Deliveristas Unidos

Kovon Flowers, delivery worker

Youssef Mubarez, Yemeni American Merchants Association

Beatrice Ajaero, owner of Nneji

Robert Lee, owner of Tidal Noodles

COMMITTEE ON CONSUMER AND WORKER PROTECTION      4

A P P E A R A N C E S (CONTINUED)

Bryan Lozano, Tech:NYC

Edward Hatchett, delivery worker

Sharon Brown, Rose of Sharon Enterprises

Joseph Mele, delivery worker

Raul Rivera, self

Christopher Leon Johnson, self

Dora Val Silva, self

COMMITTEE ON CONSUMER AND WORKER PROTECTION         5

SERGEANT-AT-ARMS: Good morning, this is a microphone check for the Committee on Consumer and Worker Protection. Today's date is June 21, 2024, located in the Chambers, recording done by Pedro Lugo. If you could just give us one second, we're having technical difficulties.

SERGEANT-AT-ARMS: ERIC GOLDSTEIN: Good morning and welcome to the New York City Council hearing of the Committee on Consumer and Worker Protection.

At this time, can everybody please silence your cell phones.

If you wish to testify, please go up to the Sergeant-at-Arms' desk to fill out a testimony slip, even if you already registered online.

Written testimony can be emailed to testimony@council.nyc.gov. Once again, that is testimony@council.nyc.gov.

At this time and going forward, no one is to approach the dais. I repeat, no one is to approach the dais.

Chair, we are ready to begin.

CHAIRPERSON MENIN: [GAVEL] Good morning. I am City Council Member Julie Menin, Chair of the

COMMITTEE ON CONSUMER AND WORKER PROTECTION        6

Committee of Consumer and Worker Protection. I want to welcome all of you to today's hearing.

First, I want to acknowledge my Colleagues who are present, Council Member Schulman, and I'll acknowledge additional Colleagues as they join.

Since the COVID-19 pandemic, the city's streetscape has been transformed by the proliferation of e-bikes, of mopeds, and other powered mobility devices. Although these devices have certainly expanded the ability for people to traverse the city, they've also driven exponential growth in deadly fires related to the lithium-ion batteries used to power these devices as well as dangerous encounters between cyclists and pedestrians and these micro-mobility vehicles. The growth in e-bike and moped usage is fueled by a surge in demand for food delivery from third-party platforms. Large delivery zones and pay incentives to complete deliveries quickly have driven delivery workers to use e-bikes, e-scooters, and powered mobility devices instead of regular bicycles. The Council has passed legislation to provide better conditions for restaurants that use third-party platforms, to provide better working

COMMITTEE ON CONSUMER AND WORKER PROTECTION        7
conditions for third-party delivery workers, and to facilitate the safe use of powered mobility devices by delivery workers. Today, we will hear a number of bills that relate to third-party food delivery and powered mobility devices. I'm just going to list and briefly describe these bills.

First, Proposed Intro. Number 30-A, sponsored by Council Member Feliz, would establish safety standards for powered bicycles and powered mobility devices when used for food delivery services, grocery delivery services, and businesses using bicycles for commercial purposes. Mobility devices used for delivery could be provided by the company or by the delivery worker but could not be provided at the food delivery worker's expense as a term of their employment.

Second, Intro. 972, sponsored by Council Member Powers, would require all third-party food delivery services to verify that the mopeds used by their food delivery workers are properly registered prior to their use.

Third, Intro. 715, sponsored by Council Member Schulman, would make third-party food delivery services responsible for ensuring that their food

COMMITTEE ON CONSUMER AND WORKER PROTECTION       8

delivery workers operate e-bikes in accordance with the laws concerning the operation of bicycles on sidewalks and at intersections.

Fourth, Intro. 762, sponsored by Council Member Salamanca, would establish exemptions for third-party delivery services from the limits on fees charged to restaurants. In 2021, this Council passed a law to cap the fees third-party food delivery services could charge restaurants. That cap protects restaurants from exorbitant fees imposed by delivery services, which was critical during the pandemic and continues to be vital to this day. Intro. Number 762 would amend this law by allowing third-party delivery services to increase their fees for restaurants that choose to pay more for additional services, such as marketing in the app.

We are hearing as well three bills introduced by Council Member Abreu that were prompted by third-party apps' responses to the historic minimum pay legislation passed by the Council. After the minimum pay standard went into effect, some of the platforms changed their apps to make it harder for consumers to tip their workers. Platforms have

COMMITTEE ON CONSUMER AND WORKER PROTECTION          9

also not been transparent with their workers about which method they are using to calculate pay.

Intro. 737 would establish gratuity standards for food delivery workers.

Intro. 738 would require third-party food delivery services that solicit gratuities to do so before or at the same time an online order is being placed.

Lastly, Intro. 859 would require third-party food delivery services and third-party courier services to disclose the pay method, display a running tally of a food delivery worker's working time, and provide food delivery service workers with an itemized pay statement for each pay period.

I look forward to hearing from everyone here in terms of their testimony on these bills.

I will now turn it over to Council Member Schulman to make her opening statement. Thank you.

COUNCIL MEMBER SCHULMAN: Thank you, Chair Menin, and good morning.

I'm proud to speak to you about Intro. 715. This important legislation seeks to enhance the safety and accountability of food delivery companies,

COMMITTEE ON CONSUMER AND WORKER PROTECTION        10

requiring third-party food delivery services to be responsible for the safe operation of electric food delivery bicycles. As you know, electric bicycles have become a crucial part of our food delivery infrastructure. However, this convenience must not come at the expense of public safety. Right now, delivery workers are essentially incentivized for speed, and their top priority is quickly completing their next delivery. This often results in driving recklessly, often putting the lives of pedestrians at risk as well as compromising their own safety. Intro. 715 specifically requires food delivery companies to ensure that their delivery workers operate electric bicycles in compliance with Sections 19-176 and 19-195 of our City Code, which govern bicycle use on sidewalks and at intersections. This bill mandates that these companies accept financial liability for any civil penalties resulting from violations of these sections while workers are engaged in deliveries. Additionally, the legislation provides an important safeguard for delivery workers and companies alike. Workers must notify their respective third-party delivery service of any fines within 10 days of issuance. In turn, it offers an affirmative

COMMITTEE ON CONSUMER AND WORKER PROTECTION        11

defense for companies if they were not properly notified of a violation by their delivery worker. This bill is not just about assigning responsibility. It is about creating a safer environment for all New Yorkers, pedestrians, cyclists, and delivery workers. By holding companies accountable, we ensure that they take an active role in promoting safe riding practices and mitigating risks associated with the increasing use of electric bicycles. I urge my fellow Council Members to support this legislation, recognizing that it strikes a necessary balance between fostering innovation in our food delivery sector and maintaining the safety and well-being of our community. Thank you, Chair.

CHAIRPERSON MENIN: Thank you very much. I'll call on additional Council Members for their opening statements as they join, so I'm now going to turn it over for the Administration to testify.

We'll be hearing testimony from Carlos Ortiz, Assistant Commissioner for External Affairs at DCWP, Elizabeth Wagoner, Deputy Commissioner of OLPS at DCWP, and Andrew Schwenk, Associate General Counsel.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        12

I'm going to turn it over to Committee Counsel to administer the affirmation.

COMMITTEE COUNSEL SWAINE: Please raise your right hands.

Do you affirm to tell the truth, the whole truth, and nothing but the truth before this Committee, and to respond honestly to Council Member questions?

ASSISTANT COMMISSIONER ORTIZ: I do.

DEPUTY COMMISSIONER WAGONER: I do.

ASSOCIATE GENERAL COUNSEL SCHWENK: I do.

COMMITTEE COUNSEL SWAINE: You may begin.

ASSISTANT COMMISSIONER ORTIZ: Thank you. Good morning, Chair Menin and Council Member Schulman, Members of the Committee on Consumer and Worker Protection. My name is Carlos Ortiz, and I am joined by my colleagues Elizabeth Wagoner and Andrew Schwenk.

Thank you for the opportunity to testify today on Introductions 30-A, 715, 737, 738, 762, 859, and 972 relating to delivery worker gratuities and pay transparency, delivery fee caps, and ensuring app responsibility with respect to street safety. Since the start of the Administration, DCWP has helped

COMMITTEE ON CONSUMER AND WORKER PROTECTION          13

deliver more than 600 million dollars into the pockets of New Yorkers. We provide fundamental consumer and worker protections and financial empowerment programming to New Yorkers. We strive to ensure that consumers who have been deceived or exploited have recourse, that workers have a passionate defender of defend their rights, and that all New Yorkers have the support they need to improve their financial health.

Just over a year ago, Mayor Adams announced the nation's first-of-its-kind minimum pay rate for app-based restaurant delivery workers, the most significant advancement of workers' rights in New York City in the 21st century. Ahead of implementation, DCWP conducted a comprehensive study of the industry, considered thousands of comments received from food delivery workers, apps, advocates, restaurants, researchers, elected officials, and members of the public when studying this historic rate. We continue to collaborate closely with key advocates and stakeholders across the space.

Delivery workers are essential workers for New York City. They have braved harsh weather conditions, harmful wildfire smoke, and even the

COMMITTEE ON CONSUMER AND WORKER PROTECTION        14

pandemic to ensure New Yorkers are fed. Thanks to their incredible organizing and determination, tens of thousands of workers have now seen their weekly pay double, with their combined annual earnings on track to increase by over 775 million dollars this year. This Administration will continue to stand shoulder to shoulder with delivery workers and ensure their fundamental rights to fair and dignified pay are protected.

Moving to today's bills, I would like to start off by commending the Council, and specifically Council Member Abreu, for recognizing a key issue that delivery workers are facing since certain major apps made changes to make it harder to tip delivery workers. We strongly support Introduction 737 and 738, which would require third-party food delivery service apps to give customers the option to leave for gratuity during an order transaction and include a suggested gratuity option of 10 percent. Before apps began paying the minimum pay rate in early December 2023, they generally made tipping a delivery worker a simple process, giving consumers the option to tip during the order transaction. However, after they began paying the minimum pay rate, two of the

COMMITTEE ON CONSUMER AND WORKER PROTECTION         15

three most used apps removed the option for a consumer to add a tip when placing an order. As a result, delivery workers' tips received on those apps have decreased dramatically, by 85 million dollars in total since the apps changed their tipping options. Conversely, other apps, including one of the three most used apps, continued to allow tipping when placing an order and, while the average tips on order placed on those apps did decrease slightly, workers are receiving substantially higher tips on those apps. To us, this speaks to the fact that New Yorkers, when given an option, recognize the incredibly difficult jobs these workers perform and choose to tip them. As we understand the intent of these bills, they would require apps to restore to consumers the option they previously had to tip workers when placing an order. We recommend changes to the bill text to make clear that apps must offer consumers these tipping options. We are eager to engage in the legislative process as soon as possible to finalize this legislation to best support delivery workers in our city.

Introduction 859 would require third-party food delivery services and third-party courier

COMMITTEE ON CONSUMER AND WORKER PROTECTION        16

services to provide delivery workers with sufficient information on their pay calculations. We are fully supportive of clear pay transparency for workers as well as this legislation. The apps are required to report aggregate monthly pay information to DCWP so that we can monitor compliance, but apps have not been transparent with workers themselves about their pay calculations. Workers should have full information about how their pay is calculated so they are not left with questions about an app's pay structure. We believe this legislation will help ensure this happens and will make it easier for advocates to educate workers on the minimum pay rate.

Council Member Salamanca's bill, Introduction 762, would amend the current fee caps for third-party food delivery services. The caps on fees that delivery apps can charge restaurants were first created by the Council during the COVID-19 pandemic and were later made permanent under Local Law 103 of 2021. Currently, delivery apps can only charge a restaurant a total of 23 percent of an order in fees, broken down as follows, up to 15 percent for delivery fees, up to 3 percent for transaction fees, and up to 5 percent for other fees. Introduction 762

COMMITTEE ON CONSUMER AND WORKER PROTECTION          17

would increase the cap on other fees from 5 percent to 25 percent, potentially allowing delivery apps to charge restaurants up to 43 percent of an order in fees. As an enforcement agency, DCWP will enforce the fee caps at the limits mandated by local law, and I would also like to note that the current fee caps are subject to ongoing litigation.

Lastly, Introduction 715 would require food delivery companies to be responsible for ensuring that their workers who use micro-mobility devices follow appropriate traffic laws. Introduction 30-A, which the Department of Transportation previously testified on in January, would establish new requirements for businesses using a bicycle for commercial purposes, such as third-party food delivery, grocery delivery, and courier services. This includes the requirement that any powered mobility device, such as an e-bike, used by a worker on behalf of such businesses meet certain safety certification standards. Introduction 972 would require third-party food delivery services to verify the registration of mopeds used by delivery workers. The Administration is committed to ensuring that micro-mobility devices are used safely on our

COMMITTEE ON CONSUMER AND WORKER PROTECTION       18

streets. Along with our colleagues at DOT, we are working on a comprehensive policy review of how micro-mobility delivery is regulated in New York City. We believe it is vital to address the current situation holistically with an approach that tackles both street safety priorities and workers' rights. Each of these three bills addresses issues that will inform vital components of that unified approach.

A key point that DOT and DCWP would like to stress is that delivery apps have a responsibility to ensure that workers have access to and use safe equipment and that workers are not compelled into unsafe riding practices because of dangerous demands made of them by those same apps. For example, we have heard reports from workers that apps may penalize or deactivate them if they do not deliver orders within the delivery app's mandated timeframe, despite there being obstacles such as traffic, restaurant delays, or route issues that are outside of a worker's control. The perverse incentives flowing from apps' unrealistic delivery times could be a major contributing factor to some of the unsafe practices we are observing in our city today. Another example I'd like to share is when workers receive app orders

COMMITTEE ON CONSUMER AND WORKER PROTECTION          19

while in transit, and if they don't respond to these app orders, they are penalized subsequently. Ultimately, workers are compelled into these situations because the deactivation can be financially devastating for them and their families.

One final point underscores DOT and DCWP's holistic approach. Introduction 30A would bring street and device safety protections to grocery delivery workers in addition to restaurant delivery workers. This is an important step in the right direction from a street safety perspective, but it should go even further for the issues DCWP enforces and has responsibility for. As discussed in the Administration's Blueprint for Economic Recovery, workers who deliver all types of consumer goods would benefit significantly from minimum pay and other protections so, as we work on all this legislation together, the Administration wants to ensure it addresses the root causes of unsafe riding, that it does not have unintended consequences on workers, and that each bill works in concert to develop better policy outcomes for New Yorkers.

Thank you for the opportunity to testify on these bills and for your collaboration with our

COMMITTEE ON CONSUMER AND WORKER PROTECTION        20

efforts to support working New Yorkers. We look forward to answering any questions you may have.

CHAIRPERSON MENIN: Thank you very much. I'm now going to turn it over to Council Member Salamanca for his opening statement.

COUNCIL MEMBER SALAMANCA: Thank you, Madam Chair, and good morning to all. Good morning to you, panel.

I would like to speak on my bill, Intro. 762. Intro. 762 is a comprised solution that is the result of months of collaboration with New York City restaurants, the Council, food delivery platforms, and other key stakeholders in New York City's delivery ecosystem. Intro. 762 offers restaurants more flexibility to opt into supplemental marketing and promotional plans, which are critical for small businesses trying to compete against national chains. This bill ensures fairness and transparency in the industry and protects restaurants from exploitation while helping them attract new customers on their terms. Intro. 762 protects businesses by prohibiting third-party apps from purchasing restaurant names for advertising purposes without consent, while also guaranteeing restaurants' ability to set prices for

COMMITTEE ON CONSUMER AND WORKER PROTECTION        21

items ordered through third-party apps compared to in-person or direct orders. A benefit to restaurants, Intro. 762 gives restaurants an option to include physical marketing materials with orders, enhancing in-house advertising efforts in the process.

Furthermore, Intro. 762 allows restaurants greater flexibility to obtain restaurant-tailored marketing services provided by third-party platforms to expand outreach to new customer bases. Intro. 762 also protects consumers by maintaining both the 15 percent cap on delivery fees as well as the 3 percent cap on credit card processing fees. A common misconception is that Intro. 762 guarantees that all restaurants will be listed and discoverable on third-party platforms regardless of whether they opt into additional marketing services.

Lastly, this bill creates a level of government oversight by requiring the Department of Consumer Affairs and Worker Protection to conduct regular assessments of the industry to ensure rules and regulations are being followed. These measures are crucial for balancing the future success of all members of the delivery ecosystem, consumers, carriers, restaurants, and delivery platforms. This

COMMITTEE ON CONSUMER AND WORKER PROTECTION          22

proposal strengthens from its previous version of Intro. 813 with input from the stakeholders, which has widespread support from small and independent restaurants throughout the city and will provide some of the strongest restaurant protections in the country.

I thank my Colleagues who have already co-sponsored Intro. 762 and look forward to working with the industry stakeholders to pass this piece of important legislation. Thank you, Madam Chair.

