# Exhibit J

**Testimony of Assistant Commissioner Carlos A. Ortiz**
**New York City Department of Consumer and Worker Protection**

**Before the Committee on**
**Consumer and Worker Protection**

**Hearing on Introductions 30-A, 715, 737, 738, 762, 859, and 972**

**June 21, 2024**

*Introduction*

Good morning, Chair Menin and the members of the Committee on Consumer and Worker Protection. My name is Carlos Ortiz, and I am the Assistant Commissioner for External Affairs at the Department of Consumer and Worker Protection (DCWP). I am joined by Elizabeth Wagoner, our Deputy Commissioner for the Office of Labor Policy & Standards, and Andrew Schwenk, our Associate General Counsel. Thank you for the opportunity to testify today on Introductions 30-A, 715, 737, 738, 762, 859, and 972, relating to delivery worker gratuities and pay transparency, delivery fee caps, and ensuring app responsibility with respect to street safety.

Since the start of the Adams Administration, DCWP has helped deliver more than $600 million into the pockets of New Yorkers. We provide fundamental consumer and worker protections, and financial empowerment programming to New Yorkers. We strive to ensure that consumers who have been deceived or exploited have recourse, that workers have a passionate defender of their rights, and that all New Yorkers have the support they need to improve their financial health.

*Delivery Workers and the Minimum Pay Rate*

Just over a year ago, Mayor Adams announced the nation's first of its kind Minimum Pay Rate (MPR) for app-based restaurant delivery workers, the most significant advancements of workers' rights in New York City in the 21st Century. Ahead of implementation, DCWP conducted a comprehensive study of the industry, and considered thousands of comments received from food delivery workers, apps, advocates, restaurants, researchers, elected officials and members of the public when setting this historic rate. We continue to collaborate closely with key advocates and stakeholders across this space.

Delivery workers are essential workers for New York City. They have braved harsh weather conditions, harmful wildfire smoke and even the pandemic to ensure New Yorkers are fed. Thanks to their incredible organizing and determination, tens of thousands of workers have now seen their weekly earnings double, with their combined annual pay on track to increase by over $775 million this year. This Administration will continue to stand shoulder to shoulder with delivery workers and ensure their fundamental rights to fair and dignified pay are protected.

1

*Introductions 737 and 738*

Moving to today's bills, I would like to start off by commending the Council, and specifically Councilmember Abreu, for recognizing a key issue that delivery workers are facing since certain major apps made changes to make it harder to tip delivery workers. We strongly support Introductions 737 and 738, which would require third-party food delivery service apps to give customers the option to leave a gratuity during an order transaction and include a suggested gratuity option of 10%.

Before apps began paying the Minimum Pay Rate in early December 2023, they generally made tipping a delivery worker a simple process, giving consumers the option to tip during the order transaction. However, after they began paying the Minimum Pay Rate, two of the three most-used apps removed the option for a consumer to add a tip when placing their order. As a result, delivery workers' tips received on those apps have decreased dramatically, by $85 million in total, since the apps changed their tipping options. Conversely, other apps, including one of the three most-used apps, continued to allow tipping when placing an order, and while the average tip on orders placed at those apps did decrease slightly, workers are receiving substantially higher tips on those apps. To us, this speaks to the fact that New Yorkers, when given an option, recognize the incredibly difficult jobs these workers perform and choose to tip them.

As we understand the intent of these bills, they would require apps to restore to consumers the option they previously had to tip workers when placing an order. We recommend changes to the bill text to make clear that apps must offer consumers these tipping options. We are eager to engage in the legislative process as soon as possible to finalize this legislation to best support delivery workers in our city.



*Introduction 859*

Introduction 859 would require third-party food delivery services and third-party courier services to provide delivery workers with sufficient information on their pay calculations. We are fully supportive of clear pay transparency for workers and this legislation. The apps are required to report aggregate monthly pay information to DCWP so that we can monitor compliance, but apps have not been transparent with workers themselves about their individual pay calculations. Workers should have full information about how their pay is calculated so they are not left with questions about an app's pay structure. We believe this legislation will help ensure this happens and will make it easier for advocates to educate workers on the Minimum Pay Rate.

*Introduction 762*

Council Member Salamanca's bill, Introduction 762, would amend the current fee caps for third-party food delivery services. The caps on fees that delivery apps can charge restaurants were first created by the City Council during the COVID-19 pandemic and were later made permanent under Local Law 103 of 2021. Currently, delivery apps can only charge a restaurant a total of 23% of an order in fees, broken down as follows: up to 15% for delivery fees; up to 3% for transaction fees; and up to 5% for other fees. Introduction 762 would increase the cap on other fees from 5% to 25%, potentially allowing delivery apps to charge restaurants up to 43% of an order in fees.

As the enforcement agency, DCWP will enforce the fee caps at the limits mandated by local law. I would like to note that the current fee caps are subject to ongoing litigation.

*Introductions 30-A, 715, and 972*

Lastly, Introduction 715 would require food delivery companies to be responsible for ensuring that their workers who use micromobility devices follow appropriate traffic laws. Introduction 30-A, which the Department of Transportation (DOT) previously testified on in January, would establish new requirements for businesses using a bicycle for commercial purposes, such as third-party food delivery, grocery delivery, and courier services, including the requirement that any powered mobility device, such as an e-bike, used by a worker on behalf of such businesses meet certain safety certification standards. Introduction 972 would require third-party food delivery services to verify the registration of mopeds used by delivery workers.

The Administration is committed to ensuring that micromobility devices are used safely on our streets. Along with our colleagues at DOT, we are working on a comprehensive policy review of how micromobility delivery is regulated in New York City. We believe it is vital to address the current situation, holistically, with an approach that tackles both street safety priorities and workers' rights. Each of these three bills addresses issues that will inform vital components of that unified approach.

3

A key point that DOT and DCWP would like to stress is that delivery apps have a responsibility to ensure that workers have access to and use safe equipment, and that workers are not compelled into unsafe riding practices because of dangerous demands made of them by those same apps. For example, we have heard reports from workers that apps may penalize or deactivate them if they do not deliver orders within a delivery app's mandated timeframe, despite there being obstacles such as traffic, restaurant delays, or route issues that are outside a worker's control. The perverse incentives flowing from apps' unrealistic delivery times could be a major contributing factor to some of the unsafe practices we are observing in our city today. And, workers are compelled into these situations, because a deactivation can be financially devastating for them and their families.

One final point underscores DOT and DCWP's holistic approach. Introduction 30-A would bring street and device safety protections to grocery delivery workers, in addition to restaurant delivery workers. That is an important step in the right direction, from a street safety perspective, but it should go even further for the issues DCWP enforces. As discussed in the Administration's Blueprint for Economic Recovery, workers who deliver all types of consumer goods would benefit significantly from minimum pay and other protections[1]. So, as we work on all this legislation together, the Administration wants to ensure it addresses the root causes of unsafe riding, that it does not have any unintended consequences on workers, and that each bill works in concert to develop better policy outcomes for New Yorkers.

### Conclusion

Thank you for the opportunity to testify on these bills, and for your collaboration with our efforts to support working New Yorkers. We look forward to answering any questions you may have.

---

[1] Mayor-Adams-Economic-Recovery-Blueprint.pdf (nyc.gov)



THE CITY OF NEW YORK
OFFICE OF THE COMPTROLLER
BUREAU OF LABOR LAW
1 CENTRE STREET
NEW YORK, NY 10007

BRAD LANDER
COMPTROLLER

## TESTIMONY OF NEW YORK CITY OFFICE OF THE COMPTROLLER

### Committee on Consumer and Worker Protection

Claudia Henriquez, Director of Workers' Rights and Bureau of Labor Law

June 21, 2024

My name is Claudia Henriquez, Director of Workers' Rights and the Bureau of Labor Law at the Office of the New York City Comptroller Brad Lander. Thank you to the Committee on Consumer and Worker Protection and Chair Julie Menin for the opportunity to testify today. As you know, when Comptroller Lander was a member of this Council, he spearheaded labor protections for delivery workers and helped secure many of the standards that are in place today. This set of issues is very important to him. At the Bureau of Labor Law, our mission is to protect vulnerable workers from exploitation, and it is in that spirit that we are here today.

Comptroller Lander supports Int. 737 and 738, which establish standards around the solicitation of gratuities for app-based delivery workers. It is well-documented that after the minimum pay law went into effect, some third-party platforms changed their tipping structure so that customers could only tip *after* the order was placed or delivered.[1] This resulted in fewer overall tips to workers on those platforms. These laws will ensure that consumers are not unwittingly disincentivized from tipping delivery workers. Complying with these laws will cost the apps nothing and will ensure workers are receiving the tips that customers intended.

The legislation also levels the playing field between the apps by standardizing the process of gratuity solicitation. Certain platforms won't have a competitive advantage over others by hiding the ball on tips. And, while we support the bills, we wanted to point out an issue with the way that both bills are drafted. Both bills state that *where* tipping is solicited, *then* the requirements would apply. We urge the Council be thoughtful about the wording so that the

---

[1] *Tip Tricks Dampen Delivery Worker Celebration of New $18-an-Hour Wage*, THE CITY, Dec. 6, 2023, *available at* Tips Tricks Dampen Delivery Worker Celebration of New $18-an-Hour Wage | THE CITY — NYC News

legislation doesn't inadvertently provide a loophole for the apps to remove the tipping option altogether, and which we understand is already being threatened.

Comptroller Lander also supports Int. 859, which would promote pay transparency. It goes without saying that transparency around how time and pay are tracked and calculated is critical for delivery workers. Simply put, workers deserve to have this information, just like workers in other industries have access to their time records and itemized pay checks. Transparency benefits the apps too, by removing opportunities for confusion and dispute.

Some of the bills before the Council address traffic safety. Workers have reported to our colleagues at the Department of Consumer and Worker Protection that they are pressured to complete deliveries in a certain amount of time. In some situations, the workers have engaged in unsafe acts, such as running a red light, because of this pressure. These actions are dangerous not just for workers, but for members of the public. Workers have also reported to DCWP that they will get toggled off an application if they do not accept offers while in the middle of completing another delivery. This is while the worker is operating an electric bicycle or a scooter, and their eyes should be fully on the road.

The City needs a comprehensive framework around traffic safety that holds the apps accountable for worker safety violations. Third party platforms cannot be allowed to create incentives for unsafe driving, and such a framework needs to hold apps accountable for creating these conditions. It must protect workers who report safety issues or infractions from deactivation or other forms of retaliation. In addition, the apps should provide workers with safe, street-legal equipment, share data with the City on popular routes to inform targeted infrastructure investments, and create Deliverista hubs where workers can rest, charge their devices, and receive educational materials.

There are a few other issues that we would like to bring to the Council's attention as it considers future legislation affecting delivery workers. First is the issue of deactivation: workers report that they are being deactivated or removed from the apps with no information or understanding of why that has happened. Other jurisdictions have begun to address this issue,

2

and it is time for New York City to continue to lead on worker protection standards by doing the same.[2]

We also urge the Council to address the fact that Relay was carved out by a court order from having to comply with the Council's previous minimum pay legislation.[3] At this point, the issue needs a legislative fix. When the state enacts a statewide minimum wage requirement, there aren't generally exclusions based on an employer's ability to pay, and the same protections should be afforded to delivery workers.

The City also should think big and invest in higher quality bike infrastructure, including wider lanes and e-bike charging facilities, and explore the creation of separate lanes for e-bikes and vehicles that belong in neither traditional bike lanes nor mixed traffic.

Thank you for the opportunity to share these remarks. This concludes my testimony on behalf of the Comptroller's Office.

---

[2] Last year, Seattle passed an Ordinance that requires companies to base deactivations on reasonable policies and provide workers with notice, records, and review by a live person. While we believe there are parts of the Ordinance that could be strengthened, it is the first of its kind to protect against arbitrary deactivation. *See* App-Based Worker Deactivation Rights Ordinance, City of Seattle Ordinance No. 126878, *available at* View.ashx (legistar.com).
[3] *Relay Delivery, Inc. v. NYC Dep't of Consumer and Worker Protection et al.*, Decision and Order on Motion, Index No. 155944 (Sup Ct, New York County 2023, Moyne, J.)

3



## In opposition to Intro 762

Good morning. My name is Kathleen Reilly Irwin, and I am the NYC Government Affairs Manager for the New York State Restaurant Association. We are a trade association representing food and beverage establishments in New York City and State. We are the largest hospitality trade association in the State, and we have advocated on behalf of our members for over 85 years.

Today, I want to express our serious concerns with Intro 762, which would upend the fee cap landscape for third-party delivery platforms that restaurants have come to rely upon. Intro 762 would give third-party delivery companies the opportunity to charge a new category of fees for marketing, on top of the fees for fulfilling a delivery, and card processing, which restaurants already pay. The new category of fee would be bundled together with the fee restaurants currently pay for facilitating an order, and would be capped at 25%. Adding together all these fee obligations, a restaurant could be charged up to **28% for a pickup order**, and **up to 43% for a delivery order**. The New York State Restaurant Association and our membership strongly oppose this legislation.

Third-party delivery companies have not been responsible actors in New York City, and that history clouds this entire conversation. They have been caught red-handed, charging phony fees, and listing restaurants without their knowledge or consent. Even pre-Covid, the Committee on Small Businesses was holding periodic fact-finding hearings to better understand the imbalanced and predatory environment that third-party delivery platforms had created in the city, including a fee landscape where restaurants were routinely charged 30% and more for every order. Starting in 2020, City Council wisely passed a whole package of regulatory legislation, including the fee caps, and restaurants now rely on this re-balanced market landscape. We and our membership strongly oppose any effort to reverse that progress. It is also highly relevant that the third-party delivery companies are in the midst of an active lawsuit against the city, seeking to overturn fee caps in the courts, and we cannot support weakening the fee caps while this lawsuit is outstanding.

If Intro 762 is passed and implemented, **it will not be possible for restaurants to continue receiving the same quality of service at the same price point.** Yes, the language of Intro 762 states that platforms must continue to offer a basic level of service – making restaurants "listed and discoverable" – at the current price point, but it would be a mistake to believe that this basic service will leave restaurants anything but buried behind the restaurants who are pressured into paying more for "marketing."

Right now, restaurants can rely on paying 5% to have an order facilitated on the platforms, 15% if they want the platforms to fulfill a delivery, and 3% in card processing fees. Under Intro 762, restaurants will either be bullied and strong-armed into paying more for each order, or they will be buried on the platforms and downgraded to substandard "basic" services at the current price point.

Third-party delivery companies have already run this play in Washington, D.C. and our counterpart restaurant association there and reporting by DCist have found exactly the circumstances we predict: restaurants suddenly shocked that they will have to pay significantly more for every order, returning to the pre-cap rates of 30% to even 50%, or, they will be reduced to "basic," worse, service.

Third-party delivery companies claim they just want a chance to offer their bespoke marketing services to restaurants; that's their earnest and only goal. If that were true, there is absolutely nothing in the current fee cap landscape preventing these companies from offering traditional marketing campaigns -- ie. for x weeks and y dollars we will provide z service to the client, such as optimizing their website or running targeted ads. There is nothing preventing them from offering marketing services structured *any way* other than per-order fees. Perplexingly, third-party delivery companies refuse this option. They insist they have been entirely kept from marketing under the current fee caps, even though that is not true. They insist on creating a sky-high per-order marketing fee because what they really want is to create a competitive, bidding-war-like dynamic where every restaurant is muscled into returning to the bad old days of fee extortion.

Here's what that dynamic could look like – first, third-party delivery companies approach all local restaurants to let them know that their delivery radius and delivery response time will be significantly limited if they opt to continue with the "basic" plan – but they can keep their current service for another 10% "marketing fee" (so 30% plus card fees). Then, one or two pizza parlors in a neighborhood get talked into paying an additional 10% for more "marketing" (so up to 40% plus card fees, total). They get prioritized on the internal third-party algorithm, and they begin to receive more orders. The third-party delivery company then approaches other pizza parlors in the neighborhood to say, "hmm, we've noticed you're not getting the orders you were earlier this year. Some of the other pizza parlors in this neighborhood opted in to an additional 10% marketing fee and their sales have gone up! Would you like to do the same?" Frustrated, hesitant, those pizza parlors agree. Now everyone is similarly promoted again, back to square one, except the restaurants are paying more, and the massive tech company platforms are pocketing more money. **Of course** this is the model the third-party delivery companies prefer.

We know that City Council is aiming to be fair and to give restaurants the best chance to succeed. We know that certain third-party platforms have expended significant resources to bring you the narrative that restaurants want to pay more for each order. While we strongly disagree that this is a prevailing opinion, we can understand that some restaurants could be intrigued by the idea of marketing services. Luckily, third-party delivery companies are already well-positioned to provide this service through traditional marketing campaigns structured *any way* other than per-order fees! If you want to hear the voices of restaurants, if you want to protect a re-balanced third-party landscape that is fair to restaurants, please do not undo the important progress of the fee caps. We strongly urge you to oppose Intro 762.

Thank you for taking the time to consider our concerns today. We look forward to being actively involved in conversations on this issue moving forward.

Respectfully Submitted,

Kathleen Reilly Irwin

NYC Government Affairs Manager

New York State Restaurant Association

401 New Karner Road

Albany, New York 12205

# Grubhub Testimony on Intro 762-2024,
# The Fair Competition for Restaurants Act

June 21, 2024

Good morning. My name is Joshua Bocian, Head of New York Government Affairs for Grubhub. I'd like to thank Chair Menin and the members of the Committee on Consumer and Worker Protection for this opportunity to discuss the merits of Intro 762 -- also known as the Fair Competition for Restaurants Act. This compromise amendment is absolutely crucial for the entire delivery ecosystem in New York City, but especially for the tens of thousands of independent restaurants who rely on third party delivery to find new customers and grow their businesses in this highly competitive market.

For the delivery industry to thrive in New York City, every side of the marketplace must be able to operate sustainably – restaurants, diners, delivery apps, and couriers. While our testimony today focuses on The Fair Competition for Restaurants Act and the need to provide long-overdue relief from marketing restrictions to New York's independent restaurants, we want to acknowledge the important work being done by the Council to support delivery couriers and reiterate our continued willingness to be a good partner and find reasonable solutions to help them maximize their potential in the gig economy.

I'd also like to remind the council that Grubhub and Seamless have been part of the fabric of New York for over two decades, since Seamless was first founded here in 1999. Today, we have more than 300 employees based at our NYC office and we partner with over 45,000 NYC restaurants and tens of thousands of couriers across the city. We are committed to their success as much as we are our own, because if restaurants and couriers succeed, then so do we. For this reason, we are pleased to have arrived at a common-sense compromise to address the last remaining fee cap found in any city in America.

<u>A consensus for compromise that has only grown stronger</u>

The Fair Competition for Restaurants Act has extensive and diverse support – support that has only continued to grow thanks to over a year and a half of close collaboration with restaurants, the Council, and other stakeholders that yielded significant enhancements to the bill. Most notably, while the previous version of this bill dispensed with fee caps entirely, The Fair Competition for Restaurants Act maintains a fee cap on delivery fees charged to restaurants. At the same time, it provides key safeguards for restaurants, while guaranteeing

1

they have freedom to market themselves how they choose. With these improvements in place, it is not an exaggeration to say that it is the strongest food delivery commission cap of its kind in the country.

Importantly, much of the support expressed for this measure has come from New York's dynamic and cherished community of small, independent restaurants that lend our neighborhoods such authentic and inimitable character.

From the New York State Latino Restaurant & Bar Association, four borough chambers of commerce, and local business improvement districts, to individual restaurateurs in Washington Heights, Long Island City, Pelham Parkway, Jamaica, Bed Stuy, and so many others – those advocating for this common sense compromise know firsthand the tangible benefits it will bring them when it comes to running their businesses and having the resources they need to grow.

But today, we are here to highlight this consensus and reaffirm our commitment to the collaborative effort behind this bill – one that will empower small businesses, bring more orders to local restaurants, and create more earning opportunities for delivery workers. It's a win-win for all stakeholders.

<u>Giving small, independent restaurants a fighting chance against the big brands</u>

Grubhub constantly invests in three core groups that are critical to the food delivery ecosystem: small and independent restaurants; delivery couriers; and the communities we serve.

The focus of The Fair Competition for Restaurants Act is to better enable small and independent restaurants to grow, compete with big chains, and support the character of their neighborhoods throughout the five boroughs.

This breaks down into two core areas: 1) Giving these restaurants more choice and autonomy to leverage delivery platforms to market to new customers; and 2) Strengthening safeguards so that restaurants have transparency, flexibility, and certainty in partnering with the platforms.

<u>Flexibility for growth</u>

Choice and autonomy enables restaurants to utilize and tailor the platform so that it works best for them – and this is especially true for those that rely on delivery volume to sustain

2

their business and expand their reach.  Rather than imposing a one-size-fits-all approach – as has been the case since this initial regulation was passed during the early days of the pandemic more than four years ago – this amendment allows restaurants to choose which level of service is best for them and to change or customize that service whenever they choose.

Some examples help illustrate why this is so important:

> -A Korean fried chicken spot in Elmhurst with a loyal following is opening a second location in Turtle Bay to cater to East Midtown office workers. They can't afford a major advertising campaign like some large national chains, so they want to maximize how they show up to potential new customers in the area who've made similar orders in the past. But they only want to do this for the first two months as they know once folks get a taste, they'll spread the word.

> -A popular juice and smoothie bar in Crown Heights has expanded its menu to include a variety of healthy salads, wraps, bowls, and other offerings. It wants to ensure prior customers have an automatic discount to sample the new fare as they launch and seek feedback.

> -A food truck in Wakefield specializing in Jamaican jerk chicken extends its hours and seeks to appeal to new customers in Woodlawn, Riverdale, and Mt. Vernon. By featuring its best-selling dishes to targeted users, it hopes to double revenue.

There are, no doubt, countless other scenarios like these. While we can speak to many of them – and several business owners are here today to tell their own stories – we cannot speak to them all. That's because the people who know their businesses best (and are best equipped to make decisions for them) are busy running those businesses.

<u>Robust safeguards for restaurants</u>

We do know, however, that some businesses have concerns about the application of unfamiliar technology to their business, and no business wants to be surprised with unanticipated costs. That's where the newly enhanced safeguards of this compromise amendment come into play.

In our extensive dialogue with restaurants and the Council, we have heard the desire to keep delivery fees capped at their current levels while allowing restaurants the flexibility to increase marketing services when it makes sense for them. They've also sought assurances that these new options for marketing would not exceed certain levels. Transparent pricing of

these services is critical: they are [clearly outlined on our website](#) for all to see to ensure such fees never exceed the proposed new cap and that there are never any surprises.

It is important to note that The Fair Competition for Restaurants Act keeps in place caps on third party fees charged to restaurants, but amends the cap on fees for marketing services to allow more flexibility in promoting their restaurant. Specifically, The Fair Competition for Restaurants Act continues the existing cap of no more than 15% charged for delivery and maintains limits on order processing fees. The only notable change to the existing fee cap structure is with regard to Other Fees, representing the marketing services restaurants can opt-into (or out of) on the fly. This marks a departure from the previous versions of this amendment, which eliminated fee caps entirely.

