Case No. 25-cv-10268 (GBD)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOORDASH, INC. and UBER
TECHNOLOGIES, INC.,

Plaintiffs,

v.

THE CITY OF NEW YORK,

Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**MURIEL GOODE-TRUFANT**
Corporation Counsel of the City of New York
*Attorney for Defendant*
100 Church Street
New York, New York 10007
Tel:  (212) 356-1646
Matter No.  2025-091189

*Of Counsel*:  Michelle Goldberg-Cahn
              Karen Selvin
              Jessica Katzen
              Amanda Ikard

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

      A.  Establishing Minimum Pay for Delivery Workers ............................. 2

      B.  The Tipping Laws ........................................................................ 3

      C.  The Instant Action ....................................................................... 5

STANDARD OF REVIEW ................................................................................................. 5

ARGUMENT ....................................................................................................................... 6

     POINT I

     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIM ....................................................................................... 6

      A.  The Tipping Laws Regulate Conduct, Not Speech ................................................................... 6

      B.  Assuming *Arguendo* That The Tipping Laws Implicate Speech More Than Incidentally, It Is Commercial Speech ...................................................... 11

      C.  To The Extent The First Amendment Is Implicated, The Tipping Laws Are Subject To Rational Basis Review Under *Zauderer* ........................................... 14

      D.  The Tipping Laws Satisfy Rational Basis Review ..................................................................... 15

      E.  Even If Intermediate Scrutiny Applied, The Tipping Laws Satisfy That Standard ................................................. 20

      F.  Strict Scrutiny Does Not Apply ....................................................... 22

**Page**

POINT II

> PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM ........................................................................... 23

POINT III

> THE BALANCE OF THE EQUITIES TIPS STRONGLY IN THE CITY'S FAVOR.................................................... 25

CONCLUSION.................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**                                                                            **Page(s)**

*Abrahamson v. United States*,
   03 Civ. 4677 (RWS), 2004 U.S. Dist. LEXIS 7150 (S.D.N.Y. Apr. 26, 2004)........................8

*Al-Amin v. City of New York*,
   979 F. Supp. 168 (E.D.N.Y. 1997) .......................................................................................11

*Bad Frog Brewery v. N.Y.S. Liquor Auth.*,
   134 F.3d 87 (2d Cir. 1998)..................................................................................................12

*Bd. of Trs. v. Fox*,
   492 U.S. 469 (1989)............................................................................................................11

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983)..................................................................................................12, 13, 15

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
   447 U.S. 557 (1980)..................................................................................................11, 12, 14, 20

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
   598 F.3d 30 (2d Cir. 2010)....................................................................................................6

*Citizens Union v. Atty. Gen.*,
   269 F. Supp. 3d 124 (S.D.N.Y. 2017)..................................................................................16

*City of Dallas v. Stanglin*,
   490 U.S. 19 (1989)...............................................................................................................8

*Clementine Co., LLC v. Adams*,
   74 F.4th 77 (2d Cir. 2023) .................................................................................................22

*Compasscare v. Hochul*,
   125 F.4th 49 (2d Cir. 2025) ...................................................................................12, 15, 16

*Edwards v. Dist. of Columbia*,
   755 F.3d 996 (D.C. Cir. 2014) ...........................................................................................21

*Evergreen Ass'n v. City of New York*,
   740 F.3d 233 (2d Cir. 2014)...............................................................................................22

*Expressions Hair Design v. Schneiderman*,
   581 U.S. 37 (2017)............................................................................................................8, 9

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009)...............................................................................................23

**Cases**                                                                               **Pages**

*Florida Bar v. Went For It, Inc.*,
   515 U.S. 618 (1995) ........................................................................................14

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) ............................................................................24

*Garland v. N.Y.C. Fire Dep't*,
   574 F. Supp. 3d 120 (E.D.N.Y. 2021) .............................................................24

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) ..........................................................................................8

*Lewis v. Thompson*,
   252 F.3d 567 (2d Cir. 2001) ......................................................................15, 17

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ..........................................................................................5

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.*,
   91 F.4th 238 (4th Cir. 2024) ...........................................................................19

*Melendez v. City of New York*,
   16 F.4th 992 (2d Cir. 2021) .............................................................................21

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*,
   556 F.3d 114 (2d Cir. 2009) ................................................................12, 13, 19

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
   272 F.3d 104 (2d Cir. 2001) ......................................................14, 16, 19, 20

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) .....................................................................................9, 22

*Nat'l Inst. of Fam. & Life Advocs. v. James*,
   24-2481-cv, 2025 U.S. App. LEXIS 31078 (2d Cir. Dec. 1, 2025).................13

*Nat'l Retail Fed. v. James*,
   25-cv-5500 (JSR), 2025 U.S. Dist. LEXIS 199836 (S.D.N.Y. Oct. 8, 2025).............15, 17, 19

*New York v. U.S. Dep't of Homeland Sec.*,
   969 F.3d 42 (2d Cir. 2020)..............................................................................23

*Nken v. Holder*,
   556 U.S. 418 (2009)..........................................................................................6

**Cases**                                                            **Pages**

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978)............................................................................................11, 12

*Poughkeepsie Supermarket Corp. v. Dutchess Cnty.*,
648 F. App'x 157 (2d Cir. 2016) ...............................................................................18

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015).....................................................................................................22

*RJ Reynolds Tobacco Co. v. FDA*,
96 F.4th 863 (5th Cir. 2024) ......................................................................................18

*Roman Catholic Diocese v. Cuomo*,
592 U.S. 14 (2020).........................................................................................................5

*Rumsfeld v. Forum for Academic & Institutional Rts., Inc.*,
547 U.S. 47 (2006)..........................................................................................7, 10, 15

*Safelite Grp. v. Jensen*,
764 F.3d 258 (2d Cir. 2014).......................................................................................19

*SEC v. AT&T, Inc.*,
626 F. Supp. 3d 703 (S.D.N.Y. 2022).......................................................................20

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)..................................................................................................7, 8

*Spence v. Wash*,
418 U.S. 405 (1974).....................................................................................................10

*Tex v. Johnson*,
491 U.S. 397 (1989).....................................................................................................10

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025).......................................................................................................23

*Time Warner Cable Inc. v. FCC*,
729 F.3d 137 (2d Cir. 2013).......................................................................................21

*Turner Broadcasting Sys., Inc. v. FCC*,
512 U.S. 622 (1994)..............................................................................................22, 23

*Uber Technologies v. City of Seattle*,
2:24-cv-2103-MJP, 2024 U.S. Dist. LEXIS 234839 (W.D. Wash. Dec. 31, 2024) ...............10

**Cases**                                                                                                                **Pages**

*Uber Technologies v. N.Y.C. Dep't of Consumer & Worker Prot.*,
    80 Misc. 3d 1221(A) (Sup. Ct. New York Cnty. 2023).....................................................1, 3, 6

*Under Seal v. Under Seal*,
    273 F. Supp. 3d 460 (S.D.N.Y. 2017)..................................................................................25