CHAIRPERSON MENIN: Thank you, and I'll now turn it over to Council Member Abreu for his opening statement.

COUNCIL MEMBER ABREU: Good morning. Thank you, Chair. Thank you to the admin. Sorry I'm a little late. I just came back from a school graduation, but on my way here I was paying attention to the testimony, and I'm very excited to see that the Admin doesn't only support the intent of the bill, but you strongly support the bill, and every time when you find all your bills to be strongly supported by the Administration, we're sending a message, and so we're sending a message that we're standing up for our deliveristas. We're sending a

COMMITTEE ON CONSUMER AND WORKER PROTECTION        23

message that we're standing up for working-class families.

Intro. 738 would require that the tipping option be displayed at checkout, not after consumers have already received their orders, they close down the apps, and are chowing down. In response to their minimum wage agreement with deliveristas, delivery apps have retaliated by hiding the tip menu for consumers, knowing that deliveristas will lose out on meaningful earnings, and they have. Uber and DoorDash removed it, but Grubhub kept it and, as the testimony today by our Deputy Commissioner Ortiz, those apps that have kept the tipping option at checkout, like Grubhub, earnings and tips have been mostly on par with the tips that we have seen before the minimum wage went into effect but, for those apps that have removed the tipping at checkout, we're talking about 85 million dollars. That is insanity, and that difference would make the difference for our working-class families, and that's why we're here today.

Intro. 737 would require that the suggested minimums to be set at 10 percent. It would only be suggested, is what I will say. A 20-dollar order, a 2-dollar tip, I mean, come on now. Also, if

COMMITTEE ON CONSUMER AND WORKER PROTECTION        24

you do not want to provide those 2 dollars on a 20-dollar order, when people are driving their orders during blizzard conditions or during times at which they're scorching weather like this heatwave today, then it is your option to not tip, but we want to provide that option because it makes it a lot more fair, and this comes at no cost to the apps or the users, but it contributes to better consumer habits.

Intro. 857 would require third-party food delivery services and third-party courier services to provide food delivery workers with standard information relating to their pay calculations. A crazy idea. We want to know how people's pay is getting calculated. We want to know their active time worked. For God's sake, is this something that we have to fight for through legislation? Any worker in this city should know their active time worked. They should know how their pay is getting calculated, and the fact that we're fighting these apps on this is insanity to me. It's insanity. Thank you, Chair.

CHAIRPERSON MENIN: Thank you, Council Member.

Okay, we're going to go into questions for the Administration. The Administration had

COMMITTEE ON CONSUMER AND WORKER PROTECTION        25

announced a number of months ago that you would be creating an Office of Sustainable Delivery. What is the status of that Office?

ASSISTANT COMMISSIONER ORTIZ: Thank you for the question, Chair Menin. As I mentioned in my testimony, we've been currently engaging with DOT to develop this comprehensive policy review. I also know that the Mayor's Office and the Deputy Mayor of Operations have been working closely with Central Staff as well to identify the particular policies that this new body will work through, particularly as it relates to street safety priorities and workers' rights. I expect that we'll be working on that over the summer, and then we can have actual content for the council to look at in September or early fall.

CHAIRPERSON MENIN: Okay. I'm going to really urge the Administration to move as expeditiously as possible on that. We really need that because right now we're dealing with an alphabet soup of agencies on this, and there's no sort of one entity that has control over the myriad issues so we really want to see that move forward as quickly as possible.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        26

What specific measures will be put in place to prevent e-bikes and mopeds from speeding on sidewalks and endangering pedestrians?

ASSISTANT COMMISSIONER ORTIZ: Well, I think, something I really like to highlight is the fact that apps bear a certain responsibility here for promoting certain practices, and we need to make sure that any approach identifies their accountability in this, and what I really want to talk about then is arbitrary deactivations, unrealistic delivery times, contacting workers while they're in transit. I think these are some of the issues that we really need to address in a comprehensive policy review to ensure that workers are not compelled into unsafe practices. Additionally, I think I'd also just want to note again that we were certainly supportive of expanding the minimum pay rate to other industries that engage in delivery for independent contractors, and I think those pieces from a DOT and DCP perspective would be really important.

CHAIRPERSON MENIN: Okay. A number of questions on the legislation. I want to start with Intro. 762. I understand, obviously, there's active

COMMITTEE ON CONSUMER AND WORKER PROTECTION        27

litigation, but what is the Administration's position on Intro. 762?

ASSISTANT COMMISSIONER ORTIZ: Thank you, Chair. I think on the advice of the Law Department, I can't comment on the position of the legislation. There is ongoing litigation. I can provide a status update of that if that's helpful. Let me just say that the City had a motion to dismiss the litigation, but that was denied, and currently we're in a process of discovery and depositions, and hence why I can't provide further comment. I think Council Member Salamanca's point is well-taken. As in the hearing last session and today's hearing, I think it's important to hear from stakeholders in this space, and I really would be encouraged to hear from restaurants, apps, delivery workers, all about the impacts of the fee cap.

CHAIRPERSON MENIN: Look, I understand there's active litigation, but I still think the Administration can comment on the legislation, which is not subject to the litigation.

ASSISTANT COMMISSIONER ORTIZ: I think for us, the litigation is still outstanding. For us, we will enforce the fee caps wherever they're set, but

COMMITTEE ON CONSUMER AND WORKER PROTECTION          28

in terms of resolving the litigation, I think that's a key question.

CHAIRPERSON MENIN: Okay. How many complaints has the Administration received related to fee caps?

ASSOCIATE GENERAL COUNSEL SCHWENK: Thank you, Council Member. We've received one single complaint about the fee caps since the law was put into place. That was a complaint received in 2022. It was successfully mediated by our office. It was a restaurant who alleged that one of the delivery apps had violated the credit card transaction fee cap and, through our mediation efforts, we were able to secure a return of over 500 dollars to the restaurant to make that restaurant whole for the overcharge on the credit card transaction fee.

CHAIRPERSON MENIN: And how many violations have been issued?

ASSOCIATE GENERAL COUNSEL SCHWENK: No violations.

CHAIRPERSON MENIN: No violations. Okay. In terms of, if you're concerned that increased fees could lead to restaurants losing access to their

COMMITTEE ON CONSUMER AND WORKER PROTECTION      29

customers, how do you plan to mitigate the risk of reduced revenue for these businesses?

ASSISTANT COMMISSIONER ORTIZ: I don't think that's a concern that we've articulated, although if restaurants do feel that's a concern, I think this hearing is a perfect setting for them to share. Ultimately, I think for us, no matter where the fee caps are at, we'll make sure to communicate that proactively to restaurants and continue the engagement we've had with the app industry, too, to ensure compliance with local laws.

CHAIRPERSON MENIN: Other than amending the fee cap, which is obviously the subject of Intro. 762, is there any additional support either your agency or SBS will be providing to restaurants to help them succeed?

ASSISTANT COMMISSIONER ORTIZ: Well, I think from, I guess, going into the other parts of our agency's work, we do have a lot of programming that supports small businesses in our city. I'd like to think, for example, about Mayor Adams' expansion of our free tax prep program for self-employed New Yorkers. SBS is a key partner in that, and I know we always work to help educate small businesses on their

COMMITTEE ON CONSUMER AND WORKER PROTECTION        30

responsibilities, and we'll continue doing that good work.

CHAIRPERSON MENIN: Moving on to Intro. 737, 738, 859, you indicated, as Council Member Abreu noted, that you strongly support this legislation in terms of 737. How many complaints have you received regarding restrictions on third-party food delivery service conduct?

ASSISTANT COMMISSIONER ORTIZ: Well, I think with respect to tipping in particular, we received eight complaints for delivery workers related to tipping as it relates to what's currently in Local Law. I will say we have received a lot of complaints from folks about the changes that happened to the interfaces, albeit none of that is necessarily illegal right now. All this legislation would change that, so we don't have clear numbers on that, but I think it's something that workers are talking about a lot and definitely have complaints about.

CHAIRPERSON MENIN: How many violations have you issued on that subject?

DEPUTY COMMISSIONER WAGONER: We have not issued violations on the tipping subject because the

COMMITTEE ON CONSUMER AND WORKER PROTECTION        31

issues that are present in this bill, it's not currently illegal to change the tipping interface.

CHAIRPERSON MENIN: Okay, and how many complaints have you received regarding the sale, lease, and rental of powered bicycles, powered mobility devices, and storage batteries for such devices?

ASSISTANT COMMISSIONER ORTIZ: This is with respect to Local Law 39, correct?

CHAIRPERSON MENIN: Yes.

ASSISTANT COMMISSIONER ORTIZ: We've received over 40 complaints with respect to Local Law 39. I think since that law took effect in September of 2023, we've conducted close to 600 inspections, issued violations to close to 200 brick and mortars as well as 25 online retailers as well.

CHAIRPERSON MENIN: Have you encountered challenges in terms of enforcing this Local Law?

ASSISTANT COMMISSIONER ORTIZ: No, I think this is the type of work that is really a bread and butter for our Consumer Protection Team, being able to identify and proactively inspect locations. It was certainly a high priority for us when this law was in place and additionally why we recommended so many

COMMITTEE ON CONSUMER AND WORKER PROTECTION       32

amendments earlier this year to increase penalties, to provide the City with ceiling authority for recidivist behavior so we're looking forward to those amendments taking effect in September for us.

CHAIRPERSON MENIN: Can you provide an update on the City's trade-in program that was established pursuant to local law 131?

ASSISTANT COMMISSIONER ORTIZ: Yes, Chair. That trade-in program is being managed by DOT. My understanding is they'll be promulgating rules in July, and they're looking to have registrants by the end of the year for that program.

CHAIRPERSON MENIN: Okay, wonderful. I'm now going to turn it over to my Colleagues for questions.

First of all, Council Member Salamanca. No? Okay, Council Member Abreu.

COUNCIL MEMBER ABREU: Thank you, Chair. This is a question to Admin. Are there any tweaks to the existing bills you would like to make?

DEPUTY COMMISSIONER WAGONER: I think with respect to both of the bills concerning tipping, we want to make sure to close a loophole we see in the current text that would allow apps to continue to

COMMITTEE ON CONSUMER AND WORKER PROTECTION        33

have the option to offer a tipping interface or not in the order process. We think it should be mandatory that apps offer the tipping interface before the order is placed.

COUNCIL MEMBER ABREU: Thank you. Very helpful. DoorDash recently sent a communication to its workers stating that my bills, Intro. 738 and 737, would decrease the amount of orders that consumers make, thereby harming both restaurants and deliveristas. This is confusing to me, considering tipping is completely optional, whereas the New York City surcharge that the apps responded with are not optional. They were willing to push that cost onto consumers and restaurants as part of their business model and then remove tipping option at checkout to artificially and disingenuously keep the total cost down. Putting that aside, however, can you please speak to the data on the volume of orders apps have reported to the agency and what differences were reported in terms of monthly deliveries made pre- and post-minimum wage taking effect?

DEPUTY COMMISSIONER WAGONER: Yes, I'm happy to. As you know, we receive monthly reporting from the apps on a variety of topics that allow us to

COMMITTEE ON CONSUMER AND WORKER PROTECTION        34

monitor compliance. That includes reporting on the total number of deliveries, and so we can compare the first quarter of 2023 to the first quarter of 2024. In other words, when there was no minimum pay rate, then compared to the first quarter of 2024 when there was a minimum pay rate and what we see is an increase of 8 percent.

COUNCIL MEMBER ABREU: There's an increase.

DEPUTY COMMISSIONER WAGONER: That's right.

COUNCIL MEMBER ABREU: Not a decrease or not even the same level. It's an increase.

DEPUTY COMMISSIONER WAGONER: That's right.

COUNCIL MEMBER ABREU: So is it fair to say that this notion that tipping at checkout would reduce the orders?

DEPUTY COMMISSIONER WAGONER: We see no reason to believe that that would occur if these bills were.

COUNCIL MEMBER ABREU: And that's an argument being made by big tech, just so you're aware. Okay. Then there was the argument that

COMMITTEE ON CONSUMER AND WORKER PROTECTION          35

removing the tipping at checkout, which was done in retaliation, that that would impact, that that's something that they're bearing as a cost. Is it your understanding that the service charge is being done to fund the minimum wage?

DEPUTY COMMISSIONER WAGONER: That may be the case. What we're seeing in the data is that customers are actually paying less for delivery now under the minimum pay rate than they were previously, in part because of these tipping changes.

ASSISTANT COMMISSIONER ORTIZ: Council Member, I think just to piggyback on that a bit, I really do appreciate the graph that we've been able to put in our testimony. I think that really showcases the issue that your bills are going after. Essentially, that New Yorkers, when given an option, do choose to tip. Again, this is all about options and, ultimately, I think the minimum pay rate has been a major success. Pay is up. Deliveries are up. Tipping is still a component of take-home pay, and we're just saying that let's make sure New Yorkers have an option here so thank you very much for these bills.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        36

COUNCIL MEMBER ABREU: Just so folks are also aware, that just because deliveristas got minimum wage, they didn't get everything under the sun. In fact, they're not getting minimum wage necessarily per hour. There was a story, and I've said this last night on Errol Louis, there was a story of a deliverista who worked from 6 a.m. to 3 p.m., worked eight hours, and only made 63 dollars because the minimum wage only applies to active time worked, from the moment you pick up the delivery to the moment you drop it off but, when you're doing call time, those resources aren't necessarily pooled evenly, and 63 dollars for eight hours is poverty wages. If they had in fact been making minimum wage per hour, they would have made nearly three times the amount, somewhere around 180 something. That is what we're up against right now, and there's a lot of disingenuous arguments being made, and our job, I'm so grateful that the Council and the Administration is united on this issue. Thank you.

CHAIRPERSON MENIN: Wonderful. Council Member Salamanca, some questions?

COUNCIL MEMBER SALAMANCA: Yeah, thank you, Madam Chair. I will be brief.

COMMITTEE ON CONSUMER AND WORKER PROTECTION          37

I understand that you're limited on what you can answer, but is the administration supportive of the revised bill now from 813 to 762?

I apologize, Council Member Salamanca. Just on the advice of the Law Department, because the litigation that the Administration and the Council are a party to, I really can't comment on the legislation today. Although I am thankful for this setting, as we've had many settings over the past few years to discuss the fee caps and for stakeholders to provide feedback to.

COUNCIL MEMBER SALAMANCA: An idea when the litigation will be completed?

ASSISTANT COMMISSIONER ORTIZ: It's hard to predict. I did mention earlier that we did file a motion to dismiss, but it was denied, and right now we're in, I think, a process of discovery and depositions of key folks so I don't really have a timeline I can share on specifics there.

COUNCIL MEMBER SALAMANCA: I just want to point out certain keys on this new bill. Under the current law, the max that can be charged at restaurants is approximately 23 percent. That's broken down by 15 percent for delivery, 5 percent for

COMMITTEE ON CONSUMER AND WORKER PROTECTION      38

marketing, and about 3 percent for order processing. Now, Intro. 762 would merely raise the cap on fees from marketing services for those restaurants who desire to give their promo a boost.

With that, I have no further questions since I understand you're limited on what you can answer on this bill. Thank you, Madam Chair.

CHAIRPERSON MENIN: Thank you, Council Member.

I'll now turn it over to Council Member Feliz.

COUNCIL MEMBER FELIZ: Thank you. Thank you so much, Chair Menin, for this hearing and also to all my Colleagues who have bills before this Committee today.

A few questions on Intro. 38. What's the Administration's position on this bill?

ASSISTANT COMMISSIONER ORTIZ: Thank you, Council Member Feliz. I think our position has not changed significantly from what DOT testified to in January. We believe that apps bear responsibility here to ensure that workers have access to safe devices, are using safe devices, that they're not being compelled into unsafe riding practices. I think

COMMITTEE ON CONSUMER AND WORKER PROTECTION         39

for us at DCWP, we're looking to work very closely

with our colleagues at DOT to make sure we're

developing a comprehensive policy to address street

safety priorities, such as your bill as well as

worker rights components for us.

COUNCIL MEMBER FELIZ: Thank you, and what

are ways that the bill could be properly implemented?

The bill would, of course, require that the apps

provide a UL certified e-bike to workers who don't

have one. I know we're basically inventing the wheel.

We would be the first in the entire country to create

an employment program like that so what are ways that

we could get this properly implemented? What are

systems that still need some work so that we could be

able to get this right?

ASSISTANT COMMISSIONER ORTIZ: Well, I

know in January, DOT mentioned as a part of their

implementation that they would consider aspects such

as safe dispatch requirements, ensuring that workers

are dispatched on safe devices, compliance planning

and things like that that the apps could report to

them. I think these are some of the key components

that DOT would work through, and we would certainly,

COMMITTEE ON CONSUMER AND WORKER PROTECTION          40

through our experience in our own delivery side of the space, would be informative of that, too.

COUNCIL MEMBER FELIZ: Okay. Are there any tweaks that you would recommend for the bill, or would you say, as written, we could move it forward to vote and pass it?