Other provisions in this compromise amendment include explicitly allowing restaurants to include physical marketing materials with their third party delivery orders; guaranteeing restaurants' ability to set their own menu prices on the platforms; mandating the Department of Consumer and Worker Protection (DCWP) conduct regular assessments regarding the effects of the caps, and a prohibition on third party delivery apps purchasing a restaurant's keywords for use in advertising.

As stated earlier but which bears repeating, with emphasis: taken together, <u>these provisions constitute the strongest food delivery commission cap of its kind for restaurants in the U.S</u>.

<u>Our commitment to transparency</u>

While it remains Grubhub's primary objective to provide New York's independent restaurants with long overdue relief from restrictions on marketing services, we recognize that there are several other bills of importance to the delivery industry and specifically, the courier community, being heard today. We've been a close partner with the Council and stakeholder groups like Los Deliveristas Unidos to strengthen the delivery experience and provide transparency to how couriers earn on our platform. We look forward to continuing these partnerships and are confident we can develop solutions that benefit all parties by tapping into the same spirit of compromise that brought us The Fair Competition for Restaurants Act.

For example, when it comes to courier pay, there is no question that DCWP's minimum pay standard added many layers of complexity to the way couriers in New York City earn. Grubhub has adhered to the letter of the law and made substantial changes to the platform in order to implement the regulation, but if delivery partners express that they are in need of more information or education on how their pay in New York City works, we are always willing

4

to engage with them, the Council, and other stakeholders to find a solution. We are constantly adding new tools and resources to improve the experience for our delivery partners, and once the fee caps that restrict our contracts with restaurants are amended, we'll be able to devote even more resources to developing these efforts.

Ultimately, whether it's the agreements we enter into with restaurants, the costs diners pay to get their food delivered, or the way we communicate about pay and scheduling with our delivery couriers, Grubhub is committed to being forthright and honest. Not because we have to -- because we want to. Because it's good business.

<u>New Yorkers can't afford to let this drag on</u>

It is and has always been Grubhub's preference to work collaboratively with the City to amend the fee caps through the legislative process rather than through legal challenges in the courts. In the absence of any appropriate amendment, Grubhub's legal challenge to the current caps has continued to move forward. If it proves successful, the City could face damages in the hundreds of millions of dollars, if not in the billions. With so many other pressing issues facing the City, from housing and immigration to crime and public transit, the City -- but most acutely, New York restaurants who demand the freedom to market themselves how they choose -- cannot afford to let this drag on.

<u>Now is the time to get this right</u>

1. It is important to remember that the original fee cap passed during the early days of the pandemic in 2020, when the restaurant industry was thrown into chaos..

2. But after four years, this emergency policy has long outlived the acute emergency that the pandemic presented. New York City is the last remaining city in the country to have a permanent limit on restaurant choice. No other city has a similar cap still on its books. New York stands alone in maintaining this Covid-era measure while so many others – like proof of vaccination and mask mandates – were eased years ago once circumstances changed.

3. Cities like San Francisco, Seattle, Minneapolis, Portland and others have removed or revised their fee caps.  And none of them did so with the additional guardrails that The Fair Competition for Restaurants Act now includes.

4. Small and independent restaurants want more choices so they can choose which services are best for them — tools like search engine marketing, promotions to target

new customers, and analytics using customer data or free websites that allow for direct-to- restaurant orders with no commissions, like Grubhub Direct.

5. We hear from many small, family- and immigrant-owned restaurants, many operating in neighborhoods beyond the central business districts of Manhattan: they want the chance to compete with big chains and restaurant brands. They overwhelmingly support this compromise amendment in large part because they lack the big budgets and large marketing teams that power major restaurant brands.

When these restaurants succeed and have the resources they need to grow, all of New York benefits.

Thank you for the opportunity to share our thoughts on the proposed amendment being discussed today. Grubhub looks forward to continuing to work with the City Council to make all of the communities we serve stronger.

—

## Broad Support for The Fair Competition for Restaurants Act

**RESTAURANTS AND ORGANIZATIONS**
A Z Nutrition & Smoothies
Absolutto Cuisine & Bar
African Services Committee
American Pakistani Advocacy Group
Arlekan Inc.
Bangladeshi American Community Development & Youth Services
Bangladeshi-American Community Council
Bedford Cafe and Restaurant
bKind - Trauma to Triumphs, Inc.
Blue Corn Restaurant
Bombay Grill House
Bombay Kabab
Brooklyn Chamber of Commerce
Cabaña Jorge's Restaurant

6

Caribbean Cultural Center African Diaspora Institute

Caribbean Taste Budz LLC

Caribeno NYC

Chamber of Commerce of Washington Heights & Inwood

Citroën

Council of People Organization

Criollas Empanadas

Crossroads Community Services

De Tandoori Knight

Dyker Natural Deli

East New York United Concerned Citizens

El Chiltepin Inc.

El Rey Del Taco To Go

Essence Bar & Grill

EZ Paella & Tapas

Fiat Cafe

Frenchy Coffee NYC LLC

Geo's Pizzeria and Restaurant Inc.

Gorkhali Brooklyn

Graziella Pizza and Restaurant

Greater NY Chamber of Commerce

Green and Healthy Standard

Haitian-Americans United for Progress

Hado Sushi

H-Yard Gourmet Deli

Hollywood Diner

Jalapeno Shack

Joenise Restaurant

Just Food

Kosher Hut of Brooklyn

La Baraka

La Estrella Del Castillo Restaurant

Little Caesars

Madison Square Boys & Girls Club

Manhattan Chamber of Commerce

Mekong

Mexicocina Mezcaleria

7

Mojitos Restaurant Bar

Mott Haven Historic Districts Association

Muslim Community Network

National ACE / AAPI Strong

National LGBT Chamber of Commerce (NGLCC)

National Restaurant and Coffee Shop

New Kam Man

New York Women's Chamber of Commerce

New York Young Entrepreneurs Roundtable

NYC Hispanic Chamber of Commerce

O'Neill's Maspeth

Oasis Pizza and Gyros

One Hundred Black Men, Inc.

Opportunities for a Better Tomorrow (OBT)

Patacon Pisao #2

Patacon Pisao LES

Parkview Market

Pat'e Palo Bar & Grill

Pera Mediterranean Brasserie

Pestos

Prima Donna

Presto Fresh Cafe

Queens Chamber of Commerce

Rabbits Chicken and Waffles

Relief Access Program for The Bronx (RAP4Bronx)

Rescuing Leftover Cuisine

Richie's Place Coffee Shop

Rittenhouse Deli and Juice Inc.

Schnitzel Haus

Satacos

South Asian Council for Social Services

Stocked Cafe + Burgers

Subway

Tabú Café and Wine

Tacombi Foundation

Tada Noodles

TechNYC

8

Teriyaki Madness

Tepeztate Restaurant

The Door

The New Bronx Chamber of Commerce

The Ribbon

Throggs Neck Community Alliance

Truth Restaurant Astoria

US Black Chambers, Inc.

US Hispanic Chamber of Commerce

Variety Boys and Girls Club of Queens

Washington Heights BID

White Tiger

Women Impacting Public Policy

**DELIVERY PARTNERS**

Aaron Trazie, Manhattan

Abubacarr, The Bronx

Adrian, Manhattan

Ahmed Adam, Manhattan

Ahmed Askar, Brooklyn

Albert, Manhattan

Alseny Barry, Queens

Amadou, Brooklyn

Amadoutelly Diallo, Other

Angel, Manhattan

Anwar Alnumair, Brooklyn

Antonio Le Febre, Manhattan

Aristote Ndudi Ontala, Manhattan

Boubacar Diallo, Manhattan

Bryce Garbutt, The Bronx

Carlos Chávez, Manhattan

Carlos Zuleta, Manhattan

Caleb Lamel, Manhattan

Christopher Smith, Manhattan

Cristian Veguilla, Queens

Danny Quinones, Queens

David Wade, Manhattan

9

David Yougbare, Manhattan

Desmond Powell, Manhattan

Desmond Winn, Brooklyn

Diallo, Brooklyn

Edward Hatchett, Brooklyn

Elisa Cohen, Manhattan

Erickson, The Bronx

Everton Walker, Manhattan

Fabian, The Bronx

Frank, Manhattan

Gedeon Daouega

Guadalupe, Manhattan

Henry, Manhattan

Javon Petty, The Bronx

James Seda, Manhattan

Jonathan C., Manhattan

Jonny A., Manhattan

Jose Garcia, Manhattan

Julia Rindenow, Manhattan

Juston, Manhattan

Karalang Janneh, The Bronx

Kande Doucoure, Manhattan

Kelvin C. Perez Perez, Manhattan

Kheismer Guanipa, Manhattan

Kindell Robinson, Brooklyn

Lambros Giannoutsos, Queens

Lucca C., Manhattan

Mahamadou Fofana, Manhattan

Mahamadou, Manhattan

Mansor Sall, Manhattan

Marcos, The Bronx

Mafe Sow, Manhattan

Matarr Drammeh, Manhattan

Michael Pollard, Manhattan

Mike Chalco, The Bronx

Moussa Diaby, Manhattan

Moustapha Sylla, Brooklyn

Natwaldo Laventure, Queens

Naimjon Rahmatov, Manhattan

Oumar Sadio Diallo, Brooklyn

Paul Hylton, The Bronx

Perry Spencer, Manhattan

Rafael Castillo, Manhattan

Rashan Johnson, Manhattan

Rayquann Quaveir, Manhattan

Richard Santo, Manhattan

Santana Rodriguez, Manhattan

Toddneisha Cook

Unique, Manhattan

Yaakov Lipsker, Manhattan

Yash Raval, Manhattan

**DOORDASH**

June 25, 2024

Council Member Julie Menin, Chair
Committee on Consumer and Worker Protection
New York City Council
New York, NY 10004

**RE: Testimony Supporting Int 762; Opposing Int 0030, 715, 737, 738, & 859**

On behalf of DoorDash, I am writing to share our positions on the seven bills being considered by the New York City Council Committee on Consumer and Worker Protection. While we welcome the Committee's consideration of Int 762, legislation that would amend the city's price controls on third-party food delivery services, the hearing ultimately represents one step forward, but several steps backwards to policy making with respect to third-party food delivery. Other bills being considered by the Committee – Ints 0030, 715, 737, 738, and 859 – are deeply concerning and, if passed, would negatively impact Dashers, restaurants, and consumers using the platform.

Please see our positions on the bills before the Committee detailed in the letter below.

### I.    SUPPORT: INT 762 - PRICE CONTROL AMENDMENT

DoorDash supports Int 762, legislation that would reform New York City's existing price control on food delivery. This bill will help restaurants, workers, and consumers by easing upward pressure on prices and ensuring restaurants can choose the products and services they need.

### A.    <u>Reforming the price controls will benefit local restaurants, workers and consumers.</u>

Food delivery has changed dramatically since New York City passed its first price control in 2020. The COVID-19 pandemic has since subsided. Partnership plans for restaurants have evolved. And today, restaurants continue to have access to affordable delivery options in New York City and throughout the U.S. In fact many restaurants already pay commissions lower than what the City's fee cap requires. Restaurants chose our lower-cost plans because they offer real value. Of merchants surveyed about our most affordable delivery option, our Basic partnership plan:
- 62% would recommend DoorDash for reaching consumers they would not otherwise have been able to reach.
- 72% would recommend DoorDash for increasing sales or volume.
- 73% would recommend DoorDash for reaching a wider range of consumers.[1]

Contrary to some representations made at the hearing, our Basic plan also offers a true presence on the platform and access to its features. For example, restaurants on Basic can be found in valuable homepage carousels that reach consumers, like "Fastest Near You," "Most Popular

---

[1] 2022 DoorDash Economic Impact Report.

Restaurant," and others, while also maintaining access to our suite of marketing and analytics tools and live support, just like those on our Plus and Premier plans.

The true effect of the price controls is to force consumers to pay more for, or cut restaurants off from, optional services that they may need and value. These are services that restaurants want to grow their businesses, reach new markets, and find new consumers. DoorDash doesn't only offer its Basic partnership plan, it offers other plans that provide different benefits for restaurants that want them. Whether it's more reach, access to DashPass, or additional advertising and promotions for a new product launch, DoorDash empowers restaurants to choose what they need to compete in today's marketplace. Price controls discourage all of these options and promote a one-size-fits-all approach.

These impacts are not hypothetical. Price controls have previously forced us to raise consumer prices in other markets, an action that drove down consumer orders and hurt both restaurants and Dashers. In New York City, we were similarly forced to raise consumer prices in response to the City's pay standard. As a result, in just a two month period, we estimate that New York City restaurants experienced 850K fewer orders and $17M less in revenue than they would have earned on DoorDash Marketplace had the market remained unchanged and continued to grow at expected levels. Over the course of a year, 5.6M orders in NYC might not be placed that we would have otherwise expected leading to over $110M in lost merchant sales.[2] These lost orders won't all be replaced. According to our consumers, 72% of meals delivered through the app might not have been ordered at all if DoorDash did not exist.[3]

Fewer orders from New York City consumers also means less work for Dashers, along with longer wait times for orders. The number of new Dashers in New York City has fallen by 20% compared to before the new minimum pay rate took effect.[4]

NYC's existing price controls put even more pressure on platforms to increase consumer fees further, or make service changes that adversely impact merchants. Like we did in response to the pay standard, we'll have to alter business operations to make them sustainable. Int 762 reduces these risks by opening the door to more choice for restaurants.

**B. Int 762 has undergone significant changes to address Council feedback and stakeholder pain points.**

The third-party food delivery services regulated by the price controls engaged in extensive conversations with the Council and stakeholders on last year's bill, Int 813. That dialogue and feedback has led to significant changes in this year's bill, including:
- Upper limits on allowable fees for certain services, including delivery.
- The ability for restaurants to manage online searches for their restaurant.
- Assurance that restaurants control menu pricing when they use third-party services for delivery.
- Certainty that restaurants can directly market to consumers by adding menus or flyers to deliveries.

---

[2] [DoorDash, An Update on the DoorDash Experience in NYC](#).
[3] [2022 DoorDash Economic Impact Report](#).
[4] [DoorDash, An Update on the DoorDash Experience in NYC](#).

The bill has new supporters (including organizations that did not support Int 813), and even the most ardent detractors have acknowledged the improvements. This bill has evolved substantially from last session, and the industry has put its best foot forward to support a package of reforms that the Council can stand behind.

C. **Nearly every city in the U.S. has repealed their price controls, with little impact on restaurants.**

The fact that price controls ultimately hurt restaurants rather than help them is demonstrated by the elimination of price controls throughout the U.S. since the pandemic ended. Unsurprisingly, moving back towards normal market conditions, and allowing businesses more choice over which products and services they want, has not resulted in fallout for restaurants.

New York City's existing price controls are an extreme outlier at this point. The vast majority of U.S. jurisdictions that imposed food delivery price controls have repealed those laws, many as early as 2021. And while a handful of U.S. cities imposed permanent laws that require platforms to offer affordable delivery options, those laws otherwise leave restaurants and platforms free to choose additional products and services beyond basic delivery without constraint. No cities have reverted to policies like New York's. At this point there is a proven track record that these laws aren't necessary.

D. **Reforming the price control can eliminate needless risk.**

Important developments have occurred since the Council last held a hearing on reforming the price controls. A court considering legal challenges to New York City's current law has raised even more serious questions about its unlawfulness. When rejecting the City's motion to dismiss the legal claims challenging the price controls, and permitting each and every claim filed to move forward, the Court expressed many concerns about the law. The current law not only remains at risk of being invalidated. If that happens, there is a serious risk of liability for the City, totalling hundreds of millions of dollars. There is no reason to take such a risk and when the existing price controls is bad policy to begin with.

## II. OPPOSE: INT 0030 - E-BIKE REQUIREMENTS

Int 0030 would require food delivery workers and other people engaged in commerce to use only certified e-bikes, and envisions that businesses would provide certified e-bikes to people that don't already have them. This bill continues to have multiple, fundamental problems that would prevent it from being effective. It ultimately seems designed to promote cutting workers off from app-based work rather than supporting them.

A. **Int 0030 completely fails to provide accountability for the businesses that created the City's battery fire problem (instead allowing them to further profit), while still requiring third-party food delivery services to pay for e-bikes twice**.

The most glaring and significant issue with Int 0030 is that it fails to account for the fact that platforms like DoorDash are already paying food delivery workers for their e-bikes and batteries. **The problem is not that third-party food delivery services aren't providing workers with**

**resources to upgrade their e-bikes–the problem is that no other entities are making any further contributions to solve this problem.**

As we've previously explained, the minimum pay standard requires third-party food delivery services (and no other businesses) to pay workers $2.26 per hour in compensation for their equipment and vehicles, the vast majority of which was calculated based on the cost of e-bikes, batteries, bike maintenance, bike safety accessories, and replacement expenses. Before the end of the year, platforms like DoorDash will already have paid even part-time workers enough in dedicated e-bike pay to purchase a new e-bike. Based on DCWP's data from July 2021 - June 2022, platforms are estimated to pay around $50 million annually to e-bike Dashers just to cover e-bike expenses, a figure that could grow to more than $66M by 2025. With this pay, even a worker that spends only the DCWP's average 21.3 number of hours per week doing this type of work  will have received enough money to buy a certified e-bike in one year. For people that are frequent delivery workers, they have likely already received enough earmarked funds under the minimum pay standard to upgrade their e-bike to a certified model.

A valid question was raised at the hearing: what about workers who are just getting started with delivery work and need a bike? The City has already addressed this issue. An important component of solving the battery fire problem is enacting and enforcing safety standards on the sale of e-bikes and batteries. Fortunately the City has already done so by passing a new law that took effect last fall. This law requires e-bikes sold in the City to meet UL 2849 and batteries to meet UL 2271 standards. This means it should now be impossible for workers to purchase an uncertified e-bike and battery in New York City. If retailers are selling products to workers that don't meet those standards, they must be held accountable. If the City's laws don't facilitate adequate enforcement mechanisms to protect consumers that are sold uncertified products, those enforcement mechanisms should be changed (an issue we understand DCWP already supports).

Unfortunately, we're yet to see any policy proposal that would see the entities that sold these fire-prone batteries make any financial commitments to help New Yorkers upgrade and dispose of their uncertified batteries. Instead the City's theory seems to be that we should in fact let these businesses profit twice by having New Yorkers go purchase safe replacements from them. This approach should be unacceptable to everyone on the Council.

We do recognize that amendments to the bill have increased the types of workers and companies that would be subject to its requirements. But this change misses the mark completely. The bill still lacks: 1) any acknowledgement of the fact that only third-party food delivery services are already required to pay workers a substantially higher wage specifically for their e-bikes and batteries; and 2) accountability for retailers that have sold dangerous batteries.

In sum, DCWP and the Council have already made a choice with respect to how third-party food delivery services are to provide workers with the funds they need to purchase e-bikes, maintain them, and replace their batteries. That policy is clear–platforms are obligated to pay workers directly. The better question that the Council should now ask when considering solutions to the e-bike fire problem is how other industries beyond third-party food delivery should contribute and help workers. Likewise, the Council has not yet addressed how to prevent retailers from unfairly profiting from selling dangerous products to delivery workers and other New Yorkers. The

Council should address those issues before adding even more requirements on third-party food delivery services.

**B.** **The bill will still hurt workers because it fails to include the right range of compliance options.**

Inexplicably, the bill continues to limit workers to having e-bikes or other e-devices that meet the UL certification for the device's entire electrical or drive system (UL 2849 or UL 2272), while the City simultaneously pursues an entirely different approach by piloting battery-only replacement programs that wouldn't enable workers to comply with either of those standards. Despite us identifying this issue multiple times since the bill was first introduced last year, the legislation still has not been amended to align with programs the City itself is piloting. This simply makes no sense. Int 0030 would literally make it unlawful for workers to keep their existing e-bike and participate in these programs (one of the key reasons for pursuing them in the first place). As long as the City continues to pilot or support battery-only e-bike replacement options for workers, the Council should not consider passing any bill that effectively prohibits workers from upgrading to a safer battery certified to UL 2271.

**C.** **The bill still does not address one of the most crucial issues to solve the battery fire problem—recycling and disposing of dangerous batteries.**

Int 0030 seems content to ignore the question of how old e-bike batteries will actually end up responsibly recycled and disposed of so that they don't continue to pose a fire risk to the community. This is a baffling omission. Programs aimed at helping people upgrade their e-bikes or batteries can only be effective if they also require that dangerous batteries be handed over so the City can be certain they won't start fires. If older batteries are not removed from circulation, they will either: 1) continue to be used in the second-hand market and charged in people's homes; or 2) be placed in the regular waste disposal stream. Either scenario furthers the risk of fires and prevents proper recycling where environmental risks can be eliminated and valuable components can be extracted. The Council should not support any e-bike or e-mobility replacement programs that don't address battery recycling and disposal.

**D.** **Recent amendments to the bill have not eliminated, or even mitigated, the myriad of harmful unintended consequences that would result from this policy.**

We previously pointed out that Int 0030 won't achieve its aim of getting workers on safe e-bikes more quickly, and will instead result in many unintended consequences. None of these issues have been addressed in the new bill. This bill would still: 1) discourage e-bike use, meaning fewer jobs for workers that rely on e-bikes, more deliveries on modes like cars, and less reliable delivery in general; 2) disrupt small business restaurants by driving up delivery costs or putting their access to delivery at risk; and 3) make workers targets for enforcement by subjecting them to requirements for e-bikes that don't apply to other New Yorkers.

**E.** **Int 0030 remains incompatible with app-based work.**

The structure of this policy remains unworkable for third-party food delivery services. When workers use multiple apps, and work irregular hours, there is no solution to deciding which

workers should get new, certified e-bikes and who should be providing them. This structural problem has not been addressed, and in its current form, the policy simply can't be implemented.

**F.  The City already has multiple policies in place that are aimed at helping workers upgrade their e-bikes that need to be implemented.**

The City has already addressed the problem of helping workers get certified e-bikes and batteries, not once but twice. First, it mandated a pay requirement for third-party food delivery services, which was calculated to include compensation specifically for the ongoing cost of worker's e-bikes, including regularly replacing their battery. Second, the Council passed Int 949, establishing a trade-in fund with an explicit mandate that the agency in charge "target[] food delivery workers" when implementing the program. Unlike Int 0030, the trade-in program that was established addressed key issues such as turning over old batteries, avoided new problems for app-based by placing control over trade-ins with the City, and it actually supported adjacent City programs by permitting battery-only upgrades. We fail to understand why the Council would now consider a new policy while Int 949 hasn't even yet been implemented.

**III.  OPPOSE: INT 715 - TRAFFIC VIOLATIONS**

Int 715 would require third-party food delivery services to "ensure" each worker follows certain traffic laws and require them to pay for citations. This proposal will not result in meaningful safety improvements–they'll simply discourage e-bikes from being used at all.

First, we're concerned that this bill is rooted in a significant misunderstanding of how the DoorDash platform works and the safeguards in place to prevent workers from rushing deliveries in a manner that jeopardizes pedestrian safety. Second, this bill would risk causing widespread worker deactivations by setting terrible incentives that actually undermine safety. Finally, the City's own data seems to be squarely at odds with this proposal as a policy response to pedestrian safety given that pedestrian fatalities in the City are overwhelmingly being caused by motor vehicles, not e-bikes.