*United States v. Caronia*,
    703 F.3d 149 (2d Cir. 2012)................................................................................................20

*United States v. O'Brien*,
    391 U.S. 367 (1968)............................................................................................................10

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976)............................................................................................................18

*Vugo, Inc. v. City of New York*,
    931 F.3d 42 (2d Cir. 2019).................................................................................................21

*We the Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021) ............................................................................................5, 6

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).........................................................................................................5, 6, 25

*Zauderer v. Off. of Disciplinary Counsel*,
    471 U.S. 626 (1985)..........................................................................14, 15, 17, 19, 20

**Statutes**

Gen. Business Law § 518.................................................................................................................8

N.Y.C. Local Law 107 (2025) .............................................................................................. *passim*

N.Y.C. Local Law 108 (2025) .............................................................................................. *passim*

N.Y.C. Admin. Code § 19-547 .......................................................................................................24

N.Y.C. Admin. Code § 20-1522(b)(3)–(5) ......................................................................................1

## PRELIMINARY STATEMENT

Local Law 107 of 2025 ("LL 107") and Local Law 108 of 2025 ("LL 108") (collectively, the "Tipping Laws") amended the New York City Administrative Code ("Admin. Code")[1] to establish standards around solicitation of gratuities for app-based food and grocery delivery workers that will restore consumer options for tipping, foster cost transparency, and promote dignified pay for delivery workers. *See* Declaration of Jessica Katzen, dated January 5, 2026 ("Katzen Decl."), Exs. 1, 2. LL 107 requires third-party food and grocery delivery services ("platforms") to provide consumers with an opportunity to tip that includes an option to tip at least 10 percent of the purchase price and an option to manually enter a different amount or percentage. LL 108 requires the platforms to provide consumers with an opportunity to tip, in plain language in a conspicuous manner, before or at the same time the consumer places the order.

These laws are a continuation of the City's years-long effort to improve the conditions of delivery workers, and are meant to reverse the practices of Plaintiffs that sought to punish delivery workers in response to the implementation of a food delivery worker minimum pay rule. Indeed, it is undisputed that Plaintiffs moved the opportunity to tip from pre- to post-checkout immediately after they failed to obtain a preliminary injunction in state court enjoining implementation of the 2023 food delivery worker minimum pay rule ("MPR").[2] *See* Complaint (Dkt. No. 20) ("Compl."), ¶¶ 46–47. As a result of Plaintiffs' retaliatory actions, tips earned by delivery workers declined significantly.[3] As Plaintiffs do not allege that they do not already provide a 10 percent option and

---

[1] LL107 amends paragraph 4, and LL108 amends paragraphs 3 and 5, of subdivision b of Admin. Code § 20-1522.

[2] *See Uber Tech. v. N.Y.C. Dep't of Consumer & Worker Prot.*, 80 Misc.3d 1221(A) (Sup. Ct. N.Y. Cnty. 2023); Case No. 2023-04880 (1st Dep't Nov. 22, 2023) (Order Denying Leave) [hereinafter, "MPR Litigation"].

[3] Upon information and belief, another third-party food delivery service, Grubhub, that challenged the food delivery worker minimum pay rule alongside Plaintiffs, did not move its pre-checkout tipping option after its similar loss in state court and is currently in compliance with the Tipping Laws. *See* Katzen Decl., Ex. I, at 3; Ex. K, at 9.

the option to enter a custom tipping amount, the Tipping Laws merely require Plaintiffs to restore the tipping mechanism at checkout.

Plaintiffs now seek a preliminary injunction enjoining the implementation and enforcement of the Tipping Laws, which are scheduled to go into effect on January 26, 2026. Plaintiffs are not entitled to a preliminary injunction. For one, Plaintiffs are unlikely to succeed on the merits of their First Amendment claim. The Tipping Laws do not implicate the First Amendment because they regulate conduct, not speech. Even if the Tipping Laws had more than an incidental burden on speech, that speech would be commercial speech subject to a less stringent standard of review. Such standard is satisfied as there is a reasonable relationship between the Tipping Laws and the governmental interests of restoring consumer tipping options, promoting worker protection measures, and ensuring consumers are informed of all transaction costs prior to placing an order. As Plaintiffs cannot establish a viable First Amendment violation, they also fail to establish irreparable harm. In any event, their allegations of lost sales and reputational harm are speculative at best. Finally, the balance of equities weighs strongly in the City's favor, as the Tipping Laws, which serve as important worker protection provisions, are in the public interest. For these reasons, the City requests that this Court deny Plaintiffs' motion for a preliminary injunction in full.

## STATEMENT OF FACTS

### A. Establishing Minimum Pay for Delivery Workers

In 2021, the New York City Council ("City Council") passed the Minimum Pay Law ("MPL"), which required the New York City Department of Consumer and Worker Protection ("DCWP") to study the working conditions of food delivery workers including pay, income, and expenses; and based on the results of such study, promulgate rules that establish a method for determining the minimum pay for delivery workers. *See* Katzen Decl., Ex. C. The City Council

knew that workers classified as independent contractors were not afforded the same protections as employees, including a minimum wage. *See* Katzen Decl., Ex. D, at 4–7.

Pursuant to the MPL, DCWP conducted its study of the working conditions of delivery workers. DCWP analyzed data obtained from platforms, conducted surveys of delivery workers and restaurant operators, heard public testimony, interviewed experts and stakeholders, and utilized publicly available information. In November 2022, DCWP published the results of the study, which found that food delivery workers earned $7.09 per hour without tips. *See* Katzen Decl., Ex. E, at 17–18. Adjusting for job-related expenses, delivery workers' take-home pay was $4.03 per hour without tips. *Id.* at 18, 21. DCWP further found that, despite their higher-than-average rates of occupational injury, delivery workers classified as independent contractors do not receive workers' compensation coverage and often do not have health insurance. *Id.* at 25–26.

Based on the results of the study, DCWP published its first iteration of its Minimum Pay Rule ("MPR"). In response to public hearings and thousands of pages of written comments, DCWP published subsequent amended iterations, culminating in the final version published on June 12, 2023. *See* Katzen Decl., Ex. F. Following an initial delay of the MPR due to issuance of a temporary restraining order, Plaintiffs' and another platforms' motions for a preliminary injunction were denied at both the trial court and appellate levels in state court, and the platforms began paying the MPR on or about December 4, 2023. *See* MPR Litigation; *see also* Compl., ¶¶ 46–47. Thereafter, Plaintiffs discontinued their state court challenges with prejudice. *See* MPR Litigation, Index No. 155943/2023 (Dkt. No. 150).

### B. The Tipping Laws

After their motions for preliminary injunctions enjoining the MPR were denied, Plaintiffs modified their app interfaces by moving the option for consumers to tip from pre- to post-checkout. *See* Compl., ¶¶ 46–48. These changes resulted in a loss of $85 million in tips earned by delivery

workers between December 2023 and June 2024. *See* Katzen Decl., Ex. K, at 9. Tipping has remained depressed at low levels through the present for food deliveries ordered on Plaintiffs' apps. *See* Declaration of Michael Papadopoulos ("Papadopoulos Decl."), ¶ 17.