ASSISTANT COMMISSIONER ORTIZ: Well, I would say one thing that I think is important from the Administration perspective, I mean, I think there are a number of bills, for example, in today's hearing that have to deal with street safety issues, worker rights issues. I think for us, it's critical that these pieces all work together in a unified approach, just thinking even definitionally to make sure things are aligned, just make sure that all these bills are working together. You know, I've certainly had experiences in other spaces where things can happen piecemeal, and I don't think that's what anybody wants here, and so our goal is to make sure that we have close coordination and collaboration with the Council. I know the Mayor's Office and the Deputy Mayor of Operations have been working closely with central staff on these issues so I'm looking forward to developing this over the

COMMITTEE ON CONSUMER AND WORKER PROTECTION        41

summer and having some content for the Council into the early fall.

COUNCIL MEMBER FELIZ: Perfect. Thank you so much, and we look forward to continued conversations about this bill just to make sure we get it right. We're, again, inventing the wheel. It requires a lot of pieces, getting them properly, just to make sure that we could get this right on the first round.

Also, just want to say, we have a major problem. Want to briefly go over some of the fire-related numbers. Numbers related from January through end of May. Last year, we had 97 fires due to e-bikes. This year, we've made a little bit of progress, but not enough. 89 fires. Just eight less fires compared to last year. Also, injuries. 65 last year from, again, January through end of May versus 44. We've made some progress, but clearly it is not enough, and we need everybody to step up, including the companies. The companies have their biggest market in the City of New York, and it's unacceptable that on a problem as serious as this one, they continue to just look away and hope that somebody else resolves the challenge so look forward to

COMMITTEE ON CONSUMER AND WORKER PROTECTION          42

getting this bill to the finish line. I would say this bill is obviously not perfect yet, and I look forward to listening from the apps, just to make sure that whatever tweaks need to be made are made but, again, we have a major problem, a problem related to safety of workers, and we need the companies to step up. It is unacceptable that, again, the companies, whether it's, well, I won't mention any, but it's unacceptable that companies with their largest market, they just, again, continue to just look away and hope that somebody else resolves the problem so look forward to working with everyone, every single company, and every single stakeholder. Get feedback about different ways of getting this bill right, so that once and for all we can finally resolve this problem but, yeah, I want to thank all of you for working with all of us to craft this bill and resolve this issue. Thank you so much.

CHAIRPERSON MENIN: Thank you, Council Member.

Council Member Abreu.

COUNCIL MEMBER ABREU: Thank you again, Chair. With regard to pay transparency, can you speak

COMMITTEE ON CONSUMER AND WORKER PROTECTION        43

to what delivery workers are currently able to see on their pay stub?

DEPUTY COMMISSIONER WAGONER: Right now the apps have a great deal of discretion in terms of what information they give workers about their pay, and so the interface is going to vary depending on the app, but what we are hearing from workers is that they are not getting details about how elements of their pay are calculated so that they're unable to understand or predict kind of what they're going to receive, and so the concept behind the bill is a good one to require apps to give workers more information about the pay calculation.

COUNCIL MEMBER ABREU: To your knowledge, are workers, or at least based on what you're hearing, are workers able to see a breakdown of their active time versus their on-call time? Have you heard any issues about that?

DEPUTY COMMISSIONER WAGONER: At some apps, that is the case. But in terms of how that allocation of on-call time translates to dollars, that is at some apps at least opaque to workers.

COUNCIL MEMBER ABREU: You know, you can name the apps. I mean, tell me which ones.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        44

Is there any way currently for workers to check for wage theft or otherwise verify the number on their pay stub matches what they were expecting for the week?

DEPUTY COMMISSIONER WAGONER: Yes. There, workers can file a complaint with DCWP at nyc.gov/workers or by calling 3-1-1 and, through a combination of information that the worker has about their individual trip time and the reporting we're getting from the apps, we are able to check and verify that for most people. There are some open investigations but, for the most part, we are able to help workers with that.

COUNCIL MEMBER ABREU: Let me ask you another question. If an app tells deliveristas, if this bill moves forward and you support this bill, this will likely result in you losing your tipping, would you consider that as retaliation?

DEPUTY COMMISSIONER WAGONER: I think I cannot speak to the app's motivations behind making that change.

COUNCIL MEMBER ABREU: But if someone is engaging in the activity of supporting this bill, supporting our bills, and then there's a threat that

COMMITTEE ON CONSUMER AND WORKER PROTECTION        45

says your tipping option may be removed if these bills pass, would that be considered retaliation? Because if not, then that's something we should look into.

DEPUTY COMMISSIONER WAGONER: Certainly, a threat against a worker for exercising protective rights under the law is retaliation.

COUNCIL MEMBER ABREU: And would you consider supporting these bills' protected activity, supporting Council legislation protected activity?

DEPUTY COMMISSIONER WAGONER: That's a complicated legal question. I'd have to think about that one.

COUNCIL MEMBER ABREU: All right. Thank you.

CHAIRPERSON MENIN: Okay. Thank you very much. I want to thank the Administration for… oh, Council Member Salamanca.

COUNCIL MEMBER SALAMANCA: Just have one question in terms of the litigation. Should the City lose this lawsuit, how much would it cost the City?

ASSOCIATE GENERAL COUNSEL SCHWENK: I don't think we have any sort of estimate of that figure here, and I think we'd be happy to put you in

COMMITTEE ON CONSUMER AND WORKER PROTECTION        46

touch with Law Department attorneys who might be able to answer more questions about the current state of the litigation.

COUNCIL MEMBER SALAMANCA: All right. I've heard a number of about it will cost the City about a billion dollars.

ASSOCIATE GENERAL COUNSEL SCHWENK: Yeah, we couldn't possibly estimate right now at this state of play.

COUNCIL MEMBER SALAMANCA: Okay. All right. Thank you.

CHAIRPERSON MENIN: Council Member Feliz.

COUNCIL MEMBER FELIZ: Thank you so much. A few more questions. The next round of questions on Intro. 972-2024 by Council Member Powers, which would require that the third-party apps verify licensing for those that are doing deliveries with mopeds. I would state the same points that I mentioned earlier in the context of mopeds. Unacceptable that we have a large amount of individuals engaging in deliveries with mopeds and the companies turning a blind eye on those that are engaging in deliveries without licensing. A big issue when people don't use licenses, we see what I've seen, you only need to

COMMITTEE ON CONSUMER AND WORKER PROTECTION          47

spend a minute in the streets of New York City to see it is people engage in recklessness, whether it's running red lights, so much more, putting everybody at risk, including themselves so I think Intro. 972 is a very important bill to make sure that the companies are playing a role in helping us resolve that issue, rather than, again, saying hopefully somebody else can resolve it. Quick question. The bill would require that the apps verify that the mopeds are licensed. What are ways that we've thought about ways that they could potentially do that? Obviously, they have a large fleet, different companies, and some workers are working for different companies at the same time, if I'm correct.

ASSISTANT COMMISSIONER ORTIZ: Thank you, Council Member. I think, well, one, I want to make sure I want to be clear for the Administration's perspective that street safety is paramount. I think we all bear responsibility to make sure we're following appropriate traffic laws and rules for the safety of our friends and neighbors and family, but I do think you've hit the nail on the head that there are certain aspects of this that are responsibility, too, of apps that are engaging tens of thousands of

COMMITTEE ON CONSUMER AND WORKER PROTECTION          48

workers throughout our city. For example, I think,

thinking about my work with my colleagues at DOT, for

example, and their standing up with the Rebel Scooter

Program, they have had aspects of confirming that

folks were wearing helmets, confirming the identity

of the riders on the Rebel Scooters. That's a case

I've heard an example of that I'm sure DOT would

delve in further for but, again, I think we are

certainly as an Administration and I'm sure as a

Council, we are having to develop these robust policy

responses because of these dynamics that have

happened in our streets that are certainly dynamics

of unsafe practices that are being driven from app

companies.

COUNCIL MEMBER FELIZ: All right. Thank

you so much.

CHAIRPERSON MENIN: Okay. Any more

questions? Going once, going twice.

Okay. Thank you to the Administration. We

really appreciate your testimony today.

ASSISTANT COMMISSIONER ORTIZ: Thank you

very much, Chair.

CHAIRPERSON MENIN: We will move right

into the public comment period because we are eager

COMMITTEE ON CONSUMER AND WORKER PROTECTION         49

to hear from the public so I'm now going to open the hearing for public testimony.

I want to remind members of the public that this is a formal government proceeding and that decorum should be observed at all times. As such, members of the public should remain silent at all times.

The witness table is reserved for people who wish to testify. No video recording or photography is allowed from the witness table. Further, members of the public may not present audio or video recordings as testimony, but they may submit transcripts of such recordings to the Sergeant-at-Arms for inclusion in the hearing record.

If you wish to speak at today's hearing, please fill out an appearance card with the Sergeant-at-Arms and wait to be recognized. When recognized, you'll have two minutes to speak on today's hearing topic, which is Intro. 30-A, 715, 737, 738, 762, 859, and 972.

If you have a written statement or additional written testimony that you wish to submit for the record, please provide a copy of that with the Sergeant-at-Arms. You may also email written

COMMITTEE ON CONSUMER AND WORKER PROTECTION          50

testimony to testimony@council.nyc.gov within 72 hours of this hearing. Audio and video recordings will not be accepted.

I will now call the first panel. The first panel is Claudia Henriquez from the New York City Comptroller's Office.

Just put the red light on. Thank you.

CLAUDIA HENRIQUEZ: Okay. Good morning. My name is Claudia Henriquez. I'm the Director of Worker Rights in the Bureau of Labor Law at the Office of the New York City Comptroller, Brad Lander and, as you all know, when Comptroller Lander was a Member of this Council, he spearheaded the labor protections for delivery workers. Many of those standards are in place today, and this set of issues is very important to him.

At the Bureau of Labor Law, our mission is to protect vulnerable workers from exploitation, and that is why we are here today. Comptroller Lander strongly supports Intro. 737 and 738, which establish standards around the solicitation of gratuities for app-based delivery workers. As my colleagues at the Department of Consumer and Worker Protection already testified, it's well-documented that after the

COMMITTEE ON CONSUMER AND WORKER PROTECTION          51

Minimum Pay Law went into effect, certain platforms changed their tipping structures so that customers could only tip after the order was placed or delivered. This resulted in lower overall tips to workers on those platforms, and so we support legislation that would regulate this. We did want to flag an issue with the way that the language is drafted. Both bills state that where tipping is solicited or if tipping is solicited, then these requirements would apply, and we encourage the Council to be thoughtful about that wording so that it doesn't inadvertently provide a loophole for the apps to remove the tipping option altogether, and which we understand has already been threatened.

Comptroller Lander also supports Intro. 859, which would promote pay transparency. Workers have the right to this information just like workers in other industries have access to their itemized paychecks and time records.

Some of the bills before the Council address traffic safety, and we support that workers be protected, that they are not incentivized to engage in unsafe acts, such as running red lights, because of the time pressures. I see that I'm almost

COMMITTEE ON CONSUMER AND WORKER PROTECTION          52

out of time. The remainder of my comments will have been submitted in writing.

CHAIRPERSON MENIN: Great. Thank you very much. Thank you.

Okay. I'm now going to call the next panel. Hayley Prim, Joshua Bocian, Kassandra Perez-Desir, and Bryan Lozano. Please come up. Thank you.

Okay. Please begin.

JOSHUA BOCIAN: Good morning. My name is Joshua Bocian, and I'm the Head of Government Affairs for GrubHub here in New York City. I'd like to thank Chair Menin and the Members of the Committee for the opportunity to testify today in support of Intro. 762, the Fair Competition for Restaurants Act, as well as a range of issues facing delivery couriers in our city. While my testimony today focuses on 762, the Fair Competition for Restaurants Act, and the need to provide New York's independent restaurants with long overdue relief from caps on marketing services, I'd like to thank the Council and recognize the important work being done to support delivery couriers. GrubHub continues to be a willing partner in these efforts, and we see reasonable paths forward on a number of these proposals being heard here

COMMITTEE ON CONSUMER AND WORKER PROTECTION          53

today. We look forward to continuing those conversations.

Intro. 762, the Fair Competition for Restaurants Act, is the result of nearly two years of collaboration and compromise so it's no surprise to see that it has broad support from multiple borough chambers of commerce, from restaurant groups like the New York State Latino Bar and Restaurant Association, and from countless restaurant owners themselves from across the city, many of whom are here today to voice their support. Together, we've made the Fair Competition for Restaurants Act, Intro. 762, the strongest bill of its kind in the country. This amendment will give New York's independent restaurants a fighting chance against the big national brands and their massive advertising budgets. It affords them the choice, let me repeat that, the choice to take advantage of tools to expand their customer base, reward loyalty, and increase orders. At the same time, it includes a number of new safeguards to ensure restaurants' interests are protected. This bill is a win-win-win for restaurants, for diners, and for the couriers who deliver their orders. I'd like to thank the Chair and

COMMITTEE ON CONSUMER AND WORKER PROTECTION      54

the Committee for holding this hearing today and discuss the Fair Competition for Restaurants Act, Intro. 762, and the whole host of issues facing our industry. By passing this amendment, we can assure that New York's small, independent restaurants are afforded a level playing field and the right to compete fairly. Let's take this crucial step together to strengthen our delivery ecosystem for the benefit of all New Yorkers. Thank you.

HAYLEY PRIM: Good morning. Hayley Prim, Senior Policy Manager at Uber. Good morning, Chair and Members of the Committee, we will submit written testimony detailing our concerns regarding intros 715, 30-A, Intro. 972, and our support for Intro. 762. I will focus my two minutes on Council Member Abreu's tipping and pay calculation bills, which we oppose in current form, but welcome any conversation on any of the legislation listed on the agenda.

First, some facts on tipping. Delivery workers who use Uber Eats currently make a minimum of $19.56 per hour plus tips. Uber Eats customers have the option to tip their delivery provider on every single order and, since January 1, they've tipped in total more than 25 million dollars, or on average, a

COMMITTEE ON CONSUMER AND WORKER PROTECTION          55

million dollars each week. Third-party food delivery workers are the only app-based workers with mandated minimum pay in the city and, by law, they receive more information and have more choice than any app-based delivery worker in the city. The DCWP's November 2022 report stated that the new pay standard would ensure that delivery workers would no longer be so reliant on tips and predicted that tipping may be reduced or eliminated in light of workers' higher pay. When the pay standard went into effect, Uber Eats did not take away the option for consumers to tip. The only thing that changed was when consumers would be able to tip, and that decision was made in part to help comply with requirements from this Council's previous legislation.

The Council is also considering a bill that would create new requirements related to workers' pay calculations. However, components of this bill are technically impossible to implement. Other components would likely lead to more questions and confusion from workers, and others contradict pieces of the pay standard. Uber supports transparency. Workers already receive pay statements every week, which provide detailed information

COMMITTEE ON CONSUMER AND WORKER PROTECTION        56

related to earnings, gratuities, total trips, and more. Just this past week, we launched an addendum to pay statements, which provides more information about the expenses, paid sick leave, and workers' compensation components that the DCWP explicitly considered when calculating the pay standard. We welcome continued conversation with the Council on these bills and others being heard today.

KASSANDRA PEREZ-DESIR: Thank you. Good morning, Chair, Members of the Committee. I'm Kassandra Perez-Desir on behalf of DoorDash. New York City's current price controls on restaurant delivery services are outdated, extreme, and risk causing further harm to restaurants, dashers, and consumers. Intro. 762 is a common-sense solution that guarantees restaurants have low-cost delivery options. It addresses concerns raised by the Council and stakeholders alike, and the Council should advance this bill so restaurants have every option available to help them recover and flourish.

However, the other bills under consideration today take a one-step-forward, three-steps-back approach with respect to delivery services in New York City and will create significant,

COMMITTEE ON CONSUMER AND WORKER PROTECTION        57

unintended consequences. Intro. 30 would require delivery workers to have certified e-bikes provided by platforms, regardless of how much they use the platform. These amendments still completely ignore that restaurant delivery platforms are the only entities contributing to e-bike safety by paying workers an additional $2.26 per hour under the City's minimum pay rules, amounting to approximately 50 million dollars to workers for the purchase of e-bikes. We remain steadfast in our opposition to any policy imposing overlapping expenses on a select few while ignoring businesses selling these dangerous products in the first place. Even platforms and the LDU can understand that imposing millions in additional costs on platforms could reduce or eliminate e-bikes as an option, essentially putting many out of work.

Intro. 737 and 738 mandate that platforms solicit tips at checkout and suggest a tip of 10 percent. However, the narrative is misleading. In reality, tipping post-checkout is to balance rising consumer costs resulting from the minimum pay rules. DCWP's support is surprising, given the suggested changes to tipping on page 36 of their study. Still,

COMMITTEE ON CONSUMER AND WORKER PROTECTION 58

higher consumer costs have resulted in an estimated 850,000 fewer orders for dashers and 17 million dollars in lost revenue for merchants in just a two-month period. Mandating tips at checkout will only exacerbate this. Worse yet, the proposals single out restaurant delivery platforms while others delivering groceries, alcohol, and other goods are not subject to any of the same pay or regulations.