**A.  DoorDash does not incentivize rushing deliveries at the expense of safety.**

Based on the testimony at the hearing, it appears this bill is rooted in a misperception that DoorDash encourages Dashers to rush deliveries, breaking traffic laws in the process, and therefore the platform should be accountable for paying tickets that workers receive. Nothing could be further from the truth.

We don't require Dashers to deliver at unsafe speeds, and actually try to encourage the opposite. We use conservative ETA estimates. We also don't factor in wait time at a restaurant or other merchant, so if a restaurant's slow, Dashers don't have to make up that time. If a Dasher accepts an additional delivery while actively on another trip, the ETA adjusts to reflect the time needed to complete the current delivery and begin the next one. Further, only Dashers who are repeatedly and excessively late risk losing access to the platform.

On top of those measures we take proactively to ensure that Dashers do not have to rush, City law guarantees all food delivery workers the ability to set a maximum delivery distance according

to their preferences.[5] So it is never the case that a Dasher must accept a delivery that they may believe is too far for them to deliver in a reasonable time. Once a Dasher has set a maximum delivery distance of their choosing, they will never be offered a delivery farther than that distance. Plus, Dashers always see – upfront, before deciding whether to accept a delivery – where they would have to go, and they can always turn down any offer they do not wish to do.

   **B.  Int 715 would encourage more reckless behavior, and in response, a zero tolerance approach to deactivating workers over tickets.**

Int 715 will encourage exactly what it intends to prevent–more traffic violations that could put pedestrians at risk. If workers no longer need to worry about paying traffic tickets, they aren't likely to take fewer chances, they'll take more. This bill is fundamentally flawed in its approach and creates the wrong set of incentives. In response platforms will have few options but to deactivate workers to prevent this obvious moral hazard. We see only one outcome of this policy–workers being removed from the platform more often to prevent liability for tickets.

We understand that some groups are calling on the City Council to adopt restrictions on deactivations before Int 715 is adopted in order to prevent platforms from removing workers who commit traffic violations. This makes the problem even worse – there is no downside whatsoever for a worker who repeatedly commits traffic violations since they cannot be liable for tickets and platforms cannot remove them.

   **C.  Int 715 is out of step with New York City's own data regarding pedestrian safety.**

In addition to actually increasing risks for pedestrians, the bill is a troubling policy response to a serious problem when viewed next to the City's own safety data. That data demonstrates that motor vehicles are–by a wide margin–the largest driver of pedestrian deaths and injuries while e-bikes account for a tiny fraction of the problem. In 2023, vehicles like cars and trucks accounted for 8,500 of the 9,000 injuries suffered by pedestrians from all vehicles (including bikes), and 101 of the 103 fatalities.[6] This data simply doesn't support the premise that e-bike delivery workers pose an imminent threat requiring targeted intervention, and it should cause the Council to reconsider what legislation it should prioritize to actually address the important issue of pedestrian safety.

   **D.  Int 715 would be impossible to comply with.**

Int 715 requires third-party food delivery services to "ensure" that workers don't violate certain traffic laws. This is simply impossible, and we don't think any business could comply with that mandate. A quick walk down a street in the City is likely to reveal countless commercial vehicles violating traffic requirements by double parking or obstructing a bike lane. No matter what measures we put in place, nor how strict our policies are, we can't prevent every traffic violation that a Dasher could commit. Int 715 is not a workable policy because it sets an unachievable high bar.

---

[5] "Each third-party food delivery service and third-party courier service shall provide each food delivery worker with the ability to specify . . . the maximum distance per trip . . . that such worker will travel on trips." NYC Admin. Code § 20-1521(a)(1).
[6] NYC Bicycle Crash Data 2023 Report.

**IV. OPPOSE: INT 737 AND INT 738 - TIP MANDATES**

The Council has proposed two bills mandating tip solicitation requirements for third-party food delivery services:

- Int 737: if a platform solicits a tip from a consumer, the platform must suggest and offer an option of tip that is at least 10% of the item purchase price.
- Int 738: if a platform solicits a tip from a consumer,  the platform must solicit the tip before or at the same time the order is placed.

These requirements only apply to platforms that facilitate third-party delivery from restaurants. These bills do not apply to platforms that deliver groceries, alcohol, or other goods, chain or local restaurants doing delivery directly, or any other services.

A. **Recent changes to tipping were made to benefit NYC consumers, Dashers, and restaurants. Conversely, this legislation would ultimately harm all parties.**

These bills are purportedly in response to changes in tipping operations by DoorDash and other platforms following NYC's food delivery worker minimum pay regulations going into effect.

The minimum pay regulations require that DoorDash and other food delivery platforms ensure that delivery workers earn at least \$19.56 per hour before tips. This pay standard – more than 20% higher than NYC's minimum wage – significantly increased operating costs requiring us to increase consumer fees. To better balance costs for NYC consumers facing increased fees at checkout, we moved the tipping option to after-checkout. The option to tip after checkout is very accessible and available during multiple points in the delivery process (see screenshots below) and up to 30 days following completion of the order.

Even with this change to tipping, over just a two month period, higher costs have resulted in NYC consumers placing an estimated **850,000 fewer orders** on the DoorDash Marketplace than they would have had the market remained unchanged and continued to grow at expected levels. These are lost earning opportunities for Dashers and equate to approximately **\$17,000,000 in lost revenue** for restaurants and other local merchants.

Forcing platforms to offer tips before checkout and suggest a tip of 10% would heavily amplify these negative impacts. More and more NYC consumers would likely abandon placing an order because of even higher costs. This is a bad result for NYC Dashers and restaurants: each lost order not only guarantees that there won't be a tip, but also means there won't be an earning opportunity for Dashers or an order for a restaurant at all.

Understanding these adverse impacts are likely to occur if tipping is retained, **Int 737 and 738 are actually encouraging third-party food delivery services to remove tips altogether**.

B. **Changes to tips were not only fully expected by DCWP – but recommended – in response to the delivery worker minimum pay regulations.**

Claims by the Department of Consumer and Worker Protection (DCWP) and other stakeholders that changes to tipping are "troubling" or not an expected outcome of the City's minimum pay regulations are disingenuous.

In adopting these pay regulations, DCWP suggested that moving tips until after checkout or removing tips altogether was one strategy for how platforms could mitigate the cost impacts for NYC consumers. In the agency's own report – a *Minimum Pay Rate for App-Based Delivery Workers* – to support adoption of the regulations, they state:

> *Beyond productivity, there also exist several other margins for adjustment to higher delivery worker pay. **For instance, apps could choose to reduce consumers' costs through changes to the user interface that discourage or eliminate tipping (or, equivalently, consumers could choose to tip less in light of workers' higher pay, independent of any changes engineered by apps)**. The Department finds that if tipping were eliminated at all apps, costs to consumers would increase by $1.06 per delivery (3%) with workers still receiving sizable pay increases.*

This statement by DCWP demonstrates that these changes are not "retaliation" as some have claimed, but rather fully aligned with how the City expected platforms to respond to minimize consumer impacts once the agency's pay rules went into effect. There is nothing nefarious about making tipping available after a consumer places an order.

C. **Despite widespread use of tipping across numerous services, the legislation arbitrarily targets just a small number of platforms.**

As demonstrated above, any policy regulating tipping is ill-advised because of the potential adverse impacts that can occur. Int 737 and Int 738 are made even worse because they create special rules about how tips should be solicited only for DoorDash and other third-party platforms that facilitate restaurant delivery. Even more perplexing is that these platforms are the only ones that are already subject to a premium minimum pay standard under NYC law. Consider these examples if the legislation were adopted:

- Under NYC law, platforms like DoorDash and Uber Eats are required to pay independent delivery workers **$19.56 per hour before tips**. Int 737 and 738 require that **tips be available to a consumer at checkout** and that 10% be suggested.
- Under NYC law, Instacart, Amazon, Shipt, and other platforms that use independent delivery workers to deliver goods other than restaurant food have **no minimum pay requirements whatsoever**. Int 737 and 738 imposes **no requirements** for how tips are solicited on these platforms.
- Under NYC law, a chain restaurant that accepts orders through its own app and fulfills the delivery with its own workers is required to ensure that they earn **$13.35 per hour, before tips**. Int 737 and 738 imposes **no requirements** for how tips are solicited on these apps.

Platforms or services that have lower or NO minimum pay requirements at all remain unregulated under Int 737 and Int 738. This is not only an illogical policy, but also likely unconstitutional. The Council should reject these bills.

### V.  OPPOSE: INT 859 - MANDATE NEW APP FEATURES AND NOTICES

Int 859 would mandate that third-party food delivery services implement new app features regarding delivery worker hours and pay. Specifically, the bill requires platforms to notify workers before the pay period begins regarding which pay method will be used, offer a tracker of NYC-specific hours spent on delivery and on the app, and a pay period receipt. All of these notices and features must be provided in the app.

### A.  Some requirements of int 859 are based on a misunderstanding of NYC's minimum pay regulations.

Under NYC's minimum pay regulations for delivery workers, a platform is allowed to determine the pay method at the end of the pay period based on how the market behaved during that week. In fact, in some instances platforms cannot choose a pay method (the alternative method) if worker utilization during the pay period falls below a specific threshold. Int 859 is in tension with these requirements because it requires platforms to indicate the intended pay method at the beginning of each pay period.

Similarly, the pay period receipt currently suggests that delivery workers exclusively earn based on the number of hours they are on delivery. This is not true for Dashers and other delivery workers who often earn by offer and are simply trued-up at the end of the pay period if the pay-by-offer earnings do not satisfy the minimum pay requirements.

### B.  The proposed hour tracker is an extreme engineering burden, with limited benefit for workers.

Int 859 requires platforms to build and offer a tracker in the app of both hours on delivery and on the online during the pay period. The tracker would be exclusively for hours incurred in NYC. Building this new feature would be complex, costly, and highly burdensome. It would require teams of engineers months to build.

In addition to being a massive undertaking to implement, this tracker would have limited added benefit for workers. After each delivery, all Dashers are already informed about the amount of time they spent on the trip. This information can be used by a Dasher to estimate the minimum pay accrued during the week. Of course, this tracker would be pointless for all Dashers and delivery workers outside of NYC.

Finally, we are concerned that the tracker would be confusing for Dashers. Any necessary pay adjustments to satisfy the minimum pay regulations do not occur until the end of the pay period. As a result, a Dasher's earnings will not necessarily align with the number of hours in the tracker at any point before the end of the pay period.

### C.  We are not opposed to a pay period receipt, but additional clarifications are needed.

We share the Council's goal of ensuring Dashers are informed about their pay. We think the best way to accomplish this goal is through the pay period receipt proposed in Int 859. However, changes are needed to clarify certain requirements and the methods by which the receipt can be provided to workers.

We have submitted proposed amendments to Int 859 to help clarify the requirements of the pay period receipt and look forward to working with the sponsor to improve that section of the bill.

### VI. PRELIMINARY FEEDBACK: INT 972 - MOPED REGISTRATION

One bill before the Committee at today's hearing was only recently introduced, and we're still reviewing the legislation to understand its implications. Based on our initial review, we offer the following feedback regarding Int 972, which would require third-party food delivery services to verify whether mopeds used by food delivery workers are registered. We note that we share the City's vision of promoting safe streets where traffic laws are followed, and we expect the same of Dashers. All Dashers must agree to follow all applicable vehicle and traffic laws when they use the DoorDash platform, including those pertaining to vehicle registration.

A. **The proliferation of unregistered mopeds must be addressed with comprehensive policy.**

Like many bills before the Committee today, this bill assumes that third-party food delivery platforms can single-handedly solve complex transportation problems that involve many other industries and people. This approach won't be effective and can't continue. There are many aspects of this problem that go far beyond third-party food delivery, and relate to the manufacturing, sale, and use of mopeds on New York City streets. We urge the Council to take into account that third-party platforms are not the police, nor the entities that make and sell mopeds.

It is crucial that both legislative and policy efforts to reduce the use of unregistered mopeds: 1) Ensure that the manufacturers that make these products are properly equipping them so that they can be registered in the first place (for example, by providing them with Vehicle Identification Numbers); 2) Require that retailers that sell mopeds provide accurate information to consumers about the legal status of the vehicle, and provide registrations at the point of sale in accordance with potential new state laws; and 3) Include an appropriate enforcement framework to hold those that choose not to register their vehicles accountable, since many users likely have no connection to delivery work. Many of these steps may prove far more effective than a registration verification that a business performs after someone has already purchased their moped.

B. **Legislation addressing commercial moped use should include all types of businesses.**

In a similar vein, this bill would also create a bespoke set of vehicle verification requirements applicable only to third-party food delivery services. This targeted and discriminatory approach to policymaking must stop. If businesses are required to verify the status of mopeds that share a connection to their business operations, then those requirements should apply to all businesses.

*       *       *

We urge the City Council to support Int 762 and reject Int 0030, 715, 737, 738, and 859 that were considered at the hearing. Thank you for your consideration of these comments, and we look forward to working with the Committee to address these issues.

Sincerely,


Kassandra Perez-Desir
Head of Government Relations, NY/NJ & Puerto Rico



June 21, 2024

**Testimony of the NYC Hospitality Alliance to NYC Council Committee on Consumer and Worker Protection on Int 762 - A Local Law to amend the administrative code of the city of New York, in relation to establishing exemptions for third-party food delivery services from the limits on fees charged by such services on food service establishments.**

The NYC Hospitality Alliance is a not-for-profit association representing thousands of restaurants across the five boroughs. We strongly oppose Int 762. The third-party delivery companies have given this bill the phony name, the *Fair Competition for Restaurants Act*, which is the opposite of this proposal. Let's call it what it is - Int 762 is the **Bigger Fees for Big Delivery Bill!**

Today the City Council is holding ANOTHER hearing on ANOTHER package of bills to further regulate third-party delivery companies because they're continually bad actors. Still, they've been able to obscure the intent of Int 762 - which deregulates them – to where they're having it considered. The City Council should not further entertain changing this fee cap law while DoorDash, Grubhub and Uber are suing the City of New York to overturn this same fee cap law. So far, their lawsuit has been unsuccessful. They are also suing the City of New York to overturn another law this legislative body passed that would prevent them from withholding a restaurant's own customer information from the restaurant, which is a technique they use to control the consumer marketplace. It's monopolistic-like behavior.

Intro 762 will increase the max fees from the current cap of 23% to letting third-party delivery companies take a WHOPPING 43% of each order from a restaurant, while also charging the consumer a fee too. The average restaurant has single digit profit margins, does the City Council want to let third-party delivery companies take nearly half the money of each restaurant order?

Yes, the third-party delivery companies agreed to a few good amendments in the new Int 762 that the NYC Hospitality Alliance advocated for as **standalone laws** that should be enacted, but **not** as part of a negotiation to gut the fee cap bill. They agreed to these amendments as a classic sleight of hand. Look over there, not over here. They say this proposal requires them to offer restaurants a 5% marketing option that makes them "<u>listed and discoverable</u>" but the bill DOES NOT define what that means.

Under this language, they could make a restaurant "<u>listed and discoverable</u>" but only if a customer types the name of a restaurant in a search box. Or only "<u>listed and discoverable</u>" to customers searching from a very limited radius of the restaurant. Or NOT listed when a customer searches by a restaurant's cuisine type. There are countless ways third-party delivery can make the required 5% offering technically "<u>listed and discoverable</u>" to comply, but not accessible in search results. Do not give them the ability to exploit this loophole, because forget a delivery bike, they'll drive a delivery truck through it.



What happens to restaurants that don't pay more than 5%? Will their delivery orders remain at the same approximate level they are today? Or will they plummet? Even if a restaurant that pays a higher fee gets more orders, it doesn't mean they'll make more money. Increased order volume doesn't necessarily mean increased profitability for small businesses when you're paying exorbitant fees – it may just mean more work for the restaurant. But increased orders coupled with higher fees does mean increased revenue and profitability for big third-party delivery companies.

Don't believe the third-party delivery companies and their surrogates that the fee cap was solely a pandemic-era policy that's outlived its usefulness. The concept originated before Covid-19 in large part resulting from oversight hearings held by the NYC Council into these companies' egregious business practices, and after U.S. Senate Majority Leader Chuck Schumer called for a federal investigation into Grubhub. Many restaurants are still struggling and Int 762 will just let these big delivery companies take more money from small restaurants.

The City Council should not believe third-party delivery companies will be good actors if the fee cap now protecting restaurants from their exploitation is gutted. When a person, or in this case, third-party delivery companies show you who they are over and over again, the City Council and restaurants should believe them.

Thank you for your consideration.

If you have comments or questions, contact NYC Hospitality Alliance's Executive Director Andrew Rigie at arigie@thenycalliance.org

Respectfully,

NYC Hospitality Alliance

Over 300 Italian Companies are waiting for you at the
Summer Fancy Food Show •Javits Center, June 23-25, 2024
THE EXTRAORDINARY ITALIAN TASTE   Ministry of Foreign Affairs   ITA   madeinitaly.gov.it

 Flip through today's papers    amNY   AMNY Newsletter Tackle the city, with our help.   Subscribe

amNY Shops | News | Things to Do | Boroughs | Sports | Sports Betting | Casinos | Contact Us | More from amNY

## Opinion

# Op-Ed | Corporate giants deploy subpoenas to squash advocacy, press

By Andrew Rigie                                      Posted on May 30, 2024



File

✉ Sign up for our amNewYork email newsletter to get news, updates, and local insights delivered straight to your inbox!

Are you a reporter who includes the voices of advocates in your coverage? Are you a non-profit advocacy organization, a lobbyist, or anyone else who seeks to influence their government in opposition to the wishes of giant corporations? If you are any of these things, you're under attack, and if we lose this fight, you may lose First Amendment protections and the power of your voice in government.



Just four years ago, New York State enacted one of the strongest anti-SLAPP laws in the nation, preventing the use of court system to burden opponents with legal defense costs in order to discourage those who may wish to speak out. But there's no such protection under Federal law, and right now, corporate giants DoorDash, Grubhub, and Uber are deploying subpoenas through the loophole in a last-ditch effort to destroy the collective voice of restaurants in New York as they seek to undo the City law that put a cap on the fees these third-party delivery companies can charge restaurants for certain services.

The law was put in place following a New York City Council hearing called as the media broke stories about the third-party marketplace's abusive relationship with restaurants. These stories described instances where restaurants were charged thousands of dollars in fraudulent fees for "customer orders" that were never placed, created secondary websites for restaurants without their knowledge, and listed restaurants on their apps without consent. Additional serious concerns were raised about how algorithms were manipulated by the delivery companies to determine the promotion and searchability of restaurants.

ADVERTISING

Lough Tay

The fee cap on these providers, along with other provisions, were the subject of aggressive and well-funded lobbying campaigns by DoorDash, Grubhub, and Uber, the companies that dominate the third-party delivery space. But the New York City Hospitality Alliance, representing thousands of restaurants across the five boroughs, along with other advocates, worked with the media and our partners in City Hall to combat this aggressive campaign and ensure our restaurants were protected.

We're not part of the lawsuit they've filed in federal court to overturn the fee cap, but that hasn't stopped them from issuing us subpoenas that seek our communications with reporters, our members, and even privileged discussions with our lawyer. They know we're a small non-profit organization with limited resources and time. They know that fighting these subpoenas could destroy our ability to advocate. They know that if they win, they'll have a precedent they, and other corporations, can follow to silence New Yorkers. Don't like someone's advocacy? File a federal lawsuit and exploit the anti-SLAPP loophole.



Yes, we need our representatives in Congress to take action and close the loophole, but that won't help the New York City Hospitality Alliance, and countless other organizations like us, today. At this moment, we need our partners and our friends to rise up and call out this attack for what it is: an attempt at taking our First Amendment rights. We can't let these powerful corporations force groups to release their emails with reporters and their lawyers, and we can't let them use the court to force us into bankruptcy in order to defend ourselves.

DoorDash, Grubhub, and Uber should take heed: The New York City restaurant industry lost a lot throughout Covid-19, but collectively we persevered, and as big and powerful as you are, you are no pandemic. You will not intimidate us to capitulate with your subpoenas. While there is a cap on your fees, there is no cap on the resilience of the New York City restaurant industry. Consider that a tip.

*Andrew Rigie is the Executive Director of the New York City Hospitality Alliance.*

NOW HIRING
GRAHAM   APPLY NOW

THINGS TO DO IN NYC
+ Post an Event

Tomorrow, all day
Summer Dates for The Lion King on Broadway
📍 Minskoff Theatre

Tomorrow, 10 am
Pride at CMOM
📍 Children's Museum of Manhattan

Tomorrow, 11 am
Bombay Sapphire Sparkling Lemon Lounge
📍 Vanderbilt Hall, Grand Central Terminal

June 24, 6 pm
Simon Doonan & Fenton Bailey discuss DRAG: THE COMPLETE HISTORY
📍 Barnes & Noble Union Square

June 25, 6:30 am
Free Film Screening at Marble Church: 'Letters Home' by Scott Roberts To Make NYC Premiere
📍 Marble Collegiate Church

June 30, 10 am
Celebrate Pride and View Panels from the AIDS Memorial Quilt at Marble Church
📍 Marble Collegiate Church

View All Events →

Ad served by Google
Ad options
Send feedback
Why this ad? ▶

JOBS IN NEW YORK
+ Add your job

MDG Design & Construction LLC
Job Out Reach Opportunity

parkingticket.com
Assistant General Counsel

Treatment Action Group
Director of Development

View all jobs →

LOEWS HOTELS
JOIN OUR TEAM
careers.loewshotels.com

TOP WORKPLACES 2024   amNY metro

Home Pros
Find a pro

TRAIL BITS
Cybersecurity preparedness is a moving target.
AI/ML • Application Security • Blockchain • Cryptography • Research & Engineering

Taste Two Works   JULY 6   TICKETS ON SALE NOW   JULY 18   Chefs of Hamptons
DansTaste.com

## Related Articles

Editorial | New York and MTA stuck in fantasyland without congestion pricing, or a real funding alternative

Op-Ed | Protecting Medicare Advantage: Sen. Schumer's vital support

Editorial | The spirit of Juneteenth in NYC and America

Op-Ed | Celebrating Juneteenth with a new heritage walk, landmark, and progress

THINGS TO DO IN NYC
FULL CALENDAR

HOME PROS
FIND A PRO

## More from around NYC


Bronx Times
Column | Public service is crucial for small business lending – here's why


QNS
Rapper Remy Ma's son arrested with Queens Village man for 2021 murder of Astoria drug kingpin: NYPD


Brooklyn Paper
Stuyvesant Heights man gets 17 years to life for knifepoint sexual assault


Gay City News
The shooter who killed 5 at a Colorado LGBTQ+ club pleads guilty to 50 federal hate crimes

Ad served by Google
Ad options   Send feedback   Why this ad? ▶



**CHAMBER
OF PROGRESS**

June 21, 2024

The Honorable Julian Menin
Chair
Council Committee on Consumer and Worker Protection
New York City Hall
New York, New York 10007

Re: Support Int. 0762-2024

Dear Chair Menin and members of the committee:

On behalf of the Chamber of Progress, a tech industry coalition committed to ensuring all Americans benefit from technological leaps, **we write to support Int. 0762-2024**. Our corporate partners include companies like DoorDash, Grubhub, and Uber, but our partners do not have a vote on or veto over our positions.