On April 11, 2024, the City Council introduced Intro. Nos. 737 and 738. Intro. No. 737, as amended, requires that platforms provide consumers with "gratuity options that may be set at the discretion of [the platform], provided that such gratuity options include an option to pay a gratuity that is at least 10 percent of the purchase price and an additional option that allows such consumers to manually enter a different amount or percentage of such purchase price." Katzen Decl., Ex. I. Intro. No. 738, as amended, requires platforms "that solicit gratuities for food delivery workers to conspicuously solicit gratuities before or at the same time an online order is placed." *See id.*

The legislative record makes clear that the Tipping Laws were inspired by a desire to combat the practices implemented by platforms that have made it harder for consumers to tip delivery workers and have resulted in a dramatic decline in workers' tips. *See* Katzen Decl., Ex. I, at 14–15; Ex. K, at 9; Papadopoulos Decl., ¶¶ 15–18. The sponsor of the bills, Councilmember Abreu, noted that, by moving the tipping option to after checkout, when consumers have already "close[d] down the apps, and are chowing down," platforms are causing delivery workers to "lose out on meaningful earnings." Katzen Decl., Ex. I, at 23. The legislative record also highlights the importance of restoring the consumer option to tip at checkout, even after the enforcement of the MPR. Due to limitations on platform access imposed by Plaintiffs and other platforms, delivery workers only work 17.4 hours per week on average, and as a result, earn an average of $366.51 in weekly pay. *See* Papadopoulos Decl., ¶ 18. *See also* Katzen Decl., Ex. I, at 36. Finally, the record shows that these bills were not intended to harm platforms, but rather to make a significant positive difference to delivery workers and their families. *See id.* at 23–24, 34.

Intro. Nos. 737-A and 738-A were passed by City Council on July 14, 2025, and returned unsigned by the Mayor on August 12, 2025, thereby becoming LL 107 and LL 108, respectively. The Tipping Laws are scheduled to go into effect on January 26, 2026. Under the Tipping Laws, whether or not a consumer chooses to tip, and how much they choose to tip, remains completely optional. In fact, LL 108 explicitly provides that "[n]othing herein shall be construed to require a customer to pay a gratuity or to prohibit a third-party food delivery service . . . from providing a customer an additional opportunity to add, remove, or adjust a gratuity after an order is placed."

### C.  The Instant Action

Plaintiffs commenced this action on December 11, 2025. The Complaint alleges that the Tipping Laws violate their First, Fifth, and Fourteenth Amendment rights, as well as corresponding rights under the New York State Constitution, and that the local laws exceed the City's police power under state law. *See generally* Compl. That same day, Plaintiffs filed a motion for a preliminary injunction that is solely premised on their First Amendment claim, seeking to enjoin the Tipping Laws from taking effect on January 26, 2026. *See* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction ("Pl. Mem.") (Dkt. No. 10). Plaintiffs are not entitled to the preliminary injunction for the reasons set forth below.

### <u>STANDARD OF REVIEW</u>

Emergency injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citations omitted). Plaintiffs must demonstrate that they are likely to succeed on the merits of their claims, are likely to suffer irreparable harm without preliminary injunctive relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *See Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 16 (2020) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *We the Patriots USA, Inc. v. Hochul*,

17 F.4th 266, 279 (2d Cir. 2021). Regarding the first factor, "a mere possibility" that relief will be granted is insufficient, rather Plaintiffs must make a showing strong enough to establish a likelihood of success on the merits. *Nken v. Holder*, 556 U.S. 418, 420 (2009). At minimum, Plaintiffs must demonstrate "that there are 'serious questions' going to the merits, [and] additionally establish that 'the balance of hardships tips decidedly' in its favor." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35–36 (2d Cir. 2010).

## ARGUMENT

### POINT I

### PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIM.

Plaintiffs allege that the Tipping Laws violate their First Amendment rights because they allegedly compel platforms to speak the City's preferred message regarding tipping. *See* Pl. Mem. at 2. However, the Tipping Laws do not implicate the First Amendment because they regulate conduct, not speech. The Tipping Laws do not require Plaintiffs to advocate any message, but instead regulate when the opportunity to tip must be made available in a consumer's commercial transaction of ordering food delivery. Even if the First Amendment was implicated, the Tipping Laws would impact solely commercial speech, and would satisfy the lesser scrutiny applied to compelled commercial-speech challenges because they are reasonably related to the governmental interests of restoring consumers' options to tip delivery workers, fostering cost transparency, and promoting worker protection measures, including increasing delivery worker pay.

### A. The Tipping Laws Regulate Conduct, Not Speech.

As the Tipping Laws regulate conduct, they fall outside the First Amendment's reach. The Tipping Laws merely require that Plaintiffs give consumers the opportunity to tip delivery workers at or before checkout, and that such option include at minimum, an option to tip 10 percent and an

option to manually enter an amount. Thus, the Tipping Laws "affect[] what [Plaintiffs] must do—[provide the opportunity for consumers to tip delivery workers at checkout]—not what they may or may not say." *Rumsfeld v. Forum for Academic & Institutional Rts., Inc.*, 547 U.S. 47, 60 (2006).

Plaintiffs concede that they previously offered such a mechanism to tip at checkout, but now they only provide the option to tip after checkout. Pl. Mem. at 7. This change was an attempt to suppress certain consumer conduct, i.e., tipping, and the Tipping Laws are meant to restore to consumers the option to engage in such conduct. Further, Plaintiffs do not allege that they do not already provide an option to tip at least 10 percent of the purchase price or to write in a different amount. Therefore, the laws do not require the platforms to *say* anything, or even do anything that they have not either done before or are currently doing. *See* Papadopoulos Decl., ¶¶ 14, 25. Notably, the Tipping Laws do not preclude platforms from continuing to offer a tipping option after checkout, in addition to one at or before checkout, nor do they preclude platforms from suggesting a variety of tipping options, from 0 percent to as high as they wish to provide, as long as one option is at least 10 percent and another is a write-in amount. The Tipping Laws therefore do not impact what message Plaintiffs may or may not speak about tipping. Instead, the Tipping Laws regulate the timing of payment for a certain commercial transaction—when a gratuity may be added by a consumer who is in the process of ordering food for delivery via Plaintiffs' apps. Such a "restriction[] on economic activity or, more generally, on nonexpressive conduct" is not subject to First Amendment protection. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

While requiring platforms to provide consumers with the option to tip at checkout requires platforms to put words on a screen, this only incidentally burdens speech because it does not require platforms to communicate an unwanted message. "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the

conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society." *Abrahamson v. United States*, 03-civ-4677, 2004 U.S. Dist. LEXIS 7150, at *10–*11 (S.D.N.Y. Apr. 26, 2004) (*quoting Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). Indeed, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes . . . but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Accordingly, as the Tipping Laws are directed at "commerce or conduct," and impose, at most, "incidental burdens on speech," they do not implicate the First Amendment. *Sorrell*, 564 U.S. at 567.