Finally, we oppose Intro. 715, which would incentivize more traffic violations, not less. We look forward to continuing to work with the Council over the summer on these concerns. Thank you.

CHAIRPERSON MENIN: Excuse me one second. We just want to take a moment to recognize we have students in the balcony from Ballet Tech Public School for Dance. We really appreciate you being here.

Number of questions that I have for this panel, and I'm sure my Colleagues do as well. What have you done to ensure that your delivery workers are riding certified e-bikes and registered mopeds while delivering for your service?

HAYLEY PRIM: Hi. Hayley from Uber. I can answer this question in a few different ways. For

COMMITTEE ON CONSUMER AND WORKER PROTECTION          59

anyone who says they plan to ride a moped to make deliveries on the app, we require them to upload insurance documentation as well as information from a registration. We also use real-time ID checks and reports from customers to make sure customers are on the right vehicle. For example, if they say they're on a manual bicycle and they're going 30 miles per hour, that's a clear indication that they're not registered the correct vehicle. Uber has also invested in partnerships in New York City, which go to increase delivery workers' access to UL-certified bikes, including through the Zumo partnership, as well as the Equitable Commute partnership.

CHAIRPERSON MENIN: And what type of active training do you do for delivery workers?

HAYLEY PRIM: We don't provide active training. We do send safety tips and road safety tips to delivery workers on a regular cadence.

CHAIRPERSON MENIN: What percentage of your delivery workers are using e-bikes, and what percentage are using mopeds?

HAYLEY PRIM: More than 50 percent of workers who've registered through the app say they're

COMMITTEE ON CONSUMER AND WORKER PROTECTION       60

using an e-bike or a manual bike. The use of mopeds is much, much smaller.

CHAIRPERSON MENIN: And what measures are you taking to ensure that individuals that are delivering on the platform have the proper equipment and are able to operate in a safe manner?

HAYLEY PRIM: I'm happy to jump in, but also…

JOSHUA BOCIAN: I'll answer if you want.

CHAIRPERSON MENIN: Yeah, yeah, if it would be helpful.

JOSHUA BOCIAN: Josh Bocian with Grubhub. Just to start off to say that I think most of our answers are the same to the ones that Hayley already gave you. It looks like Kassandra agrees that most of our answers are the same there.

In terms of ensuring that individuals have proper equipment, we cannot compel our contractors to use certain types of equipment. Safe delivery is required in our delivery partner terms and conditions. However, much like my colleagues here, we do send out regular communications to the couriers, making sure and encouraging them to follow the rules of the road, do things such as safe

COMMITTEE ON CONSUMER AND WORKER PROTECTION        61

charging with e-bikes, making sure that they're doing what they're supposed to be doing. I would also say that we support bipartisan legislation that's currently pending in the United States Congress regarding UL-certified e-bikes and e-batteries, and we actually think that those that are not UL-certified should be banned. There was also a package of legislation that recently passed in Albany, which had, I think, five or six bills, if I remember correctly, that specifically dealt with e-bikes about point of sale and that only UL-certified batteries should be sold, etc. We supported that package of legislation as well.

KASSANDRA PEREZ-DESIR: And just to add to that, in addition to directly providing workers with financial resources to pay for e-bikes and batteries through the minimum pay standard, DoorDash has taken additional steps to support access to safe e-bikes. We improved the access to certified bikes by investing 250,000 dollars in the Equitable Commute Project to fund the development of the first-ever trade-in program dedicated to delivery workers in New York City. This program will run trade-in events on a biweekly basis to help delivery workers transition

COMMITTEE ON CONSUMER AND WORKER PROTECTION        62

from their existing device to a new UL-certified e-bike. Delivery workers have three options to choose from, and e-bikes are priced as low as 700 dollars. Additionally, forging partnerships with reputable manufacturers and retailers to offer certified e-bikes to dashers at affordable prices. We have partnerships with e-bike suppliers that offer delivery workers discounted bikes and batteries that are certified to UL standards. These collaborations allow dashers to purchase e-bikes for as low as 949 dollars. We also invest in education, 100,000 dollars in the FDNY Foundation to support battery safety education initiatives and regularly update and remind dashers of the best practices. We also advocate for Congress and the U.S. Consumer Product Safety Commission to set federal battery safety standards for e-bikes and all micro-mobility devices to stop uncertified products from entering the United States in the first place.

CHAIRPERSON MENIN: What changes have you made to the platform since minimum pay went into effect?

JOSHUA BOCIAN: So, at Grubhub, Council Member, as the minimum pay went into effect, we've

COMMITTEE ON CONSUMER AND WORKER PROTECTION         63

had to make adjustments to our platform to ensure that the number of couriers that are on the platform are in the correct correlation to the number of orders that are there, and so we've had to do things such as have couriers sign up for blocks, for example, in order to make sure that, again, we have the right number of people on the road in order to do those deliveries. This is an interesting conundrum because, in fact, when the DCWP passed the minimum wage, they predicted in their own study, and I would invite Members of the Committee to take a look at the study, that, in fact, the industry would be forced to become more efficient, which would likely result in less couriers on the road. That has come to fruition. We still have about 20,000 folks at Grubhub who are active on our platform at any given time, but I do know that's less than before DCWP's minimum wage. I will say that we think that there's a way to increase the number of couriers and to increase their pay, which is to pass Intro. 762. We firmly believe that amending the cap on restaurants will lead to more exposure to diners, which will lead to more orders for restaurants, which will lead to more

COMMITTEE ON CONSUMER AND WORKER PROTECTION       64

opportunities for the couriers to make deliveries, thus leading to more money.

CHAIRPERSON MENIN: I have a question on that, but before I move on to a question on that, any other comments that either of you want to make on that topic?

HAYLEY PRIM: I was just going to say similar. Prior to the earning standard, we were open access. Since the launch, we had to limit workers' ability to go online in order to match the supply and demand.

CHAIRPERSON MENIN: In jurisdictions that have enacted a cap fee, how many users opt for the minimum fee level and how many opt for the maximum fee level?

JOSHUA BOCIAN: I can answer this. In similar jurisdictions where the fee cap has been amended, the overwhelming, and we're talking 90-plus percent of our restaurants, stayed at the exact same package that they had prior to COVID, prior to those fee caps going into effect. I can give you a specific example in San Francisco where we know that approximately 15 percent of our restaurants are at the basic package, and about 85 percent of our

COMMITTEE ON CONSUMER AND WORKER PROTECTION          65

restaurants or so in San Francisco opt for more services above the basic package.

HAYLEY PRIM: I was just going to comment that the vast majority of caps since COVID have been repealed or removed by those jurisdictions, but we do offer merchants different pricing plans currently all over the country outside of New York City that range from light to premium options, and we see restaurants take advantage of that flexibility to choose the plan that works best for them.

CHAIRPERSON MENIN: I'm going to now turn to my Colleagues for questions. Council Member Abreu.

COUNCIL MEMBER ABREU: Yeah, I have a question for Grubhub. Can you please tell me whether or not your tipping option remained at checkout after minimum wage went into effect?

JOSHUA BOCIAN: Yes.

COUNCIL MEMBER ABREU: So what do you say about this notion from Uber and DoorDash that passing the minimum wage required them to remove the tipping at checkout? What do you have to say to that?

JOSHUA BOCIAN: We're running our business and they're running their business. I'm not going to comment on how they're running their business. I

COMMITTEE ON CONSUMER AND WORKER PROTECTION          66

think you're going to have to ask my two colleagues about that. Council Member, I will say this. That is correct. We did not change our tipping policy. However, we are under a tremendous pressure to do so from our business because we are now at a competitive disadvantage. What we have seen, and this you can take it from the company that hasn't changed this tipping policy, is that in fact because of the DCWP minimum wage, we are actually seeing a decrease of approximately 25 percent of what our customers are tipping the couriers so to say that there's not been an effect, we actually have data to show that there is an effect.

COUNCIL MEMBER ABREU: And just, the Admin made clear that apps like Grubhub, which have kept tipping at checkout, for the most part have, even though there's been a slight decrease in tipping, it has been by far the most helpful for deliveristas compared to the other apps, like Uber and DoorDash, we have seen an 85-million-dollar drop so I guess I would ask DoorDash the question, what do you make of the fact that your colleagues at Grubhub have kept tipping at checkout, which have been favorable for

COMMITTEE ON CONSUMER AND WORKER PROTECTION          67

deliveristas, and you guys decided against doing that?

KASSANDRA PEREZ-DESIR: Thank you. So similarly, I'm not going to speak on behalf of Grubhub, but I will speak on behalf of DoorDash and our position on moving tips to post-checkout. Because of the NYC pay regulations, they forced DoorDash and other platforms to increase consumer fees as you know. In response to this, we made tips an option post-checkout, the intent wasn't to make tipping harder, but it was to limit the number of consumers who were abandoning placing an order because of the higher cost. Each lost order not only guarantees that there won't be a tip, but it results in no earning opportunity at all for dashers. That's bad for dashers, restaurants, and customers in the city so making these tips available after checkout is not so nefarious and definitely not retaliatory. As I mentioned in my testimony, it was even suggested by DCWP in their own study on page 36 that I referenced, and you will all have a copy of that. It was suggested in that study of the pay standard as a strategy to reduce consumer costs, so this was acknowledged by the Administration as well.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        68

COUNCIL MEMBER ABREU: Understood, and where you're engaging it is not necessarily illegal behavior, but it is certainly behavior that has bad intent and is behavior that is, I believe, inconsistent with the needs of deliveristas. You mentioned in your testimony that orders have decreased. The Admin said 8 percent has increased. How do you reconcile the Admin's testimony versus yours? Is there false reporting or is there actual decrease?

KASSANDRA PEREZ-DESIR: I have the same question. That was the first that I'd heard of it, and we are looking to follow up with them to find out.

COUNCIL MEMBER ABREU: Because there is a reporting requirement, and they said it was 8 percent and, in your testimony, you mentioned that it's for a period of two months.

KASSANDRA PEREZ-DESIR: That's right.

COUNCIL MEMBER ABREU: So I'm curious to know if that overall year period, if that matches what's been reported, because that discrepancy is very concerning.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        69

KASSANDRA PEREZ-DESIR: And it's significant as well that the last two months, those numbers, as I mentioned, are 850,000 drop in orders and 17 million dollars in loss of revenue so that's just April and May alone so we can certainly…

COUNCIL MEMBER ABREU: So would you say that the Administration is lying?

KASSANDRA PEREZ-DESIR: No, I would not say that. I would say that we have to talk after the hearing and figure out all of the numbers and compare them.

COUNCIL MEMBER ABREU: So they're either lying, they're misreporting, or what you said does not characterize the entire year period that they reported?

KASSANDRA PEREZ-DESIR: I'm not speaking for the entire industry, only for DoorDash.

COUNCIL MEMBER ABREU: Yeah, okay.

CHAIRPERSON MENIN: Council Member Salamanca, questions?

COUNCIL MEMBER SALAMANCA: Yeah, thank you. Thank you, Madam Chair.

I want to thank the panel for being here today. I just want to speak a little bit about Intro.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        70

762. I know that there is some opposition on it, and I just want to get some clarity. I thank you for the Cranes article in New York that came out. It mentions, I know that the person who wrote this op-ed is Lisa Sorin. She's from the Bronx Chamber of Commerce, and she makes mention in terms of the Bronx Chamber of Commerce being in favor of Intro. 762, but something that was quoted here, and I just wanted to get your intake on it, in terms of the opposition for the bill. It reads that opponents of this bill have argued that this amendment would just allow delivery companies to charge restaurants more for marketing services. Can you speak a little bit about that?

JOSHUA BOCIAN: Sure, Council Member. I'll take a first stab at this, and then I'm sure my colleagues will either correct me or jump in. I think there's a great misconception out there that, in fact, Intro. 762 lifts the cap completely, and that the cap completely just goes away. Let's keep in mind here, and let's remember that at the height of COVID, there were about 92 such caps that were in place across the entire country, in municipalities small and big. There's one left of this type, and it's here in New York City so we are not lifting the cap

COMMITTEE ON CONSUMER AND WORKER PROTECTION        71

completely. What we're doing is we are amending the cap in a similar way that the cap has been amended in major municipalities all across the country, whether that be Chicago or Philadelphia, Seattle, San Francisco, just to name a few. 762 is literally the culmination of two-plus years of conversations with the Council, with restaurants, with advocacy organizations to try and find a way to continue to give restaurants guidelines and guardrails, rather, and at the same time allow us to continue to operate here in New York City so let me go through some of the safeguards that 762 specifically has for restaurants. One, the right to be listed and discoverable on the platforms. Two, the right to include their own marketing materials in the deliveries. Three, to write their own in-app menu prices. Four, the right to prohibit delivery platforms purchasing their restaurant's names for advertising. Finally, it requires DCWP to do compliance assessments on a regular basis. We have literally put everything in this bill and agreed to everything that we've been asked to by the Council and, Council Member, I would invite you, when other folks come up here today to perhaps testify against

COMMITTEE ON CONSUMER AND WORKER PROTECTION        72

this piece of legislation, to ask them what more that they want, to ask them what else we should put in the bill, to ask them what their suggestions are, because we have been asking for two-and-a-half years, and we have yet to get an answer.

COUNCIL MEMBER SALAMANCA: Thank you.

KASSANDRA PEREZ-DESIR: Thank you, Council Member. I want to have an opportunity to respond to that as well and to add to it that, because of the way that the amendments in this bill are structured, the platforms will be required to provide the restaurants the option to obtain delivery for a 15 percent commission, as you're well aware, and non-delivery services, such as pickup and listing fees for a 5 percent commission, plus transaction fees inclusive of marketing or any other fees. If restaurants want to pay more for additional marketing, they're free to do so, but they are not required to do so. In addition to the increased customer visibility restaurants receive on Plus and Premier plans, DoorDash offers restaurants access to sponsored ads and promotions. A 0-dollar delivery fee for customers on DoorDash Marketplace. DoorDash also invests in marketing and advertising for DoorDash

COMMITTEE ON CONSUMER AND WORKER PROTECTION          73

Marketplace, which helps drive growth for restaurants.

COUNCIL MEMBER SALAMANCA: What would happen if a restaurant were to choose the minimum package in terms of marketing?

JOSHUA BOCIAN: All restaurants, regardless of what package they have, will be searchable and will be able to be found on the platforms. That is a guarantee of Intro. 762. Nobody gets hidden. Does not matter what package you have.

COUNCIL MEMBER SALAMANCA: All right. All right. Thank you.

The Chair stepped out for a minute. She asked me just to take over. We're just going to hand it over to Council Member Oswald Feliz for questions.

COUNCIL MEMBER FELIZ: Thank you so much. Thank you. A few questions for all of you. What's your position on Intro. 30-A, which requires that you verify UL certification and provide a UL-certified e-bike, and also Intro. 972, which requires you verify licensing for if mopeds are used for deliveries.

HAYLEY PRIM: I can start. I think on Intro. 30-A. Thank you. I know we've been talking about this for a long time. I appreciate the new

COMMITTEE ON CONSUMER AND WORKER PROTECTION          74

language. It was nice to see that it was broader and more inclusive so that third-party grocery delivery services, other restaurants, or other small businesses that contract with workers who operate on e-bikes would be included in this. However, I still have concerns that so far this is the only industry that's currently paying workers a wage that has allocation for expenses that should be going towards e-bikes as stated in the study. I think from only Uber's data, we know that, sorry, I have a number here. More than 9,000 workers have already earned at least 900 dollars towards expenses since the earning standard went into effect. The DCWP in their study said that a new e-bike is 1,800 dollars so it's reasonable to expect that after one year they'll have earned enough to purchase a UL-certified e-bike based on the DCWP study so that is a concern of ours that remains.

COUNCIL MEMBER FELIZ: Okay. What about Intro. 972, which requires that all of you verify the licensing for mopeds?

HAYLEY PRIM: Sure. Happy to start. I think, you know, we're open for discussion on that. We do currently collect insurance information as well

COMMITTEE ON CONSUMER AND WORKER PROTECTION          75

as information that comes from the registration of a vehicle for delivery workers. That bill, I believe, should, similar to 30-A, be expanded to include other companies that operate with mopeds, but I would love to talk through some flexibility of how we collect that information and what exactly verifying registration means. We are not the DMV. Of course, we would want to have a better understanding of what exactly that means to the Council.

COUNCIL MEMBER FELIZ: Okay. Can we also hear from the other companies? Same two questions, 30-A and also 972.