Int. 0762-2024 would amend the cap on commission fees charged by food delivery platforms. The compromise approach in the proposed ordinance would decrease prices for consumers, give restaurants more flexibility in their partnerships with delivery platforms, and bring New York in line with cities like San Francisco and Chicago.

The current cap on commission fees was implemented in response to extraordinary circumstances in 2020. Market conditions have changed since then, and the experience of cities across the country has shown that permanent commission fee caps resulted in higher prices for consumers and reduced orders for independent restaurants.

An analysis of 14 U.S. cities that implemented temporary or permanent fee caps found that national chains fared better while independent restaurants fared worse. The demand for chain restaurants in cities with a cap was 3.6% higher than in cities without a cap. In those same cities with a cap, demand for

independent restaurants was 6.8% lower.[1] Another study found that capping delivery commission fees at 15% resulted in a net increase in prices for consumers.[2]

The vast majority of cities with commission fee caps have allowed them to lapse or pivoted to a compromise approach similar to the one proposed here.

Int. 0762-2024 would allow restaurants to choose different tiers of service from delivery platforms, giving them more flexibility and increasing access to valuable services. Delivery platforms would be allowed to offer tiered services beyond the 15% threshold that include more promotion through in-app marketing services.

For small businesses and local restaurants, of which there are many in New York City, access to these services could be transformative, as they are more likely to benefit from visibility on the platform than a widely known chain restaurant in the community. This compromise approach has already been adopted in cities like San Francisco, Chicago, and Philadelphia.

Raising the cap on commission fees and allowing restaurants to offer tiered service options would give restaurants and small businesses better access to valuable services. It would also decrease prices for consumers and reverse a policy that benefits large chains over independent restaurants. **We encourage you to approve Int. 0762-2024.**

Sincerely,

Brianna January
Director of State & Local Government Relations, Northeast US

---

[1] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3871514
[2] https://m-r-sullivan.github.io/assets/papers/food_delivery_cap.pdf



# New York Women's Chamber of Commerce

*Promoting, Connecting and Opening Doors for Women Entrepreneurs*

June 21, 2024

Council Member Julie Menin, Chair
Committee on Consumer and Worker Protection
The New York City Council
City Hall
New York, NY  10007

Dear Chair Menin and Members of the Committee:

On behalf of New York Women's Chamber of Commerce, Inc., please accept this testimony in support of Int 762, legislation that would amend the city's price control on third-party food delivery. We support this bill because it will promote the success of local restaurants in New York City, and it will help ensure they have access to the products and services they need to reach new customers and grow their business.

The New York Women's Chamber of Commerce is an organization dedicated to economically advancing women and minorities assisting them start and grow sustainable and successful businesses, microenterprises and self-employed ventures that allows them to build financial security for themselves, their families and their communities. The Women's Chamber is an advocate of gender parity and economic justice and actively works in partnership with the City and State to level the playing field by assisting with the creation of equal and fair business opportunities and by fostering an environment that nurtures the financial growth of women and minority owned businesses. We at the NY Women's Chamber of Commerce believe that access to equal business opportunities, good paying jobs, and access to resources are key elements to ending many of the social and economic challenges minority women still face today. Since 2002, the Women's Chamber has been creating and implementing initiatives to help economically disadvantaged women and minorities in New York City lift themselves from poverty and achieve economic freedom. These initiatives provide women with the education, tools, resources and the on-ongoing support necessary for them to start, manage, and grow their business, obtain job security, manage their finances and build wealth

**Int 762 Will Help Local Businesses**

Passing this bill is critical to supporting restaurants who need options for delivery, marketing and advertising. Third-party delivery apps have proven to be valuable to the restaurant industry, allowing these businesses to meet customers where they are or take advantage of new opportunities to increase their revenue. The City's current law undermines the freedom that businesses should enjoy to choose the best way to make themselves successful through these tools. We badly need reform to help businesses regain this control and support their growth.

Unfortunately, the City's existing policy does the opposite, and instead incentivizes two outcomes: increasing customer costs or reducing the products and services that restaurants can access. Either result hurts both businesses and workers by reducing sales. Unfortunately, other regulations on food delivery are already having this effect. The higher consumer costs that the city's other laws have caused have already cost restaurants millions of dollars in lost revenue. Over the course of the year we expect restaurants to suffer millions of lost orders and hundreds of millions of dollars in lost sales. This not only hurts the bottom line of local businesses; delivery workers also suffer from the loss of work opportunities. Maintaining the status quo with respect to the price control will only exacerbate these problems and further undermine the ability of restaurants to grow their business.

**Int 762 is a More Robust Bill than Last Year**

This year's legislation is significantly different from prior proposals to reform the city's food delivery price control. Int 762 not only ensures that affordable delivery options are available to restaurants, it also sets limits on allowable fees and addresses other important issues for restaurants beyond fees. This includes provisions that enable restaurants to manage online searches for their restaurant, control pricing, and directly market to customers by adding menus or flyers to deliveries. We support the process that stakeholders have undertaken to address concerns raised by the Council.

**New York City's Law Presents Needless Risk with No Benefit**

While many cities enacted price controls on food delivery in response to the pandemic, almost none still have those laws today. Most of these other cities, counties, and states eliminated their price controls entirely. Cities that did enact permanent laws, such Philadelphia, Washington DC, San Francisco, Seattle, Portland, and Minneapolis all created policies that require apps to offer affordable delivery options, regulations that are less restrictive than the reforms in Intro 762.

Many of these reforms are nearly two years old at this point, and we've not seen cities reverse course and re-impose price controls to address problems.

It is time for New York City to also make reforms to eliminate risks that are entirely avoidable. If the current law is invalidated, hundreds of millions of dollars will be in jeopardy. There is no reason to take that chance when we can address this issue legislatively, and more importantly, when this policy is hurting local businesses to begin with.

We strongly encourage the committee to pass Int 762 and make these important changes as soon as possible. Delivery drives crucial growth for restaurants, and every business deserves the right to decide what is best for their needs.

Sincerely,

Quenia Abreu
President and CEO

1524 Amsterdam Avenue • New York, N.Y. 10031 • Tel (212) 491-9640 • Fax (212) 491-6019
www.nywcc.org



**June 21, 2024**

**Testimony of Millie Sialier**
**Director of Marketing**
**New York State Latino Restaurant Bar & Lounge Association (NYSLRBLA)**


*Before the*


**New York City Council Committee on Consumer & Worker Protection**


*Regarding*


**Int 762 - Fee Cap**


*(Testimony shared on behalf of Sandra Jaquez, President of the NYSLRBLA)*

Good morning Chair Menin and Committee members. Thank you for the opportunity to speak today.

I am Millie Sialier. I am here testifying on behalf of Sandra Jacquez, owner of Il Sole restaurant in Manhattan, and the head of New York's Latino Restaurant Association. I'm here in support of Intro 762, a local law that establishes exemptions from limits on fees for third-party delivery services.

During the pandemic, restaurant owners needed the City's third-party delivery platform fee cap. We were scared and dependent on delivery services and needed protection from high fees. However, we find ourselves at a moment now when the pandemic is over, and restaurants are looking for opportunities to market and grow their businesses to a new and diverse customer base.

By limiting the fees that platforms can charge restaurants, New York City has limited the services restaurants can access through those platforms.

This is a problem for two reasons.

First, restaurant owners should have the freedom to choose what's best for our businesses and customers.

Second, digital platforms offer neighborhood restaurants like mine valuable digital marketing and advertising capabilities we couldn't otherwise afford. That helps us compete with big chain restaurants–which have big marketing budgets–and keep our businesses growing and thriving.

Intro 762 works for both restaurants and third-party delivery apps. It shields restaurants from high delivery fees and offers us the option to choose if we would like to purchase additional marketing services from delivery platforms. This bill is an improvement on last year's Intro 813, which I opposed because it didn't do enough to protect restaurants from fees.

Finally, as the representative of the NYS Latino Restaurant Association, I want to emphasize that Intro 762 is the product of more than a year of discussions with third-party platforms. We feel this legislation is incredibly reasonable, and strikes a balance between safeguarding and supporting our restaurants.

Thank you for crafting this sensible bill, which is so important to the ongoing health and success of New York's independent restaurants–including mine. I urge you to pass Intro 762.

## Statement of Four New York Economists Regarding New York City Ordinance Capping Fees Charged by Third-Party Food Delivery Platforms

Prepared for New York City Council
Committee on Consumer and Worker Protection
June 21, 2024 Hearing re Int. 0762

Madam Chair and Committee Members:

As researchers, we are intrigued by New York City's restaurant delivery fee cap for several reasons.

First, it is the last remaining food delivery fee cap in America. Many cities and states enacted emergency caps during COVID-19 to protect defenseless restaurants that had no power to negotiate fair prices for suddenly existential delivery services. But the emergency has ended, restaurant industry revenue is <u>breaking records</u>, and every other jurisdiction's fee cap has ended.

Second, a market balance has been restored with the pandemic over, and delivery service no longer a necessity. Restaurants are free to offer delivery or not by hiring delivery employees, forming a <u>delivery co-op</u>, or partnering with delivery apps. If bullying and oligopoly pricing by delivery apps were a concern in 2020, that risk is gone, so the fee cap should also go away.

Third, New York City has squeezed delivery apps on both ends of their business. The Council has <u>decided</u> that restaurants should be 'fee cap winners' and delivery drivers should be 'minimum pay winners.' This combination of forced legal limits on revenue and forced legal minima on labor costs is an extraordinary flex of government power against a single industry that we believe is unprecedented in U.S. history by any government.

Using publicly available data, the Data Catalyst Institute <u>estimated</u> that due only to the NYC fee cap, delivery companies lost between $140M and $160M for just the years 2022 and 2023. Importantly, because the per-order fee cap frequently pays for marketing services, the cap prohibits restaurants from spending their own money to attract new diners and grow their business.

Low-cost pay-per-order <u>marketing services</u> are uniquely offered by delivery apps and predominantly benefit small restaurants. Big restaurants and chains have alternatives like radio, television, and fee-based digital advertising, which explains why independent research and data <u>document</u> that fee caps reduce orders to small restaurants.

If the Council cares about small, local, family-owned restaurants, it should eliminate the delivery app fee cap and return the power of choice to small restaurant owners.

Thank you.

**Dr. Ryall Carroll**
Director of the Master of Science in Marketing Intelligence and Associate Professor of Marketing, Peter J. Tobin College of Business, St. John's University

**Dr. Apostolos Filippas**
Assistant Professor of Information, Technology, and Operations, Gabelli School of Business, Fordham University

**Dr. Cameron D. Miller**
Associate Professor of Management, Whitman School of Management, Syracuse University

**Dr. Liad Wagman**
Professor of Economics and Dean, Lally School of Management, Rensselaer Polytechnic Institute



New York City Council Committee on Consumer and Worker Protection
June 21, 2024
Testimony of Eric McClure, Executive Director, StreetsPAC

E-bikes and other powered micro-mobility devices are central to the city's booming food-delivery economy – and are vastly preferable to cars and vans for making the type of short-range, small-sized deliveries typified by restaurant orders.

At the same time, there's no doubt that the proliferation of two-wheeled devices, both for commercial and non-commercial use, has led to a fair amount of disorder on city streets and has outpaced government's ability to regulate them. It's likely that the majority of mopeds on New York City's streets today are illegal, lacking the vehicle identification numbers necessary for required registration, but sellers of these devices routinely don't disclose that fact to the delivery workers buying them. And due to concerns about e-bike battery safety and the lack of sufficient charging infrastructure, many workers have turned to mopeds for ease of use.

Furthermore, the unreasonable expectations placed on delivery workers by delivery-app platforms often leads to unsafe operation as workers hustle to earn tips and avoid deplatforming by the apps. These poor and dangerous working conditions contribute to the chaotic street environment, which in turn exacerbate the fears that many pedestrians have about their safety.

There is some reason for optimism about improving conditions on city streets, including the recent passage of state legislation that will require point-of-sale registration for mopeds, which should ensure that new mopeds are street-legal, properly registered, and operated by licensed riders in compliance with the law. Additionally, legislative efforts at both the city and state level should lead to improved battery safety, and coupled with fledgling efforts to make battery-charging infrastructure safer and more widely available, should help reverse the trend of switching from e-bikes to mopeds.

Legislative efforts to get this all right are essential. Gas-powered mopeds are dirtier and noisier, and in most cases, faster and heavier than e-bikes, and present greater danger to pedestrians and cyclists. E-bikes offer improved mobility for workers, commuters, the elderly and others who can benefit from a little extra boost to climb hills or cover longer distances, and can help pave the way to a greener future.

150 Broadway, Suite 1212          New York, NY  10038          www.streetspac.org

**Int. 0737-2024 and Int. 0738-2024 – Support**

These bills, which would require delivery-app platforms to establish gratuity standards for delivery workers and make tipping option more apparent for consumers placing orders, are part and parcel with other efforts to make delivery work more economically sustainable for Deliveristas, including the increased minimum wage and preventing app companies from deplatforming workers for failing to meet unreasonable demands for the speed or distance of deliveries. We urge the committee to pass this legislation.

**Int. 0030-2024, Int. 0715-2024, and Int. 0972-2024 – Support in Concept**

Int. 0030-2024 would require that app platforms ensure that micro-mobility devices used by workers delivering on their behalf meet safety standards. Int. 0715-2024 would assign responsibility and liability to app companies for violations incurred by workers delivering on their behalf for operating illegally on sidewalks or failing to adhere to traffic regulations at intersections. Int. 0972-2024 would require that third-party delivery services verify that mopeds employed for deliveries on their behalf are properly registered.

All the foregoing bills are well intentioned, aiming to improve safety both for delivery workers and people who share the streets with them, and all rightly put the onus on the delivery-app platforms that are incentivizing sometimes unsafe behavior. As such, we support all three pieces of legislation conceptually.

However, any legislation focused on regulating the devices used by delivery workers needs to take a phased approach that accounts for the current situation faced by workers. Many workers are operating devices currently that would not meet the safety standards envisioned by Int. 0030, for example, and while the legislation would require third-party companies to provide devices to workers at no cost, enacting such programs would surely take time, so it's critical that such an effort would not temporarily put Deliveristas out of work.

Similarly, with so many of the mopeds currently in use lacking the VINs necessary for registration, implementing Int. 0972 would certainly sideline many workers whose devices are non-compliant. Creating pathways to compliance are absolutely necessary in advance of enactment of such legislation.

And lastly, assigning liability to the app companies for operating infractions committed when workers are making deliveries on their behalf, as outlined in Int. 0715, makes sense, but we do believe that eliminating the working conditions that lead to workers committing those infractions needs to happen concurrently. The goal should be safer and more respectful operation of micro-mobility devices, not just the reassignment of the responsibility for it.

We strongly support efforts to improve safety, and believe that those efforts are most likely to bear fruit if done holistically as part of a large-scale effort to regulate and manage the city's delivery ecosystem.



# Food Delivery Platform, E-Bike & Moped Regulations

6.21.24

## TESTIMONY: NYC COUNCIL COMMITTEE ON CONSUMER AND WORKER PROTECTION

Chair Menin and Council Members,

Tech:NYC is a nonprofit member-based organization representing over 800 technology companies in New York. Our membership includes hundreds of innovative startups as well as some of the largest tech companies in the world. We are committed to ensuring that the tech sector remains a leading driver of the city's overall economy and that all New Yorkers can benefit from innovation.

Delivery platforms are significant contributors to the tech sector and economy of New York City through their offices and employees, by working with restaurants to expand access to customers, and by providing earning opportunities to thousands of New Yorkers. During the COVID-19 pandemic when in-person dining came to a halt, building online ordering and delivery capacity through these platforms was crucial for restaurants to stay open, and remains in demand to date.

In August 2021, the City Council passed emergency legislation limiting delivery platform fees to 15% of an order for pickup and delivery, and 5% of an order for marketing and other services. Today, the pandemic is no longer a public health emergency, and in-person dining has returned - reversing the prior conditions that spurred these limits. As new restaurants are opening across the city, many seek to utilize delivery platforms' marketing services which include data analysis of local markets, advertising, featured listings, and even custom websites. These services would help new restaurants quickly grow their customer base, but the 5% marketing services fee cap prevents the restaurants from purchasing these services because their costs exceed the 5% limit.  This constraint also discourages the platforms from creating new marketing services, because restaurants that might benefit from new services cannot lawfully pay for them. At the same time, this translates to New Yorkers not being able to learn about and enjoy new restaurants.

Tech:NYC supports Int. 762-2024, which would ensure that restaurants continue to have access to low-cost delivery and marketing options. This bill would remove the cap on marketing service fees while maintaining the cap on delivery service fees. This would ensure that restaurants continue to have price protections on basic delivery services and would expand marketing opportunities for restaurants that choose to invest to grow their business. By empowering restaurant choice, this bill

1



would help restaurants grow, promote innovation by delivery services, and help New Yorkers discover and enjoy new restaurants. We encourage the Council to support this legislation.

In contrast, Introductions 30A-2024, 715-2024, 737-2024, 738-2024, and 859-2024 would make it more expensive and burdensome to provide online delivery services to customers, resulting in increased customer costs. For these reasons, Tech:NYC opposes these five bills as currently written.

Introduction 30A-2024 would require restaurant and grocery delivery platforms to purchase new safety-certified e-bikes for delivery workers, but the bill still overlooks many realities of food delivery:

- The bill does not define which delivery platform would be held responsible for making this purchase, when workers - as documented by DCWP's 2022 report on delivery worker pay - work with many different delivery platforms.
- The bill also does not require non-platform employers, e.g., grocery stores or restaurants, to purchase e-bikes for their employed workers.
- The bill also would impose the purchase requirement on platforms that are already paying - through the DCWP delivery worker minimum pay regulations - $2.26 per hour to each worker specifically to cover the costs of e-bike repairs and replacement.

Introductions 737-2024 and 738-2024 both would establish new standards for delivery platforms to collect tips for delivery workers, but do not account for consumer spending dynamics. As prices for ordering food have increased across all delivery platforms due to the new increased standard wages for delivery workers, consumers are more cognizant of the total costs of their meals, including tips and fees that are applied. While these two bills are well intended, Tech:NYC is concerned that setting new requirements for tips will remove consumer choice for tipping, apply a new mandatory increase on delivery prices, and therefore decrease average order costs and volume. As proposed in Int. 738-2024, requiring a tip to be made during or before the time of an order also decreases consumer control and confidence. As consumers have seen average delivery prices increase due to the minimum pay standards, delivery platforms have made tipping more flexible for consumers by giving consumers more time to pay a tip.

Introduction 859-2024 is also well intentioned as it would provide workers with a higher level of insight on their wages, but its requirements do not reflect that delivery workers have schedule flexibility and are not always "logged in", or actively making deliveries in set or consistent hours.

Introduction 715-2024 would also make delivery platforms responsible for delivery workers' violations of certain traffic safety laws. Tech:NYC fears that this will not impact dangerous behavior, as delivery workers would not be personally liable for their driving behavior.

Thank you for your consideration.

June 21, 2024

Council Member Julie Menin, Chair
Committee on Consumer and Worker Protection
The New York City Council
City Hall
New York, NY  10007

Dear Chair Menin and Members of the Committee:

We write to testify regarding several bills before the committee on the June 21, 2024 hearing agenda. The Bronx Chamber of Commerce:

- **Supports Int 762**, legislation that would amend the city's price control on third-party food delivery;
- **Opposes Int 737 and Int 738**, legislation mandating the suggested amount and timing of tipping on delivery platforms;
- **Opposes Int 859**, legislation mandating costly and burdensome new features on delivery platforms;
- **Opposes Int 0030**, legislation that would regulate e-bikes used by delivery workers or commercially;
- **Opposes Int 715**, legislation would impose costly liabilities for traffic violations on the food delivery industry.

The Bronx Chamber of Commerce is rooted in holistic community and economic development which advances economic opportunity and growth, innovation, and comprehensive business planning for the Bronx.

**The Bronx Chamber of Commerce Supports Int 762**

*Int 762 Will Help Local Businesses*

We support Int 762, legislation that would reform the City's food delivery price control in a way that protects restaurants while still ensuring they can access the products and services they need. Third-party delivery apps have proven to be valuable to the restaurant industry, allowing these businesses to meet customers where they are or take advantage of new opportunities to increase their revenue. Unfortunately, the City's current law undermines the freedom that businesses should enjoy to choose the best way to make themselves successful through these tools. We badly need reform to help businesses regain this control and support their growth.

The Existing law undermines the many benefits that apps can bring to restaurants, and instead encourages two harmful outcomes: higher customer costs or reduced products and services that restaurants can use to grow their business. Both of these harm businesses and delivery workers by reducing sales. Unfortunately, other regulations on food delivery are already having this effect. The higher consumer costs that the city's other laws have caused have already cost restaurants millions of dollars in lost revenue. Over the course of the year restaurants are likely to suffer from millions of lost orders and hundreds of millions of dollars in lost sales. This not only hurts the bottom line of local businesses, delivery workers also suffer from the loss of work opportunities. Maintaining the status quo with respect to the price control will only exacerbate these problems and further undermine the ability of restaurants to grow their business.

*Int 762 Is a New Bill with Many Changes from Last Year*

This year's legislation is significantly different from prior proposals to reform the city's food delivery price control. Int 762 not only ensures that affordable delivery options are available to restaurants, it also sets limits on allowable fees and addresses other important issues for restaurants beyond fees. This includes provisions that enable restaurants to manage online searches for their restaurant, control pricing, and directly market to customers by adding menus or flyers to deliveries. We support the process that stakeholders have undertaken to address concerns raised by the Council.

### *Passing the Bill Can Eliminate Needless Financial Exposure*

Many jurisdictions enacted price controls on food delivery in response to the pandemic, however almost none still have those laws today. Most eliminated their price controls entirely. The few cities that did create permanent policies, such Philadelphia, Washington DC, San Francisco, Seattle, Portland, and Minneapolis all adopted laws that require apps to offer affordable delivery options (regulations that are much less restrictive than the reforms in Intro 762). Many of these reforms are nearly two years old at this point, and we've not seen cities reverse course and re-impose price controls to address problems for restaurants.

The City's existing law is substantially different from policies elsewhere, and unfortunately exposes the city to substantial financial risk. Because the City can be held liable for lost commissions, the status quo is a serious liability. By advancing this bill, the Council can help eliminate this needless danger.

### The Bronx Chamber of Commerce Opposes Int 737 and 738

Int 737 and Int 738 mandates the suggested amount and timing of tipping on delivery platforms. These bills are the latest examples of extreme regulatory overreach proposed by members of the Council. First, the city adopted new pay requirements that resulted in increased consumer costs, hundreds of thousands of fewer orders, and millions of lost revenue for NYC restaurants. In order to better balance higher consumer costs and increase affordability under these regulations, delivery platforms changed tipping to after checkout.