The Tipping Laws are akin to typical price regulations, which the Supreme Court has explained do not trigger First Amendment scrutiny. In *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48 (2017), the Supreme Court found that New York General Business Law § 518, which addressed credit card surcharges, regulated speech and not conduct because it regulated *how* sellers could communicate their prices, not the prices themselves. *Id.* at 42. While merchants were permitted under the challenged provision to charge $10 for a product purchased with cash and $10.30 when purchased with credit, merchants were not allowed to advertise the price as "$10, with a 3% surcharge" or "$10, plus $.30 for credit." *Id.* at 47. The merchant was required to post a "single sticker price" of $10.30 and then offer a discount to customers paying with cash. Therefore, the law regulated the manner in which merchants could express their pricing schemes. However, the Court acknowledged that the challenged provision therein "is not like a typical price regulation," *id.* at 47, explaining:

> Such a [typical price] regulation—for example, a law requiring all
> New York delis to charge $10 for their sandwiches—would simply
> regulate the amount that a store could collect. In other words, it
> would regulate the sandwich seller's conduct. To be sure, in order
> to actually collect that money, a store would likely have to put "$10"
> on its menus or have its employees tell customers that price. Those
> written or oral communications would be speech, and the law—by
> determining the amount charged—would indirectly dictate the
> content of that speech. But the law's effect on speech would only be
> incidental to its primary effect on conduct . . .

*Id.* Here, the Tipping Laws' requirement that consumers be given an opportunity to tip at least 10 percent at checkout is analogous to the hypothetical law requiring that sandwiches cost $10. Similar to setting a "price," the Tipping Laws designate certain tipping options that must be made available, but do not dictate that these tipping options must be expressed in a particular manner or endorsed in any way. Thus, while Plaintiffs will have to use written language to comply with the Tipping Laws, the laws' effect on speech is only incidental to its primary effect on conduct.

Contrary to Plaintiffs' allegations, the Tipping Laws do not "compel[] Plaintiffs and other online delivery platforms to 'alter the content of their speech' and 'speak a particular message.'" Pl. Mem. at 10 (*quoting Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018)). The Tipping Laws do not require Plaintiffs to include any message regarding tipping, and importantly, do not prohibit Plaintiffs from including any message of their own. Indeed, Plaintiffs currently display messages on their platforms regarding changes to the checkout experience due to other City regulations. *See* Compl., ¶¶ 46–48. The Tipping Laws in no way prevent Plaintiffs from including similar messages expressing their views on the Tipping Laws, or from advocating for or against tipping at checkout, or for or against tipping a certain amount. Plaintiffs may even make clear that they are offering a tipping option at or before checkout because the law requires

it, which should dispel any impression that they are advocating that consumers should tip.[4] Therefore, the Tipping Laws "neither limit[] what [platforms] may say nor require[] them to say anything" and therefore, they "regulate[] conduct, not speech." *Rumsfeld*, 547 U.S. at 60.

Finally, the *conduct* regulated by the Tipping Laws also does not fall within the First Amendment's protection. The Supreme Court has "rejected the view that 'conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea'" and instead "ha[s] extended First Amendment protection only to conduct that is inherently expressive." *Rumsfeld*, 547 U.S. at 65–66 (*quoting United States v. O'Brien*, 391 U.S. 367, 376 (1968)). Plaintiffs do not, and cannot, cite to any case law providing that the regulation of how platforms facilitate a commercial transaction between consumers and workers, including the timing of when a gratuity option is presented in the process, constitutes expressive conduct. Further, the legislative history contains no evidence that the Tipping Laws were intended to convey a specific message about tipping; rather, the laws were intended to restore to consumers the opportunity to tip earlier in the transaction. *See* Points I.C, I.D, *infra*.

Lastly, "[i]n deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [Courts] have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Tex v. Johnson*, 491 U.S. 397, 404 (1989) (*quoting Spence v. Wash*, 418 U.S. 405, 410–11 (1974)). Here, unlike flag burning, armbands to protest a war, or a sit-in to protest segregation, providing the option for consumers to tip 10 percent

---

[4] In *Uber Technologies v. City of Seattle*, 2:24-cv-2103-MJP, 2024 U.S. Dist. LEXIS 234839 (W. D. Wash. Dec. 31, 2024), the Court rejected Uber's nearly identical argument that a city ordinance's requirement to disclose the company's deactivation policy impermissibly compelled speech. The Court denied Uber's motion for a preliminary injunction, finding that "the Ordinance's requirements do little more than regulate conduct without any significant impact on speech or expression." *Id.* at *9. One of the most important considerations for the Court was that "the Ordinance does not require Uber to stake out any position on what is or is not related to safety and efficiency. It can voice its opposition to the City's minimum standards even if it must comply with them." *Id.* at *10–*11.

at checkout—alongside any other options that Plaintiffs might wish to include—would not likely be interpreted by the average consumers as expressing a certain message. *See Al-Amin v. City of New York*, 979 F.Supp.168, 172 (E.D.N.Y. 1997) (collecting cases where conduct was inherently expressive). Plaintiffs have admitted that, in the past, they provided the opportunity to tip at checkout. Other platforms still provide such an option. As consumers are familiar with the practice of tipping at checkout, it is unlikely that they will interpret a specific message from the opportunity to do so. Recent news articles illustrate that a standard tip for a delivery worker ranges from 15 to 20 percent[5]; an app's inclusion of one option below that average conveys no message at all. And, in the end, as with all tipping options, ultimate control is within the hands of the consumers to tip or not to tip, and if they decide to tip, at what level. As the regulated conduct is not inherently expressive, the Tipping Laws do not implicate the First Amendment.

**B. Assuming *Arguendo* That The Tipping Laws Implicate Speech More Than Incidentally, It Is Commercial Speech.**

Even if the Tipping Laws are found to have more than an incidental effect on speech, and therefore implicate the First Amendment, the Tipping Laws concern commercial speech, which "enjoys 'a limited measure of protection.'" *Bd. of Trs. v. Fox*, 492 U.S. 469, 477 (1989) (*quoting Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978) (cleaned up)). The Supreme Court has defined commercial speech as "expression related solely to the economic interests of the speaker and its audience," or, alternatively, as speech "proposing a commercial transaction." *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 560–61 (1980). The commercial speech doctrine rests on the "'commonsense' distinction" between commercial speech and other varieties

---

[5] *See* Elizabeth Ayoola, *Here's How Much to Tip Pizza Delivery Workers*, NERDWALLET (Jan. 18, 2024), https://www.nerdwallet.com/finance/learn/how-much-to-tip-pizza-delivery; Pamela Vachon, *Here's How Delivery Drivers Are Paid and How Much You Should Be Tipping*, CNET (May 22, 2025), https://www.cnet.com/home/kitchen-and-household/heres-how-delivery-drivers-are-paid-and-how-much-you-should-be-tipping/; Jaya Saxena, *With a New Delivery Law, How Should You Tip?*, Eater (Jan. 18, 2025). https://ny.eater.com/2024/1/18/24033112/delivery-apps-tipping-nyc-laws.

of speech. *See id.* at 562 (*quoting Ohralik,* 436 U.S. at 455–56). Here, the Tipping Laws regulate a transaction associated with the ordering and delivery of a food order, which is clearly commercial in nature. *See N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 131 (2d Cir. 2009) (finding regulation that required the disclosure of calorie information in connection with the sale of a restaurant meal was commercial speech). Hence, it is a matter of "commonsense" that these laws implicate, at most, commercial speech. *See Cent. Hudson*, 447 U.S. at 562. Thus, to the extent the First Amendment is implicated, its protection is limited.