KASSANDRA PEREZ-DESIR: Yeah. Thank you, Councilman. On the mopeds issue, it has been difficult to invest more in, well, on the e-bikes, the battery safety initiatives when we're already directly compensating the workers for the e-bikes and the safety equipment. We feel that the platforms and the City must come together to align on how we can contribute to this issue and not have duplicative and unsustainable requirements. We, like the City, have also struggled to identify the best way to actually help this transition occur, and think the City's

COMMITTEE ON CONSUMER AND WORKER PROTECTION        76

participation in a trade-in scheme is essential to that success.

Additionally, on the mopeds, before gaining access to the platform, every prospective dasher must have a current valid government ID. This is for e-bikes and also mopeds alike. They have to have a Social Security Number and complete a background check. Dashers using motor vehicles, including mopeds, have to have a driving history check is also run, verifying their eligibility to drive. It also provides an individual's driving record, driving history, and minor violations such as speeding or running stop signs. Even after this approval to dash, dashers undergo regular background check reruns to ensure our records are up to date, dependent on DMV record databases, and to evaluate any new information that should be considered in determining dashers' eligibility to continue on the platform.

JOSHUA BOCIAN: Council Member, let me take the second question first, which is the moped registration question. I think currently, as the bill is written, we oppose the piece of legislation simply for the same exact reasons that my colleague Hayley

COMMITTEE ON CONSUMER AND WORKER PROTECTION         77

at Uber said, which is I'm not sure how we verify or certify a registration, right? We're not the DMV, we're not the DOT, we're not the NYPD, and we don't think that we should substitute for a City or State agency whose job it is to do that type of enforcement. However, we do require, currently, anyone who is deciding to operate by a moped or car to upload their registration, much like Hayley's, much like Uber Eats, when they sign onto our platform to become a courier so that would be that question. I think we could potentially continue the conversation with Council Member Powers to talk through that.

In terms of your legislation, Intro. 30-A, if by my count, I think this is the third time that we've had a conversation or a hearing on 30-A, right? I think it was last October, January, and now we're back. Much like my colleagues, I think we're very appreciative of the fact that you've expanded the folks who are covered under this bill, and I think that that's a good first start. However, I think we're still in opposition to it because we're running into the same problems. If you deliver for all three of our companies, how many e-bikes do you get? How many e-batteries do you get? Do you get

COMMITTEE ON CONSUMER AND WORKER PROTECTION       78

three? In addition to what Cassandra said, there's already $2.26, which is specifically built in to the DCWP minimum wage, which is supposed to go for this exact type of thing, for this exact thing of safety equipment so, for us, it feels like we're getting hit twice where we're paying $2.26 in the minimum wage for safety equipment, and then we would be asked to do it again so, I think to your point, we're not sure the bill is quite ready yet, and perhaps we need to have some additional conversation.

I just want to add one other thing. I thought Council Member Menin asked an excellent question of the Administration when she said, what's the status of the idea of the Office of Sustainable Delivery? We all sat through a meeting with the Administration regarding that proposal. I think we thought it was somewhat of a good idea, right? Let's put everything that's kind of in these disparate City agencies right now into one office. Let's see if we can solve the problem holistically and do it that way, and we'd love to see what the status of that office is.

COUNCIL MEMBER FELIZ: All right. Thank you. So, two points, and I guess the first one, the

COMMITTEE ON CONSUMER AND WORKER PROTECTION          79

first point is on the issue of moped registration verification. I know some of you mentioned that there are some systems uploading insurance information, etc., but I think anybody that, again, just spent one minute looking around in the streets of New York City would agree that whatever system we have in place has the same exact effect of having no system at all. Whatever all of you have in place on that issue is not working, not even close to working. And on the minimum wage issue covering UL certified e-bikes, what about new workers? What about workers that are starting afresh? They want to do delivery work, but they'll have to work a year with an uncertified e-bike before they could actually afford a certified one based on the wage-related numbers and the pricing for these e-bikes so that's one year that they need to work putting their lives at risk, putting their homes at risk through a fire and etc., and I think that that's a major problem, and it seems like on all these issues, it seems like the overall narrative or the thing that I hear from all the companies is, you know, let the issue potentially go away on its own. We don't want to play a role, and I think that's very problematic so a few questions on that so what

COMMITTEE ON CONSUMER AND WORKER PROTECTION        80

exactly are you doing to resolve the fire safety crisis that we're in and, yes, it's a crisis. Again, 97 fires last year from January through end of May. This year, similar numbers. We're in a crisis. So what exactly are you doing to resolve that? I know you mentioned the Equitable Commute Project. What else? And what do you say based on the numbers? Are you doing enough?

HAYLEY PRIM: Well, I want to respond to what you just said about how a new worker would have to use an uncertified, unsafe bike for a year before being able to afford a UL-certified bike. I think that's exactly why we've set up these partnerships in New York City, like Uber has Zoomo, I think Grubhub is with JOCO, so that workers can rent on a weekly or a monthly basis as they start out on the platforms and earn money in order to save up for a UL-certified bike so there's nothing that we're, I mean, we're not hoping that workers buy an uncertified bike as they start working on our platform just to earn for a UL-certified bike.

KASSANDRA PEREZ-DESIR: And I can add to that as well. This would require a lot of partnerships with the industry and with the City as

COMMITTEE ON CONSUMER AND WORKER PROTECTION        81

well, specifically on proof of UL compliance for e-bikes. Right now, this is a pointless exercise because it would require us to remove almost every e-bike based worker that uses our platform because very few workers have UL-certified devices as was mentioned. We believe the City did the right thing by setting safety standards, switching from no standard to UL 2849, and it was a fairly quick change to a standard that relatively few bikes are certified to. Even major reputable manufacturers have only recently been able to catch up. Other efforts to reduce fires by manufacturing UL-certified replacement batteries for older products are only just becoming available. Asking platforms to do this right now is essentially asking us to cut off tens of thousands of people from work.

COUNCIL MEMBER FELIZ: And based on the different programs that you've worked on, we've had a lot of conversations about them, the rentals, e-bike rentals, the Equitable Commute Project, more or less, how many delivery workers could they potentially cover based on their fleet, amount of e-bike rentals available, and etc.?

COMMITTEE ON CONSUMER AND WORKER PROTECTION        82

HAYLEY PRIM: I don't have specific numbers. I know that the Zoomo partnership, they recently got a new delivery of UL-certified bikes in just this last quarter, so I'd have to check on the number, but I think each of these programs began last year, and they had a slow ramp up but what we've seen is more and more uptake as people become more familiar, since the City's new standards went into effect so I can follow up with you on specific numbers related to those two programs.

COUNCIL MEMBER FELIZ: All right. What about the others?

JOSHUA BOCIAN: Yeah, Council Member, Grubhub has two partnerships, one with JOCO and one with an organization Whizz. I don't have the exact number sitting in front of me, but if you get in touch with us afterwards, I'll be happy to get you the data that you're requesting, not a problem.

COUNCIL MEMBER FELIZ: Okay. All right. Well, thank you so much. Again, just want to reiterate, we have issues, and whatever has been done is not even close to being enough. We're in the same position we were at last year so whatever has been done is not even close to being enough. We have

COMMITTEE ON CONSUMER AND WORKER PROTECTION          83

issues, and the companies need to play a role in resolving them. Workers make these companies. They make these companies possible, and companies should look out for the workers a little bit more and look out for their safety, for their homes, and everything else so yeah. Thank you so much.

CHAIRPERSON MENIN: Thank you, and thank you to this panel.

We are now going to move on to the next panel, which will be comprised of Andrew Rigie and Chris Lauber. Please come up. Thank you.

ANDREW RIGIE: Good afternoon. My name is Andrew Rigie. Oh, ready to go?

CHAIRPERSON MENIN: Yes, please.

ANDREW RIGIE: Thank you. My name is Andrew Rigie, and I am the Executive Director of the New York City Hospitality Alliance. We represent restaurants across the five boroughs. We strongly oppose Intro. 762. The third-party delivery companies have given this bill the phony name, the Fair Competition for Restaurants Act, which is the exact opposite of this proposal. Let's call it what it is, the Bigger Fees for Big Delivery Bill. Today, the City Council is hosting another hearing on another

COMMITTEE ON CONSUMER AND WORKER PROTECTION          84

package of bills to further regulate third-party delivery companies because they're continually bad actors. Still, they've been able to obscure the intent of 762, which deregulates them to where they're having it considered. The City Council should not further entertain changing this fee cap law while DoorDash, GrubHub, and Uber are suing the City of New York to overturn this very same fee cap law. So far, their lawsuit has been unsuccessful. They're also suing the City to overturn another law this legislative body passed that would prevent them from withholding a restaurant's own customer information from the restaurant, which is the technique they use to control the consumer marketplace. It's monopolistic-like behavior. Intro. 762 will increase the maximum fees, the current cap of 23 percent, to letting third-party delivery companies take a whopping 43 percent of each order from a restaurant while also charging the consumer a fee, too. The average restaurant has single-digit profit margins, if they're making any money. Does the City Council want to let third-party delivery companies take nearly half the money of each restaurant order? Yes. The companies have agreed to a few good amendments

COMMITTEE ON CONSUMER AND WORKER PROTECTION          85

that the hospitality lines advocated for as standalone laws that should be enacted but not as part of a negotiation to gut this fee cap. Now, I have a little… can I go? I didn't bring tons of people here, so if I could get…

CHAIRPERSON MENIN: Yeah, we have to have everyone speak the same amount, so if you could please wrap up, and then you can submit your written testimony.

ANDREW RIGIE: Will do. The most important thing is that the companies are saying that the 5 percent marketing option will make them require restaurants are listed and discoverable, but this bill does not define what listed and discoverable is. Under this language, they could technically make a restaurant listable and discoverable, but only if a restaurant customer types in the exact name or if a customer is ordering from maybe a two-block radius. There's various ways they can obscure this and make it…

CHAIRPERSON MENIN: I have to ask you to wrap up, please. Thank you.

ANDREW RIGIE: We're happy to obviously submit all of our testimony, but these companies have

COMMITTEE ON CONSUMER AND WORKER PROTECTION          86

showed you over and over again who they are. The Council and restaurants should believe them.

CHAIRPERSON MENIN: Okay. Next speaker, please.

CHRIS LAUBER: Thank you, and good morning to, I should say, actually, it is still morning, technically, to members of New York City Council and attendees. My name is Chris Lowder. I've managed restaurants and hotel operations in New York for over a decade, advised in some of the top hospitality technologies used today, and I'm currently the Senior Director of Operations for a restaurant group here in New York City. I'm here today to urge you to maintain the fee cap for the delivery platforms as they're essential for the survival of restaurants in our city. The fee caps implemented during the pandemic have been a lifeline for countless restaurants. The pandemic hit restaurants and hotels very hard, and the delivery platform usage actually soared. Restrictions for the indoor dining further increased the reliance on these delivery and take-out platforms, altering the landscape of our industry. The fee caps have changed and created different layers of marketing caps and fee caps and credit card

COMMITTEE ON CONSUMER AND WORKER PROTECTION          87

caps and otherwise, but these caps have been in place to check the absorbent fees from the platforms that would otherwise charge whatever they would like. Without these caps, restaurant fees could double or worse. From an industry with thin profit margins of 5 to 10 percent, increasing these fees could mean the difference between staying open and closing. Recently, I even had to argue with multiple platforms just to abide by the current regulations in place and not overcharge us when onboarding our restaurants so removing the fee cap would disproportionately affect smaller independent restaurants and bring bargaining power to larger restaurants, further creating an uneven playing field that favors larger chains. Small businesses in New York City create the vibrant culinary scene and culture that we have. In conclusion, I would say maintaining the marketing fee caps is crucial for the survival of independent restaurants in New York. I urge this Council to consider the long-term implications of lifting these caps. I would also like to add that with these caps, searchable and discoverable is my number one concern because we find that they are looking to find exponential ways to add on to their potential fees.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        88

CHAIRPERSON MENIN: Okay. Thank you for your testimony.

I have a couple questions, and I'll turn it over to my Colleagues for questions. With Intro. 762, since it's voluntary as to whether or not a restaurant opts to do it, it's an opt-in, why still the concern?

ANDREW RIGIE: Well, I would just say that this didn't start at the beginning of the pandemic. The reason we got here was because multiple hearings in this Council about how they use their market leverage and control to essentially force restaurants to increase the fees that they pay. If you don't pay to play, you essentially disappear. That's why I mentioned listed and discoverable. It essentially means nothing without it being defined. Sure, if I pay 5 percent, I can be technically searchable but not accessible, and then the representative goes to the pizzeria around the corner and says, if you pay 25 percent, you can basically take the business from the other restaurant so they continue to play each other off of each other, and it's important to note that the lawsuit, another one of their lawsuits, difficult to keep up with all the times these

COMMITTEE ON CONSUMER AND WORKER PROTECTION          89

companies sue the City, but the Council did pass a law that required the companies share customer information with the restaurants and, because they withhold that information, restaurants can't even directly market via email and so forth so they have a very sophisticated way of essentially leveraging their market share and power to force places to pay up and, if they don't, they lose their business. It happened year after year after year, and that's why we ended up here in the first place.

CHAIRPERSON MENIN: Can you comment on other cities that have similar legislation and the impact there?

ANDREW RIGIE: The ones that gutted the fee cap?

CHAIRPERSON MENIN: In other words, other cities that were mentioned earlier by some of the third-party apps, San Francisco and other cities, and how this kind of program works there.

ANDREW RIGIE: Yeah, their aggressive lobbying campaigns were successful at gutting the fee cap, and they have issues like the ones that we've laid out. I mean, New York City always talks about wanting to be the leader. We are a leader with this

COMMITTEE ON CONSUMER AND WORKER PROTECTION        90

fee cap, and the fact that we still have it in place

should be something that a city that leads wants to

promote, not be shamed about. Again, I can't speak

specifics of the whole history there, but we have a

long-documented history of the exploitation of local

restaurants by third-party delivery companies, much

of which has been documented in these Chambers.

CHAIRPERSON MENIN: Are there services

that you want to receive from third-party food

delivery services that aren't currently available?

CHRIS LAUBER: Would you be able to better

define the question?

CHAIRPERSON MENIN: Well, in other words,

are there things that you think the third-party

delivery apps should be offering to restaurants that

they're not offering? Are there things that would be

value-added?

CHRIS LAUBER: At the current 5 percent

rate, it appears to be an even playing field within

New York City. It's more based around proximity or

specific cuisine you're searching inside of an app

that then allows you to be found. The concern

underneath this, 762, is that searchable and

discoverable does not define how hard you have to

COMMITTEE ON CONSUMER AND WORKER PROTECTION          91

search to discover the restaurant you're looking for. Therefore, it would create an uneven playing field. For example, if, as Andrew mentioned earlier, our restaurants had been next to each other and they had two different marketing strategies inside, we would then have one exponentially higher than the other, which is ultimately what they're arguing is the point. However, the margins are so thin going into restaurants to begin with that it creates kind of an effective rat race that would be exponentially playing one off of the other to get higher and higher in the fee cap until eventually it's exhausted.

ANDREW RIGIE: They could drop their lawsuit on the customer information. One of the things that restaurants want is to be able to market directly digitally to their customers, but the third-party delivery companies withhold that information from the restaurants. That's why this City Council passed a law that has a stay because they're suing over it not to provide that information. There's another thing. For example, if you're paying for marketing and get me a new customer, incremental business, yes, that, in theory, is worth more. I'll pay a little bit of a higher marketing fee if you're

COMMITTEE ON CONSUMER AND WORKER PROTECTION          92

bringing me a new customer, a new order I would not have normally had. I'll pay 15 percent for that order. But what happens when that customer orders again? Why am I continuing to pay 15 percent or 20 percent when it's not a new sale? I think there are plenty of ways that these companies could work better and in a more fair way with restaurants. I dispute the claim that they've done everything that has been asked for them. There is tons and tons and tons of things that have been asked for them that they haven't done. This is the classic sleight of hand. Look over there, but don't look over here.

CHAIRPERSON MENIN: Okay. Do any of the Colleagues have questions? Council Member Salamanca.

COUNCIL MEMBER SALAMANCA: Yeah, I just have a few questions. Thank you for your testimony. I have just a question. I know that in the previous bill, I believe it was 813, there was opposition. We had opposition from other restaurant associations, but I've seen with this new (INAUDIBLE) bill, that opposition has leaned to being in favor of that bill. One of them being the New York State Latino Restaurant and Bar Association. Can you explain to me

COMMITTEE ON CONSUMER AND WORKER PROTECTION          93

why now those individuals that were not in favor of the previous bill are not in favor of the bill today?

ANDREW RIGIE: I'm going to be careful. These folks are my good friends. I've been doing this for 20 years. My integrity runs on this. Different organizations are going to make different decisions for different reasons just as elected officials are going to do hopefully what you all feel is right. I've studied these issues. We're all going to have to answer to our members eventually and, while they may feel they are doing the right thing, that is in their right. I believe it is very misguided to agree to this bill as is, and we will continue to fight and represent our members, represent what we believe is right, because we don't want to have to be back here with our friends again, who may be on the opposite side of it now, saying, oh, maybe we got to go back and do something, and I would just say this day is a perfect example. You passed the minimum pay rate. They lobbied hard against it. You still passed it. What did they do? They sued. Guess what? As you know, the court upheld the minimum pay rate. So what did they do? They went and obscured ways and made it more difficult for the folks to tip, and now you have a

COMMITTEE ON CONSUMER AND WORKER PROTECTION        94

bill today to address that. I would suspect that if you were to pass 762, we would be back here in the future and dealing with the same types of issues that we have been dealing with for years and years. Sorry, I was a little long-winded.