Now, dissatisfied with these predictable changes, the sponsors seek to regulate more without any consideration of the unintended consequences. Int 737 and 738 would mandate that tips on delivery platforms must be requested from consumers before checkout and suggest and recommend that consumers tip at least ten percent of the item purchase price. These regulations are unwarranted – there is nothing unique or nefarious about making tipping available on delivery platforms after a consumer checks out or the delivery has been completed.

Importantly, these bills will cause economic harm. If platforms keep tips and comply with the regulations, it will likely mean far fewer orders from consumers, less revenue for NYC restaurants, and less work for delivery workers. However, the most likely outcome is that platforms remove tipping altogether in order to avoid these negative impacts, leaving delivery workers worse off.

The Council should reject these ill-considered and unprecedented tip regulations.

### The Bronx Chamber of Commerce Opposes Int 859

We share the sponsor's goal of ensuring that delivery workers are informed about their pay, but Int 859, as currently drafted, is not the right approach. Specifically, the bill would require delivery platforms to spend months building costly and complex new features to workers into their apps. In addition to being highly burdensome to implement, these features have a limited benefit to workers and could lead to confusion based on the actual requirements of the minimum pay regulations.

The Council should reject the current version of Int 859 and evaluate alternative policies that address any concerns regarding transparency through less onerous means.

## The Bronx Chamber of Commerce Opposes Int 0030

Int 0030 would require e-bikes and other electric micromobility devices that are used commercially, including by delivery workers, to meet safety standards. Despite recent amendments, this bill still suffers from many structural and practical problems, and we oppose it.

Fundamentally, this bill still tries to impose the costs of a complicated consumer, manufacturing, and international trade problem on a small handful of companies operating in New York City. Even worse, some of the companies targeted by this law in the food delivery sector are already paying workers higher wages to specifically compensate them for the ongoing costs of buying e-bikes and replacing their batteries. Piling on even more pain to a small sector of New York's economy - one where the costs inevitably flow down to local restaurants and retailers, delivery workers, and customers, is not the right approach.

We're further concerned that many practical problems in the bill remain unresolved. The bill continues to have no solution for actually removing dangerous batteries from our streets through recycling and disposal requirements. The mandatory safety standards in the bill conflict with other efforts that the City is supporting to provide safe replacement batteries to workers that have older devices, devices that won't meet these particular standards even with their new battery. And the practical difficulties of addressing how businesses are supposed to provide equipment to workers that actually use multiple online applications run by different companies to find work are unaddressed.

Finally, this simply won't work. It will not be financially viable for companies to buy all of these new e-bikes, especially when existing pay requirements already include equipment compensation and many workers do so only occasionally. Dangerous e-bikes won't get replaced.

We do not need another law that conflicts with existing City policies. In addition to adopting a minimum pay standard for delivery workers that expressly includes compensation for e-bikes and batteries, the Council also passed a bill addressing this very issue just last fall. Int 949 set up a trade-in program accessible to all New Yorkers but "targeted" at delivery workers. It required participants to trade in their old device so that it could be disposed of. It avoided the needless complications posed by this bill with respect to app-based work. It's time to use the tools the City already has instead of passing even more duplicative legislation that won't reduce fires.

## The Bronx Chamber of Commerce Opposes Int 0715

Int 715 would require delivery apps to "ensure" that food delivery workers using e-bikes don't violate certain traffic laws (aimed at reducing bike-pedestrian conflict), and force platforms to pay for tickets that a worker receives if they violate these laws. We oppose this bill and we are deeply troubled by both its vague requirements and the unintended consequences that would likely result from this policy. We share the City's desire to leverage the climate and congestion benefits of bikes, e-bikes, and micromobility while improving safety. However, we fear that this bill will actually hurt both workers and restaurants while doing little to improve our streets.

First, the bill imposes a vague and impossible mandate to "ensure" that delivery workers never violate certain traffic laws. This is simply unattainable—there is no way for any business to guarantee that every single person performing work never violates a traffic law. A simple walk down a Manhattan street will prove this point, as commercial vehicles are commonly double parked or blocking bike lanes. Any laws regulating e-bike delivery must at least set an achievable standard.

Second, this bill is likely to result in harmful unintended consequences for both workers and businesses. We're deeply troubled that this policy would encourage people to behave more recklessly by mandating that their tickets be paid by someone else. In response, it's likely that platforms will have to take a zero tolerance approach to violations, and simply remove workers that receive tickets. This will have far reaching implications since, according to DCWP's data, 46% of workers use e-bikes.[1] This will hurt workers by taking away their ability to earn, and destabilize the delivery network to the detriment of restaurants and their customers.

Finally, the City's own data hardly supports such a punitive approach to addressing issues related to e-bikes. Pedestrian deaths are overwhelmingly attributable to collisions with cars, not bikes, e-bikes, or mopeds. NYC's own data shows that pedestrian deaths caused by large motor vehicles like cars and trucks (116 fatalities in 2022 and 101 in 2023) dramatically dwarf the risk posed by bikes and small e-vehicles (4 fatalities in 2022 and 2 in 2023).[2] Int 715 sends the opposite message by treating e-bikes as more dangerous. Targeting delivery e-bikes with heightened requirements does not make sense given this data.

We would welcome the opportunity to identify productive steps that platforms, the business community, and the City can take to improve street safety and address issues related to the use of e-bikes. But Int 715 is not the right approach.

---

[1] https://www.nyc.gov/assets/dca/downloads/pdf/workers/Delivery-Worker-Study-November-2022.pdf
[2] 2022 Data: https://www.nyc.gov/html/dot/downloads/pdf/bicycle-crash-data-report-2022.pdf
2023 Data: https://www.nyc.gov/html/dot/downloads/pdf/bicycle-crash-data-report-2023.pdf

# CRAIN'S NEW YORK BUSINESS

## Op-ed: New legislation will help Bronx small business to reach more customers

By Lisa Sorin
June 20, 2024

*Lisa Sorin is president of the New Bronx Chamber of Commerce.*



*The city maintains pandemic-era regulations that hinder a restaurant owner's ability to maximize their impact, writes New Bronx Chamber of Commerce Lisa Sorin.*

Small restaurants are a reflection of the Bronx communities they serve and a chance to share the unique tastes of their culture with customers old and new alike. However, for many small restaurants, navigating rising costs and constantly shifting rules for operating their business can be overwhelming and difficult to sustain.

That's why we're encouraged by new legislation that would give restaurants choice when it comes to what's best for their business, providing relief from overregulation and expanding access to important resources that allow them to compete and expand their reach in a tough city like New York — and we hope the City Council will join in our support.

We regularly hear from restaurants that they're looking for any way to get ahead. One important way has been using third-party delivery apps, which have offered a way for these restaurant

owners — whether new up-and-comers or decades-old favorites — to connect with customers. Local restaurants have made the most of user-friendly platforms like DoorDash, Grubhub, or Uber Eats, taking full advantage of the tools and resources they provide to serve their customers and grow their businesses.

But despite the important role these services play for thousands of restaurants, New York City has continued to maintain pandemic-era regulations that hinder their ability to maximize their impact. We see third-party delivery apps as no different from any other operational or marketing tool, whether it's an advertising tool or a payment platform. That is why we support Int 0762-2024, the proposed legislation in the City Council that would offer a long-term solution for how restaurants can work with these platforms. It would allow businesses to select the products and services that best support their needs at any moment.

Opponents of this bill have argued that this amendment would just allow delivery companies to charge restaurants more for marketing services, but that claim fundamentally misses the point of this bill. This amendment strikes the right balance for small businesses because it empowers restaurant owners to make decisions that are best for their own businesses by ensuring that platforms maintain low-cost options that still provide exceptional services to local restaurants and unparalleled access to thousands of customers across New York City. These low-cost options still provide restaurants with significant value in terms of reaching new customers, it's just a matter of if businesses want to take that value even further.

The fact of the matter is, it's not about marketing at all. It's about choice.

We know this because we work with small businesses every day. Consider if a successful local restaurant opens a second location and is eager to rapidly reach new customers to support their expansion. For many customers, delivery apps are now one of the best ways to find new restaurants that may not be in your immediate neighborhood, so what is the benefit to limiting a restaurant's ability to market themselves at a time that may be critical to their success. We need to be advocating for small businesses to have every tool at their disposal.

This is not a matter of either adopting the proposed amendments or simply maintaining the status quo; the current status quo is simply unsustainable. The platforms have made clear that if the law stays in place unchanged, they would be forced to reduce service levels, raise customer costs, or take other actions that will inevitably lead to fewer orders being placed for local restaurants. That's not a viable option for local businesses.

For these reasons, we encourage members of the business community to join us in supporting Int 0762-2024, rather than simply letting the unsustainable status quo stand. Delivery provides a crucial service in the modern economy and every business deserves the right to decide what is best for their own needs.



Good afternoon Chair Menin and Committee members,

My name is Paul Zuber and I am the Executive Vice President of The Business Council of New York State. I am here today on behalf of The Business Council, and our members, to urge your support of Int 0762, the Fair Competition for Restaurants Act.

The Business Council is the leading business organization in New York State, advocating for over 3,200 member companies, professional and trade associations and local chambers of commerce. It should be noted that 76% of our members are small businesses, and together our members employ more than 1.2 million New Yorkers. Our members represent every sector of New York's economy and every region of the state with a large number headquartered or doing business in New York City. The Business Council is the State Chamber of Commerce so our breadth of membership gives us a very unique perspective on legislation and its impact on the economy.

Third-party delivery apps have created significant new markets for restaurants. Instead of serving only diners in the limited number of seats at their premises, restaurants now feed 10, 20, and up to 70 percent or more of meals where the customers are, typically in their homes or offices.

Delivery apps also offer unique pay-for-performance advertising and marketing programs that allow restaurants to get their names and daily specials in front of new audiences without having to pay cash upfront. These services, such as email marketing and search placement, are paid through higher per-order fees, which help restaurant owners manage cash flow carefully. The delivery fee cap law has essentially extinguished these optional programs for many restaurants, a problem that 762 will address.

762 is a win-win solution. Restaurants will win because the cap on delivery fees will remain in place, the strongest in the nation. They will win again because the marketing services portion of the fee cap will be repealed, empowering restaurant owners to choose how to spend—or not spend—their advertising and marketing dollars. Additionally the new bill offer restaurants even more benefits such as a requirement to provide affordable delivery options, an upper limit cap on commissions, restaurant control over keyword searching of their business name, assurance that restaurants can include promotional materials with deliveries and assurance that restaurants can set prices for menu items.

This is the type of common-sense solution that New York City restaurants deserve. It's also the very best solution that restaurants can hope for, as the litigation alternatives would be far worse.

- If the court overturns today's fee cap law, which seems likely based on initial rulings, restaurants will have no protection against high delivery fees.
- If the court upholds the law and marketing services remain constrained, the apps have made clear, and a recent study confirmed that they are losing millions of dollars monthly in New York City, and their only alternatives will be to substantially increase consumer fees or leave New York City altogether. That would return restaurants and all New Yorkers back to the old days when delivery was limited to only a very few restaurants that hired full-time delivery workers. The smallest restaurants will be the least likely to hire full-time delivery staff, and as a result, they will lose access to a robust and growing off-premise customer base.

In closing, I want to appeal to your sense of fairness and your appreciation that these are different times, and we know more today. The fee cap law was enacted during a crisis, when neighborhood restaurants were scared and felt powerless, and the Council offered a generous helping hand. Fortunately, the pandemic has passed, and the crisis has ended. Perhaps more importantly, the data is clear that fee cap laws hurt local, independent restaurants and help big chain restaurants. I urge you to restore balance and fairness and to help neighborhood restaurants by approving 762.

Thank you.


Paul W. Zuber, Executive Vice President

**BEFORE THE NEW YORK CITY COUNCIL**
**COMMITTEE ON CONSUMER AND WORKER PROTECTION**

**COMMENTS OF UBER TECHNOLOGIES, INC.**

**June 21, 2024**

Hayley Prim
███████████████
New York, NY 10001

Dear Members of the New York City Council,

Thank you for the opportunity to provide public comment and testimony regarding the bills on the agenda for the June 21, 2024 Consumer and Worker Protection Committee hearing. Most of these bills would bring change only to a specific segment of the food delivery industry in New York, that which involves Third Party Food Delivery Services (TPFDS), and the Delivery Workers and Merchants that connect to those platforms.

### *Intro 762 (Salamanca): Establishing exemptions for third-party food delivery services from the limits on fees charged by such services on food service establishments.*

Uber strongly supports Intro 762, which would amend the current commission cap that exists between TPFDS and merchants in New York City. The current cap was passed in 2020 during the height of the COVID-19 pandemic. During this time indoor dining at restaurants was prohibited. As cities have recovered from the pandemic and restaurant and business operations have returned to normal, nearly every other municipality in the country that passed a cap purportedly related to the COVID-19 pandemic has either seen that cap expire, actively repealed the cap, or amended the cap to allow for more flexibility between restaurants and delivery platforms.

We encourage the City Council to pass Intro 762 which would enable merchants to opt into additional TPFDS services at up to 25% the cost of an order. The current cap of 5% limits restaurants' ability to opt into key services that TPFDS offer, including additional marketing services that can enable merchants to grow their customer base as well as access to high value customers through the Uber One program. This will be particularly beneficial for small, independent restaurants in New York City that don't have the same resources to market or advertise outside of the app compared to corporate chains, franchises, or restaurants that belong to broad restaurant groups and are able to tap into these marketing resources more easily.

### *Intro 715 (Schulman): Requiring food delivery companies to be responsible for the safe operation of electric food delivery bicycles.*

Uber opposes Intro 715, which would make TPFDS liable for penalties that delivery workers using e-bikes incur while delivering on their platform, including but not limited to speeding, obeying laws around sidewalks, and driving through intersections. This bill is problematic for many reasons, but first and foremost it ignores the relationship that exists between TPFDS and delivery workers. When signing up to deliver with Uber Eats, all prospective couriers go through a multi-step screening process. Once they complete this process, drivers are independent contractors who have discretion to choose when they work, where they work, which jobs to accept, and how to service their customers, including their choice of delivery vehicle. Because these workers are

independent contractors, not employees of the company, they are fully responsible for their actions while performing deliveries. Safety is a top priority for Uber and we regularly communicate with delivery workers to provide safety tips and give guidance and other tips on road safety. However, ultimately the delivery worker is responsible for executing a trip and following rules of the road as a part of that delivery.

Uber is committed to being a strong partner on road safety, using our scale, reach, and technology to improve safety for people on and off the platform. Last year, we joined the US Department of Transportation in their National Roadway Safety Strategy, committing to support Vision Zero efforts and the Safe System approach to road safety. In April, we announced a Global Courier Safety & Health Charter with the International Transport Workers' Federation. The charter introduces 12 principles Uber has committed to expand, and  it centers on two-wheel courier safety and safe riding.

Uber takes several actions to help remind all couriers–including those that drive vehicles, motorcycles, mopeds, and motorized scooters–about safe driving behaviors. We send educational materials regarding distracted driving to all NYC couriers on an annual basis during April, which is Distracted Driving Awareness Month. We also have controls in place to try to minimize messaging between couriers and consumers–and any associated distraction–when couriers are driving above a certain speed threshold. Uber also surfaces a checklist to all bicycle couriers in NYC on a weekly basis; prior to going online, this checklist highlights the most important safety precautions for couriers driving bicycles.

The Platform Access Agreement between Uber and couriers requires couriers to identify, understand, and comply with all relevant laws. In accordance with our Community Guidelines, Uber encourages couriers to comply with local traffic regulations. In our Community Guidelines, we state:

> "Everyone is responsible for knowing and obeying all applicable laws, including the rules of the road—including complying with traffic laws, signs, and signals—at all times when using the Uber Marketplace Platform. All relevant licenses, permits, and any other legal documents required of drivers and delivery people must be kept up to date. For example, all drivers and delivery people using a vehicle are required by law to maintain a valid driver's license, insurance, and vehicle registration. We review reports of crashes or traffic citations that may have happened during a trip or delivery, and other reports, including but not limited to those that may indicate poor, unsafe, or distracted driving. Local rules about parking may limit where drivers and delivery people can park their vehicle when picking up orders, making deliveries, or waiting for riders to arrive or to exit a vehicle. For example, stopping in bike lanes or blocking accessibility ramps may violate the law."

We send our Community Guidelines to all couriers when they initially sign up to deliver with Uber Eats, and again after we receive any crash or dangerous driving report; in such instances, we also remind couriers that serious or repeated claims from customers of poor, unsafe, or distracted driving can result in permanent deactivation of a driver's account. Not following any one of our Community Guidelines may result in the loss of access to all or part of the Uber Eats platform.

Uber provides suggested routes to delivery workers for each trip offered which will never include riding on sidewalks. There is no incentive awarded to workers for delivering orders faster, and the estimated time for two-wheel deliveries is based on real-time information around traffic and other conditions in the City.

This bill would do nothing to encourage workers to operate more safely while delivering; conversely, workers may be inadvertently incentivized to engage in unsafe driving behaviors on sidewalks and at intersections if they know they will not be responsible for paying for civil penalties resulting from such violations. Additionally, Uber Eats would likely be required to prioritize deliveries for workers who use cars or gas-powered mopeds and de-prioritize workers on e-bikes, if there is a risk that the company will be held liable for the actions of workers operating bicycles.

### *Intro 737 (Abreu): Establishing gratuity standards for food delivery workers & Intro 738 (Abreu): Requiring third-party food delivery services that solicit gratuities to do so before or at the same time an online order is placed*

To begin, we believe that it's important to clarify that delivery customers in New York City still have the opportunity to tip their delivery worker on every order and continue to exercise that right. Since January 1, Uber Eats delivery customers have tipped their delivery workers approximately $25 million, or around $1 million per week on average. Customers may choose to leave a tip for a worker as a way to reflect excellent service they received, which is the case in almost every instance in society when a customer tips.

We oppose Intro 737 and Intro 738, bills which seek to establish new regulations that would single out and apply exclusively to tipping that occurs on TPFDS platforms, despite the wide breadth of industries that rely on tipping throughout New York City. First, Intro 738 would require TPFDS that solicit tips from consumers to do so at or before the time of delivery, which appears to be in response to operational changes some TPFDS made when the Department of Consumer and Worker Protection ("DCWP") enacted rules to implement Local Law 115 of 2021 (the "New York City pay standard"). However, those operational changes are largely because of another law the City Council passed in 2021 which also regulates tipping. In 2021, as part of a package of bills passed to give delivery workers more protections and information, the Council required TPFDS to include the amount of the tip on the offer card, in instances where that amount is known. Once implemented, and because tips were an important component of delivery workers' take home pay each week, that became a key factor in a worker's decision to accept or reject a trip, and we even saw instances where workers would sit online near high end restaurants they knew were on the app, waiting for a large delivery that would likely come with a large tip. At this time, this practice raised no concerns for Uber Eats as an open access platform. Workers were exercising their right to accept or reject trips, and it had a negligible impact on business operations. In 2021 the average trip acceptance rate on Uber Eats in New York City was less than 20%.

However, in December 2023 the New York City pay standard went into effect. Delivery workers now earn at least $19.56 per hour while delivering, and may receive additional earnings on top of that based on the total online time (non-working time) accrued by delivery workers on the app in a given week. Workers are now making significantly higher earnings, which the DCWP pushed so they would no longer be as reliant on tips (as DCWP acknowledged in its own report studying the New York City pay standard). But because of the structure of the New York City pay standard, companies are incentivized to make sure workers' time is used efficiently, and can no longer afford to let workers stay online without accepting trips, as that non-working time is required to be paid out each week. For these reasons, Uber and other TPFDS chose to move the option for consumers to tip after an order is delivered–which is, in general, how tipping works in most industries. When you are dining out at a restaurant, you tip your server *after* you have finished your meal and paid the check. At a cocktail bar, you pay for the drink and provide a tip *after* you have received your beverage. And when you take a ride in a taxi, you tip *after* the driver has dropped you off at your destination. A consumer's ability to tip *after* a delivery is completed is in line with the vast majority of other tipping opportunities in this country. It should come as no surprise that TPFDS chose to make

changes around gratuities when the New York City pay standard went into effect. DCWP's *own* report, released in November 2022 predicted that TPFDS would make changes to how consumers could tip in order to reduce consumer costs: "For instance, apps could choose to reduce consumers' costs through changes to the user interface that discourage or eliminate tipping (or, equivalently, consumers could choose to tip less in light of workers' higher pay, independent of any changes engineered by apps)." (Report at 36.) In this case, workers are now making higher earnings and therefore should need to rely less on tips.

We also oppose Intro 737 which would compel certain speech from TPFDS suggesting that customers provide a gratuity of at least 10% of the cost of an order when they are given the option to tip. In addition to being overly prescriptive, this bill is attempting to attach a gratuity amount to the cost of a product, rather than to the effort that was required to perform the service. The cost of a food delivery order is not directly related to the work required to deliver that order, as opposed to, for example, a rideshare trip where the cost is directly related to the length of time and distance traveled. To further illustrate why this would be problematic, Delivery Worker A could accept an order that requires a one-mile bike ride to deliver a $30 fast food order, and a customer would be prompted to tip only $3. Delivery Worker B could accept an order that requires a one-mile bike ride to deliver a $100 sushi order. While these workers are doing the same amount of work, the suggested tipping tied to the cost of an order is significantly different. On a macro level, this could create disincentives for workers to accept certain less costly orders, which in turn would create disruptions in the marketplace that would impact both workers and consumers negatively.

Aside from the negative impacts these two bills would have on the food delivery industry today, the Council is also choosing to further regulate Third Party Food Delivery in New York City, an industry which was seen more than a dozen new regulations passed in the last four years which gives workers higher earnings and additional protections, choice, and information. The City Council is actively choosing to ignore the other workers in the City who do similar work and have none of the same benefits or protections. This includes Third Party Courier Services and app-based grocery delivery services which have no minimum earnings requirement, and delivery workers who are directly employed by restaurants who are subject to a tipped minimum wage.

Instead of trying to pass yet another law that conflicts with and contradicts regulations already on the books, and unfairly singles out one industry for unequal treatment, the City should look to level the playing field for the other workers in the industry who currently have few–if any–rights and protections while doing the same or similar work.

### *Intro 859 (Abreu): Requiring third-party food delivery services and third-party courier services to provide food delivery workers with information underlying their pay calculations*

Uber also opposes Intro 859, which seeks to establish new requirements on TPFDS to provide additional information to delivery workers, a sector of individuals who already receive a plethora of information related to their pay as a result of the recently passed City Council laws, and New York City pay standard. Workers already receive a pay statement each week which includes pay in a given week based on hours worked, gratuities from customers, and amounts earned based on aggregate payouts. It details how many trips workers took in a given week and total online time.

Uber favors transparency. In fact we support added transparency and information for workers when it provides a value add. For example, earlier this week Uber launched an addendum to workers pay statements, which provides them with more information around the expenses, paid sick leave, and workers compensation components that the DCWP explicitly considered when calculating the New York City Pay Standard, and now workers will be able to see

how much they have earned towards each of those components updated on a weekly basis per the CIty's calculations. From the data, we can see that more than half of the couriers who have delivered on average at least 10 hours each week since December 4, 2023  have, according to the City's calculations, already earned $1,000 toward expenses, $400 toward paid time off, and $600 toward workers compensation.