Plaintiffs' arguments as to why the Tipping Laws do not implicate the commercial speech doctrine are unavailing. *See* Pl. Mem. at 24. First, Plaintiffs claim the Tipping Laws do more than propose a commercial transaction because providing an option to tip at check out "does not reflect Plaintiffs' 'economic motivation[s]'" for the communication, as the tip is between the consumer and delivery worker, who are not employees but independent contractors. Pl. Mem. at 15 (*citing Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)). This is uncompelling. Plaintiffs acknowledge that their reasoning behind removing the option to tip at checkout was because of Plaintiffs' economic interests following implementation of the MPR. *See* Compl. ¶¶ 46–48. It is hard to comprehend, then, how the Tipping Laws, which merely require that opportunity to tip at or before checkout be restored, does not regulate "expression related solely to the economic interests of the speaker and its audience"—the audience here being consumers. *Compasscare v. Hochul*, 125 F.4th 49, 64 (2d Cir. 2025) (*quoting Cent. Hudson*, 447 U.S. at 561).

Moreover, Plaintiffs overstate *Bolger*'s application. As the Supreme Court laid out in *Bolger*, "whether . . . mixed[6] communications are considered commercial speech is based upon

---

[6] Moreover, the multifactor test applied in *Bolger* as well as the other case Plaintiffs rely on, *Bad Frog Brewery v. N.Y. St. Liquor Auth.*, 134 F.3d 87 (2d Cir. 1998) (concerning speech that "combine[d] commercial and noncommercial

a number of factors, including whether the speech is an advertisement, whether the speech references a specific product, and whether the speaker has an economic motive." However, the Court has never held that each of these factors "*must* necessarily be present in order for speech to be commercial." *Bolger*, 463 U.S. at 67 n.14 (emphasis added); *see also Nat'l Inst. Of Fam. & Life Advocates v. James*, 24-2481-cv, 2025 U.S. App. LEXIS 31078, at *31 (2d Cir. Dec. 1, 2025) ("[T]he absence of any one factor does not mean that the speech is noncommercial"). Therefore, even assuming *arguendo*, that the Tipping Laws do not implicate the economic interests of Plaintiffs,[7] this is not dispositive as to whether the Tipping Laws regulate commercial speech.

Plaintiffs also claim that tipping is inherently non-commercial. *See* Pl. Mem. 15–16. However, tipping the delivery worker is inextricably intertwined with the purchase of the food order, and, as such, is clearly commercial in nature. Indeed, arguably, a tip for a delivery order is more intertwined with the food purchase than mandated calorie count disclosures, which have previously been deemed commercial speech and upheld by the Second Circuit. *See N.Y. State Rest. Ass'n*, 556 F.3d at 131. Notably, Plaintiffs cite to no caselaw that supports the proposition that a consumer must receive something "more" than delivery service for the Tipping Laws to implicate commercial speech. *See* Pl. Mem. at 15–16. It is also entirely speculative that a consumer will "not receive anything in return" if they tip their delivery worker. *See id.* The worker may provide better service if they are informed a tip has been added at check out, or if they are aware that a tip could have been added; and consumers may simply receive a personal benefit of self-gratification for

---

elements" including a beer label and social commentary), does not apply to the Tipping Laws. As discussed, the Tipping Laws require no social commentary. Plaintiffs can convey any message they wish about tipping.

[7] Notably, in the event that a consumer chooses to tip the delivery worker at or before checkout, the amount is still paid to the platforms in a single lump sum that includes the cost of food, tax, fees, and tip. Upon information and belief, Plaintiffs have never structured their platforms in such a way that the tip goes directly to the delivery worker without any intermediary pass-through, i.e. Plaintiffs (unless a consumer chooses to tip in cash upon delivery). Therefore, Plaintiffs' contention that this is not an economic transaction—because there is absolutely no financial benefit to them or that the tip is entirely a third-party exchange, *see* Pl. Mem. at 14–15—is not persuasive.

recognizing the often hard and necessary work of the delivery worker. Therefore, for all of the above reasons, Plaintiffs' arguments that the Tipping Laws are non-commercial in nature are unlikely to succeed.

### C. To The Extent The First Amendment Is Implicated, The Tipping Laws Are Subject To Rational Basis Review Under *Zauderer*.

Because the Tipping Laws implicate, at most, commercial speech, and require platforms to provide "purely factual and uncontroversial information," rational basis review applies. *See Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626, 637, 651 (1985). While the First Amendment protects non-misleading commercial speech, it is entitled to less extensive protection than other constitutionally guaranteed expression. *Cent. Hudson*, 447 U.S. at 562–63. Generally, restrictions on commercial speech are subject to intermediate scrutiny and analyzed under the four-part test set forth in *Central Hudson*. *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995); *see also* Point I.E, *infra*. However, both the Supreme Court and Second Circuit have found that statutes that require, rather than restrict, commercial speech, are subject to an even more deferential standard. *Zauderer*, 471 U.S. at 651; *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001). Here, to the extent the Court finds the First Amendment to be implicated, the Tipping Laws are subject to rational basis review, and undoubtedly satisfy this standard.

Plaintiffs' argument that *Zauderer* does not apply because the Tipping Laws do not require disclosure of "purely factual and uncontroversial information," Pl. Mem. at 24, is misguided. If the Tipping Laws compel the conveyance of any message, it is notice to the consumer that tipping the delivery worker is an option at the time of purchasing their delivery order, which is when consumers are viewing all costs that will apply to an order, e.g., the cost of the food, applicable taxes, service fees, and delivery fees. This is factual in nature because Plaintiffs do not dispute that consumers can tip on their apps, nor do Plaintiffs dispute that 10 percent is already one such option.