COUNCIL MEMBER SALAMANCA: No, no, I appreciate your comments. On the original bill, I was on it, and I was just getting bombarded with calls from my friends in the hospitality industry, and those are the same individuals, once this new bill was introduced, giving me a call saying they are in favor of this bill, let's make it happen.

ANDREW RIGIE: And I know others who are not, and I will tell you I've been receiving emails from restaurants that are receiving stuff from many of these companies, robocalls. You know, you are all professionals at this. You know that when you lobby hard enough and throw enough money at stuff and do as much public relations, you can get people to come out and testify against what I think is their own interest but, like I said, people are going to do what they feel is right. Just with my 20 years of focus on all of these issues, I just have a very, very bad feeling, especially as this bill is drafted,

COMMITTEE ON CONSUMER AND WORKER PROTECTION          95

because while it does other things, it's not putting any guardrails on the most important point, which is the listed and discoverable piece and the percentage.

COUNCIL MEMBER SALAMANCA: All right, just one last question. I just want to get your comment on this op-ed that was written.

ANDREW RIGIE: From Lisa?

COUNCIL MEMBER SALAMANCA: Yes. It says opponents on this bill have argued that this amendment would just allow delivery companies to charge restaurants more for marketing, but that claim fundamentally misses the point of this bill. What is your comment towards that statement?

ANDREW RIGIE: Well, that's what I…

COUNCIL MEMBER SALAMANCA: Opponents of this bill argue that this amendment would allow delivery companies to charge restaurants more for marketing, but the claim fundamentally misses the point of this bill. The amendment strikes the right balance of small businesses because it empowers restaurant owners to make decisions that are best for their own businesses by ensuring that platforms maintain low-cost options that still provide exceptional services to local restaurants and

COMMITTEE ON CONSUMER AND WORKER PROTECTION          96

unparalleled access to thousands of customers across New York City.

ANDREW RIGIE: I love Lisa dearly, but I think it completely misses the whole entire point and it's exactly what these companies want to say. It's an illusion of power. The real reason that we got here before the pandemic, why this was an issue, it was the illusion. It's like, yeah, you can pay nothing and you basically get nothing, but they have a very sophisticated way of basically leveraging these businesses to get them to pay more so, sure, they can, in a sense, pay more for marketing, but what happens if they stay at the 5 percent level, right? If I'm a restaurant in your District and I continue to say, you know what, I'm just going to continue to pay the 5 percent. Are these companies going to guarantee that they're going to stay at the same delivery level? Or is GrubHub or DoorDash or Uber Eats going to go to that same restaurant in your District and say, hey, you know what, the competing restaurant across the street is now paying 25 percent, Mr. Restaurant, Mrs. Restaurant, if you start paying me more, then you could start competing, and they play each other off each other. I mean, this

COMMITTEE ON CONSUMER AND WORKER PROTECTION          97

is just what happens so I would just say in response

to that is that it's an illusion.

COUNCIL MEMBER SALAMANCA: All right. I

appreciate your statement. Thank you, Madam Chair.

CHAIRPERSON MENIN: Thank you. Any other

questions from Colleagues?

If not, we will move on.

Okay. Thank you very much to this panel.

We appreciate it.

ANDREW RIGIE: Thank you.

CHAIRPERSON MENIN: Okay. I'm going to

call our next panel. Ligia Guallpa, Alejandro

Grajales, William Medina, Antonio Solis.

Please come up. Thank you. Okay. Thank

you.

I'm also going to note we've been joined

by Council Member Brewer.

LIGIA GUALLPA: Ready?

CHAIRPERSON MENIN: Yeah.

LIGIA GUALLPA: Okay.

CHAIRPERSON MENIN: Please go ahead. Thank

you.

LIGIA GUALLPA: Thank you so much, Chair

Menin, for the opportunity to testify today. Also,

COMMITTEE ON CONSUMER AND WORKER PROTECTION          98

sponsors Shaun Abreu, Oswald Feliz, and Lynn Schulman for giving us the opportunity. My name is Ligia Guallpa. I'm the Executive Director of the Workers' Justice Project. I want to thank Commissioner Vilda Mayuga and the Department of Consumer Worker Protection for their partnership. Actually, not only implementing minimum pay, but also holding apps accountable. We've been able to collect unpaid wages from DoorDash and educate hundreds of workers. Over the past six months, we have witnessed the transformative power of minimum pay, lifting delivery workers out of poverty, but the fight is far from over. The apps continue to retaliate and sought division. Since the implementation of minimum pay, DoorDash, Uber have removed the tip option before delivery, a system that they had in place before and are actually intentionally used to discourage tipping from consumers. This tactic is hurting workers, and it's misleading the public and it's directly impacting workers' pockets. We're thankful for Intro. 737, Intro. 738, which will focus on tip transparency. These bills require app delivery companies to actually show tipping at the beginning of checkout, essentially restating the system that

COMMITTEE ON CONSUMER AND WORKER PROTECTION          99

they had in place before. Intro. 859 will actually give ability for workers to be able to see their pay and actually plan their finances in advance, which is something that we should all have the right to do it. While we deeply appreciate the advocacy and the partnership of Council Member Oswald Feliz, Lynn Schulman, and Keith Powers, and their noble intentions of legislation Intro. 30, Intro. 715, and also Intro. 972, we strongly support these intentions, our concern is that without deactivation protections could lead from thousands of people losing their jobs so we want to be able to work with City Council and Council Members to be able to ensure that workers have deactivation protections and incorporate legislative language that secure more protections, giving power to workers to fight back on fair deactivation.

CHAIRPERSON MENIN: Thank you. I'm just going to ask you to wrap up.

LIGIA GUALLPA: Yeah. So we look forward to building a stronger language so we can have more comprehensive legislation that would lead to holding these apps accountable so thank you so much.

CHAIRPERSON MENIN: Thank you.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        100

LIGIA GUALLPA: I'm going to be translating after he speaks.

CHAIRPERSON MENIN: Okay, thank you.

ALEJANDRO GRAJALES: (SPEAKING SPANISH)

LIGIA GUALLPA (INTERPRETER): I'm going to try to summarize as quickly as possible. My name is Alejandro Grajales. I'm a deliverista. Over the past six months, we have witnessed the retaliations such as removing the tipping option from the beginning of the order, setting unfair scheduling restrictions and unfair deactivations. The reality is that these apps are becoming more abusive every day, and they're constantly pressuring us to accept all deliveries. They're pushing us to fulfill orders in a very short time without taking into consideration the weather, the traffic, and other working conditions. Apps are using the algorithms to penalize if we don't deliver on time and if we don't accept all orders from the restaurants. Since the implementation of minimum pay, DoorDash and Uber have eliminated the option to tip at the beginning of the order, a system that they had in place before and that consumers were used to already. The apps continue to sow division, confusion. An example of this is that DoorDash

COMMITTEE ON CONSUMER AND WORKER PROTECTION        101

recently sent a message, an email, threatening us that they will completely eliminate the tipping option, creating more fear, confusion, and division. By removing the tipping option at the beginning of the order, these apps are not only undermining our income, but they're also devaluating our work. Many of us continue to face arbitrary lockouts, unfair deactivations. This leaves us vulnerable and unprotected, with devastating consequences. We demand the tip option to be restored at the beginning of the ordering process, and we strongly support Intro. 737, 738, and together we can fight together for a more just, equitable future for all deliveristas.

WILLIAM MEDINA: Thank you to the President of the Consumer and Workers Committee, Julie Menin, and all the Members of this Committee for the opportunity to speak today. My name is William Medina. I'm a member of the Worker Justice Project and leader of La Deliveristas Unidos, and I'm currently working delivering for Uber Eats. Delivery work in New York City has become an essential job that deserves labor protections and recognition. In extreme heat days like today, we cannot afford to stay at home but have to work in the streets to bring

COMMITTEE ON CONSUMER AND WORKER PROTECTION      102

food to our family's table, put a roof over our family heads. As independent contractors, we don't get the same labor protections like most New York City workers. We don't have the right to a safe workplace. We don't have the right to be protected from unfair deactivations, which is a form firing us. We don't have the right to refuse to work in a situation in which I will be exposed to hazards. In the past six months, DoorDash and Uber Eats removed the tipping option until after the order was delivered to discourage consumers from tipping. This tactic is intended to harm our wallet and mislead the public. While they continue to make millions in profit, also other apps like Hungry Panda force workers to pick up more than four to seven orders at the same time just to save money and put pressure on deliveristas to drive fast and avoid being penalized by the apps. The apps are using deactivation to pressure us to drive unsafely. Also, the app removed the tipping option of consumers with the clear intention to harm us. Many deliveristas have seen a significant decrease in tips because consumers are no longer provided with that option. I strongly support Intro. 737 and Intro. 738, which each intend to bring

COMMITTEE ON CONSUMER AND WORKER PROTECTION      103

us to what used to be norm and common practices before. Please note that DoorDash has threatened to remove the tipping option if this bill is passed. We need the Council to create stronger languages that will mandate apps to provide tipping options to consumers…

CHAIRPERSON MENIN: Okay, I'm going to ask you to please wrap up.

WILLIAM MEDINA: Uber can do it as well. Sorry.

CHAIRPERSON MENIN: You can submit your written testimony. We just have to give every speaker the exact same amount of time.

WILLIAM MEDINA: Thank you.

CHAIRPERSON MENIN: Great. Thank you so much. A couple questions. Oh, so sorry.

ANTONIO SOLIS: (SPEAKING SPANISH)

LIGIA GUALLPA (INTERPRETER): We are grateful to the Council Member and also the Chair for the opportunity to speak today. I'm here in support of Intro. 737 and 738, which focuses on pay transparency. I have witnessed how DoorDash has made it harder for consumers to tip with the sole intention to hurt our pockets and protect their

COMMITTEE ON CONSUMER AND WORKER PROTECTION          104

interests. This week, DoorDash sent us a communication threatening us to eliminate the tipping if these bills are approved. The communication email is full of lies, clearly sent to all deliveristas with the sole intention of creating division, confusion. I am including in my testimony a copy of that email for your reference. DoorDash's attitude is an insult and is a demonstration that these apps don't care about us and will continue to treat us as disposable labor without rights and without protections. Despite their attacks, the division they're creating, the misinformation campaign, we will continue to fight for more rights and protections, and we urgently need deactivation protections, deep transparency, pay transparency, throughout this process. GrubHub is the only company that did not remove the tipping, which clearly is example that Uber and DoorDash did this with the sole intention to reduce our earnings. We are grateful with the other bills, Intro. 030, 0970, 715, which we support but, without deactivation protections, it would only hurt us and create more deactivations causing many of us to lose our jobs. We look forward to working with you, especially to create together,

COMMITTEE ON CONSUMER AND WORKER PROTECTION          105

to be able to fight together to make this job safer and better for all.

CHAIRPERSON MENIN: Thank you so much. I have a number of questions. I just want to make sure I understood you correctly. The copy of the email that DoorDash sent is part of the testimony so that it will be provided to the Committee. Thank you. That's very helpful.

In terms of safety information that the companies are giving, what information are they giving to workers, and what do you feel is the best way for them to give safety information to workers?

LIGIA GUALLPA: (SPEAKING SPANISH)

ANTONIO SOLIS: (SPEAKING SPANISH)

LIGIA GUALLPA (INTERPRETER): What I have seen is that they have sent us a flyer, but that's not enough. We need to make sure that there is infrastructure, but also we need to make sure that as independent contractors, it is important to know that we are responsible of all the operating costs, from the devices, from the safety gear, from the equipment that we have to acquire, and somebody has to be responsible for that, and that's why we need to make sure that more is done.

COMMITTEE ON CONSUMER AND WORKER PROTECTION       106

CHAIRPERSON MENIN: Thank you very much. I just want to see if any of my Colleagues have questions. Council Member Feliz.

COUNCIL MEMBER FELIZ: Yeah. No questions, but just want to thank all of you for all the work you do. We in the City Council, we do very important work, and we could only do it right when we work with people like all of you, work with all of you, and also listen to all of you so just want to thank you for all the work you do, doing a great job amplifying the voices and the needs of delivery workers, and great speaking with all of you as well about Intro. 38. I look forward to working together to add those additional protections that all of you mentioned. Thank you so much.

CHAIRPERSON MENIN: Great. Thank you, Council Member. Now, Council Member Abreu.

COUNCIL MEMBER ABREU: And to the deliveristas, you already know where I stand on the issue. You know that I'm with you at every step of the way. I feel very, very confident that we'll get these through so thank you for everything that you're doing. Keep up the faith. Keep speaking for yourselves and, again, I hope that what we can do as

COMMITTEE ON CONSUMER AND WORKER PROTECTION        107

a Council is going to improve the lives of you and your families.

CHAIRPERSON MENIN: Thank you very much. I'll now call up the next panel. Paul Zuber, Brianna January, bear with me. Justin Nelson, Millie Sialer, and Darry, sorry, it's hard to read, it's Saldana, I believe it is.

Okay, please begin.

BRIANNA JANUARY: Good morning, Chair, esteemed Committee. For the record, Brianna January with Chamber of Progress in strong support of Intro. 762. Chamber of Progress is a tech industry coalition promoting technology's progressive future and inclusive access for all to that future. I'll note that while our corporate partners do include tech innovators like DoorDash, Grubhub, and Uber Eats, they do not have a vote or veto on our positions. That said, Chamber of Progress is in strong support of Intro. 762, and we thank the good bill sponsor for putting this compromised approach forward. Importantly, Committee, restaurant associations across the country have supported similar measures in other major cities and even helped inform the suggested cap update here. My industry colleagues

COMMITTEE ON CONSUMER AND WORKER PROTECTION        108

explained the mechanics of the bill and you do have a copy of our written testimony so I won't be repetitive, but I do just want to emphasize that Chamber of Progress' support is really based on the city's small businesses and consumers alike. Committee, under 762, New York's independent restaurants will have access and flexibility that could be transformative. Small businesses are more likely to benefit from marketing and visibility on these delivery platforms which in turn would then help level the playing field with widely known chain restaurants and, consequently, we believe that this would ultimately help lower prices for consumers that are living in and visiting New York City alike. For these reasons and for the benefit of New York's consumers and small businesses, Chamber of Progress encourages you to pass Intro. 762's compromised approach, and I thank you for our time.

CHAIRPERSON MENIN: Thank you. Next speaker, please.

DARRY SALDANA: Good afternoon, Chair Menin and Members of the Committee. On behalf of the Bronx Chamber of Commerce, please accept this testimony in support of Intro. 762 legislation that

COMMITTEE ON CONSUMER AND WORKER PROTECTION        109

would amend the City's price control on third-party food delivery. We support the bill because it will promote the success of local restaurants in New York City and it will help ensure they have access to the products and services they need to reach new customers and grow their businesses. The Bronx Chamber of Commerce is rooted in a holistic community and economic development in which advances economic opportunity and growth innovation and comprehensive business planning for the Bronx. Intro. 762 will help local businesses. Passing this bill is critical to supporting restaurants who need options for delivery, marketing, and advertising. Third-party delivery apps have proven to be valuable to the restaurant industry, allowing these businesses to meet customers where they are or take advantage of new opportunities to increase their revenue. The City's current law undermines the freedom that business should enjoy to choose the best way to make themselves successful through these tools. We badly need reform to help businesses regain this control and support their growth. Unfortunately, the City's existing policies does the opposite and, instead of incentivizing to outcomes, increases customers costs or reducing the

COMMITTEE ON CONSUMER AND WORKER PROTECTION          110

products and services that restaurants can access. Either result hurt both businesses and workers by reducing sales. Unfortunately, other regulations on food delivery already having this effect. The higher consumer costs that the City' other laws have caused have already suffered millions of loss and orders of hundreds of millions of dollars in sales. This not only hurts the bottom line of local businesses, delivery workers also suffer from loss of work opportunities. Maintaining the status quo with respect to the price control will exacerbate these problems and furthermore undermine the ability to grow their businesses. New York City law presents needless risk with no benefits. While many cities enacted price controls on food delivery in response to the pandemic, almost none still have those laws today. Most of these cities, counties, and states eliminated price controls entirely.

CHAIRPERSON MENIN: Okay, I'm just going to ask you to wrap up please and you can submit your testimony.

DARRY SALDANA: It's time for New York City to also make reforms to eliminate risks that are

COMMITTEE ON CONSUMER AND WORKER PROTECTION          111

entirely avoidable. If the current law is invalidated…

CHAIRPERSON MENIN: Okay, I'm sorry, you have to wrap up.