While we believe Intro 859 is an example of serious over-regulation, and micromanaging by the City Council, it also proposes new requirements which are technically impossible. For instance, TPFDS would be required to inform a worker of their total pay "at the end of each pay period"–which isn't defined but can be assumed to mean immediately after the pay period concludes.  The New York City pay standard gives companies seven days to provide this information to workers, because the companies need additional time after a pay period is complete to calculate and distribute earnings in compliance with the New York City pay standard. For example, because there is a calculation of "online time" that is an aggregate number not specific to individual couriers, that total amount must be calculated and distributed among the couriers in accordance with the statutory requirements.

Also, this bill would require TPFDS to provide a "description and itemization of any additional payments" made to workers beyond the payments based on trip time. In its rulemaking, the DCWP intentionally gave companies flexibility to decide the methodology for paying workers for their combined on-call time in a given week. Because of this, TPFDS reserve the right to change how they make these payments each week.

This proposed bill also seeks to require companies to provide a "running total" of delivery workers on-call time and trip time, and to report "on-call" time on a worker's weekly pay statement. There is no basis for seeking this information, and because–in accordance with the New York City pay standard–online time is not necessarily paid on a 1:1 basis, it would more than likely generate more questions from workers and confusion in general as TPFDS have different methods for paying workers for aggregate on-call time. Also, these amounts would only reflect time delivered in New York City. All NYC workers have the option to deliver outside of the five boroughs, and many choose to exercise that right. However, since the suburbs and New Jersey do not have the same requirements, any work completed in those areas would not be reflected in these totals.

It took nearly three years from passage of Local Law 115 for the DCWP to finalize the New York City pay standard, and that was after multiple public hearings, dozens of meetings with stakeholders, an independent third-party study, and data collected by the TPFDS. The Council should not now require additional information from companies to workers that is technically infeasible and unnecessary for individual workers who already have access to a significant amount of information regarding hours worked on the Uber Eats platform.

### Intro 30A (Feliz):  A Local Law to amend the administrative code of the city of New York, in relation to safety standards for powered bicycles and powered mobility devices used for deliveries

Uber strongly opposes Intro 30A. We've submitted extensive testimony detailing our concerns with the previous version of this bill at the City Council's October 2023 and January 2024 hearings, and many of those concerns remain true today. While we appreciate that the City Council has acknowledged that there are other businesses that operate with workers who utilizes electric bikes by adding Third Party Grocery Delivery Services (TPGDS) and other businesses in Section 4 (m) of this bill, it does not acknowledge that, currently, only TPFDS have been paying toward courier expense costs through the New York City pay standard.

Workers who operate on a TPGDS or through a TPCS currently do not have a New York City pay standard guarantee, and workers who operate as delivery workers for other businesses, including as employees of restaurants are

subject to a tipped minimum wage. In contrast, workers operating on Uber Eats or other TPFDS platforms are making at least $19.56 per hour plus tips. Included in this pay rate, is an expense allocation at $2.21 (proportional allocation of $2.26 at a pay rate of $19.96) per each utilized hour toward the cost of expenses including e-bikes, batteries, helmets, and more. *(Final rule, and in detail on Page 18 of DCWP's study).*

Based on data since the New York City pay standard was implemented, we have calculated that over 9,000 delivery workers have already earned more than $900 towards their expenses (and this number only takes into account their earnings on Uber Eats) – thus, they are well on their way to earn more than $1,800, the cost of an e-bike as stated by DCWP's study on Page 19, by the end of the year. It's abundantly clear that the DCWP intended workers to purchase their own equipment once this pay standard was implemented. DCWP Commissioner Mayuga explicitly stated in a July 2023 Op-ed to the New York Daily News in *the very first line* that, "The city's new minimum pay rate for app-based restaurant delivery workers will lift thousands of working New Yorkers and their families out of poverty, and help them to afford safer equipment and cover medical expenses."

This bill also does not reflect priorities from the Fire Department of NY. In April 2024, Commissioner Laura Kavanagh stated in a press conference the need for e-bikes and batteries to be stored and charged outside. While this bill would be expensive and duplicative for every company which contracts with workers who use e-bikes, it does nothing to further the safety priorities of outdoor charging, and instead would likely end up with workers having *multiple* e-bikes batteries because they work with *multiple* companies, and *nowhere but inside* to charge and store them. We encourage the City to expand upon the battery swapping and outdoor charging pilots they launched earlier this year, as that is a long term and sustainable solution for delivery workers in New York City. While workers continue to earn the New York City pay standard, they will also be generating earnings that can go toward the purchase of UL certified e-bike batteries, and ideally will be in line with the requirements related to the City's battery swapping and charging program.

### *Intro 972(Powers): A Local Law to amend the administrative code of the city of New York, in relation to requiring third-party food delivery services to verify the registration of mopeds used by food delivery workers*

Intro 2153 requires a TPFDS to verify moped registration for any delivery worker who signs up to deliver with a moped on its platform. For every car and motorbike added by a courier for delivery in NYC on the platform, Uber collects vehicle insurance information. We also collect the same information as is listed on a vehicle registration document–such as vehicle make, model, color, and year–by asking the worker to input it directly and verifying through a vehicle insurance document. While we understand the City's desire to require verification of registration information when it is required by law, it is important to allow for optionality into how that information is collected.

Moreover, we believe this bill is premature. Just this month, the New York State legislature passed a bill (S7703 / A 8450) which would require registration for limited use motorcycles or mopeds at the point of sale, but that bill has not yet been signed into law by the Governor. In reality, in New York City, it is well known that some retailers sell mopeds without requiring registration at the point of sale, putting the full onus of this on the delivery worker who purchases the moped, and may not be aware of the regulations. Only when and if the State bill is signed into law, and with a reasonable implementation timeline, should workers be required to verify moped registration with delivery platforms. We also believe this bill should be broadened to include all businesses that contract with workers who operate mopeds to perform deliveries. By limiting it to only TPFDS, you are singling out a specific group of workers and platforms, instead of addressing the issue holistically.

**YEMENI AMERICAN MERCHANTS ASSOCIATION**
جمعية التجار اليمنيين الأمريكيين
Educate – Advocate – Elevate    نَعلـم – نُدافـع – نَرتقـي

Hello, my name is Youssef Mubarez, and I represent the Yemeni American Merchants Association (YAMA). At YAMA, we believe in the value of every individual and strive to be a catalyst for positive change in the United States. Since our founding in 2017, our mission has been to empower our community through outreach, education, and support, helping Yemeni Americans build a brighter future. We focus on providing peace of mind by addressing the issues and challenges they face daily.

Today, on behalf of our merchants and business owners, I am here to express our support for Intro 762.

Context and Importance:

Before the pandemic, third-party delivery services were already becoming a crucial part of our businesses. The COVID-19 pandemic drastically accelerated this trend, making delivery services essential for the survival of our restaurants and merchants when indoor dining was restricted. The fee cap implemented during this period was vital in preventing third-party delivery services from exploiting the vulnerability of restaurants. For YAMA, this cap acts as a necessary guardrail for the industry.

As the hospitality industry slowly recovers, the environment for restaurants and merchants continues to change. It is now necessary to revisit and adjust the fee caps to ensure fair play and continued growth in this new landscape.

Key Provisions and Benefits of Intro 762:

1.      Delivery Fee Cap: The bill maintains a critical delivery fee cap at 15% of the purchase price of each online order, protecting restaurants from excessive delivery charges.

2.      Marketing Fee Flexibility: The bill allows restaurants to opt for a higher cap on marketing fees, up to 25%, giving businesses the option to invest more in marketing if they choose. Restaurants can still remain at the original 5% marketing fee cap if they prefer.

3.      Transparency and Communication: Third-party delivery services like Uber Eats will have to notify restaurants of any contractual fee changes within 30 days, ensuring transparency and allowing establishments to make informed decisions.

4.      Control Over Internet Presence: The bill prevents third-party delivery services from purchasing a restaurant's name as a keyword for internet advertising, safeguarding the online identities and brand integrity of establishments.

5.      Autonomy in Pricing: Business owners in our association will have the power to set different prices for in-store and online orders. This flexibility helps business owners manage costs and pricing strategies more effectively.

6.      Inclusion of Marketing Materials: Food establishments will be allowed to include physical marketing materials, such as menus or coupons, in delivery orders, providing additional marketing opportunities directly to consumers.

7.      Updated Reporting Requirements: The bill further mandating the Department of Consumer and Worker Protection to report biennially on the impact of fee caps and exemptions on third-party delivery services, food service establishments, and delivery workers, ensuring ongoing evaluation and adjustment of policies based on current data.

Conclusion:

We believe this bill strikes a balanced approach, offering necessary protections to restaurants while allowing third-party delivery services to operate sustainably. The flexibility and safeguards introduced by this bill will help food service establishments thrive in the evolving post-pandemic landscape.

We urge the New York City Council to pass Intro 762, as it supports our local restaurants and ensures a fair and equitable market for third-party food delivery services. As Essential Workers during the Pandemic we hope you continue to remember our sacrifice and help us grow our businesses.

Thank you for your time and consideration.

Youssef Mubarez
Director of Public relations

718-213-0030            YAMAMerchants          www.yamausa.org
6740 5th Ave Brooklyn,NY 11220     OfficialYAMAUSA        info@yamausa.org

6/17/2024

Dear Speaker Adrienne Adams, Chair Julie Menin, and Members of the Consumer and Worker Protection Committee:

We are writing to request that you support Intro 762, a bill that would amend the permanent fee cap between merchants and delivery services in New York City.

This fee cap was passed more than four years ago at the height of the COVID-19 pandemic, when restaurants had limited or no access to on-premise dining and were struggling with the rest of the City to keep our doors open.

While the goal of the cap was to protect and preserve independently owned restaurants, we are now in the place where we are unable to invest in additional marketing services to continue to grow our customer base. Intro 762 does not remove the cap. All restaurants will still be guaranteed basic discoverability and delivery services at a locked in rate, but will also now have the option to create new marketing campaigns, customer promotions and more if this is passed.

Small restaurants like ours don't have the resources to hire a communications and marketing team, and so we utilize the larger app delivery companies to help us execute those and reach new customers. We are competing against corporations and chain restaurants who have the budget and resources to grow their customer base without the app companies, and so at the moment we are currently with few if any options.

Thank you for your consideration, and we request that the City Council vote to pass Intro 762 at its earliest convenience.

Sincerely,

_____(Restaurant Signee Signature)

BIKRAM ADHIKARI _____(Printed Name and Title)
Please Print Clearly

████████████████ _____(Signee Email/Phone Number)
Please Print Clearly

SM BAR AND GRILL(Restaurant Name)
Please Print Clearly

119-15 Liberty Ave(Restaurant Address)
Please Print Clearly

To the Committee of Consumer and Worker Protection:

Thank you for the opportunity to address my concerns regarding the proposed bills, Int 737 and 738, affecting delivery apps like DoorDash. Over my five years as a Dasher, I have witnessed first-hand how even minor changes can significantly affect our work environment, let alone major ones. I am concerned that these bills might eliminate tipping on these platforms, which could severely impact my earnings.

I was raised in New York City, the heartbeat of my life and aspirations. In 2013, I ventured to Tennessee in pursuit of dreams that, unfortunately, did not materialize. Returning to New York in 2016, I faced a daunting crossroad. Shortly before my return, I started working withDoorDash. This opportunity was transformative. The platform's innovative pay and tipping structure, along with its driver-customer interaction features, enabled me to fine-tune my delivery approach and communication, significantly boosting my tips. This support was crucial in facilitating my move back home, averting financial ruin, and sustaining me through a challenging period.
As a musician with an unpredictable schedule, DoorDash offers the flexibility that a traditional 9-to-5 job cannot. This flexibility is indispensable for balancing my music career with the demands of daily life.

I appreciate the City Council's efforts to protect delivery workers. However, each proposed change brings its own set of challenges. For instance, while minimum pay rules might have improved earnings for some Dashers, they have also made the job less accessible and flexible for many others.

I fear these requirements might lead to the elimination of tipping altogether. In New York City, where customers expect streamlined services, they might be more inclined to tip generously when they experience the high-quality care that DoorDash delivers.

I hope you will avoid making the situation in NYC worse and vote no on Int 737 and 738.
I urge you to consider the broader implications and vote against Int 737 and 738 to avoid worsening the situation for NYC's delivery workers.

Sincerely,
Andres Hurtado

**From:** Baoburg <baoburg@gmail.com>
**Sent:** Wednesday, June 19, 2024 3:06 PM
**To:** Testimony
**Subject:** [EXTERNAL] Opposition to INT 762

Dear Members of the City Council,

I am writing to express my strong opposition to the proposed changes that would remove the current fee cap on third-party delivery services. As the owner of a small restaurant in our community, I want to emphasize the severe negative impact this move would have on my business and many others like mine.

The fee cap has been a crucial support for us, especially during the difficult times of the pandemic. It has enabled us to offer delivery services without being overwhelmed by excessive fees. Maintaining this cap is essential for several reasons:

1. **Financial Stability**: Small restaurants operate on very thin profit margins. The current fee cap helps us manage the costs associated with third-party delivery services. If the cap is removed or raised, our expenses would significantly increase, potentially making delivery financially unsustainable. This could lead to a reduction in revenue and force us to cut staff or reduce hours, which would hurt both our employees and customers.
2. **Consumer Accessibility**: Many of our customers depend on delivery services for their meals. If the fee cap is lifted, we would have to pass on the increased costs to our customers, making our food less affordable. This could result in a substantial drop in orders, adversely affecting our business and limiting access to our food for those who need it.
3. **Competition and Fairness**: The fee cap creates a level playing field between small, independent restaurants and larger chains that can more easily absorb higher delivery fees. Removing the cap would disproportionately harm small businesses, potentially driving many of us out of the market. This would reduce competition and limit the diversity of dining options available to our community.
4. **Local Economy**: Small restaurants are a vital part of the local economy, providing jobs and contributing to the vibrancy of our community. Higher delivery fees would strain our operations, possibly leading to closures. The loss of local businesses would have a ripple effect, negatively impacting suppliers, employees, and other related local enterprises.

In conclusion, removing the current fee cap would have devastating consequences for small restaurants like mine. It would increase operational costs, reduce consumer accessibility, unfairly disadvantage us against larger chains, and harm the local economy. I urge you to consider the broader implications and maintain the current fee cap to support the survival and growth of small businesses in our city.

Thank you for your attention to this critical issue.

Sincerely,

Suchanan Aksornnan
Baoburg Restaurant
baoburg@gmail.com

June 21, 2024

**Testimony before the NYC Council Committee on Consumer & Worker Protection**

**Topic: Support for Intro. 0762**

Good morning. My name is Beatrice Ajaero and I own Nneji, which serves West African cuisine and is located in Astoria, Queens.

Thank you for supporting New York restaurants and the opportunity for us to share our voice, especially those of us that are small, independent and may only have one location.

The pandemic was obviously very hard for all of us, but even as we recovered, other challenges such as inflation have been very difficult. We work extremely hard for every dollar we earn. I am testifying today to ask you to support this legislation to amend the current cap that will allow for more choices for restaurants like mine, but also preserve important protections – protections that have gotten stronger with this version of the bill.

This is a point I want to stress – the proposed solution has gotten better because of continued discussions where a variety of voices like mine were heard.  I've never been too involved in advocacy, but I know that that is how democracy should work.

The restaurant delivery fee cap was a very good idea during the pandemic. But because the cap also applies to optional marketing services, it has prevented me from exploring and choosing options that may work better for my restaurant in trying to get more customers.

This may be an obvious point, but it's one everyone should understand: I don't have millions (or even thousands) of dollars for my marketing budget, unlike some of the big brands that are in my neighborhood.  And I don't have a marketing department or advertising firm.

What is most helpful about the delivery platforms is that they allow me to spend marketing dollars as I go rather than committing to a big investment upfront.  They also allow me to explore what works best for my business and make changes to that at any time.

That's something I can't do if I took out a traditional ad – even if I could afford that.

The main point is flexibility and allowing restaurants to make decisions for themselves rather than being constrained — while big chains have unlimited options. I may not be the most tech savvy person, but the platforms enable us to figure out what works best.  We just need the ability to do so.

The proposed amendment not only keeps the delivery fee cap just the way it is, but it will also maintain a maximum for "marketing fee cap" so I can pay more if I choose, but it won't be unlimited. That's a good balance, and that's what I support. I should be able to spend my money to grow my business.

In my own specific experience, Grubhub helped me in sharing my food story with customers far and near. There was a challenge I faced when I attempted to market Nneji on my own. I believe that without Grub Hub's support, my doors would have been shuttered by now.

I know that my experience may not reflect that of every restaurant owner, but I appreciate this opportunity to share my perspective.  Thank you.

1

**Jenny Alcantar**

Good morning, and thank you for allowing me to speak in support of INTRO 762, the Fair Competition for Restaurants Act.

My name is Jenny Alcantar, and I own Birria Mania restaurant in Brooklyn.

Birria Mania is everything that makes New York great, all wrapped up in a taco. It's Mexican meets Asian meets American culinary favorites, and all our meat is halal.

Running an independent restaurant is a labor of love. It's financially risky and physically exhausting. But people like me do it because we want to share the best of our cultures and cuisines with fellow New Yorkers.

By voting for INTRO 762, you will help local restaurateurs like me succeed and compete with deep-pocketed chains. That's because 762 keeps the delivery fee intact, which helps restaurants, and will eliminate the part of the delivery fee cap that prevents me from buying digital marketing and advertising services from UberEats, DoorDash, and Grubhub. That also helps restaurants.

Loosening the cap will give small restaurants–with small advertising budgets–access to marketing services that allow us to punch above our weight. Not all restaurants will use the platforms' marketing services, but it should be our choice whether to do so.

I understood and appreciated the fee cap's protective purpose during the COVID-19 pandemic. But the pandemic is over, and a strict fee cap is no longer helpful. Restaurants need all the low-cost marketing options we can get, so I urge you to adopt INTRO 762's balanced solutions for the restaurant industry and help keep New York's vibrant food scene thriving.

Thank you for taking the time to listen to restaurant owners like me, and for your thoughtful work on behalf of New York's restaurants.

████████████

**From:** Janice Pullicino <bklyncakestudio@gmail.com>
**Sent:** Tuesday, June 18, 2024 12:54 PM
**To:** Testimony
**Subject:** [EXTERNAL] URGENT: Regarding Bigger Fees for Big Delivery Bill

████████████████████████████

I am writing to you as a small bakery owner in Brooklyn. I only survive due to the online delivery services. My profit margins are basically non-existent considering the increased cost of everything the past few years. Delivery apps constitute 50-60% of my sales. If the money I net now on half of my sales is reduced any further, I will no longer be able to keep my shop operational.

i want to be very clear, so I will write this in all caps… not to be rude, but to make an impact. I don't say this lightly, this is my absolute reality.

**IF YOU REMOVE THE FEE CAP, YOU WILL PUT ME OUT OF BUSINESS.**

It is as simple as that. **Please support local businesses, and not the giant corporations already making millions in profit off of OUR hard work.**

We hope and trust that you will do the right thing.


Janice
*******************************
**Janice Pullicino**
**Owner**
**BKLYN Cake Studio**
427 7th Ave, Park Slope, Brooklyn
718-576-3986
https://www.bklyncakestudio.com

1

6/17/2024

Dear Speaker Adrienne Adams, Chair Julie Menin, and Members of the Consumer and Worker Protection Committee:

We are writing to request that you support Intro 762, a bill that would amend the permanent fee cap between merchants and delivery services in New York City.

This fee cap was passed more than four years ago at the height of the COVID-19 pandemic, when restaurants had limited or no access to on-premise dining and were struggling with the rest of the City to keep our doors open.

While the goal of the cap was to protect and preserve independently owned restaurants, we are now in the place where we are unable to invest in additional marketing services to continue to grow our customer base. Intro 762 does not remove the cap. All restaurants will still be guaranteed basic discoverability and delivery services at a locked in rate, but will also now have the option to create new marketing campaigns, customer promotions and more if this is passed.

Small restaurants like ours don't have the resources to hire a communications and marketing team, and so we utilize the larger app delivery companies to help us execute those and reach new customers. We are competing against corporations and chain restaurants who have the budget and resources to grow their customer base without the app companies, and so at the moment we are currently with few if any options.

Thank you for your consideration, and we request that the City Council vote to pass Intro 762 at its earliest convenience.

Sincerely,

_____ (Restaurant Signee Signature)

_____ (Printed Name and Title)
Please Print Clearly

_____ (Signee Email/Phone Number)
Please Print Clearly

_____ (Restaurant Name)
Please Print Clearly

_____ (Restaurant Address)
Please Print Clearly

6/17/2024

Dear Speaker Adrienne Adams, Chair Julie Menin, and Members of the Consumer and Worker Protection Committee:

We are writing to request that you support Intro 762, a bill that would amend the permanent fee cap between merchants and delivery services in New York City.

This fee cap was passed more than four years ago at the height of the COVID-19 pandemic, when restaurants had limited or no access to on-premise dining and were struggling with the rest of the City to keep our doors open.

While the goal of the cap was to protect and preserve independently owned restaurants, we are now in the place where we are unable to invest in additional marketing services to continue to grow our customer base. Intro 762 does not remove the cap. All restaurants will still be guaranteed basic discoverability and delivery services at a locked in rate, but will also now have the option to create new marketing campaigns, customer promotions and more if this is passed.

Small restaurants like ours don't have the resources to hire a communications and marketing team, and so we utilize the larger app delivery companies to help us execute those and reach new customers. We are competing against corporations and chain restaurants who have the budget and resources to grow their customer base without the app companies, and so at the moment we are currently with few if any options.

Thank you for your consideration, and we request that the City Council vote to pass Intro 762 at its earliest convenience.

Sincerely,

_____(Restaurant Signee Signature)

Dave Arjune (Roshan)_____(Printed Name and Title)
Please Print Clearly

_____(Signee Email/Phone Number)
Please Print Clearly

BRAMO'S EXPRESS_____(Restaurant Name)
Please Print Clearly

118-14 Liberty Ave, Richmond Hill Queens NY 11419 (Restaurant Address)
Please Print Clearly

**From:** carmine mitroni
**Sent:** Sunday, June 23, 2024 7:32 PM
**To:** Testimony
**Subject:** [EXTERNAL] legislation Int 762

To whom it may concern,

I am writing to testify against the proposal of legislation INT 762 to remove the delivery fee caps for the 3rd party apps under the guise ( false premise ) that they are allowing marketing for smaller operators and venues. This is absolutely false . By removing the cap and delivery fees all small businesses still struggling with already substantially increased food, labor and energy costs that relies on the 3rd party apps for delivery revenue will virtually bankrupt the majority of them, The fees they charge are exorbitant enough already and they are already charging a marketing fee in addition to a delivery fee. What they did pre-covid without the delivery fee caps is bury restaurants and food providers several pages into there website or not allowing there own website to be visible on there google page unless they paid a maximum percentage to them like a chaste system where they would be slaves to the delivery apps themselves . I saw many colleagues close their business and or struggle to survive as a result of this.  Thereby conspiring  to force the guests to order through there apps. These are large corporations ie Uber eats , door dash , grub hub just to mention a few run with venture cap money with unlimited resources which despite there pretensions do not have anybody best interest in mind but there own. Left to there own devices with minimal oversight they will  in essence exploit the beauty and diversity of the Nyc food scene with multi ethnic restaurants and small operators left at there mercy resulting also in many restaurant closures .In  the aftermath will result in the loss of thousands of hospitality workers jobs which add to to the city tax base and are vital to the city. I implore you to seriously consider the ramifications of allowing the delivery cap fees to be removed as it will be devastating for the restaurant industry  We greatly appreciate  for your attention in this matter , Carmine Mitroni

1

**From:**        Chai Thai Kitchen <chaithaikitchen@gmail.com>
**Sent:**         Tuesday, June 18, 2024 1:16 PM
**To:**           Testimony
**Subject:**     [EXTERNAL] Delivery Fee Cap in Testimony

Dear Members of the City Council,

I am writing to express my strong opposition to the proposed changes that would gut the current fee cap on third-party delivery services. As the owner of a small restaurant in our community, I want to highlight the significant negative impact this move would have on my business and many others like mine.