14

Additionally, Plaintiffs allege that tipping is "controversial." Pl. Mem. at 15–16. Yet, there is nothing "controversial" about mandating an *option* be provided for consumers to tip at the time they pay for all other costs associated with an order, in an industry that has a longstanding association with tipping delivery workers. *See* Declaration of Ann Marie Rosenthal (Dkt. No. 13) ("Rosenthal Decl.") ¶ 25. Moreover, statements made "in the context of commercial transactions" do not necessarily implicate a heightened level of scrutiny, even if they are tangential to "public issues." *Bolger*, 463 U.S. at 68. In fact, the Second Circuit recently applied *Zauderer* to an act that mandated the disclosure of rights and remedies under an antidiscrimination act that touched on abortion. *See Compasscare*, 125 F.4th at 65. In doing so, the Second Circuit explained: "the policy judgment that motivated the Act may be 'controversial' in the same way that the policy judgments underlying Title VII, or minimum wage laws, are controversial. But the existence and contents of the Act—and an employer's obligation to comply with it—is not itself controversial" especially where, as here, regulated entities remained free to share "their disagreement with the Act." *Id.* at 65 (*citing Rumsfeld*, 547 U.S. at 64–65); *see also Nat'l Retail Fed. v. James*, 25-cv-5500, 2025 U.S. Dist. LEXIS 199836, at *16–18 (S.D.N.Y. Oct. 8, 2025) (finding that plaintiffs failed to show that "machine learning, algorithms, and artificial intelligence" are controversial, and even if they were, plaintiffs remained free to share their own views on the matter, and therefore applying *Zauderer*). Surely, disclosures around employees' rights on areas of reproductive health and the use of artificial intelligence are more "controversial" than a consumer being informed of the opportunity to tip—or not to tip—their delivery worker.

**D. The Tipping Laws Satisfy Rational Basis Review.**

At the outset, it is worth noting what is not required to pass muster under rational basis review. First, the government does not have to produce evidence or empirical data to sustain rationality; instead, it can rely upon "rational speculation." *Lewis v. Thompson*, 252 F.3d 567, 582

(2d Cir. 2001). Second, the statute does not have to eliminate all the evils it was designed to ameliorate. *See Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 115–16. Here, because there is a reasonable relationship between the intended purpose of the Tipping Laws and the means employed to achieve that purpose, and because the laws are not "unjustified [n]or unduly burdensome," *Compasscare*, 125 F.4th at 64, 67, Plaintiffs cannot establish that the Tipping Laws violate the First Amendment.

To ascertain the purpose of a statute, a court should look to the "bill text, legislative record and other public materials[.]" *Citizens Union v. Atty. Gen.*, 269 F. Supp. 3d 124, 140 (S.D.N.Y. 2017) (collecting cases). Here, the legislative record provides ample support for upholding the Tipping Laws. Plaintiffs' modification of their app interfaces to only allow tipping after checkout (following their loss in the MPR Litigation), *see* Compl., ¶¶ 46–48; Katzen Decl., Ex. K, at 9, resulted in a dramatic decline in tips earned by workers for Plaintiffs, totaling a loss of $85 million in the first six months. *See* Katzen Decl., Ex. K, at 9; *see also* Ex. I, at 14–15, 23 (discussing how workers are "los[ing] out on meaningful earnings."). That loss has increased to $554 million in tip earnings through the second quarter of 2025. *See* Papadopoulos Decl., ¶ 17.

The record also shows DCWP reported receiving complaints from delivery workers and consumers regarding the changes Plaintiffs made related to tipping. *See* Katzen Decl., Ex. I, at 30. Based on this evidence, the need for further legislation was evident. As a result, on April 11, 2024, City Council introduced Intro. Nos. 737 and 738, which would later become LL 107 and LL 108. *See* Katzen Decl., Exs. 7, 8. In a hearing on June 21, 2024, sponsor of the bills Councilmember Abeau commented on the importance of providing consumers an option to tip 10 percent of the purchase price, implying the reasonableness of leaving "at least a $2 tip on a $20 order." Katzen Decl., Ex. I, at 23. Indeed, 10 percent tends to fall on the *lower* end of the average tip for delivery workers. *See supra*, note 5. In the same hearing, DCWP Assistant Commissioner Carlos Ortiz also

16

remarked that the data shows "that New Yorkers, when given an option, recognize the incredibly difficult jobs these workers perform and choose to tip them" and therefore, "the intent of these bills . . . would require apps to restore to consumers the option they previously had to tip workers when placing an order." *Id.* at 23. Thus, the legislative record highlights the importance of restoring consumer choice, promoting cost transparency to consumers at or before the time they place a delivery order, and promoting worker protection measures. As this support is more than "[a]ny reasonably conceivable state of facts," *Lewis*, 252 F.3d at 582 (cleaned up), the Tipping Laws satisfy rational basis review.

Plaintiffs' contention that the Tipping Laws "erase[] Plaintiffs' freedom to remain silent," Pl. Mem. at 16, is simply wrong. Under *Zauderer*, platforms have limited protection "to remain silent" when it comes to factual, uncontroversial information. 471 U.S. at 637. Moreover, as noted in Point I.A, there is nothing that restricts Plaintiffs from adding their own messaging. For example, Grubhub, which has kept the option to tip at checkout and offers a 10 percent option, includes the below message (Fig. 1) when clicking on an informational icon associated with the option to tip. As Grubhub demonstrates, platforms "remain free to communicate that message and any additional message of their choosing." *Nat'l Retail Fed.*, 2025 U.S. Dist. LEXIS 199836, at *27. And not surprisingly, for Grubhub, "earnings and tips have mostly been on par with the tips that we have seen before the minimum wage went into effect." Katzen Decl., Ex. I, at 23 (quoting statement of Councilmember Abreu). In written testimony submitted as part of the legislative record, DCWP included the below graph (Fig. 2) that illustrates the sharp decline in tipping for Plaintiffs as compared to other platforms that did not change their interface. *See* Katzen Decl., Ex. J, at 3. These figures further support the nexus between the requirements under the Tipping Laws and their intended purposes, coupled with the limited burden placed on platforms to comply.



Fig 1.                                                Fig. 2

Plaintiffs seemingly argue that their First Amendment rights are at stake because consumers will be less likely to complete orders on their platforms if presented with an option to tip at checkout, as that is also the time at which consumers are informed of fees and taxes.[8] *But see RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 881 (5th Cir. 2024) (noting how the potential that disclosure would "drive away potential clients" did not require heightened scrutiny). This contention is in tension with the Supreme Court's policy behind the commercial speech doctrine. "[P]eople will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 770 (1976). Ultimately, the choice as to whether to tip, how much to tip, and whether to tip before or after check-out remains entirely with the consumer. The Tipping Laws merely require an opportunity be presented at or before checkout. In other words, it ensures that consumers "are well enough informed" of all potential costs of a transaction, and "well enough informed" that it is possible to give a tip to the delivery worker, at the time they render payment for the order, so that consumers can serve "their own best interests" and choose whether, and how much, to tip on an order. *Id.*

For this reason, the Tipping Laws are analogous to cases in this Circuit that have upheld compelled disclosures for the benefit of the consumer. *See, e.g.*, *Poughkeepsie Supermarket Corp.*

---

[8] As noted above, Plaintiffs concede that prior to the enforcement of the MPR, consumers were presented with the tipping option at the same time that they were informed of fees and taxes. *See* Compl., ¶¶ 46–48.