DARRY SALDANA: Thank you.

CHAIRPERSON MENIN: Thank you very much. Okay, next speaker please. Thank you.

MILLIE SIALER: Good afternoon, Chair Menin and Committee Members. Thank you for the opportunity to speak today. I am Millie Sialer. I'm here to testify on behalf of Sandra Jaquez, owner of El Sol Restaurant in Manhattan and the head of New York State's Latino Restaurant Association. I'm here to support the Intro. 762, a local law that establishes exemptions from limits on fees for third-party delivery services. During the pandemic, restaurant owners needed the City's third-party delivery platform fee cap. We were scared and dependent on delivery services and needed protection from high fees. However, we find ourselves at the moment now when the pandemic is over and restaurants are looking for opportunities to market and grow their businesses through new and diverse customer base. By limiting the fees that platforms can charge

COMMITTEE ON CONSUMER AND WORKER PROTECTION        112

restaurant, New York City has limited the services restaurants can access through those platforms. This is a problem for two reasons. First, restaurant owners should have the freedom to choose what's best for our businesses and customers. Second, digital platforms offer neighborhood restaurants like mine valuable digital marketing and advertising capabilities we couldn't afford otherwise. That helps us compete with big chain restaurants which have big marketing budgets and keep our businesses growing and thriving. Intro. 762 works for both restaurants and third-party delivery apps. It shields restaurants from high delivery fees and offers us the option to choose if we would like to purchase additional marketing services from these delivery platforms. This bill is an improvement on last year's Intro. 813, which I oppose because it didn't do enough to protect restaurants from fees. Finally, as the representative of NYS Latino Restaurant Association, I want to emphasize Intro. 762 is the product of more than a year discussion.

CHAIRPERSON MENIN: Thank you, I'm just going to ask you to wrap up, please.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        113

MILLIE SIALER: Thank you. We feel legislation is incredibly reasonable, strikes balance against safeguarding, and supporting our restaurants. Thank you very much.

CHAIRPERSON MENIN: Thank you. Okay, next speaker, please.

JUSTIN NELSON: Good afternoon, Madam Chair and committee members. My name is Justin Nelson. I'm Co-Founder and President of the National LGBT Chamber of Commerce, better known as NGLCC and NGLCCNY. On behalf of the hundreds of LGBT-plus restaurants and thousands of LGBT-plus owned small businesses in New York City, I'm pleased to speak with you today about the small business benefits offered by third-party delivery platforms and urge your support of Intro. 762. I would say if NGLCC were to survey our 30,000 affiliate member businesses nationwide, I'm confident that virtually all would prefer that the government limit fees that they can be charged for any and every product and service, except when they might choose to pay more. And why would a business owner ever choose to pay more for a product or service? The answer is easy. When services succeed and they want more services, they're happy to

COMMITTEE ON CONSUMER AND WORKER PROTECTION        114

pay more. If I pay 5 percent of my revenue to advertise and those ads deliver a 20 percent increase in sales, then my next move is to try paying 6, 7, or 8 percent of my revenue and see if the results in sales growth and return on investment continue to grow. The odd thing about the delivery fee cap law is that it stops our member restaurants from paying more when they wish to pay more. Many members would say to the Council, thank you for trying to help me by reducing my costs, but no thank you because I'd like to choose to pay these vendors more so they can provide more services. 762 will return that decision-making power to where it belongs, with the business owner. Food delivery platforms build restaurant websites, license meal ordering software, offer in-app and email promotions to restaurants that choose to use and pay for them. Small restaurants that can't afford traditional advertising and marketing agency services can offer and afford delivery firm services because they don't require payments in advance. Paying on a per order basis is an important option for restaurants, but the fee cap law stops restaurants from paying higher percentages of their order amounts for making services that restaurants

COMMITTEE ON CONSUMER AND WORKER PROTECTION        115

desire. I cannot imagine that the Council intended

its restaurant protection efforts to hurt

restaurants…

CHAIRPERSON MENIN: Okay. I'm going to ask

you to wrap up, please.

JUSTIN NELSON: And I encourage you to

support 762. Thank you.

CHAIRPERSON MENIN: Thank you. Next

speaker.

PAUL ZUBER: All right, I'm going to try

to be short and sweet. My name is Paul Zuber. I'm the

Executive Vice President of the Business Council of

New York State. The Business Council is the largest

statewide business organization in New York. We

represent 3,200 members. We represent trade

association, professional associations, pretty much

all the local chambers in New York State, and a large

amount of our members are either headquartered or

doing business here in New York City. We're here

today to extend our strong support for Intro. 762. We

think that this bill is a win-win solution.

Restaurants will win because the cap on delivery fees

will remain in place, the strongest in the nation.

They will win because the marketing services portion

COMMITTEE ON CONSUMER AND WORKER PROTECTION          116

of the fee cap will be repealed, empowering restaurant owners to choose how to spend or not to spend their advertising and marketing dollars. One of the things that we've been looking at at the Business Council, one of the things that really concerns us is cost of living. I think there was a poll a couple of months ago from (INAUDIBLE) which talked about cost of living, and it polled New York residents. 62 percent of New York residents said that cost of living is either destroying their lives or having a great impact on their lives. This bill is vitally important for the consumers. Their litigation is going on. We all know that. If the delivery apps win, then we go back to the wild, wild west. If they lose, then we've already seen data, and we've seen data from the Business Council that the delivery apps are not making money like we think. They're losing money. There's the fear that it could cause increased costs for consumers. There's a fear that the delivery apps could give up on New York City and simply leave so we think that this bill is a compromise solution that works, that helps business, that helps consumers, and that's why we strongly support the legislation.

COMMITTEE ON CONSUMER AND WORKER PROTECTION       117

CHAIRPERSON MENIN: Thank you very much. Okay, Council Member Feliz.

COUNCIL MEMBER FELIZ: Thank you. Just a quick question. So earlier, Council Member Salamanca asked about groups that are supporting the fee cap bill. Just curious. Maybe the New York City Latino Restaurant, Bar and Lounge Association. I know you were one of the groups that were initially opposed, but now you're supporting the new version so just curious what parts of the bill made you say yes.

MILLIE SIALER: I understand that our friends at NYC Hospitality also brings that to light. However, due to the fact that we're different associations and our members are completely different demographics, our association actually, we determined our decision to support this because our members are minority-owned small businesses who don't have the marketing resources or advertising budgets to compete with higher top-tier restaurants. You know, most of our members are in Upper Manhattan. Bless you, Chair. Most of our members are in Upper Manhattan and certain areas and neighborhoods in all the five boroughs where we come in and we see the necessity that they need and, thankfully, with these third-

COMMITTEE ON CONSUMER AND WORKER PROTECTION        118

party apps, they're getting the traffic that they don't get in person, but digitally so that's why we support it.

COUNCIL MEMBER FELIZ: All right. Thank you.

CHAIRPERSON MENIN: Great. Thank you to this panel.

I will now call the next panel. Haoju Lu, Jian Hui, David Dimas, Jose Yos. Please come up.

Okay. Great. Thank you. Please begin.

INTERPRETER: I will translate for him.

CHAIRPERSON MENIN: Okay. Thank you.

JIAN HUI: (SPEAKING MANDARIN)

INTERPRETER: Thank you for giving me this valuable opportunity to talk about the working condition of food delivery worker. My name is Jian Hui. I come from China. I am a food delivery rider in Flushing. In Flushing, thousands of food delivery rider like me work day and night to make a living to provide delivery service for the entire community. However, at our workplace, we face a lot of challenge and, today, I will focus on three main points.

JIAN HUI: (SPEAKING MANDARIN)

COMMITTEE ON CONSUMER AND WORKER PROTECTION          119

INTERPRETER: First, the platform's working hours are not transparent. After the implementation of the minimum wage regulation, the platform does not clearly show our daily delivery hours so we cannot calculate our delivery time and wage accurately. We hope that the platform can show the time we accept order, the time we pick up, and then the delivery completion time for each order so that we workers can verify our earnings.

JIAN HUI: (SPEAKING MANDARIN)

INTERPRETER: Second, the platform on purpose hides the tipping interface, significant reducing our tip income. Currently, customers cannot easily tip us, and our tip income has dramatically decreased from 10 each day to almost 0. Furthermore, their platform, does not accrue our waiting time and return time as our working hours, resulting our very low actual hour wage. We work 10 and 12 hours every day and earning only 100 or 130 dollar each day. We strongly urge the platform to not hide their tipping interface.

JIAN HUI: (SPEAKING MANDARIN)

CHAIRPERSON MENIN: I'm just going to ask you to wrap up, please. Thank you.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        120

INTERPRETER: (SPEAKING MANDARIN)

JIAN HUI: Okay, thank you.

INTERPRETER: Because we translate, we have four minutes is correct?

CHAIRPERSON MENIN: Yes. Sorry. You have two more minutes. Thank you so much.

INTERPRETER: (SPEAKING MANDARIN)

CHAIRPERSON MENIN: Oh, you used four? Okay. You do need to wrap up. Thank you.

JIAN HUI: (SPEAKING MANDARIN)

INTERPRETER: Third, riders face high traffic risks. The platform has shortened the working hours by increasing the number of orders. During the peak time, riders, we workers, are often assigned six or seven orders at the same time, and we have very limited time to complete each order.

CHAIRPERSON MENIN: I have to ask you to wrap up because we have to give everyone the exact same time so I'm going to ask for the next speaker.

INTERPRETER: Okay.

CHAIRPERSON MENIN: Thank you.

JIAN HUI: Thank you.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        121

CHAIRPERSON MENIN: Yeah, and please submit the written testimony. Yes, so thank you. Next speaker, please. Thank you. Thank you very much.

JOSE YOS: (SPEAKING SPANISH)

LIGIA GUALLPA (INTERPRETER): I'm going to try to summarize as fast as possible.

My name is Jose Yos, and I'm a member of Workers Justice Project, and I've also been doing delivery for the last two years, and we face many issues in this industry, and we strongly support the three legislations that talk about tipping, particularly since many consumers have been actually wanting to recognize our work by tipping us, but we have seen how the apps are making it really hard to tip. We also support other legislations, that's it's about making our work safer. We also want to recognize that e-bikes are our main mode of transportation and this is how we're able to actually provide our service to other New Yorkers. This year has been also very hard to understand the minimum pay and how apps are paying, and we want to be able to have more transparency, being able to understand how our earnings are done, and that's why we want to also be able to support legislation that mandates more pay

COMMITTEE ON CONSUMER AND WORKER PROTECTION        122

transparency. We're supporting these legislations because we know it will benefit workers in our community, and also we want to see more infrastructure, bike lanes, and also being able to offer more transparency to many of us who are doing this work so we can improve our working conditions and have a better life. Thank you.

CHAIRPERSON MENIN: Thank you very much. Okay.

DAVID DIMAS: (SPEAKING SPANISH)

LIGIA GUALLPA (INTERPRETER): My name is David Dimas, and I'm a member of Los Deliveristas Unidos, and I also work for DoorDash in the area of Queens. I want to say thank you for the opportunity to speak and for all the people who are present here for allowing us to testify today.

First of all, I want to say thank you so much for the support about minimum pay and thank you for making this a reality for us workers. We have been able to advance a lot, but it's not enough. We have received consistently harassment and have been working in a hostile environment caused by these apps who have now been changing our scheduling systems. He was sharing his own experience how they have

COMMITTEE ON CONSUMER AND WORKER PROTECTION        123

continuously moved the scheduling systems. Now, they have to wake up at 6 o'clock in the morning. Sometimes people have said 3 o'clock in the morning, just in order to get some hours of work, but they also make these changes without notice in advance. This is just one example of how these apps are behaving. We're here today to actually talk about how we want to demand more respect from these apps, but we also want to be able to get some deactivation protections because we have seen how many of my colleagues are being deactivated which means losing their jobs without enough information, without enough notice, and very often just with small details that there is some suspicion of something that we don't know what it is. We want the tips to be back to what it used to be before, making it easier for consumers to tip. Also, we want to make sure how these apps can be more accountable, especially understanding how they're paying us so that we can understand how we're paid but also forcing these companies to be more transparent and more respectful to us as workers. Thank you so much.

CHAIRPERSON MENIN: Thank you very much. We appreciate your testimony. Thank you so much.

COMMITTEE ON CONSUMER AND WORKER PROTECTION          124

Okay, I'm going to call the next panel. Thank you very much.

Okay, next panel. Beatriz Ajaero, Yousef Mubarez, Kovon Flowers, Robert Lee, Brian Lozano, please come forward.

Great, thank you. Please begin.

KOVON FLOWERS: Good morning, my name is Kovon Flowers, and I work as delivery partner for food delivery apps in New York City. I've been doing this for the past six years. I mostly deliver in neighborhoods in Brooklyn and Queens. Thank you for allowing me to share my perspective today on improving the industry and opportunities for workers like me.

First, I want to applaud and thank the City Council and City Hall for their advocacy and action supporting delivery workers, including the recently enacted new minimum wages. I want to thank the apps for implementing them. It has made a significant difference for me and many families. What has also been critical to how I support my family is the flexibility of this job, including what hours I can work as well as customer tips. Both of these have been threatened and will continue to be impacted if

COMMITTEE ON CONSUMER AND WORKER PROTECTION        125

this amendment empowering and protecting small restaurants is not passed. These impacts have already begun. Many of my fellow drivers I speak with have seen fewer opportunities in recent months. Some are waitlisted on some of the platforms, and many have reported reduced tips as a result of cost being passed on to customers. Everyone wants to be paid fairly. That is easily to understand, and most New Yorkers agree that many hard working but low-income professionals in the service industry deserve to be paid more, but higher wages mean higher costs for any business and, in any case of delivery apps, the Council imposed restrictions on what they can charge restaurants for marketing means higher prices for consumers and I, like most, increases in price that means fewer purchases.

CHAIRPERSON MENIN: Thank you. I'm just going to ask you to wrap up, please, and you can submit the written testimony.

KOVON FLOWERS: I'll submit.

CHAIRPERSON MENIN: Great. Thank you very much.

Okay, next speaker, please.

COMMITTEE ON CONSUMER AND WORKER PROTECTION          126

YOUSSEF MUBAREZ: Hello, my name is Youssef Mubarez, and I represent the Yemeni American Merchants Association. At YAMA, we believe merchants and small businesses are catalysts for positive change in the U.S. Since our founding in 2017, our mission has been to empower our community through outreach, education and support, helping Yemeni Americans build a brighter future. Today, on behalf of our merchants and restaurant owners, I'm here to express our support for Intro. 762. This bill establishes additional support for our merchants to improve their operations and sales the way they choose to. Before the pandemic, third-party delivery services were already becoming a crucial part of our business. The pandemic drastically accelerated this trend, making delivery services essential for the survival of many of our restaurants and merchants. The fee cap implemented at the time was vital in preventing third-party delivery services from exploiting the vulnerability of our restaurants. For YAMA, this cap acted as a necessary guardrail for the industry. As the restaurant industry slowly recovers and social media explodes, the environment for restaurants and merchants continues to change. It is

COMMITTEE ON CONSUMER AND WORKER PROTECTION        127

now necessary to revisit and adjust the fee caps to ensure continued growth in this new landscape. We believe this bill strikes a balanced approach, offering necessary protections to restaurants while allowing third-party delivery services to operate fairly. It's about putting this is this decision back into our merchants' hands. It's no secret that marketing is key when trying to stand out in a sea of similar businesses so close together in New York City. Furthermore, the bill encourages innovation and competition among third-party delivery services by establishing a framework that balances the interests of all stakeholders, promotes a diverse range of delivery options, which ultimately benefits consumers through better service and pricing. The flexibility and safeguards introduced by…

CHAIRPERSON MENIN: I'm going to ask you to wrap up, please.

YOUSSEF MUBAREZ: We ask the New York City to pass Intro. 762 as it supports our local restaurants, ensures a fair and equitable market for third-party delivery services. Thank you.

CHAIRPERSON MENIN: Thank you. Next speaker, please.