The fee cap has been a critical lifeline for us, especially during the challenging times of the pandemic. It has allowed us to provide delivery services without being crippled by exorbitant fees. Maintaining this cap is crucial for several reasons:

1. Financial Stability: Small restaurants operate on thin margins. The current fee cap helps us manage the costs associated with third-party delivery services. Removing or raising this cap would drastically increase our expenses, potentially making delivery financially unfeasible. This would lead to a reduction in revenue and could force us to cut staff or reduce hours, hurting both our employees and customers.

2. Consumer Accessibility: Many of our customers rely on delivery services for their meals. If the fee cap is lifted, we would have to pass on the increased costs to our customers, making our food less affordable. This could result in a significant drop in orders, adversely affecting our business and limiting access to our food for those who need it.

3. Competition and Fairness: The fee cap levels the playing field between small, independent restaurants and larger chains that can absorb higher delivery fees more easily. Removing the cap would disproportionately hurt small businesses, potentially driving many of us out of the market. This would reduce competition and limit the diversity of dining options available to our community.

4. Local Economy: Small restaurants are a vital part of the local economy, providing jobs and contributing to the vibrancy of our community. Higher delivery fees would strain our operations, possibly leading to closures. The loss of local businesses would have a ripple effect, negatively impacting suppliers, employees, and other related local enterprises.

In conclusion, gutting the current fee cap would have devastating consequences for small restaurants like mine. It would increase operational costs, reduce consumer accessibility, unfairly disadvantage us against larger chains, and harm the local economy. I urge you to consider the broader implications and maintain the current fee cap to support the survival and growth of small businesses in our city.

Thank you for your attention to this critical issue.

Sincerely,

Amornrat Fukuda
Chai Thai Kitchen

1

**OPPOSITION TO INT 762**

Good morning/afternoon, members of the New York City Council and attendees,

My name is Chris Lauber. I've managed restaurants and hotel operations in New York for over a decade, advised on some of the top hospitality technologies used today, and am currently the Senior Director of Operations for a New York restaurant group. I'm here today to urge you to maintain the marketing fee caps for delivery platforms, as they are essential for the survival of restaurants in our city. A tiered marketing system would all but force restaurants to select higher packages for any chance of visibility. That's exactly what these platforms are counting on.

The fee caps, implemented during the pandemic, have been a lifeline for countless restaurants. The pandemic hit the restaurant and hotel industry hard, while delivery platform usage soared. Restrictions on indoor dining further-increased reliance on delivery and takeout, drastically altering our industry landscape. The fee caps have checked the exorbitant fees these platforms would otherwise charge. Without these caps, restaurant fees could double, or worse. For an industry with thin profit margins of 5-10%, increased fees will mean the difference between staying open and closing. Recently, I had to argue with multiple platforms just to abide by the current regulations and not overcharge us. This raises a serious question: how can we trust these platforms to not exploit this change if we need to fight for them just to abide by the existing law?

Delivery platforms often position themselves as partners to restaurants, claiming to support local businesses and running expensive commercials. However, their actions frequently tell a different story. During the pandemic, several platforms continued to charge high marketing fees, even as restaurants struggled to pay their staff. GrubHub even used aggressive tactics, such as listing restaurants on the platform and selling their food without consent. This caused harm to businesses, exposed guests to potential foodborne illnesses by delivering items not built to travel, and created consumer confusion. Many restaurants, including mine, did not offer takeout or delivery, which led to chaos when delivery drivers arrived to pick up orders that we knew nothing about.

Removing the current fee caps would disproportionately affect smaller, independent restaurants that lack the bargaining power to negotiate rates, further creating an uneven playing field that favors larger chains. Small businesses are the heart of New York City's vibrant culinary scene, and lifting these caps threatens their existence. This affects not only restaurants, but also delivery workers who rely on these jobs.

In conclusion, maintaining the marketing fee caps is crucial for the survival of small and independent restaurants in New York City. I urge this Council to consider the long-term implications of lifting these caps and to support the small businesses that make our city unique. Let us not allow corporate giants to exploit the hardworking hospitality businesses that contribute to the soul of this city. Instead, please show your support for an industry that supported our communities during the pandemic and continues to support so many others today. I urge you to keep this delivery cap in place.

Thank you for your time and consideration.

To the New York City Council:

Thank you for allowing me to submit testimony on these bills regarding food delivery workers in New York City.

I've been a Dasher in New York City for the past six years. After someone recommended it as a way to make some extra money I realized that the flexibility and ability to work on my own schedule made a big difference, and food delivery has been my only source of income ever since.

The city's new minimum pay for delivery workers hasn't had much of an impact on me personally, but I have found it harder to find consistent ways to earn, which makes me worried that if the City Council passes Int 737 and 738 it will mean even fewer orders or that tipping on platforms is completely eliminated.

Dashing allows me to pay all of my expenses — from bills to rent, food, or utilities — and I get paid quickly and even have the option to get paid immediately, which means I can schedule when I want to work and immediately pay expenses. This is something that has worked really well for me for years, which is why I worry that if the City keeps tinkering with the platform and making all these unnecessary changes I may suddenly be left looking for another source of income.

Since the minimum pay went into effect I am making about the same amount of money as before. The base pay is better, but tips are now really rare. While of course I would appreciate more tips, I am concerned that the requirements from Int 737 and 738 will just mean that there will be even more bad changes to the way we earn in New York City.

Even with the changes to make it more affordable for customers, the tips still aren't there. If the platforms are forced to make even more changes, there could be even fewer orders or they'll just remove tips altogether. Either way, that's a cut into my earnings.

I get what the City Council is trying to do, but every time we have one of these changes there are other impacts that they don't seem to account for and eventually it's going to mean workers like me are having trouble earning money the same way we did before.

Please don't do anything to create a worse situation in NYC, and vote no on Int 737 and 738.

Sincerely,
Christopher Cruz

To the New York City Council:

Thank you for offering us a chance to testify today on these bills that could impact the future of the restaurant industry using food delivery apps.

We opened the doors to Citroën, a French bistro and cocktail bar in Greenpoint, five years ago, and we have worked hard to make it a place that is a welcoming place for our community. As lifelong New Yorkers, we take great pride in knowing our friends, neighbors, and fellow small business owners.

While we cherish the regular customers who come to eat and drink at our restaurant, delivery is what has really kept our restaurant going in recent years. We partner with platforms like DoorDash and Grubhub to help reach new customers beyond just our Greenpoint neighborhood and grow our business. Without these options, I don't think our restaurant would exist today.

That's why I am opposed to Intros 737 and 738, which could further upend the way these delivery platforms operate in New York City.

We're already facing new challenges from the new rules the City put in place this year, having to navigate through changes that platforms have had to make in response to the minimum pay regulations — including trying to limit the impact on customers. Still, customers have told us that they're unhappy because they now have higher fees, and we're starting to feel it in reduced delivery orders.

If these bills pass and make delivery seem even more expensive when they go to checkout, it could further drive down orders and put us in an even more challenging situation. We're still just figuring how to deal with all the increased costs, so now is not the time to be adding new rules on top of those that would set us further back. This approach simply does not consider restaurants like mine and the effect it would have on small businesses across the city.

We're respectfully asking the Committee to reconsider these bills and instead think about ways that restaurants like ours can continue to grow our business using these services in New York City, rather than worsen the impact its existing rules have had.

Sincerely,

Dawn Eldridge
Owner, Citroen

| | |
|---|---|
| **From:** | Dock Asian Eatery <dockasianeatery@gmail.com> |
| **Sent:** | Tuesday, June 18, 2024 1:44 PM |
| **To:** | Testimony |
| **Subject:** | [EXTERNAL] Delivery Fee Cap Testimony |

Dear Members of the City Council,

I am writing to express my strong opposition to the proposed changes that would remove the current fee cap on third-party delivery services. As the owner of a small restaurant in our community, I want to highlight the significant negative impact this move would have on my business and many others like mine.

The fee cap has been a crucial support for us, especially during the challenging times of the pandemic. It has allowed us to offer delivery services without being burdened by excessive fees. Maintaining this cap is essential for several reasons:

1. **Financial Stability**: Small restaurants operate on thin margins. The current fee cap helps us manage the costs associated with third-party delivery services. Removing or raising this cap would drastically increase our expenses, potentially making delivery financially unfeasible. This would lead to a reduction in revenue and could force us to cut staff or reduce hours, hurting both our employees and customers.

2. **Consumer Accessibility**: Many of our customers rely on delivery services for their meals. If the fee cap is lifted, we would have to pass on the increased costs to our customers, making our food less affordable. This could result in a significant drop in orders, adversely affecting our business and limiting access to our food for those who need it.

3. **Competition and Fairness**: The fee cap levels the playing field between small, independent restaurants and larger chains that can absorb higher delivery fees more easily. Removing the cap would disproportionately hurt small businesses, potentially driving many of us out of the market. This would reduce competition and limit the diversity of dining options available to our community.

4. **Local Economy**: Small restaurants are a vital part of the local economy, providing jobs and contributing to the vibrancy of our community. Higher delivery fees would strain our operations, possibly leading to closures. The loss of local businesses would have a ripple effect, negatively impacting suppliers, employees, and other related local enterprises.

In conclusion, removing the current fee cap would have devastating consequences for small restaurants like mine. It would increase operational costs, reduce consumer accessibility, unfairly disadvantage us against larger chains, and harm the local economy. I urge you to consider the broader implications and maintain the current fee cap to support the survival and growth of small businesses in our city.

Thank you for your attention to this critical issue.

Sincerely,

Futoshi Fukuda
Dock Asian Eatery

1

**Written Testimony**

To the Committee of Consumer and Worker Protection:

Thank you for offering a chance to submit testimony on these bills before the Committee that could impact food delivery workers in New York City. I think it's important for you to hear about the wide range of experiences we have had recently before implementing even more changes.

I started my journey with DoorDash in March 2019. Initially I was just doing deliveries for a few hours a week, but as the need continued to grow, so too did my commitment to dashing. I had bills to pay and a family to take care of, and making deliveries with DoorDash offered me a way to easily bring in the extra money I needed. Even better, I could choose when I made deliveries that fit around my full-time job as an accountant. Simply put — it was working for me.

Unfortunately, since the new minimum pay rules took effect, I've seen a steep drop in order volume and opportunities for dashing have become noticeably more scarce. While I loved being able to grab my bike and pick up orders around Williamsburg, now I have to go into Manhattan to have any hope of finding offers, which means less flexibility in my schedule and more time away from my family. Sometimes I only get one order a day, or I can't even get on the schedule to dash altogether. It seems like Int 737 and 738 would make these problems even worse with fewer orders or eliminating tipping altogether.

At the same time, delivering on an e-bike has been a great way for me to quickly and easily pick up deliveries. But it seems like the proposed new rules like Int 0030 regulating e-bikes would make it difficult for delivery apps to make this option as widely available for workers like me. If I'm not able to use my bike for making deliveries, I'm not sure how I could continue using this as a way to make money at all.

What's clear from years of doing these deliveries with DoorDash is that there needs to be balance — if it gets too expensive for customers to place orders, that means there are fewer opportunities for me to earn. While I would appreciate the Council trying to support delivery workers like me, I am worried that proposed new requirements will ultimately end up hurting us in the long run.

That's why I oppose these bills that would worsen the experience that the existing rules have had for food delivery workers in New York City.

Sincerely,
Ed Hatchett

6/17/2024

Dear Speaker Adrienne Adams, Chair Julie Menin, and Members of the Consumer and Worker Protection Committee:

We are writing to request that you support Intro 762, a bill that would amend the permanent fee cap between merchants and delivery services in New York City.

This fee cap was passed more than four years ago at the height of the COVID-19 pandemic, when restaurants had limited or no access to on-premise dining and were struggling with the rest of the City to keep our doors open.

While the goal of the cap was to protect and preserve independently owned restaurants, we are now in the place where we are unable to invest in additional marketing services to continue to grow our customer base. Intro 762 does not remove the cap. All restaurants will still be guaranteed basic discoverability and delivery services at a locked in rate, but will also now have the option to create new marketing campaigns, customer promotions and more if this is passed.

Small restaurants like ours don't have the resources to hire a communications and marketing team, and so we utilize the larger app delivery companies to help us execute those and reach new customers. We are competing against corporations and chain restaurants who have the budget and resources to grow their customer base without the app companies, and so at the moment we are currently with few if any options.

Thank you for your consideration, and we request that the City Council vote to pass Intro 762 at its earliest convenience.

Sincerely,

William Edwards _____(Restaurant Signee Signature)

William Edwards _____(Printed Name and Title)

Please Print Clearly

████████████████ _____(Signee Email/Phone Number)

Please Print Clearly

Gaby Fresh Pizza _____(Restaurant Name)

Please Print Clearly

95.55 Sutphin Blvd _____(Restaurant Address)

Please Print Clearly

**Written Testimony**

To the Committee on Consumer and Worker Protection:

Thank you for giving me the opportunity to make my voice heard on these bills impacting food delivery workers. I am most concerned about Int 737 and 738, which could take away opportunities for me to earn with platforms like DoorDash.

I started dashing three years ago, and the flexibility has been very important to me because I can work anytime I want. Unlike with a regular job where I have to call out or ask a boss for time off, I have had the freedom to work the way I want to.

While I appreciate the City Council's attempts to protect delivery workers, it's becoming clear that each change that has been made lately comes with downsides. For example, the minimum pay rules may have improved earnings for some Dashers but also made working on platforms less accessible and less flexible. I've gotten fewer orders, wait times have increased, and my earnings keep going down. It feels like everything has stopped working altogether.

That's why I oppose Int 737 and 738, because if they pass it will likely mean tipping on platforms is completely eliminated. Customers that I make deliveries to seem like they're already frustrated with higher costs from these new rules. While more tips sounds nice, I am worried that these requirements will only mean that tipping is eliminated entirely, and make it even harder to earn than it is now.

It's clear that being a food delivery worker in New York City has already changed for the worse. I hope you will avoid adding to these problems in NYC and vote no on Int 737 and 738.

Sincerely,
Ibrahima Magasso

To the Committee of Consumer and Worker Protection:

Thank you for allowing me to submit testimony as you consider these bills for food delivery workers like me. This income has become integral to my life, so it's important that our voices are heard before any more changes are made to the experience in New York City.

I work as a program manager at a local nonprofit that helps kids going through the transition between middle and high school and high school and college. While this work is rewarding, sometimes it's not enough for all of my expenses —  I use the extra money I make on the app to pay for childcare and put my older son through college.

Delivering on DoorDash has given me the independence I've always looked for. But the recent changes to the platform in New York City threaten the flexibility that's allowed me to pay my bills and make ends meet for my family. Some of these bills, like Int 737 and 738, could make those impacts even worse if there are even fewer opportunities to earn or tipping is eliminated entirely.

That's why I urge Council Members to vote no on Int 737 and 738 because they risk hurting the vital way of bringing in income I've come to rely on. So far, the changes have made the platforms less accessible and flexible. However, I'm worried that these new requirements would upend the experience altogether.

Sincerely,
Jamal Harris

To the Committee of Consumer and Worker Protection:

Thank you for this opportunity to provide my perspective on the bills being heard surrounding third-party delivery platforms.

I've had a long career where I've tried my hand in different kinds of work. After a while, I discovered making deliveries with DoorDash last year, and as an older guy it has given me an opportunity to work.  Now it has become my only source of income — while I may try to get back into the tech field, my income from dashing has helped make ends meet for rent, food, bills, and all my other expenses.

That's why I'm concerned about Int 737 and 738, which could make my experience as a New York City Dasher worse off. While I appreciate the City Council's attempts to protect delivery workers, each change has come with downsides, and I think that's what would happen if these bills pass.

For example, the minimum pay rules may have improved earnings for some Dashers but also made working on platforms less accessible and less flexible. Of course I would appreciate more tips, but I am worried that these requirements will instead mean that tipping is eliminated entirely.

My ability to earn income with DoorDash is already being limited because of the new minimum pay rules, and I worry that adding new rules and regulations on top of it is just going to make the situation in NYC worse. I hope you will vote no on Int 737 and 738.

Sincerely,
Joe Mele

**From:**          Paul O'Connor <paul@maddogandbeans.com>
**Sent:**          Wednesday, June 19, 2024 1:31 PM
**To:**            Testimony
**Subject:**       [EXTERNAL] Re: Intro 762 the Bigger Fees for Big Delivery Bill!

Please DO NOT allow the change to the existing Delivery Fee.
As we have witnessed in the past, the delivery companies cannot be trusted to be honest and have the interests of restaurants or customers in mind, at any time.
We are already struggling with business in general and with existing delivery fees.

Paul O'Connor
Owner
Mad Dog & Beans

1

To The New York City Council:

I am writing to express my concerns about Int 737 and 738, which taken together could have a harmful impact on my business as we continue looking for new ways to grow online.

I am the owner of Morgan's Brooklyn Barbecue and we have been proud to serve our community since 2013. While I have always loved welcoming customers into the restaurant, the business is always evolving in response to our customers' needs. Delivery is an important tool to find new customers, expand our reach, and generate more revenue. In today's world, using delivery apps is one of the ways we make this happen.

However, since the new minimum pay rates have gone into effect, my business has struggled to consistently keep our order volume up. With customers now forced to pay more when ordering for delivery, we've seen a sharp decline in demand in recent months.

During what has already been a difficult time for our business, I'm worried that this new legislation would make this situation even worse — not better. I know from years of experience in the industry that customers are extremely sensitive to price changes. Some of these third-party platforms made changes to the way tipping works in New York City specifically because they wanted to try and limit the impact on businesses like mine.

However, if customers see higher costs for their order with tips included, they may get even more frustrated and skip out on placing orders altogether. Those are orders that my business can't afford to lose, and puts my ability to keep staff on payroll at risk. While these bills are well-intended, it's clear that they really may end up ultimately hurting small businesses like mine.

I encourage the City Council to oppose these bills. Delivery provides a crucial service for small businesses like mine and I'm not sure what our future would be if these bills go through.

Thank you for the opportunity to submit testimony.

Sincerely,

Mathew Glazier
Owner, Morgan's Brooklyn Barbecue

To the Committee of Consumer and Worker Protection:

Thank you to the Committee for holding this important hearing on these bills that would impact food delivery workers. The bills around tips in particular worry me if these requirements mean that fewer orders are placed or tipping is eliminated entirely.

I first signed up with DoorDash in 2019, and have been doing delivery work with all different apps in New York City since 2020. I'm raising a family, and it's incredibly important for me to be around to spend time with my children. Some weeks I worked more, other times less, but always when I wanted to.

While I appreciate the City Council's attempts to protect delivery workers, the new changes have made it harder for me to earn, and I worry that the new rules would make it even worse. The bills that concern me are Int 737 and 738, which seem like they will take away even more earning opportunities or make tipping on platforms completely eliminated.

Since the new rules went into effect, getting orders has become a lot harder and is just not as consistent as it once was. I don't want to give up on making deliveries with DoorDash, but wait times have gone up while my earnings have gone down drastically. Even worse, it has become difficult to schedule at all.

Delivery work has been a really important way for me to support my family, but now I am having trouble continuing to use it as a way to make ends meet. I hope you will avoid making the situation in NYC worse and vote no on Int 737 and 738.

Sincerely,
Nirosha Banduge

**Deirdre O'Neill**

Good morning Committee members, and thank you for the chance to speak today.

I am Deirdre O'Neill, and I support INTRO 762.

My family has owned and operated O'Neill's Restaurant in Queens for more than 90 years.

Over the decades, our commitment to serving great food and giving back to our community has never changed. What's constantly changing, though, is how we run our business to meet our customers' changing needs and keep pace in the ever-changing digital economy.

Today, digital marketing and advertising tools are critical to independent restaurants' success. Third-party delivery platforms like Grubhub and DoorDash offer a range of marketing and advertising tools–much more than just delivery. Delivery platforms' marketing services are far more affordable and effective than TV or radio ads because they reach people precisely when they are hungry. These services help us compete with big-budget chain restaurants.

Unfortunately the City's food delivery fee caps–put in place with the best of intentions during the pandemic–mean New York restaurants can't take advantage of the delivery platforms' valuable digital tools. That stops us from choosing the best ways to keep our businesses growing and serving more families.

The delivery fee cap was sensible–and deeply appreciated–during the pandemic. But now it's time to loosen the cap, as 762 would, and give New York's restaurants protection against high delivery fees AND the freedom to choose how–or if–we want to use delivery services' marketing tools.

Thank you for giving me the chance to voice my opinion today, and for crafting INTRO 762's commonsense protections and provisions for restaurants. I urge you to help New York's neighborhood restaurants thrive by supporting INTRO 762.

To the Committee of Consumer and Worker Protection:

Thank you for this opportunity to share my experience delivering on platforms like DoorDash as you consider the bills that would impact food delivery workers in New York City.

I started delivering food on DoorDash back in March 2021, when the pandemic was easing up and I was looking to make some extra income. I have been a full-time Dasher ever since, and love the flexibility of the job because I have kids and can schedule my hours to work around their schedules and provide for them at the same time.

I use my income from DoorDash for all kinds of day-to-day expenses, and it goes a long way to help me care for my family and to pay our bills. It truly makes a difference in our financial stability.

However, in the past few months, I have noticed some frustrating changes to the way food delivery works in the city, especially if the Council is putting in place even more rules about the ways we can make money. While it's nice that DoorDash has started adding extra money each week with the minimum pay rate, it seems like it has come at a significant cost with a drop in orders. This makes me concerned about the viability of dashing as a way to be able to support my family going forward.

While I appreciate the City Council's continued attempts to protect delivery workers, each change has come with downsides. That's why I oppose Int 737 and 738 because it will likely mean tipping on platforms is completely eliminated. While I would appreciate more tips, I am worried that these requirements will only mean that there are even fewer orders or tipping is eliminated entirely.

I hope you will avoid making the situation in NYC worse and vote no on Int 737 and 738.