*v. Dutchess Cnty.*, 648 F. App'x 157, 158 (2d Cir. 2016) (upholding local law requiring price sticker requirement given the "state's valid interest in providing complete price information to consumers."); *Nat'l Retail Fed.*, 2025 U.S. Dist. LEXIS 199836, at *21 (upholding disclosure of algorithmic pricing because it "ensure[s] that consumers are better informed about how a merchant has set the displayed price[.]"); *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 114–15 (applying *Zauderer* to a law requiring special labeling of products that contain mercury as to "better inform consumers about the products they purchase"). *See also Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 248 (4th Cir. 2024) (commenting on how speech "connected with the sale of a good or a service" is commercial because it "assists consumers and furthers the societal interest"). Ultimately, consumers of platforms are paying for the delivery of food; such that the "product" platforms make available is the order and service of delivery. The Tipping Laws ensure that, prior to placing an order for that service, consumers are given all the information as to the costs of their purchase, including tipping information previously available at checkout that Plaintiffs suppressed following implementation of the MPR. *Cf. Safelite Grp. v. Jensen*, 764 F.3d 258, 275 (2d Cir. 2014) (discussing how deterring "helpful disclosure to consumers" inhibits the First Amendment).

Lastly, Plaintiffs argue that the Tipping Laws do not have a reasonable relationship to a governmental interest because tips remain voluntary, such that the laws will not guarantee delivery workers receive higher pay.[9] *See* Pl. Mem. at 25. However, comparing tipping data between platforms that removed the tipping option from checkout to those that did not shows that these laws are, in fact, likely to raise worker earnings. *See supra*, Fig. 2. More recent data shows that this trend continues to this day. *See* Papadopoulos Decl., ¶ 17. Further, Plaintiffs' argument

---

[9] Plaintiffs incorrectly claim that *Zauderer* requires the City's interest be at preventing deception to consumers. Pl. Mem. at 25. However, "laws mandating factual disclosures are subject to the rational basis test even if they address non-deceptive speech." *See N.Y. State Rest. Ass'n*, 556 F.3d at 133 & n.21.

overlooks the fact that the Tipping Laws also seek to restore consumer choice around tipping and promote cost transparency. *See* Katzen Decl. Ex. I; Ex. K. Even if there was not such strong evidence of the impact these laws will have, a law need "not get at all facets of the problem it is designed to ameliorate." *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 115–16."[G]overnments are entitled to attack problems piecemeal . . . ." *Zauderer*, 471 U.S. at 651 n.14. And, as Plaintiffs already provide an option to tip at checkout in other jurisdictions, *see* note 10, *infra*, and have previously done so in the City, Pl. Mem. At 7, it is not unduly burdensome. *See SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 750 (S.D.N.Y. 2022) (finding disclosure that company has "already chosen to make to a subset of the market" did not warrant heightened scrutiny). Thus, as made clear through the legislative record, there is a reasonable relationship between the requirement that platforms provide an option to tip at or before checkout—including displaying 10 percent as an option—and the goal of encouraging consumers to make informed decisions around tipping at the time they are rendering payment for an order.

### E.  Even If Intermediate Scrutiny Applied, The Tipping Laws Satisfy That Standard.

Assuming *arguendo* that intermediate scrutiny applies, the Tipping Laws survive such scrutiny as well. Under the test set forth in *Central Hudson*, the commercial speech must concern lawful activity and not be misleading, the asserted governmental interest must be substantial, and the regulation must directly advance the governmental interest and not be more extensive than necessary to serve that interest. *Cent. Hudson*, 447 U.S. at 566; *see also United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012). Initially, as discussed above, the Tipping Laws involve the disclosure of factual, uncontroversial information and thereby satisfies the first prong of the *Central Hudson* test. *See* 447 U.S. at 566. *See also* Pl. Mem. at 22 (agreeing first prong is met).

As Plaintiffs concede, delivery platforms are a substantial economic industry. *See* Pl. Mem. at 4. There are more than 70,000 delivery drivers in New York City who collectively perform more

than 3 million deliveries for the platforms every week. *See* Papadopoulos Decl., ¶ 10. It follows that delivery worker livelihood is a substantial government interest. *See Melendez v. City of New York*, 16 F.4th 992, 1037–38 (2d Cir. 2021); *Edwards v. Dist. of Columbia*, 755 F.3d 996, 1002 (D.C. Cir. 2014) ("[P]romoting a major industry that contributes to the economic vitality of the [locality] is a substantial government interest"). As made clear in the legislative record, the Tipping Laws sought to "provide that option [of tipping at or before checkout] because it makes it a lot more fair, and this comes at no cost to the apps or the users, but it contributes to better consumer habits." Katzen Decl., Ex. I, at 23–24. *See, e.g.*, *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 160 (2d Cir. 2013) (sustaining regulation under intermediate scrutiny because it promoted "fair competition"). Indeed, other platforms, such as Grubhub, still offer pre-checkout tipping options; therefore, these laws will ensure consistency across the industry. The legislative record, including the data highlighted above, also makes clear that these laws were enacted in direct response to the suppression of income that resulted from Plaintiffs' retaliatory actions when they removed the option to tip at checkout. *See supra*, Point I.D; Papadopoulos Decl., ¶¶ 13, 15. Accordingly, as the laws directly advance this substantial interest, they withstand intermediate scrutiny.

Also discussed above, the Tipping Laws do not impinge on Plaintiffs' ability to include other disclosures around the option to tip, or to maintain their current option of allowing a consumer to tip after delivery. *See* Point I.A, I.D. As such, they are not more extensive than necessary. In fact, the option of 10 percent is *below* standard for a delivery tip. *See supra*, note 5. The City is afforded "considerable leeway in determining the appropriate means to further a legitimate government interest." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 58 (2d Cir. 2019) (emphasizing that the Second Circuit is "loath to second-guess the government's judgment" (cleaned up)). Accordingly, the Tipping Laws satisfy intermediate scrutiny review.

### F. Strict Scrutiny Does Not Apply.

The Tipping Laws do not trigger strict scrutiny[10] because, even if they implicated the First Amendment and were found to be non-commercial, the laws are content neutral. *See Clementine Co., LLC v. Adams*, 74 F.4th 77, 87 (2d Cir. 2023) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). As discussed in Points I.A–I.E, the Tipping Laws do not implicate speech or expressive conduct, let alone speech on a controversial topic, nor do they restrict Plaintiffs from advancing their own position about tipping. The Tipping Laws are therefore distinguishable from the cases Plaintiffs rely on, including *Becerra*, 585 U.S. at 766 and *Evergreen Ass'n v. City of New York*, 740 F.3d 233 (2d Cir. 2014), where the challenged laws required pregnancy centers to post notices around access to contraception and abortion; and from *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015), which addressed a challenge brought by a local church to a law that placed *restrictions*, not compulsion, on the display of outdoor signs and treated political signs differently than directional signs. *See supra*, Points I.A, I.C.