COMMITTEE ON CONSUMER AND WORKER PROTECTION       128

BEATRICE AJAERO: Good afternoon. My name is Beatrice Ajaero. I own Nneji which serves West African cuisine is located in Astoria, Queens. Thank you for supporting New York restaurants and for the opportunity for us to share our voice, especially those of us that are small, independent, and may only have one location. The pandemic was obviously hard for all of us but, even as we recovered, other challenges such as inflation have been very, very difficult. We work extremely hard for every dollar we earn. I am testifying today to ask you to support this legislation to amend the current cap that will allow for more choices for restaurants like mine, but also preserve important protections, protections that have gotten stronger with this version of the bill. This is a point I'd like to stress. The proposed solution has gotten better because of continued discussions where variety where variety of voices like mine were heard. I've never been too involved in advocacy, but I know that that is how democracy should work. The restaurant delivery fee cap was a very good idea during the pandemic but, because the cap also applied to optional marketing services, it has prevented me from exploring and choosing options

COMMITTEE ON CONSUMER AND WORKER PROTECTION          129

that may work better for my restaurant in trying to get more customers. This may be an obvious point, but it's one everyone should understand. I don't have millions or even thousands of dollars to put towards a marketing budget, unlike some of the big brands that are in my neighborhood, and I don't have a marketing department, and I don't have an advertising firm. What is most helpful about the delivery platforms is that they allow me to spend marketing dollars as I go, rather than making me commit to a big upfront investment. They also allow me to explore what works best for my business and make changes at any time. That's something I can't do if I took out a traditional ad, even if I could afford that. The main point is flexibility and allowing restaurants to make decisions for themselves rather than being constrained while big chains have unlimited options. I may not be the most tech-savvy person, but the platforms enable us to figure out what works best. We just need the ability to do so. The proposed amendment not only keeps the delivery fee caps just the way it is, but it will also maintain a maximum for marketing fee cap, so I can pay more if I choose, but it won't be unlimited. I know that my experience,

COMMITTEE ON CONSUMER AND WORKER PROTECTION        130

I'll wrap up here, sorry, Chair. I know that my experience may not reflect that of every restaurant, but I appreciate this opportunity to share my perspective, and thank you.

CHAIRPERSON MENIN: Thank you so much. Okay, next speaker, please.

Hi, good afternoon, Chair Menin and Committee Members. My name is Robert Lee. I grew up in Queens, a child of Korean immigrants who were looking for a better life for their kids and, in part because of my own personal experiences of growing up food insecure, in 2013, I started an organization called Rescuing Leftover Cuisine to rescue excess food to feed to those facing food insecurity. In 2019, I also started Tidal Noodles because outside the Korean markets, there weren't any places serving Korean Chinese cuisine, such as Jjajangmyeon, and Tidal Noodles is located on Borden Avenue in Long Island City, and we're growing, and now we have 12 employees, and a big reason for our growth is delivery platforms, and so I'm here to ask you to support 762 and give me the ability to spend more marketing money on the platforms that send me so many customers. Delivery apps are really important to us

COMMITTEE ON CONSUMER AND WORKER PROTECTION        131

because they help us reach new customers, and our food and flavor profile is very unique, and we need that marketing help because so many people have never tried Jjajangmyeon, Jjambbong, or Kkanpunggi, and when they try it, they love it. One great thing about the apps marketing platforms is that we only have to pay if we only get orders so no orders means no fees, and that's a great deal for me. I'm very happy that this amendment keeps the delivery fee cap intact and opens the marketing services fee, so I'm protected on the delivery services, and I have more marketing choices. I'm always happy to work with GrubHub because they were such strong supporters of restaurants during the pandemic. They've ensured that restaurants can stay open and serve a critical need during difficult times, and GrubHub has also been very much in the community and supported and even helped create partnerships with organizations such as RLC, so that the NYPD, Harlem Giants, and things like that, where children are just not getting enough nutrition that they need, but I'm testifying today because it's my restaurant and it should be my choice on how to spend my marketing money. It's just that simple, so please support this amendment. Thank you.

COMMITTEE ON CONSUMER AND WORKER PROTECTION      132

CHAIRPERSON MENIN: Thank you. Next speaker, please.

BRYAN LOZANO: Good afternoon, Chair Menin and Council Member Feliz. Tech:NYC is a non-profit organization representing over 800 technology companies in New York. We are committed to ensuring that the tech sector remains a leading driver of the city's overall economy and that all New Yorkers can benefit from innovation. Delivery platforms are significant contributors to the tech sector and local economy through their offices and employees by helping businesses access more customers and providing earning opportunities to thousands of New Yorkers. During the COVID-19 pandemic, when in-person dining came to a halt, building online ordering and delivery capacity was crucial for restaurants to stay open and remains in demand to date. In 2021, the City Council passed legislation limiting delivery platform fees to 15 percent of an order and 5 percent of an order for marketing and other services. Today, the pandemic is no longer a public health emergency and in-person dining has returned, reversing the prior conditions. As new restaurants are opening across the city, many seek to utilize delivery platforms'

COMMITTEE ON CONSUMER AND WORKER PROTECTION          133

marketing services, including data analysis,

advertising, and custom websites. Tech:NYC supports

Intro. 762, which would ensure that restaurants

continue to have access to low-cost delivery and

marketing options by removing the cap on marketing

service fees while maintaining the cap on delivery

service fees.

Introduction 30-A would require

restaurant and grocery delivery platforms to purchase

new safety-certified e-bikes for delivery workers but

still overlooks many realities of food delivery by

not defining which platform would be held responsible

for these purchases and imposing the purchase

requirement of platforms that are already paying

$2.26 per hour to each worker to cover the cost of e-

bike repairs and replacement. Tech:NYC is also

submitting written testimony for the remaining bills

on the agenda today, and we thank you for your

consideration.

CHAIRPERSON MENIN: Thank you very much

and thank you to this panel.

I'm now going to call the next panel,

Jalil Foster (phonetic), Andres Hurtado, Wesley Fekou

(phonetic). Please come forward.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        134

Okay. I'm just going to call the names again. Jalil Foster, Wesley Fekou, Andres Hurtado.

Okay. I will go on to the next panel then. Edward Hatchett, Joseph Mele, Sharon Brown, Raul Rivera. Please come forward.

If people have not heard their name called and they wish to testify, please fill out a form with the Sergeant-at-Arms because this is our last panel before we go to the Zoom public testimony. Thank you.

Okay. Please begin.

EDWARD HATCHETT: Hello. My name is Ed Hatchett. Thank you for offering a chance to submit my testimony on these bills before the Committee today. I think it's important for you to hear about the wide range of experiences I have had recently before implementing even more changes. I started making deliveries with DoorDash in March of 2019, two months after I started going back to college to further my education. However, as my need continued to grow, so did my commitment to dashing. Even better, I could choose when I was able to make deliveries that fit around my school schedule in order to fulfill my dream of getting a job as a full-

COMMITTEE ON CONSUMER AND WORKER PROTECTION        135

time accountant. Simply, it was working for me. Unfortunately, since the new minimum pay rules took effect, I've seen a steep drop in orders and opportunities for dashing because they have become noticeably more scarce. While I love being able to grab my bike and pick up orders around Williamsburg, now I have to go into Manhattan in hopes of finding any offers. Sometimes I would only get one order a day or I can't even get on the app to schedule a slot to dash. At the same time, delivering on an e-bike has been a great way for me to quickly and easily pick up deliveries, but it seems like the proposed new rules around e-bikes would make it difficult for delivery apps to make the option as widely available for workers like me. If I'm not able to use my bike for making deliveries, I'm not sure how I can continue using this as a way to make money at all. What's clear from years of doing these deliveries with DoorDash is that these need to be a balance. It gets too expensive for customers to place orders and that means there are fewer opportunities for me to earn. While I would appreciate the Council trying to support delivery workers like me, I am worried that…

COMMITTEE ON CONSUMER AND WORKER PROTECTION        136

CHAIRPERSON MENIN: I'm just going to ask you to wrap up please. Thank you.

EDWARD HATCHETT: I worry that proposed new requirements will ultimately end up hurting us in the long run. That's why I oppose these bills and would worsen the experience that the existing rules have had for food delivery workers in the city.

CHAIRPERSON MENIN: Okay, thank you. Next speaker.

SHARON BROWN: Hello, my name is Sharon Brown. Release the hostages, let Yahweh's people go. I'm just remembering Israel. Okay, based on the business and the tax, oh, I didn't put that on. Oh, I said release the hostages, let Yahweh's people go, remember Israel in everything you do daily.

Based on the business tax bracket of each business, I believe the fees should commiserate with that. They should have a competitive scale for how they price their fees so that people in big businesses and people in small businesses can make money and also the apps that are providing the service can make money. It should be competitive for them. If they have someone making 100,000 a year, their fees should not be the same as a company making

COMMITTEE ON CONSUMER AND WORKER PROTECTION         137

a billion dollars a year and they are both using the same services like whatever delivery service that they have out there that's popular. Do you know any name of?

EDWARD HATCHETT: DoorDash.

SHARON BROWN: Like DoorDash. If a company that's making 100,000 dollars a year is paying a certain fee and a company that's making 8 billion dollars for food is paying the same fee, there should be a scale based on how much deliveries they're making, how much are the items on the menu, different things like that. I believe that we should make sure that they are not forcing tips on people. The tip should come after the fact. It should never be before. You don't know what the service is like. There's no standard for service if you pay a tip already. It could make someone want to do a better job. That could seem to be the possibility, but if you get bad service and you've already paid, what do you do?

CHAIRPERSON MENIN: I'm just going to ask you to wrap up.

SHARON BROWN: Okay.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        138

CHAIRPERSON MENIN: Thank you. Thank you very much. Okay. Next speaker, please.

The red light is on, then it's working.

JOSEPH MELE: Hi. My name is Joseph Mele. I want to thank you for providing me the opportunity to speak here, being heard, surrounding the third-party delivery platforms. I've worked many different jobs. I had a career in software. I've noticed as an older person, it's very hard for me to get work now. Also, during the pandemic, I used my pandemic (INAUDIBLE) to get a paralegal cert too at Stony Brook, but I haven't been able to land an interview. That was all because basically a lot of age discrimination. DoorDash has given me an opportunity to work whereas I would not have otherwise. It's made me able to pay my bills and be able to support myself. The gig economy is very important to me. I'm concerned about the 737 and 738, which can make my experience in New York even worse than last year, where I sat for a long time, not getting a single order. I appreciate the City Council's attempts to help the worker, help the DoorDasher, but I find that tipping culture has changed in this country. They've been questioning should we even tip waitresses and

COMMITTEE ON CONSUMER AND WORKER PROTECTION          139

waiters today, that they should get paid a full wage. It's not the same as it was years ago. I've noticed too that people get insulted if you ask for a tip. What I do, I say to people, tips are not necessary, but I appreciate it. Give me five stars. I notice I get a positive reaction. I get good reviews, and I get tips. It's that type of attitude. When you have a tip up front, it doesn't give you that same, it gives you like, oh, and people I think will get their hackles up. That's basically the sound of it. I appreciate more tips, obviously. By hurting the gig economy, you hurt people like me who can't get a traditional job.

          CHAIRPERSON MENIN: Okay, I'm just going to ask you to wrap up, please.

          JOSEPH MELE: Thank you, and thanks for hearing me out.

          CHAIRPERSON MENIN: Thank you very much. Last speaker on the panel.

          RAUL RIVERA: Humans first, technology second, today, tomorrow, forever. Humans first, technology second. Humans first, technology second, excuse me, I messed up here. I'm very upset. We're trying to get a meeting with you, and you are not

COMMITTEE ON CONSUMER AND WORKER PROTECTION        140

responding. The email that we got from your office was no, you don't want to sit down and meet with us the real problem is Intro. 890 and Intro. 2294 The status of the independent worker is not being respected. That's why you have all these problems and all these complaints We even complaining about tips You got to respect the independent worker 32BJ, Jessica Ramos, Amy Gallagher, and maybe yourself don't respect the independent worker. You got to respect the independent worker. Are you willing to sit down and meet with us? Are you willing?

CHAIRPERSON MENIN: First of all, you're the one testifying.

RAUL RIVERA: I'm asking you.

CHAIRPERSON MENIN: This is not a Q and A.

RAUL RIVERA: I'm asking you…

CHAIRPERSON MENIN: This is not a Q and A.

RAUL RIVERA: I asked you outside…

CHAIRPERSON MENIN: (INAUDIBLE) two minutes…

RAUL RIVERA: But I'm asking you, I'm asking if you're willing to sit down and meet with us.

COMMITTEE ON CONSUMER AND WORKER PROTECTION        141

CHAIRPERSON MENIN:  We have responded to your request. If you want to continue…

CHAIRPERSON MENIN: So if you don't want, if you don't want to sit down and meet with us, then we're going to come out to your District and we're going protest right in front of your office and we're going to let the District know that you don't stand with the workers. That's what we're going to let them know.

CHAIRPERSON MENIN: Okay. We have two more speakers on the Zoom, Christopher Leon Johnson and Dora Val Silva. Thank you.

CHRISTPHER LEON JOHNSON: Hello. Can you hear me?

CHAIRPERSON MENIN: Yes, we can hear you.

CHRISTPHER LEON JOHNSON: Hi. Good afternoon. My name is Christopher Leon Johnson. I'm currently at the UN so anybody, any clown at Trans-Alt want to say that oh, I was at City Hall and getting at Ligia and all those clowns at LDU, I was not there, I'm at the UN right now so don't lie. Let me keep it real with this bill, right? The bill is a joke, you know Shaun Abreu broke, like I don't know what happened to you, bro. Like you're the last

COMMITTEE ON CONSUMER AND WORKER PROTECTION        142

person I expected to deal with these bozos. These people are frauds. They're not deliveristas. They are lobbyists They work with Trans Alt. They work with Open Plans. This bill is bad because what's going to happen is if this bill goes through the apps are going to retaliate by implementing rules like e-verify and I-9s to start really locking the guys out the apps. Like, yeah, these guys deserve the tips, but the apps are retaliated because you guys passed the minimum wage law. Now, like I said, Ligia is a fraud. (INAUDIBLE) a construction worker. Tough Tony is a tough guy who try to fight us outside City Hall because we had the right to record in a public street, we got it all on video. These guys are thugs. These guys are criminal. These guys are fake. Where is the money that the City Council gives to Ligia Guallpa's non-profit? (INAUDIBLE) Los Deliveristas. There's no track record on how much money all these guys get paid. I'm against these bills because LDU is for these bills. If it was another organization that was for these bills like Make the Road New York or, what's the other one, La Colmena or like  Envision Freedom Fund or the NYIC, I would not be on this panel. I'd say, all right, you know what they want

COMMITTEE ON CONSUMER AND WORKER PROTECTION        143

minimize, give them minimum wage but, because Ligia Guallpa's fake self, fraud self is on this bill, supporting this bill, I'm not for it. Shaun Abreu, do not make a mistake like your co-worker, Marjorie Velázquez did, and support these guys. Look at what happened to Marjorie Velázquez, Shaun. She lost her job and she lost her marriage because of LDU. She supported LDU and they didn't even knock on doors for her, and she lost to Kristy Marmorato.

SERGEANT-AT-ARMS: Your time is expired. Thank you.

CHAIRPERSON MENIN: Thank you. The next speaker on Zoom is Dora Val Silva (phonetic).

DORA VAL SILVA: Hello. Can anyone hear me?

CHAIRPERSON MENIN: Yes, we can hear you.

DORA VAL SILVA: Hello. Good morning. My name is Dora Val Silva, and I work as a delivery partner for food delivery apps here in New York City. I have been doing this for three years. I mostly work for the neighborhoods of Manhattan and Brooklyn, and thank you for allowing me to share my perspective today on improving the industry and opportunities for workers like me. I want to thank the City Council and

COMMITTEE ON CONSUMER AND WORKER PROTECTION          144

the City Hall for the Advocacy and the actions to try to support delivery workers. It's very welcome. I'm here to support the approval of the of this amendment because it empowers and in a way protects like small restaurants, and this directly impacts negatively because with my flexibility to have this job and the earnings in the form of customer tips, like this impact is being, like it's be happening for a while Like there's a lot of fellow delivery drivers I speak with. They're like we've been seeing fewer opportunities, fewer delivery opportunities, like many people waitlisted, reduced tips and, because of this, the costs are being passed to the customer side Like people can agree that hard-working, low-income professionals in the service industry deserve to be paid more. This is common sense, that people deserve a proper wage, but like sometimes higher wages means higher costs for businesses and, in the case of delivery apps, these imposed restrictions came to help the restaurants market inside the app, they end up making the prices go up and you know high prices lead to less purchases, less delivery opportunities, and fewer tips.

COMMITTEE ON CONSUMER AND WORKER PROTECTION      145

SERGEANT-AT-ARMS: Time has expired. Thank you.

CHAIRPERSON MENIN: Thank you very much for your testimony.

I'm now going to read, there are several people who signed up on Zoom. We just want to make sure that we did not miss you so if you're here, please identify yourself. Anna Prince, Jenny Alcantara (phonetic), and Deidre O'Neill (phonetic). If you are on Zoom, please let us know.

Okay, if there's anyone else in the room that did not testify that wishes to testify, please come right now and see one of the Sergeant-at-Arms.

Okay, not seeing anyone. We are going to close the hearing.

I want to thank everyone for their testimony. We heard great testimony today. It was incredibly informative and helpful to us. You can give your testimony, sir, to the Sergeant-at-Arms. It was incredibly informative and will certainly help us as we work through these bills so thank you so much for coming. The hearing is now closed. [GAVEL]

C E R T I F I C A T E

World Wide Dictation certifies that the foregoing transcript is a true and accurate record of the proceedings. We further certify that there is no relation to any of the parties to this action by blood or marriage, and that there is interest in the outcome of this matter.



Date _____ July 21, 2024 _____