Sincerely,
Queen Omofese

| | |
|---|---|
| **From:** | Michael Miller ████████████ |
| **Sent:** | Thursday, June 20, 2024 7:04 PM |
| **To:** | Testimony |
| **Subject:** | [EXTERNAL] Testimony for Committee on Consumer and Worker Protection hearing |

On Tuesday, May 21st, I was struck while crossing the street by an e-bike that was going south on the northbound Third Avenue and 77th Street in Manhattan. My right leg was broken in three places and my left leg contused. The biker paused for a few seconds as I was lying on the asphalt in the bike lane and then sped off. A hit and run.

News media has covered this story on NBC4, Fox5, ABC7, NY1, NYPost, amNY, Our Town, among possible others.

Frankly, I'm fortunate to be alive. The woman who rushed to my aid after being hit happens to be the wife of a surgeon who is an honorary NYPD surgeon who informed me subsequently that e-bikes have caused 30 deaths over the past year plus. NBC4 asserted that 8 people have been killed by e-bikes so far in 2024. Further, those numbers do not include brain and head injuries incapacitating victims. I'm the "lucky" guy with broken leg bones that were surgically repaired at Weill Cornell Hospital with a titanium rod now permanently embedded in my leg.

I'm now at the Upper East Side Rehabilitation and Nursing Center in Manhattan where I've been since May 26th. I expect to be here another week or two as I heal from the fractures and relearn how to walk.

E-bikes and comparable 2-wheel vehicles are unregulated. Despite being able to ride at the 25 mph speed limit and beyond, they are not registered, licensed, the bikers don't need licenses, nor are bike and bike batteries inspected (deadly fires, including the horrible one in the Bronx, were caused by exploding e-bike lithium batteries) or insured.

I write as a living victim of a law violating, reckless e-biker and e-bike non-regulation. E-bikes are known to ignore traffic rules, including traffic lights, stop signs and street direction. They also frequently ride on sidewalks jeopardizing unsuspecting pedestrians.

A report has been filed with NYPD and photos of the alleged perpetrator are posted on Crime Stoppers. The perpetrator has not yet been apprehended.

I am not anti-bicycle. I am pro-safety and thoroughly committed to protecting the welfare and saving the lives of all New Yorkers, regardless of faith, race, ethnicity, etc., shielding them from the e-bike lethal menace.

I hope that the City Council of New York takes the necessary action to halt this chaotic and dangerous situation.

Thank you.

Respectfully submitted by Rabbi Michael S. Miller (for identification purposes only - CEO Emeritus of the Jewish Community Relations Council of New York). I reside at █████████████ , Manhattan. ████████
████

6/17/2024

Dear Speaker Adrienne Adams, Chair Julie Menin, and Members of the Consumer and Worker Protection Committee:

We are writing to request that you support Intro 762, a bill that would amend the permanent fee cap between merchants and delivery services in New York City.

This fee cap was passed more than four years ago at the height of the COVID-19 pandemic, when restaurants had limited or no access to on-premise dining and were struggling with the rest of the City to keep our doors open.

While the goal of the cap was to protect and preserve independently owned restaurants, we are now in the place where we are unable to invest in additional marketing services to continue to grow our customer base. Intro 762 does not remove the cap. All restaurants will still be guaranteed basic discoverability and delivery services at a locked in rate, but will also now have the option to create new marketing campaigns, customer promotions and more if this is passed.

Small restaurants like ours don't have the resources to hire a communications and marketing team, and so we utilize the larger app delivery companies to help us execute those and reach new customers. We are competing against corporations and chain restaurants who have the budget and resources to grow their customer base without the app companies, and so at the moment we are currently with few if any options.

Thank you for your consideration, and we request that the City Council vote to pass Intro 762 at its earliest convenience.

Sincerely,

_____(Restaurant Signee Signature)

Jose' Luis Oliveira _____(Printed Name and Title)
Please Print Clearly

Sanganyc@gmail.com ____(Signee Email/Phone Number)
Please Print Clearly

Sangria Tapas Bar + Rest (Restaurant Name)
Please Print Clearly

95-41 Sutphin Blvd ____(Restaurant Address)
Please Print Clearly

6/17/2024

Dear Speaker Adrienne Adams, Chair Julie Menin, and Members of the Consumer and Worker Protection Committee:

We are writing to request that you support Intro 762, a bill that would amend the permanent fee cap between merchants and delivery services in New York City.

This fee cap was passed more than four years ago at the height of the COVID-19 pandemic, when restaurants had limited or no access to on-premise dining and were struggling with the rest of the City to keep our doors open.

While the goal of the cap was to protect and preserve independently owned restaurants, we are now in the place where we are unable to invest in additional marketing services to continue to grow our customer base. Intro 762 does not remove the cap. All restaurants will still be guaranteed basic discoverability and delivery services at a locked in rate, but will also now have the option to create new marketing campaigns, customer promotions and more if this is passed.

Small restaurants like ours don't have the resources to hire a communications and marketing team, and so we utilize the larger app delivery companies to help us execute those and reach new customers. We are competing against corporations and chain restaurants who have the budget and resources to grow their customer base without the app companies, and so at the moment we are currently with few if any options.

Thank you for your consideration, and we request that the City Council vote to pass Intro 762 at its earliest convenience.

Sincerely,

_ZACK He_____(Restaurant Signee Signature)

_Zack Hoosen_ Manager_____(Printed Name and Title)
Please Print Clearly

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
_____(Signee Email/Phone Number)
Please Print Clearly

_Sunrise poyeya_____(Restaurant Name)
Please Print Clearly

_10413 Leffert Blvd NY 11419_(Restaurant Address)
Please Print Clearly

Good morning/afternoon. My name is Dawn Kelly and I own The Nourish Spot, in Jamaica, Queens.

Thank you for supporting New York restaurants and the opportunity for us to share our voice, especially those of us that are small, independent and may only have one location.

The pandemic was very hard for us and so is inflation. We need to hustle for every dollar we earn. I am testifying today to ask you to support this legislation to amend the current cap that will allow for more choices restaurants like mine,  but also preserve important protections.

The restaurant delivery fee cap was a very good idea to help us during the pandemic. But the fee cap in the law is not only on delivery. The cap also stops me from exploring and choosing options that may work better for me when it comes to getting in front of more customers.

Let me be blunt: I don't have millions if not tens or hundreds of millions of dollars for my marketing budget, unlike some of my competitors.  And I don't have a marketing department or advertising firm. My marketing team is me.

What is helpful about the delivery platforms is that they allow me to 1) target customers with precision; 2) spend marketing dollars over time rather than committing a big investment upfront; 3) explore with what works best for my business and make changes to that at any time.

This might mean offering a promotion to users who haven't tried us before, or giving discounts to frequent customers, or targeting those who love to order salads and live in our delivery area. The point is flexibility and allowing restaurants to make decisions for themselves rather than being constrained — while big chains have unlimited other options.

As I like to say, in this digital era, it's not as simple as taking out an ad in the community paper anymore!  But the good part about this is with this technology, we can figure out what works for us.  We just need the ability to do so.

The proposed amendment keeps the delivery fee cap just the way it is, but it will also change the "marketing fee cap" so I can pay more promotion money if I choose to. That's a good balance, and that's what I support. I should be able to spend my money to grow my business.

Thank you.

*Optional Additional sentences that could be added to the testimony if they apply(you may choose multiple or craft your own)*:

- Some of the food delivery apps build restaurant websites, provide software that helps customers place orders, and will list my daily specials so customers see me first. These cannot be done for free, so this amendment makes sure that I can pay for those services if they will help my business grow.

- Many small restaurants stayed open during the pandemic because the delivery platforms

made online ordering and delivery easy. If they are selling extra services that I think are worth the money, it should be my choice whether to pay extra for them.

- The delivery fee cap is excellent and I appreciate that it saves me money. But the Council should remove the fee cap on marketing services because I know best how to grow my business, and if the delivery apps can help me get more customers I'm happy to pay extra for that service.

- Thank you for capping restaurant delivery fees during the pandemic. This has saved our restaurant money, but the law should not limit how much our restaurant can spend on marketing services with food delivery apps. When business is slow, I need to be able to decide how much to spend on advertising and marketing, and that should be my choice and  not the government's decision.

- Running a restaurant is hard. I know my customers and my neighborhood, and I know best how to promote our restaurant. It's not the government's business to tell me how to spend marketing and advertising money. I need to do what's best for my business.

- My restaurant has been open for XX years. It was good that the law limited delivery fees because that helped us, but sometimes we want to use a delivery app's marketing services to boost our business. The Council should change the law so we can choose our own marketing and delivery services and pay whatever amount we think is fair.

- Some restaurants advertise on radio, billboards, the internet, and some mail coupons. Every restaurant is different, and owners have to make the best choices for our restaurants every day. The government should not decide how we spend our advertising and marketing money and grow our business. That should be our decision, so you should support this bill to amend the law.

- As any owner will tell you, staying afloat in the restaurant business is always a struggle, and COVID made it almost impossible. I'm grateful the Council helped restaurants like mine during the pandemic. But it's my restaurant, and I need the freedom to decide how to spend money growing my business.

- I don't have a big marketing and advertising budget like the chain restaurants, so I have to pick carefully where I advertise and how I promote my business. If I want to spend extra money on delivery app marketing services that's my choice and it should be my right. The Council needs to give me the freedom to spend my money the way I want.

- Running a restaurant is hard. This was especially true during COVID. I feel like keeping the delivery fee cap and ending the marketing services fee cap will give me the freedom to make decisions that will benefit my restaurant and my employees.

###

**Live Testimony**

- My name is Wesley Fecu, and I first wanted to thank the Committee for allowing food delivery workers like me to share what these bills would mean for people like me.

- I've been a courier for 5 years on many apps.

- It's clear that many of the changes that the Council has made to dashing have made it more difficult, and these bills could make it even worse.

- While the minimum pay rules may have improved earnings for some Dashers, it has made working on platforms less accessible and less flexible.

- I used to only deliver a couple hours a week for extra money during school hours. While how many deliveries I was making could vary day to day, now it's harder to find any times where I'm able to make deliveries at all.

- That's why I oppose Intros 737 and 738, which will make the problems in New York City worse if it means fewer orders or tipping on these platforms is completely eliminated.

- With orders going down, my earnings have gone down with them.

- I know I'm not alone in this, and I have friends still who also are complaining that these platforms used to be a lot better before the minimum pay rules and now they aren't.

- I hope you will avoid making the situation in NYC worse and vote no on Intros 737 and 738.

To the Committee of Consumer and Worker Protection:

Thank you for this opportunity to submit testimony on the bills you are considering around food delivery workers in New York City. Dashing has played an incredibly valuable role for me and my family, and I hope that you will see how important it is to ensure that we do not lose out any more than we already have.

When my wife needed a heart transplant in 2019 it was the toughest time in my life — and among many other things put our finances under stress. I started delivering evenings and weekends after my full time job in security. The earnings I made helped pay for her medical bills and even helped me support my son through law school.

But today, I can no longer just work hard to get ahead. Since the City implemented its new rules, doing work on these platforms no longer provides the flexibility I had depended on. What's more, the recent changes to the platform have not only made customers less likely to order at all. It has been devastating to me that I can no longer do this.

At the same time, it seems like the Council is also going to make it harder for someone like me who depends on my e-bike. For example, the proposals seem to expect that either delivery workers will find new certified bikes, or the delivery platforms will provide everyone with a free e-bike. Any reasonable person would realize this plan just isn't realistic and affordable for either workers or platforms, so I'm worried the bill will work more like a ban on e-bikes altogether rather than a pathway to get safer ones.

Simply put, the City Council's attempts to protect delivery workers have backfired. I feel like I'm working longer hours and making less money. I've heard from customers that they think the $30 we make is more than what they make leading them to not tip. If the platforms have to make even more changes, I'm afraid there would be fewer ways to earn, orders to deliver or no tips at all if bills like Int 0300, 737 and 738 pass.

The new rules have been bad for delivery workers. I hope you will avoid making the situation in NYC even worse and vote no on these bills.

Sincerely,
William Lopez

6/17/2024

Dear Speaker Adrienne Adams, Chair Julie Menin, and Members of the Consumer and Worker Protection Committee:

We are writing to request that you support Intro 762, a bill that would amend the permanent fee cap between merchants and delivery services in New York City.

This fee cap was passed more than four years ago at the height of the COVID-19 pandemic, when restaurants had limited or no access to on-premise dining and were struggling with the rest of the City to keep our doors open.

While the goal of the cap was to protect and preserve independently owned restaurants, we are now in the place where we are unable to invest in additional marketing services to continue to grow our customer base. Intro 762 does not remove the cap. All restaurants will still be guaranteed basic discoverability and delivery services at a locked in rate, but will also now have the option to create new marketing campaigns, customer promotions and more if this is passed.

Small restaurants like ours don't have the resources to hire a communications and marketing team, and so we utilize the larger app delivery companies to help us execute those and reach new customers. We are competing against corporations and chain restaurants who have the budget and resources to grow their customer base without the app companies, and so at the moment we are currently with few if any options.

Thank you for your consideration, and we request that the City Council vote to pass Intro 762 at its earliest convenience.

Sincerely,

_____ (Restaurant Signee Signature)

Tony Joseph _____ (Printed Name and Title)

Please Print Clearly

████████████████ Signee Email/Phone Number)

Please Print Clearly

Yeh Suh N-ice (Restaurant Name)

Please Print Clearly

94-14 StPhn Blvd _____ (Restaurant Address)

Please Print Clearly

June 20th, 2024

To the Committee of Consumer and Worker Protection:

Thank you to the Committee for giving me the opportunity to share my experience as a food delivery worker. I'm worried that these bills may make it worse — not better — to be making deliveries with platforms like DoorDash in New York City.

I usually dash whenever it works for my schedule, typically just a handful of hours each week. I like that I get to be my own boss and the extra cash has helped me to make ends meet, whether it goes to paying rent or helping me cover other expenses. However, I've been noticing more changes lately that have made dashing in New York City more difficult.

While I appreciate the City Council's attempts to protect delivery workers, each change has come with downsides. That's why I oppose Int 737 and 738, since they will likely mean fewer orders or remove tipping on platforms like DoorDash altogether.

I have already seen a considerable drop in orders since the new minimum pay rules went into effect. The inability to dash now whenever I want defeats the purpose of being a Dasher and undermines the flexibility that draws so many people to this kind of work.

Adding even more new rules is only going to make these problems worse. I am worried that these requirements will only mean that tips or entire earning opportunities may go away for workers like me. With this in mind, I encourage you to vote no on Int 737 and 738 and avoid making the situation in NYC worse.

Sincerely,

Yarleen Donald

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor  ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: ___Andrew Schwenk___

Address: ___Associate General Counsel___

I represent: ___NYC DCWP___

Address: _____

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor  ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: ___Carlos Ortiz___

Address: ___Assistant Commissioner for External Affairs___

I represent: _____

Address: ___NYC DCWP___

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor  ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: ___Elizabeth Wagoner___

Address: ___Deputy Commissioner, Office of Labor Policy and Standards___

I represent: _____

Address: ___NYC DCWP___



*Please complete this card and return to the Sergeant-at-Arms*

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _767_ Res. No. _____
☐ in favor    ☑ in opposition

Date: _6-21-24_

**(PLEASE PRINT)**

Name: _Chris Lawler_

Address: _851 5th Avenue_

I represent: _LT Hospitality_

Address: _Same_

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _737, 738 etc_ Res. No. _____
☑ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: _Claudia Henriquez_

Address: _____

I represent: _NYC Comptroller_

Address: _1 Centre St, 6th FL_

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _726_ Res. No. _____
☑ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: _Joshua Bocian_

Address: _5 Bryant Park_

I represent: _Grubhub_

Address: _____



*Please complete this card and return to the Sergeant-at-Arms*

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor    ☐ in opposition

Date: 6/21/24

**(PLEASE PRINT)**

Name: Andrew Schwenk

Address: DCWP

I represent: DCWP

Address: _____

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 737 Res. No. 738

☐ in favor    ☑ in opposition

Date: 6-21-2024

**(PLEASE PRINT)**

Name: EDWARD C. HATCHETT

Address: ████████████████

I represent: BROOKLYN, NY 11233

Address: _____

## THE COUNCIL
## THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 737 738 Res. No. _____

☐ in favor    ☑ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Joseph Mele

Address: ████████  ████████  ng 1/6/12

I represent: four dash

Address: _____

*Please complete this card and return to the Sergeant-at-Arms*

# THE COUNCIL
# THE CITY OF NEW YORK

18

**Appearance Card**

I intend to appear and speak on Int. No. 767 Res. No. _____
☑ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Andres Hurtado

Address: _____

I represent: Delivery Worker

Address: _____

# THE COUNCIL
# THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. _____ Res. No. _____
☐ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Elizabeth Wagoner

Address: 42 Broadway

I represent: DCWP

Address: _____

# THE COUNCIL
# THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. 767 Res. No. _____
☑ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Wesley Feru

Address: _____

I represent: Delivery Worker

Address: _____

▶ *Please complete this card and return to the Sergeant-at-Arms* ◀

WORKERS
JUSTICE

# THE COUNCIL
# THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. 737, 738 Res. No. _____

☑ in favor  ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Haoju Lu

Address: WJP

I represent: _____

Address: _____

WJP

# THE COUNCIL
# THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. 737 738 Res. No. _____

☐ in favor  ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Alejandro Grajales

Address: _____

I represent: WJP

Address: _____

WJP

# THE COUNCIL
# THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. 737 738 Res. No. _____

☑ in favor  ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: LIGIA GUALIPA, EXEC DIRECTOR

Address: _____

I represent: WJP

Address: _____



*Please complete this card and return to the Sergeant-at-Arms*

WSP

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 737 738 Res. No. _____
859
☐ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: JOSE YOS

Address: _____

I represent: WJP

Address: _____

WJP

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 737,738, 859 Res. No. _____
☐ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: DAVID DIMAS

Address: _____

I represent: WJP

Address: _____

WORKERS
JUSTICE

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _____ Res. No. _____
☐ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Tian Hui

Address: ALL BILLS

I represent: WORKERS JUSTICE

Address: _____

➡ *Please complete this card and return to the Sergeant-at-Arms* ⬅

# THE COUNCIL
# THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. _762_ Res. No. _____

☒ in favor    ☐ in opposition

Date: _8/21/24_

**(PLEASE PRINT)**

Name: _Youssef Mubarez_

Address: _____

I represent: _YAMA Action_

Address: _____

---

WJP

Intro

# THE COUNCIL
# THE CITY OF NEW YORK

2B

**Appearance Card**

I intend to appear and speak on Int. No. _737_ _738_ Res. No. _____
859

☐ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: _William Medina_

Address: _____

I represent: _WJP_

Address: _____

---

WJP

# THE COUNCIL
# THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. _737_ _738_ Res. No. _859_

☐ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: _Antonio Solis_

Address: _____

I represent: _WJP._

Address: _____

*Please complete this card and return to the Sergeant-at-Arms*

## THE COUNCIL
## THE CITY OF NEW YORK

36

### Appearance Card

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor    ☐ in opposition

Date: 6/21/2024

**(PLEASE PRINT)**

Name: Sharon Brown

Address: 130-10 140 Street Suite 1

I represent: Rose Of Sharon Enterprise

Address: Jamaica N.Y. 11436

## THE COUNCIL
## THE CITY OF NEW YORK

35

### Appearance Card

I intend to appear and speak on Int. No. 762 Res. No. _____

☑ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Paul Zuber

Address: 111 Washington Ave, Albany, NY

I represent: The Business Council of NYS

Address: _____

## THE COUNCIL
## THE CITY OF NEW YORK

### Appearance Card

I intend to appear and speak on Int. No. _____ Res. No. _____

☐ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Millie Sialer

Address: _____

I represent: New york State Latino Restaurant

Address: Int 762                Association

◆ *Please complete this card and return to the Sergeant-at-Arms* ◆

# THE COUNCIL
# THE CITY OF NEW YORK

33

**Appearance Card**

I intend to appear and speak on Int. No. ___762___ Res. No. _____
☐ in favor    ☐ in opposition

Date: _____

(PLEASE PRINT)

Name: Koron Flowers

Address: beeeee

I represent: GrubHub

Address: Bryant park

---

# THE COUNCIL
# THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. ___762___ Res. No. _____
☐ in favor    ☐ in opposition

Date: _____

(PLEASE PRINT)

Name: Justin Nelson

Address: _____

I represent: the National LGBT Chamber

Address: 1032 15th St. NW #190 WDC 20005

---

# THE COUNCIL
# THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. ___762___ Res. No. _____
☑ in favor    ☐ in opposition

Date: June 21, 2024

(PLEASE PRINT)

Name: Beatrice Ajaero

Address: _____

I represent: Nneji

Address: 32-20 34th Avenue Astoria, NY 11106

*Please complete this card and return to the Sergeant-at-Arms*

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _762_ Res. No. _____

☐ in favor    ☐ in opposition

Date: _61_

**(PLEASE PRINT)**

Name: _Jalil Fazi_

Address: _____

I represent: _Grublub_

Address: _Bryant Park_

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. _762_ Res. No. _____

☑ in favor    ☐ in opposition

Date: _6/21/24_

**(PLEASE PRINT)**

Name: _Robert Lee_

Address: _____

I represent: _Lausing Leftover Cuisine & Toda Noodles_

Address: _2523 Vode Ave Long Island City NY 11101_

---

# THE COUNCIL
# THE CITY OF NEW YORK

28

*Appearance Card*

I intend to appear and speak on Int. No. _738_ Res. No. _____

☐ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: _____

Address: _Raul Rivera_

I represent: _____

Address: _____

*Please complete this card and return to the Sergeant-at-Arms*

# THE COUNCIL
## THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. 0742 Res. No. _____
☒ in favor  ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Brianna January

Address: _____

I represent: Chamber of Progress

Address: _____

---

# THE COUNCIL
## THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. 762 Res. No. _____
☐ in favor  ☒ in opposition

Date: 6/21/24

**(PLEASE PRINT)**

Name: ANDREW RIGIE

Address: _____

I represent: NYC HOSPITALITY ALLIANCE

Address: 65 W 55 ST

---

# THE COUNCIL
## THE CITY OF NEW YORK

**Appearance Card**

I intend to appear and speak on Int. No. 762 Res. No. _____
☒ in favor  ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Bryan Lozano

Address: _____

I represent: Tech:NYC

Address: _____

*Please complete this card and return to the Sergeant-at-Arms*

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. ___762___ Res. No. _____

☒ in favor    ☐ in opposition

Date: _____

**(PLEASE PRINT)**

Name: Kassandra Perez-Desir

Address: _____

I represent: Doordash

Address: _____

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. 737, 738 Res. No. _____

☐ in favor    ☒ in opposition

Date: 6/21/24

**(PLEASE PRINT)**

Name: Hayley Prim

Address: _____

I represent: Uber

Address: 175 Greenwich St

---

# THE COUNCIL
# THE CITY OF NEW YORK

*Appearance Card*

I intend to appear and speak on Int. No. ___762___ Res. No. _____

☒ in favor    ☐ in opposition

Date: 6/21

**(PLEASE PRINT)**

Name: Oamy Huldan-

Address: Boughtisplace

I represent: The Bronx Chamber of Commerce

Address: _____

*Please complete this card and return to the Sergeant-at-Arms*