The Tipping Laws also do not discriminate based on speaker. Indeed, they treat all platforms equally in that they require all platforms to provide a pre-checkout tipping option of at least 10 percent and a manual write-in option. Accordingly, it is unclear what differential treatment Plaintiffs contend compels a strict scrutiny analysis. And, while it is true that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference," *Turner Broadcasting Sys., Inc. v. FCC ("Turner I")*, 512 U.S. 622, 658 (1994), strict scrutiny does not apply "when the differential treatment is justified by some special characteristic of the particular [speaker] being regulated," *Id.* at 660–61 (cleaned up). Thus, even

---

[10] Still, should the Court find strict scrutiny applies, the Tipping Laws meet this threshold because the governmental interest is compelling, they achieve the goals City Council sought to address, and they are narrowly tailored.

assuming that Plaintiffs suffered from some differential treatment under the Tipping Laws, that treatment is based on their special characteristics as facilitators of commercial transactions in the third-party food delivery market. *See* Compl., ¶¶ 22–25. Of note, the legislative record does not reflect animus towards Plaintiffs. Rather, the record shows that these bills were intended to make a positive impact on delivery workers, with no intended harm to platforms. *See* Katzen Decl., Ex. K, at 23–24, 34. Simply put, the Tipping Laws do not trigger strict scrutiny as they do not "impose a 'restriction, penalty, or burden' by reason of content on [the platforms]—a conclusion confirmed by the fact that [Plaintiffs] 'cannot avoid or mitigate' the effects of the [laws] by altering their speech." *See TikTok Inc. v. Garland*, 604 U.S. 56, 71 (2025) *(quoting Turner* I, 512 U.S. at 644*)*.

### POINT II

### PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM.

Plaintiffs cannot show that they will suffer irreparable harm without injunctive relief. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) ("irreparable harm is the single most important prerequisite . . .") (internal citations omitted). "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. U.S. Dep't of Homeland Sec.*, 969 F. 3d 42, 86 (2d Cir. 2020) (internal quotation omitted). For one, Plaintiffs cannot allege *per se* irreparable harm as a result of a First Amendment violation because, as discussed in Point I, the Tipping Laws do not violate Plaintiffs' First Amendment rights. Plaintiffs' other allegations of harm fail because they are financial in nature and speculative.

Plaintiffs' allegations of lost sales are highly speculative and unlikely to occur. *See* Pl. Mem. at 26; Papadopoulos Decl., ¶¶ 19–25 (discussing how Plaintiffs' allegations are not supported by any empirical evidence). Nonetheless, it is well established that such financial harms

cannot constitute irreparable harm because they are compensable by money damages. *See Garland v. N.Y.C. Fire Dep't*, 574 F. Supp. 3d 120, 132 (E.D.N.Y. 2021) (explaining that "loss of employment and pay . . . are definitionally reparable"). Additionally, any potential changes to Plaintiffs' app interfaces constitute "ordinary compliance costs [that] are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005).

Plaintiffs' allegations of loss of goodwill and loss of reputation are similarly highly speculative. *See* Pl. Mem. at 26. Plaintiffs admit that prior to the MPR, they offered the option for consumers to tip at checkout, Compl. ¶¶ 46–48, and do not allege that they suffered from a loss of goodwill or reputation during that time.[11] Additionally, while Plaintiffs rely on articles discussing "tipping fatigue," these articles illustrate that much of consumer frustration with tipping stems from confusion over when to tip, because tipping is now expected in businesses where tipping was not always customary. *See* Declaration of Gabriel Herrmann (Dkt. No. 11) ("Herrmann Decl."), Ex. 1, at 4. Plaintiffs concede that tipping delivery workers is not a new phenomenon, and therefore it is not likely to contribute to the "tipping fatigue" they warn of. *See* Rosenthal Decl. ¶ 25 ("And consumers know they can always tip their Dasher in cash when they receive delivery, just like consumers ordering delivery have done for decades.").[12] Finally, even if Plaintiffs' allegations of reputational harm were not speculative, they do not amount to irreparable harm, because

---

[11] Upon information and belief, in areas outside of New York City, Plaintiffs still provide consumers the option to tip at checkout, which undermines their claim of a loss of reputation and goodwill from "tipping fatigue." Additionally, it bears noting that Uber is subject to a similar provision, Admin. Code § 19-547, enacted in 2017 regarding its for-hire vehicle platform. Admin. Code § 19-547 requires that for-hire vehicle providers allow passengers to provide drivers with a gratuity using the same method of payment passengers use to pay for the fare. In addition, Admin. Code § 19-547 requires that the tipping options must include at least one option that is at least 20 percent of the fare and an option to manually enter another gratuity amount or percentage. Uber has never challenged the for-hire tipping law, and cannot legitimately allege that this similar provision has reduced rides or violates its constitutional rights.

[12] In fact, these articles demonstrate that consumers are more averse to Plaintiffs' fees, rather than the option to tip the delivery worker. *See* Herrmann Decl., Ex. 1 at 4 ("83% of Americans believe automatic service charges, such as those on DoorDash orders, should be banned.").

"reputational harm . . . is generally compensable with money damages." *Under Seal v. Under Seal*, 273 F. Supp. 3d 460, 473 (S.D.N.Y. 2017).

**POINT III**

**THE BALANCE OF THE EQUITIES TIPS STRONGLY IN THE CITY'S FAVOR.**

Finally, Plaintiffs cannot show that the balance of equities weighs in their favor, and that a preliminary injunction is in the public interest. *See Winter*, 555 U.S. at 20. The record demonstrates that as a result of Plaintiffs' practices, there has been a drastic decline in gratuities earned by delivery workers. However, when given the opportunity to tip at checkout, consumers frequently choose to tip. The Tipping Laws will restore that choice to consumers, enhance cost transparency at the time a consumer places a food order, and provide further protections to delivery workers who often operate in difficult conditions. While Plaintiffs allege that they will suffer from loss of goodwill, consumers relationships, and revenue, such allegations are not credible, in part because Plaintiffs continue to provide a tipping functionality that is compliant with the Tipping Laws for "self-delivery" orders, which are fulfilled by the merchant, and orders outside of New York City. *See* Papadopoulos Decl., ¶¶ 14, 25. *See also supra*, Point II. The Tipping Laws, which encourage consumer choice and transparency while ensuring that delivery workers can receive tips from appreciative consumers, are in the public interest.

**CONCLUSION**

The City respectfully requests that this Court deny the motion for a preliminary injunction in its entirety, together with such other and further relief as this Court deems just and proper.

Dated:       New York, New York
              January 5, 2026

                                  Muriel Goode-Trufant
                                  Corporation Counsel of the City of New York
                                  *Attorney for Defendant*
                                  100 Church Street
                                  New York, New York 10007
                                  (212) 356-1646

                         By:      /s/

                                  Jessica Katzen
                                  Amanda Ikard
                                  *Assistant Corporation Counsels*